THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

RECEIVED

2017 MAY 18  P 12: 32

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

KANDACE KAY EDWARDS, on behalf
of herself and all others similarly situated,

     Plaintiff,

           v.

DAVID COFIELD, in his official capacity
as Randolph County Sheriff,

CHRISTOPHER MAY, in his official
capacity as Circuit Clerk,

JILL PUCKETT, in her official capacity
as Magistrate of the Randolph County
District Court, and

CLAY TINNEY, in his official capacity
as the District Court Judge of the Randolph
County District Court,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:17-cv-321-WKW

**EXPEDITED HEARING REQUESTED**
(Class Action)

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

# I.   **INTRODUCTION**

This Circuit held over 40 years ago that the Fourteenth Amendment is violated if an indigent arrestee is jailed because she is unable to pay a secured monetary bail amount required by a bail schedule without any inquiry into or findings concerning the arrestee's ability to pay. "Utilization of a master bond schedule provides speedy and convenient release for those who have no difficulty in meeting its requirements. The incarceration of those who cannot, without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements." *Pugh v. Rainwater*, 572 F.2d 1053, 1057 (5th Cir. 1978) (en banc).[1]

Defendants ignore this principle every day in Randolph County, Alabama. Plaintiff Kandace Kay Edwards is currently jailed solely because she cannot afford to pay the amount required for her release by the bail schedule. The only reason Ms. Edwards is incarcerated is because she is indigent and cannot afford to purchase her freedom. Defendants do not consider a person's flight risk or danger to the community when they determine whether an arrestee should remain jailed, make any inquiry or findings concerning an arrestee's ability to pay the secured money bail amount, or consider non-financial alternative conditions of release. Instead, access to money is the determinative factor as to whether a person remains in jail following arrest. If a person can pay the secured money bail amount, she is released from jail immediately. But those—like Ms. Edwards—who are unable to pay are jailed solely because of their poverty.

In view of these factual circumstances, the Court should issue a temporary restraining order (TRO) limited to Plaintiff Edwards on her first and second claims for relief and a preliminary injunction on a class-wide basis as to these same claims. The Court should enjoin

---

[1]   In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit cases submitted or decided prior to October 1, 1981.

Sheriff Cofield from prospectively jailing arrestees unable to pay secured monetary bail without an individualized hearing with adequate procedural safeguards including an inquiry into and findings concerning their ability to pay, the suitability of alternative non-financial conditions of release, and a finding on the record—where counsel was made available to represent the arrestee and the arrestee was able to present evidence—that any conditions of release are the least restrictive conditions necessary to achieve public safety and court appearance. Ms. Edwards and the putative Class that she seeks to represent face imminent irreparable injury because they will continue to be unconstitutionally jailed without relief from this Court. Enjoining Defendant Cofield from jailing arrestees solely because they cannot afford to pay a monetary amount is in the public interest and favored in the balance of hardships. The practice of jailing individuals unable to pay a monetary sum without inquiry into or findings concerning their ability to pay has no place in a legal system committed to equal justice.

## II.    FACTUAL BACKGROUND

### A.    Defendants' Money Bail Practices Detain People Based on Their Wealth Rather Than Their Suitability for Release.

#### 1.    Defendants Unconstitutionally Detain People Unable to Pay Money Bail Set Pursuant to the Bail Schedule.

One out of every five people in Randolph County lives in poverty.[2] One-third of the labor force is unemployed and nearly half of the population over the age of sixteen did not work at all in 2015, the last year for which data is available.[3]

---

[2] *See* U.S. Census Bureau, *Randolph County, Alabama: Poverty Status in the Past 12 Months: 2011-2015 Am. Comm. Survey 5-Year Estimates*, attached as Ex. RR to the Decl. of Micah West in Supp. of Pl.'s Mot. for Prelim. Inj. and Pl.'s Mot. for Class Cert., filed herewith (West Decl.).

[3] *Id.*

Although nearly half of the county residents do not have a job, the Sheriff requires any person arrested and charged with a misdemeanor or felony offense to pay a secured amount of money bail (i.e., cash, commercial surety, or property) to be released from jail following arrest. The amount of money that an arrestee must pay is predetermined by a bail schedule based on the charge. *See* Randolph County Bail Schedule, attached as Ex. A to West Decl.

The bail schedule sets a secured monetary bail amount based strictly on the offense charged. *Id.* It does not contemplate consideration of a person's flight risk, danger to the community, financial resources, or whether any alternative non-financial conditions of release may mitigate any relevant risk. *Id.* Instead, immediate access to money alone determines whether a person remains in jail following arrest. If a person can pay the amount required, the individual is released from jail immediately. If the person is unable to pay, she remains incarcerated. Although the schedule states that a bail amount may be increased or reduced "on a case by case basis," in practice Defendants almost never deviate from the bail schedule. For example, in a review of the bail amount set initially in 26 cases between April 4, 2017 and April 28, 2017, 24 were set at the amount specified by the bail schedule. *See* Wood Decl. ¶¶ 3-6; Sample Bail Orders, attached as Ex. B to West Decl.

2. **Defendant Cofield Detains Arrestees Who Cannot Pay the Predetermined Money Bail Amount While Releasing Those Who Can Pay.**

When a person is arrested in Randolph County, she is booked into the Randolph County Jail, which is operated by the Sheriff's Department. Sheriff David Cofield is responsible for the operation of the jail and the release and detention of arrestees. *See* Ala. Code § 14-6-1.

After booking, arrestees are informed by Sheriff's Department employees that they are eligible for immediate release, but only if they pay a predetermined amount of money. The Sheriff determines the required amount of money by referring to the bail schedule promulgated

3

by Defendants Tinney and May. At no point does any Defendant or other person perform any inquiry into the arrestee's ability to pay the money bail amount required by the schedule. As a matter of policy and practice, Defendant Cofield keeps arrestees in jail if they cannot pay the monetary amount required by the bail schedule and releases immediately those who can pay. Defendant Cofield maintains this policy and practice even though he receives no notice that there has been an inquiry into a person's ability to pay the amount set, findings that the person can afford to meet the financial conditions of release, and consideration of alternative non-financial conditions of release.

Arrestees who do not have other restrictions on their eligibility for release can post bail themselves, make a phone call to ask a friend or family to post bail on their behalf, or contact a bonding agent to assist in posting bail. If an arrestee can afford to pay the pre-set amount, the Sheriff's Department accepts the money and releases her.

A person with financial resources will be released almost immediately after posting bail, but the Sheriff's Department will continue to detain a person who cannot afford to pay the pre-set secured bail amount. This policy and practice results in systematic wealth-based detention in Randolph County.

3.      **Defendants Puckett and Tinney Do Not Review the Predetermined Financial Conditions of Release for Up to a Month.**

Any person who cannot afford the monetary amount Defendant Cofield requires under the bail schedule is taken before Defendant Tinney or Puckett for an initial appearance. The bail schedule is printed on Defendant Mays's letterhead and instructs anyone with questions to contact him. It further states that Defendants May or Tinney must approve any changes to the bail schedule. *See* Bail Schedule at 4, attached as Ex. A to West Decl.

4

Defendant Tinney is responsible for setting policies governing release conditions, *see* Ala. Code § 15-13-103, and conducts the initial appearance for any arrestees unable to pay the monetary amount required by the bail schedule. Magistrate Jill Puckett enforces these policies and conducts initial appearances when Defendant Tinney is unavailable.

A judge or magistrate is required to conduct the initial appearance within 48 hours following a warrantless arrest or 72 hours following a warrant arrest. Ala. R. Crim. P. 4.3(a)(1)(iii), (b)(2)(i). The purposes of the initial appearance under state law are to (1) ascertain the defendant's true name and address, (2) inform the defendant of the charges against her, and (3) notify the defendant of the right to counsel. Ala. R. Crim. P. 4.4. A judicial officer is also required to determine a defendant's conditions of release. *Id.*; Ala. R. Crim. P. 7.4(a) ("If a defendant has not been released from custody and is brought before a court for initial appearance, a determination of the conditions of release shall be made.").

However, it is Defendants Tinney's and Puckett's practice to refuse to determine an arrestee's conditions of release at the initial appearance. Defendants instead generally defer this determination for up to four weeks, when a preliminary hearing is conducted in a felony case for those arrestees who exercised their right to such a hearing. *See* Sample Order on Initial Appearance, attached as Ex. B to West Decl; *see also* Ala. R. Crim. P. 5 (providing that a defendant is entitled to a preliminary hearing in a felony case within 30 days of arrest). In a misdemeanor case, Defendants generally defer any review of an arrestee's conditions of release for up to two weeks until Defendant Tinney conducts a status hearing. Because of these practices, the initial court appearance provides no opportunity for a person to raise ability to pay, to conduct a hearing on alternative conditions of release, or to raise any constitutional issues with ongoing post-arrest detention.

5

Defendants are unrepresented by counsel at the initial appearance. As a matter of policy and practice, Defendant Tinney does not appoint counsel until *after* the initial appearance. *See* Wood Decl. ¶ 12.

Defendants Tinney and Puckett generally do not allow arrestees to make arguments about their ability to pay or their suitability for release at the initial appearance. Pursuant to Defendants Tinney's and Puckett's policy and practice, arrestees are not permitted to challenge their financial conditions of release or to request non-monetary conditions of release.

At the initial appearance, Defendants Tinney and Puckett do not make any findings that a person can afford the preset amount required or that secured money bail is the least restrictive condition of release available. Indeed, they usually do not consider bail at all. *See* Sample Bail Orders, attached as Ex. B to West Decl.; Wood Decl. ¶¶ 7-11.

As noted above, Defendants Tinney and Puckett will generally not consider an arrestee's suitability for release or ability to pay until a later preliminary hearing in a felony case or a bond reduction hearing in a misdemeanor case. As a matter of policy and practice, preliminary hearings are held once every month in Randolph County and motions for a bond reduction in misdemeanor cases are held twice per month. *See* Wood Decl. ¶¶ 13-14. Thus, an individual who cannot afford the predetermined secured money bail amount usually will be detained for up to four weeks without any opportunity to raise any issues concerning her ability to pay or her suitability for release under alternative conditions. By contrast, an arrestee who can pay the monetary amount required by the bail schedule is released immediately from jail.

Defendants' reliance on predetermined, secured money bail has resulted in unnecessary wealth-based detention that is devastating for the poorest people in Randolph County. Many people in the Randolph County jail have not been convicted of a crime and are only in jail

6

because they cannot afford to pay secured money bail. *See* Jail Logs, attached as Ex. D to West Decl.

Moreover, the grand jury sits—and trials are held—only twice per year in Randolph County. *See* Wood Decl. ¶¶ 15-16. As a result, a person unable to afford monetary bail may spend longer in jail before trial than under the sentence they would receive if they pleaded guilty or were found guilty following trial.

**B.    Ms. Edwards Cannot Afford the Monetary Amount Required By the Bail Schedule.**

Ms. Edwards is a 29-year old woman, who lives in Roanoke, Alabama. Edwards Decl. ¶ 1. She is a mother of two children, who are one and two years old. *Id.* ¶ 4. She is also 7.5 months pregnant. *Id.* The pregnancy is high-risk. *Id.*

On May 17, 2017, Ms. Edwards was arrested for forging a check in the amount of $75 and charged with possession of a forged instrument in the second degree, a class C felony. *Id.* ¶ 2; Complaint, attached as Ex. SS to West Decl. She was taken to the Randolph County Jail and told that she had to pay a $7,500 bond required by the bail schedule or she would remain in jail. Edwards Decl. ¶ 3; *see also* Randolph County Bail Schedule, attached as Ex. A to West Decl. A corrections officer told her that she has a court date on June 7, 2017 and that she will remain incarcerated until that date unless she comes up with the money. *Id.* ¶ 9.

Ms. Edwards is indigent and cannot afford to buy her release from jail. *Id.* ¶¶ 6, 9. She has no assets and recently lost her job because her pregnancy made it difficult for her to work. *Id.* ¶ 6. Her only source of income is food stamps. *Id.* ¶ 7. Ms. Edwards also suffers from serious mental illness and is relying on Medicaid to support her through her pregnancy. *Id.*

7

Ms. Edwards was evicted from her home in December 2016 after losing her job. *Id.* ¶ 6.

She has been homeless since the eviction and has been staying between friends' homes. *Id.*

Many of those homes do not have power or running water. *Id.*

Ms. Edwards is concerned about her health because her pregnancy is high-risk and she is

currently sleeping on a mat on the floor of the jail. *Id.* ¶¶ 4-5.

### III.   ARGUMENT

A preliminary injunction and/or TRO is warranted if the movant demonstrates: (1) a

substantial likelihood of success on the merits; (2) irreparable harm in the absence of an

injunction; (3) that the threatened injury to the movant outweighs whatever damage the proposed

injunction may cause the opposing party; and (4) that an injunction would not disserve the public

interest. *Bryan v. Hall Chemical Co.*, 993 F.2d 831, 835 (11th Cir. 1993); *Ingram v. Ault*, 50

F.3d 898, 900 (11th Cir. 1995).

**A.   DEFENDANT COFIELD IS VIOLATING THE FOURTEENTH AMENDMENT BY JAILING MS. EDWARDS BECAUSE SHE CANNOT PAY THE MONETARY AMOUNT REQUIRED FOR HER RELEASE AND WITHOUT AN INDIVIDUALIZED RELEASE HEARING WITH ADEQUATE PROCEDURAL SAFEGUARDS.**

The constitutional principles at issue in this case are well established.  Nearly 40 years

ago, this Circuit ruled that practices nearly identical to those being challenged in Randolph

County violate the Fourteenth Amendment.  In *Pugh v. Rainwater*, 572 F.2d 1053 (5th Cir.

1978), this Circuit held that the "[u]tilization of a master bond schedule provides speedy and

convenient release for those who have no difficulty in meeting its requirements.   The

incarceration of those who cannot, without meaningful consideration of other possible

alternatives, infringes on both due process and equal protection requirements." *Id.* at 1057.

The decision in *Pugh* re-affirmed this Circuit's general principle that a system in which

"[t]hose with means avoid imprisonment [while] the indigent cannot escape imprisonment" violates the Fourteenth Amendment. *Frazier v. Jordan*, 457 F.2d 726, 728-29 (5th Cir. 1972). This Circuit has unequivocally stated that "[t]o imprison an indigent when in the same circumstances an individual of financial means would remain free constitutes a denial of equal protection of the laws." *Barnett v. Hopper*, 548 F.2d 550, 554 (5th Cir. 1977), *vacated as moot*, 439 U.S. 1041.

Over the last two years, this Court and federal district courts in Mississippi, Louisiana, Missouri, Tennessee, Kansas, Georgia, and Texas have reached the same conclusion.[4] In *Jones v. City of Clanton*, No. 2:15CV34-MHT, 2015 WL 5387219 (M.D. Ala. Sept. 14, 2015), this Court held that it violates the Fourteenth Amendment to detain a person after arrest who cannot

---

[4] *See, e.g., ODonnell v. Harris Cty.*, --- F. Supp. 3d ---, No. H-16-1414, 2017 WL 1735456, at *3 (S.D. Tex. Apr. 28, 2017) ("[A]t the heart of this case are two straightforward questions: Can a jurisdiction impose secured money bail on misdemeanor arrestees who cannot pay it, who would otherwise be released, effectively ordering their pretrial detention? If so, what do due process and equal protection require for that to be lawful? . . . [T]he answers are that, under federal and state law, secured money bail may serve to detain indigent misdemeanor arrestees only in the narrowest of cases, and only when, in those cases, due process safeguards the rights of the indigent accused."); *Walker v. City of Calhoun*, No. 4:15-CV-0170-HLM, 2016 WL 361612, at *11 (N.D. Ga. Jan. 28, 2016) ("Certainly, keeping individuals in jail because they cannot pay for their release, whether via fines, fees, or a cash bond is impermissible."), *vacated on other grounds*, --- F. App'x. ---, No. 16-10521, 2017 WL 929750 (11th Cir. Mar. 9, 2017); *Rodriguez v. Providence Cmty. Corr.*, 155 F. Supp. 3d 758, 786-69 (M.D. Tenn. Dec. 17, 2015) (enjoining a policy of detaining probationers who could not pay a predetermined amount of bail); *Thompson v. Moss Point*, No. 1:15CV182LG-RHW, 2015 WL 10322003, at *1 (S.D. Miss. Nov. 6, 2015) ("If the government generally offers prompt release from custody after arrest upon posting a bond pursuant to a schedule, it cannot deny prompt release from custody to a person because the person is financially incapable of posting such a bond."); *see also* Order and J., *Martinez v. City of Dodge City*, No. 15-CV-9344-DDC-TJJ (D. Kan. Apr. 26, 2016), attached as Ex. E to West Decl. (granting permanent injunction requiring city to release arrestees as soon as practical after booking without requiring arrestees to post any type of monetary bond); *Snow v. Lambert*, No. CV 15-567-SDD-RLB, 2015 WL 5071981 (M.D. La. Aug. 27, 2015) (issuing TRO and holding that Plaintiff was likely to succeed on the merits of her claim that defendant's money bail schedule violated due process and equal protection); *Pierce v. City of Velda City*, 4:15-cv-570-HEA, 2015 WL 10013006 (E.D. Mo. June 3, 2015) (issuing declaratory judgment that the use of a secured bail schedule is unconstitutional as applied to the indigent and enjoining its operation).

9

pay a monetary amount "without an individualized hearing regarding the person's indigence and the need for bail or alternatives to bail[.]" *Id.* at *2. This Court held that "[c]riminal defendants, presumed innocent, must not be confined in jail merely because they are poor. Justice that is blind to poverty and indiscriminately forces defendants to pay for their physical liberty is no justice at all." *Id.* at *3;[5] *see also Cooper v. City of Dothan*, No. 1:15-cv-425-WKW, 2015 WL 10013003 (M.D. Ala. June 18, 2015) (granting TRO after surveying "long standing case law" establishing "the unconstitutionality of a pretrial detention scheme whereby indigent detainees are confined for periods of time solely due to their inability to tender monetary amounts").

The Alabama Supreme Court has also condemned practices nearly identical to those practices found in Randolph County. In *State v. Blake*, 642 So. 2d 959 (Ala. 1994), the Alabama Supreme Court struck down a state statute that allowed for indigent arrestees to be held for 72 hours solely because they could not afford monetary payments to secure their release prior to their first appearance. The Court held that there was no rational basis for detaining an indigent defendant for 72 hours while releasing those defendants who could obtain release by cash bail, a bail bond, or property bond. The Court affirmed the lower court which, in expressing outrage at a system that perpetuated wealth-based detention, reasoned that "[p]utting liberty on a cash basis was never intended by the founding fathers as the basis for release pending trial." *Id.* at 966.

The aforementioned decisions rely on two lines of cases, one grounded in *Bearden v.*

---

[5] The U.S. Department of Justice filed a Statement of Interest in *Jones*, arguing that the use of a secured money bail schedule to keep indigent arrestees in jail "not only violates the Fourteenth Amendment's Equal Protection Clause, but also constitutes bad public policy." Statement of Interest of the United States ("U.S. SOI"), *Jones v. City of Clanton*, No. 2:15-cv-34-MHT, ECF No. 26 at 1 (M.D. Ala. Feb. 13, 2015), attached as Ex. F to West Decl.; *see also* Br. for the United States as Amicus Curiae in Support of Pl.-Appellee, *Walker v. City of Calhoun*, No. 16-10521-HH, at 13 (11th Cir. Aug. 18, 2016), attached as Ex. G to West Decl. ("[A] bail scheme that imposes financial conditions, without individualized consideration of ability to pay and whether such conditions are necessary to assure appearance at trial, violates the Fourteenth Amendment.").

*Georgia*, 461 U.S. 660 (1983), and its precursors, which involved challenges to post-conviction, wealth-based detention, and the other premised on *United States v. Salerno*, 481 U.S. 739 (1987), which evaluated preventative, pretrial detention under the Bail Reform Act of 1984. *Bearden* and its precursors stand for the proposition that the Fourteenth Amendment prohibits jailing a person solely because she cannot make a monetary payment. *See* 461 U.S. at 667-68. *Salerno* stands for the proposition that pretrial liberty is a "fundamental" right that may not be infringed without adequate procedural safeguards and, even then, only in serious cases under specific circumstances in which there are no less restrictive alternatives to pretrial detention. *See* 481 U.S. at 750.

The Supreme Court has applied an exacting form of heightened scrutiny in both of these lines of cases. *See Johnson v. Bredesen*, 624 F.3d 742, 748 (6th Cir. 2010) (*Bearden* applied "heightened standard of review"); *Odonnell v. Harris Cty.*, --- F. Supp. 3d ---, No. H-16-1414, 2016 WL 7337549, at *14-15 (S.D. Tex. Dec. 16, 2016) (*Bearden* requires a "careful inquiry" and "demanding review");[6] *see also Reno v. Flores*, 507 U.S. 292, 316 (1993) (O'Connor, J., concurring) (citing *Salerno* and stating that "[t]he institutionalization of an adult by the government triggers heightened substantive due process scrutiny. There must be a 'sufficiently

---

[6] When granting a preliminary injunction in Plaintiffs' favor, the *ODonnell* court determined that Plaintiffs prevailed even under the narrowing principles of intermediate scrutiny, and thus did not ultimately resolve the specific contours of heightened scrutiny that applied. *See ODonnell*, No. H-16-1414, 2017 WL 1735456, at *67 (S.D. Tex. Apr. 28, 2017). As a general matter, the Supreme Court has consistently applied strict scrutiny in cases evaluating the deprivation of a "fundamental" right, *see, e.g., Zablocki v. Redhail*, 434 U.S. 374, 388 (1978), and *Salerno* itself evaluated the deprivation of pretrial liberty based on whether it was "narrowly focused" to serve "compelling" interests, *see Lopez-Valenzuela*, 770 F.3d at 791 (citing *Salerno*, 481 U.S. at 750-51). This Court need not resolve this question at this stage because, as in *Blake*, the money-based procedures used in Randolph County fail under any level of scrutiny. *See Blake*, 642 So. 2d at 968 (finding that Alabama bail statute did not survive *rational* basis review; the statute permitted immediate release for those who could afford bail while requiring a 72-hour delay before a pretrial release hearing for those who could not).

compelling' government interest to justify such action . . . ."); *Foucha v. Louisiana*, 504 U.S. 71, 93 (1992) (Kennedy, J., dissenting) (citing *Salerno* and noting that the Supreme Court has "often subjected to heightened due process scrutiny, with regard to both purpose and duration, deprivations of physical liberty imposed before a judgment is rendered . . . ."); *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 781 (9th Cir. 2014) (applying heightened scrutiny to due process challenge to pretrial detention).

After applying heightened scrutiny here, this Court should find that Defendants' post-arrest wealth-based procedures violate the Fourteenth Amendment. *See ODonnell*, 2016 WL 7337549, at *14-15 (noting that the Court's post-conviction detention review is "demanding" and closely approximates the heightened level of scrutiny required in the pretrial context, where "individuals remain clothed with a presumption of innocence and with their constitutional guarantees intact.") (quoting *Pugh*, 572 F.2d at 1056); Statement of Interest of the United States ("U.S. SOI"), *Jones v. City of Clanton*, No. 2:15-cv-34-MHT, at 8 (M.D. Ala. Feb. 13, 2015) (rule that an arrestee may not be punished for his poverty applies "in equal, if not greater force to individuals who are detained until trial because of inability to pay fixed-sum bail amounts").

1.  **Defendants' Post-Arrest Procedures Fail the Heightened Scrutiny that Applies to Wealth-Based Detention.**

In *Pugh v. Rainwater*, 557 F.2d 1189 (5th Cir. 1977), a Fifth Circuit panel applied strict scrutiny to invalidate a Florida statute that did not consider arrestees' ability to pay a monetary amount before imposing financial conditions of release. The court applied strict scrutiny after finding that the right to pretrial freedom is "fundamental." *Id.* at 1197 (citing *Stack v. Boyle*, 342 U.S. 1, 4 (1951)). The court also relied on *Williams v. Illinois*, 399 U.S. 235 (1970) and *Tate v. Short*, 401 U.S. 395 (1971), two decisions in the post-conviction context that stand for the proposition that defendants may not be jailed solely because they cannot pay a monetary amount.

The panel noted that the court has been "extremely sensitive" to wealth-based discrimination and that "the passage of time has heightened rather than weakened attempts to mitigate the disparate treatment of indigents in the criminal process." *Pugh*, 557 F.2d at 1196-97 (quoting *Williams*, 399 U.S. at 241). After Florida changed its bail rules while the State appealed the panel decision, the Fifth Circuit vacated the panel decision en banc. In so doing, however, the Fifth Circuit also affirmed the panel's basis for its ruling, stating that "[a]t the outset we accept the principle that imprisonment solely because of indigent status is invidious discrimination and not constitutionally permissible." *Pugh*, 572 F.2d at 1055. This principle continues to guide challenges to wealth-based detention in this Circuit.

Following *Pugh*, the Supreme Court has also applied heightened scrutiny to evaluate claims based on wealth-based detention. In *Bearden*, for example, the Court held that the Fourteenth Amendment prohibits jailing a defendant solely because she cannot pay a fine. The Court held that heightened review was required before a defendant could be jailed for non-payment. 461 U.S. at 666. The Court reasoned that "[d]ue process and equal protection principles converge" in evaluating a wealth-based discrimination claim and therefore such claims "cannot be resolved by resort to easy slogans or pigeonhole analysis." *Id.* Instead, such claims require "a careful inquiry into such factors as the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose. . . ." *Id.* at 666-67 (internal quotation omitted).[7]

The Supreme Court has not limited the application of *Bearden* to the post-conviction

---

[7] Although *Bearden* did not use the phrase "strict scrutiny," the Court's analysis is most similar to that of strict scrutiny. Whatever the label, it is clear that the fundamental nature of the right to liberty must be carefully weighed against the procedures for imposing detention and the alternatives to detention.

context, but has applied *Bearden* to a variety of contexts challenging wealth-based practices in

the criminal justice system. *See Halbert v. Michigan*, 545 U.S. 605, 610-11 (2005) (applying

*Bearden* to cases brought by people "unable to pay their own way"); *M.L.B. v. S.L.J.*, 519 U.S.

102, 120-21 (1996) (claim by indigent seeking transcript "reflect[s] both equal protection and

due process concerns," requiring Court to "inspect the character and intensity of the individual

interest at stake, on the one hand, and the State's justification for its exaction, on the other."); *see*

*also* Br. for the United States as Amicus Curiae in Support of Pl.-Appellee, *Walker v. City of*

*Calhoun*, No. 16-10521-HH, at 17 (11th Cir. Aug. 18, 2016), attached as Ex. G to West Decl.

("In a long line of cases . . . the Supreme Court has held that denying equal access to justice—

including and especially through incarceration—without consideration of ability to pay and

possible alternatives to achieve a legitimate government interest, violates the Fourteenth

Amendment. In these cases, the Court has recognized that the proper analysis reflects both equal

protection and due process principles, and has rejected the use of the traditional equal protection

inquiry."). Under *Bearden*, Defendants' post-arrest procedures violate the Fourteenth

Amendment.

The first *Bearden* factor, the nature of Plaintiff's interests, here weighs in favor of a

preliminary injunction and/or TRO. The interest at stake—Plaintiff's liberty—is profound. A

person's interest in pretrial liberty is "vital," *United States v. Montalvo-Murillo*, 495 U.S. 711,

716 (1990), and courts may "not minimize the importance and fundamental nature of this right."

*Salerno*, 481 U.S. at 750. As the Court noted, "[f]reedom from imprisonment—from

government custody, detention, or other forms of physical restraint—lies at the heart of the

liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001);

*Foucha*, 504 U.S. at 80 ("Freedom from bodily restraint has always been at the core of the liberty

14

protected by the Due Process Clause from arbitrary governmental action.").

The second factor, the extent to which this interest is affected, also weighs in favor of a preliminary injunction and/or TRO. The "traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction." *Pugh*, 572 F.2d at 1056-57. Pretrial incarceration, on the other hand, "is harsh and oppressive, subjects defendants to economical and psychological hardship, interferes with their ability to defend themselves, and in many instances, deprives their families of support."[8] As the Supreme Court has explained, pretrial incarceration

> [h]as a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness. Most jails offer little or no rehabilitative programs. The time spent in jail is simply dead time. Moreover if a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense. Imposing those consequences on anyone who has not yet been convicted is serious. It is especially unfortunate to impose them on those persons who are ultimately found to be innocent. Finally, even if an accused is not incarcerated prior to trial, he is still disadvantaged by restraints on his liberty and by living under a cloud of anxiety, suspicion, and often hostility.

*Barker v. Wingo*, 407 U.S. 524, 532-33 (1972).

Empirical evidence establishes that those detained pretrial suffer worse outcomes at trial and sentencing than those released pretrial, even when charged with the same offenses.[9] Those

---

[8] ABA Standards for Crim. Just.: Pretrial Release 10-1.1, https://goo.gl/ipWB5b, attached as Ex. H to West Decl.

[9] *See, e.g.*, Christopher T. Lowenkamp et al., Laura and John Arnold Foundation, *Investigating the Impact of Pretrial Detention on Sentencing Outcomes* 4 (November 2013), https://goo.gl/FLjVZP, attached as Ex. I to West Decl. (those detained for the entire pretrial period are more likely to be sentenced to jail and prison—and receive longer sentences—than those who are released at some point before trial or case disposition); Megan Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes* 18 (Jan. 8, 2017), https://goo.gl/riaoKD, attached as Ex. J to West Decl. (finding that a person who is detained pretrial is 13% more likely to be convicted and 21% more likely to plead guilty than a person who is not detained); Arpit Gupta et al., *The Heavy Costs of High Bail: Evidence from Judge*

detained pretrial are more likely to plead guilty just to shorten their jail time, even if innocent. *See, e.g.*, *ODonnell*, No. H-16-1414, 2017 WL 1735456, at *36-40 (S.D. Tex. Apr. 28, 2017) (discussing extensive evidence that detained misdemeanor defendants are more likely to plead guilty and "abandon valid defenses" than those released pretrial "to obtain faster release than if they contested their charges"). Indeed, this possibility is particularly great in Randolph County, where trials are scheduled only twice per year. For these reasons, wealth-based pretrial detention has a devastating impact on those unable to pay secured money bail.

The third factor, the strength of the connection between the government's means and purpose, also supports the issuance of a preliminary injunction and/or TRO.[10] The purposes of bail are to assure appearance in court and to protect public safety. *Reynolds v. United States*, 80 S. Ct. 30, 32 (1959) ("The purpose of bail is to insure the defendant's appearance and submission to the judgment of the court."); *Pugh*, 557 F.2d at 1198 ("The sole governmental interest served by bail is to assure the presence of the accused at trial."); *Salerno*, 481 U.S. at 753 (noting that the "primary function of bail is to safeguard the courts' role in adjudicating the guilt or innocence of defendants"). The means by which Defendants attempt to achieve those purposes is through a bail schedule that sets monetary conditions of release based on the defendant's charge. The determination of whether these means are sufficiently related to these purposes depends on whether the monetary amount is necessary and whether there are less restrictive alternatives to automatic wealth-based detention.

---

*Randomization* 15, 19 (Aug. 18, 2016), https://goo.gl/OW5OzL, attached as Ex. K to West Decl. (finding a 12 percent increase in the likelihood of conviction using the same data).

[10] Though the *Bearden* Court uses the term "rationality" in describing this factor, the Court is referring to the government's rationale rather than the appropriate level of scrutiny. *Bearden* clearly requires a "more demanding review" than rational basis review, and this Circuit "requires courts to consider challenges to pretrial detention based on indigence with particular care." *Odonnell*, 2016 WL 7337549, at *14-15.

There is no evidence that money is necessary to achieve appearance or public safety.[11] Nor is there any evidence that requiring more money increases appearance rates or public safety.[12]  Rather, empirical evidence suggests that unsecured bail is as effective or more effective at achieving appearance and public safety for arrestees as secured money bail.[13]  Experience from other jurisdictions further suggests that non-financial conditions of release result in high rates of court appearance and low rates of new criminal activity and that simple non-financial alternatives and proper supervision are more effective than secured money bail, even for those who can afford to purchase their release from jail.[14]  Moreover, research has shown that secured money bail does not ensure public safety because release decisions are based on wealth rather than dangerousness and because a person detained for even a few days before release on money bail is *more* likely to commit new crimes in the future than an arrestee released immediately

---

[11] *See* Timothy R. Schnacke, Dep't of Just., Nat'l. Inst. of Corrs., *Fundamentals of Bail* 12 (Sept. 2014), https://goo.gl/jr7sMg, attached as Ex. L to West Decl. ("[E]ver since 1968, when the American Bar Association openly questioned the basic premise that money serves as a motivator for court appearance, no valid study has been conducted to refute that uncertainty. Instead, the best research to date suggests what criminal justice leaders have long suspected: secured money does not matter when it comes to either public safety or court appearance, but it is directly related to pretrial detention.").

[12] *See id.* at 11 ("[T]he financial condition of a bail bond is typically arbitrary; even when judges are capable of expressing reasons for a particular amount, there is often no rational explanation for why a second amount, either lower or higher, might not arguably serve the same purpose.").

[13] *See, e.g.*, Michael R. Jones, Pretrial Justice Institute, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option* 10 (Oct. 2013), https://goo.gl/UENBKJ, attached as Ex. M to West Decl. ("Whether released defendants are higher or lower risk or in-between, unsecured bonds offer the same public safety benefits as do secured bonds."); *see id.* at 11 (same conclusion, but with regard to court appearance); Arpit Gupta et al., *The Heavy Costs of High Bail*, *supra* note 9 at 21 ("Our results suggest that money bail has a negligible effect or, if anything, increases failures to appear.").

[14] Mark Heyerly, *Pretrial Reform in Kentucky* 16 (Jan. 2013), attached as Ex. O to West Decl. (finding a decrease in the percentage of defendants re-arrested following pretrial release in Kentucky, even as the percentage of defendants released on non-financial conditions increased from 50% to 66%).

17

when controlling for all other factors.[15]

Additionally, setting secured financial conditions of release at an amount beyond what a person can afford to pay defeats the very purpose of bail, which is to incentivize a person released from jail to return to court. As this Circuit held, "in the case of indigents, money bail is irrelevant in promoting the state's interest in assuring appearance." *Pugh*, 557 F.2d at 1200. To put a finer point on it, "money itself cannot serve as motivation for anything until it is actually posted. Until then, the money merely detains, and does so unequally among defendants resulting in the unnecessary detention of releasable inmates."[16]

The fourth factor, whether alternative means exist for ensuring court appearance and public safety, also weighs in favor of injunctive relief. Alabama law authorizes courts to utilize unsecured bond or non-financial conditions of release that do not result in wealth-based detention. For example, courts may impose non-monetary conditions of release such as

---

[15] *See ODonnell*, 2017 WL 1735456, at *51 ("According to the most recent and credible evidence, secured financial conditions of pretrial release do not outperform alternative nonfinancial or unsecured conditions of pretrial release in ensuring the appearance of misdemeanor defendants at hearings."); *see also* Int'l Ass'n of Chiefs of Police, *Resolution: Pretrial Release and Detention Process* 15-16 (Oct. 21, 2014), https://goo.gl/a5JUpe, attached as Ex. AA to West Decl. ("[D]efendants rated low risk and detained pretrial for longer than one day before their pretrial release are more likely to commit a new crime once they are released, demonstrating that length of time until pretrial release has a direct impact on public safety."); Christopher T. Lowenkamp et al., Laura and John Arnold Foundation, *The Hidden Costs of Pretrial Detention* 3 (2013), http://www.arnoldfoundation.org/wp-content/uploads/2014/02/LJAF_Report_hidden-costs_FNL.pdf, attached as Ex. P to West Decl. (studying 153,407 defendants and finding that "when held 2–3 days, low risk defendants are almost 40 percent more likely to commit new crimes before trial than equivalent defendants held no more than 24 hours"); Paul Heaton et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711, 768 (2017), https://goo.gl/Waj3ty, attached as Ex. Q to West Decl. ("While pretrial detention clearly exerts a protective effect in the short run, for misdemeanor defendants it may ultimately service to compromise public safety," and finding that in a representative group of 10,000 misdemeanor offenders, pretrial detention would cause an additional 600 misdemeanors and 400 felonies compared to if the same group had been released pretrial).

[16] Schnacke, *supra* note 11 at 11.

unsecured bond; reporting obligations; restrictions on the defendant's travel, associations, or place of residence; text message and phone call reminders; supervision; drug testing or counseling; and electronic monitoring or home confinement in extreme cases. *See* Ala. R. Crim. P. 7.3(b). In fact, about 75 municipalities across Alabama—including the 50 largest municipalities—allow arrestees to sign unsecured bonds for most offenses and do not require secured money bail in their municipal courts.[17] Additionally, Defendants charged with a misdemeanor or felony offense in the 10th Judicial Circuit—covering Jefferson County—are released on a personal recognizance bond if that bond is set at $5,000 or less; if bond is set at an amount greater than $5,000 but below $10,000, an employed third party may act as a personal surety.[18] These courts' policies are consistent with Alabama law and this Circuit's advice that "systems which incorporate a presumption favoring personal recognizance avoid much of the difficulty inherent in the entire subject area." *See Pugh*, 572 F.2d at 1057; *see also* Committee Comments to Ala. R. Crim. P. 7.2 ("The provisions of Rule 7.2(a) authorizing judges and magistrates to release defendants charged with bailable offenses on their personal recognizance or an unsecured appearance bond are based on the presumption of innocence of the accused and the policy that a defendant *should be released pending trial whenever possible*.") (emphasis added).

Other courts across the country have taken similar steps to avoid unconstitutionally jailing the poor without any impact on public safety or appearance. For example, Washington, D.C. releases more than 94% of all defendants without financial conditions of release, and no

---

[17] *SPLC prompts 50 Alabama cities to reform discriminatory bail practices*, S. Poverty Law Ctr. (Dec. 6, 2016) https://goo.gl/9iVqRq, attached as Ex. R to West Decl.; West Decl. ¶ 48; *see also* Amy Julia Harris, *Alabama cities agree to stop jailing people too poor to post bond*, Reveal (Dec. 8, 2016), https://goo.gl/1r19Ce, attached as Ex. S to West Decl.

[18] Kent Faulk, *Jefferson County bail reforms aimed at keeping poor out of jail*, Al.com (May 10, 2016), https://goo.gl/l1xLLu, attached as Ex. T to West Decl.

one is detained on secured money bail that they cannot afford.[19] Empirical evidence shows that 88% of released defendants in Washington, D.C. make all court appearances, 88% complete the pretrial release period without any new arrests, and 98-99% consistently avoid re-arrest for violent crime.[20] Similarly, the federal judiciary eschews wealth-based detention, requiring any detention order to be based on a finding of dangerousness or flight risk, and the practice has not harmed court appearance rates or public safety.[21] The State of New Jersey has also "removed money as a factor in pretrial release decisions and replaced it with 'an honest and direct conversation about whether a defendant is a risk to the community.'"[22]

Even if Defendants continue to utilize secured money bail upon arrest, there are less restrictive alternatives to jailing arrestees for days or weeks who cannot afford the amount required by the secured money bail schedule. For example, Defendants could administer

---

[19] *See* D.C. Code § 23-1321; Pretrial Services Agency for the District of Columbia, *Release Rates for Pretrial Defendants within Washington, DC*, https://goo.gl/VSDeDk, attached as Ex. U to West Decl. ("In Washington, DC, we consistently find over 90% of defendants are released pretrial without using a financial bond").

[20] Pretrial Services Agency for the District of Columbia, *Outcomes for Last Four Years*, https://www.psa.gov/?q=node/558, attached as Ex. V to West Decl.; Pretrial Just. Inst., *The D.C. Pretrial Services Agency: Lessons from Five Decades of Innovation and Growth*, 2 Case Studies 1 at 2 (2009), https://goo.gl/6wgPM8, attached as Ex. W to West Decl. ("The high non-financial release rate has been accomplished without sacrificing the safety of the public or the appearance of defendants in court. Agency data shows that 88% of released defendants make all court appearances, and 88% complete the pretrial release period without any new arrests.").

[21] *See* 18 U.S.C. § 3142(c)(2) ("The judicial officer may not impose a financial condition that results in the pretrial detention of the person."); *see also* Thomas H. Cohen, U.S. Dep't of Just. Bureau of Just. Statistics, *Pretrial Release and Misconduct in Federal District Courts, 2008-2010* 13 (Nov. 2012), https://www.bjs.gov/content/pub/pdf/prmfdc0810.pdf, attached as Ex. X to West Decl. (finding from 2008 to 2010, only 1% of federal defendants released pretrial failed to make court appearances and 4% were arrested for new offenses).

[22] New Jersey Administrative Office of the Courts, *First Quarter Statistics Show Criminal Justice Reform Meeting Initial Goals* (May 4, 2017), http://www.judiciary.state.nj.us/pressrel/2017/pr050417c.pdf, attached as Ex. C to West Decl.; Kevin Litten, *New Orleans City Council votes to end jailing of indigent offenders on minor crimes*, The Times-Picayune (Jan. 12, 2017), https://goo.gl/gKnJMk, attached as Ex. N to West Decl.; New Orleans, LA., Code § 54-23, https://goo.gl/6IrNaM.

Alabama's Affidavit of Substantial Hardship upon arrest and could adjust the monetary bail sum required to an affordable amount.[23]   Or, Defendants could hold a prompt and individualized release hearing that considers a person's ability to pay secured money bail and the suitability of non-financial release conditions—a hearing that is already contemplated by state law.  *See* Ala. R. Crim. P. 7.4 ("If a defendant has not been released from custody and is brought before a court for initial appearance, a determination of the conditions of release shall be made."); Ala. R. Crim. P. 7.2 (court must "impose the least onerous condition or conditions" to ensure appearance and public safety by considering 14 factors, including "the defendant's financial condition"). Defendants' failure to afford any of the procedures required by *Bearden* violates the right of pretrial arrestees against wealth-based detention.

### 2.   Defendants Post-Arrest Procedures Fail the Heightened Scrutiny Required for De Facto Orders of Detention.

Rather than provide the procedural protections necessary to eliminate wealth-based detention under *Bearden*, Defendants routinely jail pretrial arrestees by mechanically requiring secured money bail in amounts arrestees cannot afford.  Setting a financial condition of release beyond what a person can afford, in addition to making an "end run" around Alabama's constitutional guarantee of pretrial liberty for non-capital offenses, is the functional equivalent of the detention order discussed in *Salerno*.  *See Odonnell*, 2017 WL 1735456, at *44 ("In Harris

---

[23] *See* Affidavit of Substantial Hardship and Order, State of Alabama Unified Judicial System Forms C-10(A-B), https://goo.gl/TmyYx4, attached as Ex. Y to West Decl. Indeed, the City of Foley recently entered a Standing Order doing just this.  *See* Foley Mun. Ct. Standing Order Regarding Bail 2 ¶2 (Dec. 27, 2016), attached as Ex. Z to West Decl. ("If an arrestee is unable to meet the requirements of a secured bond by reason of inability to pay, said person shall be allowed to file a financial form . . . for determination of an inability to pay due to financial limitations.  If it is determined the arrestee is unable to pay a secured bond, then in that event, the arrestee shall be granted an unsecured bond utilizing the bail schedule as a guide to set the amount of said bond.  The determination of financial status shall be part of the normal bonding process.").

County, secured money bail is not just a de facto pretrial detention order; it is literally a pretrial detention order."); *see also United States v. Leathers*, 412 F.2d 169, 171 (D.C. Cir. 1969) ("[T]he setting of bond unreachable because of its amount would be tantamount to setting no conditions at all."); *State v. Brown*, 338 P.3d 1276, 1292 ("Intentionally setting bail so high as to be unattainable is simply a less honest method of unlawfully denying bail altogether."); U.S. SOI, *Jones*, No. 2:15-cv-34-MHT, at 8 ("Fixed-sum bail systems . . . are based solely on the criminal charge. Because such systems do not account for individual circumstances of the accused, they essentially mandate pretrial detention for anyone who is too poor to pay the predetermined fee. This amounts to mandating pretrial detention only for the indigent" in violation of the Fourteenth Amendment); *see also Bandy v. United States*, 81 S. Ct. 197, 198 (1960) (Douglas, J., in chambers) ("It would be unconstitutional to fix excessive bail to assure that a defendant will not gain his freedom. Yet in the case of an indigent defendant, the fixing of bail in even a modest amount may have the practical effect of denying him release."). As explained below, such orders trigger additional constitutional protections that Defendants fail to provide.

In *Salerno*, the Court applied heightened scrutiny in evaluating a challenge to provisions in the Bail Reform Act that authorized preventative detention. The Court described a person's interest in pretrial liberty as "fundamental" and emphasized that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." 481 U.S. at 750, 755. Thus, the Court held that to satisfy due process robust procedural protections "must attend" any order of pretrial detention. *Id.* at 755.

The Court held that the Act satisfied due process because the challenged provisions limited preventative detention to circumstances in which the government convinced a judge that

"no conditions of pretrial release can reasonably assure the safety of other persons and the community." *Id.* at 742. The Court emphasized that the Act "carefully limits" the circumstances under which detention may be sought to the "most serious of crimes." *Id.* at 748. It also limited a judicial officer's discretion to impose a detention order by requiring that officer to consider factors such as the nature and seriousness of the charges, the substantiality of the government's evidence against the arrestee, the arrestee's background and characteristics, and the nature and seriousness of the danger posed by the suspect's release. The Court also held that the challenged provisions satisfied due process because they provided for counsel at the detention hearing and permitted arrestees to testify and present witnesses, proffer evidence, and cross-examine other witnesses testifying at the hearing.

Under *Salerno*, a court violates due process by issuing a de-facto detention order unless the court affords an arrestee adequate procedural safeguards and makes written findings that the unaffordable financial conditions are an "indispensable component of the conditions for release." *United States v. Mantecon-Zayas*, 949 F.2d 548, 551 (1st Cir. 1991); *United States v. McConnell*, 842 F.2d 105, 110 (5th Cir. 1988) ("When no attainable conditions of release can be put into place, the defendant must be detained pending trial. In such an instance, the court must explain its reasons for concluding that the particular financial requirement is a *necessary* part of the conditions for release.") (emphasis added); *see also Zadvydas*, 533 U.S. at 690-91 ("[W]e have upheld preventive detention based on dangerousness only when limited to specially dangerous individuals and subject to strong procedural protections."); *see also ODonnell*, 2017 WL 1735456, at *68 ("Under the Equal Protection Clause as applied in the Fifth Circuit, pretrial detention of indigent defendants who cannot pay a financial condition of release is permissible only if a court finds, based on evidence and in a reasoned opinion, either that the defendant is not

23

indigent and is refusing to pay in bad faith, or that no less restrictive alternative can reasonably meet the government's compelling interest.") (citing *Bearden*, 461 U.S. at 674). A court, in other words, must afford a defendant the same strict procedural safeguards necessary for a valid detention order before imposing unaffordable financial conditions of release.

Here, Defendants' wealth-based post-arrest procedures do not survive heightened scrutiny because they routinely impose de facto detention orders based on the accident of wealth rather than after appropriately tailored individualized and adversarial proceedings concerning danger to the community, risk of flight, and alternatives to detention. Indeed, Defendants provide *none* of the procedural safeguards that the *Salerno* Court found "must attend" any order of pretrial detention. *Salerno*, 481 U.S. at 755.

First, Defendants do not require the government to establish "by clear and convincing evidence" that an arrestee cannot be released on affordable conditions of release or non-financial alternative conditions of release. Instead, the only condition on release is blunt ability to pay, which has no relationship to future dangerousness. *See Bearden*, 461 U.S. at 671 (although State may consider defendant's employment history and financial resources to determine appropriate punishment, it may not use defendant's poverty as "the *sole* justification for imprisonment"); *Blake*, 642 So. 2d at 968 (procedures allowing arrestees who could afford cash bail, bail bond, or property bond to be released from jail immediately while requiring arrestees who could not to remain in custody for 72-hours before release hearing was "not a reflection of the State's interest in public safety"); *see also supra* pp. 16-17.

Second, Defendants do not limit detention to arrestees who are charged with "extremely serious offenses" or those arrestees who are most likely "to be responsible for dangerous acts in the community after arrest." *Salerno*, 481 U.S. at 750. In fact, a person's flight risk or danger to

24

the community plays *no role* in whether a person is released or detained following arrest; whether a person remains in jail following arrest in Randolph County is entirely based on a person's financial resources. Those who can pay the amount required are released from jail immediately; those who cannot remain incarcerated, even if charged with the same offense. But, as the Supreme Court has held, indigency "is itself no threat to [public] safety . . . ." *See Bearden*, 461 U.S. at 668 n.9; *see also supra* pp. 16-17 (citing empirical evidence that relative wealth has no relationship to dangerousness or court appearance).

Third, Defendants make no inquiry into arrestees' ability to pay, nor do they consider factors such as the nature and seriousness of the charges, the substantiality of the government's evidence, or the arrestees' background and characteristics. Defendants also do not provide arrestees with counsel before release conditions are imposed or permit arrestees to testify and present witnesses, proffer evidence, and cross-examine witnesses. Instead, Defendants automatically require a secured monetary amount predetermined by the charge and detain anyone who cannot pay the amount required by the bail schedule.

Because there are less restrictive alternatives available, this Court should find that Defendants' post-arrest procedures do not survive heightened scrutiny and that Plaintiff is substantially likely to prevail on her Fourteenth Amendment claim that Defendants violate due process by jailing her without an individualized hearing with adequate procedural protections that includes an inquiry into and findings concerning her ability to pay, the suitability of non-financial conditions of release, and a finding on the record that any conditions of release are the least restrictive conditions necessary to achieve public safety and court appearance.

**B.   MS. EDWARDS AND THE PUTATIVE CLASS WILL SUFFFER IMMEDIATE AND IRREPARABLE INJURY UNLESS A PRELIMINARY INJUNCTION AND/OR TRO ISSUES.**

Without a preliminary injunction and/or TRO, Ms. Edwards and the putative class she seeks to represent will continue to be unconstitutionally jailed. Imprisonment in violation of one's constitutional rights is an irreparable harm. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690; *see also Foucha*, 504 U.S. at 80 ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."). Even one additional night in jail is a harm to a person that cannot be later undone. *See, e.g., United States v. Bogle*, 855 F.2d 707, 710–11 (11th Cir. 1988) ("unnecessary deprivation of liberty clearly constitutes irreparable harm"); *Wanatee v. Ault*, 120 F. Supp. 2d 784, 789 (N.D. Iowa 2000) ("[E]very day of unconstitutional incarceration generally constitutes irreparable harm to the person in such custody."); *Lake v. Speziale*, 580 F. Supp. 1318, 1335 (D. Conn. 1984) (issuing preliminary injunction requiring court to inform child support debtors of right to counsel because unlawful incarceration would be irreparable harm); *Cobb v. Green*, 574 F. Supp. 256, 262 (W.D. Mich. 1983) ("There is no adequate remedy at law for a deprivation of one's physical liberty. Thus the Court finds the harm . . . is substantial and irreparable."). Moreover, depriving Plaintiff of her fundamental right to pretrial liberty may cause psychological and economic harm and may undermine her ability to prepare a defense. *See Barker*, 407 U.S. at 532; *see also supra* pp. 14-15.

For these reasons, the Court should find that Ms. Edwards and the putative class will suffer irreparable injury without a preliminary injunction and/or TRO. *See ODonnell*, 2017 WL 1735456, at *81 (issuing preliminary injunction after finding that plaintiffs had demonstrated irreparable injury in the absence of a preliminary injunction); *Rodriguez*, 155 F. Supp. 3d at 771

(irreparable harm from jailing probationers on secured money bonds for probation violations supported injunction); *Walker*, 2016 WL 361612 at \*14 (finding practice of jailing defendant "simply because he could not afford to post money bail" demonstrated irreparable harm); *Cooper*, 2015 WL 10013003, at \*2 ("[I]f a temporary restraining order is not entered, Mr. Cooper will remain confined at the City jail pending his initial appearance as a result of his inability to pay the schedule bond amount, Mr. Cooper has sufficiently demonstrated that this threat of injury is immediate and irreparable.").

## C. THE THREATENED INJURY TO MS. EDWARDS OUTWEIGHS ANY POTENTIAL HARM A PRELIMINARY INJUNCTION AND/OR TRO MIGHT CAUSE.

The threat of injury to Ms. Edwards and the putative Class considerably outweighs any threat of harm to Defendants. Without immediate injunctive relief, Ms. Edwards will be unconstitutionally jailed because she cannot "forthwith pay" the amount required by the bail schedule. *See Tate*, 401 U.S. at 398 (holding that the Constitution prohibits the State from jailing a person "solely because the defendant is indigent and cannot" pay a monetary amount). Jailing Plaintiff and the putative Class because of their poverty will also result in additional harms. As this Court has noted, pretrial detention "often means loss of a job; it disrupts family life; and it enforces idleness. It can also impede the preparation of one's defense; it can induce even the innocent to plead guilty so that they may secure a quicker release; and it may result in a period of pretrial detention that exceeds the expected sentence." *See Jones*, 2015 WL 5387219, at \*3 (internal citations and quotations omitted). There is overwhelming evidence that defendants who are detained until disposition are more likely to be sentenced to jail or prison than those who are

released before trial.[24]

A preliminary injunction and/or TRO would not undermine public safety. As the Alabama Supreme Court explained over twenty years ago, keeping indigent people in jail because they cannot afford to pay secured money bail does not protect public safety. *See Blake*, 642 So.2d at 968 ("[W]e conclude that the procedures under the Act by which a defendant may obtain release by cash bail, a bail bond, property bail, or judicial public bail are not a reflection of the State's interest in public safety."). Instead, empirical evidence suggests that Randolph County will be safer by ceasing to needlessly detain the poor.[25]

Empirical evidence also suggests that a preliminary injunction and/or TRO will not increase the likelihood that a defendant will fail to appear. Rather, Defendants could safely release many arrestees on unsecured bond or other non-financial conditions without any impact on the administration of justice.[26] In fact, empirical evidence suggests that pretrial detention may *increase* the likelihood that a defendant may fail to appear.[27]

---

[24] *See* Lowenkamp, *Investigating the Impact of Pretrial Detention on Sentencing Outcomes*, *supra* note 9 at 3 (concluding that defendants who are detained for the entire pretrial period are much more likely to be sentenced to jail and prison—and also receive longer jail and prison sentenced—than those who are released at some point before trial and case disposition).

[25] *See* Int'l Ass'n of Chiefs of Police Res., *supra* note 15 at 16 ("[D]efendants rated low risk and detained pretrial for longer than one day before their pretrial release are more likely to commit a new crime once they are released, demonstrating that length of time until pretrial release has a direct impact on public safety."); Lowenkamp, *The Hidden Costs of Pretrial Detention*, *supra* note 15 at 3–4 (studying 153,407 defendants and finding that "when held 2–3 days, low risk defendants are almost 40 percent more likely to commit new crimes before trial than equivalent defendants held no more than 24 hours").

[26] Jones, *Unsecured Bonds*, *supra* note 13 at 16 ("When released defendants fail to appear, unsecured bonds offer the same probability of fugitive-return as do secured (including surety-only) bonds.").

[27] *See* Lowenkamp, *The Hidden Cost of Pretrial Detention*, *supra* note 15 at 4 (concluding that longer pretrial detention is associated with the likelihood of failure to appear pending trial); Gupta et al., *The Heavy Costs of High Bail*, *supra* note 9 at 21 ("Our results suggest that money bail has a negligible effect or, if anything, increases failures to appear.").

Defendants will likely save money if this Court grants a preliminary injunction and/or TRO.[28] As this Court has noted, "unnecessary pretrial detention burdens States, localities, and taxpayers, and its use appears widespread: nationwide, about 60 % of jail inmates are pretrial detainees, and the majority of those people are charged with nonviolent offenses." *Jones*, 2015 WL 5387219, at *3. Nationally, local governments spend $13.6 billion per year on pretrial detention.[29] Most of the people in pretrial detention are in jail because they are too poor to pay secured money bail. "Money, or the lack thereof, is now the most important factor in determining whether someone is held in jail pretrial."[30] Randolph County is no different, given that Defendants condition arrestees' freedom on the payment of secured money bail.

Finally, given severe overcrowding, Defendants will likely improve conditions and safety at the Randolph County Jail if they no longer detain people simply because they are poor.[31]

---

[28] Pretrial Justice Institute, *Pretrial Justice: How Much Does It Cost?*, https://goo.gl/0lLtLM, attached as Ex. BB to West Decl. ("It has been estimated that implementing validated, evidence-based risk assessment to guide pretrial release decisions could yield $78 billion in savings and benefits, nationally."); United States Court, *Supervision Costs Significantly Less than Incarceration in Federal System* (July 18, 2013), https://goo.gl/dJpDrn, attached as Ex. CC to West Decl. (In 2012, "[p]retrial detention for a defendant was nearly 10 times more expensive than the cost of supervision of a defendant by a pretrial services officer in the federal system").

[29] Peter Wagner & Bernadette Rabuy, Prison Policy Initiative, *Following the Money of Mass Incarceration* (Jan. 25, 2017), https://goo.gl/WBi553, attached as Ex. DD to West Decl.

[30] Ram Subramanian et al., Vera Institute of Justice, *Incarceration's Front Door: The Misuse of Jail in America* 32 (Feb. 2015) (updated July 29, 2015), https//goo.gl/JgPQjP, attached as Ex. EE to West Decl.

[31] Vanessa Sorrell Burnside, *County seeks sales tax for new jail*, TheRandolphLeader.com (Feb. 10, 2016) (noting that the Randolph County Jail was built to house 36 prisoners, but had 110 at one point in 2015), https://goo.gl/40DNvn, attached as Ex. FF to West Decl.; *see also* Br. for American Bar Association as Amicus Curiae in Support of Appellees and Affirmance, *Walker v. City of Calhoun*, No. 16-10521-HH, at 17 (11th Cir. Aug. 18, 2016), https://goo.gl/G6Sqpw, attached as Ex. GG to West Decl. ("[I]nflexible money-bail systems, which tie pretrial detention to the defendant's ability to pay rather than an objective risk assessment, do not improve appearance rates or public safety, and leave jurisdictions that use such systems bearing the costs of overcrowded jails.").

Over the last few years, the Department of Justice, the American Bar Association, the

National Sheriffs Association, and the International Association of Chiefs of Police have

concluded that predetermined secured money bail schedules violate the Fourteenth Amendment

and constitute bad public policy.[32]   Last year, the Maryland Attorney General also issued a

formal opinion stating that the use of financial conditions of release without an inquiry into and

findings concerning a person's ability to pay is unconstitutional.[33]   And in a nearly identical

lawsuit in California, the Sheriff explained her refusal to defend San Francisco's bail schedule:

[32] *See* U.S. SOI, *Jones*, No. 2:15-cv-34-MHT, *supra* note 5 at 1; Br. for American Bar Association as Amicus Curiae in Support of Appellees and Affirmance, *Walker*, No. 16-10521-HH, *supra* note 31 at 14 ("[I]nflexible money-bail requirements drawn from a preset schedule of offenses, which takes no account of a defendant's individual circumstances, should be abolished. Inflexible money-bail systems discriminate against the indigent, seriously impair the rights of persons accused of crimes. . . . , and provide little if any benefit to the public.  Furthermore, financial conditions on pretrial release should not be imposed unless no less restrictive conditions of release will reasonably ensure the defendant's appearance in court . . . ."); Nat. Sheriffs' Assoc. Res. 2012-6, *National Sheriffs' Association Supports & Recognizes the Contribution of Pretrial Services Agencies to Enhance Public Safety* (June 18, 2012), https://goo.gl/PAA1xq, attached as Ex. HH to West Decl. ("[A] justice system relying heavily on financial conditions of release at the pretrial stage is inconsistent with a fair and efficient justice system"); Int'l Ass'n of Chiefs of Police Res., *supra* note 15 at 15 ("[T]he pretrial release and detention process currently utilized throughout most of the United States relies on limited information and the use of a bail schedule, without considering empirically developed information regarding individual risks posed by defendants[.]"); *see also* Vanita Gupta, U.S. Dep't of Justice, *Head of the Civil Rights Division Vanita Gupta Delivers Remarks at the Symposium on the Criminalization of Poverty at University of Michigan Law School*, 3 (Feb. 19, 2016), https://goo.gl/slF2m2, attached as Ex. II to West Decl. ("In certain pretrial detention systems around the country, bail practices end up penalizing defendants simply because they cannot afford to pay for their release.  Of course, sometimes we must use pretrial detention to protect the safety of our communities.  But bail or bond systems that fail to account for indigence can result in detention based on wealth, not on valid concerns such as public safety or securing defendants' appearance in court.").

[33] Letter from Brian E. Frosh, Maryland Attorney General, to the Honorable Alan M. Wilner, Chair, Standing Committee on R. of Prac. and Proc. 1-2 (Oct. 25, 2016), https://goo.gl/yXzN1N, attached as Ex. JJ to West Decl. (urging amendments to rules governing bail to "expressly clarify that where the judicial officer determines, based on all applicable criteria, that bail is the least onerous condition necessary to ensure the defendant's appearance or to protect public safety, that officer must conduct an individualized inquiry into the defendant's financial circumstances and may not set bail that exceeds the defendant's means for the purpose of detaining the defendant.").

> Those who can pay are released at a time of their choosing, regardless of any threat they may pose to public safety and regardless of any flight risk. Those who cannot pay must wait. This two-tiered system of pretrial justice does not serve the interests of the government or the public, and unfairly discriminates against the poor. It transforms money bail from its limited purpose in securing the appearance of the accused at trial into an all-purpose denial of liberty for the indigent. The Sheriff is required to enforce the State's law, and she will, unless and until it is unconstitutionally established in the courts. But she is not required to defend it, and she will not.

Answer to Pls.' Third Am. Compl. by Sheriff Vicki Hennessy, *Buffin v. Hennessey*, 4:15-cv-04959-YGR, Doc. 101 at 2 (Nov. 1, 2016).[34]

The judiciary and legal academy raised similar concerns over 50 years ago.[35] In 1965, Justice Arthur Goldberg raised concerns about the impact on poor people from a pretrial system that relied principally on money bail:

> If it is true that the quality of a nation's civilization can be largely measured by the methods it uses in the enforcement of its criminal law, then the American bail system as it now operates can no longer be tolerated. At best, it is a system of checkbook justice; at worst, a highly commercialized racket.
>
> [. . .]
>
> A basic defect of the present bail system is that it operates to the prejudice of the poor. Yet it is the central aim of our entire judicial system that, all people charged with crime must, so far as the law is concerned, stand on an equality before the bar of justice in every American court. The simple truth is that, despite this most basic concept that equal justice be afforded to the poor and to the rich alike, the bail system operates to discriminate on account of poverty.[36]

_____

[34] Attached as Ex. KK to West Decl.

[35] *See, e.g.*, Caleb Foote, *The Coming Constitutional Crisis in Bail: I*, 113 U. Pa. L. Rev. 959, 960 (1965), https://goo.gl/6o7Yeb, *attached as* Ex. LL to West Decl. ("[I]t has been established that pretrial imprisonment of the poor solely as a result of their poverty, under harsher conditions than those applied to convicted prisoners, so pervades our system that for a majority of defendants accused of anything more serious than petty crimes, the bail system operates effectively to deny rather than to facilitate liberty pending trial.").

[36] Hon. Arthur J. Goldberg, *Forward* to Ronald Goldfarb, *Ransom: A Critique of the American Bail System* ix (1965) (internal quotations omitted), attached as Ex. MM to West Decl.; *see also* President Lyndon B. Johnson, Remarks at the Signing of the Bail Reform Act of 1966 (June 22, 1966), The American Presidency Project https://goo.gl/g939CD, attached as Ex. NN to West Decl. ("The defendant with means can afford to pay bail. He can afford to buy his

Such is the system in Randolph County. Accordingly, this Court should find that the harm to the Plaintiff effectuated by this system outweighs any harm to Defendants.

## D.   AN INJUNCTION AND/OR TRO WOULD SERVE THE PUBLIC INTEREST.

The public interest weighs strongly in favor of Plaintiff and the putative Class. No harm to the public interest would result from issuing an injunction and/or TRO. Instead, the public interest strongly favors preventing constitutional deprivations. *See Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) ("[T]he district court did not abuse its discretion in finding that the injunction would not disserve the public interest because it will prevent constitutional deprivations."); *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *Cento Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013) ("Upholding constitutional rights surely serves the public interest."); *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").

Detaining indigent arrestees has significant negative consequences for the public interest. The evidence suggests that keeping indigent people in jail—even for a few days after an arrest— has terrible consequences. First, it is enormously expensive to house people in jail.[37] Second,

---

freedom. But the poorer defendant cannot pay the price. He languishes in jail weeks, months, and perhaps even years before trial. He does not stay in jail because he is guilty. He does not stay in jail because any sentence has passed. He does not stay in jail because he is any more likely to flee before trial. He stays in jail for one reason only—he stays in jail because he is poor.").

[37] *See* Christian Henrichson et al., Vera Inst. of Just., *The Price of Jails: Measuring the Taxpayer Cost of Local Incarceration* (May 2015), https://goo.gl/WofwLD, attached as Ex. OO to West Decl. (explaining that even the reported costs of approximately $50 to $570 per inmate per day in custody at local jails around the country was a significant underestimate of the cost to local jurisdictions of incarceration in local jails).

jailing the poor can devastate lives by disrupting stable employment and child custody arrangements.[38]  Third, even 48 hours in jail after an arrest leads to worse outcomes for all involved by increasing poverty, hurting an arrestee's family, and making it more likely that an arrestee will recidivate.[39]  All of these factors highlight that the public interest is furthered by pretrial release and by a system that grants all arrestees the freedom currently limited to those wealthy enough to purchase it.

## V. THE COURT SHOULD NOT REQUIRE PLAINTIFF TO POST A SECURITY.

The Court should issue injunctive relief without requiring Ms. Edwards to post security. Rule 65(c) permits security to protect the other party from any financial harm caused by a temporary injunction and/or TRO, but under this Circuit's "interpretation of Rule 65(c), the amount of security required by the rule is a matter within the discretion of the trial court," which "may elect to require no security at all." *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B Feb. 1981) (quotation and citation omitted).

Ms. Edwards is indigent, and her inability to post bond should not prevent her from obtaining a court order to protect her constitutional rights. Edwards Decl. ¶ 6; *see also Wayne Chem. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977) (affirming district court's order of no bond for indigent person); *Johnson v. Bd. of Police Comm'rs*, 351 F. Supp. 2d

---

[38]  *See, e.g.*, Nick Pinto, *The Bail Trap*, N.Y. Times, Aug. 13, 2015, https://nyti.ms/2k7367s, attached as Ex. SS to West Decl. (relating story of a women who lost custody of her daughter while incarcerated due to her inability to pay $1,500 money bail, and who was still attempting to regain custody of her child five months after release pretrial).

[39]  *See* Schnacke, *supra* note 11 at 12–15; *see also* Lowenkamp, *The Hidden Costs of Pretrial Detention, supra* note 15 at 3 (studying 153,407 defendants and finding "when held 2–3 days, low risk defendants are almost 40 percent more likely to commit new crimes before trial than equivalent defendants held no more than 24 hours"); Arnold Foundation, *Pretrial Criminal Justice Research Summary* 5 (Nov. 2013), https://goo.gl/Fcn5N0, attached as Ex. PP to West Decl. (finding "low-risk defendants held 2–3 days were 17 percent more likely to commit another crime within two years" and those detained "4–7 days yielded a 35 percent increase in re-offense rates.").

929, 952 (E.D. Mo. 2004) (requiring no bond for homeless plaintiffs).

Moreover, Ms. Edwards is "engaged in public-interest litigation, an area in which the courts have recognized an exception to the Rule 65 security requirement" because requiring security would deter others from exercising their constitutional rights. *City of Atlanta*, 636 F.2d at 1094.

Finally, as explained in detail in Section III.A., *supra*, Ms. Edwards is likely to succeed on the merits. The outcome of any trial, if necessary, is likely to reaffirm the well-established principle that a person may not be jailed on a monetary amount that she cannot afford. *See Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) ("no security was needed because of the strength of [Plaintiff's] case and the strong public interest involved").

## VI.    CONCLUSION

For the foregoing reasons, the balance of equities tips sharply in favor of issuing injunctive relief enjoining Sheriff Cofield from prospectively jailing arrestees unable to pay secured monetary bail without an individualized hearing with adequate procedural safeguards that include an inquiry into and findings concerning their ability to pay, the suitability of alternative non-financial conditions of release, and a finding on the record that any conditions of release are the least restrictive conditions necessary to achieve public safety and court appearance.

Dated: May 18, 2017.                    Respectfully submitted,

Samuel Brooke
*On behalf of Attorneys for Plaintiff*

Samuel Brooke (ASB-1172-L60B)
Micah West (ASB-1842-J82F)[‡]
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue

Montgomery, AL  36104
P: (334) 956-8200
F: (334) 956-8481
E: samuel.brooke@splcenter.org
E: micah.west@splcenter.org

Alec Karakatsanis (DC Bar No. 999294)*
Katherine Hubbard (Cal. Bar No. 302729)*
CIVIL RIGHTS CORPS
910 17th Street NW, Suite 500
Washington, DC  20006
P: (202) 930-3835
E: alec@civilrightscorps.org
E: katherine@civilrightscorps.org

Randall C. Marshall (ASB-3023-A56M)
ACLU FOUNDATION OF ALABAMA, INC.
P.O. Box 6179
Montgomery, AL  36106-0179
P: (334) 420-1741
E: rmarshall@aclualabama.org

Brandon Buskey (ASB-2753-A50B)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
CRIMINAL LAW REFORM PROJECT
125 Broad Street, 18th Floor
New York, NY  10004
P: (212) 549-2654
E: bbuskey@aclu.org

‡ *Admission pending*
\**Admission pro hac vice pending*
**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that arrangements have been made to, on this date, deliver a true and correct copy of the foregoing by hand delivery to the following at the below addresses:

David Cofield, Sheriff
Randolph County Sheriffs' Office
1 N Main Street
Wedowee, AL  36278

Hon. Jill Puckett, Magistrate
Randolph County District Court
1 N Main Street
Wedowee, AL  36278

Christopher May, Circuit Clerk
Randolph County Circuit Court
1 N Main Street
Wedowee, AL  36278

Hon. Clay Tinney, Judge
Randolph County District Court
1 N Main Street
Wedowee, AL  36278

Formal proof of service will be filed with the Court when completed.

I further certify that arrangements have been made to, on this date, deliver a true and correct courtesy copy of the foregoing by hand delivery and by electronic mail to the following:

James W. "Jim" Davis, Section Chief
Constitutional Defense Section
Office of the Attorney General
501 Washington Avenue
Montgomery, AL  36104
E: jimdavis@ago.state.al.us

Jamie H. Kidd
J. Randall McNeill
WEBB & ELEY, P.C.
P.O. Box 240909
Montgomery, AL  36124
E: jkidd@webbeley.com
E: rmcneill@webbeley.com

John Alvin Tinney
Randolph County Attorney
P.O. Box 1430
Roanoke, AL  36274-9121
E: johntinneyattorney@gmail.com

on this May 18, 2017.

Samuel Brooke