**EXHIBIT F**

**To Declaration of Micah West in Support of
Motion for Preliminary Injunction
& Motion for Class Certification**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

---

**CHRISTY DAWN VARDEN, et al.**

    **Plaintiffs,**

 v.

    Case No. 2:15-cv-34-MHT-WC

**THE CITY OF CLANTON,**

    (Class Action)

    **Defendant.**

---

## STATEMENT OF INTEREST OF THE UNITED STATES

Incarcerating individuals solely because of their inability to pay for their release, whether through the payment of fines, fees, or a cash bond, violates the Equal Protection Clause of the Fourteenth Amendment. *See Tate v. Short*, 401 U.S. 395, 398 (1971); *Williams v. Illinois*, 399 U.S. 235, 240-41 (1970); *Smith v. Bennett*, 365 U.S. 708, 709 (1961). In this case, Plaintiffs allege that they are subjected to an unlawful bail scheme in Clanton, Alabama. Under this scheme, Plaintiffs are allegedly required to pay a cash "bond" in a fixed dollar amount for each misdemeanor charge faced or else remain incarcerated. Without taking a position on the factual accuracy of Plaintiff's claims, the United States files this Statement of Interest to assist the Court in evaluating the constitutionality of Clanton's bail practices. It is the position of the United States that, as courts have long recognized, any bail or bond scheme that mandates payment of pre-fixed amounts for different offenses in order to gain pre-trial release, without any regard for indigence, not only violates the Fourteenth Amendment's Equal Protection Clause, but also constitutes bad public policy.

## INTEREST OF THE UNITED STATES

The United States has authority to file this Statement of Interest pursuant to 28 U.S.C § 517, which permits the Attorney General to attend to the interests of the United States in any case pending in a federal court. The United States can enforce the rights of the incarcerated pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997. The United States uses that statute to address unconstitutional conditions of confinement, many of which are caused by the overcrowding of prisons and jails.

The United States has a clear interest in ensuring that state and local criminal justice systems are fair, nondiscriminatory, and rest on a strong constitutional foundation.[1] Unfortunately, that is not always the case. As noted by Attorney General Eric Holder at the National Symposium on Pretrial Justice in 2011:

> As we speak, close to three quarters of a million people reside in America's jail system. . . . Across the country, nearly two thirds of all inmates who crowd our county jails—at an annual cost of roughly nine billion taxpayer dollars—are defendants awaiting trial. . . . Many of these individuals are nonviolent, non-felony offenders, charged with crimes ranging from petty theft to public drug use. And a disproportionate number of them are poor. They are forced to remain in custody—for an average of two weeks, and at a considerable expense to taxpayers—because they simply cannot afford to post the bail required . . . .[2]

For these reasons, the United States is taking an active role to provide guidance on the due process and equal protection issues facing indigent individuals charged with state and local crimes. For example, the United States filed Statements of Interest in *Wilbur v. City of Mount*

---

[1] ABA Standards for Criminal Justice, *Prosecution and Defense Function,* Standard 3-1.2(d) (1993) ("It is an important function of the prosecutor to seek to reform and improve the administration of criminal justice. When inadequacies or injustices in the substantive or procedural law come to the prosecutor's attention, he or she should stimulate efforts for remedial action." ).

[2] Eric Holder, Att'y Gen. of the United States, U.S. Dep't of Justice, Speech at the National Symposium on Pretrial Justice (June 1, 2011), *available at* http://www.justice.gov/opa/speech/attorney-general-eric-holder-speaks-national-symposium-pretrial-justice.

2

*Vernon* in 2013[3] and *Hurrell-Harring v. State of New York* in 2014.[4] Both cases involved the fundamental right to counsel for indigent criminal defendants and the role counsel plays in ensuring the fairness of our justice system.[5]

Accordingly, the United States files this Statement of Interest, reaffirming this country's commitment to the principles of fundamental fairness and to ensuring that "the scales of our legal system measure justice, not wealth."[6]

## BACKGROUND

It is long established that the American criminal justice system should not work differently for the indigent and the wealthy. Indeed, as early as 1956, the Supreme Court declared that "there can be no equal justice where the kind of trial a man gets depends on the amount of money he has." *Griffin v. Illinois*, 351 U.S. 12, 19 (1956). Twenty years later, the Fifth Circuit extended that precept to incarceration: "[t]o imprison an indigent when in the same circumstances an individual of financial means would remain free constitutes a denial of equal

---

[3] Statement of Interest of the United States, *Wilbur v. City of Mount Vernon*, Civ. Action No. 11-1100 (W.D. Wash., Aug. 8, 2013), *available at* http://www.justice.gov/crt/about/spl/documents/wilbursoi8-14-13.pdf.

[4] Statement of Interest of the United States, *Hurrell-Harring v. State of New York*, Case No. 8866-07 (N.Y. Sup. Ct., Sept. 25, 2014), *available at* http://www.justice.gov/crt/about/spl/documents/hurrell_soi_9-25-14.pdf.

[5] In both Statements of Interest, the United States did not take a position on the merits of the plaintiffs' claims. In *Wilbur*, the United States provided its expertise by recommending that if the court found for the plaintiffs, it should ensure that public defender counsel have realistic workloads, sufficient resources, and are carrying out the hallmarks of minimally effective representation. In *Hurrell-Harring*, the United States provided an informed analysis of existing case law to synthesize the legal standard for constructive denial of counsel.

[6] Robert F. Kennedy, Att'y Gen. of the United States, U.S. Dep't of Justice, Address to the Criminal Law Section of the American Bar Association (Aug. 10, 1964), *available at* http://www.justice.gov/ag/rfkspeeches/1964/08-10-1964.pdf; *see also* Eric Holder, Att'y Gen. of the United States, U.S. Dep't of Justice, Speech at the National Association of Criminal Defense Lawyers 57th Annual Meeting (Aug. 1, 2014), *available at* http://www.justice.gov/iso/opa/ag/speeches/2014/ag-speech-140801.html (quoting Attorney General Robert F. Kennedy).

3

protection of the laws." *Barnett v. Hopper*, 548 F.2d 550, 554 (5th Cir. 1977)[7], *vacated as moot*, 439 U.S. 1041 (1978). Under the clear precedent of this Circuit, "imprisonment solely because of indigent status is invidious discrimination and not constitutionally permissible." *Pugh v. Rainwater*, 572 F.2d 1053, 1056 (5th Cir. 1978) (en banc).

The sweeping reforms to the federal bail system during the 1960s were based on these same constitutional principles—that access to justice should not be predicated on financial means. In 1962, Attorney General Robert F. Kennedy called for wide-scale bail reform, noting that "[i]f justice is priced in the market place, individual liberty will be curtailed and respect for law diminished."[8] In 1964, Attorney General Kennedy convened a National Conference on Bail and Criminal Justice with the express purpose of understanding and improving both the federal and state bail systems.[9] During his closing remarks at the conference, Attorney General Kennedy declared:

> [U]sually only one factor determines whether a defendant stays in jail before he comes to trial. That factor is not guilt or innocence. It is not the nature of the crime. It is not the character of the defendant. That factor is, simply, money. How much money does the defendant have?[10]

At the time, federal courts routinely employed cash bail schemes similar to the one alleged in this case: bail amounts were based on the charges for which defendants were arrested, and

---

[7] The Eleventh Circuit has adopted as precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

[8] Robert F. Kennedy, Att'y Gen. of the United States, U.S. Dep't of Justice, Address to the American Bar Association (Aug. 6, 1962), *available at* http://www.justice.gov/sites/default/files/ag/legacy/2011/01/20/08-06-1962%20Pro.pdf.

[9] Robert F. Kennedy, Att'y Gen. of the United States, U.S. Dep't of Justice, Welcome Address to the National Conference on Bail and Criminal Justice (May 27, 1964), *available at* http://www.justice.gov/sites/default/files/ag/legacy/2011/01/20/05-27-1964.pdf.

[10] National Criminal Justice Reference Service, *Proceedings and Interim Report from the National Conference on Bail and Criminal Justice* 297 (1965), *available at* https://www.ncjrs.gov/pdffiles1/Photocopy/355NCJRS.pdf.

4

judicial officers routinely set cash bail amounts that some defendants simply could not afford to pay.

Attorney General Kennedy's conference on bail reform sparked wide-scale changes to the federal pre-trial detention and bail system. Testifying before the Senate Judiciary Committee while bail reform legislation was under consideration, Attorney General Kennedy articulated the Department's growing concern that "the rich man and the poor man do not receive equal justice in our courts. And in no area is this more evident than in the matter of bail."[11] The main reason for this disparity, according to Attorney General Kennedy, was that the federal bail-setting process was "unrealistic and often arbitrary." Bail was set "without regard to a defendant's character, family ties, community roots or financial status." Instead, bail was frequently set based on the nature of the crime alone.[12]

Today, federal law expressly forbids that practice with a single sentence: "The judicial officer may not impose a financial condition that results in the pretrial detention of the person."[13] This concise but profound change was initiated as part of the Bail Reform Act of 1966, which marked a significant departure from past practices. The stated purpose of the Act was "to revise the practices relating to bail to assure that all persons, regardless of their financial status, shall not needlessly be detained pending their appearance to answer charges, to testify, or pending appeal, when detention serves neither the ends of justice nor the public interest."[14]

---

[11] *See Hearings on S. 2838, S. 2839, & S. 2840 Before the Subcomm. on Constitutional Rights and Subcomm. on Improvements in Judicial Machinery of the S. Comm. on the Judiciary*, 88th Cong. (1964) (Testimony by Robert F. Kennedy, Att'y Gen. of the United States, U.S. Dep't of Justice), *available at* http://www.justice.gov/sites/default/files/ag/legacy/2011/01/20/08-04-1964.pdf.

[12] *Id.*

[13] 18 U.S.C. § 3142(c)(2).

[14] Bail Reform Act of 1966, Pub. L. No. 89-465, § 2, 80 Stat. 214 (1966). *See also Allen v. United States*, 386 F.2d 634, 637 (D.C. Cir. 1967) (Bazelon, J., dissenting) ("It plainly appears from the language and

5

The Bail Reform Act requires federal judges and magistrates to conduct an individualized analysis of each defendant prior to ordering pretrial detention.[15] The individualized analysis requires consideration of factors such as ties to the community, employment, and prior record and precludes fixing bail based solely on the charge.[16] In weighing these factors, judges are to consider 1) the extent to which pre-trial release will endanger the safety of those in the community, and 2) what is necessary to reasonably assure that the defendant will return to court when necessary—*i.e.*, that the defendant will not flee or otherwise attempt to avoid justice.[17]

Federal judges must also consider a wide range of "conditions" to be placed upon a defendant's pre-trial release that could alleviate these concerns. These conditions include regular community reporting, establishing curfews, abstaining from drug or alcohol use, and various types of community supervision.[18] Financial conditions, including money bonds, can be among these measures and, in appropriate cases where an accused might be a flight risk, financial conditions can provide strong incentives to return to court. But the imposition of financial conditions can only be made after an individualized assessment of the particular defendant. And, importantly, the Bail Reform Act expressly precludes any federal judge or magistrate from

---

history of the Bail Reform Act that its central purpose was to prevent pretrial detention because of indigency.") (citations omitted).

[15] Federal judges must make these determinations during or following detention hearings in open court, in which defendants facing pre-trial detention are represented by counsel, either appointed or retained. 18 U.S.C. § 3142(f).

[16] The Comprehensive Crime Control Act of 1984, signed into law by President Ronald Reagan, modified several sections of the 1966 Act, but made even more explicit the requirement of an individualized determination and the prohibition against cash bail for those who could not pay.

[17] *See generally*, 18 U.S.C. § 3142(b)-(d) (outlining factors the courts must consider in determining whether or not to hold a defendant over until trial, or release him or her on his or her own recognizance or pursuant to conditions).

[18] 18 U.S.C. § 3142(c)(1)(B).

imposing money bail that an accused person cannot afford to pay and would therefore result in that person's pretrial detention.[19]

If the judge determines that no amount of conditions can reasonably secure the safety of the community and the return of the defendant, the judge may order pretrial detention. In doing so, the judge must provide a written statement of facts and the reasons for detention via a "detention order."[20] Reasons for or against pretrial detention include the nature and circumstances of the defendant's charges, the weight of the evidence against the defendant, the defendant's history and character (including family and community ties and employment), and the dangerousness or risk of flight that the defendant may pose if released.[21]

Essentially, the Bail Reform Act's provisions ensure that pretrial detention is based on an objective evaluation of dangerousness and risk of flight, rather than ability to pay. Previous critics of bail reform suggested that the Act would "create a nation of fugitives,"[22] but the Department has not found that to be the case. To the contrary, the Department has found that judicial officers are well suited to make fair, individualized determinations about the risks, if any, of releasing a particular defendant pending his or her next court date and that they are able to do so efficiently with the assistance of an able pretrial services staff and the input of both the prosecutor and defense counsel. Individualized determination and the basic elements of due

---

[19] 18 U.S.C. § 3142(c)(2) ("The judicial officer may not impose a financial condition that results in the pretrial detention of the person.").

[20] 18 U.S.C. § 3142(i)(1).

[21] 18 U.S.C. § 3142(g).

[22] *Hearings on S. 2838, S. 2839, & S. 2840 Before the Subcomm. on Constitutional Rights and Subcomm. on Improvements in Judicial Machinery of the S. Comm. on the Judiciary*, 88th Cong. (1964) (Testimony by George L. Will, Executive Director of the American Society of Professional Bail Bondsmen).

7

process help ensure that federal defendants are not detained unnecessarily or simply because they are poor.

## DISCUSSION

Plaintiffs in this case seek declaratory, injunctive and compensatory relief, alleging that the mandatory imposition of a bail schedule that sets bail at a fixed amount per charge violates due process and equal protection. If Clanton's bail system indeed fixes bond amounts based solely on the arrest charge, and does not take individual circumstances into account, the Court should find this system to be unconstitutional. Not only are such schemes offensive to equal protection principles, they also constitute bad public policy.

### I. Fixed-sum Bail Systems are Unconstitutional under the Equal Protection Clause of the Fourteenth Amendment

In general, the Equal Protection Clause of the Fourteenth Amendment prohibits "punishing a person for his poverty." *Bearden v. Georgia*, 461 U.S. 660, 671 (1983). This is especially true when it comes to depriving a person of his liberty. The Supreme Court has considered a variety of contexts in which the government attempted to incarcerate or continue incarceration of an individual because of his or her inability to pay a fine or fee, and in each context, the Court has held that indigency cannot be a barrier to freedom. *Tate*, 401 U.S. at 398; *Williams*, 399 U.S. at 240-41; *Smith*, 365 U.S. at 709.

Although much of the Court's jurisprudence in this area concerns sentencing or early release schemes, the Court's Fourteenth Amendment analysis applies in equal, if not greater force to individuals who are detained until trial because of inability to pay fixed-sum bail amounts. Liberty is particularly salient for defendants awaiting trial, who have not been found guilty of any crime. *See United States v. Salerno*, 481 U.S. 739, 750 (1987) (recognizing the fundamental nature of the right to pretrial liberty). To be sure, pretrial detention may be

8

necessary in some circumstances including if a court finds a likelihood of future danger to society or that the defendant poses a flight risk. Fixed-sum bail systems, however, such as the one allegedly used in Clanton, Alabama, do not take these considerations into account. Such systems are based solely on the criminal charge. Because such systems do not account for individual circumstances of the accused, they essentially mandate pretrial detention for anyone who is too poor to pay the predetermined fee. This amounts to mandating pretrial detention only for the indigent.

The Fifth Circuit briefly discussed fixed-sum bail systems, otherwise referred to as "bail schedules," in *Pugh v. Rainwater*, 572 F.2d 1053 (5th Cir. 1978) (en banc). There, the Court held that the new bail scheme passed by the Florida legislature was not constitutionally deficient simply because it failed to articulate a presumption against imposing cash bail. The *en banc* court noted that Florida's new system allowed for six different types of pretrial release—cash bail was but one option of many. Importantly, however, the Court pointed out that the utilization of bond schedules, and only bond schedules, creates an injustice for individuals who cannot meet the financial threshold:

> Utilization of a master bond schedule provides speedy and convenient release for those who have no difficulty in meeting its requirements. The incarceration of those who cannot, without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements.

*Pugh*, 572 F.2d at 1057.

As correctly noted in Plaintiff's Motion for Temporary Restraining Order or in the Alternative Motion for Preliminary Injunction (ECF No. 34), courts in this Circuit have had occasion to address scenarios analogous to those alleged here. For example, in *Frazier v. Jordan*, 457 F.2d 726, 728 (5th Cir. 1972), the Fifth Circuit invalidated a sentencing scheme that offered defendants the choice of immediately paying a $17 fine or serving a 13-day jail sentence as

9

applied to indigent defendants who could not pay the fine. As the Court noted, "[t]he alternative fine before us creates two disparately treated classes: those who can satisfy a fine immediately upon its levy, and those who can pay only over a period of time, if then. Those with means avoid imprisonment; the indigent cannot escape imprisonment." *Id.*

Similarly, in *Tucker v. City of Montgomery*, 410 F. Supp. 494 (M.D. Ala. 1976), this Court held that the City's practice of charging a bond to exercise appellate rights denied the equal protection of the law to indigent prisoners. In so holding, the court found that "[t]he imposition by the State of financial barriers restricting the availability of appellate review for indigent criminal defendants has no place in our heritage of Equal Justice Under Law." *Id.* at 502 (quoting *Burns v. Ohio*, 360 U.S. 252, 258 (1959)).

Finally, this Court's recent decision in *United States v. Flowers*, 946 F. Supp. 2d 1295 (M.D. Ala. 2013), addressed practices analytically indistinguishable from those practices Plaintiffs allege are occurring in Clanton. In *Flowers*, the defendant could avoid prison only if she paid for her home confinement, an option her poverty prevented. This Court noted correctly that "it is inequitable for indigent defendants who cannot pay for home-confinement monitoring to be imprisoned while those who can pay to be subject to the more limited monitored home confinement avoid prison." *Id.* at 1302. If Plaintiffs' allegations in this case are true, indigent defendants in Clanton face a similar problem—pay a monetary bond they cannot afford or go to jail. This determination, like the sentence in *Flowers*, would be "constitutionally infirm and [unable to] stand." *Id.* at 1300.

## II. Public Policy Weighs Strongly Against Fixed Bail Systems

In addition to being unconstitutional, fixed-bail systems that do not account for a defendant's indigency are an inadequate means of securing the safety of the public or ensuring

10

the return of the defendant to the court – the central rationales underlying pretrial detention. Indeed, such schemes are driven by financial considerations, rather than legitimate public safety concerns. This is bad public policy, and results in negative outcomes for both defendants and the community at large.

The problems with bail systems based on financial considerations are well-documented.[23] As summarized in a recent Department of Justice publication: "The two central issues concerning money bail are: (1) its tendency to cause unnecessary incarceration of defendants who cannot afford to pay secured financial conditions either immediately or even after some period of time; and (2) its tendency to allow for, and sometimes foster, the release of high-risk defendants, who should more appropriately be detained without bail."[24]

When bail amounts are too high for indigent individuals to afford, fewer defendants will be released pretrial,[25] thereby creating a burden on local jails.[26] Today, according to a Bureau of Justice Statistics analysis, more than 60 percent of all jail inmates nationwide are in custody awaiting an adjudication of their charges, and the majority of these pretrial detainees are charged

---

[23] *See*, *e.g.*, Timothy R. Schnacke, United States Department of Justice, National Institute of Corrections, *Fundamentals of Bail: A Resource Guide for Pretrial Practitioners and a Framework for American Pretrial Reform* (2014), *available at* http://www.pretrial.org/download/research/Fundamentals%20of%20Bail%20-%20NIC%202014.pdf.

[24] *Id.* at 15.

[25] Thomas H. Cohen & Brian A. Reaves, United States Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Pretrial Release of Felony Defendants in State Courts: State Court Processing Statistics, 1990-2004*, *Special Report*, NCJ 214994 (2007) (study of state courts in the 75 largest counties from 1990 to 2004, finding that about 7 of 10 defendants secured release when bail was set at less than $5,000, but only 1 in 10 secured release when bail was set at $10,000 or more), *available at* http://www.bjs.gov/content/pub/pdf/prfdsc.pdf.

[26] *See generally* Ram Subramaniam, et al., Vera Institute of Justice, *Incarceration's Front Door: The Misuse of Jails in America* 29-35 (Feb. 2015), *available at* http://vera.org/pubs/incarcerations-front-door-misuse-jails-america.

11

with nonviolent offenses.[27] Jail overcrowding, in turn, can result in significant security and life and safety risks for both inmates and staff.[28]

While there is a need for continued quantitative research on the effects of pretrial detention, it is clear that the decision to release or detain a defendant pretrial has many collateral consequences beyond the loss of liberty. As detailed by the Supreme Court:

> The time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness. Most jails offer little or no recreational or rehabilitative programs. The time spent in jail is simply dead time. . . Imposing those consequences on anyone who has not yet been convicted is serious. It is especially unfortunate to impose them on those persons who are ultimately found to be innocent.

*Barker v. Wingo*, 407 U.S. 514, 532-33 (1972). Incarceration carries weighty mental and social burdens for the accused and for those closest to them. Family obligations may go unmet while defendants are detained, and jobs may be lost, both of which can cause irreparable harm to the defendant, their families, and their communities.

In addition, for many reasons, the judicial decision to detain or release the accused pretrial may be a critical factor affecting the outcome of a case.[29] Pretrial detention can impede

---

[27] Todd D. Minton, United States Department of Justice, Bureau of Justice Statistics, *Jail Inmates at Midyear 2012 – Statistical Tables*, NCJ 241264, at 1 (2013) *available at* www.bjs.gov/content/pub/pdf/jim12st.pdf (showing that the percentage of pretrial detainees in jail has remained unchanged since 2005)*; see also* Donna Lyons, *Predicting Pretrial Success,* State Legislatures, February 2014 at 18-19, *available at* http://www.ncsl.org/Portals/1/Documents/magazine/articles/2014/SLG_0214_Pretrial_1.pdf; Arthur W. Pepin, Conference of State Court Administrators, *Policy Paper: Evidence-Based Pretrial Release* (2014), *available at* http://www.colorado.gov/ccjjdir/Resources/Resources/Ref/EBPre-TrialRelease_2012.pdf.

[28] *See generally Brown v. Plata*, 131 S. Ct. 1910 (2011) (overcrowding in California prisons created unconstitutional conditions of confinement, including inadequate medical and mental health care); *see also Hutto v. Finney*, 437 U.S. 678, 688 (1978) (upholding 30-day limit on confinement in isolation, noting that overcrowding in the isolation unit contributed to violence and vandalism of cells).

[29] Mary T. Phillips, New York City Criminal Justice Agency, Inc., *Pretrial Detention and Case Outcomes, Part 1: Nonfelony Cases* (2007), *available at* http://www.nycja.org/lwdcms/doc-view.php?module=reports&module_id=669&doc_name=doc.

12

the preparation of a defense, such as gathering evidence and interviewing witnesses, and pretrial detention can make it more difficult to confer with an attorney.[30] Research indicates that these barriers have practical consequences: defendants who are detained pretrial have less favorable outcomes than those who are not detained, notwithstanding other relevant factors such as the charges they face or their criminal history. One contributing factor is that detained defendants are more likely to plead guilty, if only to secure release, possibly resulting in at least some wrongful convictions.[31] In some instances, the time someone is detained pretrial can even exceed the likely sentence if the defendant were later found guilty.[32]

For these reasons, many states have moved away from bail systems that are based entirely on the criminal charge and towards systems that allow for different pretrial release options based on individualized determinations of dangerousness or risk of flight.[33] The

---

[30] Andrew D. Leipold, *How the Pretrial Process Contributes to Wrongful Convictions*, 42 Am. Crim. L. Rev. 1123, 1165 (2005); *see also Barker*, 407 U.S. at 532-33 (noting that a defendant detained pretrial "is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense.").

[31] *Id. See also* Mary T. Phillips, New York City Criminal Justice Agency, Inc., *Bail, Detention, and Felony Case Outcomes*, *Research Brief No. 18* (2008), available at http://www.nycja.org/lwdcms/doc-view.php?module=reports&module_id=597&doc_name=doc; *Barker*, 407 U.S. at 533, n.35.

[32] *See* Stephanos Bibas, *Plea Bargaining Outside the Shadow of Trial*, 117 Harv. L. Rev. 2463, 2492 (2004).

[33] States employ a variety of bail systems that satisfy constitutional concerns. The federal model, while constitutionally sufficient, is not the only adequate scheme. *See* Arizona (AR.S. Crim. Proc. Rule 7.2); Arkansas (Arkansas Rules of Criminal Procedure, Rule 9.2); Connecticut (C.G.S.A § 54-63b(b)); Illinois (725 ILCS 5/110-2); Maine (15 M.R.S.A §§ 1002, 1006); Massachusetts (MGL Ch. 276, § 58); Michigan (M.C.L.A 780.62-for misdemeanors only); Minnesota (49 M.S.A, Rules Crim. Proc. § 6.02(1)); Missouri (Missouri Supreme Court Rule 33.01); Montana (MCA 46-9-108 (2)); Nebraska (Neb. Rev. Stat. § 29-901); New Mexico (NMRA, Rule 5-401(D)(2)); North Carolina (N.C.G.S.A. § 15A-534(b)); North Dakota (N.D.R. Crim. P. 46); Oregon (ORS 135.245(3)); Rhode Island (RI ST § 12-13-1.3(e)); South Carolina (S.C. Code § 17-15-10—for non-capital cases only); South Dakota(SDCL § 23A-43-2—for non-capital cases only); Tennessee (T. C. A § 40-11-116(a)); Vermont (13 V.S.A § 7554—for misdemeanors only); Washington (WA ST SUPER CT CR CrR 3.2(b)—for non-capital cases only); Wisconsin (W.S.A 969.01(4)); Wyoming (WY RCRP Rule 46.1(c)(1)(B)—for non-capital cases only). *See generally* Cynthia E. Jones, *"Give Us Free:" Addressing Racial Disparities in Bail Determinants*, 16 N.Y.U. J. Leg. & Pub. Pol'y 919, 930 (2013).

13

American Bar Association's *Standards for Criminal Justice* have also evolved to reflect the importance of the presumption of pretrial release and the need for individualized determinations before imposing pretrial detention. The Standards advocate for the imposition of the least restrictive of release conditions necessary to ensure the defendant's appearance in court. The Standards also include guidelines to limit the use of financial conditions for pretrial release.[34]

The use of a more dynamic bail scheme, such as that set forth in the federal Bail Reform Act, not only ensures adherence to constitutional principles of due process and equal protection, but constitutes better public policy. Individualized determinations, rather than fixed-sum schemes that unfairly target the poor, are vital to preventing jail overcrowding, avoiding the costs attendant to incarceration,[35] and providing equal justice for all. Consequently, in light of the potential harmful consequences of prolonged confinement and the strain that unnecessary confinement puts on jail conditions, the United States urges that pretrial detention be used only when necessary, as determined by an appropriate individualized determination.

## CONCLUSION

Fundamental and long-standing principles of equal protection squarely prohibit bail schemes based solely on the ability to pay. Fixed-sum bail schemes do not meet these mandates. By using a predetermined schedule for bail amounts based solely on the charges a defendant faces, these schemes do not properly account for other important factors, such as the defendant's potential dangerousness or risk of flight. For these reasons, if the bail system in Clanton is as Plaintiff describes, the system should not stand.

---

[34] ABA Standards for Criminal Justice, *Pretrial Release*, Standard 10-1.4 (3d ed. 2007).

[35] As noted by the Supreme Court, pretrial detention not only adversely impacts defendants – it also creates significant costs for taxpayers. *See Tate*, 401 U.S. at 399 (prolonged pretrial detention "saddles the State with the cost of feeding and housing [the defendant] for the period of his imprisonment.").

Respectfully submitted,

VANITA GUPTA
Acting Assistant Attorney General
Civil Rights Division
United States Department of Justice

MARK KAPPELHOFF
Deputy Assistant Attorney General
Civil Rights Division

JONATHAN M. SMITH (DC 396578)
Chief
Civil Rights Division
Special Litigation Section

GEORGE L. BECK, JR.
United States Attorney
Middle District of Alabama

Of Counsel:
Lisa Foster (CA 122178)
Director
Access to Justice Initiative
Telephone: (202) 514-7073
lisa.foster3@usdoj.gov

/s/ Winsome G. Gayle
WINSOME G. GAYLE (DC 479887)
Special Litigation Counsel
Civil Rights Division
Special Litigation Section
Winsome.Gayle@usdoj.gov

Jennifer Katzman (NY 4388898)
Senior Counsel
Access to Justice
Telephone: (202) 514-7086
jenni.katzman@usdoj.gov

/s/ Paul Killebrew
PAUL KILLEBREW (LA 32176)
Paul.Killebrew@usdoj.gov

/s/ Sharon Brett
SHARON BRETT (NY 5090279)
Trial Attorneys
Civil Rights Division
Special Litigation Section
Sharon.Brett@usdoj.gov

Robert B. Bullock (CA 219942)
Senior Counsel
Access to Justice
Telephone: (202) 514-5324
bob.bullock@usdoj.gov

Andrew Stanner (DC 979839)
Senior Counsel
Access to Justice
Telephone: (202) 353-9024
andrew.stanner@usdoj.gov

15

                            /s/Robert G. Anderson
                            ROBERT G. ANDERSON (MSB 1589)
                            Assistant United States Attorney
                            131 Clayton Street
                            Montgomery, AL 36104
                            (334) 223-7280
                            Robert.Anderson@usdoj.gov

                            *Attorneys for the United States of America*

_____

## CERTIFICATE OF SERVICE

      I hereby certify that on February 13, 2015, a copy of the foregoing Statement of Interest was filed electronically. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

                            /s/ Robert G. Anderson
                            Assistant United States Attorney