**EXHIBIT G**

**To Declaration of Micah West in Support of
Motion for Preliminary Injunction
& Motion for Class Certification**

No. 16-10521-HH

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

MAURICE WALKER, on behalf of himself
and others similarly situated,

Plaintiff-Appellee

v.

CITY OF CALHOUN, GEORGIA,

Defendant-Appellant
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
_____

BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE*
SUPPORTING PLAINTIFF-APPELLEE AND URGING AFFIRMANCE
ON THE ISSUE ADDRESSED HEREIN
_____

JOHN A. HORN
  United States Attorney
    Northern District of Georgia

LISA FOSTER
  Director, Office for Access to Justice

VANITA GUPTA
  Principal Deputy Assistant
    Attorney General

TOVAH R. CALDERON
CHRISTINE H. KU
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 353-9044

Case No. 16-10521-HH

*Maurice Walker* v. *City of Calhoun, Georgia*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, *Amicus Curiae* United States certifies that, in addition to the persons and entities identified in the briefs of defendant-appellant, plaintiff-appellee, and all of the *amici curiae*, the following persons may have an interest in the outcome of this case:

1.　Calderon, Tovah R., United States Department of Justice, Civil Rights Division, counsel for *amicus curiae* United States;

2.　Foster, Lisa, United States Department of Justice, Office for Access to Justice, counsel for *amicus curiae* United States;

3.　Gupta, Vanita, United States Department of Justice, Civil Rights Division, counsel for *amicus curiae* United States;

4.　Horn, John A., United States Attorney, Northern District of Georgia, counsel for *amicus curiae* United States;

5.　Ku, Christine H., United States Department of Justice, Civil Rights Division, counsel for *amicus curiae* United States.


s/ Christine H. Ku
CHRISTINE H. KU
Attorney


Date: August 18, 2016

C1 of 1

## TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT

INTEREST OF THE UNITED STATES ...................................................................1

STATEMENT OF THE ISSUE ...............................................................................4

STATEMENT OF THE CASE ................................................................................4

     1.   *Overview Of Bail In The United States* ...................................................4

     2.   *Relevant Facts And Procedural History* ...............................................8

SUMMARY OF THE ARGUMENT .....................................................................12

ARGUMENT

     A BAIL PRACTICE VIOLATES THE FOURTEENTH
     AMENDMENT IF, WITHOUT CONSIDERATION OF
     ABILITY TO PAY AND ALTERNATIVE METHODS OF
     ASSURING APPEARANCE AT TRIAL, IT RESULTS IN
     THE PRETRIAL DETENTION OF INDIGENT DEFENDANTS ..............13

          A.   *The Fourteenth Amendment Prohibits Incarcerating*
               *Individuals Without Meaningful Consideration Of*
               *Indigence And Alternative Methods Of Achieving A*
               *Legitimate Government Interest* ...............................................13

          B.   *Bail Systems That Keep Indigent Defendants In Jail*
               *Solely Because They Cannot Pay Bail Result In*
               *Unnecessary Pretrial Detention And Impede The*
               *Fair Administration Of Justice* ...............................................21

CONCLUSION ....................................................................................................24

**TABLE OF CONTENTS (continued):**

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF CITATIONS

**CASES:**                                              **PAGE**

*Allen* v. *United States*, 386 F.2d 634 (D.C. Cir. 1967)................................7

*Barker* v. *Wingo*, 407 U.S. 514 (1972) ............................................ 22-23

*Barnett* v. *Hopper*, 548 F.2d 550 (5th Cir. 1977)
      vacated as moot, 439 U.S. 1041 (1978)........................................16

*\*Bearden* v. *Georgia*, 461 U.S. 660 (1983).....................................12, 16-17, 20-21

*Bonner* v. *City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc) .................19

*\*Griffin* v. *Illinois*, 351 U.S. 12 (1956) ............................................ 12-15

*Hudson* v. *Parker*, 156 U.S. 277 (1895) ....................................................22

*M.L.B.* v. *S.L.J.*, 519 U.S. 102 (1996)........................................................20

*Pierce* v. *City of Velda City*, No. 4:15-cv-570,
      2015 WL 10013006 (E.D. Mo. June 3, 2015) ..................................8

*\*Pugh* v. *Rainwater*, 572 F.2d 1053 (5th Cir. 1978) (en banc) ............. 5, 13, 19, 22

*Smith* v. *Bennett*, 365 U.S. 708 (1961) ....................................................14

*Snow* v. *Lambert*, No. 3:15-cv-567 (M.D. La. Sept. 3, 2015) ...................................8

*\*Tate* v. *Short,* 401 U.S. 395 (1971) .................................................. 16, 19

*United States* v. *City of Ferguson*,
      No. 4:16-cv-180 (E.D. Mo. Apr. 19, 2016)..................................2, 8

*United States* v. *Salerno*, 481 U.S. 739 (1987)..........................................4-5, 17-18

*Varden* v. *City of Clanton*, No. 2:15-cv-34,
      2015 WL 5387219 (M.D. Ala. Sept. 14, 2015).................................. 3, 8, 19

**CASES (continued):**                                                                    **PAGE**

*Washington* v. *Davis*, 426 U.S. 229 (1976) ............................................................20

\*Williams v. Illinois, 399 U.S. 235 (1970) ....................................................... 15-16

**STATUTES:**

Civil Rights of Institutionalized Persons Act (CRIPA),
    42 U.S.C. 1997 *et seq.* .....................................................................................2

18 U.S.C. 3142(c)(2) .....................................................................................................7

18 U.S.C. 3142(g) .........................................................................................................7

42 U.S.C. 1983 ............................................................................................................10

42 U.S.C. 14141 ............................................................................................................2

Bail Reform Act of 1966, Pub. L. No. 89-465, 80 Stat. 214 ................................. 6-7

Ga. Code Ann. § 17-6-1(b)(1) (West 2014) ..............................................................9

**LEGISLATIVE HISTORY:**

H.R. Rep. No. 98-1121, 98th Cong., 2d Sess. 12 (1984) ...........................................7

**MISCELLANEOUS:**

Andrew D. Leipold, *How the Pretrial Process Contributes to Wrongful
    Convictions*, 42 Am. Crim. L. Rev. 1123 (2005) ..........................................22

ABA Standards for Criminal Justice:  Pretrial Release (3d ed. 2007),
    available at http://www.americanbar.org/publications/criminal_
    justice_section_archive/crimjust_standards_pretrialrelease_
    blk.html#10-1.1..........................................................................................5, 23

**MISCELLANEOUS (continued):**                                    **PAGE**

*Attorney General Loretta E. Lynch Delivers Remarks at White House*
    *Convening on Incarceration and Poverty* (Dec. 3, 2015), available at
    https://www.justice.gov/opa/speech/attorney-general-loretta-e-lynch-
    delivers-remarks-white-house-convening-incarceration-and.....................2-3

Department of Justice, *Address by Attorney General Robert F. Kennedy*,
    *American Bar Association House of Delegates* (Aug. 6, 1962), available at
    http://www.justice.gov/sites/default/files/ag/legacy/2011/01/20/
    08-06-1962%20Pro.pdf .................................................................6

*Justice Department Announces Resources to Assist State and Local*
    *Reform of Fine and Fee Practices* (Mar. 14, 2016), available at
    https://www.justice.gov/opa/pr/justice-department-announces-
    resources-assist-state-and-local-reform-fine-and-fee-practices .....................3

Letter from Vanita Gupta, Principal Deputy Assistant Attorney General,
    Civil Rights Div., Dep't of Justice, and Lisa Foster, Director,
    Office for Access to Justice, to Colleagues (Mar. 14, 2016),
    available at https://www.justice.gov/crt/file/832461/download.....................4

Mary T. Phillips, New York City Criminal Justice Agency, Inc.,
    *Bail, Detention, and Felony Case Outcomes*, *Research Brief*
    *No. 18* (2008), available at http://www.nycja.org/lwdcms/doc-
    view.php?module=reports&module_id=597&doc_name=doc................... 22

Open Society Justice Initiative, *The Socioeconomic Impact of*
    *Pretrial Detention* (2001), available at http://www.pretrial.org/
    download/research/OSI%20Socioeconomic%20Impact%
    20Pretrial%20Detention%202011.pdf...........................................23

Ram Subramaniam, *et al*., Vera Institute of Justice, *Incarceration's Front*
    *Door: The Misuse of Jails in America* (updated July 29, 2015),
    available at http://archive.vera.org/sites/default/files/
    resources/downloads/incarcerations-front-door-report_02.pdf...................7-8

**MISCELLANEOUS (continued):**                                    **PAGE**

Richard Williams, *Bail or Jail*, State Legislatures (May 2012),
    available at http://www.ncsl.org/research/civil-and-criminal-
    justice/bail-or-jail.aspx ...................................................................21

Stephanos Bibas, *Plea Bargaining Outside the Shadow of Trial*,
    117 Harv. L. Rev. 2463 (2004).....................................................22

*Testimony by Attorney General Robert F. Kennedy on Bail Legislation*
    *Before the Subcomms. on Constitutional Rights and Improvements*
    *in Judicial Machinery of the S. Judiciary Comm.* (Aug. 4, 1964) (*Testimony*
    *by RFK*), available at http://www.justice.gov/sites/default
    /files/ag/legacy/2011/01/20/08-04-1964.pdf. ..................................6

Todd D. Minton & Zhen Zeng, United States Department of Justice,
    Bureau of Justice Statistics, *Jail Inmates at Midyear 2014*,
    NCJ 248629 (2015), available at http://www.bjs.gov/content/pub/
    pdf/jim14.pdf ...............................................................................21

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

No. 16-10521-HH

MAURICE WALKER, on behalf of himself
and others similarly situated,

Plaintiff-Appellee

v.

CITY OF CALHOUN, GEORGIA,

Defendant-Appellant
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
_____

BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE*
SUPPORTING PLAINTIFF-APPELLEE AND URGING AFFIRMANCE
ON THE ISSUE ADDRESSED HEREIN
_____

## INTEREST OF THE UNITED STATES

The United States has a strong interest in ensuring that criminal justice

systems, including bail practices within those systems, are fair and

nondiscriminatory.  In March 2010, the Department of Justice (Department or

DOJ) established the Office for Access to Justice, whose mission is to help

criminal and civil justice systems efficiently deliver fair and accessible outcomes,

irrespective of wealth and status.  The Department also has authority to investigate

- 2 -

unlawful criminal justice practices, including the problematic use of fines and fees and bond procedures. See, *e.g.*, Consent Decree at 1-2, 83, 86-87 (Doc. 41), *United States* v. *City of Ferguson*, No. 4:16-cv-180 (E.D. Mo. Apr. 19, 2016) (consent decree effectuated pursuant to the Department's authority under 42 U.S.C. 14141). By encouraging practices that avoid unnecessary and excessive incarceration, the Department strives to reduce the risk of unconstitutional conditions of confinement, which the Attorney General is authorized to address under the Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C. 1997 *et seq.*

In the context of bail, the Department has promoted practices that do not discriminate against the poor. From the National Symposium on Pretrial Justice, which the Department's Office of Justice Programs helped convene in 2011, to the White House and DOJ Convening on the Cycle of Incarceration: Prison, Debt and Bail Practices in 2015, the Department has sought to call attention to the problem of discriminatory bail practices in state and local courts. At the White House convening, Attorney General Lynch discussed discriminatory bail practices, reiterating the Department's commitment "[t]o ensur[e] that in the United States

- 3 -

there is indeed no price tag on justice."[1]  In addition, the Department's Bureau of

Justice Assistance funds the National Task Force on Fines, Fees and Bail Practices,

a joint project of the Conference of Chief Justices and the Conference of State

Court Administrators, along with a $2.5 million grant program entitled *The Price*

*of Justice:  Rethinking the Consequences of Justice Fines and Fees*.[2]  Both are

intended to encourage state and local court reforms aimed at ending practices,

including bail practices, that unfairly discriminate against the poor.  These recent

initiatives build upon DOJ's efforts since the 1960s to help reform bail practices.

See pp. 5-6, *infra*.

In February 2015, the Department filed a statement of interest (SOI) arguing

that bail practices that incarcerate indigent individuals before trial solely because

of their inability to pay for their release violates the Fourteenth Amendment.  See

U.S. SOI, *Varden* v. *City of Clanton*, No. 2:15-cv-34, 2015 WL 5387219 (M.D.

Ala. Sept. 14, 2015).  And in March 2016, the Department issued a Dear Colleague

---

[1]  *Attorney General Loretta E. Lynch Delivers Remarks at White House Convening on Incarceration and Poverty* (Dec. 3, 2015), available at https://www.justice.gov/opa/speech/attorney-general-loretta-e-lynch-delivers-remarks-white-house-convening-incarceration-and.

[2]  See *Justice Department Announces Resources to Assist State and Local Reform of Fine and Fee Practices* (Mar. 14, 2016), available at https://www.justice.gov/opa/pr/justice-department-announces-resources-assist-state-and-local-reform-fine-and-fee-practices.

- 4 -

Letter advising state and local courts that due process and equal protection principles require that, among other things, they "must not employ bail or bond practices that cause indigent defendants to remain incarcerated solely because they cannot afford to pay for their release."[3]

## STATEMENT OF THE ISSUE

The United States will address the following question only:

Whether a bail practice that results in the incarceration of indigent individuals without meaningful consideration of their ability to pay and alternative methods of assuring their appearance at trial violates the Fourteenth Amendment.[4]

## STATEMENT OF THE CASE

*1.    Overview Of Bail In The United States*

"In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States* v. *Salerno*, 481 U.S. 739, 755 (1987).  Courts have recognized that it is within this limited exception that conditions can be imposed, or in rare circumstances, release can be denied, to

---

[3]  Letter from Vanita Gupta, Principal Deputy Assistant Attorney General, Civil Rights Div., Dep't of Justice, and Lisa Foster, Director, Office for Access to Justice, to Colleagues 2 (Mar. 14, 2016), available at https://www.justice.gov/crt/file/832461/download.

[4]  The United States takes no position on the facts of this case or on any other issue raised in appellant's brief.

achieve legitimate goals like preventing the flight of defendants before trial or

protecting the public from future danger.  See *id.* at 754-755.  Future appearance in

court and public safety often can be assured through the imposition of

nonmonetary conditions, such as supervised release or reasonable restrictions on

activities and movements.  See ABA Standards for Criminal Justice:  Pretrial

Release 10-1.4, 10-5.2 (3d ed. 2007).[5]  Financial conditions (often referred to

simply as "bail"), however, "should be used only when no other conditions will

ensure appearance."  *Id.* 10-1.4(c).  This is because "[a] primary function of bail is

to safeguard the courts' role in adjudicating the guilt or innocence of defendants."

*Salerno*, 481 U.S. at 753; see also *Pugh* v. *Rainwater*, 572 F.2d 1053, 1057 (5th

Cir. 1978) (en banc) (recognizing bail's limited function "of assuring the presence

of [the] defendant").

Until the reform of the federal bail system in the 1960s, however, pretrial

detention was effectively the norm rather than the exception for indigent federal

defendants.  Federal courts routinely set monetary bail conditions without regard

for indigence, and "often the sole consideration in fixing bail [was] the nature of

---

[5]  Available at http://www.americanbar.org/publications/criminal_justice_
section_archive/crimjust_standards_pretrialrelease_blk.html#10-1.1.

- 6 -

the crime."[6]  In 1962, Attorney General Robert F. Kennedy called national

attention to the "problem of bail," pointing out that pretrial detention "is directly

influenced by how wealthy [a defendant] is."[7]  In testifying to Congress about the

problems associated with bail systems that fail to account for indigence, Attorney

General Kennedy told the story of an individual who spent 54 days in jail because

he could not afford the $300 bail amount for a traffic offense for which the

maximum penalty was only five days in jail.  See *Testimony by RFK* 3.  Under

Attorney General Kennedy's leadership, the Department pressed for expansive

reforms that culminated in the Attorney General's National Conference on Bail and

Criminal Justice in 1964 and the Bail Reform Act of 1966, Pub. L. No. 89-465, 80

Stat. 214.

     The Bail Reform Act abolished the use of bail conditions that discriminate

against indigent arrestees in the federal system.  The Act's purpose was to revise

federal bail practices "to assure that all persons, regardless of their financial status,

---

[6] *Testimony by Attorney General Robert F. Kennedy on Bail Legislation Before the Subcomms. on Constitutional Rights and Improvements in Judicial Machinery of the S. Judiciary Comm.* 2 (Aug. 4, 1964) (*Testimony by RFK*), available at http://www.justice.gov/sites/default/files/ag/legacy/2011/01/20/08-04-1964.pdf.

[7] Department of Justice, *Address by Attorney General Robert F. Kennedy, American Bar Association House of Delegates* (Aug. 6, 1962), available at https://www.justice.gov/sites/default/files/ag/legacy/2011/01/20/08-06-1962%20Pro.pdf.

- 7 -

shall not needlessly be detained pending their appearance  *  *  *  when detention

serves neither the ends of justice nor the public interest."  Bail Reform Act of 1966

§ 2; see also *Allen* v. *United States*, 386 F.2d 634, 637 (D.C. Cir. 1967) (Bazelon,

J., dissenting) ("It plainly appears from the language and history of the Bail

Reform Act that its central purpose was to prevent pretrial detention because of

indigency.").  In 1984, the Act was amended to make clear that a "judicial officer

may not impose a financial condition that results in the pretrial detention of the

person." 18 U.S.C. 3142(c)(2); see H.R. Rep. No. 98-1121, 98th Cong., 2d Sess.

12 (1984).  This express mandate helps ensure that federal courts base pretrial

detention decisions on an individualized assessment of dangerousness and risk of

flight and that indigent defendants are not detained without meaningful

consideration of an individual's ability to pay and alternative methods of achieving

the government's interests.  See also 18 U.S.C. 3142(g) (listing factors that judicial

officers should consider to "reasonably assure" the appearance of an individual in

court and the safety of others).

Many other jurisdictions, however, still maintain bail systems that

incarcerate people without regard for indigency.[8]  But as noted above, the

_____

[8]  Indeed, the use of monetary bail has increased substantially since 1990.
See Ram Subramaniam, *et al.*, Vera Institute of Justice, *Incarceration's Front
Door:  The Misuse of Jails in America* 29 (updated July 29, 2015), available at
(continued…)

Department is working with state and local courts to reform their systems and promote constitutional bail practices. In *Varden*, after the Department filed its SOI, the parties reached a settlement agreeing to a bail policy that allows for release on an unsecured bond as the norm rather than the exception. See *Varden* v. *City of Clanton*, No. 2:15-cv-34, 2015 WL 5387219 (M.D. Ala. Sept. 14, 2015); see also Consent Decree, *City of Ferguson*, *supra*. Lawsuits challenging bail practices in other local jurisdictions have also been resolved by agreement or court order. See, *e.g.*, *Pierce* v. *City of Velda City*, No. 4:15-cv-570, 2015 WL 10013006 (E.D. Mo. June 3, 2015) (adopting a settlement agreeing to a new bail policy and declaring that, under the Equal Protection Clause, no defendant can be held in custody based solely on inability to post a monetary bond); *Snow* v. *Lambert*, No. 3:15-cv-567 (M.D. La. Sept. 3, 2015) (accepting a settlement prohibiting use of a secured monetary bond to hold misdemeanor arrestees in jail who cannot afford the bond).

2.    *Relevant Facts And Procedural History*

a. Plaintiff Maurice Walker is a 54-year old man who was arrested by the Calhoun Police Department for being a pedestrian under the influence and was

---

(…continued)
http://archive.vera.org/sites/default/files/resources/downloads/incarcerations-front-door-report_02.pdf.

- 9 -

kept in jail for six nights without making bail.  Doc. 29-2, at 1.[9]  He filed this class

action alleging that the City of Calhoun, Georgia, employs an unconstitutional bail

practice that imprisons indigent defendants because of their inability to pay fixed

bail amounts for misdemeanors, traffic offenses, and ordinance violations.  Doc. 1,

at 5-7, 13.

According to the complaint, Walker has a serious mental health disability

and limited income with no assets.  He lives with his sister, who manages his only

income of $530 per month of Social Security disability benefits.  Doc. 1, at 3.

When Walker was arrested on September 3, 2015, he was informed that he would

not be released unless he paid the $160 fixed cash bond amount set by the City for

the misdemeanor of being a pedestrian under the influence.  Georgia law provides

that "at no time  *  *  *  shall any person charged with a misdemeanor be refused

bail."  Ga. Code Ann. § 17-6-1(b)(1) (West 2014).  But Walker alleged that,

contrary to state law, the City's policy and practice was to immediately release

individuals arrested for minor traffic or misdemeanor offenses if they can pay

preset bond amounts (which vary by offense), but to hold those who cannot afford

the bond in jail until their first court appearance.  See Doc. 1, at 2; Doc. 29-5, at 9-

10, 12, 15 (Calhoun's Bail Schedule).  By contrast, Walker contended that many

---

[9]  Citations to "Doc. __, at __" are to documents on the district court docket
sheet and relevant page numbers.

- 10 -

other cities provide for release of misdemeanor arrestees on recognizance or unsecured bonds.  These forms of security involve promises to appear with penalties for failing to appear in court, such as an added criminal charge or a monetary fine.  Doc. 1, at 5-6.

Walker alleged that because he is indigent, and because he could not afford the fixed bail amount, he was kept in jail for several nights to await his court appearance.  Doc. 1, at 4-5.  When this lawsuit was filed, the City held court only on non-holiday Mondays, and because Walker was arrested on the Thursday before Labor Day, he remained in jail for six days until his counsel could secure his release on his own recognizance.  Doc. 29, at 2.  During his pretrial detention, Walker claimed that he was unable to take his daily medication, and that he was allowed out of his cell for only one hour each day.  Doc. 1, at 5.  Walker also alleged that "[e]ach Monday [when court is held], there are commonly about four to six indigent defendants who were not able to pay * * * to secure their release."  Doc. 1, at 7.

On behalf of himself and those similarly situated, Walker sued the City under 42 U.S.C. 1983, alleging that its bail practice violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  He sought damages on behalf of himself and declaratory and injunctive relief on behalf of the class.  Doc. 1, at 3, 13-14.

b. On January 28, 2016, the district court granted Walker's motion for a preliminary injunction. The court ordered the City to implement constitutional post-arrest procedures and, in the interim, to release any misdemeanor arrestees on their own recognizance or on an unsecured bond. Doc. 40, at 72. The court held, among other things, that there was a substantial likelihood that Walker would succeed on the merits of his claim, because "[a]ny bail or bond scheme that mandates payment of pre-fixed amounts for different offenses to obtain pretrial release, without any consideration of indigence or other factors, violates the Equal Protection Clause." Doc. 40, at 49. In reaching this conclusion, the district court reviewed Supreme Court and circuit precedent recognizing that equal protection and due process principles prohibit punishing people for their poverty. The court then determined that this rule was "especially true" for pretrial detainees who had yet to be found guilty of a crime. Doc. 40, at 49-52; see also Doc. 40, at 52-56 (observing that other courts have reached similar conclusions).[10]

---

[10] The district court also determined that the City's new Standing Bail Order, which was adopted after the lawsuit was filed, neither mooted Walker's claims nor remedied the constitutional deficiencies in the prior bail policy. Doc. 40, at 56, 59-62. Again, the United States takes no position on these or any other issues in this case that is not addressed herein.

- 12 -

## SUMMARY OF THE ARGUMENT

If this Court reaches the issue, it should affirm the district court's holding that a bail scheme that mandates payment of fixed amounts to obtain pretrial release, without meaningful consideration of an individual's indigence and alternatives that would serve the City's interests, violates the Fourteenth Amendment.

In a long line of cases beginning with *Griffin* v. *Illinois*, 351 U.S. 12 (1956), the Supreme Court has held that denying equal access to justice—including and especially through incarceration—without consideration of ability to pay and possible alternatives to achieve a legitimate governmental interest, violates the Fourteenth Amendment. In these cases, the Court has recognized that the proper analysis reflects both equal protection and due process principles, and has rejected use of the traditional equal protection inquiry. The appropriate inquiry focuses instead on "the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose." *Bearden* v. *Georgia*, 461 U.S. 660, 666-667 (1983) (citation omitted; brackets in original).

As the district court recognized, the Supreme Court's holdings and analysis apply with special force in the bail context, where deprivations of liberty are at issue and defendants are presumed innocent. Under *Bearden* and other cases in

*Griffin*'s progeny, a bail scheme that imposes financial conditions, without individualized consideration of ability to pay and whether such conditions are necessary to assure appearance at trial, violates the Fourteenth Amendment. Thus, as the former Fifth Circuit acknowledged, while the use of fixed bail schedules may provide a convenient way to administer pretrial release, incarcerating those who cannot afford to pay the bail amounts, without meaningful consideration of alternatives, infringes on equal protection and due process requirements. See *Pugh* v. *Rainwater*, 572 F.2d 1053, 1057 (5th Cir. 1978) (en banc).

In addition to violating the Fourteenth Amendment, such bail systems result in the unnecessary incarceration of people and impede the fair administration of justice for indigent arrestees. Thus, they are not only unconstitutional, but they also constitute bad public policy.

## ARGUMENT

## A BAIL PRACTICE VIOLATES THE FOURTEENTH AMENDMENT IF, WITHOUT CONSIDERATION OF ABILITY TO PAY AND ALTERNATIVE METHODS OF ASSURING APPEARANCE AT TRIAL, IT RESULTS IN THE PRETRIAL DETENTION OF INDIGENT DEFENDANTS

A.   *The Fourteenth Amendment Prohibits Incarcerating Individuals Without Meaningful Consideration Of Indigence And Alternative Methods Of Achieving A Legitimate Government Interest*

The Supreme Court has long held that "[t]here can be no equal justice where the kind of trial a man gets depends on the amount of money he has." *Griffin* v.

- 14 -

*Illinois*, 351 U.S. 12, 19 (1956) (plurality opinion); accord *Smith* v. *Bennett*, 365 U.S. 708, 710 (1961). As explained more fully below, in a long line of cases beginning with *Griffin*, the Court has repeatedly reaffirmed that denying access to equal justice, without meaningful consideration of indigence and alternative methods of achieving a legitimate government interest, violates the Fourteenth Amendment. Although a jurisdiction has discretion to determine which rights and penalties beyond what the Constitution minimally requires are appropriate to achieve its legitimate interests, the Fourteenth Amendment prohibits a jurisdiction from categorically imposing different criminal consequences—including and especially incarceration—on poor people without accounting for their indigence.

In *Griffin*, the Court first considered whether a State "may, consistent with the Due Process and Equal Protection Clauses of the Fourteenth Amendment, * * * deny adequate appellate review [of a criminal conviction] to the poor while granting such review to all others." 351 U.S. at 13. The Court held that once a State decides to grant appellate rights, it may not "do so in a way that discriminates against some convicted defendants on account of their poverty." *Id.* at 18. The Court therefore found it unconstitutional to deny indigent criminal defendants appellate review by effectively requiring them to furnish appellate courts with a trial transcript, which cost money, before they could appeal their convictions. See *id.* at 18-19. In holding that "[d]estitute defendants must be afforded as adequate

appellate review as defendants who have money enough to buy transcripts," *id*. at 19, the Court declined to hold that the State "must purchase a stenographer's transcript in every case where a defendant cannot buy it," *id*. at 20. Instead, it held that the State "may find other means of affording adequate and effective appellate review to indigent defendants." *Ibid*.

In a line of cases building on *Griffin*, the Supreme Court has held that incarcerating individuals solely because of their inability to pay a fine or fee, without regard for indigence and a meaningful consideration of alternative methods of achieving the government's interests, effectively denies equal protection to one class of people within the criminal justice system while also offending due process principles. In *Williams* v. *Illinois*, 399 U.S. 235, 244 (1970), for example, the Court struck down a practice of incarcerating an indigent individual beyond the statutory maximum term because he could not pay the fine and court costs to which he had been sentenced. The Court held that "once the State has defined the outer limits of incarceration necessary to satisfy its penological interests and policies, it may not then subject a certain class of convicted defendants to a period of imprisonment beyond the statutory maximum solely by reason of their indigency." *Id.* at 241-242. The Court made clear, however, that "[t]he State is not powerless to enforce judgments against those financially unable to pay a fine." *Id*. at 244. On the contrary, nothing in the

- 16 -

Court's holding "limits the power of the sentencing judge to impose alternative sanctions" under state law." *Id*. at 245.

Similarly, in *Tate* v. *Short*, 401 U.S. 395, 398 (1971), the Court held that incarcerating an indigent individual convicted of fines-only offenses to "satisfy" his outstanding fines constituted unconstitutional discrimination because it "subjected [him] to imprisonment solely because of his indigency." *Id.* at 397-398. The Court explained that the scheme in *Tate* suffered from the same constitutional defect as that in *Williams*, and again emphasized that there "other alternatives to which the State may constitutionally resort to serve its concededly valid interest in enforcing payment of fines." *Id*. at 399.[11]

And in *Bearden* v. *Georgia*, 461 U.S. 660 (1983), the Court held that the Fourteenth Amendment prohibits a State from revoking an indigent defendant's probation for failure to pay a fine and restitution "without determining that [the defendant] had not made sufficient bona fide efforts to pay or that adequate alternative forms of punishment did not exist." *Id.* at 661-662. Such treatment of indigent defendants would amount to "little more than punishing a person for his poverty." *Id.* at 662.

---

[11] See also *Barnett* v. *Hopper*, 548 F.2d 550, 554 (5th Cir. 1977) (relying on *Williams* and *Tate* to hold that "[t]o imprison an indigent when in the same circumstances an individual of financial means would remain free constitutes a denial of equal protection of the laws"), vacated as moot, 439 U.S. 1041 (1978).

- 17 -

The *Bearden* Court further explained that, because "[d]ue process and equal protection principles converge in the Court's analysis in these cases," 461 U.S. at 665, the traditional equal protection framework that usually requires analysis under a particular level of scrutiny does not apply. Because "indigency in this context is a relative term rather than a classification, fitting the problem of this case into an equal protection framework is a task too Procrustean to be rationally accomplished." *Id.* at 666 n.8 (internal quotation marks omitted). "Whether analyzed in terms of equal protection or due process, the issue cannot be resolved by resort to easy slogans or pigeonhole analysis." *Id.* at 666. Instead, the relevant analysis "requires a careful inquiry into such factors as the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose." *Id*. at 666-667 (citation and internal quotation marks omitted; brackets in original).

Although *Bearden* and other cases in *Griffin*'s progeny have arisen in the sentencing and post-conviction contexts, their holdings apply with equal, if not greater, force in the bail context. Indeed, defendants who have not been found guilty have an especially "strong interest in liberty." *United States* v. *Salerno*, 481 U.S. 739, 750, 755 (1987). Because of that liberty interest, pretrial release should be the norm, and pretrial detention "the carefully limited exception." *Ibid*. To be

- 18 -

sure, in certain circumstances, such as when a court finds that a defendant poses a

threat to others or presents a flight risk, this fundamentally important right may be

circumscribed on a case-by-case basis.  See, *e.g.*, *id.* at 750-751, 754-755.  If a

court finds that no other conditions may reasonably assure an individual's

appearance at trial, financial conditions may be constitutionally imposed—but

"bail must be set by a court at a sum designed to ensure that goal, and *no more*."

*Id*. at 754 (emphasis added).  Although the imposition of bail in such

circumstances may result in a person's incarceration, the deprivation of liberty in

such circumstances is not based *solely* on inability to pay.

But fixed bail schedules that allow for the pretrial release of only those who

can pay, without accounting for ability to pay and alternative methods of assuring

future appearance, do not provide for such individualized determinations, and

therefore unlawfully discriminate based on indigence.  Under such bail schemes,

arrestees who can afford to pay the fixed bail amount are promptly released

whenever they are able to access sufficient funds for payment, even if they are

likely to miss their assigned court date or pose a danger to others.  Conversely, the

use of such schedules effectively denies pretrial release to those who cannot afford

to pay the fixed bail amount, even if they pose no flight risk, and even if alternative

methods of assuring appearance (such as an unsecured bond or supervised release)

could be imposed.  Such individuals are unnecessarily kept in jail until their court

- 19 -

appearance often for even minor offenses, such as a traffic or ordinance violation, including violations that are not punishable by incarceration.

As the former Fifth Circuit recognized in an en banc decision, while "[u]tilization of a master bond schedule provides speedy and convenient release for those who have no difficulty in meeting its requirements," the "incarceration of those who cannot, without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements." *Pugh* v. *Rainwater*, 572 F.2d 1053, 1057 (5th Cir. 1978) (en banc).[12] Although the court in *Pugh* found moot plaintiffs' claim challenging the use of monetary bail to incarcerate defendants pretrial without meaningful consideration of alternatives, it acknowledged "that imprisonment solely because of indigent status is invidious discrimination and not constitutionally permissible." *Id.* at 1056 (citing *Williams*, *supra*; *Tate*, *supra*); see also *Varden*, *supra*, at *2 (concluding that "[t]he Fourteenth Amendment prohibits punishing a person for his poverty, and this includes deprivations of liberty based on the inability to pay fixed-sum bail amounts"—a principle that "applies with special force" to pretrial defendants (internal citation and quotation marks omitted)). In fact, where fixed bail

---

[12]  Decisions of the former Fifth Circuit rendered before October 1, 1981, serve as binding precedent of the Eleventh Circuit.  See *Bonner* v. *City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

schedules are used without meaningful consideration of alternatives that account for inability to pay, indigent arrestees seeking bail are faced with precisely the same type of "illusory choice" that the Supreme Court has recognized "works an invidious discrimination." *Williams*, 399 U.S. at 242.

Although fixed bail schedules appear to be neutral on their face, the Supreme Court has explained that policies that impose sanctions on only indigent individuals are not neutral in their operation.  Thus, contrary to the City's argument (Appellant's Br. 45-46), its policies do not fall outside the Fourteenth Amendment's prohibition of disparate treatment.  The City relies on *Washington* v. *Davis*, 426 U.S. 229, 244-245 (1976), which held that, absent evidence of a discriminatory purpose, a facially neutral law with a racially discriminatory effect does not violate equal protection.  But the Supreme Court has rejected this argument with respect to policies that implicate due process concerns and discriminate against the indigent in the sanctions imposed, explaining that, because such policies "expose[] *only indigents*" to an additional sanction, they are "not merely *disproportionate* in impact.  Rather, they are wholly contingent on one's ability to pay, and thus 'visi[t] different consequences on two categories of persons[]'; they apply to all indigents and do not reach anyone outside that class." *M.L.B.* v. *S.L.J.*, 519 U.S. 102, 127 (1996) (internal citation omitted; second brackets in original); see also *Bearden*, 461 U.S. at 664 (applying "*Griffin*'s

- 21 -

principle of 'equal justice'" post-*Washington* v. *Davis* to prohibit revocations of probation without inquiring into ability to pay and consideration of alternatives); *Williams*, 399 U.S. at 242 ("Here the Illinois statutes as applied to Williams works an invidious discrimination solely because he is unable to pay the fine.").

In sum, under *Bearden* and other cases in *Griffin*'s progeny, a jurisdiction may not use a bail system that incarcerates indigent individuals without meaningful consideration of their indigence and alternative methods of assuring their appearance at trial.

B.    *Bail Systems That Keep Indigent Defendants In Jail Solely Because They Cannot Pay Bail Result In Unnecessary Pretrial Detention And Impede The Fair Administration Of Justice*

Bail practices that do not account for indigence result in the unnecessary incarceration of numerous individuals who are presumed innocent. Of the more than 730,000 individuals incarcerated in local jails nationwide in 2011, for example, about 60% were pretrial detainees (a rate unchanged since 2005), and most of them were accused of nonviolent offenses.[13] Unnecessary pretrial detention significantly burdens the limited resources of taxpayers and state and

---

[13]    See Richard Williams, *Bail or Jail*, State Legislatures (May 2012), available at http://www.ncsl.org/research/civil-and-criminal-justice/bail-or-jail.aspx; see also Todd D. Minton & Zhen Zeng, United States Department of Justice, Bureau of Justice Statistics, *Jail Inmates at Midyear 2014*, NCJ 248629, at 1, 3 (2015), available at http://www.bjs.gov/content/pub/pdf/jim14.pdf.

local governments.  It also creates additional problems as jails become overcrowded.

The repercussions of unnecessary pretrial detention that disproportionately affect indigent individuals can reverberate in other parts of the criminal justice process and impede the fair administration of justice.  The "traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction."  *Pugh*, 572 F.2d at 1056-1057 (en banc) (citing *Hudson* v. *Parker*, 156 U.S. 277, 285 (1895)).  But incarceration could hinder a defendant's "ability to gather evidence, contact witnesses, or otherwise prepare his defense."  *Barker* v. *Wingo*, 407 U.S. 514, 533 (1972).  Excessive pretrial detention could also induce the innocent to plead guilty for a speedier release or result in a detention period that exceeds the expected sentence.[14]  And because "[m]ost jails offer little or no recreational or rehabilitative programs," pretrial detention is not likely to reduce recidivism.  *Ibid.*

---

[14]  See, *e.g.*, Andrew D. Leipold, *How the Pretrial Process Contributes to Wrongful Convictions*, 42 Am. Crim. L. Rev. 1123, 1154 (2005); Mary T. Phillips, New York City Criminal Justice Agency, Inc., *Bail, Detention, and Felony Case Outcomes*, *Research Brief No. 18*, at 7 (2008), available at http://www.nycja.org/lwdcms/doc-view.php?module=reports&module_id=597&doc_name=doc; Stephanos Bibas, *Plea Bargaining Outside the Shadow of Trial*, 117 Harv. L. Rev. 2463, 2492 (2004).

- 23 -

Pretrial incarceration also "often means loss of a job; it disrupts family life; and it enforces idleness." *Barker*, 407 U.S. at 532; see also ABA Standards for Criminal Justice: Pretrial Release 10-1.1 ("Deprivation of liberty pending trial is harsh and oppressive, subjects defendants to economic and psychological hardship, interferes with their ability to defend themselves, and, in many instances, deprives their families of support.").[15]  This impact may be exacerbated for indigent individuals who, as a consequence of their poverty, are already in vulnerable situations.[16]

In short, bail practices that fail to account for indigence are not only unconstitutional, but also conflict with sound public policy considerations.

---

[15]  Available at http://www.americanbar.org/publications/criminal_justice_section_archive/crimjust_standards_pretrialrelease_blk.html#10-1.1.

[16]  See Open Society Justice Initiative, *The Socioeconomic Impact of Pretrial Detention* 27-32 (2001) (examining the costs to pretrial detainees and their families as measured by income, employment, education, incarceration-related expenses, and long-term effects), available at http://www.pretrial.org/download/research/OSI%20Socioeconomic%20Impact%20Pretrial%20Detention%202011.pdf.

## CONCLUSION

If this Court reaches the issue presented herein, the Court should affirm the district court's holding that a bail scheme violates the Fourteenth Amendment if, without a court's meaningful consideration of ability to pay and alternative methods of assuring appearance at trial, it results in the detention of indigent defendants pretrial.

Respectfully submitted,

JOHN A. HORN
  United States Attorney
    Northern District of Georgia

VANITA GUPTA
  Principal Deputy Assistant
    Attorney General

s/ Christine H. Ku

LISA FOSTER
  Director, Office for Access to Justice

TOVAH R. CALDERON
CHRISTINE H. KU
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 353-9044

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29 and 32(a)(7), because:

This brief contains 4491 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because:

This brief has been prepared in a proportionally spaced typeface using Word 2010 in 14-point Times New Roman font.

s/ Christine H. Ku
CHRISTINE H. KU
  Attorney

Date:  August 18, 2016

**CERTIFICATE OF SERVICE**

I hereby certify that on August 18, 2016, I electronically filed the foregoing BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE* SUPPORTING PLAINTIFF-APPELLEE AND URGING AFFIRMANCE ON THE ISSUE ADDRESSED HEREIN with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system.

I certify that all participants in this case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that on August 18, 2016, I will cause seven paper copies of this brief to be sent to the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by certified U.S. mail, postage prepaid and will cause one paper copy of the same to be mailed to the following counsel by certified U.S. mail, postage prepaid:

> Bradley Williams Cornett
> Ford Howard & Cornett, PC
> 140 S 9th ST
> Gadsden, AL  35902
>
> Lorelei Lein
> Alabama League of Municipalities
> 535 Adams Ave
> Montgomery, AL  36104-4333

s/ Christine H. Ku
CHRISTINE H. KU
 Attorney