**EXHIBIT L**

**To Declaration of Micah West in Support of
Motion for Preliminary Injunction
& Motion for Class Certification**

# Fundamentals of Bail



A Resource Guide for Pretrial Practitioners and a Framework for American Pretrial Reform



# Fundamentals of Bail: A Resource Guide for Pretrial Practitioners and a Framework for American Pretrial Reform

Timothy R. Schnacke

**September 2014**

**NIC Accession Number: 028360**

This document was prepared under technical assistance event number 13CS02GK04 from the National Institute of Corrections, U.S. Department of Justice. Points of view or opinions stated in this guide are those of the author and do not necessarily represent the official position or policies of the U.S. Department of Justice.

## Table of Contents

Preface ................................................................................................................................... i

Acknowledgments ............................................................................................................... ii

Executive Summary ............................................................................................................ iii

    Why Do We Need Pretrial Improvements? ................................................................. iii

    The History of Bail ....................................................................................................... iv

    The Legal Foundations of Pretrial Justice ................................................................... v

    Pretrial Research ......................................................................................................... v

    The National Standards on Pretrial Release ............................................................... vi

    Pretrial Terms and Phrases ........................................................................................ vi

    Guidelines for Pretrial Reform ................................................................................... vi

Introduction ....................................................................................................................... 1

Chapter 1: Why Do We Need Pretrial Improvements? ....................................................... 7

    The Importance of Understanding Risk ...................................................................... 7

    The Importance of Equal Justice ................................................................................ 8

    Negative Outcomes Associated with the Traditional Money Bail System ................... 9

    Unnecessary Pretrial Detention ............................................................................... 11

    Other Areas in Need of Pretrial Reform ................................................................... 16

    The Third Generation of Bail/Pretrial Reform .......................................................... 17

Chapter 2: The History of Bail .......................................................................................... 19

    The Importance of Knowing Bail's History ................................................................ 19

    Origins of Bail ........................................................................................................... 21

    The Evolution to Secured Bonds/Commercial Sureties ............................................. 24

    The "Bail/No Bail" Dichotomy .................................................................................. 27

    "Bail" and "No Bail" in America ................................................................................ 28

    Intersection of the Two Historical Phenomena ......................................................... 32

    The Current Generation of Bail/Pretrial Reform ....................................................... 36

    What Does the History of Bail Tell Us? ...................................................................... 37

Chapter 3: Legal Foundations of Pretrial Justice .............................................................. 40

    History and Law ........................................................................................................ 40

Fundamental Legal Principles ............................................................. 43

    The Presumption of Innocence ................................................. 43

    The Right to Bail ...................................................................... 46

    Release Must Be the Norm....................................................... 50

    Due Process ............................................................................. 50

    Equal Protection ...................................................................... 52

    Excessive Bail and the Concept of Least Restrictive Conditions ................... 54

    Bail May Not Be Set For Punishment (Or For Any Other Invalid Purpose) . 58

    The Bail Process Must Be Individualized ............................................. 59

    The Right to Counsel ............................................................... 60

    The Privilege Against Compulsory Self-Incrimination .................................. 61

    Probable Cause ....................................................................... 61

Other Legal Principles ......................................................................... 62

What Do the Legal Foundations of Pretrial Justice Tell Us?......................... 62

Chapter 4: Pretrial Research ................................................................. 64

The Importance of Pretrial Research ........................................................ 64

Research in the Last 100 Years: The First Generation ................................ 68

The Second Generation ........................................................................ 71

The Third Generation........................................................................... 73

Current Research – Special Mention ....................................................... 81

Empirical Risk Assessment Instruments .................................................. 81

Effects of Release Types and Conditions on Pretrial Outcomes.................... 83

Application and Implications ................................................................. 84

What Does the Pretrial Research Tell Us? ................................................ 85

Chapter 5: National Standards on Pretrial Release ................................... 87

The ABA Standards.............................................................................. 87

Chapter 6: Pretrial Terms and Phrases ................................................... 90

The Importance of a Common Vocabulary................................................ 90

The Meaning and Purpose of "Bail"........................................................ 91

Other Terms and Phrases...................................................................... 95

Chapter 7: Application – Guidelines for Pretrial Reform ........................... 98

Individual Action Leading to Comprehensive Cultural Change .................... 98

Individual Decisions ............................................................................................... 99

Individual Roles .................................................................................................... 100

Judicial Leadership ............................................................................................... 103

Conclusion .......................................................................................................... 106

# Preface

Achieving pretrial justice is like sharing a book – it helps when everyone is on the same page. So this document, "Fundamentals of Bail: A Resource Guide for Pretrial Practitioners and a Framework for American Pretrial Justice," is primarily designed to help move America forward in its quest for pretrial reform by getting those involved in that quest on the same page. Since I began studying, researching, and writing about bail I (along with others, including, thankfully, the National Institute of Corrections) have seen the need for a document that figuratively steps back and takes a broader view of the issues facing America when it comes to pretrial release and detention. The underlying premise of this document is that until we, as a field, come to a common understanding and agreement about certain broad fundamentals of bail and how they are connected, we will see only sporadic rather than widespread improvement. In my opinion, people who endeavor to learn about bail will be most effective at whatever they hope to do if their bail education covers each of the fundamentals – the history, the law, the research, the national standards, and its terms and phrases.

Timothy R. Schnacke

Executive Director

Center for Legal and Evidence-Based Practices

# Acknowledgments

Many different people contributed to this paper in different ways, and it is not possible to list and thank them all by name. Nevertheless, a few entities and people warrant special mention. The first is the National Institute of Corrections, and especially Lori Eville and Katie Green, for conceiving the idea for the paper and allowing me the time to flesh it out. The NIC has been in the forefront of pretrial justice for many years, and I am honored to be able to add to their long list of helpful pretrial literature.

Cherise Fanno Burdeen and the National Association of Pretrial Services Agencies, through the helpful assistance of John Clark and Ken Rose, provided invaluable input on the draft, and Spurgeon Kennedy saved the day with his usual excellent editorial assistance. Also, I am especially grateful to my friend Dan Cordova and his staff at the Colorado Supreme Court Law Library. Their extraordinary expertise and service has been critical to everything I have written for the past seven years. Special thanks, as well, go to my friend and mentor, Judge Truman Morrison, who continues daily to teach and inspire me on issues surrounding bail and pretrial justice.

I would also like to thank my dear friend and an extraordinary criminal justice professor, Eric Poole, who patiently listened and helped me to mold the more arcane concepts from the paper. Moreover, I am also indebted to my former boss, Tom Giacinti, whose foresight and depth of experience in criminal justice allowed him to forge a path in this generation of American bail reform.

Finally, I give my deepest thanks and appreciation to Claire Brooker (Jefferson County, Colorado) and Mike Jones (Pretrial Justice Institute), who not only inspired most of the paper, but also acted (as usual) as my informal yet indispensable editors. It is impossible to list all of their contributions to my work, but the biggest is probably that Claire and Mike have either conceived or molded – through their intellectual and yet practical lenses – virtually every thought I have ever had concerning bail. If America ever achieves true pretrial justice, it will be due to the hard work of people like Claire Brooker and Mike Jones.

# Executive Summary

Pretrial justice in America requires a common understanding and agreement on all of the component parts of bail. Those parts include the need for pretrial justice, the history of bail, the fundamental legal principles underlying bail, the pretrial research, the national standards on pretrial release and detention, and how we define our basic terms and phrases.

## Why Do We Need Pretrial Improvements?

If we can agree on why we need pretrial improvements in America, we are halfway toward implementing those improvements. As recently as 2007, one of the most frequently heard objections to bail reform was the ubiquitous utterance, "If it ain't broke, don't fix it." That has changed. While various documents over the last 90 years have consistently pointed toward the need to improve the administration of bail, literature from this current generation of pretrial reform gives us powerful new information from which we can articulate exactly why we need to make changes, which, in turn, frames our vision of pretrial justice designed to fix what is most certainly broken.

Knowing that our understanding of pretrial risk is flawed, we can begin to educate judges and others on how to embrace risk first and mitigate risk second so that our foundational American precept of equal justice remains strong. Knowing that the traditional money-based bail system leads both to unnecessary pretrial detention of lower risk persons and the unwise release of many higher risk persons, we can begin to craft processes that are designed to correct this illogical imbalance. Knowing and agreeing on each issue of pretrial justice, from infusing risk into police officer stops and first advisements to the need for risk-based bail statutes and constitutional right-to-bail language, allows us as a field to look at each state (or even at all states) with a discerning eye to begin crafting solutions to seemingly insoluble problems.

The History of Bail

Knowing the history of bail is critical to understanding why America has gone through two generations of bail reform in the 20th century and why it is currently in a third. History provides the contextual answers to virtually every question raised at bail. Who is against pretrial reform and why are they against it? What makes this generation of pretrial reform different from previous generations? Why did America move from using unsecured bonds administered through a personal surety system to using mostly secured bonds administered through a commercial surety system and when, exactly, did that happen? In what ways are our current constitutional and statutory bail provisions flawed? What are historical solutions to the dilemmas we currently see in the pretrial field? What is bail, and what is the purpose of bail? How do we achieve pretrial justice? All of these questions, and more, are answered through knowledge of the history of bail.

For example, the history tells us that bail should be viewed as "release," just as "no bail" should be viewed as detention. It tells us that whenever (1) bailable defendants (or those whom we feel should be bailable defendants) are detained, or (2) unbailable defendants (or those whom we feel should be unbailable defendants) are released, history demands a correction to ensure that, instead, bailable defendants are released and unbailable defendants are detained. Knowledge of this historical need for correction, by itself, points to why America is currently in a third generation of pretrial reform.

The history also tells us that it is the collision of two historical threads – the movement from an unsecured bond/personal surety system to a secured bond/commercial surety system colliding with the creation and nurturing of a "bail/no bail" dichotomy, in which bailable defendants are released and unbailable defendants are detained – that has led to the acute need for bail reform in the last 100 years. Thus, the history of bail instructs us not only on relevant older practices, but also on the important lessons from more recent events, including the first two generations of bail reform in America in the 20th century. It tells us how we can change state laws, policies, and practices so that bail can be administered in a lawful and effective manner, thereby greatly diminishing, if not avoiding altogether, the need for future reform.

## The Legal Foundations of Pretrial Justice

The history of bail and the law underlying the administration of bail are intertwined (with the law in most cases confirming and solidifying the history), but the law remains as the framework and boundary for all that we do in the pretrial field. Unfortunately, however, the legal principles underlying bail are uncommon in our court opinions; rarely, if ever, taught in our law schools and colleges; and have only recently been resurrected as subjects for continuing legal education. Nevertheless, in a field such as bail, which strives to follow "legal and evidence-based practices," knowledge of the fundamental legal principles and why they matter to the administration of bail is crucial to pretrial justice in America. Knowing "what works" – the essence of following the evidence in any particular field – is not enough in bail. We must also know the law and how the fundamental legal principles apply to our policies and practices.

Each fundamental principle of national applicability, from probable cause and individualization to excessiveness, due process, and equal protection, is thus a rod by which we measure our daily pretrial practices so that they further the lawful goals underlying the bail process. In many cases, the legal principles point to the need for drastic changes to those practices. Moreover, in this generation of bail reform we are beginning to learn that our current state and local laws are also in need of revision when held up to the broader legal foundations. Accordingly, as changing concepts of risk are infused into our knowledge of bail, shedding light on practices and local laws that once seemed practical but now might be considered irrational, the fundamental legal principles rise up to instruct us on how to change our state constitutions and bail statutes so that they again make sense.

## Pretrial Research

The history of bail and the law intertwined with that history tell us that the three goals underlying the bail process are to maximize release while simultaneously maximizing court appearance and public safety. Pretrial social research that studies what works to effectuate all three of these goals is superior to research that does not, and as a field we must agree on the goals as well as know the difference between superior and inferior research.

Each generation of bail reform in America has had a body of literature supporting pretrial improvements, and while more research is clearly needed (in all genres, including, for example, social, historical, and legal research) this generation nonetheless has an ample supply from which pretrial practitioners can help ascertain what works to achieve our goals. Current research that is highly significant to today's pretrial justice movement includes research used to design empirical risk assessment instruments and to gauge the effectiveness of release types or specific conditions on pretrial outcomes.

The National Standards on Pretrial Release

The pretrial field benefits significantly from having sets of standards and recommendations covering virtually every aspect of the administration of bail. In particular, the American Bar Association Standards, first promulgated in 1968, are considered not only to contain rational and practical "legal and evidence-based" recommendations, but also to serve as an important source of authority and have been used by legislatures and cited by courts across the country.

As a field we must recognize the importance of the national standards and stress the benefits from jurisdictions holding up their practices against what most would consider to be "best" practices. On the other hand, we must recognize that the rapidly evolving pretrial research may ultimately lead to questioning and possibly even revising those standards.

## Pretrial Terms and Phrases

A solid understanding of the history of bail, the legal foundations of bail, the pretrial research, and the national standards means, in many jurisdictions, that even such basic things as definitions of terms and phrases are in need of reform. For example, American jurisdictions often define the term "bail" in ways that are not supported by the history or the law, and these improper definitions cause undue confusion and distraction from significant issues. As a field seeking some measure of pretrial reform, we must all first agree on the proper and universally true definitions of our key terms and phrases so that we speak with a unified voice.

## Guidelines for Pretrial Reform

Pretrial justice in America requires a complete cultural change from one in which we primarily associate bail with money to one in which we do not. But cultural change starts with individuals making individual decisions to act. It may seem daunting, but it is not; many persons across America have decided to follow the research and the evidence to assess whether pretrial improvements are necessary, and many of those same persons have persuaded entire jurisdictions to make improvements to the administration of bail. What these persons have in common is their knowledge of the fundamentals of bail. When they learn the fundamentals, light bulbs light, the clouds of confusion part, and what once seemed impossible becomes not only possible, but necessary and seemingly long overdue.

This document is designed to help people come to the same epiphany that has led so many to focus on pretrial reform as one of the principle criminal justice issues facing our country today. It is a resource guide written at a time when the resources are expanding exponentially and pointing in a single direction toward reform. More importantly,

however, it represents a mental framework – a slightly new and interconnected way of looking at things – so that together we can finally and fully achieve pretrial justice in America.

# Introduction

It is a paradox of criminal justice that bail, created and molded over the centuries in England and America primarily to facilitate the release of criminal defendants from jail as they await their trials, today often operates to deny that release. More unfortunate, however, is the fact that many American jurisdictions do not even recognize the paradox; indeed, they have become gradually complacent with a pretrial process through which countless bailable defendants are treated as unbailable through the use of money. To be paradoxical, a statement must outwardly appear to be false or absurd, but, upon closer examination, shown to be true. In many jurisdictions, though, a statement such as, "The defendant is being held on $50,000 bail," a frequent tagline to any number of newspaper articles recounting a criminal arrest, seems to lack the requisite outward absurdity to qualify as paradoxical. After all, defendants are "held on bail" all the time. But the idea of being held or detained on bail is, in fact, absurd. An equivalent statement would be that the accused has been freed and is now at liberty to serve time in prison.

Recognizing the paradox is paramount to fully understanding the importance of bail, and the importance of bail cannot be overstated. Broadly defined, the study of bail includes examining all aspects of the non-sentence release and detention decision during a criminal defendant's case.[1] Internationally, bail is the subject of numerous treaties, conventions, rules, and standards. In America, bail has been the focus of two significant generations of reform in the 20th century, and appears now to be firmly in the middle of a third. Historically speaking, bail has existed since Roman times and has been the catalyst for such important criminal jurisprudential innovations as preliminary hearings, habeas corpus, the notion of "sufficient sureties," and, of course, prohibitions on pretrial detention without charge and on "excessive" bail as foundational to our core constitutional rights. Legally, decisions at bail trigger numerous foundational principles, including due process, the presumption of innocence, equal protection, the right to counsel, and other key elements of federal and state law. In the realm of criminal justice social science research, bail is a continual source of a rich literature, which, in turn, helps criminal justice officials as well as the society at large to decide the most effective manner in which to administer the release and detention decision. And finally, the sheer

---

[1] A broad definition of the study of criminal bail would thus appropriately include, and has in the past included, discussion of issues occasionally believed to be outside of the bail process, such as the use of citations in order to avoid arrest altogether or pretrial diversion as a dispositional alternative to the typical pretrial release or detention/trial/adjudication procedure. A broad definition would certainly include discussions of post-conviction bail, but because of fundamental differences between pretrial defendants and those who have been convicted, that subject is beyond the scope of this paper. For purposes of this paper, "bail" will refer to the pretrial process.

volume and resulting outcomes of the decisions themselves – decisions affecting over 12 million arrestees per year – further attest to the importance of bail as a topic that can represent either justice or injustice on a grand scale.

## Getting Started – What is Bail?
## What is Bond?

Later in this paper we will see how the history, the law, the social science research, and the national best practice standards combine to help us understand the proper definitions of terms and phrases used in the pretrial field. For now, however, the reader should note that the terms "bail" and "bond" are used differently across America, and often inaccurately when held up to history and the law. In the 1995 edition to his Dictionary of Modern Legal Usage, Bryan Garner described the word "bail" as a "chameleon-hued" legal term, with strikingly different meanings depending on its overall use as a noun or a verb. And indeed, depending on the source, one will see "bail" defined variously as money, as a person, as a particular type of bail bond, and as a process of release. Occasionally, certain definitions will conflict with other definitions or word usage even within the same source. Accordingly, to reflect an appropriate legal and historical definition, the term "bail" will be used in this paper to describe a process of releasing a defendant from jail or other governmental custody with conditions set to provide reasonable assurance of court appearance or public safety.

The term "bond" describes an obligation or a promise, and so the term "bail bond" is used to describe the agreement between a defendant and the court, or between the defendant, a surety (commercial or noncommercial), and the court that sets out the details of the agreement. There are many types of bail bonds – secured and unsecured, with or without sureties, and with or without other conditions – that fall under this particular definition. Later we will also see how defining types of bonds primarily based on their use of money in the process (such as a "cash" bond or a "personal recognizance bond") is misleading and inaccurate.

This paper occasionally mentions the terms "money bail," and the "traditional money bail system." "Money bail" is typically used as a shorthand way to describe the bail process or a bail bond using secured financial conditions (which necessarily includes money that must be paid up-front prior to release). The two central issues concerning money bail are: (1) its tendency to cause unnecessary incarceration of defendants who cannot afford to pay secured financial conditions either immediately or even after some period of time; and (2) its tendency to allow for, and sometimes foster, the release of high-risk defendants, who should more appropriately be detained without bail.

The "traditional money bail system" typically describes the predominant American system (since about 1900) of primarily using secured financial conditions on bonds administered through commercial sureties. More broadly, however, it means any system of the administration of bail that is over-reliant on money, typically when compared to the American Bar Association's National Standards on Pretrial Release. Some of its hallmarks include monetary bail bond schedules, overuse of secured bonds, a reliance on commercial sureties (for-profit bail bondsmen), financial conditions set to protect the public from future criminal conduct, and financial conditions set without

consideration of the defendant's ability to pay, or without consideration of non-financial conditions or other less-restrictive conditions that would likely reduce risk.

**Sources and Resources:** Black's Law Dictionary (9th ed. 2009); Bryan A. Garner, A Dictionary of Modern Legal Usage (Oxford Univ. Press, 2nd ed. 1995); Timothy R. Schnacke, Michael R. Jones, Claire M.B. Brooker, *Glossary of Terms and Phrases Relating to Bail and the Pretrial Release or Detention Decision* (PJI 2011).

The importance of bail foreshadows the significant problems that can arise when the topic is not fully understood. Those problems, in turn, amplify the paradox. A country founded upon liberty, America leads the world in pretrial detention at three times the world average. A country premised on equal justice, America tolerates its judges often conditioning pretrial freedom based on defendant wealth – or at least on the ability to raise money – versus important and constitutionally valid factors such as the risk to public and victim safety. A country bound by the notion that liberty not be denied without due process of law, America tolerates its judges often ordering de-facto pretrial detention through brief and perfunctory bail hearings culminating with the casual utterance of an arbitrary and often irrational amount of money. A country in which the presumption of innocence is "axiomatic and elementary" [2] to its administration of criminal justice and foundational to the right to bail,[3] America, instead, often projects a presumption of guilt. These issues are exacerbated by the fact that the type of pretrial justice a person gets in this country is also determined, in large part, on where he or she is, with some jurisdictions endeavoring to follow legal and evidence-based pretrial practices but with others woefully behind. In short, the administration of bail in America is unfair and unsafe, and the primary cause for that condition appears simply to be: (1) a lack of bail education that helps to illuminate solutions to a number of well-known bail problems; and (2) a lack of the political will to change the status quo.

> *"It is said that no one truly knows a nation until one has been inside its jails. A nation should not be judged by how it treats its highest citizens, but its lowest ones."*
>
> Nelson Mandela, 1995

Fortunately, better than any other time in history, we have now identified, and in many cases have actually illustrated through implementation, solutions to the most vexing problems at bail. But this knowledge is not uniform. Moreover, even where the

---

[2] *Coffin v. United States,* 156 U.S. 432, 453 (1895).
[3] *See Stack v. Boyle,* 342 U.S. 1, 4 (1951).

knowledge exists, we find that jurisdictions are in varying stages of fully understanding the history of bail, legal foundations of bail, national best practice recommendations, terms and phrases used at bail, and legal and evidence-based practices that fully implement the fair and transparent administration of pretrial release and detention. Pretrial justice requires that those seeking it be consistent with both their vision and with the concept of pretrial best practices, and this document is designed to help further that goal. It can be used as a resource guide, giving readers a basic understanding of the key areas of bail and the criminal pretrial process and then listing key documents and resources necessary to adopt a uniform working knowledge of legal and evidence-based practices in the field.

Hopefully, however, this document will serve as more than just a paper providing mere background information, for it is designed, instead, to also provide the intellectual framework to finally achieve pretrial justice in America. As mentioned previously, in this country we have undertaken two generations of pretrial reform, and we are currently in a third. The lessons we have learned from the first two generations are monumental, but we have not fully implemented them, leading to the need for some "grand unifying theory" to explore how this third generation can be our last. In my opinion, that theory comes from a solid consensus understanding of the fundamentals of bail, why they are important, and how they work together toward an idea of pretrial justice that all Americans can embrace.

The paper is made up of seven chapters designed to help jurisdictions across America to reach consensus on a path to pretrial justice. In the first chapter, we will briefly explore the need for pretrial improvements as well as the reasons behind the current generation of reform. In the second chapter, we will examine the evolution of bail through history, with particular emphasis on why the knowledge of certain historical themes is essential to reforming the pretrial process. In the third chapter, we will list and explain fundamental legal foundations underpinning the pretrial field. The fourth chapter will focus on the evolution of empirical pretrial research, looking primarily at research associated with each of the three generations of bail reform in America in the 20th and 21st centuries.

The fifth chapter will briefly discuss how the history, law, and research come together in the form of national pretrial standards and best practice recommendations. In the sixth chapter, we will further discuss how bail's history, law, research, and best practice standards compel us to agree on certain changes to the way we define key terms and phrases in the field. In the seventh and final chapter, we will focus on practical application – how to begin to apply the concepts contained in each of the previous sections to lawfully administer bail based on best practices. Throughout the document, through sidebars, the reader will also be introduced to other important but sometimes neglected topics relevant to a complete understanding of the basics of bail.

Direct quotes are footnoted, and other, unattributed statements are either the author's own or can be found in the "additional sources and resources" sections at the end of

most chapters. In the interest of space, footnoted sources are not necessarily listed again in those end sections, but should be considered equally important resources for pretrial practitioners. Throughout the paper, the author occasionally references information that is found only in various websites. Those websites are as follows:

The American Bar Association: http://www.americanbar.org/aba.html;

The Bureau of Justice Assistance: https://www.bja.gov/;

The Bureau of Justice Statistics: http://www.bjs.gov/;

The Carey Group: http://www.thecareygroup.com/;

The Center for Effective Public Policy: http://cepp.com/;

The Crime and Justice Institute: http://www.crj.org/cji;

The Federal Bureau of Investigation Crime Reports: http://www.fbi.gov/about-us/cjis/ucr/ucr;

Human Rights Watch: http://www.hrw.org/;

Justia: http://www.justia.com/;

The Justice Management Institute: http://www.jmijustice.org/;

The Justice Policy Institute: http://www.justicepolicy.org/index.html;

NACo Pretrial Resources, http://www.naco.org/programs/csd/Pages/PretrialJustice.aspx;

The National Association of Pretrial Services Agencies: http://napsa.org/;

The National Criminal Justice Reference Service: https://www.ncjrs.gov/;

The National Institute of Corrections, http://nicic.gov;

The National Institute of Justice: http://www.nij.gov/Pages/welcome.aspx;

The Pretrial Justice Institute: http://www.pretrial.org/;

The Pretrial Services Agency for the District of Columbia, http://www.psa.gov/;

The United States Census Bureau, http://www.census.gov/;

The Vera Institute of Justice: http://www.vera.org/;

The Washington State Institute for Public Policy: http://www.wsipp.wa.gov/.

# Chapter 1: Why Do We Need Pretrial Improvements?

### The Importance of Understanding Risk

Of all the reasons for studying, identifying, and correcting shortcomings with the American system of administering bail, two overarching reasons stand out as foundational to our notions of freedom and democracy. The first is the concept of risk. From the first bail setting in Medieval England to any of a multitude of bail settings today, pretrial release and detention has always been concerned with risk, typically manifested by the prediction of pretrial misbehavior based on the risk that any particular defendant will not show up for court or commit some new crime if released. But often missing from our discussions of pretrial risk are the reasons for why we allow risk to begin with. After all, pretrial court appearance rates (no failures to appear) and public safety rates (no new crimes while on pretrial release) would most certainly hover near 100% if we could simply detain 100% of defendants.

The answer is that we not only allow for risk in criminal justice and bail, we demand it from a society that is based on liberty. In his Commentaries on the Laws of England (the eighteenth century treatise on the English common law used extensively by the American Colonies and our Founding Fathers) Sir William Blackstone wrote, "It is better that ten guilty persons escape than that one innocent suffer,"[4] a seminal statement of purposeful risk designed to protect those who are governed against unchecked despotism. More specifically related to bail, in 1951, Justice Robert H. Jackson succinctly wrote, "Admission to bail always involves a risk . . . a calculated risk which the law takes as the price of our system of justice."[5] That system of justice – one of limited government powers and of fundamental human rights protected by the Constitution, of defendants cloaked with the presumption of innocence, and of increasingly arduous evidentiary hurdles designed to ensure that only the guilty suffer punishment at the hands of the state – inevitably requires us to *embrace* risk at bail as fundamental to maintaining our democracy. Our notions of equality, freedom, and the rule of law demand that we embrace risk, and embracing risk requires us to err on the side of release when considering the right to bail, and on "reasonable assurance," rather than complete assurance, when limiting pretrial freedom.

Despite the fact that risk is necessary, however, many criminal justice leaders lack the will to undertake it. To them, a 98% court appearance rate is 2% too low, one crime committed by a defendant while on pretrial release is one crime too many, and detaining some large percentage of defendants pretrial is an acceptable practice if it

---

[4] William Blackstone, *Commentaries on the Laws of England*, Book 4, ch. 27 (Oxford 1765-1769).
[5] *Stack v. Boyle*, 342 U.S. 1, 8 (1951) (Jackson, J., concurring).

avoids those relatively small percentage failures. Indeed, the fears associated with even the smallest amount of pretrial failure cause those leaders to focus first and almost entirely on mitigating perceived risk, which in turn leads to unnecessary pretrial detention.

> *"All too often our current system permits the unfettered release of dangerous defendants while those who pose minimal, manageable risk are held in costly jail space."*
>
> Tim Murray, Pretrial Justice Institute, 2011

But these fears misapprehend the entire concept of bail, which requires us first to embrace the risk created by releasing defendants (for the law presumes and very nearly demands the release of bailable defendants) and then to seek to mitigate it only to reasonable levels. Indeed, while the notion may seem somewhat counterintuitive, in this one unique area of the law, everything that we stand for as Americans reminds us that when court appearance and public safety rates are high, we must at least consider taking the risk of releasing more defendants pretrial. Accordingly, one answer to the question of why pretrial improvements are necessary, and the first reason for correcting flaws in the current system, is that criminal justice leaders must continually take risks in order to uphold fundamental precepts of American justice; unfortunately, however, many criminal justice leaders, including those who administer bail today, often fail to fully understand that connection and have actually grown risk averse.

## The Importance of Equal Justice

The second foundational reason for studying and correcting the administration of bail in America is epitomized by a quote from Judge Learned Hand uttered during a keynote address for the New York City Legal Aid Society in 1951. In his speech, Judge Hand stated, "If we are to keep our democracy, there must be one commandment: Thou shalt not ration justice."[6] Ten years later, the statement was repeated by Attorney General Robert Kennedy when discussing the need for bail reform, and it became a foundational quote in the so-called "Allen Committee" report, the document from the Attorney General's Committee on Poverty and the Administration of Federal Criminal Justice that provided a catalyst for the first National Conference on Bail and Criminal Justice in 1964. Judge Hand's quote became a rallying cry for the first generation of American bail reform, and it remains poignant today, for in no other area of criminal procedure do we so blatantly restrict allotments of our fundamental legal principles. Like our aversion to

---

[6] *See* The Legal Aid Society website at http://www.legal-aid.org/en/las/thoushaltnotrationjustice.aspx.

risk, our rationing of justice at bail is something to which we have grown accustomed. And yet, if Judge Hand is correct, such rationing means that our very form of government is in jeopardy. Accordingly, another answer for why pretrial improvements are necessary, and a second reason for correcting flaws in the current system, is that allowing justice for some, but not all Americans, chips away at the founding principles of our democracy, and yet those who administer bail today have grown content with a system in which justice capriciously eludes persons based on their lack of financial resources.

Arguably, it is America's aversion to risk that has led to its complacency toward rationing pretrial justice. That is because bail, and therefore the necessary risk created by release, requires an in-or-out, release/no release decision. As we will see later in this paper, since at least 1275, bail was meant to be an in-or-out proposition, and only since about the mid to late 1800s in America have we created a process that allows judges to delegate that decision by merely setting an amount of up-front money. Unfortunately, however, setting an amount of money is typically not a release/no release decision; indeed, it can often cause both unintended releases and detentions. Setting money, instead, creates only the illusion of a decision for when money is a precondition to release, the actual release (or, indeed, detention) decision is then made by the defendant, the defendant's family, or perhaps some third party bail bondsman who has analyzed the potential for profit. This illusion of a decision, in turn, has masked our aversion to risk, for it appears to all that some decision has been made. Moreover, it has caused judges across America to be content with the negative outcomes of such a non-decision, in which pretrial justice appears arbitrarily rationed out only to those with access to money.

## Negative Outcomes Associated with the Traditional Money Bail System

Those negative outcomes have been well-documented. Despite overall drops in total and violent crime rates over the last twenty years, jail incarceration rates remain high – so high, in fact, that if we were to jail persons at the 1980 incarceration rate, a rate from a time in which crime rates were actually higher than today, our national jail population would drop from roughly 750,000 inmates to roughly 250,000 inmates. Moreover, most of America's jail inmates are classified as pretrial defendants, who today account for approximately 61% of jail populations nationally (up from approximately 50% in 1996). As noted previously, the United States leads the world in numbers of pretrial detainees, and detains them at a rate that is three times the world average.

---

### Understanding Your Jail Population

Knowing who is in your jail as well as fundamental jail population dynamics is often the first step toward pretrial justice. Many jurisdictions are simply unaware of who is in the jail, how they get into the jail, how they leave the jail, and how long they stay, and yet knowing these basic data is crucial to focusing on particular jail populations such as pretrial inmates.

A jail's population is affected not only by admissions and lengths of stay, but also by the discretionary decisionmaking by criminal justice officials who, whether on purpose or unwittingly, often determine the first two variables. For example, a local police department's policy of arresting and booking (versus release on citation) more defendants than other departments or to ask for unusually high financial conditions on warrants will likely increase a jail's number of admissions and can easily add to its overall daily population. As another example, national data has shown that secured money at bail causes pretrial detention for some defendants and delayed release for others, both increasing the lengths of stay for that population and sometimes creating jail crowding. Accordingly, a decision by one judge to order mostly secured (i.e., cash or surety) bonds will increase the jail population more than a judge who has settled on using less-restrictive means of limiting pretrial freedom while mitigating pretrial risk.

Experts on jail population analysis thus advise jurisdictions to adopt a systems perspective, create the infrastructure to collect and analyze system data, and collect and track trend data not only on inmate admissions and lengths of stay, but also on criminal justice decisionmaking for policy purposes.

**Sources and Resources:** David M. Bennett & Donna Lattin, *Jail Capacity Planning Guide: A Systems Approach* (NIC, Nov. 2009); Cherise Fanno Burdeen, *Jail Population Management: Elected County Officials' Guide to Pretrial Services* (NACo/BJA/PJI, 2009); Mark A. Cunniff, *Jail Crowding: Understanding Jail Population Dynamics,* (NIC, Jan. 2002); Robert C. Cushman, *Preventing Jail Crowding: A Practical Guide* (NIC, 2nd ed., May 2002); Todd D. Minton, *Jail Inmates at Midyear- 2012 Statistical Tables,* (BJS, 2013 and series). **Policy Documents Using Jail Population Analysis:** Jean Chung, *Baltimore Behind Bars, How to Reduce the Jail Population, Save Money and Improve Public Safety* (Justice Policy Institute, Jun. 2010); Marie VanNostrand, *New Jersey Jail Population Analysis: Identifying Opportunities to Safely and Responsibly Reduce the Jail Population* (Luminosity/Drug Policy Alliance, Mar. 2013).

---

These trends are best explained by the justice system's increasing use of secured financial conditions on a population that appears less and less able to afford them. In 2013, the Census Bureau announced that the poverty rate in America was 15%, about one in every seven persons and higher than in 2007, which was just before the most recent recession. Nevertheless, according to the Bureau of Justice Statistics, the percentage of cases for which courts have required felony defendants to post money in order to obtain release has increased approximately 65% from 1990 to 2009 (from 37% to 61% of cases overall, mostly from the large increase in use of surety bonds), and the amounts of those financial conditions have steadily risen over the same period.

Unnecessary Pretrial Detention

The problem highlighted by these data comes from the fact that secured financial conditions at bail cause unnecessary pretrial detention. In a recent and rigorous study of 2,000 Colorado cases comparing the effects between defendants ordered to be released on secured financial conditions (requiring either money or property to be paid in advance of release) and those ordered released on unsecured financial conditions (requiring the payment of either money or property only if the defendant failed to appear and not as a precondition to release), defendants with unsecured financial conditions were released in "statistically significantly higher" numbers no matter how high or low their individual risk.[7] Essentially, defendants ordered to be released but forced to pay secured financial conditions: (1) took longer to get out of jail (presumably for the time needed to gather the necessary money or to find willing sureties); and (2) in many cases did not get out at all. In short, using secured bonds leads to the detention of bailable defendants by delaying or preventing pretrial release. These findings are consistent with comparable national data; indeed, the federal government has estimated the percentage of felony defendants detained for the duration of their pretrial period nationally to be approximately 38%, and the percentage of those defendants detained simply due to the lack of money to be approximately 90% of that number.

There are numerous reasons to conclude that anytime a bailable defendant is detained for lack of money (rather than detained because of his or her high risk for pretrial misbehavior), that detention is unnecessary. First, secured money at bail is the most restrictive condition of release – it is typically the only precondition to release itself – and, in most instances, other less-restrictive alternatives are available to respond to pretrial risk without the additional financial condition. Indeed, starting in the 1960s, researchers have demonstrated that courts can use alternatives to release on money bonds that have acceptable outcomes concerning risk to public safety and court appearance. Second, the money itself cannot serve as motivation for anything until it is actually posted. Until then, the money merely detains, and does so unequally among defendants resulting in the unnecessary detention of releasable inmates. This problem is exacerbated by the fact that the financial condition of a bail bond is typically arbitrary; even when judges are capable of expressing reasons for a particular amount, there is often no rational explanation for why a second amount, either lower or higher, might not arguably serve the same purposes. Third, money set with a purpose to detain is likely unlawful under numerous theories of law, and is also unnecessary given the Supreme Court's approval of a lawful detention scheme that uses no money whatsoever. Financial conditions of release are indicators of decisions to release, not to detain; accordingly, any resulting detention due to money bonds used outside of a

---

[7] Michael R. Jones, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option*, 12 (PJI 2013).

lawful detention process makes that money-based detention unnecessary or potentially unlawful. Fourth, no study has ever shown that money can protect the public. Indeed, in virtually every American jurisdiction, financial conditions of bail bonds cannot even be forfeited for new crimes or other breaches in public safety, making the setting of a money bond for public safety irrational. Given that irrationality, any pretrial detention resulting from that practice is per se unnecessary.

Fifth, ever since 1968, when the American Bar Association openly questioned the basic premise that money serves as a motivator for court appearance, no valid study has been conducted to refute that uncertainty. Instead, the best research to date suggests what criminal justice leaders have long suspected: secured money does not matter when it comes to either public safety or court appearance, but it is directly related to pretrial detention. This hypothesis was supported most recently by the Colorado study, mentioned above, which compared outcomes for defendants released on secured bonds with outcomes for defendants released on unsecured bonds. In 2,000 cases of defendants from all risk categories, this research showed that while having to pay the money up-front led to statistically significantly higher detention rates, whether judges used secured or unsecured money bonds did not lead to any differences in court appearance or public safety rates.

A sixth reason for concluding that bailable defendants held on secured financial conditions constitutes unnecessary pretrial detention is that we know of at least one jurisdiction, Washington D.C., that uses virtually no money at all in its bail setting process. Instead, using an "in or out," "bail/no bail" scheme of the kind contemplated by American law, the District of Columbia releases 85-88% of all defendants – detaining the rest through rational, fair, and transparent detention procedures – and yet maintains high court appearance (no FTA) and public safety (no new crime) rates. Moreover, that jurisdiction does so day after day, with all types of defendants charged with all types of crimes, using almost no money whatsoever.

Unnecessary pretrial detention is also suggested whenever we look at the adjudicatory outcomes of defendants' cases to see if they are the sorts of individuals who must be absolutely separated from society. When we look at those outcomes, however, we see that even though we foster a culture of pretrial detention, very few persons arrested or admitted to jail are ultimately sentenced to significant incarceration post-trial. Indeed, only a small fraction of jail inmates nationally (from 3-5%, depending on the source) are sent to prison. In one statewide study, only 14% of those defendants detained for the *entire duration* of their case were sentenced to prison. Thirteen percent had their cases dismissed (or the cases were never filed), and 37% were sentenced to noncustodial sanctions, including probation, community corrections, or home detention. Accordingly, over 50% of those pretrial detainees were released into the community once their cases were done. In another study, more than 25% of felony pretrial detainees were acquitted or had their cases dismissed, and approximately 20% were ultimately sentenced to a noncustodial sentence. Clearly, another disturbing paradox at bail involves the dynamic

of releasing presumptively innocent defendants back into the community only after they have either pleaded or been found guilty of a particular crime.

In addition, and as noted by the Pretrial Justice Institute (PJI), these statistics vary greatly across the United States, and that variation itself hints at the need for reform. According to PJI:

> Looking at the counties individually shows the great disparity in pretrial release practices and outcomes. In 2006, pretrial release rates ranged from a low of 31% in one county to a high of 83% in another. Non-financial release rates ranged from lows of zero in one county, 3% in another, and 5% in a third to a high of 68%.[8]

---

[8] *Important Data on Pretrial Justice* (PJI 2011).

### Different Laws/Different Practices

Bail laws are different among the states, often due to the extent to which those states have fully embraced the principles and practices evolving out of the two previous generations of bail reform in the 1960s and 1980s. Even in states with similar laws, however, pretrial practices can nonetheless vary widely. Indeed, local practices can vary among jurisdictions under the same state laws, and, given the great discretion often afforded at bail, even among judges within individual jurisdictions. Disparity beyond that needed to individualize bail settings can rightfully cause concerns over equal justice, through which Americans can be reasonably assured that the laws will not have widely varying application depending on their particular geographical location, court, or judge.

Normally, state and federal constitutional law would provide adequate benchmarks to maintain equal justice, but with bail we have an unfortunate scarcity of language and opinions from which to gauge particular practices or even the laws from which those practices derive. Fortunately, however, we have best practice standards on pretrial release and detention that take fundamental legal principles and marry them with research to make recommendations concerning virtually every issue surrounding pretrial justice. In this current generation of pretrial reform, we are realizing that both bail practices and the laws themselves – from court rules to constitutions – must be held up to best practices and the legal principles underlying them to create bail schemes that are fair and applied somewhat equally among the states.

The American Bar Association's (ABA's) Criminal Justice Standards on Pretrial Release can provide the benchmarks that we do not readily find in bail law. When followed, those Standards provide the framework from which pretrial practices or even laws can be measured, implemented, or improved. For example, the use of monetary bail schedules (a document assigning dollar amounts to particular charges regardless of the characteristics of any individual defendant) are illegal in some states but actually required by law in others. There is very little law on the subject, but the ABA standards (using fundamental legal principles, such as the need for individuality in bail setting as articulated by the United States Supreme Court), research (indicating that release or detention based on individual risk is a superior practice to any mechanism based solely on charge and wealth), and logic (the standards call schedules "arbitrary and inflexible") reject the use of monetary bail schedules, thus suggesting that any state that either mandates or permits their use should consider statutory amendment.

**Sources and Resources:** *American Bar Association Standards for Criminal Justice – Pretrial Release* (3rd ed. 2007).

Pretrial detention, whether for a few days or for the duration of the case, imposes certain costs, and unnecessary pretrial detention does so wastefully. In a purely monetary sense, these costs can be estimated, such as the comparative cost of incarceration (from $50 to as much as $150 per day) versus community supervision (from as low as $3 to $5 per day). Given the volume of defendants and their varying lengths of stays, individual jails can incur costs of millions of dollars per year simply to house lower risk defendants who are also presumed innocent by the law. Indeed, the United States Department of Justice estimates that keeping the pretrial population behind bars costs American taxpayers roughly 9 billion dollars per year. Jails that are crowded can create an even more costly scenario for taxpayers, as new jail construction can easily reach $75,000 to $100,000 per inmate bed. Added to these costs are dollars associated with lost wages, economic mobility (including intergenerational effects), possible welfare costs for defendant families, and a variety of social costs, including denying the defendant the ability to assist with his or her own defense, the possibility of imposing punishment prior to conviction, and eroding justice system credibility due to its complacency with a wealth-based system of pretrial freedom.

Perhaps more disturbing, though, is research suggesting that pretrial detention alone, all other things being equal, leads to harsher treatment and outcomes than pretrial release. Relatively recent research from both the Bureau of Justice Statistics and the New York City Criminal Justice Agency continues to confirm studies conducted over the last 60 years demonstrating that, controlling for all other factors, defendants detained pretrial are convicted and plead guilty more often, and are sentenced to prison and receive harsher sentences than those who are released. Moreover, as recently as November 2013, the Laura and John Arnold Foundation released a study of over 150,000 defendants finding that – all other things being equal – defendants detained pretrial were over four times more likely to be sentenced to jail (and with longer sentences) and three times more likely to be sentenced to prison (again with longer sentences) than defendants who were not detained.[9]

While detention for a defendant's entire pretrial period has decades of documented negative effects, the Arnold Foundation research is also beginning to demonstrate that even small amounts of pretrial detention – perhaps even the few days necessary to secure funds to pay a cash bond or fee for a surety bond – have negative effects on defendants and actually makes them more at risk for pretrial misbehavior.[10] Looking at the same 150,000 case data set, the Arnold researchers found that low- and moderate-risk defendants held only 2 to 3 days were more likely to commit crimes and fail to appear for court before trial than similar defendants held 24 hours or less. As the time

---

[9] *See* Christopher T. Lowenkamp, Marie VanNostrand, & Alexander Holsinger, *Investigating the Impact of Pretrial Detention on Sentencing Outcomes*, at 10-11 (Laura & John Arnold Found. 2013).

[10] *See* Christopher T. Lowenkamp, Marie VanNostrand, & Alexander Holsinger, *The Hidden Costs of Pretrial Detention* (Laura & John Arnold Found. 2013).

in jail increased, the researchers found, the likelihood of defendant misbehavior also increased. The study also found similar correlations between pretrial detention and long-term recidivism, especially for lower risk defendants. In a field of paradoxes, the idea that a judge setting a condition of bail intending to protect public safety might be unwittingly *increasing* the danger to the public – both short and long-term – is cause for radically rethinking the way we administer bail.

## Other Areas in Need of Pretrial Reform

Unnecessary pretrial detention is a deplorable byproduct of the traditional money bail system, but it is not the only part of that system in need of significant reform. In many states, the overreliance on money at bail takes the place of a transparent and due-process-laden detention scheme based on risk, which would allow for the detention of high-risk defendants with no bail. Indeed, the traditional money bail system fosters processes that allow certain high-risk defendants to effectively purchase their freedom, often without being assessed for their pretrial risk and often without supervision. These processes include using bail schedules (through which defendants are released by paying an arbitrary money amount based on charge alone), a practice of dubious legal validity and counter to any notions of public safety. They include using bail bondsmen, who operate under a business model designed to maximize profit based on getting defendants back to court but with no regard for public safety. And they include setting financial conditions to help protect the public, a practice that is both legally and empirically flawed. In short, the use of money at bail at the expense of risk-based best practices tends to create the two main reasons cited for the need for pretrial reform: (1) it needlessly and unfairly keeps lower risk defendants in jail, disproportionately affecting poor and minority defendants and at a high cost to taxpayers; and (2) it too often allows higher risk defendants out of jail at the expense of public safety and integrity of the justice system. Both of these reasons were illustrated by the Colorado study, cited above, which documented that when making bail decisions without the benefit of an empirical risk instrument, judges often set financial conditions that not only kept lower risk persons in jail, but also frequently allowed the highest risk defendants out.

While the effect of money at bail is often cited as a reason for pretrial reform, research over the last 25 years has also illuminated other issues ripe for pretrial justice improvements. They include the need for (1) bail education among all criminal justice system actors; (2) data-driven policies and infrastructure to administer bail; (3) improvements to procedures for release through citations and summonses; (4) better prosecutorial and defense attorney involvement at the front-end of the system; (5) empirically created pretrial risk assessment instruments; (6) traditional (and untraditional) pretrial services functions in jurisdictions without those functions; (7) improvements to the timing and nature of first appearances; (8) judicial release and detention decision-making to follow best practices; (9) systems to allocate resources to better effectuate best practices; and (10) changes in county ordinances, state statutes,

and even state constitutions to embrace and facilitate pretrial justice and best practices at bail.

> *"What has been made clear . . . is that our present attitudes toward bail are not only cruel, but really completely illogical. . . . '[O]nly one factor determines whether a defendant stays in jail before he comes to trial [and] that factor is, simply, money."*
>
> Attorney General Robert Kennedy, 1962
>
> *Many pretrial inmates "are forced to remain in custody . . . because they simply cannot afford to post the bail required – very often, just a few hundred dollars."*
>
> Attorney General Eric Holder, 2011

## The Third Generation of Bail/Pretrial Reform

The traditional money bail system that has existed in America since the turn of the 20th century is deficient legally, economically, and socially, and virtually every neutral and objective bail study conducted over the last 90 years has called for its reform. Indeed, over the last century, America has undergone two generations of bail reform, but those generations have not sufficed to fully achieve what we know today constitutes pretrial justice. Nevertheless, we are entering a new generation of pretrial reform with the same three hallmarks seen in previous generations.

First, like previous generations, we now have an extensive body of research literature – indeed, we have more than previous generations – pointing uniformly in a single direction toward best practices at bail and toward improvements over the status quo. Second, we have the necessary meeting of minds of an impressive number of national organizations – from police chiefs and sheriffs, to county administrators and judges – embracing the research and calling for data-driven pretrial improvements. Third, and finally, we are now seeing jurisdictions actually changing their laws, policies, and practices to reflect best practice recommendations for improvements. Fortunately, through this third generation of pretrial reform, we already know the answers to most of the pressing issues at bail. We know what changes must be made to state laws, and we know how to follow the law and the research to create bail schemes in which pretrial practices are rational, fair, and transparent.

A deeper understanding of the foundations of bail makes the need for pretrial improvements even more apparent. The next three parts of this paper are designed to

summarize the evolution and importance of three of the most important foundational aspects of bail – the history, the law, and the research.

**Additional Sources and Resources:** American Bar Association Standards for Criminal Justice – Pretrial Release (3rd ed. 2007); Spike Bradford, *For Better or for Profit: How the Bail Bonding Industry Stands in the Way of Fair and Effective Pretrial Justice* (JPI 2012); E. Ann Carson & William J. Sabol, *Prisoners in 2011* (BJS 2012); *Case Studies: the D.C. Pretrial Services Agency: Lessons From Five Decades of Innovation and Growth* (PJI), found at http://www.pretrial.org/download/pji-reports/Case%20Study-%20DC%20Pretrial%20Services%20-%20PJI%202009.pdf; Thomas H. Cohen & Tracey Kyckelhahn, *Felony Defendants in Large Urban Counties*, 2006 (BJS 2010); Jean Chung, *Bailing on Baltimore: Voices from the Front Lines of the Justice System* (JPI 2012); Thomas H. Cohen & Brian A. Reaves, *Pretrial Release of Felony Defendants in State Courts* (BJS 2007); Jamie Fellner, *The Price of Freedom: Bail and Pretrial Detention of Low Income Nonfelony Defendants in New York City* (Human Rights Watch 2010); *Frequently Asked Questions About Pretrial Release Decision Making* (ABA 2012); Robert F. Kennedy, *Address by Attorney General Robert F. Kennedy to the American Bar Association House of Delegates, San Francisco, Cal.*, (Aug. 6, 1962) available at http://www.justice.gov/ag/rfkspeeches/1962/08-06-1962%20Pro.pdf; Christopher T. Lowenkamp & Marie VanNostrand, *Exploring the Impact of Supervision on Pretrial Outcomes* (Laura & John Arnold Found. 2013); Barry Mahoney, Bruce D. Beaudin, John A. Carver, III, Daniel B. Ryan, & Richard B. Hoffman, *Pretrial Services Programs: Responsibilities and Potential* (NIJ 2001); Todd D. Minton, *Jail Inmates at Midyear 2012 – Statistical Tables* (BJS 2013); *National Symposium on Pretrial Justice: Summary Report of Proceedings* (PJI/BJA 2011); Melissa Neal, *Bail Fail: Why the U.S. Should End the Practice of Using Money for Bail* (JPI 2012); Mary T. Phillips, *Bail, Detention, and Non-Felony Case Outcomes, Research Brief Series No. 14* (NYCCJA 2007); Mary T. Phillips, *Pretrial Detention and Case Outcomes, Part 2, Felony Cases, Final Report* (NYCCJA 2008); *Rational and Transparent Bail Decision Making: Moving From a Cash-Based to a Risk-Based Process* (PJI/MacArthur Found. 2012); Brian A. Reaves, *Felony Defendants in Large Urban Counties, 2009 – Statistical Tables* (BJS 2013); *Report of the Attorney General's Committee on Poverty and the Administration of Federal Criminal Justice* (Univ. of Mich. 2011) (1963); *Responses to Claims About Money Bail for Criminal Justice Decision Makers* (PJI 2010); Timothy R. Schnacke, Michael R. Jones, Claire M.B. Brooker, *The Third Generation of Bail Reform* (Univ. Den. L. Rev. online, 2011); Standards on Pretrial Release (NAPSA, 3rd ed. 2004); Bruce Western & Becky Pettit, *Collateral Costs: Incarceration's Effect on Economic Mobility* (The PEW Charitable Trusts 2010).

# Chapter 2: The History of Bail

According to the American Historical Association, studying history is crucial to helping us understand ourselves and others in the world around us. There are countless quotes on the importance of studying history from which to draw, but perhaps most relevant to bail is one from philosopher Soren Kierkegaard, who reportedly said, "Life must be lived forward, but it can only be understood backward." Indeed, much of bail today is complex and confusing, and the only way to truly understand it is to view it through a historical lens.

## The Importance of Knowing Bail's History

Understanding the history of bail is not simply an academic exercise. When the United States Supreme Court equated the right to bail to a "right to release before trial," and likened the modern practice of bail with the "ancient practice of securing the oaths of responsible persons to stand as sureties for the accused,"[11] the Court was explaining the law by drawing upon notions discernible only through knowledge of history. When the commercial bail insurance companies argue that pretrial services programs have "strayed" beyond their original purpose, their argument is not fully understood without knowledge of 20th century bail, and especially the improvements gained from the first generation of bail reform in the 1960s. Some state appellate courts have relied on sometimes detailed accounts of the history of bail in order to decide cases related to release under "sufficient sureties," a term fully known only through the lens of history.

> *"This difference [between the U.S. and the Minnesota Constitution] is critical to our analysis and to fully understand this critical difference, some knowledge of the history of bail is necessary. Therefore, it is important to examine the origin of bail and its development in Anglo-American jurisprudence."*
>
> *State v. Brooks*, 604 N.W.2d 345 (Minn. 2000)

In short, knowledge of the history of bail is necessary to pretrial reform, and therefore it is crucial that this history be shared. Indeed, the history of bail is the starting point for understanding all of pretrial justice, for that history has shaped our laws, guided our research, helped to mold our best practice standards, and forced changes to our core definitions of terms and phrases. Fundamentally, though, the history of bail answers two pressing questions surrounding pretrial justice: (1) given all that we know about the

---

[11] *Stack v. Boyle,* 342 U.S. 1, 4-5 (1951).

deleterious effects of money at bail, how did America, as opposed to the rest of the world, come to rely upon money so completely?; and (2) does history suggest solutions to this dilemma, which might lead to American pretrial justice?

---

### Civil Rights, Poverty, and Bail

Anyone who has read the speeches of Robert F. Kennedy while he was Attorney General knows that civil rights, poverty, and bail were three key issues he wished to address. Addressing them together, as he often did, was no accident, as the three topics were, and continue to be, intimately related.

In 1961, philanthropist Louis Schweitzer and magazine editor Herbert Sturz took their concerns over the administration of bail in New York City (a system "that granted liberty based on income") to Robert Kennedy and Daniel Freed, Department of Justice liaison to the newly created Committee on Poverty and the Administration of Federal Criminal Justice, known as the "Allen Committee." Schweitzer's and Sturz's efforts ultimately led to the creation of the Vera Foundation (now the Vera Institute of Justice), whose pioneering work on the Manhattan Bail Project heavily influenced the first generation of bail reform by finding effective alternatives to the commercial bail system. Freed, in turn, took the Vera work and incorporated it into an entire chapter of the Allen Committee's report, leading to the first National Conference on Bail and Criminal Justice in 1964.

At the same time that these bail and poverty reformers were working to change American notions of equal justice, civil rights activists were taking on a traditionally difficult hurdle for Southern blacks – the lack of money to bail themselves and others out of jail – and using it to their advantage. Through the "jail, no bail" policy, activists refused to pay bail or fines after being arrested for sit-ins, opting instead to have the government incarcerate them, and sometimes to force them to work hard labor, to bring more attention to their cause.

The link between civil rights, poverty, and bail was probably inevitable, and Kennedy set out to rectify overlapping injustices seen in all three areas. But despite promising improvements encompassed in the war on poverty, the civil rights movement, and the first generation of bail reform in the 1960s, we remain unfortunately tolerant of a bail process inherently biased against the poor and disproportionately affecting persons of color. Studies continue to demonstrate that bail amounts are empirically related to increased (and typically needless) pretrial detention, and other studies are equally consistent in demonstrating racial disparity in the application of bail and detention.

Fortunately, however, just like those persons pursuing civil rights and equal justice in the 20th century, the current generation of pretrial reform is fueled by committed individuals urging cultural changes to a system manifested by disparate state laws, unfair practices, and irrational policies that negatively affect the basic human rights of the most vulnerable among us. The commitment of those individuals, stemming from the success of past reformers, remains the catalyst for pretrial justice across the nation.

**Sources and Resources:** Thomas H. Cohen and Brian A. Reaves, *Pretrial Release of Felony Defendants in State Courts, 1990-2004* (BJS Nov. 2007); Cynthia E. Jones, *"Give Us Free": Addressing Racial Disparities in Bail Determinations,* 16 N.Y.U. J. Legis. & Pub. Pol'y 919 (2013); Michael R. Jones, *Unsecured Bonds: The As Effective and Most Efficient*

*Pretrial Release Option* (PJI Oct. 2013); Besiki Kutateladze, Vanessa Lynn, & Edward Liang, *Do Race and Ethnicity Matter in Prosecution? Review of Empirical Studies* (1st Ed.) (Vera Institute of Justice 2012) at 11-12; *National Symposium on Pretrial Justice: Summary Report of Proceedings* at 35-35 and citations therein (PJI/BJA 2011) (statement of Professor Cynthia Jones).

## Origins of Bail

While bail can be traced to ancient Rome, our traditional American understanding of bail derives primarily from English roots. When the Germanic tribes the Angles, the Saxons, and the Jutes migrated to Britain after the fall of Rome in the fifth century, they brought with them the blood feud as the primary means of settling disputes. Whenever one person wronged another, the families of the accused and the victim would often pursue a private war until all persons in one or both of the families were killed. This form of "justice," however, was brutal and costly, and so these tribes quickly settled on a different legal system based on compensation (first with goods and later with money) to settle wrongs. This compensation, in turn, was based on the concept of the "wergeld," meaning "man price" or "man payment" and sometimes more generally called a "bot," which was a value placed on every person (and apparently on every person's property) according to social rank. Historians note the existence of detailed tariffs assigning full wergeld amounts to be paid for killing persons of various ranks as well as partial amounts payable for injuries, such as loss of limbs or other wrongs. As a replacement to the blood feud between families, the wergeld system was also initially based on concepts of kinship and private justice, which meant that wrongs were still settled between families, unlike today, where crimes are considered to be wrongs against all people or the state.

With the wergeld system as a backdrop, historians agree on what was likely a prototypical bail setting that we now recognize as the ancestor to America's current system of release. Author Hermine Meyer described that original bail process as follows:

> Since the [wergeld] sums involved were considerable and could rarely be paid at once, the offender, through his family, offered sureties, or *wereborh*, for the payment of the *wergeld*. If accepted, the injured party met with the offender and his surety. The offender gave a *wadia*, a *wed*, such as a stick, as a symbol or pledging or an indication of the assumption of responsibility. The creditor then gave it to the surety, indicating that he recognized the surety as the trustee for the debt. He thereby relinquished his right to use force against the debtor. The debtor's pledge constituted a pledging of person and property. Instead of finding himself

in the hands of the creditor, the debtor found himself, up to the date when payment fell due, in the hands of the surety.[12]

This is, essentially, the "ancient practice of securing the oaths" referred to by the Supreme Court in *Stack v. Boyle,* and it has certain fundamental properties that are important to note. First, the surety (also known as the "pledge" or the "bail") was a person, and thus the system of release became known as the "personal surety system." Second, the surety was responsible for making sure the accused paid the wergeld to avoid a feud, and he did so by agreeing in early years to stand in completely for the accused upon default of his obligations ("body for body," it was reported, meaning that the surety might also suffer some physical punishment upon default), and in later years to at least pay the wergeld himself in the event of default. Thus, the personal surety system was based on the use of recognizances, which were described by Blackstone as obligations or debts that would be voided upon performance of specified acts. Though not completely the same historically, they are essentially what we might now call unsecured bonds using co-signors, with nobody required to pay any money up-front, and with the security on any particular bond coming from the sureties, or persons, who were willing to take on the role and acknowledge the amount potentially owed upon default.

Third, the surety was not allowed to be repaid or otherwise profit from this arrangement. As noted above, the wadia, or the symbol of the suretyship arrangement, was typically a stick or what historians have described as some item of trifling value. In fact, as discussed later, even reimbursing or merely promising to reimburse a surety upon default – a legal concept known as indemnification – was declared unlawful in both England and America and remained so until the 1800s.

Fourth, the surety's responsibility over the accused was great and was based on a theory of continued custody, with the sureties often being called "private jailers" or "jailers of [the accused's] own choosing."[13] Indeed, it was this great responsibility, likely coupled with the prohibition on reimbursement upon default and on profiting from the system, which led authorities to bestow great powers to sureties as jailers to produce the accused – powers that today we often associate with those possessed by bounty hunters under the common law. Fifth, the purpose of bail in this earliest of examples was to avoid a blood feud between families. As we will see, that purpose would change only once in later history. Sixth and finally, the rationale behind this original bail setting made sense because the amount of the payment upon default was identical to the amount of the punishment. Accordingly, because the amount of the promised payment

---

[12] Hermine Herta Meyer, *Constitutionality of Pretrial Detention,* 60 Geo. L. J. 1139, 1146 (1971-1972) (citing and summarizing Elsa de Haas, *Antiquities of Bail: Origin and Historical Development in Criminal Cases to the Year 1275,* 3-15 (NY, AMS Press, 1966).
[13] *Reese v. United States*, 76 U.S. (9 Wall.) 13, 21 (1869).

was identical to the wergeld, for centuries there was never any questioning whether the use of that promised amount for bail was arbitrary, excessive, or otherwise unfair.

The administration of bail has changed enormously from this original bail setting, and these changes in America can be attributed largely to the intersection during the 20th century of two historical phenomena. The first was the slow evolution from the personal surety system using unsecured financial conditions to a commercial surety system (with profit and indemnification) primarily using secured financial conditions. The second was the often misunderstood creation and nurturing of a "bail/no bail" or "release/no release" dichotomy, which continues to this day.

## The Evolution to Secured Bonds/Commercial Sureties

The gradual evolution from a personal surety system using unsecured bonds to the now familiar commercial surety system using secured bonds in America began with the Norman Invasion. When the Normans arrived in 1066, they soon made changes to the entire criminal justice system, which included moving from a private justice system to a more public one through three royal initiatives. First, the crown initiated the now-familiar idea of crimes against the state by making certain felonies "crimes of royal concern." Second, whereas previously the commencement of a dispute between families might start with a private summons based upon sworn certainty, the crown initiated the mechanism of the presentment jury, a group of individuals who could initiate an arrest upon mere suspicion from third parties. Third, the crown established itinerant justices, who would travel from shire to shire to exert royal control over defendants committing crimes of royal concern. These three changes ran parallel to the creation of jails to hold various arrestees, although the early jails were crude, often barbaric, and led to many escapes.

These changes to the criminal justice process also had a measurable effect on the number of cases requiring bail. In particular, the presentment jury process led to more arrests than before, and the itinerant justice system led to long delays between arrest and trial. Because the jails at the time were not meant to hold so many persons and the sheriffs were reluctant to face the severe penalties for allowing escapes, those sheriffs began to rely more frequently upon personal sureties, typically responsible (and preferably landowning) persons known to the sheriff, who were willing to take control of the accused prior to trial. The need for more personal sureties, in turn, was met through the growth of the parallel institutions of local government units known as tithings and hundreds – a part of the overall development of the frankpledge system, a system in which persons were placed in groups to engage in mutual supervision and control.

While there is disagreement on whether bail was an inherent function of frankpledge, historians have frequently documented sheriffs using sureties from within the tithings and hundreds (and sometimes using the entire group), indicating that that these larger non-family entities served as a safety valve so that sheriffs or judicial officials rarely lacked for "sufficient" sureties in any particular case. The fundamental point is that in this period of English history, sureties were individuals who were willing to take responsibility over defendants – for no money and with no expectation of indemnification upon default – and the sufficiency of the sureties behind any particular release on bail came from finding one or more of these individuals, a process that was made exceedingly simpler through the use of the collective, non-family groups.

All of this meant that the fundamental purpose of bail had changed: whereas the purpose of the original bail setting process of providing oaths and pledges was to avoid a blood feud between families while the accused met his obligations, the use of more

lengthy public processes and jails meant that the purpose of bail would henceforth be to provide a mechanism for release. As before, the purpose of conditioning that release by requiring sureties was to motivate the accused to face justice – first to pay the debt but now to appear for court – and, indeed, court appearance remained the sole purpose for limiting pretrial freedom until the 20th century.

Additional alterations to the criminal process occurred after the Norman Invasion, but the two most relevant to this discussion involve changes in the criminal penalties that a defendant might face as well as changes in the persons, or sureties, and their associated promises at bail. At the risk of being overly simplistic, punishments in Anglo-Saxon England could be summed up by saying that if a person was not summarily executed or mutilated for his crime (for that was the plight of persons with no legal standing, who had been caught in the act, or persons of "ill repute" or long criminal histories, etc.), then that person would be expected to make some payment. With the Normans, however, everything changed. Slowly doing away with the wergeld payments, the Normans introduced first afflictive punishment, in the form of ordeals and duels, and later capital and other forms of corporal punishment and prison for virtually all other offenses.

The changes in penalties had a tremendous impact on what we know today as bail. Before the Norman Invasion, the surety's pledge matched the potential monetary penalty perfectly. If the wergeld was thirty silver pieces, the surety was expected to pay exactly thirty silver pieces upon default of the primary debtor. After the Invasion, however, with increasing use of capital punishment, corporal punishment, and prison sentences, it became frequently more difficult to assign the amount that ought to be pledged, primarily because assigning a monetary equivalent to either corporal punishment or imprisonment is largely an arbitrary act. Moreover, the threat of these seemingly more severe punishments led to increasing numbers of defendants who refused to stay put, which created additional complexity to the bail decision. These complexities, however, were not enough to cause society to radically change course from its use of the personal surety system. Instead, that change came when both England and America began running out of the sureties themselves.

As noted previously, the personal surety system generally had three elements: (1) a reputable person (the surety, sometimes called the "pledge" or the "bail"); (2) this person's willingness to take responsibility for the accused under a private jailer theory and with a promise to pay the required financial condition on the back-end – that is, only if the defendant forfeited his obligation; and (3) this person's willingness to take the responsibility without any initial remuneration or even the promise of any future payment if the accused were to forfeit the financial condition of bail or release. This last requirement addressed the concept of indemnification of sureties, which was declared unlawful by both England and America as being against the fundamental public policy for having sureties take responsibility in the first place. In both England and America, courts repeatedly articulated (albeit in various forms) the following rationale when declaring surety indemnification unlawful: once a surety was paid or given a promise to

be paid the amount that could potentially be forfeited, that surety lost all interest and motivation to make sure that the condition of release was performed. Thus, a prohibition on indemnifying sureties was a foundational part of the personal surety system.

And indeed, the personal surety system flourished in England and America for centuries, virtually ensuring that those deemed bailable were released with "sufficient sureties," which were designed to provide assurance of court appearance. Unfortunately, however, in the 1800s both England and America began running out of sureties. There are many reasons for this, including the demise of the frankpledge system in England, and the expansive frontier and urban areas in America that diluted the personal relationships necessary for a personal surety system. Nevertheless, for these and other reasons, the demand for personal sureties gradually outgrew supply, ultimately leading to many bailable defendants being unnecessarily detained.

It is at this point in history that England and the United States parted ways in how to resolve the dilemma of bailable defendants being detained for lack of sureties. In England (and, indeed, in the rest of the world), the laws were amended to allow judges to dispense with sureties altogether when justice so required. In America, however, courts and legislatures began chipping away at the laws against surety indemnification. This transformation differed among the states. In the end, however, across America states gradually allowed sureties to demand re-payment upon a defendant's default and ultimately to profit from the bail enterprise itself. By 1898, the first commercial surety was reportedly opened for business in America. And by 1912, the United States Supreme Court wrote, "The distinction between bail [i.e., common law bail, which forbade indemnification] and suretyship is pretty nearly forgotten. The interest to produce the body of the principal in court is impersonal and wholly pecuniary."[14]

Looking at court opinions from the 1800s, we see that the evolution from a personal to a commercial surety system (in addition to the states gradually increasing defendants ability to self-pay their own financial conditions, a practice that had existed before, but that was used only rarely) was done in large part to help release bailable defendants who were incarcerated due only to their inability to find willing sureties. However, that evolution ultimately virtually assured unnecessary pretrial incarceration because bondsmen began charging money up-front (and later requiring collateral) to gain release in addition to requiring a promise of indemnification. While America may have purposefully moved toward a commercial surety system from a personal surety system to help release bailable defendants, perhaps unwittingly, and certainly more importantly, it moved to a secured money bail system (requiring money to be paid before release is granted) from an unsecured system (promising to pay money only upon default of obligations). The result has been an increase in the detention of bailable defendants over the last 100 years.

---

[14] *Leary v. United States,* 224 U.S. 567, 575 (1912).

The "Bail/No Bail" Dichotomy

The second major historical phenomenon involved the creation and nurturing of a "bail/no bail" dichotomy in both England and America. Between the Norman Invasion and 1275, custom gradually established which offenses were bailable and which were not. In 1166, King Henry II bolstered the concept of detention based on English custom through the Assize of Clarendon, which established a list of felonies of royal concern and allowed detention based on charges customarily considered unbailable. Around 1275, however, Parliament and the Crown discovered a number of abuses, including sheriffs detaining bailable defendants who refused or could not pay those sheriffs a fee, and sheriffs releasing unbailable defendants who were able to pay some fee. In response, Parliament enacted the Statute of Westminster in 1275, which hoped to curb abuses by establishing criteria governing bailability (largely based on a prediction of the outcome of the trial by examining the nature of the charge, the weight of the evidence, and the character of the accused) and, while doing so, officially categorized presumptively bailable and unbailable offenses.

Importantly, this statutory enactment began the legal tradition of expressly articulating a bail/no bail scheme, in which a right to bail would be given to some, but not necessarily to all defendants. Perhaps more important, however, are other elements of the Statute that ensured that bailable defendants would be released and unbailable defendants would be detained. In 1275, the sheriffs were expressly warned through the Statute that to deny the release of bailable defendants or to release unbailable defendants was against the law; all defendants were to be either released or detained (depending on their category), and without any additional payment to the sheriff. Doing otherwise was deemed a criminal act.

> *"And if the Sheriff, or any other, let any go at large by Surety, that is not replevisable . . . he shall lose his Fee and Office for ever. . . . And if any withhold Prisoners replevisable, after that they have offered sufficient Surety, he shall pay a grievous Amerciament to the King; and if he take any Reward for the Deliverance of such, he shall pay double to the Prisoner, and also shall [be in the great mercy of] the King."*
>
> Statute of Westminster 3 Edward I. c. 15, *quoted in* Elsa de Haas, Antiquities of Bail, Origin and Historical Development in Criminal Cases to the Year 1275 (NY AMS Press 1966).

Accordingly, in 1275 the right to bail was meant to equal a right to release and the denial of a right to bail was meant to equal detention, and, generally speaking, these important concepts continued through the history of bail in England. Indeed, throughout that history any interference with bailable defendants being released or

with unbailable (or those defendants whom society deemed unbailable) defendants being lawfully detained, typically led to society recognizing and then correcting that abuse. Thus, for example, when Parliament learned that justices were effectively detaining bailable defendants through procedural delays, it passed the Habeas Corpus Act of 1679, which provided procedures designed to prevent delays prior to bail hearings. Likewise, when corrupt justices were allowing the release of unbailable defendants, thus causing what many believed to be an increase in crime, it was rearticulated in 1554 that unbailable defendants could not be released, and that bail decisions be held in open session or by two or more justices sitting together. As another example, when justices began setting financial conditions for bailable defendants in prohibitively high amounts, the abuse led William and Mary to consent to the English Bill of Rights in 1689, which declared, among other things, that "excessive bail ought not to be required."[15]

## "Bail" and "No Bail" in America

Both the concept of a "bail/no bail" dichotomy as well as the parallel notions that "bail" should equal release and "no bail" should equal detention followed into the American Colonies. Generally, those Colonies applied English law verbatim, but differences in beliefs about criminal justice, customs, and even crime rates led to more liberal criminal penalties and bail laws. For example, in 1641 the Massachusetts Body of Liberties created an unequivocal right to bail to all except for persons charged with capital offenses, and it also removed a number of crimes from its list of capital offenses. In 1682, Pennsylvania adopted an even more liberal law, granting bail to all persons except when charged with a capital offense "where proof is evident or the presumption great," adding an element of evidentiary fact finding so as to also allow bail even for certain capital defendants. This provision became the model for nearly every American jurisdiction afterward, virtually assuring that "bail/no bail" schemes would ultimately find firm establishment in America.

Even in the federal system – despite its lack of a right to bail clause in the United States Constitution – the Judiciary Act of 1789 established a "bail/no bail," "release/detain" scheme that survived radical expansion in 1984 and that still exists today. Essentially, any language articulating that "all persons shall be bailable . . . unless or except" is an articulation of a bail/no bail dichotomy. Whether that language is found in a constitution or a statute, it is more appropriately expressed as "release (or freedom) or detention" because the notion that bailability should lead to release was foundational in early American law.

---

[15] English Bill of Rights, 1 W. & M., 2nd Sess., Ch. 2 (1689).

## "Bail" and "No Bail" in the Federal and District of Columbia Systems

Both the federal and the District of Columbia bail statutes are based on "bail/no bail" or "release/no release" schemes, which, in turn, are based on legal and evidence-based pretrial practices such as those found in the American Bar Association's Criminal Justice Standards on Pretrial Release. Indeed, each statute contains general legislative titles describing the process as either "release" or "detention" during the pretrial phase, and each starts the bail process by providing judges with four options: (1) release on personal recognizance or with an unsecured appearance bond; (2) release on a condition or combination of conditions; (3) temporary detention; or (4) full detention. Each statute then has provisions describing how each release or detention option should function.

Because they successfully separate bailable from unbailable defendants, thus allowing the system to lawfully and transparently detain unbailable defendants with essentially none of the conditions associated with release (including secured financial conditions), both statutes are also able to include sections forbidding financial conditions that result in the preventive detention of the defendant – an abuse seen frequently in states that have not fully incorporated notions of a release/no release system.

The "bail" or "release" sections of both statutes use certain best practice pretrial processes, such as presumptions for release on recognizance, using "least restrictive conditions" to provide reasonable assurance of public safety and court appearance, allowing supervision through pretrial services entities for both public safety and court appearance concerns, and prompt review and appeals for release and detention orders.

The "no bail" or "detention" sections of both statutes are much the same as when the United States Supreme Court upheld the federal provisions against facial due process and 8th Amendment claims in *United States v. Salerno* in 1987. The *Salerno* opinion emphasized key elements of the existing federal statute that helped it to overcome constitutional challenges by "narrowly focusing" on the issue of pretrial crime. Moreover, the Supreme Court wrote, the statute appropriately provided "extensive safeguards" to further the accuracy of the judicial determination as well as to ensure that detention remained a carefully limited exception to liberty. Those safeguards included: (1) detention was limited to only "the most serious of crimes;" (2) the arrestee was entitled to a prompt hearing and the maximum length of pretrial detention was limited by stringent speedy trial time limitations; (3) detainees were to be housed separately from those serving sentences or awaiting appeals; (4) after a finding of probable cause, a "fullblown adversary hearing" was held in which the government was required to convince a neutral decision maker by clear and convincing evidence that no condition or combination of conditions of release would reasonably assure court appearance or the safety of the community or any person; (5) detainees had a right to counsel, and could testify or present information by proffer and cross-examine witnesses who appeared at the hearing; (6) judges were guided by statutorily enumerated factors such as the nature of the charge and the characteristics of the defendant; (7) judges were to include written findings of fact and a written statement of reasons for a decision to detain; and (8) detention decisions were subject to immediate appellate review.

While advances in pretrial research are beginning to suggest the need for certain alterations to the federal and D.C. statutes, both laws are currently considered "model" bail laws, and the Summary Report to the National Symposium on Pretrial Justice specifically recommends using the federal statute as a structural template to craft meaningful and transparent preventive detention provisions.

**Sources and Resources**: District of Columbia Code, §§ 23-1301-09, 1321-33; Federal Statute, 18 U.S.C. §§ 3141-56; *United States v. Salerno*, 481 U.S. 739 (1987); *National Symposium on Pretrial Justice: Summary Report of Proceedings*, at 42 (PJI/BJA 2011).

Indeed, given our country's foundational principles of liberty and freedom, it is not surprising that this parallel notion of bailable defendants actually obtaining release followed from England to America. William Blackstone, whose Commentaries on the Laws of England influenced our Founding Fathers as well as the entire judicial system and legal community, reported that denying the release of a bailable defendant during the American colonial period was considered itself an offense. In examining the administration of bail in Colonial Pennsylvania, author Paul Lermack reported that few defendants had trouble finding sureties, and thus, release.

This notion is also seen in early expressions of the law derived from court opinions. Thus, in the 1891 case of *United States v. Barber*, the United States Supreme Court articulated that in criminal bail, "it is for the interest of the public as well as the accused that the latter should not be detained in custody prior to his trial if the government can be assured of his presence at that time."[16] Four years later, in *Hudson v. Parker,* the Supreme Court wrote that the laws of the United States "have been framed upon the theory that [the accused] shall not, until he has been finally adjudged guilty . . . be absolutely compelled to undergo imprisonment or punishment."[17] Indeed, it was *Hudson* upon which the Supreme

Court relied in *Stack v. Boyle* in 1951, when the Court wrote its memorable quote equating the right to bail with the right to release and freedom:

> From the passage of the Judiciary Act of 1789, to the present Federal Rules of Criminal Procedure, Rule 46 (a)(1), federal law has unequivocally provided that a person arrested for a non-capital offense shall be admitted to bail. This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction. Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning.[18]

---

[16] *United States v. Barber*, 140 U.S. 164, 167 (1891).

[17] *United States v. Hudson*, 156 U.S. 277, 285 (1895).

[18] 342 U.S. 1, 4 (1951) (internal citations omitted).

In his concurring opinion, Justice Jackson elaborated on the Court's reasoning:

> The practice of admission to bail, as it has evolved in Anglo-American law, is not a device for keeping persons in jail upon mere accusation until it is found convenient to give them a trial. On the contrary, the spirit of the procedure is to enable them to stay out of jail until a trial has found them guilty. Without this conditional privilege, even those wrongly accused are punished by a period of imprisonment while awaiting trial and are handicapped in consulting counsel, searching for evidence and witnesses, and preparing a defense. To open a way of escape from this handicap and possible injustice, Congress commands allowance of bail for one under charge of any offense not punishable by death . . . providing: 'A person arrested for an offense not punishable by death shall be admitted to bail' . . . before conviction.[19]

And finally, in perhaps its best known expression of the right to bail, the Supreme Court did not explain that merely having one's bail set, whether that setting resulted in release or detention, was at the core of the right. Instead, the Court wrote that "liberty" – a state necessarily obtained from actual release – is the American "norm."[20]

Nevertheless, in the field of pretrial justice we must also recognize the equally legitimate consideration of "no bail," or detention. It is now fairly clear that the federal constitution does not guarantee an absolute right to bail, and so it is more appropriate to discuss the right as one that exists when it is authorized by a particular constitutional or legislative provision. The Court's opinion in *United States v. Salerno* is especially relevant because it instructs us that when examining a law with no constitutionally-based right-to-bail parameters (such as, arguably, the federal law), the legislature may enact statutory limits on pretrial freedom (including detention) so long as: (1) those limitations are not excessive in relation to the government's legitimate purposes; (2) they do not offend due process (either substantive or procedural); and (3) they do not result in a situation where pretrial liberty is not the norm or where detention has not been carefully limited as an exception to release.

It is not necessarily accurate to say that the Court's opinion in *Salerno* eroded its opinion in *Stack,* including *Stack's* language equating bail with release. *Salerno* purposefully explained *Stack* and another case, *Carlson v. Landon*, together to provide cohesion. And therefore, while it is true that the federal constitution does not contain an explicit right to bail, when that right is granted by the applicable statute (or in the various states' constitutions or statutes), it should be regarded as a right to pretrial freedom. The *Salerno* opinion is especially instructive in telling us how to create a fair and transparent

---

[19] *Id.* at 7-8.
[20] *United States v. Salerno,* 481 U.S. 739, 755 (1987) ("In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception").

"no bail" side of the dichotomy, and further reminds us of a fundamental principle of pretrial justice: both bail and no bail are lawful if we do them correctly.

Liberalizing American bail laws during our country's colonial period meant that these laws did not always include the English "factors" for initially determining bailability, such as the seriousness of the offense, the weight of the evidence, and the character of the accused. Indeed, by including an examination of the evidence into its constitutional bail provision, Pennsylvania did so primarily to allow bailability despite the defendant being charged with a capital crime. Nevertheless, the historical factors first articulated in the Statute of Westminster survived in America through the judge's use of these factors to determine *conditions* of bail.

Thus, technically speaking, bailability in England after 1275 was determined through an examination of the charge, the evidence, and the character or criminal history of the defendant, and if a defendant was deemed bailable, he or she was required to be released. In America, bailability was more freely designated, but judges would still typically look at the charge, the evidence, and the character of the defendant to set the only limitation on pretrial freedom available at that time – the amount of the financial condition. Accordingly, while bailability in America was still meant to mean release, by using those factors traditionally used to determine bailability to now set the primary condition of bail or release, judges found that those factors sometimes had a determining effect on the actual release of bailable defendants. Indeed, when America began running out of personal sureties, judges, using factors historically used to determine bailability, were finding that these same factors led to unattainable financial conditions creating, ironically, a state of unbailability for technically bailable defendants.

> *"Bail is a matter of confidence and personal relation. It should not be made a matter of contract or commercialism. . . . Why provide for a bail piece, intended to promote justice, and then destroy its effect and utility? Why open the door to barter freedom from the law for money?"*
>
> *Carr v Davis* 64 W. Va. 522, 535 (1908) (Robinson, J. dissenting).

## Intersection of the Two Historical Phenomena

The history of bail in America in the 20th century represents an intersection of these two historical phenomena. Indeed, because it involved requiring defendants to pay money up-front as a prerequisite to release, the blossoming of a secured bond scheme as administered through a commercial surety system was bound to lead to perceived abuses in the bail/no bail dichotomy to such an extent that history would demand some correction. Accordingly, within only 20 years of the advent of commercial sureties, scholars began to study and critique that for-profit system.

In the first wave of research, scholars focused on the inability of bailable defendants to obtain release due to secured financial conditions and the abuses in the commercial surety industry. The first generation of bail reform, as it is now known, used research from the 1920s to the 1960s to find alternatives to the commercial surety system, including release on recognizance and nonfinancial conditional release. Its focus was on the "bail" side of the dichotomy and how to make sure bailable defendants would actually obtain release.

The second generation of bail reform (from the 1960s to the 1980s) focused on the "no bail" side, with a wave of research indicating that there were some defendants whom society believed should be detained without bail (rather than by using money) due to their perceived dangerousness through documented instances of defendants committing crime while released through the bail process. That generation culminated with the United States Supreme Court's approval of a federal detention statute, and with states across America changing their constitutions and statutes to reflect not only a new constitutional purpose for restricting pretrial liberty – public safety – but also detention provisions that followed the Supreme Court's desired formula.

---

### Three Generations of Bail Reform: Hallmarks and Highlights

Since the evolution from a personal surety system using unsecured bonds to primarily a commercial surety system using secured bonds, America has seen two generations of bail or pretrial reform and is currently in a third. Each generation has certain elements in common, such as significant research, a meeting of minds, and changes in laws, policies, and practices.

**The First Generation – 1920s to 1960s: Finding Alternatives to the Traditional Money Bail System; Reducing Unnecessary Pretrial Detention of Bailable Defendants**

    **Significant Research –** This generation's research began with Roscoe Pound and Felix Frankfurter's *Criminal Justice in Cleveland* (1922) and Arthur Beeley's *The Bail System in Chicago* (1927), continued with Caleb Foote's study of the Philadelphia process found in *Compelling Appearance in Court: Administration of Bail in Philadelphia* (1954), and reached a peak through the research done by the Vera Foundation and New York University Law School's Manhattan Bail Project (1961) as well as similar bail projects such as the one created in Washington D.C. in 1963.

    **Meeting of Minds –** The meeting of minds for this generation culminated with the 1964 Attorney General's National Conference on Bail and Criminal Justice and the Bail Reform Act of 1966.

    **Changes in Laws, Policies and Practices –** The Supreme Court's ruling in *Stack v. Boyle* (1951) had already guided states to better individualize bail determinations through their various bail laws. The Bail Reform Act of 1966 (and state statutes modeled after the Act) focused on alternatives to the traditional money bail system by encouraging release on least restrictive, nonfinancial conditions as well as presumptions favoring release on recognizance, which were based on information gathered concerning a defendant's community ties to help assure court appearance. The American Bar Association's Criminal Justice Standards on Pretrial Release in 1968 made legal and evidence-based recommendations for all aspects of release and detention

decisions. Across America, though, states have not fully incorporated the full panoply of laws, policies, and practices designed to reduce unnecessary pretrial detention of bailable defendants

**The Second Generation – late 1960s to 1980s: Allowing Consideration of Public Safety as a Constitutionally Valid Purpose to Limit Pretrial Freedom; Defining the Nature and Scope of Preventive Detention**

   **Significant Research –** Based on discussions in the 1960s, the American Bar Association Standards on Pretrial Release first addressed preventive detention (detaining a defendant with no bail based on danger and later expressly encompassing risk for failure to appear) in 1968, a position later adopted by other organizations' best practice standards. Much of the "research" behind this wave of reform focused on: (1) philosophical debates surrounding the 1966 Act's inability to address public safety as a valid purpose for limiting pretrial freedom; and (2) judges' tendencies to use money to detain defendants due to the lack of alternative procedures for defendants who pose high risk to public safety or for failure to appear for court. The research used to support Congress's finding of "an alarming problem of crimes committed by persons on release" (noted by the U.S. Supreme Court in *United States v. Salerno*) is contained in the text and references from Senate Report 98-225 to the Bail Reform Act of 1984. Other authors, such as John Goldkamp (*see Danger and Detention: A Second Generation of Bail Reform,* 76 J. Crim. L. & Criminology 1 (1985)) and Senator Ted Kennedy (*see A New Approach to Bail Release: The Proposed Federal Criminal Code and Bail Reform,* 48 Fordham L. Rev. 423 (1980)), also contributed to the debate and relied on a variety of empirical research in their papers.

   **Meeting of Minds –** Senate Report 98-225 to the Bail Reform Act of 1984 cited broad support for the idea of limiting pretrial freedom up to and including preventive detention based on public safety in addition to court appearance. This included the fact that consideration of public safety already existed in the laws of several states and the District of Columbia, the fact that the topic was addressed by the various national standards, and the fact that it also had the support from the Attorney General's Task Force on Violent Crime, the Chief Justice of the United States Supreme Court, and even the President.

   **Changes in Laws, Policies and Practices –** Prior to 1970, court appearance was the only constitutionally valid purpose for limiting a defendant's pretrial freedom. Congress first allowed public safety to be considered equally to court appearance in the District of Columbia Court Reform and Criminal Procedure Act of 1970, and many states followed suit. In 1984, Congress passed the Bail Reform Act of 1984 (part of the Comprehensive Crime Control Act), which included public safety as a valid purpose for limiting pretrial freedom and procedures designed to allow preventive detention without bail for high-risk defendants. In 1987, the United States Supreme Court upheld the Bail Reform Act of 1984 against facial due process and excessive bail challenges in *United States v, Salerno*. However, as in the first generation of bail reform, states across America have not fully implemented the laws, policies, and practices needed to adequately and lawfully detain defendants when necessary.

**The Third Generation – 1990 to present: Fixing the Holes Left by States Not Fully Implementing Improvements from the First Two Generations of Bail Reform; Using Legal and Evidence-Based Practices to Create a More Risk-Based System of Release and Detention**

**Significant Research –** Much of the research in this generation revisits deficiencies caused by the states not fully implementing adequate "bail" and "no bail" laws, policies, and practices developed in the previous two generations. Significant legal, historical, and empirical research sponsored by the Department of Justice, the Pretrial Justice Institute, the New York City Criminal Justice Agency, the District of Columbia Pretrial Services Agency, the Administrative Office of the U.S. Courts, various universities, and numerous other public, private, and philanthropic entities across America have continued to hone the arguments for improvements as well as the solutions to discreet bail issues. Additional groundbreaking research involves the creation of empirical risk assessment instruments for local, statewide, and now national use, along with research focusing on strategies for responding to predicted risk while maximizing release.

**Meeting of Minds –** The meeting of minds for this generation has been highlighted so far by the Attorney General's National Symposium on Pretrial Justice in 2011, along with the numerous policy statements issued by national organizations favoring the administration of bail based on risk.

**Changes in Laws, Policies and Practices –** Jurisdictions are only now beginning to make changes reflecting the knowledge generated and shared by this generation of pretrial reform. Nevertheless, changes are occurring at the county level (such as in Milwaukee County, Wisconsin, which has implemented a number of legal and evidence-based pretrial practices), the state level (such as in Colorado, which passed a new bail statute based on pretrial best practices in 2013), and even the national level (such as in the federal pretrial system, which continues to examine its release and detention policies and practices).

## The Current Generation of Bail/Pretrial Reform

The first two generations of bail reform used research to attain a broad meeting of the minds, which, in turn, led to changes to laws, policies, and practices. It is now clear, however, that these two generations did not go far enough. The traditional money bail system, which includes heavy reliance upon secured bonds administered primarily through commercial sureties, continues to flourish in America, thus causing the unnecessary detention of bailable defendants. Moreover, for a number of reasons, the states have not fully embraced ways to fairly and transparently detain persons without bail, choosing instead to maintain a primarily charge-and-money-based bail system to respond to threats to public safety. In short, the two previous generations of bail reform have instructed us on how to properly implement both "bail" (release) and "no bail" (detention), but many states have instead clung to an outmoded system that leads to the detention of bailable defendants (or those whom we believe should be bailable defendants) and the release of unbailable defendants (or those whom we believe should be unbailable defendants) – abuses to the "bail/no bail" dichotomy that historically demand correction.

Fortunately, the current generation of pretrial reform has a vast amount of relevant research literature from which to fashion solutions to these problems. Moreover, like previous generations, this generation also shaped a distinct meeting of minds of numerous individuals, organizations, and government agencies, all of which now believe that pretrial improvements are necessary.

At its core, the third generation of pretrial reform thus has three primary goals. First, it aims to fully implement lawful bail/no bail dichotomies so that the right persons (and in lawful proportions) are deemed bailable and unbailable. Second, using the best available research and best pretrial practices, it seeks to lawfully effectuate the release and subsequent mitigation of pretrial risk of defendants deemed bailable and the fair and transparent detention of those deemed unbailable. Third, it aims to do this primarily by replacing charge-and-money-based bail systems with systems based on empirical risk.

**Generations of Reform and the Commercial Surety Industry**

The first generation of bail reform in America in the 20th century focused almost exclusively on finding alternatives to the predominant release system in place at the time, which was one based primarily on secured financial conditions administered through a commercial surety system. In hindsight, however, the second generation of bail reform arguably has had more of an impact on the for-profit bail bond industry in America. That generation focused primarily on public safety, and it led to changes in federal and state laws providing ways to assess pretrial risk for public safety, to release defendants with supervision designed to mitigate the risk to public safety, and even to detain persons deemed too risky.

Despite this national focus on public safety, however, the commercial surety industry did not alter its business model of providing security for defendants solely to help provide reasonable assurance of court appearance. Today, judges concerned with public safety cannot rely on commercial bail bondsmen because in virtually every state allowing money as condition of bail, the laws have been crafted so that financial conditions cannot be forfeited for breaches in public safety such as new crimes. In those states, a defendant who commits a new crime may have his or her bond revoked, but the money is not lost. When the bond is revoked, bondsmen, when they are allowed into the justice system (for most countries, four American states, and a variety of other large and small jurisdictions have ceased allowing profit at bail), can simply walk away, even though the justice system is not yet finished with that particular defendant. Bondsmen are free to walk away and are even free re-enter the system – free to negotiate a new surety contract with the same defendant, again with the money forfeitable only upon his or her failing to appear for court. Advances in our knowledge about the ineffectiveness and deleterious effects of money at bail only exacerbate the fundamental disconnect between the commercial surety industry, which survives on the use of money for court appearance, and what our society is trying to achieve through the administration of bail.

There are currently two constitutionally valid purposes for limiting pretrial freedom – court appearance and public safety. Commercial bail agents and the insurance companies that support them are concerned with only one – court appearance – because legally money is simply not relevant to public safety. Historically speaking, America's gradual movement toward using pretrial services agencies, which, when necessary, supervise defendants both for court appearance and public safety concerns, is due, at least in part, to the commercial surety industry's purposeful decision not to take responsibility for public safety at bail.

## What Does the History of Bail Tell Us?

The history of bail tells us that the pretrial release and detention system that worked effectively over the centuries was a "bail/no bail" system, in which bailable defendants (or those whom society deemed should be bailable defendants) were expected to be

released and unbailable defendants (or those whom society deemed should be unbailable defendants) were expected to be detained. Moreover, the bail side of the dichotomy functioned most effectively through an uncompensated and un-indemnified personal surety system based on unsecured financial conditions. What we in America today know as the traditional money bail system – a system relying primarily on secured financial conditions administered through commercial sureties – is, historically speaking, a relatively new system that was encouraged to solve America's dilemma of the unnecessary detention of bailable defendants in the 1800s. Unfortunately, however, the traditional money bail system has only exacerbated the two primary abuses that have typically led to historical correction: (1) the unnecessary detention of bailable defendants, whom we now often categorize as lower risk; and (2) the release of those persons whom we feel should be unbailable defendants, and whom we now often categorize as higher risk.

The history of bail also instructs us on the proper purpose of bail. Specifically, while avoiding blood feuds may have been the primary purpose for the original bail setting, once more public processes and jails were fully introduced into the administration of criminal justice, the purpose of bail changed to one of providing a mechanism of conditional release. Concomitantly, the purpose of "no bail" was and is detention. Historically speaking, the only purpose for limiting or conditioning pretrial release was to assure that the accused come to court or otherwise face justice. That changed in the 1970s and 1980s, as jurisdictions began to recognize public safety as a second constitutionally valid purpose for limiting pretrial freedom.[21]

The American history of bail further instructs us on the lessons of the first two generations of bail and pretrial reform in the 20th century. If the first generation provided us with practical methods to better effectuate the release side of the "bail/no bail" dichotomy, the second generation provided us with equally effective methods for lawful detention. Accordingly, despite our inability to fully implement what we now know are pretrial best practices, the methods gleaned from the first two generations of

---

[21] Occasionally, a third purpose for limiting pretrial freedom has been articulated as maintaining or protecting the integrity of the courts or judicial process. Indeed, the third edition of the ABA Standards changed "to prevent intimidation of witnesses and interference with the orderly administration of justice" to "safeguard the integrity of the judicial process" as a "third purpose of release conditions." ABA Standards *American Bar Association Standards for Criminal Justice (3rd Ed.) Pretrial Release* (2007), Std. 10-5.2 (a) (history of the standard) at 107. The phrase "integrity of the judicial process," however, is one that has been historically misunderstood (its meaning requires a review of appellate briefs for decisions leading up to the Supreme Court's opinion in *Salerno*)*,* and that typically begs further definition. Nevertheless, in most, if not all cases, that further definition is made unnecessary as being adequately covered by court appearance and public safety. Indeed, the ABA Standards themselves state that one of the purposes of the pretrial decision is "maintaining the integrity of the judicial process by securing defendants for trial." *Id.* Std. 10-1.1, at 36.

bail reform as well as the research currently contributing to the third generation have given us ample knowledge to correct perceived abuses and to make improvements to pretrial justice. In the next section, we will see how the evolution of the law and legal foundations of pretrial justice provide the parameters for those improvements.

**Additional Sources and Resources:**  William Blackstone, *Commentaries on the Laws of England* (Oxford 1765-1769); June Carbone, *Seeing Through the Emperor's New Clothes: Rediscovery of Basic Principles in the Administration of Bail,* 34 Syracuse L. Rev. 517 (1983); Stevens H. Clarke, *Pretrial Release: Concepts, Issues, and Strategies for Improvement,* 1 Res. in Corr. 3:1 (1988); Comment, *Bail: An Ancient Practice Reexamined,* 70 Yale L. J. 966 (1960-61); Elsa de Haas, *Antiquities of Bail: Origin and Historical Development in Criminal Cases to the Year 1275* (AMS Press, Inc., New York 1966); F.E. Devine, *Commercial Bail Bonding: A Comparison of Common Law Alternatives* (Praeger Pub. 1991); Jonathan Drimmer, *When Man Hunts Man: The Rights and Duties of Bounty Hunters in the American Criminal Justice System,* 33 Hous. L. Rev. 731 (1996-97); William F. Duker, *The Right to Bail: A Historical Inquiry,* 42 Alb. L. Rev. 33 (1977-78); Caleb Foote, *The Coming Constitutional Crisis in Bail: I and II,* 113 Univ. Pa. L. Rev. 959 and 1125 (1965); Daniel J. Freed & Patricia M. Wald, *Bail in the United States: 1964* (DOJ/Vera Found. 1964); Ronald Goldfarb, *Ransom: A Critique of the American Bail System* (Harper & Rowe 1965); James V. Hayes, *Contracts to Indemnify Bail in Criminal Cases,* 6 Fordham L. Rev. 387 (1937); William Searle Holdsworth, *A History of English Law* (Methuen & Co., London, 1938); Paul Lermack, *The Law of Recognizances in Colonial Pennsylvania,* 50 Temp. L. Q. 475 (1977); Evie Lotze, John Clark, D. Alan Henry, & Jolanta Juszkiewicz, *The Pretrial Services Reference Book: History, Challenges, Programming* (Pretrial Servs. Res. Ctr. 1999); Hermine Herta Meyer, *Constitutionality of Pretrial Detention,* 60 Geo. L. J. 1139 (1971-72); Gerald P. Monks, *History of Bail* (1982); Luke Owen Pike, *The History of Crime in England* (Smith, Elder, & Co. 1873); Frederick Pollock & Frederic Maitland, *The History of English Law Before the Time of Edward I* (1898); Timothy R. Schnacke, Michael R. Jones, Claire M. B. Brooker, *The History of Bail and Pretrial Release* (PJI 2010); Wayne H. Thomas, Jr. *Bail Reform in America* (Univ. CA Press 1976); Peggy M. Tobolowsky & James F. Quinn, *Pretrial Release in the 1990s: Texas Takes Another Look at Nonfinancial Release Conditions,* 19 New Eng. J. on Crim. & Civ. Confinement 267 (1993); Marie VanNostrand, *Legal and Evidence-Based Practices: Application of Legal Principles, Laws, and Research to the Field of Pretrial Services* (CJI/NIC 2007); Betsy Kushlan Wanger, *Limiting Preventive Detention Through Conditional Release: The Unfulfilled Promise of the 1982 Pretrial Services Act,* 97 Yale L. J. 320 (1987-88). **Cases:** *United States v. Edwards,* 430 A. 2d 1321 (D.C. 1981) (en banc); *State v. Brooks,* 604 N.W. 2d 345 (Minn. 2000); *State v. Briggs,* 666 N.W. 2d 573 (Iowa 2003).

# Chapter 3: Legal Foundations of Pretrial Justice

## History and Law

History and the law clearly influence each other at bail. For example, in 1627, Sir Thomas Darnell and four other knights refused to pay loans forced upon them by King Charles I. When the King arrested the five knights and held them on no charge (thus circumventing the Statute of Westminster, which required a charge, and the Magna Carta, on which the Statute was based), Parliament responded by passing the Petition of Right, which prohibited detention by any court without a formal charge. Not long after, however, officials sidestepped the Petition of Right by charging individuals and then running them through numerous procedural delays to avoid release. This particular practice led to the Habeas Corpus Act of 1679. However, by expressly acknowledging discretion in setting amounts of bail, the Habeas Corpus Act also unwittingly allowed determined officials to begin setting financial conditions of bail in prohibitively high amounts. That, in turn, led to passage of the English Bill of Rights, which prohibited "excessive" bail. In America, too, we see historical events causing changes in the laws and those laws, in turn, influencing events thereafter. One need only look to events before and after the two American generations of bail reform in the 20th century to see how history and the law are intertwined.

And so it is that America, which had adopted and applied virtually every English bail reform verbatim in its early colonial period, soon began a process of liberalizing both criminal laws generally, and bail in particular, due to the country's unique position in culture and history. Essentially, America borrowed the best of English law (such as an overall right to bail, habeas corpus, and prohibition against excessiveness) and rejected the rest (such as varying levels of discretion potentially interfering with the right to bail as well as harsh criminal penalties for certain crimes). The Colonies wrote bail provisions into their charters and re-wrote them into their constitutions after independence. Among those constitutions, we see broader right-to-bail provisions, such as in the model Pennsylvania law, which granted bail to all except those facing capital offenses (limited to willful murder) and only "where proof is evident or the presumption great."[22] Nevertheless, some things remained the same. For example, continuing the long historical tradition of bail in England, the sole purpose of limiting pretrial freedom in America remained court appearance, and the only means for doing so remained setting financial conditions or amounts of money to be forfeited if a defendant missed court.

---

[22] June Carbone, *Seeing Through the Emperor's New Clothes: Rediscovery of Basic Principles in the Administration of Bail,* 34 Syracuse L. Rev. 517, 531 (1983) (quoting 5 American Charters 3061, F. Thorpe ed. 1909).

> *"The end of law is not to abolish or restrain, but to preserve and enlarge freedom. For in all the states of created beings capable of law, where there is no law, there is no freedom."*
>
> John Locke, 1689

In America, the ultimate expression of our shared values is contained in our founding documents, the Declaration of Independence and the Constitution. But if the Declaration can be viewed as amply supplying us with certain fundamental principles that can be interwoven into discussions of bail, such as freedom and equality, then the Constitution has unfortunately given us some measure of confusion on the topic. The confusion stems, in part, from the fact that the Constitution itself explicitly covers only the right of habeas corpus in Article 1, Section 9 and the prohibition on excessive bail in the 8th Amendment, which has been traced to the Virginia Declaration of Rights. There is no express right to bail in the U.S. Constitution, and that document provides no illumination on which persons should be bailable and which should not. Instead, the right to bail in the federal system originated from the Judiciary Act of 1789, which provided an absolute right to bail in non-capital federal criminal cases. Whether the constitutional omission was intentional is subject to debate, but the fact remains that when assessing the right to bail, it is typical for a particular state to provide superior rights to the United States Constitution. It also means that certain federal cases, such *United States v. Salerno*, must be read realizing that the Court was addressing a bail/no bail scheme derived solely from legislation. And it means that any particular bail case or dispute has the potential to involve a fairly complex mix of state and federal claims based upon any particular state's bail scheme.

> ### The Legal "Mix"
>
> There are numerous sources of laws surrounding bail and pretrial practices, and each state – and often a jurisdiction within a state – has a different "mix" of sources from that of all other jurisdictions. In any particular state or locality, bail practices may be dictated or guided by the United States Constitution and United States Supreme Court opinions, federal appellate court opinions, the applicable state constitution and state supreme court and other state appellate court decisions, federal and state bail statutes, municipal ordinances, court rules, and even administrative regulations. Knowing your particular mix and how the various sources of law interact is crucial to understanding and ultimately assessing your jurisdiction's pretrial practices.

The fact that we have separate and sometimes overlapping federal and state pretrial legal foundations is one aspect of the evolution of bail law that adds complexity to particular cases. The other is the fact that America has relatively little authoritative legal guidance on the subject of bail. In the federal realm, this may be due to issues of incorporation and jurisdiction, but in the state realm it may also be due to the relatively recent (historically speaking) change from unsecured to secured bonds. Until the nineteenth century, historians suggest that bail based on unsecured bonds administered through a personal surety system led to the release of virtually all bailable criminal defendants. Such a high rate of release leaves few cases posing the kind of constitutional issues that require an appellate court's attention. But even in the 20th century, we really have only two (or arguably three) significant United States Supreme Court cases discussing the important topic of the release decision at bail. It is apparently a topic that lawyers, and thus federal and state trial and appellate courts, have largely avoided. This avoidance, in turn, potentially stands in the way of jurisdictions looking for the bright line of the law to guide them through the process of improving the administration of bail.

On the other hand, what we lack in volume of decisions is made up to some extent by the importance of the few opinions that we do have. Thus, we look at *Salerno* not as merely one case among many from which we may derive guidance; instead, *Salerno* must be scrutinized and continually referenced as a foundational standard as we attempt to discern the legality of proposed improvements. The evolution of law in America, whether broadly encompassing all issues of criminal procedure, or more narrowly discussing issues related directly to bail and pretrial justice, has demonstrated conclusively the law's importance as a safeguard to implementing particular practices in the criminal process. Indeed, in other fields we speak of using evidence-based practices to achieve the particular goals of the discipline. In bail, however, we speak of "legal and

evidence-based practices,"[23] because it is the law that articulates those disciplinary goals to begin with. The phrase legal and evidence-based practices acknowledges the fact that in bail and pretrial justice, the empirical evidence, no matter how strong, is always subservient to fundamental legal foundations based on fairness and equal justice.

## Fundamental Legal Principles

While all legal principles affecting the pretrial process are important, there are some that demand our particular attention as crucial to a shared knowledge base. The following list is derived from materials taught by D.C. Superior Court Judge Truman Morrison, III, in the National Institute of Corrections' Orientation for New Pretrial Executives, and occasionally supplemented by information contained in Black's Law Dictionary (9th ed.) as well as the sources footnoted or cited at the end of the chapter.

### The Presumption of Innocence

Perhaps no legal principle is as simultaneously important and misunderstood as the presumption of innocence. Technically speaking, it is the principle that a person may not be convicted of a crime unless and until the government proves guilt beyond a reasonable doubt, without any burden placed on the defendant to prove his or her innocence. Its importance is emphasized in the Supreme Court's opinion in *Coffin v. United States*, in which the Court wrote: "a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law."[24] In *Coffin,* the Court traced the presumption's origins to various extracts of Roman law, which included language similar to the "better that ten guilty persons go free" ratio articulated by Blackstone. The importance of the presumption of innocence has not waned, and the Court has expressly quoted the "axiomatic and elementary" language in just the last few years.

Its misunderstanding comes principally from the fact that in *Bell v. Wolfish*, the Supreme Court wrote that the presumption of innocence "has no application to a determination of the rights of a pretrial detainee during confinement before his trial has even begun,"[25] a line that has caused many to argue, incorrectly, that the presumption of innocence has no application to bail. In fact, *Wolfish* was a "conditions of confinement" case, with inmates complaining about various conditions (such as double bunking), rules

---

[23] Marie VanNostrand, *Legal and Evidence-Based Practices: Application of Legal Principles, Laws, and Research to the Field of Pretrial Services* (CJI/NIC 2007).

[24] *Coffin v. United States,* 156 U.S. 432, 453 (1895).

[25] *Bell v. Wolfish*, 441 U.S. 520, 533 (1979).

(such as prohibitions on receiving certain books), and practices (such as procedures involving inmate searches) while being held in a detention facility. In its opinion, the Court was clear about its focus in the case: "We are not concerned with the initial decision to detain an accused and the curtailment of liberty that such a decision necessarily entails. . . . Instead, what is at issue when an aspect of pretrial detention that is not alleged to violate any express guarantee of the Constitution is challenged, is the detainee's right to be free from punishment, and his understandable desire to be as comfortable as possible during his confinement, both of which may conceivably coalesce at some point."[26] Specifically, and as noted by the Court, the parties were not disputing whether the government could detain the prisoners, the government's purpose for detaining the prisoners, or even whether complete confinement was a legitimate means for limiting pretrial freedom, all issues that would necessarily implicate the right to bail, statements contained in *Stack v. Boyle*, and the presumption of innocence. Instead, the issue before the Court was whether, after incarceration, the prisoners' complaints could be considered punishment in violation of the Due Process Clause.

Accordingly, the presumption of innocence has everything to do with bail, at least so far as determining which classes of defendants are bailable and the constitutional and statutory rights flowing from that decision. And therefore, the language of *Wolfish* should in no way diminish the strong statements concerning the right to bail found in *Stack v. Boyle* (and other state and federal cases that have quoted *Stack*), in which the Court wrote, "This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction. Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning."[27] The idea that the right to bail (that is, the right to release when the accused is bailable) necessarily triggers serious consideration of the presumption of innocence is also clearly seen through Justice Marshall's dissent in *United States v. Salerno,* in which he wrote, albeit unconvincingly, that "the very pith and purpose of [the Bail Reform Act of 1984] is an abhorrent limitation of the presumption of innocence."[28]

As explained by the Court in *Taylor v. Kentucky*, the phrase is somewhat inaccurate in that there is no true presumption – that is, no mandatory inference to be drawn from evidence. Instead, "it is better characterized as an 'assumption' that is indulged in the absence of contrary evidence."[29] Moreover, the words "presumption of innocence" themselves are found nowhere in the United States Constitution, although the phrase is linked to the 5th, 14th, and 6th Amendments to the Constitution. *Taylor* suggests an appropriate way of looking at the presumption as "a special and additional caution" to

---

[26] *Id.* at 533-34 (internal citations omitted).
[27] 342 U.S. 1, 4 (1951) (internal citation omitted).
[28] *United States v. Salerno*, 481 U.S. 739, 762-63 (1987).
[29] *Taylor v Kentucky*, 436 U.S. 478, 483 n. 12 (1978).

consider beyond the notion that the government must ultimately prove guilt. It is the idea that "no surmises based on the present situation of the accused"[30] should interfere with the jury's determination. Applying this concept to bail, then, the presumption of innocence is like an aura surrounding the defendant, which prompts us to set aside our potentially negative surmises based on the current arrest and confinement as we determine the important question of release or detention.

> *"Here we deal with a right, the right to release of presumably innocent citizens. I cannot conceive that such release should not be made as widely available as it reasonably and rationally can be."*
>
> *Pugh v. Rainwater*, 572 F.2d 1053 (5th Cir. 1978) (Gee, J. specially concurring)

---

[30] *Id.* at 485 (quoting 9 J. Wigmore, Evidence § 2511 (3d ed. 1940) at 407).

**The Right to Bail**

*When granted by federal or state law,* the right to bail should be read as a right to release through the bail process. It is often technically articulated as the "right to non-excessive" bail, which goes to the reasonableness of any particular conditions or limitations on pretrial release.

The preface, "when granted by federal or state law" is crucial to understand because we now know that the "bail/no bail" dichotomy is one that legislatures or the citizenry are free to make though their statutes and constitutions. Ever since the Middle Ages, there have been certain classes of defendants (typically expressed by types of crimes, but changing now toward categories of risk) who have been refused bail – that is, denied a process of release altogether. The bail/no bail dichotomy is exemplified by the early bail provisions of Massachusetts and Pennsylvania, which granted bail to some large class of persons "except," and with the exception being the totality of the "no bail" side. These early provisions, as well as those copied by other states, were technically the genesis of what we now call "preventive detention" schemes, which allow for the detention of risky defendants – the risk at the time primarily being derived from the seriousness of the charge, such as murder or treason.

The big differences between detention schemes then and now include: (1) the old schemes were based solely on risk for failure to appear for court; we may now detain defendants based on a second constitutionally valid purpose for limiting pretrial freedom – public safety; (2) the old schemes were mostly limited to findings of "proof evident and presumption great" for the charge; today preventive detention schemes often have more stringent burdens for the various findings leading to detention; (3) overall, the states have largely widened the classes of defendants who may lawfully be detained – they have, essentially, changed the ratio of bailable to unbailable defendants to include potentially more unbailable defendants than were deemed unbailable, say, during the first part of the 20th century; and (4) in many cases, the states have added detailed provisions to the detention schemes (in addition to their release schemes). Presumably, this was to follow guidance by the United States Supreme Court from its opinion in *United States v. Salerno,* which approved the federal detention scheme based primarily on that law's inclusion of certain procedural due process elements designed to make the detention process fair and transparent.

How a particular state has defined its "bail/no bail" dichotomy is largely due to its constitution, and arguably on the state's ability to easily amend that constitution. According to legal scholars Wayne LaFave, et al., in 2009 twenty-three states had constitutions modeled after Pennsylvania's 1682 language that guaranteed a right to bail to all except those charged with capital offenses, where proof is evident or the presumption is great. It is unclear whether these states today choose to remain broad "right-to-bail" states, or whether their constitutions are simply too difficult to amend.

Nevertheless, these states' laws likely contain either no, or extremely limited, statutory pretrial preventive detention language.[31]

Nine states had constitutions mirroring the federal constitution – that is, they contain an excessive bail clause, but no clause explicitly granting a right to bail. The United States Supreme Court has determined that the federal constitution does not limit Congress' ability to craft a lawful preventive detention statute, and these nine states likewise have the same ability to craft preventive detention statutes (or court rules) with varying language.

The remaining 18 states had enacted in their constitutions relatively recent amendments describing more detailed preventive detention provisions. As LaFave, et al., correctly note, these states may be grouped in three ways: (1) states authorizing preventive detention for certain charges, combined with the requirement of a finding of danger to the community; (2) states authorizing preventive detention for certain charges, combined with some condition precedent, such as the defendant also being on probation or parole; and (3) states combining elements of the first two categories.

There are currently two fundamental issues concerning the right to bail in America today. The first is whether states have created the right ratio of bailable to unbailable defendants. The second is whether they are faithfully following best practices using the ratio that they currently have. The two issues are connected.

American law contemplates a presumption of release, and thus there are limits on the ratio of bailable to unbailable defendants. The American Bar Association Standards on Pretrial Release describes its statement, "the law favors the release of defendants pending adjudication of charges" as being "consistent with Supreme Court opinions emphasizing the limited permissible scope of pretrial detention."[32] It notes language from *Stack v. Boyle*, in which the Court equates the right to bail to "[the] traditional right to freedom before conviction,"[33] and from *United States v. Salerno*, in which the Court wrote, "In our society, liberty is the norm, and detention prior to trial or without trial is

---

[31] *See* Wayne R. LaFave, Jerold H. Israel, Nancy J. King and Orin S. Kerr, *Criminal Procedure* (3rd ed. 2007 & 5th ed. 2009). Readers should be vigilant for activity changing these numbers. For example, the 2010 constitutional amendment in Washington State likely adds it to the category of states having preventive detention provisions in their constitutions. Moreover, depending on how one reads the South Carolina constitution, the counts may, in fact, reveal 9 states akin to the federal scheme, 21 states with traditional right to bail provisions, and 20 states with preventive detention amendments.

[32] *American Bar Association Standards for Criminal Justice (3rd Ed.) Pretrial Release* (2007), Std. 10-1.1 (commentary) at 38.

[33] 342 U.S. 1, 4 (1951).

the carefully limited exception."[34] Beyond these statements, however, we have little to tell us definitively and with precision how many persons should remain bailable in a lawful bail/no bail scheme.

We do know, however, that the federal "bail/no bail" scheme was examined by the Supreme Court and survived at least facial constitutional attacks based on the Due Process Clause and the 8th Amendment. Presumably, a state scheme fully incorporating the detention-limiting elements of the federal law would likely survive similar attacks. Accordingly, using the rest of the *Salerno* opinion as a guide, one can look at any particular jurisdiction's bail scheme to assess whether that scheme appears, at least on its face, to presume liberty and to restrict detention by incorporating the numerous elements from the federal statute that were approved by the Supreme Court. For example, if a particular state included a provision in either its constitution or statute opening up the possibility of detention for all defendants no matter what their charges, the scheme should be assessed for its potential to over-detain based on *Salerno's* articulated approval of provisions that limited detention to defendants "arrested for a specific category of extremely serious offenses."[35] Likewise, any jurisdiction that does not "carefully" limit detention – that is, it detains carelessly or without thought possibly through the casual use of money – is likely to be seen as running afoul of the foundational principles underlying the Court's approval of the federal law.

The second fundamental issue concerning the right to bail – whether states are faithfully following the ratio that they currently have – is connected to the first. If states have not adequately defined their bail/no bail ratio, they will often see money still being used to detain defendants whom judges feel are extreme risks, which is essentially the same practice that led to the second generation of American bail reform in the 20th century. Simply put, a proper bail/no bail dichotomy should lead naturally to an in-or-out decision by judges, with bailable defendants released pursuant to a bond with reasonable conditions and unbailable defendants held with no bond. Without belaboring the point, judges are not faithfully following any existing bail/no bail dichotomy whenever they (1) treat a bailable defendant as unbailable by setting unattainable conditions, or (2) treat an unbailable defendant as bailable in order to avoid the lawfully enacted detention provisions. When these digressions occur, then they suggest either that judges should be compelled to comply with the existing dichotomy, or that the balance of the dichotomy must be changed.

This latter point is important to repeat. Among other things, the second generation of American bail reform was, at least partially, in response to judges setting financial conditions of bail at unattainable levels to protect the public despite the fact that the constitution had not been read to allow public safety as a proper purpose for limiting pretrial freedom. Judges who did so were said to be setting bail "sub rosa," in that they

---

[34] 481 U.S. 739, 755 (1987).
[35] *Id.* at 750.

were working secretively toward a possibly improper purpose of bail. The Bail Reform Act of 1984, as approved by the United States Supreme Court, was designed to create a more transparent and fair process to allow the detention of high-risk defendants for the now constitutionally valid purpose of public safety. From that generation of reform, states learned that they could craft constitutional and statutory provisions that would effectively define the "bail" and "no bail" categories so as to satisfy both the Supreme Court's admonition that liberty be the "norm" and the public's concern that the proper persons be released and detained.

Unfortunately, many states have not created an appropriate balance. Those that have attempted to, but have done so inadequately, are finding that the inadequacy often lies in retaining a charge-based rather than a risk-based scheme to determine detention eligibility. Accordingly, in those states judges continue to set unattainable financial conditions at bail to detain bailable persons whom they consider too risky for release. If a proper bail/no bail balance is not crafted through a particular state's preventive detention provisions, and if money is left as an option for conditional release, history has shown that judges will use that money option to expeditiously detain otherwise bailable defendants. On the other hand, if the proper balance is created so that high-risk defendants can be detained through a fair and transparent process, money can be virtually eliminated from the bail process without negatively affecting public safety or court appearance rates.

Despite certain unfortunate divergences, the law, like the history, generally considers the right to bail to be a right to release. Thus, when a decision has been made to "bail" a particular defendant, every consideration should be given, and every best practice known should be employed, to effectuate and ensure that release. Bailable defendants detained on unattainable conditions should be considered clues that the bail process is not functioning properly. Judicial opinions justifying the detention of bailable defendants (when the bailable defendant desires release) should be considered aberrations to the historic and legal notion that the right to bail should equal the right to release.

## What Can International Law and Practices Tell Us About Bail?

Unnecessary and arbitrary pretrial detention is a worldwide issue, and American pretrial practitioners can gain valuable perspective by reviewing international treaties, conventions, guidelines, and rules as well as reports documenting international practices that more closely follow international norms.

According to the American Bar Association's Rule of Law Initiative,

"International standards strongly encourage the imposition of noncustodial measures during investigation and trial and at sentencing, and hold that deprivation of liberty should be imposed only when non-custodial measures would not suffice. The overuse of detention is often a symptom of a dysfunctional criminal justice system that may lack protection for the rights of criminal defendants and the institutional capacity to impose, implement, and monitor non-custodial measures and sanctions. It is also

often a cause of human rights violations and societal problems associated with an overtaxed detention system, such as overcrowding; mistreatment of detainees; inhumane detention conditions; failure to rehabilitate offenders leading to increased recidivism; and the imposition of the social stigma associated with having been imprisoned on an ever-increasing part of the population. Overuse of pretrial detention and incarceration at sentencing are equally problematic and both must be addressed in order to create effective and lasting criminal justice system reform."

International pretrial practices, too, can serve as templates for domestic improvement. For example, bail practitioners frequently cite to author F.E. Devine's study of international practices demonstrating various effective alternatives to America's traditional reliance on secured bonds administered by commercial bail bondsmen and large insurance companies.

**Sources and Resources:** David Berry & Paul English, *The Socioeconomic Impact of Pretrial Detention* (Open Society Foundation 2011); F.E. Devine, *Commercial Bail Bonding: A Comparison of Common Law Alternatives* (Greenwood Publishing Group 1991); Anita H. Kocsis, *Handbook of International Standards on Pretrial Detention Procedure* (ABA, 2010); Amanda Petteruti & Jason Fenster, *Finding Direction: Expanding Criminal Justice Options by Considering Policies of Other Nations* (Justice Policy Institute, 2011). There are also several additional documents and other resources available from the Open Society Foundation's Global Campaign for Pretrial Justice online website, found at http://www.opensocietyfoundations.org/projects/global-campaign-pretrial-justice.

### Release Must Be the Norm

This concept is part of the overall consideration of the right to bail, discussed above, but it bears repeating and emphasis as its own fundamental legal principle. The Supreme Court has said, "In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."[36] As noted previously, in addition to suggesting the ratio of bailable to unbailable defendants, the second part of this quote cautions against a release process that results in detention as well as a detention process administered haphazardly. Given that the setting of a financial bail condition often leaves judges and others wondering whether the defendant will be able to make it – i.e., the release or detention of that particular defendant is now essentially random based on any number of factors – it is difficult to see how such a detention caused by money can ever be considered a "carefully limited" process.

### Due Process

Due Process refers generally to upholding people's legal rights and protecting individuals from arbitrary or unfair federal or state action pursuant to the rights

---

[36] *Id.* at 755.

afforded by the Fifth and Fourteenth Amendments of the United States Constitution (and similar or equivalent state provisions). The Fifth Amendment provides that "No person shall be . . . deprived of life, liberty, or property, without due process of law."[37] The Fourteenth Amendment places the same restrictions on the states. The concept is believed to derive from the Magna Carta, which required King John of England to accept certain limitations to his power, including the limitation that no man be imprisoned or otherwise deprived of his rights except by lawful judgment of his peers or the law of the land. Many of the original provisions of the Magna Carta were incorporated into the Statute of Westminster of 1275, which included important provisions concerning bail.

As noted by the Supreme Court in *United States v. Salerno*, due process may be further broken down into two subcategories:

> So called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' or interferes with rights 'implicit in the concept of ordered liberty.' When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner. This requirement has traditionally been referred to as 'procedural' due process.[38]

In *Salerno,* the Court addressed both substantive and procedural fairness arguments surrounding the federal preventive detention scheme. The substantive due process argument dealt with whether detention represented punishment prior to conviction and an ends-means balancing analysis. The procedural issue dealt with how the statute operated – whether there were procedural safeguards in place so that detention could be ordered constitutionally. People who are detained pretrial without having the benefit of the particular safeguards enumerated in the *Salerno* opinion could, theoretically, raise procedural due process issues in an appeal of their bail-setting.

A shorthand way to think about due process is found in the words "fairness" or "fundamental fairness." Other words, such as "irrational," "unreasonable," and "arbitrary" tend also to lead to due process scrutiny, making the Due Process Clause a workhorse in the judicial review of bail decisions. Indeed, as more research is being conducted into the nature of secured financial conditions at bail – their arbitrariness, the irrationality of using them to provide reasonable assurance of either court appearance or public safety, and the documented negative effects of unnecessary pretrial detention – one can expect to see many more cases based on due process clause claims.

---

[37] U.S. Const. amend. V.
[38] 481 U.S 739, 746 (internal citations omitted).

**Equal Protection**

If the Due Process Clause protects against unfair, arbitrary, or irrational laws, the Equal Protection Clause of the Fourteenth Amendment (and similar or equivalent state provisions) protects against the government treating similarly situated persons differently under the law. Interestingly, "equal protection" was not mentioned in the original Constitution, despite the phrase practically embodying what we now consider to be the whole of the American justice system. Nevertheless, the Fourteenth Amendment to the United States Constitution now provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."[39] While there is no counterpart to this clause that is applicable to the federal government, federal discrimination may be prohibited as violating the Due Process Clause of the Fifth Amendment.

> *"The only stable state is the one in which all men are equal before the law."*
>
> Aristotle, 350 B.C.

Over the years, scholars have argued that equal protection considerations should serve as an equally compelling basis as does due process for mandating fair treatment in the administration of bail, especially when considering the disparate effect of secured money bail bonds on defendants due only to their level of wealth. This argument has been bolstered by language from Supreme Court opinions in cases like *Griffin v. Illinois*, which dealt with a defendant's ability to purchase a transcript required for appellate review. In that case, Justice Black wrote, "There can be no equal justice where the kind of trial a man gets depends on the amount of money he has."[40] Moreover, sitting as circuit justice to decide a prisoner's release in two cases, Justice Douglas uttered the following dicta frequently cited as support for equal protection analysis: (1) "Can an indigent be denied freedom, where a wealthy man would not, because he does not happen to have enough property to pledge for his freedom?";[41] and (2) "[N]o man should be denied release because of indigence. Instead, under our constitutional system, a man is entitled to be released on 'personal recognizance' where other relevant factors make it reasonable to believe that he will comply with the orders of the Court."[42] Overall, despite scholarly arguments to invoke equal protection analysis to the

---

[39] U.S. Const. amend. XIV, § 1.
[40] 351 U.S. 12, 19 (1956).
[41] *Bandy v. United States*, 81 S. Ct. 197, 198 (1960).
[42] *Bandy v. United States*, 82 S. Ct. 11, 13 (1961).

issue of bail (including any further impact caused by the link between income and race),
the courts have been largely reluctant to do so.

**Excessive Bail and the Concept of Least Restrictive Conditions**

Excessive bail is a legal term of art used to describe bail that is unconstitutional pursuant to the 8th Amendment to the United States Constitution (and similar or equivalent state provisions). The 8th Amendment states, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."[43] The Excessive Bail Clause derives from reforms made by the English Parliament in the 1600s to curb the abuse of judges setting impossibly high money bail to thwart the purpose of bail to afford a process of pretrial release. Indeed, historians note that justices began setting high amounts on purpose after King James failed to repeal the Habeas Corpus Act, and the practice represents, historically, the first time that a condition of bail rather than the actual existence of bail became a concern. The English Bill of Rights of 1689 first used the phrase, "Excessive bail ought not to be required," which was incorporated into the 1776 Virginia Declaration of rights, and ultimately found its way into the United States and most state constitutions. Excessiveness must be determined by looking both at federal and state law, but a rule of thumb is that the term relates overall to reasonableness.

"Excessive bail" is now, in fact, a misnomer, because bail more appropriately defined as a process of release does not lend itself to analysis for excessiveness. Instead, since it was first uttered, the phrase excessive bail has always applied to conditions of bail or limitations on pretrial release. The same historical factors causing jurisdictions to define bail as money are at play when one says that bail can or cannot be excessive; hundreds of years of having only one condition of release – money – have caused the inevitable but unfortunate blurring of bail and one of its conditions. Accordingly, when we speak of excessiveness, we now more appropriately speak in terms of limitations on pretrial release or freedom.

Looking at excessiveness in England in the 1600s requires us to consider its application within a personal surety system using unsecured amounts. Bail set at a prohibitively high amount meant that no surety (i.e., a person), or even group of sureties, would willingly take responsibility for the accused. Even before the prohibition, however, amounts were often beyond the means of any particular defendant, requiring sometimes several sureties to provide "sufficiency" for the bail determination. Accordingly, as is the case today, it is likely that some indicator of excessiveness at a time of relatively plentiful sureties for any particular defendant was continued detention of an otherwise bailable defendant. Nevertheless, before the abuses leading to the English Bill of Rights and Habeas Corpus Act, there was no real indication that high amounts required of sureties led to detention in England. And in America, "[a]lthough courts had broad authority to deny bail for defendants charged with capital offenses, they would generally release in a form of pretrial custody defendants who

---

[43] U.S. Const. amend. VIII.

were able to find willing custodians."[44] In a review of the administration of bail in Colonial Pennsylvania, author Paul Lermack concluded that "bail . . . continued to be granted routinely . . . for a wide variety of offenses . . . [and] [a]lthough the amount of bail required was very large in cash terms and a default could ruin a guarantor, few defendants had trouble finding sureties."[45]

The current test for excessiveness from the United States Supreme Court is instructive on many points. In *United States v. Salerno*, the Court wrote as follows:

> The only arguable substantive limitation of the Bail Clause is that the Government's proposed conditions of release or detention not be 'excessive' in light of the perceived evil. Of course, to determine whether the Government's response is excessive, we must compare that response against the interest the Government seeks to protect by means of that response. Thus, when the Government has admitted that its only interest is in preventing flight, bail must be set by a court at a sum designed to ensure that goal, and no more. *Stack v. Boyle*, *supra*. We believe that, when Congress has mandated detention on the basis of a compelling interest other than prevention of flight, as it has here, the 8th Amendment does not require release on bail.[46]

Thus, as explained in *Galen v. County of Los Angeles,* to determine excessiveness, one must

> look to the valid state interests bail is intended to serve for a particular individual and judge whether bail conditions are excessive for the purpose of achieving those interests. The state may not set bail to achieve invalid interests . . . nor in an amount that is excessive in relation to the valid interests it seeks to achieve.[47]

*Salerno* thus tells us at least three important things. First, the law of *Stack v. Boyle* is still strong: when the state's interest is assuring the presence of the accused, "[b]ail set at a figure higher than an amount reasonably calculated to fulfill this purpose is 'excessive' under the 8th Amendment."[48] The idea of "reasonable" calculation necessarily compels us to assess how judges are typically setting bail, which might be arbitrarily (such as through a bail schedule) or irrationally (such as through setting financial conditions to

---

[44] Betsy Kushlan Wanger, *Limiting Preventive Detention Through Conditional Release: The Unfulfilled Promise of the 1982 Pretrial Services Act,* 97 Yale L. J. 323, 323-24 (1987-88) (internal citations omitted).

[45] Paul Lermack, *The Law of Recognizances in Colonial Pennsylvania,* 50 Temp. L. Q. 475 at 497, 505 (1977).

[46] 481 U.S. 739, 754-55 (1987).

[47] 477 F.3d 652, 660 (9th Cir. 2007) (internal citations omitted).

[48] 342 U.S. 1, 5 (1951).

protect the public when those conditions cannot be forfeited for breaches in public safety, or when they are otherwise not effective at achieving the lawful purposes for setting them, which recent research suggests).

Second, financial conditions (i.e., amounts of money) are not the only conditions vulnerable to an excessive bail claim. Any unreasonable condition of release, including a nonfinancial condition, that has no relationship to mitigating an identified risk, or that exceeds what is needed to reasonably assure the constitutionally valid state interest, might be deemed constitutionally excessive.

Third, the government must have a proper purpose for limiting pretrial freedom. This is especially important because scholars and courts (as well as Justice Douglas, again sitting as circuit justice) have indicated that setting bail with a purpose to detain an otherwise bailable defendant would be unconstitutional. In states where the bail/no bail dichotomy has been inadequately crafted, however, judges are doing precisely that.

While the Court in *Salerno* upheld purposeful pretrial detention pursuant to the Bail Reform Act of 1984, it did so only because the statute contained "numerous procedural safeguards" that are rarely, if ever, satisfied merely through the act of setting a high money bond. Therefore, when a state has established a lawful method for preventively detaining defendants, setting financial conditions designed to detain otherwise bailable defendants outside of that method could still be considered an unlawful purpose. Purposeful pretrial detention through a process of the type endorsed by the United States Supreme Court is entirely different from purposeful pretrial detention done through setting unattainable financial conditions of release.

When the United States Supreme Court says that conditions of bail must be set at a level designed to assure a constitutionally valid purpose for limiting pretrial freedom "and no more," as it did in *Salerno,* then we must also consider the related legal principle of "least restrictive conditions" at bail. The phrase "least restrictive conditions" is a term of art expressly contained in the federal and District of Columbia statutes, the American Bar Association best practice standards on pretrial release, and other state statutes based on those Standards (or a reading of *Salerno*). Moreover, the phrase is implicit through similar language from various state high court cases articulating, for example, that bail may be met only by means that are "the least onerous" or that impose the "least possible hardship" on the accused.

Commentary to the ABA Standard recommending release under the least restrictive conditions states as follows:

> This Standard's presumption that defendants should be released under the least restrictive conditions necessary to provide reasonable assurance they will not flee or present a danger is tied closely to the presumption favoring release generally. It has been codified in the Federal Bail Reform

> Act and the District of Columbia release and pretrial detention statute, as well as in the laws and court rules of a number of states. The presumption constitutes a policy judgment that restrictions on a defendant's freedom before trial should be limited to situations where restrictions are clearly needed, and should be tailored to the circumstances of the individual case. Additionally, the presumption reflects a practical recognition that unnecessary detention imposes financial burdens on the community as well as on the defendant.[49]

The least restrictive principle is foundational, and is expressly reiterated throughout the ABA Standards when, for example, those Standards recommend citation release or summonses versus arrest. Moreover, the Standards' overall scheme creating a presumption of release on recognizance, followed by release on nonfinancial conditions, and finally release on financial conditions is directly tied to this foundational premise. Indeed, the principle of least restrictive conditions transcends the Standards and flows from even more basic understandings of criminal justice, which begins with presumptions of innocence and freedom, and which correctly imposes increasing burdens on the government to incrementally restrict one's liberty.

More specifically, however, the ABA Standards' commentary on financial conditions makes it clear that the Standards consider secured financial conditions to be more restrictive than both unsecured financial conditions and nonfinancial conditions: "When financial conditions are warranted, the least restrictive conditions principle requires that unsecured bond be considered first."[50] Moreover, the Standards state, "Under Standard 10-5.3(a), financial conditions may be employed, but only when no less restrictive non-financial release condition will suffice to ensure the defendant's appearance in court. An exception is an unsecured bond because such a bond requires no 'up front' costs to the defendant and no costs if the defendant meets appearance requirements."[51] These principles are well founded in logic: setting aside, for now, the argument that money at bail might not be of any use at all, it at least seems reasonably clear that secured financial conditions (requiring up-front payment) are always more restrictive than unsecured ones, even to the wealthiest defendant. Moreover, in the aggregate, we know that secured financial conditions, as typically the only condition precedent to release, are highly restrictive compared to all nonfinancial conditions and unsecured financial conditions in that they tend to cause pretrial detention. Like detention itself, any condition causing detention should be considered highly restrictive. In sum, money is a highly restrictive condition, and more so (and possibly excessive) when combined with other conditions that serve the same purpose.

---

[49] *American Bar Association Standards for Criminal Justice (3rd Ed.) Pretrial Release* (2007), Std. 10-1.2 (commentary) at 39-40 (internal citations omitted).
[50] *Id.* Std. 10-1.4 (c) (commentary) at 43-44.
[51] *Id.* Std. 10-5.3 (a) (commentary) at 112.

---

### What Can the Juvenile Justice System Tell Us About Adult Bail?

In addition to the fact that the United States Supreme Court relied heavily on *Schall v. Martin,* a juvenile preventive detention case, in writing its opinion in *United States v. Salerno,* an adult preventive detention case, the juvenile justice system has an impressive body of knowledge and research that can be used to inform the administration of bail for adults.

Perhaps most relevant is the work being done through the Annie E. Casey Foundation's Juvenile Detention Alternatives Initiative (JDAI), an initiative to promote changes to juvenile justice policies and practices to "reduce reliance on secure confinement, improve public safety, reduce racial disparities and bias, save taxpayers' dollars, and stimulate overall juvenile justice reforms."

In remarks at the National Symposium on Pretrial Justice in 2011, Bart Lubow, Director of the Juvenile Justice Strategy Center of the Foundation, stated that JDAI used cornerstone innovations of adult bail to inform its work with juveniles, but through collaborative planning and comprehensive implementation of treatments designed to address a wider array of systemic issues, the juvenile efforts have eclipsed many adult efforts by reducing juvenile pretrial detention an average of 42% with no reductions in public safety measures.

**Sources and Resources**: *National Symposium on Pretrial Justice: Summary Report of Proceedings* at 23-24 (Statement of Bart Lubow) (PJI/BJA 2011); *Schall v. Martin*, 467 U.S 253 (1984); *United States v. Salerno,* 481 U.S. 739 (1987); Additional information may be found at the Annie E. Casey Foundation Website, found at http://www.aecf.org/.

---

**Bail May Not Be Set For Punishment (Or For Any Other Invalid Purpose)**

This principle is related to excessiveness, above, because analysis for excessiveness begins with looking at the government's purpose for limiting pretrial freedom. It is more directly tied to the Due Process Clause, however, and was mentioned briefly in *Salerno* when the Court was beginning its due process analysis. In *Bell v. Wolfish*, the Supreme Court had previously written, "The Court of Appeals properly relied on the Due Process Clause, rather than the 8th Amendment, in considering the claims of pretrial detainees. Due process requires that a pretrial detainee not be punished."[52] Again, there are currently only two constitutionally valid purposes for limiting pretrial freedom – court appearance and public safety. Other reasons, such as punishment or, as in some states, to enrich the treasury, are clearly unconstitutional. And still others, such as setting a financial condition to detain, are at least potentially so.

---

[52] 441 U.S. 520, 535 and n. 16 (1979).

**The Bail Process Must Be Individualized**

In *Stack v. Boyle*, the Supreme Court wrote as follows:

> Since the function of bail is limited, the fixing of bail for any individual defendant must be based upon standards relevant to the purpose of assuring the presence of that defendant. The traditional standards, as expressed in the Federal Rules of Criminal Procedure [at the time, the nature and circumstances of the offense, the weight of the evidence against the defendant, and the defendant's financial situation and character] are to be applied in each case to each defendant.[53]

In his concurrence, Justice Jackson observed that if the bail in *Stack* had been set in a uniform blanket amount without taking into account differences between defendants, it would be a clear violation of the federal rules. As noted by Justice Jackson, "Each defendant stands before the bar of justice as an individual."[54]

At the time, the function of bail was limited to setting conditions of pretrial freedom designed to provide reasonable assurance of court appearance. Bail is still limited today, although the purposes for conditioning pretrial freedom have been expanded to include public safety in addition to court appearance. Nevertheless, pursuant to *Stack*, there must be standards in place relevant to these purposes. After *Stack,* states across America amended their statutes to include language designed to individualize bail setting for purposes of court appearance. In the second generation of bail reform, states included individualizing factors relevant to public safety. And today, virtually every state has a list of factors that can be said to be "individualizing criteria" relevant to the proper purposes for limiting pretrial freedom. To the extent that states do not use these factors, such as when over-relying on monetary bail bond schedules that merely assign amounts of money to charges for all or average defendants, the non-individualized bail settings are vulnerable to constitutional challenge.

The concept of requiring standards to ensure that there exists a principled means for making non-arbitrary decisions in criminal justice is not without a solid basis under the U.S. Constitution. Indeed, such standards have been a fundamental precept of the Supreme Court's death penalty jurisprudence under the cruel and unusual punishment clause of the 8th Amendment.

---

[53] 342 U.S. 1, 5 (1951) (internal citations omitted).
[54] *Id.* at 9.

> *"The term [legal and evidence-based practices] is intended to reinforce the uniqueness of the field of pretrial services and ensure that criminal justice professionals remain mindful that program practices are often driven by law and when driven by research, they must be consistent with the pretrial legal foundation and the underlying legal principles."*
>
> Marie VanNostrand, Ph.D., 2007

### The Right to Counsel

This principle refers to the Sixth Amendment right of the accused to assistance of counsel for his or her defense. There is also a 5th Amendment right, which deals with the right to counsel during all custodial interrogations, but the 6th Amendment right more directly affects the administration of bail as it applies to all "critical stages" of a criminal prosecution. According to the Supreme Court, the 6th Amendment right does not attach until a prosecution is commenced. Commencement, in turn, is "the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."[55] In *Rothgery v. Gillespie County*, the United States Supreme Court "reaffirm[ed]" what it has held and what "an overwhelming majority of American jurisdictions" have understood in practice: "a criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel."[56]

Both the American Bar Association's and the National Association of Pretrial Services Agencies' best practice standards on pretrial release recommend having defense counsel at first appearances in every court, and important empirical data support the recommendations contained in those Standards. Noting that previous attempts to provide legal counsel in the bail process had been neglected, in 1998 researchers from the Baltimore, Maryland, Lawyers at Bail Project sought to demonstrate empirically whether or not lawyers mattered during bail hearings. Using a controlled experiment (with some defendants receiving representation at the bail bond review hearing and others not receiving representation) those researchers found that defendants with lawyers: (1) were over two and one-half times more likely to be released on their own recognizance; (2) were over four times more likely to have their initially-set financial conditions reduced at the hearing; (3) had their financial conditions reduced by a greater amount; (4) were more likely to have the financial conditions reduced to a more

---

[55] *See United States* v. *Gouveia*, 467 U. S. 180, 188 (1984) (quoting *Kirby* v. *Illinois*, 406 U. S. 682, 689 (1972) (plurality opinion)).
[56] 554 U.S. 191, 198, 213 (2008).

affordable level ($500 or under); (5) spent less time in jail (an average of two days versus nine days for unrepresented defendants); and (6) had longer bail bond review hearings than defendants without lawyers at first appearance.

### The Privilege Against Compulsory Self-Incrimination

This foundational principle refers to the Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment (in addition to similar or equivalent state provisions), which says that no person "shall be compelled, in any criminal case, to be a witness against himself . . ." At bail there can be issues surrounding pretrial interviews as well as with incriminating statements the defendant makes while the court is setting conditions of release. In that sense, the principle against compulsory self-incrimination is undoubtedly linked to the right to counsel in that counsel can help a particular defendant fully understand his or her other rights.

### Probable Cause

Black's Law Dictionary defines probable cause as reasonable cause, or a reasonable ground to suspect that a person has committed or is committing a crime or that a place contains specific items connected with a crime. Probable cause sometimes refers to having more evidence for than against. It is a term of art in criminal procedure referring to the requirement that arrests be based on probable cause. Probable cause to arrest is present when "at that moment [of the arrest] the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [person] had committed or was committing an offense."[57] In *County of Riverside v. McLaughlin,*[58] the Supreme Court ruled that suspects who are arrested without a warrant must be given a probable cause hearing within 48 hours.

As the arrest or release decision is technically one under the umbrella of a broadly defined bail or pretrial process, practices surrounding probable cause or the lack of it are crucial for study. Interestingly, because a probable cause hearing is a prerequisite only to "any significant pretrial restraint of liberty,"[59] jurisdictions that employ bail practices that are speedy and result in a large number of releases using least restrictive conditions (such as the District of Columbia) may find that they need not hold probable cause hearings for every arrestee prior to setting bail.

---

[57] *Beck v. Ohio*, 379 U.S. 89, 91 (1964).
[58] 500 U.S. 44 (1991).
[59] *Gerstein v. Pugh*, 420 U.S. 103, 125 (1975).

## Other Legal Principles

Of course, there are other legal principles that are critically important to defendants during the pretrial phase of a criminal case, such as certain rights attending trial, evidentiary rules and burdens of proof, the right to speedy trial, and rules affecting pleas. Moreover, there are principles that arise only in certain jurisdictions; for example, depending on which state a person is in, using money to protect public safety may be expressly unlawful and thus its prohibition may rise to the level of other, more universal legal principles beyond its inferential unlawfulness due to its irrationality. Nevertheless, the legal foundations listed above are the ones most likely to arise in the administration of bail. It is thus crucial to learn them and to recognize the issues that arise within them.

## What Do the Legal Foundations of Pretrial Justice Tell Us?

Pretrial legal foundations provide the framework and the boundaries within which we must work in the administration of bail. They operate uniquely in the pretrial phase of a criminal case, and together should serve as a cornerstone for all pretrial practices; they animate and inform our daily work and serve as a visible daily backdrop for our pretrial thoughts and actions.

For the most part, the legal foundations confirm and solidify the history of bail. The history of bail tells us that the purpose of bail is release, and the law has evolved to strongly favor, if not practically demand the release of bailable defendants as well as to provide us with the means for effectuating the release decision. The history tells us that "no bail" is a lawful option, and the law has evolved to instruct us on how to fairly and transparently detain unbailable defendants. History tells us that court appearance and public safety are the chief concerns of the bail determination, and the law recognizes each as constitutionally valid purposes for limiting pretrial freedom.

The importance of the law in "legal and evidence-based practices" is unquestioned. Pretrial practices, judicial decision making (for judges are sworn to uphold the law and their authority derives from it), and even state bail laws themselves must be continually held up to the fundamental principles of broad national applicability for legal legitimacy. Moreover, the law acts as a check on the evidence; a pretrial practice, no matter how effective, must always bow to the higher principles of equal justice, rationality, and fairness. Finally, the law provides us with the fundamental goals of the pretrial release and detention decision. Indeed, if evidence-based decision making is summarized as attempting to achieve the goals of a particular discipline by using best practices, research, and evidence, then the law is critically important because it tells us that the goals of bail are to maximize release while simultaneously maximizing court appearance and public safety. Accordingly, all of the research and pretrial practices must be

continually questioned as to whether they inform or further these three inter-related goals. In the next section, we will examine how the evolution of research at bail has, in fact, informed lawful and effective bail decision making.

**Additional Sources and Resources:** Black's Law Dictionary (9th ed. 2009); Douglas L. Colbert, Ray Paternoster, & Shawn Bushway, *Do Attorneys Really Matter? The Empirical and Legal Case for the Right to Counsel at Bail,* 32 Cardozo L. Rev. 1719 (2002); *Early Appointment of Counsel: The Law, Implementation, and Benefits* (Sixth Amend. Ctr./PJI 2014); Wayne R. LaFave, Jerold H. Israel, Nancy J. King and Orin S. Kerr, *Criminal Procedure* (3rd ed. 2007 & 5th ed. 2009); Jack K. Levin & Lucan Martin, 8A American Jurisprudence 2d, *Bail and Recognizance* (West 2009); Timothy R. Schnacke, Michael R. Jones, & Claire M. B. Brooker, *Glossary of Terms and Phrases Relating to Bail and the Pretrial Release or Detention Decision* (PJI 2011); Marie VanNostrand, *Legal and Evidence-Based Practices: Applications of Legal Principles, Laws, and Research to the Field of Pretrial Services* (CJI/NIC 2007); 3B Charles Allen Wright & Peter J. Henning, Federal Practice and Procedure §§ 761-87 (Thomson Reuters 2013).

# Chapter 4: Pretrial Research

## The Importance of Pretrial Research

Research allows the field of bail and pretrial justice to advance. Although our concepts of proper research have certainly changed over the centuries, arguably no significant advancement in bail or pretrial justice has ever occurred without at least some minimal research, whether that research was legal, historical, empirical, opinion, or any other way of better knowing things. This was certainly true in England in the 1200s, when Edward I commissioned jurors to study bail and used their documented findings of abuse to enact the Statute of Westminster in 1275. It is especially true in America in the 20th century, when research was the catalyst for the first two generations of bail reform and has arguably sparked a third.

While other research disciplines are important, the current workhorse of the various methods in bail is social research. According to noted sociologists Earl Babbie and Lucia Benaquisto, social research is important because we often already know the answers to life's most pressing problems, but we are still unable to solve them. Social science research provides us with the solutions to these problems by telling us how to organize and run our social affairs by analyzing the forms, values, and customs that make up our lives. This is readily apparent in bail, where many of the solutions to current problems are already known; social science research provides help primarily by illuminating how we can direct our social affairs so as to fully implement those solutions. By continually testing theories and hypotheses, social science research finds incremental explanations that simplify a complex life, and thus allows us to solve confounding issues such as how to reduce or eliminate unnecessary pretrial detention.

> *"We can't solve our social problems until we understand how they come about, persist. Social science research offers a way to examine and understand the operation of human social affairs. It provides points of view and technical procedures that uncover things that would otherwise escape our awareness."*
>
> Earl Babbie & Lucia Benaquisto, 2009

Like history and the law, social science research and the law are growing more and more entwined. In the 1908 case of *Muller v. Oregon,*[60] Louis Brandeis submitted a voluminous brief dedicated almost exclusively to social science research indicating the

---

[60] *Muller v. Oregon,* 208 U.S. 412 (1908).

negative effects of long work hours on women. This landmark instance of the use of social research in the law, ultimately dubbed a "Brandeis brief," became the model for many legal arguments thereafter. One need only read the now famous footnote 11 of the Supreme Court's opinion in *Brown v. Board of Education*,[61] which ended racial segregation in America's schools and showed the detrimental effects of segregation on children, to understand how social science research can significantly shape our laws.

Social science research and the law are especially entwined in criminal justice and bail. Perhaps no single topic ignites as deep an emotional response as crime – how to understand it, what to do about it, and how to prevent it. And bail, for better or worse, ignites the same emotional response. Moreover, bail is deceptively complex because it superimposes notions of a defendant's freedom and the presumption of innocence on top of our societal desires to bring defendants to justice and to avoid pretrial misbehavior. Good social science research can aid us in simplifying the topic by answering questions surrounding the three legal and historical goals of bail and conditions of bail. Specifically, social science pretrial research tells us what works to simultaneously: (1) maximize release; (2) maximize public safety; and (3) maximize court appearance.

Because of the complex balance of bail, research that addresses all three of these goals is superior to research that does not. For example, studies showing only the effectiveness of release pursuant to a commercial surety bond at ultimately reducing failures to appear (whether true or not) is less helpful than also knowing how those bonds do or do not affect public safety and tend to detain otherwise bailable defendants. It is helpful to know that pretrial detention causes negative long-term effects on defendants; it is more helpful to learn how to reduce those effects while simultaneously keeping the community safe. It is helpful to know a defendant's risk empirically; it is more helpful to know how to best embrace risk so as to facilitate release and then to mitigate known risk to further the constitutionally valid purposes for limiting pretrial freedom.

Nevertheless, some research is always better than no research, even if that research is found on the lowest levels of an evidence-based decision making hierarchy of evidence pyramid. And that is simply because we are already making decisions every day at bail, often with no research at all, and typically based on customs and habits formed over countless decades of uninformed practice. To advance our policies, practices, and laws, we must at least become informed consumers of pretrial research. We must recognize the strengths and limitations of the research, understand where it is coming from, and even who is behind creating it. Ultimately, however, we must use it to help solve what we perceive to be our most pressing problems at bail.

---

[61] *Brown v. Board of Education,* 347 U.S. 483 (1954).

## Research in the Context of Legal and Evidence-Based Practices

The term "evidence-based practices" is common to numerous professional fields. As noted earlier, however, due to the unique nature of the pretrial period of a criminal case as well as the importance of legal foundations to pretrial decision making, Dr. Marie VanNostrand has more appropriately coined the term "legal and evidence-based practices" for the pretrial field. Legal and evidence-based practices are defined as "interventions and practices that are consistent with the pretrial legal foundation, applicable laws, and methods research has proven to be effective in decreasing failures to appear in court and danger to the community during the pretrial stage."

In addition to holding up practices and the evidence behind them to legal foundations, to fully follow an evidence-based decision making model jurisdictions must also determine how much research is needed to make a practice "evidence-based." According to the U.S. Department of Health and Human Services (HHS), this is done primarily by assessing the strength of the evidence indicating that the practice leads to the desired outcome. To help with making this assessment, many fields employ the use of graphics indicating the varying "strength of evidence" for the kinds of data or research they are likely to use. For example, the Colorado Commission on Criminal and Juvenile Justice, a statewide commission that focuses on evidence-based recidivism reduction and cost-effective criminal justice expenditures, refers to the strength of evidence pyramid, below, which was developed by HHS's Substance Abuse and Mental Health Services Administration's Co-Occurring Center for Excellence (COCE).



As one can see, the levels vary in strength from lower to higher, with higher levels more likely to illuminate research that works better to achieve the goals of a particular field.

As noted by the COCE, "Higher levels of research evidence derive from literature reviews that analyze studies selected for their scientific merit in a particular treatment area, clinical trial replications with different populations, and meta-analytic studies of a body of research literature. At the highest level of the pyramid are expert panel reviews of the research literature."

**Sources and Resources:** Marie VanNostrand, *Legal and Evidence-Based Practices: Applications of Legal Principles, Laws, and Research to the Field of Pretrial Services* (CJI/NIC 2007); Information gathered from the Colorado Commission on Criminal and Juvenile Justice website, found at http://www.colorado.gov/cs/Satellite/CDPS-CCJJ/CBON/1251622402893; *Understanding Evidence-Based Practices for Co-Occurring Disorders* (SAMHSA's CORE) contained in SAMHSA's website, found online at http://www.samhsa.gov/co-occurring/topics/training/OP5-Practices-8-13-07.pdf.

Research in the Last 100 Years: The First Generation

If we focus on just the last 100 years, we see that major periods of bail research in America have led naturally to more intense periods of reform resulting in new policies, practices, and laws. Although French historian Alexis de Tocqueville informally questioned America's continued use of money bail in 1835, detailed studies of bail practices in America had their genesis in the 1920s, first from Roscoe Pound and Felix Frankfurter's study of criminal justice in Cleveland, Ohio, and then from Arthur Beeley's now famous study of bail in Chicago, Illinois. Observing secured-money systems primarily administered through the use of commercial bail bondsmen (that had really only existed since 1898), both of those 1920s studies found considerable flaws in the current way of administering bail. Beeley's seminal statement of the problem in 1927, made at the end of a painstakingly detailed report, is still relevant today:

> [L]arge numbers of accused, but obviously dependable persons are needlessly committed to Jail; while many others, just as obviously undependable, are granted a conditional release and never return for trial. That is to say, the present system, in too many instances, neither guarantees security to society nor safeguards the rights of the accused. The system is lax with those with whom it should be stringent and stringent with those with whom it could safely be less severe.[62]

Pound, Frankfurter, and Beeley began a period of bail research, advanced significantly by Caleb Foote in the 1950s, that culminated in the first generation of bail reform in the 1960s. That research consisted of several types – for example, one of the most important historical accounts of bail was published in 1940 by Elsa de Haas. But the most significant literature consisted of social science studies observing and documenting the deficiencies of the current system. As noted by author Wayne H. Thomas, Jr.,

> [These] studies had shown the dominating role played by bondsmen in the administration of bail, the lack of any meaningful consideration to the issue of bail by the courts, and the detention of large numbers of defendants who could and should have been released but were not because bail, even in modest amounts, was beyond their means. The studies also revealed that bail was often used to 'punish' defendants prior to a determination of guilt or to 'protect' society from anticipated future conduct, neither of which is a permissible purpose of bail; that defendants detained prior to trial often spent months in jail only to be acquitted or to receive a suspended sentence after conviction; and that

---

[62] Arthur L. Beeley, *The Bail System in Chicago*, at 160 (Univ. of Chicago Press, 1927).

jails were severely overcrowded with pretrial detainees housed in conditions far worse than those of convicted criminals.[63]

Clearly, the most impactful of this period's research was so-called "action research," in which bail practices were altered and outcomes measured in pioneering "bail projects" to study alternatives to the secured bond/commercial surety system of release. Perhaps the most well-known of these endeavors was the Manhattan Bail Project, conducted by the Vera Foundation (now the Vera Institute of Justice) and the New York University Law School beginning in 1960. The Manhattan Bail Project used an experimental design to demonstrate that given the right information, judges could release more defendants without the requirement of a financial bond condition and with no measurable impact on court appearance rates. At that time in American history, bail had only two goals – to release defendants while simultaneously maximizing court appearance – because public safety had not yet been declared a constitutionally valid purpose for limiting pretrial freedom. The Manhattan Bail Project was significant because it worked to achieve both of the existing goals. Based on the information provided by Vera, release rates increased while court appearance rates remained high.

---

[63] Wayne H. Thomas, Jr., *Bail Reform in America* at 15 (Univ. Cal. Press 1976).

---

**Caleb Foote's Unfulfilled Prediction
Concerning Bail Research**

At the National Conference on Bail and Criminal Justice in 1964, Professor of Law Caleb Foote explained to attendees that courts would likely move from their "wholly passive role" during the first generation of bail reform to a more active one, saying, "Certainly courts are not going to be immune to the sense of basic unfairness which alike has motivated scholarly research, foundation support for bail action projects, the Attorney General's Committee on Poverty, and your attendance at this Conference." Noting the lack of any definitive empirical evidence showing that pretrial detention alone adversely affected the quality of treatment given to criminal defendants, Foote nonetheless cited current studies attempting to show that very thing, and predicted:

"If it comes to be generally accepted that in the outcome of his case the jailed defendant is prejudiced compared with the defendant who has pretrial liberty, such a finding will certainly have a profound impact upon any judicial consideration of constitutional bail questions. It was such impermissible prejudicial effects, stemming from poverty, which formed the basis of the due process requirement of counsel in *Gideon v. Wainwright.*"

Since then, numerous studies have highlighted the prejudicial effects of pretrial detention, with the research consistently demonstrating that when compared to defendants who are released, defendants detained pretrial – all other things being equal – plead guilty more often, are convicted more often, get sentenced to prison more often, and receive longer sentences. And yet, despite this overwhelming research, Foote's prediction of increased judicial interest and activity in the constitutional issues of bail has not come true.

**Sources and Resources:** *American Bar Association Standards for Criminal Justice (3rd Ed.) Pretrial Release* at 29 n. 1 (2007) (citing studies); John Clark, *Rational and Transparent Bail Decision Making: Moving From a Cash-Based to a Risk-Based Process*, at 2 (PJI/MacArthur Found. 2012) (same); *The National Conference on Bail and Criminal Justice, Proceedings and Interim Report,* at 224-25 (Washington, D.C. April 1965);

---

The Manhattan Bail Project was the center of discussion of bail reform at the 1964 National Conference on Bail and Criminal Justice, which in turn led to changes in both federal and state laws designed to facilitate the release of bailable defendants who were previously unnecessarily detained. Those changes included presumptions for release on recognizance, release on unsecured bonds (like those used for centuries in England and America prior to the 1800s), release on "least restrictive" nonfinancial conditions, and additional constraints on the use of secured money bonds. The improvements were, essentially, America's attempt to solve the early 20th century's dilemma of bailable defendants not being released – a dilemma that, historically speaking, has always demanded correction.

The Second Generation

Research flowing toward the second generation of pretrial reform in America followed the same general pattern of identifying abuses or areas in need of improvement and then gradually creating a meeting of minds on practical solutions to those abuses. In that generation, though, the identified "abuse" dealt primarily with the "no bail" side of the "bail/no bail" dichotomy – the side that determines who should not be released at all. As summarized by Senator Edward Kennedy in 1980,

> Historically, bail has been viewed as a procedure designed to ensure the defendant's appearance at trial by requiring him to post a bond or, in effect, make a promise to appear. Current findings, suggest, however, that this traditional approach, though noble in design, has one important shortcoming. It fails to deal effectively with those defendants who commit crimes while they are free on bail.[64]

Indeed, for nearly 1,500 years, the only acceptable purpose for limiting pretrial freedom was to assure that the defendant performed his or her duty to face justice, which ultimately came to mean appearing for court. Even when crafting their constitutional and statutory exceptions to any recognized right to bail, the states and the federal government had always done so with an eye toward court appearance. To some, limiting freedom based on future dangerousness was un-American, more akin to tyrannical practices of police states, and contrary to all notions of fundamental human rights. Indeed, there was considerable debate over whether it could *ever* be constitutional to do so.

Nevertheless, many judges felt compelled to respond to legitimate fears for public safety even if the law did not technically allow for it. Accordingly, those judges often followed two courses of action when faced with obviously dangerous defendants who perhaps posed virtually no risk of flight: (1) if those defendants happened to fall in the categories listed as "no bail," judges could deny their release altogether; (2) if they did not fall into a "no bail" category, judges could and would set high monetary conditions of bail to effectively detain the defendant. The practice of detaining persons for public safety, or preventive detention, was known at the time as furthering a "sub rosa" or secret purpose for limiting freedom, and it was done with little interference from the appellate courts.

The research leading to reform in this area was multifaceted. Law reviews published articles on the right to bail, the Excessive Bail Clause, and on due process concerns. Historians examined the right to bail in England and America to determine if and how it could be restricted or even denied altogether for purposes of public safety. Politicians

---

[64] Edward M. Kennedy, *A New Approach to Bail Release: The Proposed Federal Criminal Code and Bail Reform,* 48 Fordham L. Rev. 423, 423 (1980) (internal footnotes omitted).

and others looked to the experiences of states that had already changed their laws to account for public safety and danger. And social scientists documented what Congress ultimately called "the alarming problem of crimes committed by persons on release"[65] by conducting empirical studies of pretrial release and re-arrest rates in a number of American jurisdictions.

Ultimately, this research led to dramatic changes in the administration of bail. Congress passed the Bail Reform Act of 1984, which expanded the law to allow for direct, fair, and transparent detention of certain dangerous defendants after a due process hearing. In *United States v. Salerno*, the Supreme Court upheld the Act, giving constitutional validity to public safety as a limitation on pretrial freedom. If they had not already done so, many states across the country changed their statutes and constitutions to allow consideration of dangerousness in the release and detention decision and by re-defining the "no bail" side of their schemes to better reflect which defendants should be denied the right to bail altogether.

---

[65] S. Rep. No. 98-225, P. L. 98-473 p. 3 (1983).

## The Third Generation

The previous generations of bail research have followed the pattern of identifying abuses or issues of concern and then finding consensus on solutions, and the current generation is no different. Some of the research in this generation of bail reform is merely a continuation of studies begun in previous generations. For example, a body of literature examining the effects of pretrial detention on ultimate outcomes of cases (guilty pleas, sentences, etc.) began in the 1950s and has continued to this day. As another example, after Congress passed the Bail Reform Act of 1966, pretrial services programs gradually expanded from the "bail projects" of the early 1960s to more comprehensive agencies designed to carry out the mandates of new laws requiring risk assessment and often supervision of pretrial defendants. As these programs evolved, a body of research began to develop around their practices. In 1973, the National Association of Pretrial Services Agencies (NAPSA) was founded to, among other things, promote research and development in the field. In 1976, NAPSA and the Department of Justice created the Pretrial Services Resource Center (PSRC, now the Pretrial Justice Institute), an entity also designed to, among other things, collect and disseminate research and information relevant to the pretrial field. The data collected by these entities over the years, in addition to the numerous important reports they have issued analyzing that data, have been instrumental sources of fundamental pretrial research.

> ### A Meeting of Minds – Who is Currently In Favor of Pretrial Improvements?
>
> The following national organizations have produced express policy statements generally supporting the use of evidence-based and best pretrial practices, which include risk assessment and fair and transparent preventive detention, at the front end of the criminal justice system:
>
> The Conference of Chief Justices
>
> The Conference of State Court Administrators
>
> The National Association of Counties
>
> The International Association of Chiefs of Police
>
> The Association of Prosecuting Attorneys
>
> The American Council of Chief Defenders
>
> The National Association of Criminal Defense Lawyers
>
> The American Jail Association
>
> The American Bar Association
>
> The National Judicial College
>
> The National Sheriff's Association
>
> The American Probation and Parole Association
>
> The National Association of Pretrial Services Agencies
>
> In addition, numerous other organizations and individuals are lending their support or otherwise partnering to facilitate pretrial justice in America. For a list of just those organizations participating in the Pretrial Justice Working Group, created in the wake of the National Symposium on Pretrial Justice, go to http://www.pretrial.org/infostop/pjwg/

As another example, in 1983, the PSRC – with funding from the Bureau of Justice Statistics (BJS) – initiated the National Pretrial Reporting Program, which was designed to create a national pretrial database by collecting local bail data and aggregating it at the state and national levels. In 1994, that program became BJS's State Court Processing Statistics (SCPS) program, which collected data on felony defendants in jurisdictions from the 75 most populous American counties. Research documents analyzing that data, including the *Felony Defendants from Large Urban Counties* series, and *Pretrial Release of Felony Defendants in State Courts*, have become crucial, albeit sometimes misinterpreted sources of basic pretrial data, such as defendant charges and demographics, case outcomes, types of release and release rates, financial condition amounts, and basic information on pretrial misconduct. Most recently, BJS asked the

Urban Institute to re-design and re-develop the National Pretrial Reporting Program as a replacement to SCPS.

## An Unusual, But Necessary, Research Warning

Since 1988, the Bureau of Justice Statistic's (BJS) State Court Processing Statistics (SCPS) program (formerly the National Pretrial Reporting Program) has been an important source of data on criminal processing of persons charged with felonies in the 75 most populous American counties. Issues surrounding pretrial release, in particular, have been tempting topics for study due to the SCPS's inclusion of data indicating whether defendants were released pretrial, the type of release (e.g., personal recognizance, surety bond), and whether the defendant misbehaved while on pretrial release. In some cases, researchers would use the SCPS data to make "evaluative" statements, that is, statements declaring that a particular type of release was superior to another based on the data showing pretrial misbehavior associated with each type. Moreover, when these studies favored the commercial bail bonding and insurance industry, that industry would repeat the researcher's evaluative statements (as well as make their own statements based on their own reading of the SCPS data), and claim that the data demonstrated that the use of a commercial surety bond was a superior form of release.

According to Bechtel, et.al, (2012) "The bonding industry's claims based on the SCPS data became so widespread that BJS was compelled to take the unusual and unprecedented step of issuing a 'Data Advisory.'" That advisory, issued in March of 2010, listed the limitations of the SCPS data, and specifically warned that, "Any evaluative statement about the effectiveness of a particular program in preventing pretrial misconduct based on SCPS is misleading."



Despite the warning, there are those who persist in citing SCPS data to convince policy makers or others about the effectiveness of one type of release over another. Both Bechtel, et al., and VanNostrand, et al., have listed flaws in the various studies using the data and have given compelling reasons for adopting a more discriminating attitude whenever persons or entities begin comparing one type of release with another.

As mentioned in the body of this paper, the best research at bail, which will undoubtedly include future efforts at comparing release types, must not only comply with the rigorous standards necessary so as not to violate the BJS Data Advisory, but should also address all three legal and evidence-based goals underlying the bail decision, which include maximizing release while maximizing public safety and court appearance.

> **Sources and Resources:** Kristin Bechtel, John Clark, Michael R. Jones, & David J. Levin, *Dispelling the Myths, What Policy Makers Need to Know About Pretrial Research* (PJI, 2012); Thomas Cohen & Tracey Kyckelhahn, *Data Advisory: State Court Processing Statistics Data Limitations* (BJS 2010); Marie VanNostrand, Kenneth J. Rose, & Kimberly Weibrecht, *State of the Science of Pretrial Release Recommendations and Supervision* (PJI/BJA 2011).

Finally, a related body of ongoing research derives simply from pretrial services agencies and programs measuring themselves, which can be a powerful way to present and use data to affect pretrial practices. In 2011, the NIC published *Measuring What Matters: Outcome and Performance Measures for the Pretrial Services Field,* which proposed standardized definitions and uniform suggested measures consistent with established pretrial standards to "enable pretrial services agencies to gauge more accurately their programs' effectiveness in meeting agency and justice system goals."[66] Broadly speaking, standardized guidelines and definitions for documenting performance measures and outcomes enables better communication and leads to better and more coordinated research efforts overall.

Other research flowing toward this current generation of pretrial reform, akin to Arthur Beeley's report on Chicago bail practices, has been primarily observational. That research, such as some of the multifaceted analyses performed in Jefferson County, Colorado, in 2007-2010, merely examines system practices to assess whether those practices or even the current laws can be improved. Other entities, such as Human Rights Watch and the Justice Policy Institute, have created similar research documents that include varying ratios of observational and original research. On the other hand, another body of this generation's research goes far beyond observation and uses large data sets and complex statistical tests to create empirical pretrial risk instruments that provide scientific structure and meaning to current lists dictating the factors judges must consider in the release and detention decision.

In between is a body of research most easily identified by topic, but sometimes associated best with the person or entity producing it. For example, throughout the years researchers have been interested in analyzing judicial discretion and guided discretion in the decision to release, and so one finds numerous papers and studies examining that issue. In particular, though, Dr. John Goldkamp spent much of his distinguished academic career focusing on judicial discretion in the pretrial release decision, and published numerous important studies on his findings. Likewise, other local jurisdictions have delved deep into their own systems to look at a variety of issues associated with pretrial release and detention, but perhaps none have done so as consistently and thoroughly as the New York City Criminal Justice Agency, and its research continues to inspire and inform the nation.

---

[66] *Measuring What Matters: Outcome and Performance Measures for the Pretrial Services Field* (NIC 2011) at v.

Other topics of interest in this generation of reform include racial disparity, cost benefit analyses affecting pretrial practices, training police officers for first contacts and effects of that training on pretrial outcomes, citation release, the legality and effectiveness of monetary bail schedules, pretrial processes and outcomes measurements, re-entry from jail to the community, bail bondsmen and bounty hunters, special populations such as those with mental illness or defendants charged with domestic violence, and gender issues. Prominent organizations consistently working on publishing pretrial research literature include various agencies within the Department of Justice, including the National Institute of Corrections, the Bureau of Justice Assistance, the Bureau of Justice Statistics, and the National Institute of Justice. Other active entities include the Pretrial Justice Institute, the National Association of Counties, the United States Probation and Pretrial Services, the Pretrial Services Agency for the District of Columbia, the Vera Institute, the Urban Institute, and the Justice Policy Institute. Other organizations, such as the International Association of Chiefs of Police, the National Association of Drug Court Professionals, National Council on Crime and Delinquency, the Council of State Governments, the Pew Research Center, the American Probation and Parole Association, and various colleges and universities have also become actively involved in pretrial issues.

Along with these entities are a number of individuals who have consistently led the pretrial field by devoting much or all of their professional careers on pretrial research, such as Dr. John Goldkamp, D. Alan Henry, Dr. Marie VanNostrand, Dr. Christopher Lowenkamp, Dr. Alex Holsinger, Dr. James Austin, Dr. Mary Phillips, Dr. Brian Reaves, Dr. Thomas Cohen, Dr. Edward J. Latessa, Timothy Cadigan, Spurgeon Kennedy, John Clark, Kenneth J. Rose, Barry Mahoney, and Dr. Michael Jones. Often these individuals are sponsored by generous philanthropic foundations interested in pretrial justice, such as the Public Welfare Foundation and the Laura and John Arnold Foundation.

---

### Public Opinion Research

An important subset of criminal justice research is survey research, which can include collecting data to learn how people feel about crime or justice policy. For example, in 2012 the PEW Center on the States published polling research by Public Opinion Strategies and the Mellman Group showing that while people desire public safety and criminal accountability, they also support sentencing and corrections reforms that reduce imprisonment, especially for non-violent offenders. In 2009, the National Institute of Corrections reported a Zogby International poll similarly showing that 87% of those contacted would support research-based alternatives to jail to reduce recidivism for non-violent persons.

Very little of this type of research had been done in the field of pretrial release and detention, but in 2013 Lake Research Partners released the results of a nationwide poll focusing on elements of the current pretrial reform movement. That research found "overwhelming support" for replacing a cash-based bonding system with risk-based screening tools. Moreover, that support was high among all demographics, including gender, age, political party identification, and region. Interestingly too, most persons polled were unaware of the current American situation, with only 36% of persons

---

understanding that empirical risk assessment was not currently happening in most places.

**Sources and Resources:** *A Framework for Evidence-Based Decision Making in Local Criminal Justice Systems* (NIC, 2010); *Support for Risk Assessment Programs Nationwide* (Lake Research Partners 2013) found at http://www.pretrial.org/download/advocacy/Support%20for%20Risk%20Assessment%20Nationwide%20-%20Lake%20Research%20Partners.pdf. Public Opinion on Sentencing and Corrections Policy in America (Public Opinion Strategies/Mellman Group 2012) found at http://www.pewstates.org/uploadedFiles/PCS_Assets/2012/PEW_NationalSurveyResearchPaper_FINAL.pdf;

All of this activity brings hope to a field that has recently been described as significantly limited in its research agenda and output. In 2011, the Summary Report to the National Symposium on Pretrial Justice listed four recommendations related to a national research agenda: (1) collect a comprehensive set of pretrial data needed to support analysis, research, and reform through the Bureau of Justice Statistics; (2) embark on comprehensive research that results in the identification of proven best pretrial practices through the National Institute of Justice; (3) develop and seek funding for research proposals relating to pretrial justice; and (4) prepare future practitioners and leaders to effectively address pretrial justice issues in a fair, safe, and effective manner.

In the wake of the Symposium, the Department of Justice's Office of Justice Programs (OJP) convened a Pretrial Justice Working Group, a standing, multidisciplinary group created to collaboratively address national challenges to moving toward pretrial reform. The Working Group, in turn, established a "Research Subcommittee," which was created to stimulate detailed pretrial data collection, increase quantitative and qualitative pretrial research, support existing OJP initiatives dealing with evidence-based practices in local justice systems, and develop pretrial justice courses of studies in academia. Due in part to that Subcommittee's purposeful focus, its members have begun a coordinated effort to identify pretrial research needs and to develop research projects designed specifically to meet those needs. Accordingly, across America, we are seeing great progress in both the interest and the output of pretrial research.

> *"Research is formalized curiosity. It is poking and prying with a purpose."*
>
> Zora Neale Hurston, 1942

However, there are many areas of the pretrial phase of a defendant's case that are in need of additional helpful research. For example, while Professor Doug Colbert has created groundbreaking and important research on the importance of defense attorneys at bail, and while the Kentucky Department of Public Advocacy has put that research into practice through a concentrated effort toward advancing pretrial advocacy, there is relatively little else on this very important topic. Similarly, other areas under the umbrella of pretrial reform, such as a police officer's decision to arrest or cite through a summons, the prosecutor's decision to charge, early decisions dealing with specialty courts, and diversion, suffer from a relative lack of empirical research. This is true in the legal field as well, as only a handful of scholars have recently begun to focus again on fundamental legal principles or on how state laws can help or hinder our intent to follow evidence-based pretrial practices. In sum, there are still many questions that, if answered through research, would help guide us toward creating bail systems that are the most effective in maximizing release, public safety, and court appearance. Moreover, there exists today even a need to better compile, categorize, and disseminate the research that we do have. To that end, both the National Institute of Justice and the Pretrial Justice Institute have recently created comprehensive bibliographies on their websites.

## Current Research – Special Mention

One strand of current pretrial research warranting special mention, however, is research primarily focusing on one or both of the two following categories: (1) empirical risk assessment; and (2) the effect of release type on pretrial outcomes, including the more nuanced question of the effect of specific conditions of release on pretrial outcomes. The two topics are related, as often the data sets compiled to create empirical risk instruments contain the sort of data required to answer the questions concerning release type and conditions as well as the effects of conditional release or detention on risk itself. The more nuanced subset of how conditions of release affect pretrial outcomes can become quite complicated when we think about differential supervision strategies including questions of dosage, e.g., how much drug testing must we order (if any) to achieve the optimal pretrial court appearance and public safety rates?

## Empirical Risk Assessment Instruments

Researchers creating empirical pretrial risk assessment instruments take large amounts of defendant data and identify which specific factors are statistically related and how strongly they are related to defendant pretrial misconduct. Ever since the mid-20th century, primarily in response to the United States Supreme Court's opinion in *Stack v. Boyle,* states have enacted into their laws factors judges are supposed to consider in making a release or detention decision. For the most part, these factors were created using logic and later some research from the 1960s showing the value of community ties to the pretrial period. Unfortunately, however, little to no research existed to demonstrate which of the many enacted factors were actually predictive of pretrial misconduct and at what strength. Often, judges relied on one particular factor – the current charge or sometimes the charge and police affidavit – to make their decisions. Over the years, single jurisdictions, such as counties, occasionally created risk instruments using generally accepted social science research methods, but their limited geographic influence and sometimes their lack of data from which to test multiple variables meant that research in this area spread slowly.

In 2003, however, Dr. Marie VanNostrand created the Virginia Pretrial Risk Assessment Instrument, most recently referred to by Dr. VanNostrand and others as simply the "Virginia Model," which was ultimately tested and validated in multiple Virginia jurisdictions and then deployed throughout the state. Soon after, other researchers developed other multi-jurisdictional risk instruments, including Kentucky, Ohio, Colorado, Florida, and the federal system, and now other American jurisdictions, including single counties, are working on similar instruments. Still others are "borrowing" existing instruments for use on local defendants while performing the process of validating them for their local population. Most recently, in November 2013, researchers sponsored by the Laura and John Arnold Foundation announced the creation of a "national" risk instrument, capable of accurately predicting pretrial risk

(including risk of violent criminal activity) in virtually any American jurisdiction due to the extremely large database used to create it.

In its 2012 issue brief titled, *Pretrial Risk Assessment 101: Science Provides Guidance on Managing Defendants,* PJI and BJA summarize the typical risk instrument as follows:

> A pretrial risk assessment instrument is typically a one-page summary of the characteristics of an individual that presents a score corresponding to his or her likelihood to fail to appear in court or be rearrested prior to the completion of their current case. Instruments typically consist of 7-10 questions about the nature of the current offense, criminal history, and other stabilizing factors such as employment, residency, drug use, and mental health.
>
> Responses to the questions are weighted, based on data that shows how strongly each item is related to the risk of flight or rearrest during pretrial release. Then the answers are tallied to produce an overall risk score or level, which can inform the judge or other decisionmaker about the best course of action.[67]

Using a pretrial risk assessment instrument is an evidence-based practice, and to the extent that it helps judges with maximizing the release of bailable defendants and identifying those who can lawfully be detained, it is a legal and evidence-based practice. Nevertheless, it is a relatively new practice – it is too new for detailed discussion in the current ABA Criminal Justice Standards on Pretrial Release – and so the fast-paced research surrounding these instruments must be scrutinized and our shared knowledge constantly updated to provide for the best application of these powerful tools. In 2011, Dr. Cynthia Mamalian authored *The State of the Science of Pretrial Risk Assessment*, and noted many of the issues (including "methodological challenges") that surround the creation and implementation of these instruments.[68]

---

**Bail and the Aberrational Case**

Social scientists primarily deal with aggregate patterns of behavior rather than with individual cases, but the latter is often what criminal justice professionals are used to. Cases that fall outside of a particular observable pattern might be called "outliers" or "aberrations" by social scientists and thus disregarded by the research that is most relevant to bail. Unfortunately, however, it is often these aberrational cases – typically those showing pretrial misbehavior – that drive public policy.

Thus, when making policy decisions about bail it is important for decision makers to embrace perspective by also studying aggregates. By looking at a problem from a

---

[67] *Pretrial Risk Assessment 101: Science Provides Guidance on Managing Defendants* (PJI/BJA 2012) (internal footnote omitted).
[68] *See* Cynthia A. Mamalian, *State of the Science of Pretrial Risk Assessment*, at 26 (PJI/BJA 2011).

> distance, one can often see that the single episode that brought a particular case to the pretrial justice discussion table may not present the actual issue needing improvement. If the single case represents an aggregate pattern, however, or if that case illustrates some fundamental flaw in the system that demands correction, then that case may be worthy of further study.
>
> In the aggregate, very few defendants misbehave while released pretrial (for example, the D.C. Pretrial Services Agency reports that in 2012, 89% of released defendants were arrest-free during their pretrial phase, and that only 1% of those arrested were for violent crimes; likewise, Kentucky reports a 92% public safety rate), and yet occasionally defendants will commit heinous crimes under all forms of supervision, including secured detention. In the aggregate, most people show up for court (again, D.C. Pretrial reports that 89% of defendants did not miss a single court date; likewise, Kentucky reports a 90% court appearance rate), and yet occasionally some high profile defendant will not appear, just as fifty may not show up for traffic court on the same day. In the aggregate, virtually all defendants will ultimately be released back into our communities and thus can be safety supervised within our communities while awaiting the disposition of their cases, and yet occasionally there are defendants who are so risky that they must be detained.
>
> **Sources and Resources:** Tara Boh Klute & Mark Heyerly, *Report on Impact of House Bill 463: Outcomes, Challenges, and Recommendations* (KY Pretrial Servs. 2012); Michael G. Maxfield & Earl Babbie, Research Methods for Criminal Justice and Criminology (Wadsworth, 6th ed. 2008); D.C. Pretrial statistics found at http://www.psa.gov/.

Beyond those issues, however, is the somewhat under-discussed topic of what these "risk-based" instruments mean for states that currently have entire bail schemes created without pure notions of risk in mind. For example, many states have preventive detention provisions in their constitutions denying the right to bail for certain defendants, but often these provisions are tied primarily to the current charge or the charge and some criminal precondition. The ability to better recognize high-risk defendants, who perhaps should be detained but who, because of their charge, are not detainable through the available "no bail" process, has caused these states to begin re-thinking their bail schemes to better incorporate risk. The general move from primarily a charge-and-resource-based bail system to one based primarily on pretrial risk automatically raises questions as to the adequacy of existing statutory and constitutional provisions.

## Effects of Release Types and Conditions on Pretrial Outcomes

The second category of current research – the effect of release type as well as the effect of individual conditions on pretrial outcomes – continues to dominate discussions about what is next in the field. Once we know a particular defendant's risk profile, it is natural to ask "what works" to then mitigate that risk. The research surrounding this topic is evolving rapidly. Indeed, during the writing of this paper, the Pretrial Justice Institute released a rigorous study indicating that release on a secured (money paid up front) bond does nothing for public safety or court appearance compared to release on an

unsecured (money promised to be paid only if the defendant fails to appear) bond, but that secured bonds have a significant impact on jail bed use through their tendency to detain defendants pretrial. Likewise, in November 2013, the Laura and John Arnold Foundation released its first of several research studies focusing on the impact of pretrial supervision. Though admittedly lacking detail in important areas, that study suggested that moderate and higher risk defendants who were supervised were significantly more likely to show up for court than non-supervised defendants.

In 2011, VanNostrand, Rose, and Weibrecht summarized the then-existing research behind a variety of release types, conditions, and differential supervision strategies, including court date notification, electronic monitoring, pretrial supervision and supervision with alternatives to detention, release types based on categories of bail bonds, and release guidelines, and that summary document, titled *State of the Science of Pretrial Release Recommendations and Supervision,* remains an important foundational resource for anyone focusing on the topic. Nevertheless, as the Pretrial Justice Institute explained in its conclusion to that report, we have far to go before we can confidently identify legal and evidence-based conditions and supervision methods:

> Great strides have been made in recent years to better inform [the pretrial release decision], both in terms of what is appropriate under the law and of what works according to the research, and to identify which supervision methods work best for which defendants.

> As this document demonstrates, however, there is still much that we do not know about what kinds of conditions are most effective. Moreover, as technologies advance to allow for the expansion of potential pretrial release conditions and the supervision of those conditions, we can anticipate that legislatures and courts will be called upon to define the limits of what is legally appropriate.[69]

## Application and Implications

Applying the research has been a major component of jurisdictions currently participating in the National Institute of Correction's (NIC's) Evidence-Based Decision Making Initiative, a collaborative project among the Center for Effective Public Policy, the Pretrial Justice Institute, the Justice Management Institute, and the Carey Group. The seven jurisdictions piloting the NIC's collaborative "Framework," which has been described as providing a "purpose and a process" for applying evidence-based decision making to all decision points in the justice system, are actively involved in applying research and evidence to real world issues with the aim toward reducing harm and

---

[69] Marie VanNostrand, Kenneth J. Rose, & Kimberly Weibrecht, *State of the Science of Pretrial Release Recommendations and Supervision*, at 42 (conclusion by PJI) (PJI/BJA 2011).

victimization while maintaining certain core justice system values. Those Framework jurisdictions focusing on the pretrial release and detention decision are learning first hand which areas have sufficient research to fully inform pretrial improvements and which areas have gaps in knowledge, thus signifying the need for more research. Their work will undoubtedly inform the advancement of pretrial research in the future.

Finally, the weaving of the law with the research into pretrial application has the potential to itself raise significantly complex issues. For example, if GPS monitoring is deemed by the research to be ineffective, is it not then excessive under the 8th Amendment? If a secured money condition does nothing for public safety or court appearance, is it not then irrational, and thus also a violation of a defendant's right to due process, for a judge to set it? If certain release conditions actually increase a lower risk defendant's chance of pretrial misbehavior, can imposing them ever be considered lawful? These questions, and others, will be the sorts of questions ultimately answered by future court opinions.

## What Does the Pretrial Research Tell Us?

Pretrial research is crucial for telling us what works to achieve the purposes of bail, which the law and history explain are to maximize release while simultaneously maximizing public safety and court appearance. All pretrial research informs, but the best research helps us to implement laws, policies, and practices that strive to achieve all three goals. Each generation of bail or pretrial reform has a body of research literature identifying areas in need of improvement and creating a meeting of minds surrounding potential solutions to pressing pretrial issues. This current generation is no different, as we see a growing body of literature illuminating poor laws, policies, and practices while also demonstrating evidence-based solutions that are gradually being implemented across the country.

Nevertheless, in the field of pretrial research there are still many areas requiring attention, including areas addressed in this chapter such as risk assessment, risk management, the effects of money bonds, cost/benefit analyses, impacts and effects of pretrial detention, and racial disparity as well as areas not necessarily addressed herein, such as money bail forfeitures, fugitive recovery, and basic data on misdemeanor cases.

Most of us are not research producers. We are, however, research consumers. Accordingly, to further the goal of pretrial justice we must understand how rapidly the research is evolving, continually update our knowledge base of relevant research, and yet weed out the research that is biased, flawed, or otherwise unacceptable given our fundamental legal foundations. We must strive to understand the general direction of the pretrial research and recognize that a change in direction may require changes in laws, policies, and practices to keep up. Most importantly, we must continue to support pretrial research in all its forms, for it is pretrial research that advances the field.

**Additional Sources and Resources:** Steve Aos, Marna Miller, & Elizabeth Drake, *Evidence-Based Public Policy Options to Reduce Future Prison Construction, Criminal Justice Costs, and Crime Rates* (WSIPP 2006); Earl Babbie & Lucia Benaquisto, *Fundamentals of Social Research: Second Canadian Edition* (Cengage Learning 2009); Bernard Botein, *The Manhattan Bail Project: Its Impact on Criminology and the Criminal Law Processes,* 43 Tex. L. Rev. 319 (1964-65); Kristin Bechtel, John Clark, Michael R. Jones, & David J. Levin, *Dispelling the Myths, What Policy Makers Need to Know About Pretrial Research* (PJI, 2012); John Clark, *A Framework for Implementing Evidence-Based Practices in Pretrial Services,* Topics in Cmty. Corr. (2008); Thomas H. Cohen & Tracey Kyckelhahn, *Felony Defendants in Large Urban Counties, 2006* (BJS 2010); Thomas Cohen & Tracey Kyckelhahn, *Data Advisory: State Court Processing Statistics Data Limitations* (BJS 2010); Elsa de Haas, *Antiquities of Bail: Origin and Historical Development in Criminal Cases to the Year 1275* (AMS Press, Inc., New York 1966); *Evidence-Based Practices in the Criminal Justice System (Annotated Bibliography)* (NIC updated 2013); Caleb Foote, *Compelling Appearance in Court: Administration of Bail in Philadelphia,* 102 Univ. of Pa. L. Rev. 1031 (1954); Daniel J. Freed & Patricia M. Wald, *Bail in the United States: 1964* (DOJ/Vera Found. 1964); Michael R. Jones, *Pretrial Performance Measurement: A Colorado Example of Going from the Ideal to Everyday Practice* (PJI 2013); Michael R. Jones, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option* (PJI Oct. 2013); *Laura and John Arnold Foundation Develops National Model for Pretrial Risk Assessments* (Nov. 2013) found at [http://www.arnoldfoundation.org/laura-john-arnold-foundation-develops-national-model-pretrial-risk-assessments/](http://www.arnoldfoundation.org/laura-john-arnold-foundation-develops-national-model-pretrial-risk-assessments/); Christopher T. Lowenkamp & Marie VanNostrand, *Exploring the Impact of Supervision on Pretrial Outcomes* (Laura & John Arnold Found. 2013); Christopher T. Lowenkamp, Marie VanNostrand, & Alexander Holsinger, *Investigating the Impact of Pretrial Detention on Sentencing Outcomes* (Laura & John Arnold Found. 2013); Christopher T. Lowenkamp, Marie VanNostrand, & Alexander Holsinger, *The Hidden Costs of Pretrial Detention* (Laura & John Arnold Found. 2013); Michael G. Maxfield & Earl Babbie, *Research Methods for Criminal Justice and Criminology* (Wadsworth, 6th ed. 2008); *National Conference on Bail and Criminal Justice, Proceedings and Interim Report* (Washington, D.C. 1965); *National Symposium on Pretrial Justice: Summary Report of Proceedings* (PJI/BJS 2011); Mary T. Phillips, *A Decade of Bail Research in New York City* (N.Y. NYCCJA 2012); Roscoe Pound & Felix Frankfurter (Eds.), *Criminal Justice in Cleveland* (Cleveland Found. 1922); Marie VanNostrand, *Assessing Risk Among Pretrial Defendants In Virginia: The Virginia Pretrial Risk Assessment Instrument* (VA Dept. Crim. Just. Servs. 2003); Marie VanNostrand, *Legal and Evidence-Based Practices: Application of Legal Principles, Laws, and Research to the Field of Pretrial Services* (CJI/NIC 2007).

# Chapter 5: National Standards on Pretrial Release

Pretrial social science research tells us what works to further the goals of bail. History and the law tell us that the goals of bail are to maximize release while simultaneously maximizing public safety and court appearance, and the law provides a roadmap of how to constitutionally deny bail altogether through a transparent and fair detention process. If this knowledge was all that any particular jurisdiction had to use today, then its journey toward pretrial justice might be significantly more arduous than it really is. But it is not so arduous, primarily because we have national best practice standards on pretrial release and detention, which combine the research and the law (which is intertwined with history) to develop concrete recommendations on how to administer bail.

In the wake of the 1964 National Conference on Bail and Criminal Justice and the 1966 Federal Bail Reform Act, various organizations began issuing standards designed to address relevant pretrial release and detention issues at a national level. The American Bar Association (ABA) was first in 1968, followed by the National Advisory Committee on Criminal Justice, the National District Attorneys Association, and finally the National Association of Pretrial Services Agencies (NAPSA). The NAPSA Standards, in particular, provide important detailed provisions dealing with the purposes, roles, and functions of pretrial services agencies.

## The ABA Standards

Among these sets of standards, however, the ABA Standards stand out. Their preeminence is based, in part, on the fact that they "reflect[] a consensus of the views of representatives of all segments of the criminal justice system,"[70] which includes prosecutors, defense attorneys, academics, and judges, as well as various groups such as the National District Attorneys Association, the National Association of Criminal Defense Lawyers, the National Association of Attorneys General, the U.S. Department of Justice, the Justice Management Institute, and other notable pretrial scholars and pretrial agency professionals.

More significant, however, is the justice system's use of the ABA Criminal Justice Standards as important sources of authority. The ABA's Standards have been either quoted or cited in more than 120 U.S. Supreme Court opinions, approximately 700 federal circuit court opinions, over 2,400 state supreme court opinions, and in more than 2,100 law journal articles. By 1979, most states had revised their statutes to implement some part of the Standards, and many courts had used the Standards to

---

[70] Martin Marcus, *The Making of the ABA Criminal Justice Standards, Forty Years of Excellence,* 23 Crim. Just. (Winter 2009).

implement new court rules. According to Judge Martin Marcus, Chair of the ABA Criminal Justice Standards Committee, "[t]he Standards have also been implemented in a variety of criminal justice projects and experiments. Indeed, one of the reasons for creating a second edition of the Standards was an urge to assess the first edition in terms of the feedback from such experiments as pretrial release projects."[71]

> *"The Court similarly dismisses the fact that the police deception which it sanctions quite clearly violates the American Bar Association's Standards for Criminal Justice – Standards which the Chief Justice has described as 'the single most comprehensive and probably the most monumental undertaking in the field of criminal justice ever attempted by the American legal profession in our national history,' and which this Court frequently finds helpful."*
>
> *Moran v. Burbine*, 475 U.S. 412 (1986) (Stevens, J. dissenting)

The ABA's process for creating and updating the Standards is "lengthy and painstaking," but the Standards finally approved by the ABA House of Delegates (to become official policy of the 400,000 member association) "are the result of the considered judgment of prosecutors, defense lawyers, judges, and academics who have been deeply involved in the process, either individually or as representatives of their respective associations, and only after the Standards have been drafted and repeatedly revised on more than a dozen occasions, over three or more years."[72]

Best practices in the field of pretrial release are based on empirically sound social science research as well as on fundamental legal principles, and the ABA Standards use both to provide rationales for its recommendations. For example, in recommending that commercial sureties be abolished, the ABA relies on numerous critiques of the money bail system going back nearly 100 years, social science experiments, law review articles, and various state statutes providing for its abolition. In recommending a presumption of release on recognizance and that money not be used to protect public safety, the ABA relies on United States Supreme Court opinions, findings from the Vera Foundation's Manhattan Bail Project, discussions from the 1964 Conference on Bail and Criminal Justice, Bureau of Justice Statistics data, as well as the *absence* of evidence, i.e., "the absence of any relationship between the ability of a defendant to post a financial bond and the risk that a defendant may pose to public safety."[73]

The ABA Standards provide recommendations spanning the entirety of the pretrial phase of the criminal case, from the decision to release on citation or summons, to

---

[71] *Id.* (internal quotation omitted).

[72] *Id.*

[73] *American Bar Association Standards for Criminal Justice (3rd Ed.) Pretrial Release* (2007), Std. 10-5.3 (a) (commentary) at 111.

accountability through punishment for pretrial failure. They are based, correctly, on a "bail/no bail" or "release/detain" model, designed to fully effectuate the release of bailable defendants while providing those denied bail with fair and transparent due process hearing prior to detention.

Drafters of the 2011 Summary Report to the National Symposium on Pretrial Justice recognized that certain fundamental features of an ideal pretrial justice system are the same features that have been a part of the ABA Standards since they were first published in 1968. And while that Report acknowledged that simply pointing to the Standards is not enough to change the customs and habits built over 100 years of a bail system dominated by secured money, charge versus risk, and profit, the Standards remain a singularly important resource for all pretrial practitioners. Indeed, given the comprehensive nature of the ABA Standards, jurisdictions can at least use them to initially identify potential areas for improvement by merely holding up existing policies, practices, and even laws to the various recommendations contained therein.

# Chapter 6: Pretrial Terms and Phrases

## The Importance of a Common Vocabulary

It is only after we know the history, the law, the research, and the national standards that we can fully understand the need for a common national vocabulary associated with bail. The Greek philosopher Socrates correctly stated that, "The beginning of wisdom is a definition of terms." After all, how can you begin to discuss society's great issues when the words that you apply to those issues elude substance and meaning? But beyond whatever individual virtue you may find in defining your own terms, the undeniable merit of this ancient quote fully surfaces when applied to dialogue with others. It is one thing to have formed your own working definition of the terms "danger" or "public safety," for example, but your idea of danger and public safety can certainly muddle a conversation if another person has defined the terms differently. This potential for confusion is readily apparent in the field of bail and pretrial justice, and it is the wise pretrial practitioner who seeks to minimize it.

Minimizing confusion is necessary because, as noted previously, bail is already complex, and the historically complicated nature of various terms and phrases relating to bail and pretrial release or detention only adds to that complexity, which can sometimes lead to misuse of those terms and phrases. Misuse, in turn, leads to unnecessary quibbling and distraction from fundamental issues in the administration of bail and pretrial justice. This distraction is multiplied when the definitions originate in legislatures (for example, by defining bail statutorily as an amount of money) or court opinions (for example, by articulating an improper or incomplete purpose of bail). Given the existing potential for confusion, avoiding further complication is also a primary reason for finding consensus on bail's basic terms and phrases.

As also noted previously, bail is a field that is changing rapidly. For nearly 1,500 years, the administration of bail went essentially unchanged, with accused persons obtaining pretrial freedom by pledging property or money, which, in turn, would be forfeited if those persons did not show up to court. By the late 1800s, however, bail in America had changed from the historical personal surety system to a commercial surety system, with the unfortunate consequence of solidifying money at bail while radically transforming money's use from a condition subsequent (i.e., using unsecured bonds) to a condition precedent (i.e., using secured bonds) to release. Within a mere 20 years after the introduction of the commercial surety system in America, researchers began documenting abuses and shortcomings associated with that system based on secured financial conditions. By the 1980s, America had undergone two generations of pretrial reform by creating alternatives to the for-profit bail bonding system, recognizing a second constitutionally valid purpose for the government to impose restrictions on pretrial freedom, and allowing for the lawful denial of bail altogether based on extreme

risk. These are monumental changes in the field of pretrial justice, and they provide further justification for agreeing on basic definitions to keep up with these major developments.

Finally, bail is a topic of increasing interest to criminal justice researchers, and criminal justice research begins with conceptualizing and operationalizing terms in an effort to collect and analyze data with relevance to the field. For example, until we all agree on what "court appearance rates" mean, we will surely struggle to agree on adequate ways to measure them and, ultimately, to increase them. In the same way, as a field we must agree on the meaning and purpose of so basic a term as "bail."

More important than achieving simple consensus, however, is that we agree on meanings that reflect reality or truth. Indeed, if wisdom begins with a definition of terms, wisdom is significantly furthered when those definitions hold up to what is real. For too long, legislatures, courts, and various criminal justice practitioners have defined bail as an amount of money, but that is an error when held up to the totality of the law and practice through history. And for too long legislatures, courts, and criminal justice practitioners have said that the purpose of bail is to provide reasonable assurance of public safety and/or court appearance, but that, too, is an error when held up against the lenses of history and the law. Throughout history, the definition of "bail" has changed to reflect what we know about bail, and the time to agree on its correct meaning for this generation of pretrial reform is now upon us.

## The Meaning and Purpose of "Bail"

For the legal and historical reasons articulated above, bail should never be defined as money. Instead, bail is best defined in terms of release, and most appropriately as a process of conditional release. Moreover, the purpose of bail is not to provide reasonable assurance of court appearance and public safety – that is the province and purpose of conditions of bail or limitations on pretrial freedom. The purpose of bail, rather, is to effectuate and maximize release. There is "bail" – i.e., a process of release – and there is "no bail," – a process of detention. Constitutionally speaking, "bail" should always outweigh "no bail" because, as the U.S. Supreme Court has explained, "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."[74]

Historically, the term bail derives from the French "baillier," which means to hand over, give, entrust, or deliver. It was a delivery, or bailment, of the accused to the surety – the jailer of the accused's own choosing – to avoid confinement in jail. Indeed, even until the 20th century, the surety himself or herself was often known as the "bail" – the person to whom the accused was delivered. Unfortunately, however, for centuries money was also a major part of the bail agreement. Because paying money was the

---

[74] *United States v. Salerno,* 481 U.S. 739, 755 (1987).

primary promise underlying the release agreement, the coupling of "bail" and money meant that money slowly came to be equated with the release process itself. This is unfortunate, as money at bail has never been more than a condition of bail – a limitation on pretrial freedom that must be paid upon forfeiture of the bond agreement. But the coupling became especially misleading in America after the 1960s, when the country attempted to move away from its relatively recent adoption of a secured money bond and toward other methods for releasing defendants, such as release on recognizance and release on nonfinancial conditions.

Legally, bail as a process of release is the only definition that (1) effectuates American notions of liberty from even colonial times; (2) acknowledges the rationales for state deviations from more stringent English laws in crafting their constitutions (and the federal government in crafting the Northwest Territory Ordinance of 1787); and (3) naturally follows from various statements equating bail with release from the United States Supreme Court from *United States v. Barber*[75] and *Hudson v. Parker,*[76] to *Stack v. Boyle*[77]

and *United States v. Salerno*.[78]

Bail as a process of release accords not only with history and the law, but also with scholars' definitions (in 1927, Beeley defined bail as the release of a person from custody), the federal government's usage (calling bail a process in at least one document), and use by organizations such as the American Bar Association, which has quoted Black's Law Dictionary definition of bail as a "process by which a person is released from custody."[79] States with older (and likely outdated) bail statutes often still equate bail with money, but many states with newer provisions, such as Virginia (which defines bail as "the pretrial release of a person from custody upon those terms and conditions specified by order of an appropriate judicial officer"),[80] Colorado (which defines bail as security like a pledge or a promise, which can include release without money),[81] and Florida (which defines bail to include "any and all forms of pretrial

---

[75] 140 U.S. 164, 167 (1891) ("[I]n criminal cases it is for the interest of the public as well as the accused that the latter should not be detained in custody prior to his trial if the government can be assured of his presence at that time . . . .").

[76] 156 U.S 277, 285 (1895) ("The statutes of the United States have been framed upon the theory that a person accused of a crime shall not, until he has been finally adjudged guilty . . . be absolutely compelled to undergo imprisonment or punishment, but may be admitted to bail . . . .").

[77] 342 U.S. 1, 4 (1951) ("[F]ederal law has unequivocally provided that a person arrested for a non-capital offense shall be admitted to bail. This traditional right to freedom before conviction . . . .").

[78] 481 U.S. 739, 755 (1987) ("In our society, liberty is the norm . . . .").

[79] *Frequently Asked Questions About Pretrial Release Decision Making* (ABA 2012).

[80] Va. Code. § 19.2-119 (2013).

[81] Colo. Rev. Stat. § 16-1-104 (2013).

release"[82]) have enacted statutory definitions to recognize bail as something more than simply money. Moreover, some states, such as Alaska,[83] Florida,[84] Connecticut,[85] and Wisconsin,[86] have constitutions explicitly incorporating the word "release" into their right-to-bail provisions.

> *"In general, the term 'bail' means the release of a person from custody upon the undertaking, with or without one or more persons for him, that he will abide the judgment and orders of the court in appearing and answering the charge against him. It is essentially a delivery or bailment of a person to his sureties—the jailers of his own choosing—so that he is placed in their friendly custody instead of remaining in jail."*
>
> Arthur Beeley, 1927

A broad definition of bail, such as "release from governmental custody" versus simply release from jail, is also appropriate to account for the recognition that bail, as a process of conditional release prior to trial, includes many mechanisms – such as citation or "station house release" – that effectuate release apart from jails and that are rightfully considered in endeavors seeking to improve the bail process.

### The Media's Use of Bail Terms and Phrases

Much of what the public knows about bail comes from the media's use, and often misuse, of bail terms and phrases. A sentence from a newspaper story stating that "the defendant was released without bail," meaning perhaps that the defendant was released without a secured financial condition or on his or her own recognizance, is an improper use of the term "bail" (which itself means release) and can create unnecessary confusion surrounding efforts at pretrial reform. Likewise, stating that someone is being "held on $50,000 bail" not only misses the point of bail equaling release, but also equates money with the bail process itself, reinforcing the misunderstanding of money merely as a condition of bail – a limitation of pretrial freedom which, like all such limitations, must be assessed for legality and effectiveness in any particular case. For several reasons, the media continues to equate bail with money and tends to focus singularly on the amount of the financial condition (as opposed to any number of non-financial conditions) as a sort-of barometer of the justice system's sense of severity of the crime. Some of those reasons are directly related to faulty use of terms and phrases by the various states, which define terms differently from one another, and which occasionally define the same bail term differently at various places within a single statute.

---

[82] Fla. Stat. § 903.011 (2013).
[83] Alaska Const. art. I, § 11.
[84] Fla. Const. art. I, § 14.
[85] Conn. Const. art. 1, § 8.
[86] Wis. Const. art. 1, § 8.

In the wake of the 2011 National Symposium on Pretrial Justice, the Pretrial Justice Working Group created a Communications Subcommittee to, among other things, create a media campaign for public education purposes. To effectively educate the public, however, the Subcommittee recognized that some measure of media education also needed to take place. Accordingly, in 2012 the John Jay College Center on Media, Crime, and Justice, with support from the Public Welfare Foundation, held a symposium designed to educate members of the media and to help them identify and accurately report on bail and pretrial justice issues. Articles written by symposium fellows are listed as they are produced, and continue to demonstrate how bail education leads to more thorough and accurate coverage of pretrial issues.

**Sources and Resources:** John Jay College and Public Welfare Foundation Symposium resources, found at http://www.thecrimereport.org/conferences/past/2012-05-jailed-without-conviction-john-jaypublic-welfare-sym. Pretrial Justice Working Group website and materials, found at http://www.pretrial.org/infostop/pjwg/.

To say that bail is a process of release and that the purpose of bail is to maximize release is not completely new (researchers have long described an "effective" bail decision as maximizing or fostering release) and may seem to be only a subtle shift from current articulations of meaning and purpose. Nevertheless, these ideas have not taken a firm hold in the field. Moreover, certain consequences flow from whether or not the notions are articulated correctly. In Colorado, for example, where, until recently, the legislature incorrectly defined bail as an amount of money, bail insurance companies routinely said that the sole function of bail was court appearance (which only makes sense when bail and money are equated, for legally the only purpose of money was court appearance), and that the right to bail was the right merely to have an amount of money set – both equally untenable statements of the law. Generally speaking, when states define bail as money their bail statutes typically reflect the definition by overemphasizing money over all other conditions throughout the bail process. This, in turn, drives individual misperceptions about what the bail process is intended to do.

Likewise, when persons inaccurately mix statements of purpose for bail with statements of purpose for conditions of bail, the consequences can be equally misleading. For example, when judges inaccurately state that the purpose of bail is to protect public safety (again, public safety is a constitutionally valid purpose for any particular condition of bail or limitation of pretrial freedom, not for bail itself), those judges will likely find easy justification for imposing unattainable conditions leading to pretrial detention – for many, the safest pretrial option available. When the purpose of bail is thought to be public safety, then the emphasis will be on public safety, which may skew decisionmakers toward conditions that lead to unnecessary pretrial detention. However, when the purpose focuses on release, the emphasis will be on pretrial freedom with conditions set to provide a reasonable assurance, and not absolute assurance, of court appearance and public safety.

Thus, bail defined as a process of release places an emphasis on pretrial release and bail conditions that are attainable at least in equal measure to their effect on court appearance and public safety. In a country, such as ours, where bail may be constitutionally denied, a focus on bail as release when the right to bail is granted is crucial to following *Salerno's* admonition that pretrial liberty be our nation's norm. Likewise, by correctly stating that the purpose of any particular bail condition or limitation on pretrial freedom is tied to the constitutionally valid rationales of public safety and court appearance, the focus is on the particular condition – such as GPS monitoring or drug testing – and its legality and efficacy in providing reasonable assurance of the desired outcome.

## Other Terms and Phrases

There are other terms and phrases with equal need for accurate national uniformity. For example, many states define the word "bond" differently, sometimes describing it in terms of one particular type of bail release or condition, such as through a commercial

surety. A bond, however, occurs whenever the defendant forges an agreement with the court, and can include an additional surety, or not, depending on that agreement. Prior definitions – and thus categories of bail bonds – have focused primarily on whether or how those categories employ money as a limitation on pretrial freedom, thus making those definitions outdated. Future use of the term bond should recognize that money is only one of many possible conditions, and, in light of legal and evidence-based practices, should take a decidedly less important role in the agreement forged between a defendant and the court. Accordingly, instead of describing a release by using terms such as "surety bond," "ten percent bond," or "personal recognizance bond," pretrial practitioners should focus first on release or detention, and secondarily address conditions (for release is always conditional) of the release agreement.

Other misused terms include: "pretrial" and "pretrial services," which are often inaccurately used as a shorthand method to describe pretrial services agencies and/or programs instead of their more appropriate use as (1) a period of time, and (2) the actual services provided by the pretrial agency or program; "court appearance rates" (and, concomitantly, "failure to appear rates") which is defined in various ways by various jurisdictions; "the right to bail," "public safety," "sureties" or "sufficient sureties," and "integrity of the judicial process." There have been attempts at creating pretrial glossaries designed to bring national uniformity to these terms and phrases, but acceptance of the changes in usage has been fairly limited. Until that uniformity is reached, however, jurisdictions should at least recognize the extreme variations in definitions of terms and phrases, question whether their current definitions follow from a study of bail history, law, and research, and be open to at least discussing the possibility of changing those terms and phrases that are misleading or otherwise in need of reform.

**Additional Sources and Resources:** Black's Law Dictionary (9th ed. 2009); *Criminal Bail: How Bail Reform is Working in Selected District Courts,* U.S. GAO Report to the Subcomm. on Courts, Civ. Liberties, and the Admin. of Justice (1987); Bryan A. Garner, A Dictionary of Modern Legal Usage (Oxford Univ. Press, 3rd ed. 1995); Timothy R. Schnacke, Michael R. Jones, & Claire M. B. Brooker, *Glossary of Terms and Phrases Relating to Bail and the Pretrial Release or Detention Decision* (PJI 2011) (currently available electronically on the PJI website).

# Chapter 7: Application – Guidelines for Pretrial Reform

In a recent op-ed piece for *The Crime Report,* Timothy Murray, then Executive Director of the Pretrial Justice Institute, stated that "the cash-based model [relying primarily on secured bonds] represents a tiered system of justice based on personal wealth, rather than risk, and is in desperate need of reform."[87] In fact, from what we know about the history of bail, because a system of pretrial release and detention based on secured bonds administered primarily through commercial sureties causes abuses to both the "bail" and "no bail" sides of our current dichotomy, reform is not only necessary – it is ultimately inevitable. But how should we marshal our resources to best accomplish reform? How can we facilitate reform across the entire country? What can we do to fully understand pretrial risk, and to fortify our political will to embrace it? And how can we enact and implement laws, policies, and practices aiming at reform so that the resulting cultural change will actually become firmly fixed?

## Individual Action Leading to Comprehensive Cultural Change

The answers to these questions are complex because every person working in or around the pretrial field has varying job responsibilities, legal boundaries, and, presumably, influence over others. Nevertheless, pretrial reform in America requires all persons – from entry-level line officers and pretrial services case workers to chief justices and governors – to embrace and promote improvements within their spheres of influence while continually motivating others outside of those spheres to reach the common goal of achieving a meaningful top to bottom (or bottom to top) cultural change. The common goal is collaborative, comprehensive improvement toward maximizing release, public safety, and court appearance through the use of legal and evidence-based practices, but we will only reach that goal through individual action.

---

[87] Timothy Murray, *Why the Bail Bond System Needs Reform,* The Crime Report (Nov. 19, 2013) found at http://www.thecrimereport.org/viewpoints/2013-11-why-the-bail-bond-system-needs-reform

## Individual Decisions

Individual action, in turn, starts with individual decisions. First, every person working in the field must decide whether pretrial improvements are even necessary. It is this author's impression, along with numerous national and local organizations and entities, that improvements are indeed necessary, and that the typical reasons given to keep the customary yet damaging practices based on a primarily money-based bail system are insufficient to reject the national movement toward meaningful pretrial reform. The second decision is to resolve to educate oneself thoroughly in bail and to make the necessary improvements by following the research, wherever that research goes and so long as it does not interfere with fundamental legal foundations. Essentially, the second decision is to follow a legal and evidence-based decision making model for pretrial improvement. By following that model, persons (or whole jurisdictions working collaboratively) will quickly learn (1) which particular pretrial justice issues are most pressing and in need of immediate improvement, (2) which can be addressed in the longer term, and (3) which require no action at all.

Third, each person must decide how to implement improvements designed to address the issues. This decision is naturally limited by the person's particular job and sphere of influence, but those limitations should not stop individual action altogether. Instead, the limitations should serve merely as motivation to recruit others outside of each person's sphere to join in a larger collaborative process. Fourth and finally, each person must make a decision to ensure those improvements "stick" by using proven implementation techniques designed to promote the comprehensive and lasting use of a research-based improvement.

Learning about improvements to the pretrial process also involves learning the nuances that make one's particular jurisdiction unique in terms of how much pretrial reform is needed. If, for example, in one single (and wildly hypothetical) act, the federal government enacted a provision requiring the states to assure that no amount of money could result in the pretrial detention of any particular defendant – a line that is a currently a crucial part of both the federal and District of Columbia bail statutes – some states would be thrust immediately into perceived chaos as their constitutions and statutes practically force bail practices that include setting high amounts of money to detain high-risk yet bailable defendants pretrial. Other states, however, might be only mildly inconvenienced, as their constitutions and statutes allow for a fairly robust preventive detention process that is simply unused. Still others might recognize that their preventive detention provisions are somewhat archaic because they rely primarily on charge-based versus risk-based distinctions. Knowing where one's jurisdiction fits comparatively on the continuum of pretrial reform needs can be especially helpful when crafting solutions to pretrial problems. Some states underutilize citations and summonses, but others have enacted statutory changes to encourage using them more.

Some jurisdictions rely heavily on money bond schedules, but some have eliminated them entirely. There is value in knowing all of this.

## Individual Roles

The process of individual decision making and action will look different depending on the person and his or her role in the pretrial process. For a pretrial services assessment officer, for example, it will mean learning everything available about the history, fundamental legal foundations, research, national standards, and terms and phrases, and then holding up his or her current practices against that knowledge to perhaps make changes to risk assessment and supervision methods. Despite having little control over the legal parameters, it is nonetheless important for each officer to understand the fundamentals so that he or she can say, for example, "Yes, I know that bail should mean release and so I understand that our statute, which defines bail as money, has provisions that can be a hindrance to certain evidence-based pretrial practices. Nevertheless, I will continue to pursue those practices within the confines of current law while explaining to others operating in other jobs and with other spheres of influence how amending the statute can help us move forward." This type of reform effort – a bottom to top effort – is happening in numerous local jurisdictions across America.

> *"Once you make a decision, the universe conspires to make it happen."*
>
> Ralph Waldo Emerson

For governors or legislators, it will mean learning everything available about the history, legal foundations, research, national standards, and terms and phrases, and then also holding up the state's constitution and statutes against that knowledge to perhaps make changes to the laws to better promote evidence-based practices. It is particularly important for these leaders to know the fundamentals and variances across America so that each can say, for example, "I now understand that our constitutional provisions and bail statutes are somewhat outdated, and thus a hindrance to legal and evidence-based practices designed to fully effectuate the bail/no bail dichotomy that is already technically a part of our state bail system. I will therefore begin working with state leaders to pursue the knowledge necessary to make statewide improvements to bail and pretrial justice so that our laws will align with broad legal and evidence-based pretrial principles and therefore facilitate straightforward application to individual cases." This type of reform effort – a top to bottom effort – is also happening in America, in states such as New York, New Jersey, Delaware, and Kentucky.

Everyone has a role to play in pretrial justice, and every role is important to the overall effort. Police officers should question whether their jurisdiction uses objective pretrial risk assessment and whether it has and uses fair and transparent preventive detention

(as the International Chiefs of Police/PJI/Public Welfare Foundation's Pretrial Justice Reform Initiative asks them to do), but they should also question their own citation policies as well as the utility of asking for arbitrary money amounts on warrants. Prosecutors should continue to advocate support for pretrial services agencies or others using validated risk assessments (as the Association of Prosecuting Attorneys policy statement urges them to do), but they should also question their initial case screening policies as well as whether justice is served through asking for secured financial conditions for any particular bond at first appearance. Defense attorneys, jail administrators, sheriffs and sheriff's deputies, city and county officials, state legislators, researchers and academics, persons in philanthropies, and others should strive individually to actively implement the various policy statements and recommendations that are already a part of the pretrial justice literature, and to question those parts of the pretrial system seemingly neglected by others.

Everyone has a part to play in pretrial justice, and it means individually deciding to improve, learning what improvements are necessary, and then implementing legal and evidence-based practices to further the goals of bail. Nevertheless, while informed individual action is crucial, it is also only a means to the end of a comprehensive collaborative culture change. In this generation of pretrial reform, the most successful improvement efforts have come about when governors and legislators have sat at the same table as pretrial services officers (and everyone else) to learn about bail improvements and then to find comprehensive solutions to problems that are likely insoluble through individual effort alone.

## Collaboration and Pretrial Justice

In a complicated justice system made up of multiple agencies at different levels of government, purposeful collaboration can create a powerful mechanism for discussing and implementing criminal justice system improvements. Indeed, in the National Institute of Corrections document titled *A Framework for Evidence-Based Decision Making in Local Criminal Justice Systems,* the authors call collaboration a "key ingredient" of an evidence-based system, which uses research to achieve system goals.

Like other areas in criminal justice, bail and pretrial improvements affect many persons and entities, making collaboration between system actors and decision makers a crucial part of an effective reform strategy. Across the country, local criminal justice coordinating committees (CJCCs) are demonstrating the value of coming together with a formalized policy planning process to reach system goals, and some of the most effective pretrial justice strategies have come from jurisdictions working through these CJCCs. Collaboration allows individuals with naturally limited spheres of influence to interact and achieve group solutions to problems that are likely insoluble through individual efforts. Moreover, through staff and other resources, CJCCs often provide the best mechanisms for ensuring the uptake of research so that full implementation of legal and evidence-based practices will succeed.

The National Institute of Corrections currently publishes two documents designed to help communities create and sustain CJCCs. The first, Robert Cushman's *Guidelines for Developing a Criminal Justice Coordinating Committee* (2002)*,* highlights the need for system coordination, explains a model for a planning and coordination framework, and describes mechanisms designed to move jurisdictions to an "ideal" CJCC. The second, Dr. Michael Jones's *Guidelines for Staffing a Criminal Justice Coordinating Committee* (2012), explains the need and advantages of CJCC staff and how that staff can help collect, digest, and synthesize research for use by criminal justice decision makers.



## Judicial Leadership

Finally, while everyone has a role and a responsibility, judges must be singled out as being absolutely critical for achieving pretrial justice in America. Bail is a judicial function, and the history of bail in America has consistently demonstrated that judicial participation will likely mean the difference between pretrial improvement and pretrial stagnation. Indeed, the history of bail is replete with examples of individuals who attempted and yet failed to make pretrial improvements because those changes affected only one or two of the three goals associated with evidence-based decision making at bail, and they lacked sufficient judicial input on the three together. Judges alone are the individuals who must ensure that the balance of bail – maximizing release (through an understanding of a defendant's constitutional rights) while simultaneously maximizing public safety and court appearance (through an understanding of the constitutionally valid purposes of limiting pretrial freedom, albeit tempered by certain fundamental legal foundations such as due process, equal protection, and excessiveness, combined with evidence-based pretrial practices) – is properly maintained. Moreover, because the judicial decision to release or detain any particular defendant is the crux of the administration of bail, whatever improvements we make to other parts of the pretrial process are likely to stall if judges do not fully participate in the process of pretrial reform. Finally, judges are in the best position to understand risk, to communicate that understanding to others, and to demonstrate daily the political will to embrace the risk that is inherent in bail as a fundamental precept of our American system of justice.

Indeed, this generation of bail reform needs more than mere participation by judges; this generation needs judicial leadership. Judges should be organizing and directing pretrial conferences, not simply attending them. Judges should be educating the justice system and the public, including the media, about the right to bail, the presumption of innocence, due process, and equal protection, not the other way around.

Fortunately, American judges are currently poised to take a more active leadership role in making the necessary changes to our current system of bail. In February of 2013, the Conference of Chief Justices, made up of the highest judicial officials of the fifty states, the District of Columbia, and the various American territories, approved a resolution endorsing certain fundamental recommendations surrounding legal and evidence-based improvements to the administration of bail. Additionally, the National Judicial College has conducted focus groups with judges designed to identify opportunities for improvement. Moreover, along with the Pretrial Justice Institute and the Bureau of Justice Assistance, the College has created a teaching curriculum to train judges on legal and evidence-based pretrial decision making. Judges thus need only to avail themselves of these resources, learn the fundamentals surrounding legal and evidence-based

pretrial practice, and then ask how to effectuate the Chief Justice Resolution in their particular state.

The Chief Justice Resolution should also serve as a reminder that all types of pretrial reform include both an evidentiary and a policy/legal component – hence the term legal and evidence-based practices. Indeed, attempts to increase the use of evidence or research-based practices without engaging the criminal justice system and the general public in the legal and policy justifications and parameters for those practices may lead to failure. For example, research-based risk assessment, by itself, can be beneficial to any jurisdiction, but only if implementing it involves a parallel discussion of the legal parameters for embracing and then mitigating risk, the need to avoid other practices that undermine the benefits of assessment, and the pitfalls of attempting to fully incorporate risk into a state legal scheme that is unable to adequately accommodate it. On the other hand, increasing the use of unsecured financial conditions, coupled with a discussion of how research has shown that those conditions can increase release without significant decreases in court appearance and public safety – the three major legal purposes underlying the bail decision – can move a jurisdiction closer to model bail practices that, among other things, ensure bailable defendants who are ordered release are actually released.

**Additional Sources and Resources:** Association of Prosecuting Attorneys, *Policy Statement on Pretrial Justice* (2012) found at

http://www.apainc.org/html/APA+Pretrial+Policy+Statement.pdf.
Conference of Chief Justices Resolution 3: *Endorsing the Conference of State Court Administrators Policy Paper on Evidence-Based Pretrial* Release (2013), found at

http://www.pretrial.org/wp-content/uploads/2013/05/CCJ-Resolution-on-Pretrial.pdf; William F. Dressell & Barry Mahoney, *Pretrial Justice in Criminal Cases: Judges' Perspectives on Key Issues and Opportunities for Improvement* (Nat'l. Jud. College 2013); *Effective Pretrial Decision Making: A Model Curriculum for Judges* (BJA/PJI/Nat'l Jud. Coll. (2013)

http://www.pretrial.org/download/infostop/Judicial%20Training.pdf; Dean L. Fixsen, Sandra F. Naoom, Karen A. Blase, Robert M. Friedman, and Frances Wallace, *Implementation Research: A Synthesis of the Literature* (Univ. S. Fla. 2005); International Chiefs of Police Pretrial Justice Reform Initiative, found at

http://www.theiacp.org/Pretrial-Justice-Reform-Initiative.

# Conclusion

Legal and evidence-based pretrial practices, derived from knowing the history of bail, legal foundations, and social science pretrial research, and expressed as recommendations in the national best practice standards, point overwhelmingly toward the need for pretrial improvements. Fortunately, in this third generation of American bail reform, we have amassed the knowledge necessary to implement pretrial improvements across the country, no matter how daunting or complex any particular state believes that implementation process to be. Whether the improvements are minor, such as adding an evidence-based supervision technique to an existing array of techniques, or major, such as drafting new constitutional language to allow for the fair and transparent detention of high-risk defendants without the need for money bail, the only real prerequisites to reform are education and action. This paper is designed to further the process of bail education with the hope that it will lead to informed action.

As a prerequisite to national reform, however, that bail education must be uniform. Accordingly, achieving pretrial justice in America requires everyone both inside and outside of the field to agree on certain fundamentals, such as the history of bail, the legal foundations, the importance of the research and national standards, and substantive terms and phrases. This includes agreeing on the meaning and purpose of the word "bail" itself, which has gradually evolved into a word that often is used to mean anything but its historical and legal connotation of release. Fully understanding these fundamentals of bail is paramount to overcoming our national amnesia of a system of bail that worked for centuries in England and America – an unsecured personal surety system in which bailable defendants were released, in which non-bailable defendants were detained, and in which no profit was allowed.

> *"A sound pretrial infrastructure is not just a desirable goal – it is vital to the legitimate system of government and to safer communities."*
>
> Deputy Attorney General James M. Cole (2011).

Moreover, while we have learned much from the action generated by purely local pretrial improvement projects, we must not forget the enormous need for pretrial justice across the entire country. We must thus remain mindful that meaningful American bail reform will come about only when entire American states focus on these important issues. Anything less than an entire state's complete commitment to examine all pretrial practices across jurisdictions and levels of government – by following the research from all relevant disciplines – means that any particular pretrial practitioner's foremost duty is to continue communicating the need for reform until that complete commitment is achieved. American pretrial justice ultimately depends on reaching a

tipping point among the states, which can occur only when enough states have shown that major pretrial improvements are necessary and feasible.

In 1964, Robert Kennedy stated the following:

> [O]ur present bail system inflicts hardship on defendants and it inflicts considerable financial cost on society. Such cruelty and cost should not be tolerated in any event. But when they are *needless*, then we must ask ourselves why we have not developed a remedy long ago. For it is clear that the cruelty and cost of the bail system *are* needless.[88]

Fifty years later, this stark assessment remains largely true, and yet we now have significant reason for hope that this third generation of bail reform will be America's last. For in the last 50 years, we have accumulated the knowledge necessary to replace, once and for all, this "cruel and costly" system with one that represents safe, fair, and effective administration of pretrial release and detention. We have amassed a body of research literature, of best practice standards, and of experiences from model jurisdictions that together have created both public and criminal justice system discomfort with the status quo. It is a body of knowledge that points in a single direction toward effective, evidence-based pretrial practices, and away from arbitrary, irrational, and customary practices, such as the casual use of money. We now have the information necessary to recognize and fully understand the paradox of bail. We know what to do, and how to do it. We need only to act.

---

[88] Attorney General Robert F. Kennedy, Testimony on Bail Legislation Before the Subcommittee on Constitutional Rights and Improvements in the Judicial Machinery of the Senate Judiciary Committee 4 (Aug. 4, 1964) (emphasis in original) *available at* http://www.justice.gov/ag/rfkspeeches/1964/08-04-1964.pdf.