**EXHIBIT O**

**To Declaration of Micah West in Support of
Motion for Preliminary Injunction
& Motion for Class Certification**

# PRETRIAL REFORM IN KENTUCKY



**PRETRIAL SERVICES**
ADMINISTRATIVE OFFICE OF THE COURTS
KENTUCKY COURT OF JUSTICE

JANUARY 2013

100 MILLCREEK PARK
FRANKFORT, KY 40601
502-537-2350 OR 800-928-2350
WWW.COURTS.KY.GOV

{2}

**Table of Contents**

**Part 1: Understanding the Functions & Principles of Pretrial Services** …………....3

    **Overview of Pretrial Services in Kentucky** ……………………………………3

    **Guiding Principals Courts** ………………………………………………… 3

    **Pretrial Services Operations** ……………………………………..........5

    **Pretrial Supervision: MCR** ………………………………………..……5

    **Pretrial Supervision: Misdemeanor Diversion** ……………………………. 6

    **Pretrial Supervision: Deferred Prosecution** …………………………….. 8

**Part 2: Implementing a Culture of Change** ………………………………….. 9

    **Prelude to Reformation** ……………………………………………….…9

    **Legal & Evidence-Based Practices** ……………………………….……..…… 9

    **Risk Assessment Validation** ……………………………………………..10

    **Data Collection** ……………………………………………………...… 10

    **Reliability & Internal Reform** …………………………………………….11

    **Engaging Stakeholders** ……………………………………….…………12

    **HB 463** ……………………………………………………………....….. 13

    **Outcome & Performance Measures** ………………………………….14

    **Kentucky Data** ……………………………………………..…………… 15

**Conclusion** ………………………………………..……………………………… 17

# PART 1: UNDERSTANDING THE FUNCTIONS AND PRINCIPLES OF PRETRIAL SERVICES

*"THE DENIAL OF A CITIZEN'S LIBERTY THROUGH THE ARREST PROCESS IS THE GREATEST SINGLE POWER THE GOVERNMENT MAINTAINS UNDER THE UNITED STATES CONSTITUTION. THE FRAMERS OF THE CONSTITUTION KNEW THAT THIS POWER HAD BEEN HISTORICALLY ABUSED BY EUROPEAN GOVERNMENTS AND TOOK SPECIFIC ACTION IN THE 'BILL OF RIGHTS' TO ENSURE OUR GOVERNMENT DID NOT DENY LIBERTY WITHOUT AN OPPORTUNITY FOR BAIL UNLESS THE DEFENDANT WAS CHARGED WITH AN OFFENSE PUNISHABLE BY DEATH"*
*- KENTUCKY PRETRIAL SERVICES AGENCY MANUAL, CIRCA 1978-1980*

## Overview of Pretrial Services in Kentucky Courts

Kentucky Pretrial Services was created in 1976 as part of the Bail Bond Reform Act when commercial bail bonding for profit was abolished. Pretrial Services is a statewide agency housed under Kentucky's Administrative Office of the Courts (AOC), the operations arm for Kentucky's judicial branch, also known as the Court of Justice. Kentucky courts are a unified, four-tiered system consisting of the Supreme Court, Court of Appeals, Circuit Court and District Court. District Court is a court of limited jurisdiction and handles misdemeanors, violations, traffic offenses, city and county ordinances, felony probable cause hearings, juvenile matters, and a variety of civil cases. Circuit Court is a court of general jurisdiction and hears felony and capital offenses, appeals from District Court, and various other civil matters. The Supreme Court is the state court of last resort and the final interpreter of Kentucky law. Court unification means that all courts operate under the same administrative rule, while the Chief Justice of the Supreme Court serves as the administrative head of the entire court system.

## Guiding Principles

The Kentucky Pretrial Services program operates under the premise, supported by federal and state constitutions, that defendants are presumed innocent until proven guilty and are entitled to reasonable bail. Defendants are entitled to the least restrictive release terms possible, depending on whether they are likely to appear in court and whether they present a risk to public safety. As a defendant's case makes its way through Kentucky courts, pretrial officers strive to perform an essential service in a fair, effective manner. An early Kentucky Pretrial Services Agency Manuals reads, "In order to ensure that defendants lodged in Kentucky's jails did not languish without an opportunity for release, the statewide Pretrial Services Agency was created. This was the first statewide pretrial services agency and the first to offer services to rural areas." The Pretrial Services mission statement reads:

> *To assist the court in making informed pretrial release decisions, to effectively supervise defendants in order to support safe communities and to ensure that defendants meet court obligations while maintaining the constitutional presumption of innocence and the right to reasonable bail.*

Founded in United States and Kentucky law, the framework for the operation of pretrial justice is based upon these six essential principles:

- Presumption of Innocence
- Right to Counsel
- Right Against Self-incrimination
- Right to Due Process of the Law
- Right to Equal Protection Under the Law
- Right to Bail that is Not Excessive

In addition to these principles, the United States Bail Reform Act of 1966 emphasized the purpose of bail was to assure a defendant's appearance in court and advised release should be by the least restrictive conditions, preferably a non-financial release on recognizance for those charged with non-capital offenses, unless the risk of flight was a factor. The Bail Reform Act of 1984 expanded the release decision to include danger to the community as a factor. In *United States v. Salerno,* the latter act was challenged in federal court; ultimately, the U.S. Supreme Court ruled the act constitutional, clarifying, "In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."[1] While these two laws apply to the federal court system, most states, including Kentucky, have followed the intent of these acts in forming their own bail laws.

While not necessarily defining the field's guiding principles, there have been several noteworthy publications which have also helped shape the direction and channel the work of pretrial service agencies. In a field where there has traditionally been little to no research conducted, especially compared to other criminal justice systems such as probation, or even drug court, these documents have been invaluable to new pretrial services agencies and well-established programs such as Kentucky's.

The National Association of Pretrial Service Agencies (NAPSA) and the American Bar Association (ABA) have published separate *Standards on Pretrial Release*, with both currently in their third edition. While these documents are extensive in their information, both documents were last updated in 2004 and 2002, respectively. An older but still fairly relative document is the National Institute of Justice's white paper, *"Pretrial Services Programs: Responsibilities and Potential,"* published in 2001. It asserts, "Pretrial release/detention policies and decisions have very important implications for society's capacity to achieve the ideal of equal justice under law. By providing judicial officers with essential information for decision-making and by helping to supervise released defendants, pretrial services programs help courts reduce discrimination based on wealth and other factors not related to risk of flight or danger to the community. Fair and effective pretrial release policies are an essential component of equal justice."[2] More recently, the Pretrial Justice Institute, a clearinghouse for the pretrial services field, has published two, important *"State of the Science"* publications, one on *"Pretrial Risk Assessment"* and another on *"Release Recommendations and Supervision."*

In 2007, the Crime and Justice Institute along with National Institute of Corrections (NIC) published, *"Legal and Evidence-based Practices: Applications of Legal Principles, Laws, and Research to the Field of Pretrial Services,"* authored by researcher Dr. Marie VanNostrand, of Luminosity, Inc. In 2011, the NIC released, *"Measuring What Matters: Outcome and Performance Measures for the Pretrial Services Field."* Although Kentucky Pretrial Services was implementing legal and evidence-based practices (LEBP) before 2007, and evaluating outcome and performance measures well before 2011, these two documents have been critical in helping to drive the trainings and the conversations, internal and external, necessary to change Kentucky Pretrial Services' culture and prepare the agency for bigger and better accomplishments.

---

[1] *United States v. Salerno*, 481 U.S. 739 at 755 (1987)

[2] B. Mahoney, et al., *Pretrial Services Programs: Responsibilities and Potential*, Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, 2001.

**Pretrial Services Operations**

Pretrial Services has 294 employees divided into forty-nine (49) local program districts, including a Central Office, which includes the Chief Operating Officer, the Manager, eight (8) Regional Supervisors, a Project Specialist and support staff. Local programs consist of a Program Supervisor and frontline Pretrial Officers. Louisville, Lexington and the Northern Kentucky district also employ an Urban Supervisor. Many rural districts cover multiple counties, and thereby multiple courts, and sometimes, multiple jails. Pretrial Services operates in all 120 Kentucky counties and provides services seven days a week and 24 hours a day. Per court rule, pretrial officers are mandated to conduct an interview and investigation of all persons arrested on bailable offenses within 24 hours of his or her arrest, although many jurisdictions strive to provide their services within 12 hours of the defendant's initial incarceration.

The interviews and investigations are voluntary and confidential, and are conducted in person at the local, incarcerating jail. As a part of the interview and investigation process, officers also screen defendants for alcohol, drug abuse, and mental health issues. Pretrial officers then verify the information provided by the defendant during the interview, conduct a thorough criminal history check and utilize a validated risk assessment that measures flight risk and anticipated criminal conduct. This information is used to make appropriate recommendations to the court regarding pretrial release. The risk assessment classifies defendants as low, moderate or high risk. Pretrial officers present the findings and make recommendations for release to their local district or circuit court judge – or in some rural areas, a specially appointed Trial Commissioner – who make the actual release decision.

**Pretrial Supervision: MCR**

As a part of their routine duties, pretrial officers also administer three formal, supervision programs. Utilized in every county statewide, the Monitored Conditional Release (MCR) program allows pretrial officers to supervise defendants and monitor compliance with release conditions throughout the pretrial stage. The other two programs Pretrial Services offers in various locations are a Misdemeanor Diversion program and a Deferred Prosecution program.

The MCR program was implemented in 2005 as a response to jail overcrowding. Defendants required to post a financial bond often cannot afford it, thus overcrowding Kentucky jails. MCR gives judges an alternative to financial bail and allows defendants the opportunity to be released with supervision while their cases are pending as opposed to being detained in jail on a monetary bail.

Based upon the findings from the pretrial release investigation, including risk factors discovered from the validated risk assessment instrument, pretrial officers formulate a risk reduction plan and a supervision strategy that is recommended to the court as a method of supervised release for the individual. Pretrial Services recommends release on recognizance or a non-financial bond for all low risk defendants. The target population for supervision is defendants classified as moderate to high risk. For these defendants, a non-financial release is recommended to the court with supervision by Pretrial Services. This is in accordance with the 'risk principal', which asserts that higher-risk offenders should be given more intensive supervision services than lower-risk offenders. Research behind the risk principle also found giving low risk individuals the supervision services

normally reserved for higher-risk individuals could actually increase their risk level.[3] Additionally, the most effective use of limited resources and good fiscal management call for the court to reserve the use of supervision strategies to the corresponding risk level.

Release conditions are individualized to fit a defendant's circumstances.  Upon completion of a needs assessment, Pretrial Services staff utilizes a supervision matrix to match the appropriate supervision level with the corresponding level of risk and defendant needs.  Once a defendant has been released through the MCR program, pretrial officers may offer a wide array of supervision services depending on needs, location and access to outside resources.  The most commonly used supervision tools include curfew, court notification, reporting and compliance monitoring, drug testing and electronic monitoring.  Depending on the crime alleged and the situation, release conditions often include restrictions on driving, orders to obtain employment or a GED, stipulations to have no contact with the alleged victim(s), orders to not possess weapons, and/or referrals to a treatment or counseling program.  Pretrial officers respond to defendant non-compliance based on clearly defined protocols and procedures that are developed locally and fit the needs of the court and the program.

It is important to note drug testing and electronic monitoring are defendant-paid requirements which tend to be very costly.  Kentucky has no funding to provide these services to defendants.  As such, pretrial officers allow defendants to choose the provider of their choice based from an approved list of providers who have met best practices guidelines.

Monitored Conditional Release reduces unnecessary detention of pretrial defendants who can be released into the community with minimal risk.  Pretrial Services supervision not only provides for safe communities, it allows defendants to become productive citizens becasue they can return to work, jobs and families as well as seek counseling or treatment.  MCR also reduces jail costs in that jail space is saved for the convicted and not the accused.  In CY 2012, over 10,000 defendants were referred to MCR statewide.

**Pretrial Supervision: Misdemeanor Diversion**

In addition to the MCR program, there are currently 52 misdemeanor diversion programs operating within the Court of Justice and administered by Pretrial Services.  Thirty of these programs accept all types of misdemeanor offenses while some limit referrals to those defendants charged with certain, specified offenses.  All of the programs are based on the National Association of Pretrial Services Agencies' "Standards for Pretrial Diversion."  Pretrial misdemeanor diversion programs offer defendants an alternative to prosecution.  The purpose and goals of the program are to assist misdemeanor offenders in avoiding a criminal conviction by making positive changes in their lives, thus preventing future criminal behavior.  By diverting minor offenses the court can reserve resources for more serious cases and keep the overall dockets smaller.  The overall success of the diversion program is measured by the impact it has in three areas: the diversion clients, the courts, and the community.

The most obvious beneficiary would be the individual client.  For the first-time offender with no prior criminal record, completing the program results in a dismissal of the charges, thus, preventing a criminal

---

[3] C. Lowencamp and E. Latessa, *Understanding the Risk Principal: How and Why Correctional Interventions Can Harm Low-Risk Offenders,* Washington D.C.: National Institute of Corrections, 2004.

conviction on their record. The client who is assigned community service also gains from the experience of giving to others and by doing so is rewarded with a sense of fulfillment and enhanced self-esteem. In CY 2012, 87% of misdemeanor diversion clients successfully completed the program.

The diversion program benefits the court system by reducing trial docket caseloads, thus, allowing resources to be allocated to more serious cases. In CY 2012, Kentucky Pretrial Services supervised more than 4,000 misdemeanor cases through diversion. In addition, caseloads are further reduced through decreased recidivism by the successful graduates of the program. Since the program serves primarily first-time offenders, it can affect the way the judicial process is perceived by the public, creating a positive out of what could be a negative experience.

Lastly, the most visible benefit to the community is the contribution of volunteer hours by diversion clients at non-profit, charitable and public agencies. Diversion clients provide these organizations with a steady pool of volunteers. In CY 2012, nearly 25,000 hours of community service were completed by diversion program clients. The money saved by utilizing these volunteers allows these organizations to better serve the public. The community benefits from a reduced recidivism rate from successful clients who go on to become productive citizens. Another benefit is the participation of the victim or complainant in the process. He or she can have input by making suggestions for loss or damage from the incident through the payment of restitution. In 2012, diversion program clients paid $56,760 in restitution to victims in Kentucky.

Prior to arraignment, the pretrial officer submits a report to the district judge and prosecutor listing of all the defendants who are eligible under the local court rules. Defendants who are not eligible under the court rules may still be referred to the program through prosecutorial or judicial discretion. Once referred to the program by the judge, the defendant reports to the Pretrial Services office for acceptance. Diversion is voluntary, therefore the client must agree to participant after consulting with an attorney. A program fee is assessed on a sliding scale based on the Federal Poverty Guidelines. Once consent is given, the pretrial officer collects background information, performs an assessment using standardized screening tools or refers the client to an outside agency for further evaluation. The pretrial officer may ask questions about education, employment/vocation, health, mental health, family background, behavioral problems, or substance abuse in order to discover areas of focus or referral. Pretrial officers may also consult with the victim in the case. Pretrial officers who operate diversion programs have participated in numerous training workshops related to alcohol and drug abuse, mental health issues, conflict management, case monitoring, victim advocacy and customer service for social services professionals.

The intake screening process, charge information, victim's consent and external and internal assessments are all taken into account to develop an individually based service plan. The service plan is then written into a diversion agreement, or contract. The contract contains information about the specific terms that the client must abide by in order to successfully complete the program. Many community resources are utilized by the diversion program in order to address the needs of the client or for community service. Some examples are:

- Alcohol and drug treatment
- Mental health and counseling services
- Social Services agencies
- Educational programs and institutions
- Vocational and job training agencies
- Health departments and medical facilities
- Public and charitable non-profit agencies for volunteer work

{ 7 }

The pretrial officer explains the terms of the contract to the client and his or her attorney so they can make an informed decision about participation. Diversion clients are required to meet with a pretrial officer on a regular basis in order to ensure compliance with all requirements. The standard contract length ranges from 2 to 12 months.

Once the client satisfies all requirements of the program, the pretrial officer submits the information to the court for dismissal with prejudice. If a client fails to complete the terms of the contract, the pretrial officer makes every attempt to assist the client to achieve compliance. If the client has good reason why s/he is not in compliance and has shown substantial effort, the pretrial officer can redefine the terms of the contract or grant an extension. If, after given every opportunity for compliance, a client still fails to meet the requirements, the pretrial officer notifies the client of the programs intent to terminate and the case is referred back to court for prosecution.

**Pretrial Supervision: Deferred Prosecution**

Deferred Prosecution, which was legislatively created in 2011 and began in June 2012, is the newest supervision program. Defendants placed on Deferred Prosecution may enter Drug Court or may be supervised by Pretrial Services. While there are some similarities between Deferred Prosecution, MCR and Pretrial Misdemeanor Diversion, there are a few key differences.

Eligibility for Deferred Prosecution is legislatively narrow. Deferred Prosecution applies only to defendants charged with first or second offenses of Possession of a Controlled Substance 1st Degree, a class D felony. If the defendant successfully completes the program, the defendant's charges are dismissed and all records are sealed. To receive Deferred Prosecution, the defendant makes a written request and the Commonwealth Attorney may grant or deny. By statute, Deferred Prosecution is the preferred alternative for first offenses of these charges, and the law states if a defendant is denied, "…the prosecutor shall state on the record the substantial and compelling reasons why the defendant cannot be safely and effectively supervised in the community, is not amenable to community-based treatment, or poses a significant risk to public safety."[4]

By statute, the Commonwealth Attorney sets all conditions and receives all violations filed. Of note, defendants accepted into Deferred Prosecution are not required to plead guilty or enter an Alford Plea as a condition of acceptance to the program, so the case truly remains in the pretrial stage of legal proceedings. Pretrial Services' supervision strategies for Deferred Prosecution cases are similar to MCR supervision. Common conditions often include but are not limited to: random drug testing, office visits, and referrals to treatment or counseling. Though the period of Deferred Prosecution cases may be shorter, statutorily, they cannot extend beyond two years in duration.

---

[4] Kentucky Revised Statutes, 218A.1415

## PART 2: IMPLEMENTING A CULTURE OF CHANGE

> *"I skate to where the puck is going to be, not where it has been."*
> — Wayne Gretzky, Hall of Fame pro hockey player

> *"What is the difference between a living thing and a dead thing? In the medical world, a clinical definition of death is a body that does not change. Change is life. Stagnation is death. If you don't change, you die. It's that simple. It's that scary."*
> — Leonard Sweet, author and theologian

**Prelude to Reformation**

There are many reasons Kentucky Pretrial Services has embraced reformations. At times, change is internally compelled. Vigilant leaders see deficiencies and know that adjustments need to be made, both programmatic and idealistic restructuring. Though not necessarily unwanted, some changes have been external as law makers pass bills that affect not only what Pretrial Services *does*, but may also affect *who Pretrial Services is.* While the pretrial executive team, along with other influential members of the Court of Justice may be able to advocate for a certain legislative agenda or policy change, ultimately, the agency must abide by the state laws, court administrative rules and Administrative Office of the Court (AOC) policies that determine its core functions and actions.

The current economic crisis, coupled with the continuous, mounting costs of housing inmates, has state and local governments scrambling to find real, sustainable solutions to budget woes. Releasing inmates while balancing constitutional rights with public safety has become a hot topic in many criminal justice and public policy circles. Kentucky's Pretrial Services believes it may have the solutions and the framework for other communities to emulate. Clichéd as it is, recent budgets given to the AOC, and by default Pretrial Services, has caused them to do more with less. Legal and evidence-based practices can aid pretrial agencies in accomplishing its mission while operating within budgetary constraints.

**Legal and Evidence-Based Practices**

Legal and evidence-based practices (LEBP) are defined as, "Interventions and practices that are consistent with the pretrial legal foundation, applicable laws, and methods research has proven to be effective in decreasing failures to appear in court and danger to the community during the pretrial stage."[5] Of note, the term "legal" is commonly added to reinforce the uniqueness of the field of pretrial services and that research-based practices must also be coherent with pretrial legal principles. Differing from LEBP, other closely related concepts are evidence-based knowledge, evidence-based decision making, and evidence-based principles.

Pretrial Services LEBP's relate primarily to an objective risk assessment, pretrial recommendations for release or detention, and supervision strategies. Also recently entering the discussion of LEBP, are the

---

[5] M. VanNostrand, *Legal and evidence-based practices: Applications of Legal Principles, Laws, and Research to the Field of Pretrial Services,* Washington D.C.: U.S. Dept. of Justice, National Institute of Corrections, 2007.

aforementioned Pretrial Justice Institute's articles, "State of the Science on Pretrial Risk Assessment" and "State of the Science on Release Recommendations and Supervision."

Kentucky Pretrial Services, to various degrees, had already been moving towards the applications of LEBP before the term was in wide use. Kentucky Pretrial Services' pioneering use of evidence-based practices has made it a role model for other jurisdictions nationwide. The agency has become increasingly recognized by the Pretrial Justice Institute and the National Association of Pretrial Services Agencies as a leader in the growing field of pretrial release.

**Risk Assessment Validation**

For nearly 30 years, Kentucky Pretrial Services went largely unchanged. In 2005, the Monitored Conditional Release program was introduced. This was the first significant alteration to pretrial officers' basic duties since the inception of the agency; but the seeds of modern change for Pretrial Services really began taking root in 2006, beginning with two significant program modifications. One was implementation of a computer-based, case management system, and simultaneously, a revamp of the risk assessment was put into service.

In 1961, the Vera Institute of Justice gave the pretrial field its first defendant screening tool, the Manhattan Bail Project. It demonstrated that defendants could be released from jail without posting monetary bail, and be relied upon to appear for their court hearing(s).[6] To determine the likelihood if a defendant would return to court, staff members interviewed defendants and administered a point-based risk assessment scale. The factors incorporated in the risk assessment included assessing points or deducting points by examining the defendants' personal ties to the area, employment status, education, and prior criminal record. When Kentucky Pretrial Services began operation in 1976, it utilized this same risk assessment tool.

Through the years, Pretrial Services made revisions to its risk assessment and the point-scoring system, relying on feedback from its officers, jail officials, court clerks, and judges. A domestic violence addendum was added which could better inform judges about the relationship and circumstances of a victim and the defendant. Yet the instrument had never been empirically validated. In 2009, the JFA Institute conducted research and found "[Kentucky's]… instrument is producing a strong association between the risk levels of low, moderate and high and FTA and pretrial arrest rates." The research also made suggestions for improvements to strengthen the tool, resulting in today's objective risk assessment: a 12-question appraisal where each factor can be directly correlated with a defendant's risk for pretrial misconduct, i.e. failing to appear for court hearings, committing a new criminal offense while on pretrial release, or both.

**Data Collection**

As a part of the much larger Administrative Office of the Courts, which employs nearly 3,600 employees, Kentucky Pretrial Services benefits from having access to a range of technology expertise, from software engineers and programmers, to system administrators. In fact, the Technology Services division has put the Judicial Branch on the cutting edge of court technology nationwide. They created and maintain KyCourts, a

---

[6] C. Lowencamp, et. al., *The Development and Validation of a Pretrial Screening Tool,* Washington D.C.: Federal Probation, A Journal of Correctional Philosophy and Practice, Vol. 72, No. 3, The Administrative Office of the United States Courts, 2008.

centralized, county-by-county case management system for the trial courts, and CourtNet, a web-based system which provides a summary of cases statewide and acts as the primary method of the Kentucky criminal records check performed by pretrial officers. The department also designed a computerized, case information management system for Pretrial Services, originally called 'Neo8.' Launched in 2006, the introduction of this system marked another major change for Pretrial Services.

The system, now named 'PRIM' (Pretrial Release Information Management), is a central, server-based application, used by all pretrial officers in the collection, assessment and monitoring of defendant information. All aspects of the pretrial process and practically every interaction between a pretrial officer and a defendant – from charge information, to a defendant's interview answers, to the risk assessment and ultimately the actual release decision – are entered and maintained. The system also keeps track of supervision information, including all compliance and non-compliance issues, as well as performance and outcome measurement data. The system captures over 250 variables, cumulating in a wealth of available data. Transitioning from a paper-based system to the computerized case management system has given Pretrial Services the ability to collect, organize, analyze and interpret data in a manner simply not even attainable prior to 2006.

**Reliability and Internal Reform**

As with any new technology, though, the transition to PRIM was not without its difficulties. The first task was training employees - many of whom had little to no computer experience - in basic computer operation. Over time, Kentucky Pretrial Services managers began realizing another, potentially larger problem: deficiencies in information accuracy and data entry. Either from inadequate training and skill development or from a lackadaisical approach towards their job duties, supervisors and central office staff began noticing data inaccuracies beyond normally expected errors. Through PRIM, access to both aggregate and individual data sets was now easily accessible, whereas the previous, paper-based output remained hidden in files in local offices, only spot-checked by line supervisors when their schedule allowed or when an employee evaluation was coming due.

Pretrial Services leadership understood the importance of having reliable, 'clean' data. The leadership sensed more was wrong than just having unreliable statistics. Morale was low; turnover was high, and rumors of commercial bail bonding returning to the state were quietly being whispered. Change needed to come.

Several corrective actions were taken in a process which lasted the better part of two years. From 2007 to 2009, Pretrial Services changed its organizational structure, redefined agency priorities and values, and developed a strategic plan to return the agency to its core function. First, internal policies and procedures were examined and tweaked if found to be ineffective. The training curriculum for new employees was overhauled and then consistently fine-tuned. A proficiency test was created, first for all current employees to pass, and then required of new employees before working alone in the field. Program fidelity was emphasized at regional trainings and attendance was required of all current employees. Lengthy, "Data Correction" reports were generated and assigned to the originating counties for staff to verify and correct. Regional supervisors and in turn, local supervisors were trained in more rigorous, quality assurance practices, which were conducted locally on a near daily basis.

In formal trainings, yearly conferences, and at more informal meetings between Central Office staff and local supervisors/line staff, legal and evidence-based practices were introduced as concepts. Because many of the LEBP notions were already in practice in the field, for many these were more of a change in thought and outlook, i.e., *attitude*, rather than a change in actual procedures. Also introduced to supervisors were performance and outcome measures. For the first time, local supervisors were required to not only understand these measures, but also mandated to actually calculate their local program's performance and outcome data and submit a report detailing the analysis. These protracted, systemic changes, both in modus operandi and in attitude, were a key element in helping reform Kentucky's Pretrial Services.

In 2009, to gauge progress, Pretrial Services leadership secured a Bureau of Justice Assistance Criminal Courts Technical Assistance Study, which was an in-depth review of the entire program, top to bottom. After many hours of data analyses, staff and outside agency/stakeholder interviews, policy review, and program observance, a team of national experts concluded that Kentucky Pretrial Services, "…is well within compliance with accepted national standards and best practices for pretrial services agencies. Input from local system partners and those within the AOC exemplify [Pretrial Services] as an essential and well-respected partner in Kentucky's criminal justice system."[7] The review did have some further recommendations, including but not limited to strengthening the procedures manual, expanding the use of best practices, improving communications, and enhancing quality assurance. Several of the recommendations were already in the implementation process, and since 2009, most of the recommendations have now been implemented, planned, or discarded as no longer relevant.

**Engaging Stakeholders**

One of the final stages of the Kentucky Pretrial Services strategic plan was engaging key stakeholders. Local program supervisors are encouraged to meet semi-regularly with the local district and circuit judges to discuss changes in the law and procedures and how that will affect day-to-day operations. They are also encouraged to discuss their county's performance and outcome measures, e.g., the Appearance Rate, Compliance Rate, and Public Safety Rate. Prior to 2009, though, pretrial supervisors knew that parts of the data were not 100% accurate and the risk assessment was not yet officially validated. In 2009, after both of these pieces came together, along with all the other program trainings and changes, efforts to engage judges intensified. Judges needed to hear the message: Pretrial Services is backed by research and has the performance and outcome data to support this statement.

Knowing the program was validated and employees well-trained and supportive of the mission, Pretrial Services leadership then engaged other essential, outside stakeholders. They conducted trainings, spoke at professional conferences, and if needed, met with stakeholders individually. This included but was not limited to:

- District and Circuit Judicial Colleges
- Trial Commissioners Conference
- Prosecutor's Conferences
- Jailer's Association trainings
- Department of Public Advocacy (Public Defenders) events

---

[7] S. Kennedy, et. al., *Review of Pretrial Services in Four Representative Kentucky Counties,* Washington D.C.: Bureau of Justice Assistance (BJA) Criminal Courts Technical Assistance Project at American University, 2009.

- Kentucky Association of Counties
- Kentucky Bar Association

**House Bill 463**

During the 2011 General Assembly, the Kentucky legislature passed House Bill 463, the first major overhaul to the Commonwealth's criminal laws and penal codes in more than 30 years. The bill was intended to reduce the ever-increasing financial burden of housing Kentucky's inmates while not increasing risk to public safety. The bill was researched by the Task Force on the Penal Code and Controlled Substances Act, chaired by a Democrat and a Republican, and had the support of Governor Steve Beshear. The Task Force was also aided by the Pew Research Center, which had previously contended that Kentucky had the nation's fastest growing prison population (costing Kentucky taxpayers nearly $440 million annually). The 150-page measure was passed by the House in a majority vote, 97–2, was subsequently passed unanimously by the Senate, and went into effect on June 8, 2011.

At the bill's signing ceremony, Kentucky Governor Steve Beshear remarked, "House Bill 463 helps us be tough on crime, while being smart on crime.[8]" Among the sweeping changes that impacted all areas of the Commonwealth's criminal justice system, law enforcement, the judiciary and corrections, were several key provisions significant to pretrial release. First, it recognizes the efficacy of utilizing empirical research, both for pretrial risk assessments and for supervision strategies and mandates the use of evidence-based practices (EBP). Next, HB 463 dictates presumptive, non-financial release for low and moderate risk defendants, with financial bonds being the exception, and only then if the judge documents a defendant is a flight risk or danger to the community. Key highlights of HB 463 affecting Kentucky pretrial release are:

- Formally defined the "Pretrial Risk Assessment" as an objective, research based, validated assessment tool that measures a defendant's risk of flight and anticipated criminal conduct while on pretrial release pending adjudication;

- Requires that state-funded supervision and intervention programs gradually implement and utilize evidence-based practices, and beginning July 1, 2016, at least 75% of all such programs use EBP;

- Requires a defendant who, per the Pretrial Risk Assessment, is determined to be at a low risk level of failure to appear for court or being re-arrested during their pretrial phase is to be released on their recognizance (ROR) or with an unsecured bond (USB);

- Requires a defendant who, per the Pretrial Risk Assessment, is a moderate risk level to be released either ROR or USB with the court to consider additional supervision, e.g., to Pretrial Services' Monitored Conditional Release program, GPS tracking, etc.;

---

[8] S. Beshear, *Gov. Beshear signs landmark corrections reform bill into law,* Frankfort, KY: Office of Kentucky Governor Steve Beshear, http://migration.kentucky.gov/Newsroom/governor/20110303hb463.htm, March 3, 2011.

- In cases where the release decision is not ROR/unsecured bond, sets maximum bail amounts for defendants who are charged only with misdemeanors at the maximum fine plus court costs for the single highest charged misdemeanor;

- Regardless of bail amount, permits the court to credit a defendant $100 per day toward payment of bail for each day the defendant serves in jail prior to trial up to and including the full amount of the bail, thus releasing the defendant from jail;

- If the presiding judge has deemed the defendant to be a flight risk and/or a danger to others, or if the defendant has been previously convicted of certain sex crimes or is a violent offender, these bail rules may not be applicable. Also allows for defendants charged with certain felony drug possession crimes to be eligible for deferred prosecution.

**Outcome & Performance Measures**

In 2010, the National Institute of Corrections (NIC) Pretrial Executive Network, of which the General Manager of Kentucky Pretrial Services is a member, identified the need for consistent and meaningful data to track individual pretrial services program performance. Current information on pretrial programming is limited and may not be descriptive of individual program outcomes. National data specific to pretrial program outcomes and performance will help individual programs measure their effectiveness in achieving goals and objectives and meeting the expectations of the respective justice systems. The Network commissioned a working group to develop suggested outcome and performance measures and mission critical data. This included identifying performance indicators and recommending strategies for programs to develop ambitious but attainable measure targets. Consistent with public and private sector best practices, pretrial services agency's program *outcome measures*, *performance measures*, and *mission critical data* will tie into individual agency's mission, local justice system needs, state and local bail laws, and national pretrial release standards.

The NIC's suggested outcome measures are:

*Appearance Rate:* The percentage of supervised defendants who make all scheduled court appearances.

*Safety Rate:* The percentage of supervised defendants who are not charged with a new offense during the pretrial stage.

*Concurrence Rate:* The ratio of defendants whose supervision level or detention status corresponds with their assessed risk of pretrial misconduct.

*Success Rate:* The percentage of released defendants who are 1) not revoked for technical violations due to condition violations, 2) appear for all scheduled court appearances, and 3) are not charged with a new offense during pretrial supervision.

> *Pretrial Detainee Length of Stay:* The average lengths of jail stay for pretrial detainees who are eligible by statute for pretrial release.

The NIC's suggested performance measures are:

> *Universal Screening:* The percentage of defendants eligible for release by statute that the program assesses for release eligibility.

> *Recommendation Rate:* The percentage of time the program follows its risk assessment criteria when recommending release or detention.

> *Response to Defendant Conduct:* Frequency of policy-approved responses to compliance and noncompliance with court-ordered release conditions.

> *Pretrial Intervention Rate*: The pretrial agency's effectiveness at resolving outstanding bench warrants, arrest warrants and capiases.

Finally, the NIC's suggested mission critical data are:

> *Number of Defendants Released By Release Type and Condition:* The number of release types ordered during a specified time frame.

> *Caseload Ratio:* The number of supervised defendants divided by the number of case managers.

> *Time from Nonfinancial Release Order to Start of Pretrial Supervision:* Time between a court's order of release and the pretrial agency's assumption of supervision.

> *Time on Pretrial Supervision:* Time between the pretrial agency's assumption of supervision and the end of program supervision.

> *Pretrial Detention Rate:* Ratio of pretrial defendants who are detained throughout pretrial case processing.

**Kentucky Data**



OUTCOMES: RELEASE RATES BY RISK LEVEL

Statistically, about 70% of pretrial defendants are released in Kentucky; 90% of those make all future court appearances and 92% do not get re-arrested while on pretrial release. When looking at release rates by risk level, the data shows that judges are following the recommendations of the pretrial officer. In CY 2011, 85% of low risk defendants were released, 67% of moderate risk defendants were released and 51% of high risk defendants obtained pretrial release.

Since the passage of HB 463 Pretrial Services data has shown a 10% decrease in the number of defendants arrested and a 5% increase in the overall release rate. Overall release rates have not shown a significant increase, however the data shows a substantial increase in non-financial releases and releases for low and moderate risk defendants. The non-financial release rate has increased from 50% to 66%, the low risk release rate has increased from 76% to 85% and the moderate risk release rate has increased from 59% to 67%. Furthermore, pretrial jail populations have decreased by 279 people, while appearance and public safety rates have remained consistent.



KENTUCKY PRETRIAL DEFENDANTS

{ 16 }



PRETRIAL SERVICES OUTCOME MEASURES

## Conclusion

In a 2007 article titled *Our Journey Toward Pretrial Justice,* researchers Dr. Marie VanNostrand and Gena Keebler wrote, "The pretrial release decision is a reflection of pretrial justice; it is the primary attempt to balance the rights afforded to accused persons awaiting trial with the need to protect the community, maintain the integrity of the judicial process, and assure court appearance."[9] Kentucky Pretrial Services was been on this journey since 1976. In recent years, many changes have taken place within Kentucky to advance the state closer to this ideal of achieving pretrial justice. Some of these changes have been minor and some have been major, such as the provisions in 2011's HB 463.

From the beginning of this journey, Kentucky Pretrial Services has always operated under the strong belief defendants are presumed innocent until proven guilty and are entitled to the least restrictive release conditions available including reasonable bail. The functions of Pretrial Services are critical to the daily, effective operation of criminal justice in all 120 Kentucky counties. Its core purpose is to assist local courts by presenting accurate information upon which to base pretrial release decisions and, since 2005, provide supervision services for pretrial defendants to mitigate any risk of failing to appear and any risk posed to endangering the community. Pretrial Services relies on its defendant interviews and investigations to help the courts; at the heart of this operation is their validated, risk assessment tool.

Within the last decade, the pretrial services field has seen a marked increase in research efforts (though the field remains light years behind the volume of available probation and drug court research), leading to 2007's landmark publication on Legal and Evidence-based Practices (LEBP). The term 'legal' is often added to help underline the importance in the field of pretrial services that research into program practices must be coherent with the pretrial legal foundation and the field's fundamental legal principles.

---

[9] M. VanNostrand and G. Keebler, *Our Journey Toward Pretrial Justice,* Washington D.C.: Federal Probation Journal, 71, No. 2, Sept. 2007.

Kentucky Pretrial Services' journey to reforming their practices, however, predates the 2007 LEBP publication. Recognizing the need for research, Kentucky pretrial managers first implemented a statewide case information management system. This system, now called 'PRIM,' was launched in 2006 and gave the agency the ability to track hundreds of variables relating to their core duties of investigating defendants, measuring the risk they pose, assisting in the court's release decision, and providing supervision services. It became quickly apparent the data behind Kentucky's performance and outcome measures was not reliable. Decisive actions were taken to improve training procedures for new hires and enhance staff development efforts for current employees. Thorough quality assurance processes were also developed and implemented. Not only did pretrial officers and line supervisors change the way they work, but a paradigm shift began transforming how they viewed the importance of their work.

The time and energy devoted to ensuring procedures were understood and properly executed paid off. Able to finally produce high-quality, reliable data, in 2009 Pretrial Services was found to meet or exceed national standards for pretrial services agencies by the Bureau of Justice Assistance's Criminal Courts Technical Assistance Project. Following those accolades, came the research validating Kentucky Pretrial Services' risk assessment tool. Having their risk assessment instrument validated by empirical research was a paramount accomplishment. For more than 30 years, Pretrial Services was advising judges to rely on this instrument to make risk-based release decisions – as opposed to charge-based release decisions – but now they could provide the data to support their release recommendations.



RELEASE TRENDS - ARRESTS & PRETRIAL RELEASED TOTALS

2010: 267 / 174
2011: 251 / 173
2012: 244 / 168

ARRESTS   PRETRIAL RELEASED
(ROUNDED TO NEAREST 1,000TH)
(THOUSANDS)

Armed with the data, supported by the research, with outcomes that sustained the notion utilizing a risk-based release decision can reduce the pretrial jail population while assuring court appearance and safe behavior for the overwhelming majority of defendants, Pretrial Services began engaging stakeholders at every chance. Pretrial management discussed their work with of the Kentucky Supreme Court, local district and circuit judges,

prosecutors, public defenders and the private bar, jailers, and Kentucky legislators, to name a few of the key stakeholders.

The stakeholders listened. In 2011, Kentucky passed House Bill 463, the Public Safety and Offender Accountability Act. While the historic legislation included provisions affecting every facet of criminal justice in Kentucky, the bill had many crucial changes to transform pretrial release. Among other items, it requires non-financial release of low and moderate-risk defendants, established a maximum bail amount for certain misdemeanor offenses, requires utilization of evidence-based practices and the Pretrial Services risk assessment, and requires law enforcement to issue citation in lieu of custodial arrests on certain misdemeanors.

Because of HB 463, Pretrial Services underwent many more changes. Pretrial jail populations decreased overall, and release rates for low and moderate risk defendants increased as intended, as did non-financial release rates. Monitored Conditional Release (MCR) referral rates and MCR work caseloads skyrocketed. This has created some challenges for Pretrial Services. For example, the increase in workload coupled with a freeze in salary has added to the agency's staff turnover rate. There is an old adage, "Change is the only constant;" and so it is with Kentucky Pretrial Services. Even as previous obstacles are conquered and new milestones are realized, the future will not be idle. Already, the winds of change are gusting about in Kentucky Pretrial Services…

To learn more Kentucky Pretrial Services, contact:

Tara Boh Klute
General Manager
502-573-2350
taraklute@kycourts.net

Report by:
Mark Heyerly
Project Specialist
606-739-2382
markheyerly@kycourts.net