**EXHIBIT Q**

**To Declaration of Micah West in Support of
Motion for Preliminary Injunction
& Motion for Class Certification**

Stanford Law Review



Volume 69                                                    March 2017

ARTICLE

# The Downstream Consequences of Misdemeanor Pretrial Detention

## Paul Heaton, Sandra Mayson & Megan Stevenson*

**Abstract.** In misdemeanor cases, pretrial detention poses a particular problem because it may induce innocent defendants to plead guilty in order to exit jail, potentially creating widespread error in case adjudication. While practitioners have long recognized this possibility, empirical evidence on the downstream impacts of pretrial detention on misdemeanor defendants and their cases remains limited. This Article uses detailed data on hundreds of thousands of misdemeanor cases resolved in Harris County, Texas—the third-largest county in the United States—to measure the effects of pretrial detention on case outcomes and future crime. We find that detained defendants are 25% more likely than similarly situated releasees to plead guilty, are 43% more likely to be sentenced to jail, and receive jail sentences that are more than twice as long on average. Furthermore, those detained pretrial are more likely to commit future crimes, which suggests that detention may have a criminogenic effect. These differences persist even after fully controlling for the initial bail amount, offense, demographic information, and criminal history characteristics. Use of more limited sets of controls, as in prior research, overstates the adverse impacts of detention. A quasi-experimental analysis based on case timing confirms that these differences likely reflect the causal effect of detention. These results raise important constitutional questions and suggest that Harris County could save millions of dollars per year, increase public safety, and reduce wrongful convictions with better pretrial release policy.

* Paul Heaton is a Senior Fellow at the University of Pennsylvania Law School and the Academic Director of the Quattrone Center for the Fair Administration of Justice. Sandra Mayson and Megan Stevenson are Quattrone Fellows at the University of Pennsylvania Law School. The Authors contributed equally to the work and are listed alphabetically. They are deeply grateful for thoughtful input from Alex Bunin; Jonah Gelbach; John Hollway; Seth Kreimer; David Rudovsky; and participants in the April 2016 Quattrone Center Advisory Board meeting, the University of Pennsylvania Faculty Ad Hoc Workshop, and the 2016 Conference on Empirical Legal Studies. They would also like to thank the editors of the *Stanford Law Review* for their superb editorial assistance. The contents of this Article are solely the responsibility of the Authors.

*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

## Table of Contents

Introduction .................................................................................................................. 713

I.    The Pretrial Process and Prior Empirical Literature ............................... 718
      A.   On Bail and Pretrial Detention ............................................................ 718
      B.   Challenges for Empirical Study ........................................................... 723
      C.   Prior Empirical Literature .................................................................... 724

II.   Misdemeanor Pretrial Detention in Harris County ............................... 729
      A.   The Misdemeanor Pretrial Process ..................................................... 729
      B.   Representativeness of Harris County's Misdemeanor Pretrial System........... 731
      C.   Data Description ...................................................................................... 734
      D.   Pretrial Detention and Wealth ............................................................. 736

III.  Analysis of the Effects of Pretrial Detention ......................................... 741
      A.   Regression Analysis ................................................................................ 742
      B.   Natural Experiment ................................................................................ 752
      C.   Future Crime ............................................................................................ 759

IV.   Constitutional Implications ......................................................................... 769
      A.   Equal Protection/Due Process: Does Pretrial Detention Produce Class-
           Based Case Outcomes? ........................................................................... 769
      B.   Sixth Amendment Right to Counsel: Is Bail-Setting a "Critical Stage"?........... 773
      C.   Eighth Amendment: When Is Bail or Detention "Excessive"? ...................... 777
           1.   Cash bail ............................................................................................ 777
           2.   Pretrial detention ............................................................................. 780
      D.   Substantive Due Process: Is Pretrial Detention Punishment? Does It
           Impermissibly Infringe Liberty? ......................................................... 782
           1.   Pretrial punishment ......................................................................... 782
           2.   Impermissible regulatory detention ............................................. 783
      E.   Procedural Due Process: Does Pretrial Detention Produce "Involuntary"
           Plea Bargains? .......................................................................................... 784

Conclusion ...................................................................................................................... 786

Appendix .......................................................................................................................... 789

*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

## Introduction

The United States likely detains millions of people each year for inability to post modest bail. There are approximately eleven million annual admissions into local jails.[1] Many of those admitted remain jailed pending trial. At midyear 2014, there were an estimated 467,500 people awaiting trial in local jails, up from 349,800 at the same point in 2000 and 298,100 in 1996.[2] Available evidence suggests that the large majority of pretrial detainees are detained because they cannot afford their bail, which is often a few thousand dollars or less.[3]

This expansive system of pretrial detention has profound consequences both within and beyond the criminal justice system. A person detained for even a few days may lose her job, housing, or custody of her children.[4] There is

1. *See* Todd D. Minton & Zhen Zeng, Bureau of Justice Statistics, U.S. Dep't of Justice, Jail Inmates at Midyear 2014, at 1 (2015), https://www.bjs.gov/content/pub/pdf/jim14.pdf.

2. Darrell K. Gilliard & Allen J. Beck, Bureau of Justice Statistics, U.S. Dep't of Justice, Prison and Jail Inmates at Midyear 1996, at 7 (1997), https://www.bjs.gov/content/pub/pdf/pjim97.pdf; Minton & Zeng, *supra* note 1, at 3 tbl.2. Jail incarceration rates rose steadily between 1983 and 2007. *See* Ram Subramanian et al., Vera Inst. of Justice, Incarceration's Front Door: The Misuse of Jails in America 7-10 (2015), https://www.vera.org/publications/incarcerations-front-door-the-misuse-of-jails-in-america (to locate, select the "Full Report" hyperlink). This trend accompanied a shift away from release on recognizance and toward reliance on cash bail. Whereas between the years 1990 and 1994, 41% of pretrial releases were on recognizance and 24% were by cash bail, between 2002 and 2004 the relation was reversed: 23% of releases were on recognizance, and 42% were by cash bail. Thomas H. Cohen & Brian A. Reaves, Bureau of Justice Statistics, U.S. Dep't of Justice, State Court Processing Statistics, 1990-2004: Pretrial Release of Felony Defendants in State Courts 2 (2007), https://www.bjs.gov/content/pub/pdf/prfdsc.pdf. In 2009, 61% of releases in felony cases in the seventy-five largest urban jurisdictions included financial conditions of release. Brian A. Reaves, Bureau of Justice Statistics, U.S. Dep't of Justice, Felony Defendants in Large Urban Counties, 2009—Statistical Tables 1, 15 (2013).

3. *See* N.Y.C. CRIMINAL JUSTICE AGENCY, ANNUAL REPORT 2013, at 22, 30 & exh. 18 (2014), http://www.nycja.org/lwdcms/doc-view.php?module=reports&module_id=1410&doc_name=doc (documenting bail of $500 or less in 33% of nonfelony cases and 3% of felony cases in New York City and reporting that 30% of felony defendants and 46% of nonfelony defendants whose bail was $500 or less were detained until the disposition of their case); Cohen & Reaves, *supra* note 2, at 1 (reporting that five in six felony defendants detained until disposition had bail set and that approximately 30% of felony defendants with bail set at $5000 or less were detained); Reaves, *supra* note 2, at 15 (reporting that nine in ten felony defendants detained until disposition had bail set). What is unclear is how many of the defendants detained despite bail are there for inability to pay and how many elect not to post bail for reasons other than financial inability (for instance, because they have a probation detainer or plan to plead guilty and expect a custodial sentence). *See infra* Table 1 and accompanying text (discussing rates of misdemeanor pretrial detention in Harris County).

4. *See, e.g.*, Curry v. Yachera, No. 15-1692, 2016 WL 4547188, at *3 (3d Cir. Sept. 1, 2016) ("While imprisoned [pretrial on a bail he could not afford], [Curry] missed the birth of his only child, lost his job, and feared losing his home and vehicle."); OPEN SOC'Y JUSTICE

*footnote continued on next page*

*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

also substantial reason to believe that detention affects case outcomes. A detained defendant "is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense."[5] This is thought to increase the likelihood of conviction, either by trial or by plea, and may also increase the severity of any sanctions imposed.[6] More directly, a detained person may plead guilty—even if innocent—simply to get out of jail.[7] Not least importantly, a money bail system that selectively detains the poor threatens the constitutional principles of due process and equal protection.[8]

To date, however, empirical evidence of the downstream effects of pretrial detention has been limited. There is ample documentation that those detained pretrial are convicted more frequently, receive longer sentences, and commit more future crimes than those who are not (on average).[9] But this is precisely what one would expect if the system detained those who pose the greatest flight or public safety risk. One key question for pretrial law and policy is whether detention actually *causes* the adverse outcomes with which it is linked, independently of other factors. On this question, past empirical work is inconclusive.[10]

This Article presents original evidence that pretrial detention causally affects case outcomes and the commission of future crimes. Using detailed data on hundreds of thousands of misdemeanor cases resolved in Harris County, Texas (the third-largest county in the United States[11]), this Article deploys two

---

INITIATIVE, THE SOCIOECONOMIC IMPACT OF PRETRIAL DETENTION: A GLOBAL CAMPAIGN FOR PRETRIAL JUSTICE REPORT 13 (2011), http://www.unicef.org/ceecis/Socioeconomic_impact_pretrial_detention.pdf (attempting to "catalogue the socioeconomic impact of excessive pretrial detention around the world"); Nick Pinto, *The Bail Trap*, N.Y. TIMES MAG. (Aug. 13, 2015), http://nyti.ms/1INtghe (chronicling the story of a woman who, "five months after her arrest, . . . was still fighting in family court to regain custody of her daughter").

5. Barker v. Wingo, 407 U.S. 514, 533 (1972).

6. *See infra* Part I.C (describing prior research finding evidence of these effects).

7. *See infra* note 16 and accompanying text.

8. *See infra* Part IV.B.

9. *See infra* Part I.C.

10. The literature has produced suggestive evidence of the causal effects of detention, but prior studies were limited by the data available and the number of variables for which they were able to control. *See infra* Part I.C. Only one study, a report published by the New York City Criminal Justice Agency, has focused on misdemeanor cases specifically. MARY T. PHILLIPS, N.Y.C. CRIMINAL JUSTICE AGENCY, PRETRIAL DETENTION AND CASE OUTCOMES, PART 1: NONFELONY CASES (2007) [hereinafter PHILLIPS, NONFELONY CASES], http://www.nycja.org/lwdcms/doc-view.php?module=reports&module_id=669&doc_name=doc. That study found that misdemeanor pretrial detention is correlated with unfavorable case outcomes. *Id.* at 25-43, 55-56. Because of the limited set of controls, however, it is unclear whether the relationship is causal.

11. *Largest Counties in the U.S. 2015*, STATISTA, https://www.statista.com/statistics/241702/largest-counties-in-the-us (last visited Mar. 3, 2017).

714

quantitative methods to estimate the causal effect of detention: (1) a regression analysis that controls for a significantly wider range of confounding variables than past studies, and (2) a quasi-experimental analysis related to case timing. The results provide compelling evidence that pretrial detention causally increases the likelihood of conviction, the likelihood of receiving a carceral sentence, the length of a carceral sentence, and the likelihood of future arrest for new crimes.

This Article intentionally focuses on misdemeanor cases. "Misdemeanor" may sound synonymous with "trivial," but that connotation is misleading. Misdemeanors matter. Misdemeanor convictions can result in jail time, heavy fines, invasive probation requirements, and collateral consequences that include deportation, loss of child custody, ineligibility for public services, and barriers to finding employment and housing.[12] Beyond the consequences of misdemeanor convictions for individuals, the misdemeanor system has a profound impact because it is enormous: while national data on misdemeanors are lacking, a 2010 analysis found that misdemeanors represented more than three-quarters of the criminal caseload in state courts where data were available.[13]

For misdemeanor defendants who are detained pretrial, the worst punishment may come before conviction.[14] Conviction generally means getting out of jail; people detained on misdemeanor charges are routinely offered sentences for "time served" or probation in exchange for tendering a guilty plea.[15] And

---

12. Alexandra Natapoff, *Misdemeanors*, 85 S. CAL. L. REV. 1313, 1316-17 (2012) (reporting that a misdemeanor conviction can limit a person's access to "employment, as well as educational and social opportunities"; can limit eligibility for "professional licenses, child custody, food stamps, student loans, health care," or public housing; can "lead to deportation"; and "heightens the chances of subsequent arrest, and can ensure a longer felony sentence later on"); Jenny Roberts, *Crashing the Misdemeanor System*, 70 WASH. & LEE L. REV. 1089, 1090 (2013) (noting that misdemeanor convictions "can affect future employment, housing, and many other basic facets of daily life").

13. ROBERT C. LAFOUNTAIN ET AL., NAT'L CTR. FOR STATE COURTS, EXAMINING THE WORK OF STATE COURTS: AN ANALYSIS OF 2008 STATE COURT CASELOADS 47 (2010), http://www.courtstatistics.org/~/media/Microsites/Files/CSP/EWSC-2008-Online.ashx; *see also* Natapoff, *supra* note 12, at 1315 ("Most U.S. convictions are misdemeanors, and they are generated in ways that baldly contradict the standard due process model of criminal adjudication.").

14. *See* MALCOLM M. FEELEY, THE PROCESS IS THE PUNISHMENT: HANDLING CASES IN A LOWER CRIMINAL COURT 9-10 (1979) (reporting that in a sample of more than 1600 cases, "twice as many people were sent to jail prior to trial than after trial"). This practice stands in sharp contrast to the traditional right to pretrial release on bail for noncapital defendants. *Cf.* Stack v. Boyle, 342 U.S. 1, 4 (1951) ("[The] traditional right to freedom before conviction . . . serves to prevent the infliction of punishment prior to conviction.").

15. Jenny Roberts, *Why Misdemeanors Matter: Defining Effective Advocacy in the Lower Criminal Courts*, 45 U.C. DAVIS L. REV. 277, 308 (2011) ("In such cases, defendants must
*footnote continued on next page*

their incentives to take the deal are overwhelming. For defendants with a job or apartment on the line, the chance to get out of jail may be impossible to pass up. Misdemeanor pretrial detention therefore seems especially likely to induce guilty pleas, including wrongful ones.[16] This is also, perversely, the realm where the utility of cash bail or pretrial detention is most attenuated. These defendants' incentives to abscond should be relatively weak, and the public safety benefit of detention is dubious.[17]

Despite these structural problems, money bail practices that result in systemic misdemeanor pretrial detention have persisted nationwide. In Harris County, Texas—the site of this study—more than half of all misdemeanor defendants are detained.[18] Other jurisdictions also detain people accused of misdemeanors at surprising rates.[19] There are several possible reasons for this. A money bail system may be easier to operate than a system of broad release with effective pretrial services. The bail bondsman lobby is a potent political force.[20] The individual judges or magistrates who make pretrial custody

---

generally choose between remaining in jail to fight the case or taking an early plea with a sentence of time served or probation.").

16. *See, e.g.*, Samuel R. Gross & Barbara O'Brien, *Frequency and Predictors of False Conviction: Why We Know So Little, and New Data on Capital Cases*, 5 J. EMPIRICAL LEGAL STUD. 927, 930-31 (2008) (noting that "it is entirely possible that most wrongful convictions . . . are based on negotiated guilty pleas to comparatively light charges" to avoid "prolonged pretrial detention"); Natapoff, *supra* note 12, at 1316 ("[E]very year the criminal system punishes thousands of petty offenders who are not guilty."); *id.* at 1343-47 (cataloging the pressures that lead innocent misdemeanor defendants to plead guilty); Alexandra Natapoff, *Negotiating Accuracy: DNA in the Age of Plea Bargaining, in* WRONGFUL CONVICTIONS AND THE DNA REVOLUTION: TWENTY-FIVE YEARS OF FREEING THE INNOCENT (Daniel Medwed ed., forthcoming 2017), http://papers.ssrn.com/sol3/papers.cfm? abstract_id=2693218 ("Because most of those arrested [for public-order offenses pursuant to aggressive broken windows policing in New York City] pled out to avoid pre-trial detention, that police policy resulted in numerous wrongful convictions.").

17. That is both because people accused of misdemeanors are likely to pose much less of a threat than people charged with more serious offenses and because detention for the life of a misdemeanor case constitutes only very short-term incapacitation—which may be outweighed by criminogenic effects. *See infra* Part III.C.

18. *Infra* Table 1.

19. *See, e.g.*, Charlie Gerstein, Note, *Plea Bargaining and the Right to Counsel at Bail Hearings*, 111 MICH. L. REV. 1513, 1525 n.81 (2013) ("In New York . . . 25 percent of nonfelony defendants are held on bail. In Baltimore, that number is closer to 50 percent."). In Philadelphia and New York City, around 25% of misdemeanor defendants are detained pretrial. Statistics for Philadelphia are based on the Authors' calculations using Philadelphia court records; for statistics for New York City, see PHILLIPS, NONFELONY CASES, *supra* note 10, at 13.

20. *See* Press Release, Am. Bail Coal., *Former U.S. Solicitor General Paul D. Clement Files Amicus* Brief in Defense of the Eighth Amendment Constitutional Right to Bail on Behalf of the American Bail Coalition, the Georgia Association of Professional Bondsmen, and the Georgia Sheriffs' Association (June 21, 2016),
*footnote continued on next page*

decisions suffer political blowback if they release people (either directly or via affordable bail) who subsequently commit violent crimes, but they suffer few consequences, if any, for setting unaffordable bail that keeps misdemeanor defendants detained. In short, institutional actors in the misdemeanor system have strong incentives to rely on money bail practices that result in systemic pretrial detention.[21]

Given the inertia, misdemeanor bail policy is unlikely to shift in the absence of compelling empirical evidence that the status quo does more harm than good. This Article provides such evidence through the use of two types of quantitative analysis. The first is a regression analysis that controls for a wide range of confounding factors: defendant demographics, extensive criminal history variables, wealth measures (zip code and claims of indigence), judge effects, and 121 different categories of charged offense. Importantly, the analysis also controls for the precise amount of bail set at the initial hearing, meaning that the effects of bail are assessed by comparing defendants presumably viewed by the court as representing equal risk but who nonetheless differ in whether they are ultimately detained. In addition, this Article undertakes a quasi-experimental analysis that, akin to a randomized controlled trial that would be used to determine the effect of a treatment in an experimental setting, measures the effects of detention by leveraging random variation in the access defendants have to bail money based on the timing of arrest. These quasi-experimental results are very similar to those produced through regression analysis with detailed controls.

This Article finds that defendants who are detained on a misdemeanor charge are much more likely than similarly situated releasees to plead guilty and serve jail time. Compared to similarly situated releasees, detained defendants are 25% more likely to be convicted and 43% more likely to be sentenced to jail. On average, their incarceration sentences are nine days longer, more than double that of similar releasees. Furthermore, we find that

---

http://www.americanbailcoalition.org/in-the-news/former-u-s-solicitor-general-paul -d-clement-files-amicus-brief-defense-constitutional-right-bail (showing that the bail bond industry is represented in federal court by a prominent Supreme Court advocate and former Solicitor General); Nat'l Ass'n of Pretrial Serv. Agencies, The Truth About Commercial Bail Bonding in America 4-5 (2009), https://www.pretrial.org/download/ pji-reports/Facts%20and%20Positions%201.pdf (describing legislative efforts by the American Legislative Exchange Council on behalf of the bail bond industry); *About the American Bail Coalition*, AM. BAIL COALITION, http://www.americanbailcoalition.org/ about-us (last visited Mar. 3, 2017) ("The American Bail Coalition is a trade association made up of national bail insurance companies . . . .").

21. However, that may be changing in some places thanks to recent reform efforts. *See, e.g., Ending the American Money Bail System*, EQUAL JUST. UNDER L., http://equaljusticeunderlaw.org/wp/current-cases/ending-the-american-money-bail -system (last visited Mar. 3, 2017) (describing the organization's litigation campaign against money bail systems).

pretrial detainees are more likely than similarly situated releasees to commit future crimes. Although detention reduces defendants' criminal activity in the short term through incapacitation, by eighteen months post-hearing, detention is associated with a 30% increase in new felony charges and a 20% increase in new misdemeanor charges, a finding consistent with other research suggesting that even short-term detention has criminogenic effects. These results raise important constitutional questions and suggest that with modest changes to misdemeanor pretrial policy, Harris County could save millions of dollars per year, increase public safety, and reduce wrongful convictions.

Interest in pretrial policy is now surging. In the months prior to publication of this Article, several other studies have been released that also use both a natural experiment and complex multivariate regression to estimate the effects of pretrial detention.[22] Those studies are set in Philadelphia, New York City, Pittsburgh, and Miami, and they too find that pretrial detention has a causal adverse effect on case outcomes.[23] As a whole, this body of research presents compelling evidence that detention effects exist across case types and jurisdictions. This Article offers a unique contribution by focusing on misdemeanor cases, setting its analysis in Harris County, and putting its empirical findings in constitutional context.

This Article proceeds in four parts. Part I provides background on pretrial detention and surveys the existing empirical literature assessing its effects. Part II outlines the pretrial process in Harris County, which has much in common with the process in other large jurisdictions, and describes the dataset. Part II also reports the results of an empirical analysis on the relationship between wealth and detention rates. Part III presents the results from a series of empirical analyses designed to measure the effect of pretrial detention on case and crime outcomes. Part IV, finally, explores the implications of the results for ongoing constitutional and policy debates.

## I.    The Pretrial Process and Prior Empirical Literature

### A.    On Bail and Pretrial Detention

The pretrial process begins with arrest and ends with the disposition of the criminal case. Since the Founding, the United States has relied heavily on a money bail system adapted from the English model to ensure the appearance of the accused at trial.[24] Bail is deposited with the court and serves as security. If

---

22. *See infra* notes 63-73 and accompanying text.

23. *See infra* notes 63-73 and accompanying text.

24. *See* Hermine Herta Meyer, *Constitutionality of Pretrial Detention*, 60 GEO. L.J. 1139, 1146 (1972) (chronicling the history of the bail system in Anglo-Saxon law); Timothy R. Schnacke, Nat'l Inst. of Corr., U.S. Dep't of Justice, Fundamentals of Bail: A Resource

*footnote continued on next page*

the accused appears in court when ordered to do so, his bail is returned at the conclusion of the case; if not, it is forfeited.[25] But whereas in eighteenth-century England many offenses were "unbailable," the American colonies guaranteed a broad right to bail with a narrow exception for capital cases.[26] In 1951, the Supreme Court held that the Excessive Bail Clause prohibits bail "set at a figure higher than an amount reasonably calculated" to ensure the appearance of the accused.[27] The Court ruminated that "[u]nless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning."[28]

The second half of the twentieth century brought major changes to America's pretrial system. In the 1960s, the realization that many people were detained pretrial for their inability to post bail led to a national reform movement.[29] Reform efforts sought to limit the use of money bail in favor of simple release on recognizance (ROR), where the defendant is released solely on his promise to return to court.[30] In the 1970s and 1980s, concerns about

---

Guide for Pretrial Practitioners and a Framework for American Pretrial Reform 21-44 (2014), http://www.clebp.org/images/2014-11-05_final_bail_fundamentals_september_8,_2014.pdf.

25. *See, e.g.*, ARIZ. R. CRIM. P. 7.6(c)(2) ("If at the [bail forfeiture] hearing, the [bail] violation is not explained or excused, the court may enter an appropriate order of judgment forfeiting all or part of the amount of the bond, which shall be enforceable by the state as any civil judgment."); PA. R. CRIM. P. 535(D) ("[W]ithin 20 days of the full and final disposition of the case, the [bail] deposit shall be returned to the depositor . . . ."); *id.* 536(A)(2)(a) ("When . . . the defendant has violated a condition of the bail bond, the bail authority may order the cash or other security forfeited and shall state in writing or on the record the reasons for so doing."); TEX. CODE CRIM. PROC. ANN. art. 17.02 (West 2015) ("Any cash funds deposited under this article shall . . . , on order of the court, be refunded . . . after the defendant complies with the conditions of the defendant's bond . . . ."); *id.* art. 22.01 ("When a defendant . . . fails to appear in any court in which such case may be pending and at any time when his personal appearance is required under this Code, . . . a forfeiture of his bail and a judicial declaration of such forfeiture shall be taken . . . .").

26. *See* Judiciary Act of 1789, ch. 20, § 33, 1 Stat. 73, 91-92 (guaranteeing a right to bail in noncapital cases); JOHN S. GOLDKAMP, TWO CLASSES OF ACCUSED: A STUDY OF BAIL AND DETENTION IN AMERICAN JUSTICE 55-60 (1979) (explaining the "classic" state constitutional bail clause and statutory definition of the right to bail); Schnacke, *supra* note 24, at 29-33 (describing the "bail/no bail" dichotomy in early America).

27. Stack v. Boyle, 342 U.S. 1, 5 (1951).

28. *Id.* at 4.

29. *See* GOLDKAMP, *supra* note 26, at 23-25, 84.

30. *See, e.g.*, Bail Reform Act of 1966, Pub. L. No. 89-465, § 2, 80 Stat. 214, 214 ("The purpose of this Act is to revise the practices relating to bail to assure that all persons, regardless of their financial status, shall not needlessly be detained pending their appearance . . . ."); NAT'L CONFERENCE ON BAIL & CRIMINAL JUSTICE, PROCEEDINGS AND INTERIM REPORT OF THE NATIONAL CONFERENCE ON BAIL AND CRIMINAL JUSTICE, at xiii-xxxii (1965) (describing the proceedings of a high-level policy committee convened to address inequalities in the bail system and shift toward release on recognizance); Robert F.

*footnote continued on next page*

rising rates of pretrial crime led to a second wave of reform, this time directed at identifying and managing defendants who posed a threat to public safety.[31] The federal government and many states enacted pretrial preventive detention statutes, and almost every jurisdiction in the country amended its pretrial laws to direct courts to consider "public safety" when setting bail or conditions of release.[32]

As of this writing, most U.S. jurisdictions rely heavily on money bail as the central mechanism of the pretrial system.[33] The Supreme Court has held that "the fixing of bail for any individual defendant must be based upon standards relevant to the purpose of assuring the presence of *that* defendant," including "the nature and circumstances of the offense charged, the weight of the evidence against him, the financial ability of the defendant to give bail and the character of the defendant."[34] Many jurisdictions, however, do not adhere to this mandate. Bail hearings are typically just a few minutes long, often conducted over videoconference and without defense representation.[35] Some jurisdictions employ bail "schedules" with predetermined bail amounts for each offense, which do not consider individual circumstances relevant to flight risk

---

Kennedy, U.S. Att'y Gen., Address to the Criminal Law Section of the American Bar Association 4 (Aug. 10, 1964), https://www.justice.gov/sites/default/files/ag/legacy/2011/01/20/08-10-1964.pdf ("We have been deeply concerned anout [sic] the effect of bail on the poor man. The Allen Committee . . . recommended that release on recognizance be increased wherever possible at the Federal level and we have followed that recommendation.").

31. *See* John S. Goldkamp, *Danger and Detention: A Second Generation of Bail Reform*, 76 J. CRIM. L. & CRIMINOLOGY 1, 5-6, 15 (1985).

32. *See id.* at 15.

33. *See supra* note 2 and accompanying text.

34. Stack v. Boyle, 342 U.S. 1, 5 & n.3 (1951) (emphasis added) (quoting FED. R. CRIM. P. 46(c) (amended 1966)).

35. *See* Pretrial Justice Inst., 2009 Survey of Pretrial Services Programs 44-45 (2009), http://www.pretrial.org/download/pji-reports/new-PJI%202009%20Survey%20of%20Pretrial%20Services%20Programs.pdf. While there is no systematic survey of bail hearing lengths, many jurisdictions report bail hearings of just a few minutes. For example, bail hearings are three minutes long on average in North Dakota, *Length of a Bail Hearing in North Dakota: 3 Minutes*, NAT'L CTR. FOR ACCESS TO JUST. (Jan. 25, 2013), http://ncforaj.org/2013/01/25/length-of-a-bail-hearing-in-north-dakota-3-minutes, and they are often less than two minutes long in Illinois's Cook County, Injustice Watch Staff, *Change Difficult as Bail System's Powerful Hold Continues Punishing the Poor*, INJUSTICE WATCH (Oct. 14, 2016), http://injusticewatch.org/interactives/bent-on-bail. Harris County bail hearings, the length of which is evidenced by the time stamp on the court records, are usually only a couple of minutes long, as is true in Philadelphia. *See* Megan Stevenson, Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes 6 (Jan. 12, 2017) (unpublished manuscript), https://papers.ssrn.com/abstract=2777615.

or ability to pay.[36] In many jurisdictions, judges set higher bail for defendants they perceive as dangerous, either as directed by statute or on their own initiative, despite the fact that money bail is a dubious mechanism for managing future crime risk.[37]

Once bail is set, detention status depends on a defendant's ability and willingness to pay bail. Those who post bail are released. Often a bail bondsman serves as a middleman, posting the refundable bail deposit in exchange for a nonrefundable fee (usually about 10% of the total).[38] Those who do not post bail are detained pending trial. The length of pretrial detention varies tremendously by jurisdiction and the particulars of a given case. In most places, the state must institute formal charges and arraign the defendant within a few days of arrest, and misdemeanor cases may be resolved within a few weeks.[39] In other places the timeline is longer, and a misdemeanor defendant may be detained for weeks or months before she is even arraigned.[40]

It has long been conventional wisdom that pretrial detention has an adverse effect on case outcomes (from the perspective of the accused).[41] If this is

---

36. *See* Pretrial Justice Inst., Pretrial Justice in America: A Survey of County Pretrial Release Policies, Practices and Outcomes 2, 7 (2010), https://www.pretrial.org/download/research/PJI%20Pretrial%20Justice%20in%20America%20-%20Scan%20of%20Practices%202009.pdf (indicating that 64% of the U.S. counties surveyed reported using a bail schedule). *But cf.* ABA STANDARDS FOR CRIMINAL JUSTICE: PRETRIAL RELEASE § 10-5.3(e) (3d ed. 2007) [hereinafter ABA STANDARDS: PRETRIAL RELEASE] ("Financial conditions . . . should never be set by reference to a predetermined schedule of amounts fixed according to the nature of the charge.").

37. *Cf.* ABA STANDARDS: PRETRIAL RELEASE, *supra* note 36, § 10-5.3(b) ("Financial conditions of release should not be set to prevent future criminal conduct during the pretrial period or to protect the safety of the community or any person.").

38. *See* Justice Policy Inst., For Better or for Profit: How the Bail Bonding Industry Stands in the Way of Fair and Effective Pretrial Justice 6 (2012), http://www.justicepolicy.org/uploads/justicepolicy/documents/_for_better_or_for_profit_.pdf.

39. In the Harris County data, the median time to disposition for detained misdemeanor defendants is three days, and 80% of detained defendants had their cases resolved within eighteen days.

40. In Louisiana, people may be detained on misdemeanor arrest charges for up to seventy-five days without being arraigned. *See* LA. CODE CRIM. PROC. ANN. art. 701(B)(1)(a) (2016) (requiring that formal charges be instituted within forty-five days of arrest if the misdemeanor defendant is detained); *id.* art. 701(C) (requiring arraignment within thirty days of the filing of formal charges).

41. *See* Esmond Harmsworth, *Bail and Detention: An Assessment and Critique of the Federal and Massachusetts Systems*, 22 NEW ENG. J. CRIM. & CIV. CONFINEMENT 213, 217 (1996) ("The idea that detention correlates with, and causes, increased conviction rates goes back to Wayne Morse and R. Beattie's study of Multnomah County, Oregon in the 1920s and Caleb Foote's Philadelphia studies in the 1950s." (footnote omitted)); Patricia Wald, *Pretrial Detention and Ultimate Freedom: A Statistical Study*, 39 N.Y.U. L. REV. 631, 632 (1964) ("[W]e can no longer disregard the impact of prior detention . . . on the sentencing process."); *see also infra* Part I.C.

true, there are at least six possible mechanisms. Detained defendants might experience worse outcomes because they (1) have increased incentives to plead guilty, including potentially overwhelming incentives; (2) cannot effectively prepare a defense; (3) have reduced financial resources for their defense; (4) cannot demonstrate positive behavior; (5) cannot obstruct the prosecution; and (6) lack the advantage of long delay.

Most obviously, detention alters the incentives for fighting a charge. A detained defendant generally has less to lose by pleading guilty; detention may have already caused major disruption to her life. And whereas for a released defendant the prospect of a criminal sentence—custodial or otherwise—represents a serious loss of liberty, for a detainee it is, at worst, an extension of the status quo. A second possible mechanism is that detention may limit the ability of the accused to develop a defense by working with his attorney or collecting relevant evidence. Relatedly, detention might limit the financial resources a person has to dedicate to her defense (if, for instance, detention results in loss of wages). Fourth, detention prevents an accused person from engaging in commendable behavior that might mitigate her sentence or increase the likelihood of acquittal, dismissal, or diversion. Such foreclosed conduct includes paying restitution, seeking drug or mental health treatment, and demonstrating commitment to educational or professional advancement.[42] Fifth, detention might prevent the accused from engaging in reprehensible behaviors that have similar effects on the case outcome, like intimidating witnesses, destroying evidence, or engaging in bad-faith delay tactics. Finally, even if released defendants do not actively seek to delay adjudication, it may be the case that they have better outcomes simply because their cases move more slowly,[43] which entails some inevitable degradation of evidence.

---

42. *See, e.g.,* IND. CODE § 35-38-1-7.1(b) (2016) (listing mitigating factors for sentencing, including a showing that the defendant "is likely to respond affirmatively to probation" or "has made or will make restitution"); N.C. GEN. STAT. § 15A-1340.16(e) (2016) (listing mitigating factors, including a showing of "substantial or full restitution to the victim"; "good character or . . . a good reputation in the community"; that the defendant "is currently involved in or has successfully completed a drug treatment program or an alcohol treatment program subsequent to arrest and prior to trial"; and that the defendant "supports the defendant's family," "has a support system in the community," "is gainfully employed," or "has a good treatment prognosis, and a workable treatment plan is available").

43. *See, e.g.,* Cohen & Reaves, *supra* note 2, at 7 ("Released [felony] defendants waited a median of 127 days from time of arrest until adjudication, nearly 3 times as long as those who were detained (45 days)."). Many states have contracted speedy trial limits for those detained pretrial. *See, e.g.,* LA. CODE CRIM. PROC. ANN. art. 701(D)(1)(b) ("The trial of a defendant charged with a misdemeanor shall commence within thirty days if he is continued in custody and within sixty days if he is not continued in custody."); *infra* note 136 (noting that in the Harris County dataset, the median time to judgment is 3 days for detained defendants and 125 days for released defendants and that there are large disparities in case resolution time between detained and released defendants even

*footnote continued on next page*

*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

### B. Challenges for Empirical Study

As a practical matter, testing whether detention has a causal impact on case outcomes is complicated by the fact that those detained are systematically different from those released. Because those who are detained pretrial are likely to have committed more serious crimes, have a longer criminal history, or have less wealth, one might expect to observe differences in case outcomes between detainees and releasees even absent any causal effect of pretrial custody status. To take a simple example, if crime is correlated over time such that more frequent offenders in one period are more likely to offend in future periods and a bail process detains defendants with more past convictions, then one would expect the future recidivism of those detained (who are already high-frequency offenders) to be greater than that of those who are released even when pretrial release does not affect behavior at all. Thus, estimates of the causal effect of bail must properly account for any sorting effect of bail that occurs in the real world.

This sorting effect is further complicated by the fact that defendants themselves usually know whether they are guilty or innocent, but, in general, courts or researchers do not. A defendant who is factually guilty and plans to plead guilty may wish to forgo bail simply to get the punishment over with, anticipating that she will receive credit for time served. On the other hand, a defendant who believes she has a strong case for innocence may have greater incentive to post bail to avoid being detained when innocent.

A final difficulty for measuring the effect of pretrial detention is that data on those factors known to be relevant for determining outcomes tend to be limited. While court records usually contain basic demographic information, current charges, and criminal history, they generally do not contain information on strength of evidence, wealth, or lawyer quality. Because case-level factors such as the quality of evidence cannot generally be observed, empirical studies on the impacts of pretrial detention are subject to the potential for bias in measuring causal effects. The degree of bias depends not only on how significantly the unobserved factors affect the outcome of interest but also on how closely correlated they are with pretrial detention.

---

after controlling for the charged offense). And simply as a matter of policy, criminal justice system actors tend to prioritize detained defendants' cases in order to minimize the length of pretrial detention. *Cf.* ABA STANDARDS FOR CRIMINAL JUSTICE: SPEEDY TRIAL AND TIMELY RESOLUTION OF CRIMINAL CASES § 12-1.3(b) (3d ed. 2006) ("The time limits concerning speedy trial for detained defendants should ordinarily be shorter than the limits applicable to defendants on pretrial release.").

C.   Prior Empirical Literature

Notwithstanding these challenges, there is a body of prior empirical work dedicated to assessing the effects of pretrial detention on criminal justice outcomes. To varying degrees, prior studies have attempted to control for underlying differences between detainees and releasees in order to estimate the true causal effect of detention. Earlier studies, which preceded the advent of computers and digitized data systems, could only control for a few variables at a time. More recent studies have been able to control for a wider variety of variables, moving closer to an accurate causal estimate.

The first major empirical study addressing the causal effect of detention was an innovative study known as the Manhattan Bail Project conducted by the Vera Foundation starting in 1961.[44] The researchers conducted pretrial interviews and verifications designed to assess flight risk on the basis of community ties.[45] They then recommended ROR to the judge in a randomly selected subset of cases that met certain criteria for low flight-risk status.[46] For the rest of the cases that met the same criteria, they offered no recommendation to the judge.[47] To a modern researcher, this experimental approach is an ideal way of determining the causal impact of pretrial detention: those for whom the ROR recommendation was communicated should be statistically identical to those for whom it was not, with the only difference being a higher pretrial release rate among the former. If the two groups also had differing case outcomes, one could infer that the difference was due to pretrial detention.

Disappointingly, the researchers did not report overall outcomes for these two groups. They only compared case outcomes among those in the reporting group who were released versus those in the nonreporting group who were detained.[48] They found that those detained were dramatically more likely to be found guilty and sentenced to prison than those who were not.[49]

The Manhattan Bail Project made a profound contribution but was limited by its design. Because the two groups actually compared were subject to the additional filter of a release decision, they cannot be considered statistically identical. Comparing their outcomes might therefore provide a biased view of the causal impact of pretrial detention.[50]

---

44. Charles E. Ares et al., *The Manhattan Bail Project: An Interim Report on the Use of Pre-Trial Parole*, 38 N.Y.U. L. REV. 67, 71 (1963).

45. *Id.* at 72-73.

46. *Id.* at 74.

47. *Id.*

48. *Id.* at 87 & tbl.12.

49. *Id.*

50. A follow-up study using data on seven hundred of the Manhattan Bail Project cases used some basic cross-tabulations to find that the correlation between detention and
*footnote continued on next page*

Another important early study came to different conclusions. John Goldkamp in 1980 examined whether pretrial detention affected case outcomes at three separate stages in a criminal proceeding: dismissal at the outset, entry into a diversion program, and verdict.[51] Focusing on roughly eight thousand Philadelphia criminal cases, Goldkamp found that after controlling for six variables—charge seriousness, existence of detainers/warrants, number of prior arrests, being under supervision, existence of open cases, and number of charges—pretrial detention had no discernible impact on any of these phases.[52] The only outcome for which Goldkamp found some support for a causal channel of influence was on the likelihood of being sentenced to incarceration.[53] His method, however, divided the impact pretrial detention has on case outcomes into three steps: the impact on dismissal, diversion, and adjudication. The impact on any of these steps would necessarily be less than the overall impact on case outcomes.

Empirical scholarship evaluating pretrial detention waned in the 1980s and 1990s, but the new millennium brought new research. Since 2000, a number of correlational studies have been published that have provided evidence on this subject, although not always as a primary focus of the paper.[54] Although most of these studies have evaluated relatively small samples, they have taken advantage of improvements in data to control for a wider variety of underlying differences in defendant characteristics. Most of these studies have found that pretrial detention is correlated with unfavorable case outcomes for defendants.[55]

---

unfavorable case outcomes is not explained away by prior record, bail amount, type of counsel, family integration, or employment stability. Anne Rankin, *The Effect of Pretrial Detention*, 39 N.Y.U. L. REV. 641, 655 (1964).

51. John S. Goldkamp, *The Effects of Detention on Judicial Decisions: A Closer Look*, 5 JUST. SYS. J. 234, 237 (1980).

52. *Id.* at 240-44.

53. *Id.* at 249.

54. *See* sources cited *infra* note 55.

55. *E.g.*, Gail Kellough & Scot Wortley, *Remand for Plea: Bail Decisions and Plea Bargaining as Commensurate Decisions*, 42 BRIT. J. CRIMINOLOGY 186, 187 (2002) (finding that a negative personality assessment by police increases the likelihood of detention in Canada and that those detained are more likely to plead guilty); Michael J. Leiber & Kristan C. Fox, *Race and the Impact of Detention on Juvenile Justice Decision Making*, 51 CRIME & DELINQ. 470, 471 (2005) (assessing how the interaction between race and detention status affects juvenile delinquency case outcomes); J.C. Oleson et al., *The Effect of Pretrial Detention on Sentencing in Two Federal Districts*, 33 JUST. Q. 1103, 1117-19 (2014) (showing that pretrial detention is associated with an increased prison sentence in federal courts); Christine Tartaro & Christopher M. Sedelmaier, *A Tale of Two Counties: The Impact of Pretrial Release, Race, and Ethnicity upon Sentencing Decisions*, 22 CRIM. JUST. STUD. 203, 203-04, 208, 218 (2009) (examining heterogeneity in the effects of pretrial detention on sentences of incarceration for minority defendants in different Florida counties); Marian R. Williams, *The Effect of Pretrial Detention on Imprisonment Decisions*,

*footnote continued on next page*

The new millennium also brought the publication of several important research studies funded by nonprofit organizations. Although not published in peer-reviewed or academic journals, these papers represented an advance because of their large sample sizes. In 2007 and 2008, the New York Criminal Justice Agency (CJA) published two reports that assessed the impact of pretrial detention on case outcomes for nonfelony and felony cases, respectively.[56] Several years later, the Laura and John Arnold Foundation funded a pair of studies that assessed the impact of pretrial detention on case outcomes and on future crime.[57]

With sample sizes in the tens to hundreds of thousands, the CJA and Arnold Foundation studies controlled for offense type (within eight to ten main classifications) along with gender, ethnicity, age, and criminal history.[58] They still found substantial correlations between pretrial detention and conviction rates, sentences of incarceration, and postdisposition crime.[59] The Arnold Foundation study in particular found large effects: low risk defendants detained throughout the pretrial period were 5.41 times more likely to be sentenced to jail and 3.76 times more likely to be sentenced to prison than similarly situated defendants who were released at some point before trial.[60]

These large effects, however, are unlikely to represent the true causal effect of pretrial detention. The researchers in these studies did not control for the particular offense charged, using only broad offense categories such as "violent" offenses.[61] Without controlling for the exact offense, the researchers are unlikely to be comparing apples to apples. There is substantial variation within each broad offense class. Those released on a violent offense are more

28 CRIM. JUST. REV. 299, 306, 313 (2003) (showing that pretrial detention is correlated with increased incarceration sentences using a small sample of Florida felony cases).

56. PHILLIPS, NONFELONY CASES, *supra* note 10; MARY T. PHILLIPS, N.Y.C. CRIMINAL JUSTICE AGENCY, PRETRIAL DETENTION AND CASE OUTCOMES, PART 2: FELONY CASES (2008) [hereinafter PHILLIPS, FELONY CASES].

57. Christopher T. Lowenkamp et al., The Hidden Costs of Pretrial Detention (2013) [hereinafter Lowenkamp et al., Hidden Costs], http://www.arnoldfoundation.org/wp -content/uploads/2014/02/LJAF_Report_hidden-costs_FNL.pdf; Christopher T. Lowenkamp et al., Investigating the Impact of Pretrial Detention on Sentencing Outcomes (2013) [hereinafter Lowenkamp et al., Investigating the Impact], http://www.arnoldfoundation.org/wp-content/uploads/2014/02/LJAF_Report_state -sentencing_FNL.pdf.

58. PHILLIPS, NONFELONY CASES, *supra* note 10, at 11, 23 tbl.7; Lowenkamp et al., Investigating the Impact, *supra* note 57, at 12 & tbl.2.

59. PHILLIPS, NONFELONY CASES, *supra* note 10, at 55-56; PHILLIPS, FELONY CASES, *supra* note 56, at 57-59; Lowenkamp et al., Hidden Costs, *supra* note 57, at 4; Lowenkamp et al., Investigating the Impact, *supra* note 57, at 4.

60. Lowenkamp et al., Investigating the Impact, *supra* note 57, at 11.

61. PHILLIPS, NONFELONY CASES, *supra* note 10, at 76 tbl.B; Lowenkamp et al., Investigating the Impact, *supra* note 57, at 12 tbl.2.

likely to be facing minor charges like simple assault, and those detained on a violent offense are more likely to be facing serious charges like murder or rape. Given that likely variation, the study does not necessarily compare outcomes across similarly situated individuals, and differences in outcomes would be expected even in the absence of a causal effect.

In general, then, despite major improvements in data and analysis, prior research on the downstream effects of pretrial detention has controlled for only a limited set of confounding variables, making it difficult to distinguish the effect of detention from the effects of underlying differences between detainees and releasees. Previous studies have typically controlled only for limited measures of prior criminal involvement and grouped cases into a limited number of offense categories. They have also tended to lack controls for defendants' wealth, which clearly affects pretrial release in cash bail systems and is also likely to affect defendants' access to high-quality defense counsel and services—such as counseling or drug treatment—that might encourage courts to impose more lenient sentences. It is difficult, in other words, to exclude the possibility of "omitted variable bias" from the outcomes this past research has yielded.[62]

The newest empirical work on pretrial detention effects seeks to avoid the problem of omitted variable bias by deploying quasi-experimental design. A working paper by Megan Stevenson, one of this Article's Authors, uses a natural experiment in Philadelphia to estimate the causal effect of pretrial detention on case outcomes.[63] Stevenson exploits the fact that defendants have their bail set by different bail magistrates with broad discretion. Some magistrates tend to set bail at unaffordable rates, while others set bail more leniently.[64] The group of defendants randomly assigned to a high-bail magistrate are detained pretrial at higher rates than the group assigned to the more lenient magistrate.[65] In all other respects, however, the two groups should be similar.[66]

---

62. *See generally* Carol S. Aneshensel, Theory-Based Data Analysis for the Social Sciences 90 (2d ed. 2013) (defining "omitted variable bias" as "the result of leaving out of the model a variable" that both "is a cause of the dependent variable" and "is associated with one or more of the independent variables in the model" and noting that this results in the model "incorporating the effect of the omitted variable in the error term").

63. Stevenson, *supra* note 35.

64. *See id.* at 41 fig.2 (showing average detention rates per magistrate for defendants facing different types of charges).

65. *See id.* at 17.

66. *Id.* at 14-15.

Stevenson ultimately finds that defendants who receive the strict magistrate are more likely to plead guilty and receive harsher sentences.[67] Since this quasi-experimental method eliminates the bias that results from comparing individuals with different underlying characteristics, it produces a causal estimate of the effect of pretrial detention. Stevenson also performs a standard regression analysis (controlling for a detailed set of variables) that yields similar results, suggesting that with enough controls, researchers can produce reasonable estimates of the causal effects of pretrial detention even in the absence of a natural experiment.[68]

Several other very recent working papers developed in 2016 have used a research design similar to Stevenson's to assess the impact of pretrial detention in New York, Miami, Philadelphia, and Pittsburgh. Gupta, Hansman, and Frenchman find that money bail in Philadelphia leads to a 12% increase in the likelihood of conviction, and money bail in Philadelphia and Pittsburgh leads to a 6-9% increase in the yearly probability of receiving a new charge.[69] Dobbie, Goldin, and Yang find that pretrial detention leads to a 27.3% increase in the likelihood of conviction but prevents a 37.6% increase in the likelihood of rearrest pretrial.[70] They find no discernible postdisposition crime effects of pretrial detention, but they do find suggestive evidence that pretrial detention decreases ties to the formal employment sector.[71] Their research is set in both Philadelphia and Miami.[72] Leslie and Pope look at the impacts of pretrial detention in New York City and estimate that detention leads to a 13 percentage point increase in the likelihood of conviction among felony defendants and a 7.4 percentage point increase in the likelihood of conviction among misdemeanor defendants.[73]

This Article offers several contributions to the empirical literature on pretrial detention. First, like the other 2016 studies, this Article offers both a quasi-experimental analysis and a regression analysis with a large set of highly detailed controls. Second, it focuses on misdemeanor defendants and assesses the effect of pretrial detention on both case outcomes and future crime. Third,

---

67. *Id.* at 17-18.

68. *Id.* at 18.

69. Arpit Gupta et al., *The Heavy Costs of High Bail: Evidence from Judge Randomization*, 45 J. LEGAL STUD. 471, 472-73 (2016).

70. Will Dobbie et al., *The Effects of Pre-Trial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges* 3 (Nat'l Bureau of Econ. Research, Working Paper No. 22511, 2016), http://www.nber.org/papers/w22511.pdf.

71. *See id.* at 3-4.

72. *Id.* at 1.

73. Emily Leslie & Nolan G. Pope, The Unintended Impact of Pretrial Detention on Case Outcomes: Evidence from NYC Arraignments 15-16 (Nov. 9, 2016) (unpublished manuscript), http://home.uchicago.edu/~npope/pretrial_paper.pdf.

it offers the first large-scale empirical study of misdemeanor pretrial detention in Harris County—which, because its pretrial process is representative of many jurisdictions[74] and because of the sheer number of people it affects, presents a particularly illuminating location of study.

## II.  Misdemeanor Pretrial Detention in Harris County

### A.  The Misdemeanor Pretrial Process

The present analysis focuses on Harris County, Texas, the third-largest county in the United States. Countywide, around 70,000 misdemeanors are processed each year, and these cases are adjudicated by the Harris County Criminal Courts at Law.[75] Indigent defense in the county was historically provided though an appointed private counsel system, but a public defender office was established in 2010 and has gradually expanded.[76] Still today, though, the public defender office handles only a small subset of misdemeanor cases, with the remainder of cases assigned to appointed private counsel.[77]

After arrest and booking, alleged misdemeanants are held at the county jail in downtown Houston until a bail hearing occurs.[78] Bail hearings are held continuously every day during the year and nearly always occur within twenty-four hours of the initial booking.[79] To manage the large volume of new defendants who arrive each day, the county has developed a videoconferencing

---

74. *See infra* Part II.B.

75. We report this total misdemeanor count on the basis of data on file with the Authors.

76. Tony Fabelo et al., Council of State Gov'ts Justice Ctr., Improving Indigent Defense: Evaluation of the Harris County Public Defender 12, 14 & fig.3 (2013), http://harriscountypublicdefender.org/wp-content/uploads/2013/10/JCHCPDFinal Report.pdf.

77. The Harris County Public Defender office represents only those misdemeanor defendants who are severely mentally ill, as identified by a computer algorithm on the basis of three criteria: (1) they have taken prescribed psychoactive drugs in the last ninety days; (2) they have a diagnosis of schizophrenia, bipolar disorder, or major depression; or (3) they are assigned to the jail's specialty mental health housing. This totals approximately 2500 persons annually. E-mail from Alex Bunin, Harris Cty. Pub. Def., to Paul Heaton, Senior Fellow, Univ. of Pa. Law Sch., (June 16, 2016, 11:41 AM) (on file with authors).

78. For details on some of the processes described here, see First Amended Class Action Complaint, ODonnell v. Harris County, No. 16-cv-01414 (S.D. Tex. Sept. 1, 2016); and Harris Cty. Criminal Courts at Law, Rules of Court (as amended through Dec. 1, 2016), http://www.ccl.hctx.net/attorneys/rules/rules.pdf. Others are reported as described in e-mail and telephone correspondence with Alex Bunin of the Harris County Public Defender office. *See, e.g.,* E-mail from Alex Bunin, Harris Cty. Pub. Def., to Megan Stevenson, Quattrone Fellow, Univ. of Pa. Law Sch. (Oct. 20, 2015, 2:57 PM) (on file with authors).

79. First Amended Class Action Complaint, *supra* note 78, ¶¶ 54, 56.

process for bail hearings. Defendants are taken to a conferencing facility within the jail and participate in the hearing by speaking to a split video screen that shows a prosecutor and the magistrate handling the hearing.[80] Bail hearings are typically handled in an assembly-line fashion, with some hearings lasting approximately a minute.[81] Unless they have somehow managed to retain counsel, which is very rare, defendants are not represented at the bail hearings.[82]

Magistrates making bail determinations have access to information from a pretrial services report that includes the defendant's prior criminal record and can also ask the defendant questions during the bail hearing.[83] Texas statutory law defines bail as "the security given by the accused that he will appear and answer before the proper court the accusation brought against him."[84] Notwithstanding this unitary focus on ensuring appearance, the law also directs the officer who sets bail to consider public safety in determining the bail amount.[85]

In Harris County, bail is typically set according to a bail schedule promulgated by the county courts. The schedule proposes bail of $500 for a low-level misdemeanor by a defendant with no prior criminal record and escalates bail in $500 increments according to the seriousness of the charged offense and the number of prior felony and misdemeanor convictions, up to a maximum of $5000.[86] Although release without bail—referred to as a "personal bond" in Harris County—is allowed, it is not included on the schedule and occurs infrequently.[87] Prosecutors have an opportunity during the bail hearing to argue for departures from the schedule.

---

80. *See id.* ¶¶ 56, 65-66.

81. *Id.* ¶ 67.

82. *Id.* ¶ 61.

83. This practice was described in e-mail and telephone correspondence with Alex Bunin. *See* E-mail from Alex Bunin to Megan Stevenson, *supra* note 78.

84. TEX. CODE CRIM. PROC. ANN. art. 17.01 (West 2015).

85. *Id.* art. 17.15(5).

86. Harris Cty. Criminal Courts at Law, *supra* note 78, § 9.1, at 15. A nonprofit advocacy organization, Equal Justice Under Law, recently filed a civil rights lawsuit against Harris County on behalf of misdemeanor pretrial detainees, alleging that reliance on the bail schedule violates the Due Process and Equal Protection Clauses. *See* First Amended Class Action Complaint, *supra* note 78, at 2; *see also* Lise Olsen, *Harris County's Pretrial Detention Practices Challenged as Unlawful in Federal Court*, HOUS. CHRON. (May 19, 2016), http://www.houstonchronicle.com/news/houston-texas/houston/article/Harris-County-s-pretrial-detention-practices-7759726.php.

87. *See* TEX. CODE CRIM. PROC. ANN. art. 17.03 (defining "personal bond" and judicial authority to order it); HARRIS CTY. PRETRIAL SERVS., 2015 ANNUAL REPORT (n.d.) (noting that only 8.5% of misdemeanor defendants in Harris County posted personal bond in 2015).

Nearly all misdemeanor defendants in Harris County are theoretically eligible for appointed counsel in the event of indigence.[88] To apply for appointed counsel, defendants must complete a form that asks about their income and other assets.[89] Judges may also direct questions regarding defendants' financial circumstances from the bench either during the bail hearing or in later proceedings.[90] When it would facilitate a more orderly transaction of court business, particularly when defendants appear pro se (without a lawyer), the judge may appoint indigent counsel without a formal request.[91] Although Texas law and the county's written policy prohibit judges from considering whether a defendant made bail in deciding whether she qualifies for appointed counsel (except to the extent it reflects her financial circumstances),[92] there is considerable anecdotal evidence suggesting that this rule is violated in practice.[93] Thus under the current system, one potential impact of posting bail may be to alter one's chances of receiving an appointed attorney.

### B.  Representativeness of Harris County's Misdemeanor Pretrial System

The study is set in a populous urban area with criminal justice structures comparable to those in many large cities in the United States. Harris County is the third-largest county in the United States and is home to Houston, the nation's fourth-largest city.[94] Harris County boasts a diverse population of about 4.5 million residents, 19.6% of whom are African American, 42% Hispanic/Latino, 25.3% foreign-born, and 17.3% living below the federal

---

88. *See* Harris Cty. Dist. Courts, Standards and Procedures: Appointment of Counsel for Indigent Defendants § 1.0 (2009), https://www.justex.net/JustexDocuments/0/FDAMS/standards.pdf. The analysis that follows controls for public defender representation on the theory that these cases may be systematically different from other cases.

89. *See id.* § 1.1.

90. *See id.* § 1.4.2.

91. This is apparent on the basis of the data, which sometimes show counsel appointed without a motion (often on the day of final adjudication) and were confirmed in a personal conversation with Alex Bunin, Harris County Public Defender, on July 27, 2016.

92. TEX. CODE CRIM. PROC. ANN. art. 26.04(*l*)-(m); Harris Cty. Dist. Courts, *supra* note 88, § 1.2.

93. *See, e.g.*, Emily DePrang, *Poor Judgment*, TEX. OBSERVER (Oct. 12, 2015, 8:56 AM CST), https://www.texasobserver.org/poor-judgment; Paul B. Kennedy, *Who Is Indigent in Harris County?*, DEF. RESTS (Jan. 25, 2010, 3:28 PM), http://kennedy-law.blogspot.com/2010/01/who-is-indigent-in-harris-county.html.

94. *See Largest Counties in the U.S. 2015, supra* note 11; *see also* Population Div., U.S. Census Bureau, The 15 Most Populous Cities: July 1, 2014 (2015), https://www.census.gov/content/dam/Census/newsroom/releases/2015/cb15-89_table3.xlsx.

poverty line.[95] In Houston, which houses nearly half the county's population, the 2014 Federal Bureau of Investigation (FBI) index crime rate was 1 per 100 residents for violent crime and 5.7 per 100 residents overall, placing Houston thirtieth among the 111 U.S. cities with populations above 200,000.[96]

While the Bureau of Justice Statistics has collected extensive information about more serious crimes,[97] there are no nationally representative data available on the numbers of misdemeanor arrests and convictions, let alone data about pretrial detention rates, bail, or sentencing. Nonetheless, other empirical studies on the effects of pretrial detention provide some insight into misdemeanor pretrial practices in other large urban areas and suggest that Harris County is not an outlier. In New York City, about 35% of misdemeanor defendants spend more than a week detained pretrial[98] and 14% of misdemeanor defendants remain in jail during the entire pretrial period.[99] Sixty-seven percent of misdemeanor defendants in New York City are convicted, and the vast majority of these convictions are guilty pleas.[100] Ten percent of misdemeanor defendants in New York City receive a sentence of incarceration.[101]

In Philadelphia, 25% of misdemeanor defendants remain in jail for more than three days after the bail hearing, and 50% are found guilty of at least one charge.[102] Philadelphia, however, differs from many other jurisdictions in its broad use of bench trials (trials in front of a judge instead of a jury), which are the default for misdemeanor cases.[103] As a result, the plea rate is much lower: only half of misdemeanor convictions in Philadelphia are achieved through plea negotiation. Sixteen percent of misdemeanor defendants receive a

---

95. *QuickFacts: Harris County, Texas*, U.S. CENSUS BUREAU, https://www.census.gov/quickfacts/table/PST045215/48201 (last visited Mar. 3, 2017).

96. The Authors' calculations are based on data compiled from the FBI. *See Table 8: Offenses Known to Law Enforcement*, FED. BUREAU INVESTIGATION, https://ucr.fbi.gov/crime-in-the-u.s/2014/crime-in-the-u.s.-2014/tables/table-8/Table_8_Offenses_Known_to_Law_Enforcement_by_State_by_City_2014.xls (last visited Mar. 3, 2017).

97. *Data Collection: National Judicial Reporting Program (NJRP)*, BUREAU JUST. STAT., http://www.bjs.gov/index.cfm?ty=dcdetail&iid=241 (last visited Mar. 3, 2017).

98. For the data underlying the Authors' calculations, see PHILLIPS, NONFELONY CASES, *supra* note 10, at 53 fig.11.

99. *See id.* at 14 & tbl.2.

100. For the data underlying the Authors' calculations, see Leslie & Pope, *supra* note 73, at 30 tbl.2.

101. *Id.*

102. The Philadelphia statistics in this paragraph are from the Authors' calculations using data from Philadelphia court records. The underlying data can be requested from the Pennsylvania court system. *See Public Record Policies*, UNIFIED JUD. SYS. PA., http://www.pacourts.us/public-record-policies (last visited Mar. 3, 2017).

103. Stephen J. Schulhofer, *Is Plea Bargaining Inevitable?*, 97 HARV. L. REV. 1037, 1051 (1984).

*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

sentence of incarceration, including those who receive a sentence of time served.

The statistics in Harris County differ somewhat, but not dramatically, from those in New York City and Philadelphia.[104] The detention rate is a bit higher: about 53% of misdemeanor defendants in Harris County are detained for more than seven days. The conviction rate is similar (68%), and, as in New York City, most convictions come about through guilty pleas (65%). The misdemeanor incarceration rate in Harris County is much higher than in the other two cities; 58% of those convicted receive a jail sentence, including time served. The average jail sentence, however, is relatively short at less than a month.

Other pretrial practices in Harris County are regularly observed in other jurisdictions. For example, the use of a schedule specifying bail amounts based on the charge and prior convictions is not uncommon.[105] A 2009 survey of pretrial services around the country indicates that 57% of jurisdictions use videoconferencing for bail hearings,[106] as Harris County does. This same survey also indicates that about half of U.S. jurisdictions, like Harris County, do not provide representation at bail hearings. The use of commercial bail bondsmen is also fairly widespread. Four states—Illinois, Kentucky, Oregon, and Wisconsin—have banned the commercial bail bond industry, but bail bondsmen remain a common source for bail funds in most other states.[107] Thus, although Harris County has unique features, it is similar to many other jurisdictions in detaining substantial numbers of misdemeanor defendants pretrial; in its reliance on a cash bail schedule; in holding short, videoconfer-

---

104. All Harris County statistics in this paragraph are from the Authors' calculations using the dataset described in Part II.C below.

105. The nonprofit advocacy organization Equal Justice Under Law has filed ten class action challenges in eight states to money bail practices that do not take ability to pay into account, including the use of bail schedules. The jurisdictions where lawsuits have been filed include both large urban areas, like San Francisco and Harris County, and smaller cities like Clanton, Alabama. *See Ending the American Money Bail System, supra* note 21 (describing the organization's litigation campaign); *see also, e.g.,* Walker v. City of Calhoun, No. 4:15-CV-0170-HLM, 2016 WL 361612, at *14 (N.D. Ga. Jan. 28, 2016) (granting the plaintiff's motion for a preliminary injunction and holding that the city "may not continue to keep arrestees in its custody for any amount of time solely because the arrestees cannot afford a secured monetary bond"); Order, Pierce v. City of Velda City, No. 4:15-cv-570-HEA (E.D. Mo. June 3, 2015) (granting declaratory judgment for the plaintiffs, including new standards for pretrial release); First Amended Class Action Complaint, *supra* note 78.

106. Pretrial Justice Inst., *supra* note 35, at 45 tbl.35.

107. *See* Cohen & Reaves, *supra* note 2, at 2, 4 (showing that 48% of all pretrial releases studied were based on financial conditions, most of which—33% of all releases—were on surety bond).

*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

ence bail hearings without court-appointed representation for the accused; and in the prominent role of a commercial bail bond industry.

### C. Data Description

Study data are derived from the court docket sheets maintained by the Harris County District Clerk.[108] These docket sheets include the universe of unsealed criminal cases adjudicated in the county and document considerable detail regarding each case. This Article focuses on 380,689 misdemeanor cases filed between 2008 and 2013. For each case, the docket data include the defendant's name, address, and demographic information; prior criminal history; and most serious charge. To obtain information about the neighborhood environment for each defendant, the court data were linked by the defendant's zip code of residence—which was available for 85% of defendants—to zip code-level demographic data from the 2008-2012 American Community Survey.[109] The docket data also report the time of the bail hearing; the bail amount; whether and when bail was posted, the judge and courtroom assignment; motions and other metrics of procedural progress; and the final case outcome, including whether the case was resolved through a plea.

The discussion and analysis below focus on the bail amount set at the initial hearing, which is likely to have a disproportionate impact on detention both because it is the operative bail during the early period when most defendants who post bail do so and because it serves as a reference point for any further negotiations over bail. However, in Harris County, as in other jurisdictions, judges can exercise discretion to adjust bail as additional facts about a particular defendant or case come to light.

The court data have a few important limitations. Only a single, most serious charge is recorded in each misdemeanor case. This makes it impossible to clearly differentiate defendants with large numbers of charges. Although court personnel have access to criminal history information from across the state, these data only include criminal history data covering offenses within Harris County, not other jurisdictions. A further limitation is that the data do not always provide clear indications of failure to appear, an obvious outcome of interest in a comprehensive evaluation of bail since one of the main purposes of bail is to ensure appearance in court. The attorney information is also incomplete—although the data indicate the identity of court-appointed

---

108. For these data, see *Search Our Records and Documents*, HARRIS COUNTY DISTRICT CLERK'S OFF., http://www.hcdistrictclerk.com/edocs/public/search.aspx (last visited Mar. 3, 2017).

109. *American FactFinder—American Community Survey*, U.S. CENSUS BUREAU, https://factfinder.census.gov/faces/nav/jsf/pages/programs.xhtml?program=acs (last visited Mar. 3, 2017).

counsel and the fact that they are court-appointed, the identity of counsel is not observed when privately retained. The data do not clearly distinguish those who proceed pro se and those who hire a private attorney. Race and citizenship data are not carefully verified, so they may not be fully reliable.[110] Additionally, although these data represent the near universe of criminal cases in the county, a small fraction of criminal court records are sealed or otherwise unavailable on the online court docket database. And finally, arrestees who successfully complete diversion programs through which they avoid having charges filed are not included in the data.[111]

---

110. This was observed in e-mail and telephone correspondence with Alex Bunin. *See, e.g.,* E-mail from Alex Bunin to Paul Heaton, *supra* note 77.

111. An example of one such program operating in Harris County is the First Chance Intervention Program, which diverts first-time, low-level marijuana offenders. *See 1st Chance Intervention Program*, HARRIS COUNTY OFF. DISTRICT ATT'Y, https://app.dao.hctx .net/OurOffice/FirstChanceIntervention.aspx (last visited Mar. 3, 2017).

*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

**Table 1**

Characteristics of Defendants by Pretrial Release Status

|  | Overall | Detained | Released |
|---|---|---|---|
| Convicted | 68.3% | 79.4% | 55.7% |
| Guilty plea | 65.6% | 76.8% | 52.8% |
| Any jail sentence | 58.7% | 75.0% | 40.2% |
| Jail sentence days | 17.0 | 25.4 | 7.4 |
| Any probation sentence | 14.0% | 6.2% | 22.9% |
| Probation sentence days | 49.4 | 22.5 | 79.9 |
| Requested appointed counsel | 53.2% | 71.3% | 32.6% |
| Amount of bail | $2225 | $2786 | $1624 |
| Class A misdemeanor | 30.7% | 33.5% | 27.4% |
| Male | 76.8% | 79.8% | 73.5% |
| Age (years) | 30.8 | 31.6 | 30.0 |
| Black | 38.9% | 45.6% | 31.3% |
| Citizen | 74.1% | 71.5% | 77.0% |
| Prior misdemeanors | 1.51 | 2.08 | 0.85 |
| Prior felonies | 0.74 | 1.11 | 0.31 |
| *Sample size* | *380,689* | *202,386* | *178,303* |

Table 1 above presents summary statistics describing the sample of misdemeanor defendants examined in the study. Any individual who did not post bond within the first seven days following the bail hearing is categorized as detained. The data reveal stark differences in plea rates, conviction rates, and jail sentences for detainees as compared to those who are able to make bail. However, detainees are also different from releasees across a number of preexisting characteristics that seem likely to be related to case outcomes. For example, detainees are much more likely to request appointed counsel due to indigence (71% versus 33%), are disproportionately charged with more serious Class A misdemeanors (34% versus 27%), and have more extensive prior criminal records. Thus, it remains unclear to what extent the differences in case outcomes reflect the effect of detention versus other preexisting differences across the two groups.

D.    Pretrial Detention and Wealth

Not listed in Table 1 because it is unobserved in the data—though probably the most obvious characteristic that would differentiate the detained and released—is wealth. A clear concern with a predominantly cash-based bail

system as exists in Harris County is that individuals with money or other liquid assets will be most able to make bail, skewing the system in favor of the wealthy. Although the individual wealth of each defendant is unobserved, one can proxy for defendant wealth based upon median income in each defendant's zip code of residence. To illustrate the prominent role of wealth in the pretrial system, Figure 1 below calculates the pretrial detention rate for defendants residing in each of the 217 zip codes observed in the data that contain at least fifty defendants and plots this against the median household income in the zip code.

The pattern is striking. Those who come from poorer zip codes are substantially more likely to be detained than those from wealthier zip codes. Only about 30% of defendants from the wealthiest zip codes are detained pretrial, versus around 60-70% of defendants from the poorest zip codes.

Although Figure 1 suggests that wealth may be an important determinant of pretrial release, it is possible that the patterns in Figure 1 reflect differential offending by defendants from lower-income zip codes. If, for example, lower-income misdemeanor defendants commit more serious offenses or tend to have more extensive criminal histories, one might expect them to be assigned higher bail amounts and be more likely to be detained for legally appropriate reasons. Figure 2 below, however, demonstrates that the strongly negative wealth/detention relationship persists when focusing on the pool of defendants with no prior charges in Harris County. Moreover, Figure 3 below, which shows the average seriousness of the charge, demonstrates that there is no relationship between wealth and offense seriousness.[112] Thus, the wealth gradient does not seem to be explainable simply as a matter of more extensive or more serious offending by low-income defendants.

Nor does the lower detention rate of wealthier defendants appear to be caused solely by differences in evidence or other factors related to public safety. This can be demonstrated by constructing an expected probability of detention for each defendant from the actual detention rates of all other defendants in the sample who were assigned identical bail amounts at the initial hearing. This measure captures the average custody outcome for all defendants who were considered by the court as representing the same degree of risk, at least as expressed through the bail amount. For defendants falling within each decile of the zip code income distribution, one can then compare this expected detention measure to the true rates of detention.

Figure 4 below reveals a striking pattern in which the actual detention rates for the poorest defendants are substantially above those that would be predicted based upon their assigned bail and the reverse is true for the

---

112. In a zip code-level regression of average seriousness on median household income, the estimated coefficient on income is practically small and not statistically significant.

*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

wealthiest defendants. Defendants in the lowest-income decile are about 15% (8 percentage points) more likely to be detained than would be expected based on their court-assigned bail. Those in the top decile are 19% (9 percentage points) less likely to be detained. Because these comparisons already account for the bail amount, the differences cannot be plausibly attributed to anything in the court record that might implicate worthiness for bail. It thus appears that wealthier defendants are advantaged in their ability to obtain pretrial release beyond what would be expected simply based on the merits of their case.

**Figure 1**

Relationship Between Wealth and Detention Rates Among Misdemeanor Defendants in Harris County, Texas



This figure reports detention rates versus median income by zip code. Each dot in the chart represents defendants residing within a particular zip code.

*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

**Figure 2**

Relationship Between Wealth and Detention Rates Among Misdemeanor Defendants
with No Prior Criminal Record in Harris County, Texas



This figure reports detention rates versus median income by zip code. Each dot in the chart represents defendants residing within a particular zip code.

*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

**Figure 3**
Relationship Between Wealth and Offense Seriousness Among Misdemeanor
Defendants in Harris County, Texas



This figure reports the fraction of defendants charged with a Class A misdemean-
or versus median income by zip code. Each dot in the chart represents defendants
residing within a particular zip code.

*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

**Figure 4**
Expected Detention Rates Versus Actual Detention Rates by Income Decile



Expected detention rates are calculated by comparing defendants to all other defendants with equal bail amounts. Whiskers represent 95% confidence intervals.

## III. Analysis of the Effects of Pretrial Detention

This Part reports results from both a regression analysis and a quasi-experimental analysis of the effects of pretrial detention. The regression analysis yields more generalizable and more precise estimates, but it at least potentially suffers from bias due to failure to fully control for all relevant factors affecting outcomes. The quasi-experiment should address such omitted variable problems. However, both approaches ultimately yield similar conclusions, suggesting the regression analysis may work well when sufficient controls are available.

*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

A. Regression Analysis

To begin to assess the impacts of bail, a series of regression models were estimated where the unit of observation is a case, the outcome is whether the case resulted in conviction, and the primary explanatory variable is a 0/1 indicator for whether a particular defendant was detained pretrial. The models progressively introduce richer and richer sets of control variables to assess the extent to which the measured "effects" of detention might simply be attributable to uncontrolled factors other than detention.[113] As additional controls are added, the estimates may get closer to the true causal estimate. But these estimates are all subject to the limitation that there may be uncontrolled, unobserved factors—such as defendant wealth or quality of evidence—that bias these as estimates of the causal effects of detention.

Table 2 below reports the regression estimates. The first specification reports a coefficient from a bivariate regression with no controls. The baseline conviction rate for those not detained is 56%, so detainees are 23.6 percentage points (or 42%) more likely to be convicted. Specification 2 adds controls for the charged offense along with the age, race, gender, and citizenship status of the defendant. In contrast to prior research, which tends to group crimes into a small number of general categories (for example, "sex offense" or "minor public order offense"), this regression controls for 121 different offense categories representing a wide range of different types and severities of offenses. The only prior study to focus entirely on misdemeanors controlled for 10 offense categories.[114] These additional controls do not dramatically alter the measured relationship between detention and conviction.

Specification 3 adds controls for defendant build, skin color, and nativity and also includes a full set of fixed effects for the zip code of residence. One clear drawback of attempting to measure the effects of pretrial detention through regression modeling is that wealth and socioeconomic status (SES) are strong predictors of case outcomes and seem likely to be correlated with pretrial detention, but they are rarely observed in court data. By including zip code controls, these regression models in essence compare two individuals who come from the same neighborhood but differ in pretrial detention status. While wealth and SES can vary within a zip code, the high degree of

---

113. We do not seek, by this methodology, to measure the effect of any of the variables we progressively introduce. For that purpose, this methodology would be flawed. *See generally* Jonah B. Gelbach, *When Do Covariates Matter? And Which Ones, and How Much?*, 34 J. LAB. ECON. 509, 509-10 (2016) (discussing sequence sensitivity when adding covariates). We simply seek to assess the impact of detention under various specifications of increasing complexity.

114. *See* PHILLIPS, NONFELONY CASES, *supra* note 10, at 76 tbl.B.

socioeconomic segregation that exists in Harris County[115] (as in many urban areas in the United States) suggests that zip codes can be a reasonable proxy for SES.[116] Once again, the additional controls do not dramatically alter the results.

Specification 4 includes indicators for the number of prior misdemeanor and felony charges and convictions as additional controls. Controlling for prior criminal history is important because prior offenses enter directly into the bail schedule and thus have a direct influence on detention. Prior criminal history may also factor into the outcome of the current case, particularly with regard to sentencing. As noted above, the criminal history data only capture criminal justice contacts within Harris County.[117] After conditioning on factors such as citizenship status, nativity, and residence location, however, it seems less likely that patterns of out-of-county offending would differ systematically between those who are detained and those who are released. This suggests that the available controls may be adequate for capturing prior criminal activity. Somewhat surprisingly, controlling for prior criminal activity only modestly reduces the estimated relationship between detention and conviction.

Although individual wealth is not directly observed, one can further proxy for wealth with whether a particular defendant requested appointed counsel, thereby claiming indigence. Specification 5 adds an indigence indicator to the set of control variables. Controlling for this proxy for wealth appreciably reduces the coefficient estimate on detention, but the estimate remains statistically significant and practically large.

Specification 6 adds a full set of indicators for the actual bail amount set. This specification compares individuals who have the same bail set at their hearing—and who are also equivalent across all variables enumerated in prior specifications—but differ in their detention status. Since the amount of cash bail is, at least in theory, supposed to adjust to reflect the risk of flight and threat to public safety, conditioning precisely to the bail amount is akin to comparing individuals only to others whom the court has deemed equally risky. On a conceptual level, comparing individuals with similar court-determined risk is attractive because it means that any subsequent difference in outcomes cannot result from the sorting function of the bail process; the controls completely account for the instrumentality of sorting, which is the

---

115. *See, e.g.*, Harris Cty. Cmty. Servs. Dep't, Program Year 2013-2017: Consolidated Plan 3-25, 3-37 (2013), http://www.csd.hctx.net/PYConsolidatedPlan.aspx (showing substantial amounts of segregation by income and educational attainment in Harris County).

116. Using average zip code wealth as a proxy for individual wealth is a common method when individual-level data are not available. For a more detailed discussion, see Arline T. Geronimus et al., *On the Validity of Using Census Geocode Characteristics to Proxy Individual Socioeconomic Characteristics*, 91 J. Am. Stat. Ass'n 529 (1996).

117. *See supra* Part II.C.

*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

bail amount. In this, the preferred specification, pretrial detention is associated with a 14 percentage point (or 25%) increase in the likelihood of conviction.

*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

**Table 2**

Regression Estimates of the Effect of Pretrial Detention on Conviction

| Specification | |
|---|---|
| 1. | No controls | 0.236** |
| | | (0.001) |
| 2. | Add controls for offense and basic demographics | 0.266** |
| | | (0.002) |
| 3. | Add controls for zip code of residence and other characteristics | 0.255** |
| | | (0.002) |
| 4. | Add controls for prior criminal history | 0.220** |
| | | (0.002) |
| 5. | Add control for a claim of indigence | 0.151** |
| | | (0.002) |
| 6. | Add control for bail amount | 0.140** |
| | | (0.002) |

This table reports coefficient estimates from linear probability regressions estimating the relationship between pretrial detention and whether a misdemeanor defendant is convicted. The unit of observation is a case, and the sample size is 380,689. The dependent variable is an indicator for whether a particular defendant in a case was convicted, and the primary explanatory variable of interest is an indicator for whether the defendant in the case was released pretrial. Each table entry reports a coefficient from a separate regression; coefficients on other control variables are unreported. The mean conviction probability among those not detained was 0.557. Specification 1 is a simple bivariate regression. Specification 2 adds controls for defendant age (85 categories), gender, race (6 categories), citizenship status (3 categories), charged offense (121 categories), and week of case filing (289 categories). Specification 3 adds controls for the defendant's skin tone (14 categories), build (5 categories), whether the defendant was born in Texas, and zip code of residence (223 categories). Specification 4 adds controls for the number of prior misdemeanor and felony charges (10 misdemeanor and 10 felony categories) and convictions (10 misdemeanor and 10 felony categories). Specification 5 adds an indicator for whether a defendant requested appointed counsel due to indigence. Specification 6 adds a full set of initial bail amount fixed effects (315 categories) as additional controls. Because the public defender handles a nonrandom subset of misdemeanors, all regressions with controls include an indicator for cases handled by the public defender. Robust standard errors are reported in parentheses. ** indicates an estimate that is statistically significant at the 0.01 level.

One variable not included in these specifications that might be important is the type of defense representation actually provided (for instance, hired private counsel, public defender, appointed private counsel, or no counsel). It is not included for two reasons: First, it cannot fully control for representation

type because the data do not distinguish between those who hire a private attorney and those who choose to represent themselves.[118] While one can control for whether the defendant receives a court-appointed attorney, this specification is difficult to interpret, as it essentially places those with a hired attorney and those representing themselves in the same category. Second, it might not be optimal to control for counsel type even if the data were available. The type of counsel may itself be an outcome of whether the defendant is detained pretrial; to control for it is thus to ignore one important effect of detention. Changes to detention policy would likely also alter the type of representation received by defendants.[119]

Finally, controlling for counsel type might actually introduce a new source of bias. In general, statistical practice cautions against controlling for variables that are not predetermined (for instance, variables that are influenced by the main variable of interest). The evidence suggests that judges are more likely to approve a request for counsel if the defendant is detained.[120] This suggests that releasees who receive court-appointed attorneys may be poorer and have more challenging cases than detainees with appointed counsel. Thus, controlling for attorney status would tend to bias the results toward zero; instead of comparing similarly situated individuals, one would be comparing relatively wealthy detainees with relatively poor releasees.

Nonetheless, for the sake of completeness, a specification that controls for whether the defendant received a court-appointed attorney was also estimated. The estimated coefficient was 0.042 with a *p*-value < 0.01—a smaller bail/conviction relationship, but one that remains statistically significant and relevant for policy purposes. This is not the preferred specification, however, due to both the data limitations and the difficulties of interpreting the results of a regression that controls for one of the outcomes of pretrial detention.

The basic message from the analysis of conviction is that accounting for preexisting differences in detainees and releasees is important, but even after controlling for a fairly wide range of relevant characteristics, pretrial detention remains a sizeable predictor of outcomes.

---

118. In Harris County, judges will as a rule not proceed in misdemeanor cases without eventually assigning counsel. But in rare cases, defendants insist on representing themselves. *See* E-mail from Alex Bunin to Paul Heaton, *supra* note 77.

119. Detention may also affect attorney type through other channels. Those who have lost their job as a result of detention, for instance, may be less able to afford a private attorney.

120. There is some evidence that judges see the posting of bail as an indication that a defendant is not indigent enough to merit public defense. *See* DePrang, *supra* note 93. In Harris County, 90% of detainee requests for counsel are granted but only 44% of releasee requests, according to the Authors' calculations. This could be because the act of paying bail is interpreted as evidence that the defendant has funds or because detainees are unable to work while detained.

Table 3 below extends the analysis to consider a range of additional case outcomes. The first row of the table replicates the previously reported results for conviction. The columns of the table report results from regressions with no controls, with a limited set of controls (basic offense and demographics, similar to much of the past research measuring the effects of detention), and from the preferred specification that controls for a rich set of defendant and case characteristics and the bail amount (equivalent to Specification 6 in Table 2). Although detention has a sizable impact on all outcomes, estimated effects become smaller as one controls for a richer set of defendant and case characteristics. This indicates that prior research, which controlled for a limited set of variables, may indeed have overestimated the causal effect of detention.

The table demonstrates that nearly all of the difference in convictions can be explained by higher plea rates among those who are detained, with detainees pleading at a 25% (13 percentage points) higher rate than similarly situated releasees. We also find that those detained are more likely to receive jail sentences instead of probation. In our preferred specification, those detained are 43% (17 percentage points) more likely to receive a jail sentence and receive jail sentences that are nine days longer than (or more than double that of) nondetainees. This estimate of the impact of pretrial detention includes in the sample those without a jail sentence, so it incorporates both the extensive effect on jail time (those detainees who, but for detention, would not have received a jail sentence at all) and the intensive effect on jail time (those who would have received a jail sentence regardless but whose sentence may be longer as a result of detention). Those detained are both less likely to receive sentences of probation and receive fewer days of probation (including, once again, both the extensive and intensive margin).

These results do not provide definitive evidence on which of the various potential mechanisms linking detention to case outcomes operate in Harris County. However, the overall patterns in Table 3 are consistent with an environment in which released defendants are able to engage in prophylactic measures—maintaining a clean record, engaging in substance abuse treatment or anger management, or providing restitution—that lead to charges being dismissed and encourage more lenient treatment. Detained defendants, in contrast, have essentially accumulated credits toward a final sentence of jail as a result of their detention and are therefore more likely to accede to and receive sentences of imprisonment.

One can also construct estimates of the effects of detention analogous to those presented in Tables 2 and 3 but limiting the sample to various subsets of the defendant population. Comparing the estimated impact of detention across different subgroups offers a means of assessing whether certain types of defendants are more or less disadvantaged by detention. For example, if one mechanism through which detention induces guilty pleas is causing some

defendants to "pre-serve" their expected sentences so that contesting guilt has little ultimate effect on the amount of punishment, one might expect to see larger effects of detention for offenses where the expected punishment is low.

**Table 3**

Regression Estimates of the Effect of Pretrial Detention on Other Case Outcomes

| Outcome | Average for Those Released | Estimated Effect of Pretrial Detention | | |
|---|---|---|---|---|
| | | No Controls | Limited Controls | Preferred Specification |
| Conviction | 0.557 | 0.236** | 0.266** | 0.140** |
| | | (0.001) | (0.002) | (0.002) |
| Guilty plea | 0.528 | 0.240** | 0.264** | 0.133** |
| | | (0.002) | (0.002) | (0.002) |
| Received jail sentence | 0.402 | 0.348** | 0.317** | 0.172** |
| | | (0.002) | (0.002) | (0.002) |
| Jail sentence days | 7.38 | 18.0** | 15.85** | 8.67** |
| | | (0.10) | (0.10) | (0.12) |
| Received probation | 0.229 | -0.167** | -0.125** | -0.076** |
| | | (0.001) | (0.001) | (0.001) |
| Probation days | 79.9 | -57.5** | -41.2** | -25.3** |
| | | (0.45) | (0.46) | (0.55) |

This table reports coefficient estimates from linear regressions estimating the relationship between case outcomes and whether a defendant was detained pretrial. Each entry represents results from a unique regression. The "limited controls" column reports regressions with controls as in Specification 2 of Table 2, and the "preferred specification" column reports regressions with controls as in Specification 6 of Table 2. The "jail sentence days" and "probation days" outcomes include defendants assigned no jail or probation. ** indicates an estimate that is statistically significant at the 0.01 level. Standard errors are reported in parentheses.

Table 4 below reports such a subgroup analysis. It first considers differences by prior criminal history, comparing defendants with no prior charges in Harris County to those with prior charges. Categorizing by charges rather than convictions accounts for the possibility that some individuals who are charged but later acquitted may have nonetheless accumulated experience with pretrial detention. Several mechanisms suggest that there may be different effects of detention for someone who has never been previously detained. First, those with prior experience in detention may experience less psychological or emotional discomfort because they have a clearer idea of what detention

entails, a sort of acclimation effect.[121] Second, these defendants may experience fewer collateral consequences of detention, either because they have already been labeled as offenders or because they have accumulated experience in dealing with collateral consequences. Finally, those with no prior record may be more likely to receive plea offers that involve low sanctions, increasing their incentives to accept the plea even if innocent.

Table 4 reveals that defendants without prior records are disproportionately affected by detention. Detention has more than twice the effect on conviction for first-time offenders and appreciably increases their likelihood of being given a custodial sentence. Although other explanations are possible, this pattern is consistent with a scenario in which defendants detained for the first time are particularly eager to cut a deal to escape custody as quickly as possible; more experienced defendants, who perhaps have become acclimated to the jail environment or who face more serious consequences of conviction, are less influenced by their detention status. It appears that one consequence of pretrial detention, at least as practiced in Harris County, is that it causes large numbers of first-time alleged misdemeanants to be convicted and sentenced to jail time, rather than receiving intermediate sanctions or avoiding a criminal conviction altogether.

Table 4 demonstrates few differences in outcomes between "whites" and "nonwhites" or between U.S. citizens and noncitizens.[122] Incentives to post bail may be different for noncitizens with immigration detainers, who are often held in custody for immigration purposes even after posting bail.[123] However, the fact that results are similar for citizens and noncitizens suggests that detainers may not be an important omitted variable here.

There is some important heterogeneity in the effects of custody by the primary offense of record. For driving while intoxicated (DWI), for example, detention has little effect on adjudication of guilt—presumably because there is sufficient evidence from alcohol tests in most cases to convict.[124] But there is

---

121. *Cf.* Craig Haney, *The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment*, *in* PRISONERS ONCE REMOVED: THE IMPACT OF INCARCERATION AND REENTRY ON CHILDREN, FAMILIES, AND COMMUNITIES 33, 37-38 (Jeremy Travis & Michelle Waul eds., 2003) (discussing acclimation to incarceration).

122. As noted above, *see supra* Part II.C, the race and citizenship designations in the Harris County data may not be wholly reliable.

123. *See* Lena Graber & Amy Schnitzer, Nat'l Immigration Project of the Nat'l Lawyers Guild, The Bail Reform Act and Release from Criminal and Immigration Custody for Federal Criminal Defendants 1 (2013), https://nationalimmigrationproject.org/PDFs/practitioners/practice_advisories/crim/2013_Jun_federal-bail.pdf.

124. *See* TEX. OFFICE OF COURT ADMIN., ANNUAL STATISTICAL REPORT FOR THE TEXAS JUDICIARY: FISCAL YEAR 2014, at 72 (2015), http://www.txcourts.gov/media/885306/Annual-Statistical-Report-FY-2014.pdf (showing that DWI has the highest rate of

*footnote continued on next page*

evidence that those who are not detained are much more readily able to substitute probation for a custodial sentence. The largest effects on conviction accrue for assault and trespassing, two crimes for which physical evidence may be lacking and the ability to obtain statements from witnesses in court may play an important role.[125]

Consistent with the evidence for defendants of varying criminal history, when examining subsets of the defendant population based on assigned bail, the most substantial effects are observed for those with low bail, at least for conviction and type of sentence. Effects on sentence length are largest in absolute terms for those with higher bail amounts, but this is perhaps unsurprising because these defendants face more serious sentences overall. Detention has a greater *relative* effect on sentence length for people with low bail, given their shorter average sentence lengths. One implication of these patterns is that Harris County could potentially achieve much of the benefit of liberalizing access to pretrial release by focusing on those with the lowest bail amounts, which may make reform more politically feasible. This may also be true in other jurisdictions similar to Harris County.

Finally, the effects of bail by zip code wealth quartile were analyzed to determine whether those detained from wealthier zip codes fare as badly in their case outcomes as those from poorer zip codes. Although Table 4 shows that those from the poorest areas of the county are much more likely to be detained, the effects of detention itself are fairly uniform across the wealth distribution. Thus, those who cannot post bond suffer higher conviction rates and a lowered likelihood of probation versus jail even when they come from more affluent parts of the county.

---

guilty pleas and the highest conviction rate across all categories of misdemeanors in the state).

125. Stevenson observes similar patterns in her Philadelphia data. *See* Stevenson, *supra* note 35, at 21-22, 43 fig.4a (showing that effect sizes are largest among case types where evidence tends to be weaker).

*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

**Table 4**

Estimated Effects of Pretrial Detention for Population Subgroups

| | Group | Group Detention Date | Conviction | Sentenced to Jail? | Jail Sentence (Days) | Sentenced to Probation? | Probation Sentence (Days) |
|---|---|---|---|---|---|---|---|
| **Criminal history** | No prior charges | 0.384 | 0.195** (0.003) | 0.213** (0.003) | 7.07** (0.126) | -0.084** (0.003) | -23.6** (0.909) |
| | Prior charges | 0.634 | 0.092** (0.002) | 0.128** (0.002) | 9.44** (0.177) | -0.057** (0.001) | -23.0** (0.677) |
| **Citizenship** | U.S. citizen | 0.514 | 0.145** (0.002) | 0.163** (0.002) | 8.24** (0.137) | -0.064** (0.002) | -19.9** (0.630) |
| | Noncitizen | 0.586 | 0.114** (0.004) | 0.178** (0.004) | 9.50** (0.219) | -0.099** (0.003) | -36.4** (1.12) |
| **Race** | White | 0.481 | 0.143** (0.002) | 0.184** (0.002) | 9.63** (0.156) | -0.085** (0.002) | -29.6** (0.784) |
| | Nonwhite | 0.603 | 0.132** (0.003) | 0.148** (0.003) | 7.12** (0.173) | -0.058** (0.002) | -16.5** (0.728) |
| **Offense** | Drug | 0.464 | 0.150** (0.004) | 0.143** (0.004) | 5.31** (0.142) | -0.033** (0.003) | -7.34** (0.868) |
| | DWI | 0.309 | 0.034** (0.004) | 0.224** (0.005) | 13.22** (0.331) | -0.190** (0.005) | -82.8** (2.35) |
| | Assault | 0.597 | 0.215** (0.007) | 0.210** (0.007) | 15.51** (0.528) | -0.046** (0.005) | -12.3** (2.11) |
| | Theft | 0.592 | 0.151** (0.005) | 0.132** (0.005) | 5.26** (0.245) | -0.094** (0.004) | -23.1** (1.48) |
| | Trespassing | 0.809 | 0.196** (0.008) | 0.229** (0.008) | 8.04** (0.409) | -0.047** (0.004) | -12.5** (1.30) |
| **Bond amount** | $0-$500 | 0.353 | 0.179** (0.003) | 0.198** (0.003) | 5.75** (0.109) | -0.082** (0.003) | -2.88** (1.02) |
| | $501-$2500 | 0.464 | 0.146** (0.003) | 0.173** (0.003) | 8.42** (0.180) | -0.075** (0.002) | -24.2** (0.975) |
| | $2501+ | 0.704 | 0.085** (0.003) | 0.128** (0.003) | 10.92** (0.265) | -0.053** (0.002) | -25.3** (0.855) |
| **Zip code income quartile** | 1st quartile | 0.597 | 0.131** (0.004) | 0.175** (0.004) | 9.13** (0.267) | -0.087** (0.003) | -29.6** (1.07) |
| | 2d quartile | 0.550 | 0.127** (0.004) | 0.166** (0.004) | 8.61** (0.261) | -0.084** (0.003) | -27.8** (1.14) |
| | 3d quartile | 0.495 | 0.148** (0.004) | 0.170** (0.004) | 8.25** (0.230) | -0.069** (0.003) | -21.9** (1.17) |
| | 4th quartile (highest) | 0.423 | 0.158** (0.004) | 0.168** (0.004) | 8.32** (0.238) | -0.053** (0.003) | -16.9** (1.37) |

This table reports coefficient estimates from linear regressions estimating the relationship between case outcomes and whether a defendant was detained pretrial for subgroups of the defendant population. Each entry represents results from a unique regression. Controls are as in Specification 6 of Table 2. ** indicates

*Downstream Consequences*
69 Stan. L. Rev. 711 (2017)

that the estimate is statistically significant at the 0.01 level. Standard errors are
reported in parentheses.

### B.   Natural Experiment

The preceding analysis indicates that even after controlling for a wide
range of defendant and case characteristics, including bail amount (which
should capture the information observed by the court when making bail
decisions), there remains a large gap in case outcomes between those who are
detained and observationally similar defendants who make bail. Nevertheless,
it remains possible that some of the differences in outcomes revealed thus far
reflect unobserved factors other than pretrial detention that were not
controlled for in the regression analysis.

From a purely research perspective, the ideal approach to estimating the
causal effect of pretrial detention would be to randomly select a subset of
defendants, detain them, and then compare their downstream outcomes with
those who were not detained. Random assignment to detention status would
help ensure that the two groups were otherwise comparable on other factors
that might influence outcomes, including culpability. As a practical matter,
however, implementing such an experiment would be unethical.

Absent the ability to run a true experiment, one might seek to identify a
naturally occurring "experiment" or some situation that causes pretrial
detention to vary across different defendants for reasons unrelated to their
underlying characteristics or culpability. Comparing outcomes among those
more likely to be detained for such idiosyncratic reasons to those less likely to
be detained could offer another measure of the effects of detention.

The next analysis compares defendants with bail hearings earlier in the
week to those with hearings later in the week as a sort of natural experiment,
under the theory that those with bail set later in the week are more likely to
actually make bail. This analysis is limited to bail hearings that occur Tuesday
through Thursday so as to focus on a set of days with fairly uniform crime
patterns and avoid comparisons between crime occurring on the weekends—
which tends to involve different types of actors and activities—and crime
occurring on weekdays.[126]

Table 5 below helps illustrate the logic behind this natural experiment,
reporting the time elapsed between the bail hearing and posting of bond for

---

126. The similarity of cases between Tuesday and Thursday can be seen in Table 6, and the
differences between midweek and weekend crimes are from the Authors' calculations
using Harris County data.

those who successfully make bail. The first forty-eight hours following the bail hearing appear to be a fairly critical period for making bail, as 77% of all those who eventually make bail do so during this period. Put differently, at the time of the bail hearing, a representative defendant has a 44% chance of being detained until judgment, but after two days have elapsed without yet making bail, the chances of never making bail have risen to 75%.

**Table 5**

Time Elapsed Between Bail Bond Hearing and Release for Misdemeanor Defendants Posting Bond in Harris County, Texas

|                | Number of Defendants | Percent of Defendants |
|----------------|----------------------|-----------------------|
| Same day       | 107,327              | 50.30%                |
| 1 day later    | 50,191               | 23.52%                |
| 2 days later   | 7598                 | 3.56%                 |
| 3 days later   | 3794                 | 1.78%                 |
| 4 days later   | 2867                 | 1.34%                 |
| 5 days later   | 2493                 | 1.17%                 |
| 6 days later   | 2103                 | 0.99%                 |
| 7 days later   | 1930                 | 0.90%                 |
| > 7 days later | 35,088               | 16.44%                |

Typically, defendants rely on friends or family members to either post cash bail at a predetermined facility[127] or visit a bail bonding company, which then posts a surety bond. The premise behind the natural experiment is that it is easier to get ahold of someone who is willing to show up to post bail on the weekend than during the week. As an example, consider a defendant with a Tuesday bail hearing who then must get in contact with someone to post bail. Family members or friends may be reluctant to disrupt school or work schedules to come to the bail facility and post bond, and they may be more difficult to contact if they are at work or otherwise away from home. A similarly situated defendant with a bail hearing on a Thursday, in contrast, may have an easier time getting ahold of someone who is willing to appear to post bail since the acquaintance could more easily do so on a Saturday.

An additional factor that may contribute to a defendant's ability to make bail is liquidity. Because bail must be paid in cash or cash equivalents (cashier's

---

127. In Harris County, this is the correctional office complex located at 49 San Jacinto Street in Houston. *See Inmate Bonding Process*, HARRIS COUNTY SHERIFF'S OFF., http://www.sheriff.hctx.net/JailInfo/inmate_info_inmate_bondingprocess.aspx (last visited Mar. 3, 2017).

check or money order) in Harris County,[128] to the extent access to cash varies over the course of the week, this is likely to affect access to pretrial release. Many workers are paid on Friday, and so workers may have more ready access to cash on weekends immediately after being paid than at other times during the week.[129] Thus, this liquidity channel might also explain why those with bail hearings closer to the weekend could be more likely to make bail.

Figure 5 below provides evidence that weekend availability may indeed be a constraint affecting pretrial release by comparing the distribution of bail hearing dates over the course of the week with the dates on which defendants actually post bond. If it were equally easy to get a friend to post bond on any day of the week, one might expect the distribution of release days to closely mirror the distribution of bail hearings. In actuality, however, the figure reveals that releases are disproportionately more likely on Saturdays and Sundays and less likely in the middle of the week. While other factors certainly influence the patterns shown in Figure 5, this simple comparison suggests that it may be easier to obtain release if the critical forty-eight-hour period when pretrial releases most often occur overlaps with a weekend.

---

128. *See id.*

129. Figure A.1 in the Appendix below provides direct evidence for this point by plotting Google search volume for the terms "payday," "check cashing," and "payday loans" by day of the week. Search volume for "payday" peaks on Friday, and demand for check-cashing services is highest on Friday, Saturday, and Sunday. Searches for "payday loans" show a reverse pattern, with the lowest search traffic observed on Saturdays and Sundays. Payday loans are typically provided by outlets similar to those offering check-cashing services.

*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

**Figure 5**
Comparison of Timing of Bail Hearings Versus Timing of Release by Day of Hearing



The basic premise underlying this natural experiment is that defendants with bail hearings on Thursdays should be largely similar to those with bail hearings on Tuesdays and Wednesdays, including in underlying culpability, but Thursday defendants may be more likely to make bail simply because there is an upcoming weekend when family or a friend can more easily appear with the cash necessary to post bail. Table 6 below explores this possibility by comparing the average characteristics of defendants with bail hearings held on Tuesday, Wednesday, and Thursday and reports results from tests designed to assess whether there is a statistically significant difference across the three groups of defendants in the listed characteristics. Because there is abundant evidence that the composition of offenses varies by day of the week[130] and differences in the charged offense could legitimately affect pretrial detention, the comparisons in Table 6 control for the underlying offense, which is

---

130. *See, e.g.,* Gerhard J. Falk, *The Influence of the Seasons on the Crime Rate,* 43 J. CRIM. L. & CRIMINOLOGY 199, 212 (1952); Marcus Felson & Erika Poulsen, *Simple Indicators of Crime by Time of Day,* 19 INT'L J. FORECASTING 595, 596 (2003); Chief Justice Earl Warren Inst. on Law & Soc. Policy, When and Where Does Crime Occur in Oakland?: A Temporal and Spatial Analysis (January 2008-July 2013), at 5 (2014), https://www.law.berkeley.edu/files/When_and_Where_Does_Crime_Occur_in_Oakland.pdf.

*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

conceptually equivalent to comparing defendants charged with the same offense who appear at bail hearings on different days.

**Table 6**

Average Characteristics of Defendants by Day of Bail Hearing

|  | **Tuesday** | **Wednesday** | **Thursday** | **p-Value** |
|---|---|---|---|---|
| Amount of bail | $2297 | $2300 | $2297 | 0.945 |
| Pretrial release | 40.6% | 41.8% | 44.2% | 0.000 |
| Class A misdemeanor | 31.1% | 31.1% | 31.1% | 0.916 |
| Male | 75.3% | 74.9% | 75.2% | 0.159 |
| Age (years) | 30.7 | 30.7 | 30.7 | 0.809 |
| Black | 43.1% | 44.0% | 44.3% | 0.000 |
| Citizen | 76.2% | 76.0% | 76.1% | 0.822 |
| Height (in.) | 67.8 | 67.8 | 67.8 | 0.576 |
| Weight (lbs.) | 164.8 | 164.7 | 164.9 | 0.573 |
| Born in Texas | 46.0% | 46.0% | 46.3% | 0.495 |
| Dark complexion | 20.7% | 20.8% | 21.2% | 0.212 |
| Prior misdemeanor charges | 1.90 | 1.91 | 1.90 | 0.476 |
| Prior misdemeanor convictions | 1.63 | 1.65 | 1.63 | 0.407 |
| Prior felony charges | 1.05 | 1.06 | 1.04 | 0.272 |
| Prior felony convictions | 0.83 | 0.84 | 0.82 | 0.109 |
| Requested appointed counsel | 55.2% | 54.6% | 53.6% | 0.000 |

Reported *p*-values are *p*-values from statistical tests of the null hypothesis that the characteristics listed in each row do not vary on average across all three days of the week. Averages are calculated controlling for underlying offense, so Class A misdemeanor rates are equal by design.

Table 6 suggests a remarkable degree of similarity among defendants with bail hearings on Tuesdays, Wednesdays, and Thursdays across a broad range of case and offender characteristics. While for a few characteristics (including race and appointed counsel request) there are statistically significant differences due to the large sample, the sizes of these differences are quite small. Importantly, as demonstrated in the first row of the table, the actual bail amounts set for these different groups are statistically and practically the same on average, and, as shown in Appendix Figure A.2, the entire distribution of bail amounts is in fact virtually unvarying across day of bail hearing. These patterns provide strong evidence that courts view these three sets of defendants as identical in terms of their worthiness for pretrial release. However, the second row of the table demonstrates that, despite being assessed

the same bail amounts, defendants with hearings on Thursday are about 3.6 percentage points (or 9%) more likely to make bail than those with hearings on Tuesday. This difference seems likely attributable to ease in producing cash for bail, which may be greater on weekends for the reasons described above. Because the convenience of paying bail is likely unrelated to a defendant's underlying culpability, the weekend effect shown in Figure 5 offers a plausible source of variation in pretrial detention that might be used to measure its causal effect.[131]

The main results from the analysis based on the natural experiment are presented in Table 7 below. For reference in gauging the magnitude of pretrial detention's impacts, the first column reports the average outcome among defendants released pretrial. The second column reports coefficient estimates from ordinary regressions similar to those presented previously, where the offense, defendant demographics, zip code, prior criminal history, indigence status, and bail amount have been controlled. These estimates differ from those presented in the third column of Table 3 only because the sample for this analysis is restricted to the subset of defendants with bail hearings on Tuesday, Wednesday, or Thursday. The final column reports effects as measured by the natural experiment, which are estimated using two-stage least squares in an instrumental variables (IV) framework.[132]

Several patterns in the table are notable. The natural experiment/IV estimates are large, almost all statistically significant, and, consonant with the regression results, indicate that pretrial detention greatly influences case outcomes. As a general matter, the IV point estimates indicate larger effects of pretrial detention than the regression estimates, suggesting that the estimates presented earlier, to the extent they imperfectly capture the causal effect of pretrial detention due to inability to control for all relevant factors, may in fact

---

131. One might wonder why defendants arrested on Tuesday do not simply wait until the weekend to post bail and get out. There are several possible explanations. It may be that for those who lose jobs or suffer other major life disruptions as the result of pretrial detention, the damage is done within the first few days and spending money on bail thus offers diminishing returns (especially if the money will go to a bail bondsman). Moreover, for a crime with an expected punishment of a few days' imprisonment, a quick guilty plea may become relatively more attractive after a few days than posting bail.

132. Two-stage least squares is a regression-based approach for measuring the effect of an explanatory variable (here, detention) on an outcome, controlling for other factors, that relies on an "instrument" (here, day of week of bail hearing) that shifts the explanatory variable but is thought to be otherwise unrelated to the outcome. By only exploiting variation in the explanatory variable that arises due to the instrument—which may be less prone to incorporating the influences of unobserved, confounding factors—this approach is designed to deliver better causal estimates. *See* JOSHUA D. ANGRIST & JÖRN-STEFFEN PISCHKE, MOSTLY HARMLESS ECONOMETRICS: AN EMPIRICIST'S COMPANION 113-216 (2009).

understate its effects. Such understatement could occur if, for example, defendants who have spent their funds paying bail are less able to afford a high-quality private attorney than a similarly situated (from the same zip code, charged with the same crime, et cetera) individual who did not pay bail. For all of the outcomes except jail days, however, the difference between the natural experiment and regression estimates is not statistically significant. This suggests that the regression approach yields reasonable causal estimates when sufficient controls are available.

**Table 7**

Effects of Pretrial Detention Based on the Natural Experiment

| Outcome | Average for Those Released | Estimated Effect of Pretrial Detention | |
| --- | --- | --- | --- |
| | | Regression with Controls | Natural Experiment |
| Conviction | 0.542 | 0.122** | 0.204** |
| | | (0.003) | (0.077) |
| Guilty plea | 0.510 | 0.116** | 0.234** |
| | | (0.003) | (0.078) |
| Received jail sentence | 0.410 | 0.142** | 0.227** |
| | | (0.003) | (0.078) |
| Jail sentence days | 7.5 | 7.33** | 19.3** |
| | | (0.18) | (5.39) |
| Received probation | 0.214 | -0.067** | -0.124* |
| | | (0.002) | (0.058) |
| Probation days | 71.2 | -2.2** | -42.3 |
| | | (0.81) | (22.1) |

This table reports coefficients from ordinary least squares (column two) and IV (column three) regressions measuring the effect of pretrial detention on the listed outcome. In the IV regressions, the instrument is whether the bail hearing occurred on Tuesday, Wednesday, or Thursday; the unreported first-stage effect is in the expected direction and highly significant. Controls are as in Specification 6 of Table 2. Each reported estimated effect is from a unique regression. The sample size is 146,078, and the sample is limited to defendants with bail hearings on Tuesday, Wednesday, or Thursday. * indicates that the estimate is statistically significant at the 0.05 level. ** indicates that the estimate is statistically significant at the 0.01 level. Standard errors are reported in parentheses.

The natural experiment is not without drawbacks. The underlying assumption of the natural experiment—that those with Thursday bail hearings would have had similar case outcomes to those with Tuesday or Wednesday

*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

bail hearings were it not for their enhanced access to pretrial release—is not directly testable. Moreover, because the absolute difference in detention rates across the Tuesday, Wednesday, and Thursday groups is relatively modest—about 4 percentage points—to the extent that there are remaining uncontrolled, unobserved differences across the groups, even small ones, such differences could be the true causal source of what appear to be detention effects. Additionally, although the natural experiment does deliver statistically significant estimates, the confidence intervals on these estimates are much larger. This means that this approach allows us to make less definitive claims about the magnitude of the relationship between detention and outcomes. Thus, the results of this analysis are probably best interpreted as providing evidence that, after including a fairly rich set of controls, regression estimates approximate causal estimates of the effects of detention, and any remaining biases that may exist seem unlikely to fundamentally alter the conclusion that pretrial detention has significant adverse downstream consequences.

C.   Future Crime

In addition to the impacts in the immediate case, pretrial detention carries the potential to affect later criminal activity. Given that a primary policy purpose of pretrial detention is to enhance public safety, such downstream effects—to the extent they exist—should be an important component of any bail assessment.[133] Unfortunately, rigorous estimates of the downstream crime effects of pretrial detention are relatively uncommon in the existing empirical work on bail. This Subpart presents new estimates of the impact of misdemeanor detention on future crime in Harris County.

Downstream crime effects might occur through several mechanisms. Some of these mechanisms would reduce future offending. Most directly, pretrial detention generates an incapacitation effect over the period of pretrial custody. Thus, at least in the immediate period following arrest, detainees should commit fewer crimes than similarly situated releasees simply due to the fact that they are in custody. Second, the experience of being detained might change offender perceptions of the disutility of confinement. To the extent offenders discover that confinement is worse than expected, this could enhance the deterrent effect of criminal law. This mechanism seems more likely to operate for first-time offenders or those with relatively little prior experience with confinement. Lastly, if pretrial detention increases the conviction rate (as the prior analysis suggests) and a prior conviction increases the possible sanctions for additional crime, pretrial detention may augment the expected sanction following a new crime, which would also enhance deterrence.

---

133. For a discussion of the constitutional dimensions of this point, see Part IV below.

Other mechanisms would increase future offending (or arrests). If detention teaches offenders that confinement is less unpleasant than anticipated, it could reduce deterrence. Detention may also lead to job loss, disrupted interpersonal relationships, or other collateral consequences that change the relative attractiveness of crime in the future.[134] To take a simple example: if a detained defendant loses her job, acquisitive criminal activities such as larceny or robbery might become comparatively more attractive as a means of making up for lost income. Pretrial detainees may also make new social ties or learn new skills through their interactions with other jail inmates that change their propensity for crime.[135] Detention could also paradoxically lower expected sanctions for future crime if detention leads defendants to substitute custodial sentences for probation, because those on probation would face a supervision period where additional crime would trigger punishment for not only the new but also the prior offense. Finally, pretrial detention might alter the probability that future behavior is labeled by the criminal justice system as worthy of sanction. For instance, imagine that Defendant *A* is detained pretrial and then pleads guilty, while similar Defendant *B* is released, enrolls in a treatment program, and ultimately has the charge dismissed. Both are arrested in the future on allegations that the prosecutor views as presenting a marginal case. The prosecutor pursues charges against Defendant *A* because he has a prior conviction but not against Defendant *B*, who does not.

Given that these various potential mechanisms cut in opposite directions, it is not apparent on a theoretical level whether pretrial detention should increase or decrease future crime. This is thus an empirical question of considerable import. To measure recidivism, new charges for each defendant filed during the eighteen months following his or her initial misdemeanor bail hearing were examined. Future crime was measured relative to the date the bail hearing occurred rather than the date the case ended because released defendants' cases take considerably longer to clear than those of detained defendants.[136] Waiting until a case is resolved to start the clock would compare

---

134. *See supra* note 12 and accompanying text (discussing the collateral consequences of detention).

135. *See, e.g.*, Patrick Bayer et al., *Building Criminal Capital Behind Bars: Peer Effects in Juvenile Corrections*, 124 Q.J. ECON. 105, 108 (2009); Megan Stevenson, Breaking Bad: Mechanisms of Social Influence and the Path to Criminality in Juvenile Jails 3 (Oct. 12, 2015) (unpublished manuscript), http://ssrn.com/abstract=2627394 (presenting evidence of peer effects in juvenile incarceration facilities).

136. Unsurprisingly, the cases of defendants in detention tend to resolve much more quickly. For detained defendants, the median time to first judgment is 3 days, and 80% of defendants have their cases resolved within 18 days. For those who make bond, the median time to first judgment is 125 days. These large disparities are also apparent among defendants charged with the same offense. (These statistics are from the Authors' own calculations.)

released defendants months or in some cases even years after their initial arrest to detained defendants in the days and weeks after their arrest. The recidivism analysis was conducted using conventional regression modeling and continues to adjust for offense, defendant demographics, prior criminal record, zip code of residence, indigence, public defender representation, and time and court of adjudication.[137] Misdemeanor and felony charges were considered separately, and charges were measured cumulatively.

An important feature of this analysis is that, as before in the preferred specification, it fully controls for the bail amount assessed at the bail hearing. This means it compares detained defendants to similarly situated released defendants who were assigned the same bail. As a general matter, one might expect higher recidivism among those who are detained relative to those who are released simply as a result of the correct operation of the bail process. In particular, if the government is correctly assessing defendant risk, higher risk defendants (who will ultimately commit more crime) should be detained more often. This analysis, however, compares two defendants whom the bail process has determined to be of equal risk because their bail was set identically. Thus, the impacts documented here already net out any effects that might reflect the differential sorting of defendants through the bail system.

Figure 6 below plots results from a series of regressions where the outcome is the number of new misdemeanors recorded between the bail hearing and some number of days post-hearing. The actual average number of offenses for the released population is depicted in the figure along with the adjusted rate for the detained population. This adjusted rate is calculated by estimating regressions similar to those in Specification 6 of Table 2 but with new offenses as the outcome and then adding the resultant estimate for the effect of pretrial detention to the actual offending rate for releasees. This, in essence, depicts what the expected misdemeanor offending rate would be for the detainees if they were similar in demographics, case characteristics, prior criminal history, and all other relevant characteristics to the released population. Figure 6 includes bars denoting the 95% confidence intervals for the adjusted rates and shows impacts through the first thirty days post-hearing. The figure demonstrates a steady rise in the number of new charges for both groups over time. This increase over time is a direct consequence of the choice to define the outcome as the cumulative number of new charges. For the first nineteen days after the bail hearing, the incidence of misdemeanors for detainees is below that of releasees, which likely reflects criminal incapacitation from being in

---

137. We explored applying the natural experiment to recidivism outcomes, but the results, while not inconsistent with the results reported in this Article, were insufficiently precise to provide useful guidance. For example, the instrumental variables estimates implied that detention increases felonies committed as of eighteen months after the bail hearing by 15%, but the 95% confidence interval for this estimate was -59% to 219%.

jail. These differences are statistically significant through day thirteen. By day thirty, however, there is a statistically significantly higher incidence of misdemeanors among the detained population. Thus, despite the initial incapacitation, by one month after the hearing the average number of new charges for detainees has exceeded that of their similarly situated counterparts who were released. To the extent that the rich set of controls allows one to construe these differences as causal, they suggest that pretrial detention has a greater criminogenic than deterrent effect.

Figure 7 below plots similar differences between releasees and detainees in misdemeanor crime but expands the time window to a full eighteen months after the bail hearing. Throughout this later period, the disparity between detainees and releasees remains statistically significant and practically large. Table A.1 in the Appendix below, which reports the numeric estimates underlying Figure 7, shows that the gap between detainees and those released stabilizes at about one year post-hearing and represents a roughly 22% increase in misdemeanor crime associated with detention.

*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

**Figure 6**
New Misdemeanor Charges by Pretrial Release Status During the First Thirty Days
After the Bail Hearing



**Figure 7**

New Misdemeanor Charges by Pretrial Release Status During the First Eighteen
Months After the Bail Hearing



Figure 8 below depicts similar estimates, this time focusing on felonies and considering the time window from 0 to 100 days post-hearing. For felony offending, incapacitation effects from detention appear somewhat longer lasting, with detainees overtaking releasees only after several months. By three months post-hearing, however, there is a statistically significant positive effect of detention on felony offending.

Figure 9 below, which extends the analysis to a full eighteen months after the bail hearing, demonstrates continued heightened felony offending for those who are detained compared to similarly situated releasees. Table A.2 in the Appendix below, which reports the estimates used to construct Figures 8 and 9, demonstrates that the offending gap appears to stabilize toward the end of the sample period, with detainees committing nearly a third more felonies. By eighteen months after the conviction, a group of 100 detained defendants would be expected to have committed about four additional felonies as compared to an observationally similar group of 100 released defendants.

*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

**Figure 8**
New Felony Charges by Pretrial Release Status During the First One Hundred Days
After the Bail Hearing



*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

**Figure 9**

New Felony Charges by Pretrial Release Status During the First Eighteen Months
After the Bail Hearing



The notion that pretrial detention might actually increase future crime is consistent with recent research that suggests incarceration might itself be criminogenic. A paper by Michael Mueller-Smith, also set in Harris County, uses a research design that leverages random assignment to judges to estimate the causal effect of incarceration on future crime.[138] He finds that incarceration for misdemeanor defendants—who are in jail for a median of ten days following the filing of charges—leads to a 6.0 percentage point increase in the likelihood of being charged with a new misdemeanor and a 6.7 percentage point increase in the likelihood of being charged with a new felony.[139] These

---

138. Michael Mueller-Smith, The Criminal and Labor Market Impacts of Incarceration 2 (Aug. 18, 2015) (unpublished manuscript), http://sites.lsa.umich.edu/mgms/wp -content/uploads/sites/283/2015/09/incar.pdf.

139. *Id.* at 24-27 (showing that in the quarter during which the misdemeanor defendant was in jail—the average jail time being only a tiny fraction of the quarter—there is a 4.6% increase in new misdemeanor charges and a 6.4% increase in new felony charges). Added to these are the average quarterly increases in new misdemeanor and felony charges of 1.4% and 0.3%, respectively. *Id.* at 27 tbl.5.

*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

estimates are not dissimilar to those presented here, although the timing of the effects is somewhat different. Mueller-Smith finds most of the effect within the first three months after charges are filed, while this Article finds a larger effect somewhat further out.[140]

Stakeholders' assessment of the cost of increased crime from pretrial detention may depend in part on whether the increase represents individuals shifting into offending who otherwise would have maintained a clean record or more intensive offending by individuals who would have accumulated charges in any case. To address this question, Table 8 below reports estimates from regressions analogous to those used to produce Figures 6-9 that use an indicator variable for whether a particular defendant had any future charges as the outcome variable of interest. These regressions assess whether some individuals who would not have been expected to offend later if released do so after being detained.

Table 8 reveals that detention increases the share of defendants charged with new misdemeanors by 9.7% as of eighteen months post-hearing. Over the same period, the likelihood of any future felony charges increases by 32.2%. Comparing this eighteen-month estimate for felonies in Table 8 to the eighteen-month estimated effect on the total count of crimes reported in Table A.2 (30.9%) reveals that essentially all of the increase in felony offending can be explained by an increase in the number of individuals accumulating new felony charges. This suggests that detention has broad effects, shifting many defendants who would have avoided future criminal behavior (at least as captured by charges in Harris County) into further contact with the criminal justice system.

---

140. *See id.* at 26; *see also* Anna Aizer & Joseph J. Doyle, Jr., *Juvenile Incarceration, Human Capital, and Future Crime: Evidence from Randomly Assigned Judges*, 130 Q.J. ECON. 759, 763 (2015) (finding that incarceration has a criminogenic effect); Rafael Di Tella & Ernesto Schargrodsky, *Criminal Recidivism After Prison and Electronic Monitoring* 4 (Nat'l Bureau of Econ. Research, Working Paper No. 15602, 2009), http://www.nber.org/papers/w15602.pdf (finding the same). Other papers, however, concluded that incarceration is not in fact criminogenic. *See, e.g.*, Charles E. Loeffler, *Does Imprisonment Alter the Life Course?: Evidence on Crime and Employment from a Natural Experiment*, 51 CRIMINOLOGY 137, 154 (2013).

**Table 8**
Effects of Pretrial Detention on Likelihood of Reoffending

| Crime Type | Follow-Up Time Since Bail Hearing | Fraction of Released Defendants with New Charges | Estimated Effect of Pretrial Detention | Percent Increase |
|---|---|---|---|---|
| Misdemeanor | Thirty days | 0.018 | 0.0024** (0.0006) | 13.7 |
| | One year | 0.152 | 0.0146** (0.0015) | 9.6 |
| | Eighteen months | 0.193 | 0.0186** (0.0017) | 9.7 |
| Felony | Thirty days | 0.009 | -0.0013** (0.0004) | -15.1 |
| | One year | 0.066 | 0.0209** (0.0012) | 31.5 |
| | Eighteen months | 0.088 | 0.0285** (0.0013) | 32.2 |

This table reports coefficients from regressions measuring the effect of pretrial detention on the likelihood defendants are charged with new crimes at various follow-up periods post-bail hearing. Controls are as in Specification 6 of Table 2. Each reported estimated effect is from a unique regression. The sample size is 352,573. * indicates that the estimate is statistically significant at the 0.05 level. ** indicates that the estimate is statistically significant at the 0.01 level. Standard errors are reported in parentheses.

These differences in recidivism are important from a policy perspective. To the extent the estimates identified in this Article can be construed as causal, they suggest that a representative group of 10,000 misdemeanor offenders who are released pretrial would accumulate 2800 new misdemeanor charges and roughly 1300 new felony charges in Harris County in the eighteen months after their release. If this same group were instead detained, they would accumulate 3400 new misdemeanors and 1700 felonies over the same time period—an increase of 600 misdemeanors and 400 felonies. While pretrial detention clearly exerts a protective effect in the short run, for misdemeanor defendants it may ultimately serve to compromise public safety.

## IV. Constitutional Implications

The results reported here are relevant to an array of constitutional questions. As the Supreme Court has affirmed, "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."[141] Whether or not that remains true as a descriptive matter, it remains the aspiration of the law. The constitutional principles that serve to safeguard pretrial liberty include the Sixth Amendment right to counsel,[142] the Eighth Amendment prohibition on excessive bail,[143] due process,[144] and equal protection.[145] The effects of pretrial detention should inform constitutional analysis in each of these arenas.[146]

This Article is limited, of course, to a particular dataset. It does not support generalization about the downstream effects of pretrial detention in all times and places and for all people. But it adds further evidence to the body of literature finding that pretrial detention causally affects conviction and future crime rates. This Part synthesizes the constitutional implications of such effects in Harris County and wherever else they might exist.

### A. Equal Protection/Due Process: Does Pretrial Detention Produce Class-Based Case Outcomes?

To begin with, the Harris County data and results illustrate the extent to which the Harris County pretrial system produces disparate outcomes for the poor and the wealthy. The principle of equal protection (as applied to the states

---

141. United States v. Salerno, 481 U.S. 739, 755 (1987).

142. *Id.* amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, . . . and to be informed of the nature and cause of the accusation . . . , and to have the Assistance of Counsel for his defence.").

143. *Id.* amend. VIII ("Excessive bail shall not be required . . . .").

144. *Id.* amend. V ("No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ."); *id.* amend. XIV, § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . .").

145. *Id.* amend. XIV, § 1 ("[N]or shall any State . . . deny to any person within its jurisdiction the equal protection of the laws."); Bolling v. Sharpe, 347 U.S. 497, 499 (1954) (reading the equal protection principle into the Fifth Amendment Due Process Clause).

146. The Fourth Amendment also protects pretrial liberty. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."); *see also* Gerstein v. Pugh, 420 U.S. 103, 125 n.27 (1975) ("The Fourth Amendment was tailored explicitly for the criminal justice system, and its balance between individual and public interests always has been thought to define the 'process that is due' for seizures of person or property in criminal cases, including the detention of suspects pending trial.").

by the Fourteenth Amendment[147] and to the federal government by the Fifth Amendment, as a component of due process[148]) prohibits invidious or irrational state discrimination.[149] As a general matter, a claimant must show intentional or facial discrimination in order to prevail on an equal protection claim.[150] When a person's liberty is at stake, however, the Supreme Court has held that conditioning liberty on payment of an amount she cannot afford violates due process and equal protection.[151] More precisely, the Court has prohibited detention for inability to pay a monetary amount unless there are no other means that can meet the state's interests.[152]

Bail schedules have recently drawn criticism—and litigation—for conditioning liberty on a fixed monetary amount. Since 2015, a nonprofit organization called Equal Justice Under Law has challenged the use of money bail schedules in ten jurisdictions on the ground that such schedules, if implemented without consideration of defendants' financial status, violate the Equal Protection and Due Process Clauses.[153] The organization has filed one such lawsuit in Harris County.[154] As of this writing, the Department of Justice

147. U.S. CONST. amend. XIV, § 1 ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws.").

148. *Id.* amend. V ("No person shall . . . be deprived of life, liberty, or property, without due process of law . . . .").

149. *See, e.g.*, City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985) ("The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." (quoting U.S. CONST. amend. XIV, § 1)); *Bolling*, 347 U.S. at 499 (noting that the Fifth Amendment due process principle includes the same prohibition vis-à-vis the federal government).

150. *See, e.g.*, Washington v. Davis, 426 U.S. 229, 240-42 (1976) (explaining "the basic equal protection principle that the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose").

151. *See, e.g.*, Bearden v. Georgia, 461 U.S. 660, 667 (1983) ("The rule of *Williams* and *Tate*, then, is that the State cannot 'impos[e] a fine as a sentence and then automatically conver[t] it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full.'" (alterations in original) (quoting Tate v. Short, 401 U.S. 395, 398 (1971))); *id.* at 672-73 (holding that to "deprive the probationer of his conditional freedom simply because, through no fault of his own, he cannot pay the fine . . . would be contrary to the fundamental fairness required by the Fourteenth Amendment"); *see also* Statement of Interest of the United States at 1, Varden v. City of Clanton, No. 2:15-cv-34-MHT-WC (M.D. Ala. Feb. 13, 2015) ("Incarcerating individuals solely because of their inability to pay for their release . . . violates the Equal Protection Clause of the Fourteenth Amendment." (citing *Tate*, 401 U.S. at 398; Williams v. Illinois, 399 U.S. 235, 240-41 (1970); and Smith v. Bennett, 365 U.S. 708, 709 (1961))).

152. *Bearden*, 461 U.S. at 674.

153. *See Ending the American Money Bail System*, *supra* note 21.

154. *See* First Amended Class Action Complaint, *supra* note 78 (challenging the Harris County bail schedule on due process and equal protection grounds).

has submitted a statement of interest in one of the bail schedule lawsuits[155] and an amicus brief in another, asserting that "bail practices that incarcerate indigent individuals before trial solely because of their inability to pay for their release violate[] the Fourteenth Amendment."[156] It also issued a Dear Colleague Letter to state and local courts, making the same point.[157]

The data and results reported here do not directly demonstrate whether Harris County's misdemeanor bail practices result in detention for poverty alone. They do show that more than half the misdemeanor defendants with bail set were nonetheless detained pending trial.[158] The average bail amount for these detainees was $2786.[159] It is possible that some number of these people choose not to post the bail but unlikely that many do. The more likely explanation is that they simply do not have the money. The analysis of detention rates by zip code, furthermore, suggests that wealth is an important determinant of who is detained pending trial.[160]

This Article's results provide stronger evidence that any wealth-based inequality in pretrial detention translates into wealth-based inequality in case outcomes. In this dataset, detention increases the likelihood of pleading guilty by 25% for no reason relevant to guilt.[161] In other words, the results suggest that approximately 17% of the detained misdemeanor defendants in the Harris County dataset who pleaded guilty would not have been convicted at all had they been released pretrial. They pleaded guilty because they were detained.

While there are several possible explanations for this detention effect, it is likely that detention obligates many defendants to serve more time than the likely sentence prior to adjudication. If a guilty plea for "time served" or a noncustodial sentence is an option, many a detained person will take it; the costs of staying in jail to fight a charge are simply overwhelming.[162] More

---

155. Statement of Interest of the United States, *supra* note 151.

156. Brief for the United States as Amicus Curiae Supporting Plaintiff-Appellee & Urging Affirmance of the Issue Addressed Herein at 3, Walker v. City of Calhoun, No. 16-10521-HH (11th Cir. Aug. 18, 2016).

157. Letter from Vanita Gupta, Principal Deputy Assistant Att'y Gen., Civil Rights Div., U.S. Dep't of Justice, and Lisa Foster, Dir., Office for Access to Justice, U.S. Dep't of Justice, to Colleague 7 (Mar. 14, 2016), https://www.justice.gov/crt/file/832461/download ("[A]ny bail practices that result in incarceration based on poverty violate the Fourteenth Amendment.").

158. *Supra* Table 1.

159. *Supra* Table 1.

160. *See supra* Part II.D.

161. *See supra* Table 3.

162. *See, e.g.*, Curry v. Yachera, No. 15-1692, 2016 WL 4547188, at *3 (3d Cir. Sept. 1, 2016) ("Unable to post his bail, Curry was sent to jail and waited there for months for his case to proceed. While imprisoned, he missed the birth of his only child, lost his job, and feared losing his home and vehicle. Ultimately, he pled *nolo contendere* in order to
*footnote continued on next page*

broadly, the results suggest that the outcome of a bail hearing can profoundly impair the accused's ability to contest the charges against him.[163]

There is now a nationwide movement to make the pretrial system fairer by shifting from the money bail model to a "risk-based" model driven by actuarial assessment of a defendant's risk of flight and rearrest.[164] It is important to note that this shift will not eliminate inequality. Actuarial risk assessment will import the effects of race and class disparities earlier in the system.[165] Without violating the Equal Protection Clause, risk assessment may still result in the disproportionate pretrial detention of poor and minority communities.[166] To the extent detention also changes case outcomes, this means that a risk-based system of pretrial detention could continue to dispense unequal justice. In view of the cost of detention—both its immediate fiscal and human costs and its downstream effects—policymakers should work to avoid this result.

---

return home."); Sixth Amendment Ctr. & Pretrial Justice Inst., Early Appointment of Counsel: The Law, Implementation, and Benefits 9 (2014), http://sixthamendment.org/6ac/6ACPJI_earlyappointmentofcounsel_032014.pdf (noting that "those who work in criminal justice systems" report that this happens frequently (citing Joel M. Schumm, Am. Bar Ass'n Standing Comm. on Legal Aid & Indigent Defendants, National Indigent Defense Reform: The Solution is Multifaceted 26 (2012), http://www.americanbar.org/content/dam/aba/publications/books/ls_sclaid_def_national_indigent_defense_reform.authcheckdam.pdf)).

163. This is true of any of the potential mechanisms discussed above, *see supra* Part I.A, except if the detention effect results from the inability of detainees to obstruct justice. It seems unlikely, however, that misdemeanor defendants released pretrial routinely engage in obstructionist tactics.

164. *See, e.g.*, Pretrial Justice Inst., *Resource-Based to Risk-Based Pretrial Justice*, PREZI (Aug. 7, 2015), https://prezi.com/h6eboff0oyhx/resource-based-to-risk-based-pretrial-justice.

165. The most universal risk factors for future criminal behavior in current pretrial risk assessment tools are prior contacts with the criminal justice system. *See* Bernard E. Harcourt, *Risk as a Proxy for Race: The Dangers of Risk Assessment*, 27 FED. SENT'G REP. 237, 238-40 (2015); Sandra G. Mayson, Dangerous Defendants 11 tbl.1, app. at 47 (Aug. 10, 2016) (unpublished manuscript) (on file with authors).

166. As a general matter, the equal protection principle only prohibits facial (explicit) and intentional discrimination, not disparate impact alone, Washington v. Davis, 426 U.S. 229, 240-42 (1976), although the line of case law prohibiting incarceration for inability to pay a fine diverges from this framework, *see supra* note 151 and accompanying text. There is an argument that actuarial risk assessment is facially discriminatory if the variables used to predict risk include characteristics like race and income. *See* Sonja B. Starr, *Evidence-Based Sentencing and the Scientific Rationalization of Discrimination*, 66 STAN. L. REV. 803, 811-12, 821-36 (2014).

### B.  Sixth Amendment Right to Counsel: Is Bail-Setting a "Critical Stage"?

The results of this Article also suggest that bail-setting should be deemed a "critical stage" of criminal proceedings at which accused persons have the right to the effective assistance of counsel.[167]

Despite arguments by scholars and advocates that accused persons should have the assistance of counsel at bail hearings,[168] that has not been the practical or legal reality. Some jurisdictions provide counsel at bail hearings, but many do not.[169] Federal statutory law does not guarantee the right to counsel at a bail hearing (although it prohibits federal courts from setting money bail that results in pretrial detention, and it requires an adversarial hearing at which the accused has the right to representation before a court can order the person detained).[170] A 2008-2009 survey of state practice found that only ten states uniformly provided counsel at an accused's first appearance.[171] Ten states

---

167. Rothgery v. Gillespie County, 554 U.S. 191, 212 (2008).

168. *See, e.g.,* Alexander Bunin, *The Constitutional Right to Counsel at Bail Hearings,* CRIM. JUST., Spring 2016, at 23, 47 ("[L]awyers are necessary at initial bail hearings."); Douglas L. Colbert, *Coming Soon to a Court Near You—Convicting the Unrepresented at the Bail Stage: An Autopsy of a State High Court's Sua Sponte Rejection of Indigent Defendants' Right to Counsel,* 36 SETON HALL L. REV. 653, 654-55 (2006) ("[T]he pretrial release or bail determination hearing should be considered a 'critical stage' of a criminal prosecution, triggering the Sixth and Fourteenth Amendments' right to counsel." (footnotes omitted)); Douglas L. Colbert et al., *Do Attorneys Really Matter?: The Empirical and Legal Case for the Right of Counsel at Bail,* 23 CARDOZO L. REV. 1719, 1763-83 (2002) [hereinafter Colbert et al., *Do Attorneys Really Matter?*] (demonstrating that defense representation significantly improves defendants' bail hearing outcomes and arguing for provision of such representation); Douglas L. Colbert, *Prosecution Without Representation,* 59 BUFF. L. REV. 333, 335 (2011) [hereinafter Colbert, *Prosecution Without Representation*] (urging the criminal and human rights law bars to encourage the Supreme Court to articulate a constitutional right to counsel at bail hearings); Douglas L. Colbert, *Thirty-Five Years After* Gideon*: The Illusory Right to Counsel at Bail Proceedings,* 1998 U. ILL. L. REV. 1, 7 [hereinafter Colbert, *Thirty-Five Years After* Gideon] (exploring "the constitutional basis for extending an accused's right to counsel to bail [hearings]"); Gerstein, *supra* note 19, at 1516 (arguing that, because the outcome of a bail hearing "can prejudice the outcome of a plea negotiation," defendants have the right to counsel at bail hearings); Constitution Project Nat'l Right to Counsel Comm., Don't I Need a Lawyer?: Pretrial Justice and the Right to Counsel at First Judicial Bail Hearing (2015), http://www.constitutionproject.org/wp-content/uploads/2015/03/RTC-DINAL_3.18. 15.pdf (laying out constitutional and practical arguments for providing counsel at bail hearings); Sixth Amendment Ctr. & Pretrial Justice Inst., *supra* note 162 (explaining the ambiguity of relevant constitutional law but urging jurisdictions to provide counsel at bail hearings and describing how some have done so).

169. *E.g.,* Colbert et al., *Do Attorneys Really Matter?, supra* note 168, at 1719 ("Most states do not consider the right to counsel to apply until a later stage of a criminal proceeding—days, weeks or months after the pretrial release determination.").

170. *See* 18 U.S.C. § 3142(c)(2), (f) (2015).

171. Colbert, *Prosecution Without Representation, supra* note 168, at 389.

uniformly provided no counsel.[172] The remaining thirty provided appointed counsel "in select counties only."[173]

It remains an open question of constitutional law, meanwhile, whether the Sixth Amendment right to counsel extends to bail hearings. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."[174] The Supreme Court has held the right to include the "effective" assistance of counsel with respect to any charge that may carry a sentence of incarceration and the right to an appointed attorney if the accused cannot afford to hire one.[175] As a temporal matter, the right "attaches" at "the first appearance before a judicial officer at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty."[176] This is the nature of most bail hearings. But to say that the right attaches is not to say that counsel need be present. Rather, once the right attaches, "counsel must be appointed within a reasonable time . . . to allow for adequate representation at any critical stage before trial, as well as at trial itself."[177]

The open question is whether the bail hearing is itself a "critical stage."[178] Unfortunately, the term has no precise definition.[179] The Court has offered many formulations. It most recently described critical stages as those

---

172. *Id.* at 395-96.

173. *Id.* at 345, 400. *But see* Rothgery v. Gillespie County, 554 U.S. 191, 203-04 (2008) ("We are advised without contradiction that not only the Federal Government, including the District of Columbia, but 43 States take the first step toward appointing counsel 'before, at, or just after initial appearance.'" (quoting Brief of Amicus Curiae the National Ass'n of Criminal Defense Lawyers in Support of Petitioner app. at 1a, *Rothgery*, 554 U.S. 191 (No. 07-440))).

174. U.S. CONST. amend. VI; *see also* Gideon v. Wainwright, 372 U.S. 335, 344 (1963) ("The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours.").

175. McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970) ("It has long been recognized that the right to counsel is the right to the effective assistance of counsel."); *see also* Strickland v. Washington, 466 U.S. 668, 687 (1984) (articulating the test for an ineffective assistance claim); Argersinger v. Hamlin, 407 U.S. 25, 37 (1972) (holding that "absent a knowing and intelligent waiver, no person may be imprisoned for any offense . . . unless he was represented by counsel at his trial"); *Gideon*, 372 U.S. at 342-45 (incorporating the right to counsel, including appointed counsel for indigent persons, against the states).

176. *Rothgery*, 554 U.S. at 194, 199.

177. *Id.* at 212.

178. The *Rothgery* majority stopped short of deciding it. *Id.* at 212 n.15 (emphasizing that the Court was not deciding "the scope of an individual's post-attachment right to the presence of counsel").

179. *See* Van v. Jones, 475 F.3d 292, 312 (6th Cir. 2007) (noting that "[o]ne would welcome a comprehensive and final one-line definition of 'critical stage'" and providing a survey of varying Supreme Court formulations).

"proceedings between an individual and agents of the State . . . that amount to 'trial-like confrontations,' at which counsel would help the accused 'in coping with legal problems or . . . meeting his adversary.'"[180] It has also stated that "those pretrial procedures that would impair defense on the merits if the accused is required to proceed without counsel" constitute critical stages.[181] The Court has classified arraignments,[182] preliminary hearings,[183] pretrial lineups,[184] deliberate attempts to elicit incriminating information from an accused,[185] efforts to elicit consent to a psychiatric interview,[186] and plea bargaining[187] as critical stages.

Some of this case law supports the argument that a bail hearing is a critical stage. In *Coleman v. Alabama*, a plurality of the Court concluded that an Alabama preliminary hearing was a critical stage for reasons that could also apply to bail hearings. It reasoned that, at a preliminary hearing, an effective defense lawyer could (1) "expose fatal weaknesses in the State's case that may lead the magistrate to refuse to bind the accused over," (2) examine witnesses so as to "fashion a vital impeachment tool" for trial "or preserve testimony favorable to the accused," (3) "discover the case the State has against his client and make possible the preparation of a proper defense," and (4) make "effective arguments for the accused on such matters as the necessity for an early psychiatric examination or bail."[188] Three of these four reasons arguably apply to bail hearings as well. At a bail hearing, defense counsel can expose fatal weaknesses in the state's case, learn about the allegations in order to prepare "a proper defense," and make "effective arguments" for an early psychiatric examination or release. The only opportunity that defense counsel has at a preliminary hearing but not at a bail hearing is to examine witnesses.

On the other hand, *Gerstein v. Pugh* presents an obstacle to the argument that the bail hearing is a critical stage. *Gerstein* concerned a postarrest probable cause determination, which would also allow defense counsel—if she were present—to point out fatal flaws in the case, learn about the allegations in order to prepare an effective defense, and make arguments for release. In *Gerstein*,

---

180. *Rothgery*, 554 U.S. at 212 n.16 (second alteration in original) (quoting United States v. Ash, 413 U.S. 300, 312-13 (1973)).

181. Gerstein v. Pugh, 420 U.S. 103, 122 (1975).

182. Hamilton v. Alabama, 368 U.S. 52, 54-55 (1961).

183. Coleman v. Alabama, 399 U.S. 1, 9-10 (1970) (plurality opinion); White v. Maryland, 373 U.S. 59, 60 (1963) (per curiam).

184. United States v. Wade, 388 U.S. 218, 236-37 (1967).

185. Massiah v. United States, 377 U.S. 201, 204-06 (1964).

186. Estelle v. Smith, 451 U.S. 454, 470-71 (1981).

187. Lafler v. Cooper, 132 S. Ct. 1376, 1385-86, 1388 (2012).

188. *Coleman*, 399 U.S. at 9 (plurality opinion).

however, the Court held that a postarrest probable cause determination is not a critical stage.[189] It reasoned that a postarrest probable cause determination "is addressed only to pretrial custody."[190] The Court acknowledged that "pretrial custody may affect to some extent the defendant's ability to assist in preparation of his defense" but concluded that "this does not present the high probability of substantial harm identified as controlling in *Wade* and *Coleman.*"[191]

This Article suggests that the Court's assumption about the limited effect of pretrial custody was incorrect. As noted above, pretrial custody does present a high probability of substantial harm, at least for Harris County misdemeanor defendants.[192] The rise of plea bargaining has only enhanced the importance of the bail hearing. As the Supreme Court has recognized, "[i]n today's criminal justice system, . . . the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant."[193] And pretrial detention puts defendants at a profound disadvantage in plea negotiations vis-à-vis the position they would be in if negotiating from freedom. The disadvantage is not just theoretical; the results reported here suggest that approximately 17% of the detained misdemeanor defendants who pleaded guilty would not have been convicted at all but for their detention. For these defendants, the bail hearing was *the* critical stage of criminal proceedings.[194]

Finally, there is reason to think that representation at bail hearings can reduce the likelihood of detention, and thus of conviction, for this subset of defendants.[195] As a matter of logic, defense counsel should be able to advocate for release by providing the judicial officer charged with pretrial custody determinations with a fuller picture of the accused's financial resources, connections to the community, and, if necessary, appropriate conditions of release.[196] Empirical data bear that logic out. In the mid-1980s, a controlled

---

189. Gerstein v. Pugh, 420 U.S. 103, 122 (1975).

190. *Id.* at 123. The Court also noted that a probable cause determination does not involve witness testimony, *id.*, but given that the Court has recognized plea bargaining as a critical stage, *see Lafler,* 132 S. Ct. at 1385, this cannot be determinative.

191. *Gerstein,* 420 U.S. at 123.

192. *But see* State v. Williams, 210 S.E.2d 298, 300 (S.C. 1974) ("There is no showing in this record, nor does appellant contend, that anything occurred at the bail hearing which in any way affected or prejudiced his subsequent trial or that was likely to do so.").

193. Missouri v. Frye, 132 S. Ct. 1399, 1407 (2012).

194. *See* Gerstein, *supra* note 19, at 1516 (laying out the argument that "a bail hearing is a critical stage because it can prejudice the outcome of a plea negotiation").

195. *Cf.* Colbert, *Thirty-Five Years After* Gideon, *supra* note 168, at 37 (noting that "a showing that counsel's absence at the bail hearing prejudiced the accused's fair trial rights" would provide grounds for finding that bail-setting is a critical stage).

196. *See, e.g.*, Constitution Project Nat'l Right to Counsel Comm., *supra* note 168, at 30-32 (explaining the opportunity for such advocacy).

experiment funded by the National Institute of Justice found that defendants who had public defenders assigned before the bail hearing spent significantly less time in pretrial detention.[197] In the 1990s, Douglas Colbert, Ray Paternoster, and Shawn Bushway ran a similar experiment in Baltimore, randomly assigning student lawyers to represent a treatment group of defendants for purposes of bail.[198] The assignment of student lawyers to bail hearings increased the pretrial release rate by 15 percentage points.[199] Given the evidence that pretrial release has a significant effect on case outcomes, it is difficult to maintain that the bail hearing is not a critical stage.[200]

C.  Eighth Amendment: When Is Bail or Detention "Excessive"?

1.  Cash bail

The raw data from Harris County suggest that Harris County bail officers may be regularly setting bail that violates the Eighth Amendment prohibition on "excessive bail."[201]

The Eighth Amendment requires that a bail determination be individualized. In *Stack v. Boyle*, the Supreme Court held that "the fixing of bail for any individual defendant must be based upon standards relevant to the purpose of assuring the presence of *that* defendant," including "the nature and circumstances of the offense charged, the weight of the evidence against him, the financial ability of the defendant to give bail and the character of the defendant."[202] Bail set higher than an amount "reasonably calculated" to assure

---

197. ERNEST J. FAZIO, JR. ET AL., NAT'L INST. OF JUSTICE, U.S. DEP'T OF JUSTICE, NCJ 97595, EARLY REPRESENTATION BY DEFENSE COUNSEL FIELD TEST: FINAL EVALUATION REPORT 208, 211 (1985), http://www.ncjrs.gov/pdffiles1/Digitization/97595NCJRS.pdf.

198. Colbert et al., *Do Attorneys Really Matter?*, *supra* note 168, at 1720 (explaining that the study found "convincing empirical data that the benefits of representation are measurable and that representation is crucial to the outcome of a pretrial release hearing"); *id.* at 1728-31 (describing the appointment of student lawyers); *id.* at 1746-47 (describing the experiment's randomization).

199. *Id.* at 1728-31, 1757; *see also id.* at 1720 (reporting that "more than two and one half times as many represented defendants were released on recognizance from pretrial custody as were unrepresented defendants" and that "two and one half times as many represented defendants had their bail reduced to an affordable amount").

200. *See, e.g.,* Hurrell-Harring v. State, 930 N.E.2d 217, 223 (N.Y. 2010) ("There is no question that 'a bail hearing is a critical stage of the State's criminal process . . . .'" (quoting Higazy v. Templeton, 505 F.3d 161, 172 (2d Cir. 2007))); *cf.* Gonzalez v. Comm'r of Corr., 68 A.3d 624, 637 (Conn. 2013) ("[T]he petitioner had a sixth amendment right to effective assistance of counsel at the arraignment stage in which proceedings pertaining to the setting of bond and credit for presentence confinement occurred . . . .").

201. U.S. CONST. amend. VIII ("Excessive bail shall not be required . . . .").

202. Stack v. Boyle, 342 U.S. 1, 5 & n.3 (1951) (emphasis added) (quoting FED. R. CRIM. P. 46(c) (amended 1966)).

the presence of a particular defendant "is 'excessive' under the Eighth Amendment."[203]

The Supreme Court arguably expanded the permissible purposes of money bail in *United States v. Salerno*,[204] but it did not alter the *Stack* rule that the excessiveness inquiry is a particularized one. *Salerno* held that, in some circumstances, the state may constitutionally deny bail altogether on the grounds of a defendant's dangerousness.[205] Many lower courts have interpreted *Salerno* to authorize consideration of a defendant's dangerousness in setting money bail.[206] That interpretation is questionable but prevalent.[207] Texas, moreover, has maintained a conception of bail focused on ensuring appearance; it defines bail as "the security given by the accused that he will appear and answer before the proper court the accusation brought against him."[208]

Whatever the permissible purposes of money bail, the important point is that bail is an incentive mechanism, and the Excessive Bail Clause requires that it be calibrated to the particular circumstances of each case. Bail set higher than necessary to serve as a compelling incentive for *a particular individual* violates the Excessive Bail Clause.[209] And what constitutes a compelling incentive will vary. For a multimillionaire charged with murder, even hefty bail might be inadequate.[210] For a poor person charged with a misdemeanor, $500 may be excessive.

In Harris County, more than half of misdemeanor defendants with bail set are nonetheless detained pending trial. Their bail amounts appear to have been

---

203. *Id.* at 5.

204. 481 U.S. 739, 754 (1987) ("Nothing in the text of the Bail Clause limits permissible Government considerations solely to questions of flight.").

205. *Id.* at 752-55.

206. *See, e.g.*, Galen v. County of Los Angeles, 477 F.3d 652, 662 (9th Cir. 2007) ("We also reject Galen's argument that flight risk is the only factor the Commissioner was allowed to consider in setting bail . . . . *Salerno* holds that these non-flight-related considerations are permissible . . . .").

207. Rather, *Salerno* authorized the state to pursue pretrial crime prevention "through regulation of pretrial release." 481 U.S. at 753. Most obviously, this language authorizes the state to pursue pretrial crime prevention through regulation of *who* is released, which was the power at issue in *Salerno*. The Court's language might or might not authorize the use of money bail as a mechanism to discourage crime.

208. TEX. CODE CRIM. PROC. ANN. art. 17.01 (West 2015).

209. *See* United States v. Arzberger, 592 F. Supp. 2d 590, 605-06 (S.D.N.Y. 2008) ("[I]f the Excessive Bail Clause has any meaning, it must preclude bail conditions that are (1) more onerous than necessary to satisfy legitimate governmental purposes and (2) result in deprivation of the defendant's liberty.").

210. *See* Charles V. Bagli & Kevin Flynn, *Durst Jumps Bail, and a Nationwide Dragnet Is on*, N.Y. TIMES (Oct. 17, 2001), http://nyti.ms/2d7dKo4 (reporting that "New York real estate scion" Robert Durst fled a Texas homicide prosecution despite having posted $250,000 bail).

set according to a bail schedule. These facts suggest that their bail amounts do not reflect the individualized determination that the Eighth Amendment requires. To the extent that these bail amounts are greater than "reasonably calculated" to ensure the appearance of individual misdemeanor arrestees, they violate the Eighth Amendment.

It is at least arguable, furthermore, that whenever money bail results in detention because a defendant cannot pay, it is per se excessive. The premise of money bail is that the prospect of some financial loss is a sufficient deterrent to prevent pretrial flight. Detention is not necessary. If the bail is unaffordable and therefore results in detention, it is not functioning as a deterrent at all. It is functioning as an indirect means of detention. The use of unaffordable bail to detain pretrial defendants was precisely the practice that the original Excessive Bail Clause was intended to prevent.[211]

The counterargument is that, in some cases, an unaffordable bail amount is the only amount sufficient to create an adequate disincentive to flee.[212] But if that is so, the reality is that *no* bail can reasonably assure that particular defendant's appearance. In that case, judges should explicitly order detention and explain the reason for doing so.[213] Indeed, the Excessive Bail Clause arguably requires them to take this approach.[214]

---

211. *See* Samuel Wiseman, *Discrimination, Coercion, and the Bail Reform Act of 1984: The Loss of the Core Constitutional Protections of the Excessive Bail Clause*, 36 Fordham Urb. L.J. 121, 127 (2008).

212. *See, e.g.*, United States v. McConnell, 842 F.2d 105, 110 (5th Cir. 1988) (rejecting the claim that unaffordable bail violated the Eighth Amendment on the basis that "[t]he court has found that only a substantial financial component will yield a reasonable assurance of McConnell's appearance"); White v. United States, 330 F.2d 811, 814 (8th Cir. 1964) ("The purpose for bail cannot in all instances be served by only accommodating the defendant's pocketbook and his desire to be free pending possible conviction.").

213. *Cf.* Hairston v. United States, 343 F.2d 313, 316 (D.C. Cir. 1965) (Bazelon, C.J., dissenting) ("It may be that [by setting unaffordable bail] the District Court intended to deny bail because there was no adequate assurance of appellant's presence . . . . If so, it should have specified the reason. To deny the reality of bail while maintaining the fiction, perverts and distorts the administration of bail.").

214. *See* Carlisle v. Landon, 73 S. Ct. 1179, 1182 (1953) (opinion of Douglas, J.) (interpreting the Excessive Bail Clause to mean "that a person may not be capriciously held" and that "[t]here must be an informed reason for the detention"); *cf.* 18 U.S.C. § 3142(e) (2015) ("If . . . the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required . . . , such judicial officer shall order the detention of the person before trial."). This is not possible in states that guarantee a right to bail, but the right to bail should be understood as a right to release. *See* Schnacke, *supra* note 24, at 63 ("[T]he right to bail should be read as a right to release through the bail process."); *id.* at 21-36, 42, 51-56 (making historical and legal arguments for this conclusion).

Few courts have held that unaffordable money bail is excessive per se. Many lower courts have held that it is not.[215] The Supreme Court has not weighed in one way or the other beyond the case law cited in this Article.[216] But federal statutory law and the American Bar Association's Standards on Pretrial Release are consistent with the argument that unaffordable bail is excessive. Both prohibit the setting of money bail in an amount that results in detention.[217] These authorities do not constitute constitutional law, but they reflect an understanding of the constitutional limits on money bail.

### 2. Pretrial detention

The results of this Article have implications for the question when pretrial detention itself (as distinct from a money bail amount) is unconstitutionally excessive. This question will become particularly topical as jurisdictions seeking to curtail the use of money bail adopt more explicit preventive detention regimes.[218] In *United States v. Salerno,* the Supreme Court held that the Excessive Bail Clause does not entail an absolute right to bail—that is, it does not prohibit detention without bail in some circumstances.[219] The Court also endorsed public safety as a basis for ordering the pretrial detention of some defendants.[220] But it suggested that the Excessive Bail Clause might require that "the Government's proposed conditions of release or detention not be 'excessive' in light of the perceived evil" they are designed to address.[221] To determine whether the intrusion on pretrial liberty is excessive, courts must

---

215. *E.g., McConnell*, 842 F.2d at 107 ("[A] bail setting is not constitutionally excessive merely because a defendant is financially unable to satisfy the requirement."); White v. Wilson, 399 F.2d 596, 598 (9th Cir. 1968) ("The mere fact that petitioner may not have been able to pay the bail does not make it excessive."); Byrd v. Mascara, No. 4D16-1424, 2016 WL 3919078, at *1 (Fla. Dist. Ct. App. July 20, 2016) (per curiam) ("[A] defendant's inability to post a certain amount of bond does not render that amount per se unreasonable.").

216. *See* Scott W. Howe, *The Implications of Incorporating the Eighth Amendment Prohibition on Excessive Bail*, 43 HOFSTRA L. REV. 1039, 1039 (2015) ("The Eighth Amendment prohibition on 'excessive bail' is perhaps the least developed of the criminal clauses in the *Bill of Rights*." (quoting U.S. CONST. amend. VIII)).

217. 18 U.S.C. § 3142(c)(2) ("The judicial officer may not impose a financial condition that results in the pretrial detention of the person."); ABA STANDARDS: PRETRIAL RELEASE, *supra* note 36, § 10-1.4(e) ("The judicial officer should not impose a financial condition of release that results in the pretrial detention of a defendant solely due to the defendant's inability to pay.").

218. *See* Mayson, *supra* note 165, at 7-8 (describing third-generation bail reform, which seeks to "shift[] the entire pretrial paradigm from a cash-based to a risk-based model").

219. 481 U.S. 739, 754-55 (1987).

220. *Id.* at 755.

221. *Id.* at 754.

"compare" it "against the interest the Government seeks to protect by means of that response."[222]

The analysis of Eighth Amendment "excessiveness" thus requires a kind of cost-benefit analysis. A court analyzing a claim that pretrial detention is unconstitutionally excessive must first determine the "perceived evil" that detention is designed to address—presumably a risk of flight or pretrial crime.[223] It must then determine whether detention is "'excessive' in light of the perceived evil."[224] As a matter of logic, this requires an evaluation of whether the costs of detention are excessive in relation to risk (the likelihood that harm would occur without detention and the severity of that harm). That is, courts must determine whether the costs of detention to the detainee are excessive in relation to its benefit to the state.[225]

Pretrial detention has serious costs. In addition to the immediate costs to the detainee (loss of liberty and potential loss of employment, housing, et cetera), the results reported here demonstrate that detention can distort criminal adjudication.[226] That is a significant cost, both to the people who would not have been convicted but for their detention and to the legitimacy of the system as a whole.[227]

On the other side of the ledger, the benefit of detention lies in the number and severity of harms it prevents. If there is only a small risk that the defendant will abscond or commit a serious harm if released, then detention provides little benefit; it does not substantially promote the state's interests. Furthermore, detention may increase future criminal offending.[228] To the extent jurisdictions impose pretrial detention in order to prevent pretrial crime, its benefit—the crime averted—must be discounted by the increase in crime it produces. If it is not clear that the pretrial crime averted is worth the increase in future crime, detention might be an excessive response to the public safety threat. More generally, if the costs of detention vastly outweigh its

---

222. *Id.*

223. *Id.*

224. *Id.*; *see also* Galen v. County of Los Angeles, 477 F.3d 652, 660 (9th Cir. 2007) ("To determine whether the Excessive Bail Clause has been violated, we look to the valid state interests bail is intended to serve for a particular individual and judge whether bail conditions are excessive for the purpose of achieving those interests.").

225. For a recent effort to engage in systemic cost-benefit analysis of pretrial detention, see Shima Baradaran Baughman, *Costs of Pretrial Detention*, 97 B.U. L. REV. 1 (2017).

226. *See supra* Part III.A-B.

227. To the extent the cost of detention to taxpayers is relevant to this analysis, that cost is also substantial. *See* Pretrial Justice Inst., Pretrial Justice: How Much Does It Cost? 2 (2017), https://university.pretrial.org/viewdocument/pretrial-justice-how-much-does -it (estimating that pretrial detention costs taxpayers $38 million each day, which amounts to $14 billion annually).

228. *See supra* Part III.C.

expected benefit in preventing flight or pretrial crime, a court should conclude that it is an excessive response to the risk the defendant presents. This is even clearer if less restrictive alternatives like GPS monitoring can provide similar benefit at less cost.[229]

D.  Substantive Due Process: Is Pretrial Detention Punishment? Does It Impermissibly Infringe Liberty?

1.  Pretrial punishment

Our results also support an argument that pretrial detention in some circumstances violates substantive due process by inflicting punishment before trial. "[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."[230] Pretrial detainees, that is, have the "right to be free from punishment."[231] The difficult question is when a restraint on liberty amounts to punishment.

Pursuant to current doctrine, the answer turns on whether the restraint is rationally related to a nonpunitive purpose and not "excessive" for that purpose.[232] Thus far, the Court has declined to classify any pretrial restraint as punishment. In *Bell v. Wolfish*, a challenge to certain conditions of pretrial confinement, the Court concluded that the conditions did not amount to punishment because they were rationally related to legitimate needs of the prison administration and not excessive for those ends.[233] In *Salerno*, the Court rejected the argument that pretrial detention pursuant to the federal Bail Reform Act constituted punishment per se on the basis that the detention regime was carefully tailored to the "legitimate" goal of preventing danger to the community and the "incidents" of detention were not "excessive in relation

---

229. *See* Samuel R. Wiseman, *Pretrial Detention and the Right to Be Monitored*, 123 YALE L.J. 1344, 1384 (2014) (arguing that pretrial detention "is clearly excessive if monitoring could serve the state's goals equally well (and equally efficiently)").

230. Bell v. Wolfish, 441 U.S. 520, 535 (1979). Note that this right against pretrial punishment is distinct from the presumption of innocence. *See id.* at 533 (stating that the presumption of innocence "is a doctrine that allocates the burden of proof in criminal trials" and "has no application to a determination of the rights of a pretrial detainee"). *But see* County of Riverside v. McLaughlin, 500 U.S. 44, 58 (1991) (alluding to the importance of minimizing "the time a presumptively innocent individual spends in jail").

231. *Bell*, 441 U.S. at 534.

232. *Id.* at 537-38 (quoting Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69 (1963)); *see also* United States v. Salerno, 481 U.S. 739, 747 (1987).

233. 441 U.S. at 560-61. The challenged conditions were forced "double-bunking" in single cells, limitations on detainees' access to printed materials, a near-prohibition on receipt of packages, unannounced "shakedowns" of detainees' living areas, and strip searches after contact visits. *Id.* at 541-60.

to the regulatory goal Congress sought to achieve."[234] In both cases, however, the Court left open the possibility that in specific cases, or other circumstances, it might reach a different conclusion.[235]

The analysis whether a particular instance or regime of pretrial detention constitutes "punishment" effectively mirrors the Excessive Bail Clause analysis. Both require a court to determine whether the detention at issue is an "excessive" response to a risk of flight or pretrial crime.[236] The smaller the risk and the greater the costs of detention, the more likely it is to be an excessive response. Our results provide compelling evidence that the costs of detention include increasing the likelihood of conviction and future entanglement with the criminal justice system. Given these and other costs of pretrial detention, it may be an excessive response to low risks of pretrial flight and crime—and therefore constitute impermissible pretrial "punishment."

### 2. Impermissible regulatory detention

Even if pretrial detention does not constitute punishment, it might, in some cases, violate substantive due process as an impermissible regulatory infringement on individual liberty. "Freedom from imprisonment . . . lies at the heart of the liberty that [the Due Process] Clause protects."[237] The state must therefore meet a high burden of justification when it seeks to detain individuals for regulatory, nonpunitive purposes. When challenges to regulatory detention have made their way to the Supreme Court, the Court has applied some type of heightened scrutiny.[238] Most relevant here, in *Salerno* the

---

234. 481 U.S. at 747-48.

235. *E.g., id.* at 745 (noting "[t]he fact that the Bail Reform Act might operate unconstitutionally under some conceivable set of circumstances"); *id.* at 745 & n.3 (noting that the suit is a facial, not an as-applied, challenge); *id.* at 747 n.4 ("We intimate no view as to the point at which detention in a particular case might become excessively prolonged, and therefore punitive, in relation to Congress' regulatory goal."); *Bell*, 441 U.S. at 561-62 (acknowledging that "excessive" or "exaggerated" responses to security concerns at a pretrial detention facility would constitute impermissible pretrial punishment).

236. *See, e.g.*, Lopez-Valenzuela v. Arpaio, 770 F.3d 772, 791 (9th Cir. 2014) (en banc) (finding a "*severe* lack of fit between the asserted nonpunitive purpose and the actual operation" of an Arizona constitutional amendment denying bail to undocumented immigrants); *id.* at 792 (concluding that "the challenged laws are excessive in relation to the state's legitimate interest in assuring arrestees' presence for trial" and "therefore impermissibly impose punishment before an adjudication of guilt").

237. Zadvydas v. Davis, 533 U.S. 678, 690 (2001).

238. *See, e.g., id.* at 690 (explaining that regulatory detention violates substantive due process rights except "in certain special and 'narrow' nonpunitive 'circumstances,' where a special justification, such as harm-threatening mental illness, outweighs the 'individual's constitutionally protected interest in avoiding physical restraint'" (citation omitted) (first quoting Foucha v. Louisiana, 504 U.S. 71, 80 (1992); and then quoting Kansas v. Hendricks, 521 U.S. 346, 356 (1997))).

Supreme Court rejected a substantive due process challenge to the federal preventive detention regime because the regime was "narrowly focuse[d]" on the "legitimate and compelling" state interest of preventing pretrial crime by an especially dangerous subset of defendants.[239]

Pursuant to *Salerno*'s analysis, a specific instance or regime of pretrial detention might violate substantive due process if it is not carefully tailored to its goal or if its costs vastly outweigh its benefits. Once again, the costs documented here should inform the calculation.[240] If a defendant poses little risk of flight or pretrial crime, then pretrial detention—given its attendant costs—is a blunt tool to mitigate the risk. Our analysis of the effect of pretrial detention on future crime suggests that it may even be counterproductive. Pretrial detention that exacerbates the harm it is supposed to prevent is not a "narrowly focused" means of protecting public safety, so it may violate substantive due process as an unjustified infringement on liberty.

### E.  Procedural Due Process: Does Pretrial Detention Produce "Involuntary" Plea Bargains?

To the extent the causal effect of pretrial detention on conviction rates reflects a reality that detained people plead guilty simply to get out of jail, it raises the question whether such pleas are fully "voluntary." The Due Process Clauses of the Fifth and Fourteenth Amendments require that guilty pleas be "voluntary" and "intelligent," which requires that a defendant have and make a meaningful choice.[241]

Plea bargaining poses a dilemma because it is always in some sense coercive. The Supreme Court has confronted this question in two cases since 1970: *Brady v. United States* and *Bordenkircher v. Hayes*.[242] In *Brady*, the Court held that

---

239. 481 U.S. at 750-52 ("Given the legitimate and compelling regulatory purpose of the Act and the procedural protections it offers, we conclude that the Act is not facially invalid under the Due Process Clause of the Fifth Amendment.").

240. The tests the Court has articulated for impermissible pretrial "punishment" and impermissible regulatory detention are quite similar and overlap with the Eighth Amendment prohibition on "excessive" pretrial restraints on liberty; each requires courts to assess the fit between the state's goal (for example, preventing flight or pretrial crime) and the means taken to achieve it. *See supra* Part IV.C.2; *see also, e.g., Lopez-Valenzuela*, 770 F.3d at 789, 791-92 (holding that an Arizona constitutional amendment denying bail to undocumented immigrants violated substantive due process rights on the two "independent grounds" that it failed heightened scrutiny and constituted pretrial punishment and acknowledging the very similar analysis for each).

241. Brady v. United States, 397 U.S. 742, 748 (1970) (holding that a plea must be a "knowing, intelligent act[] done with sufficient awareness of the relevant circumstances and likely consequences"); *see also* Boykin v. Alabama, 395 U.S. 238, 242 (1969) (holding, on procedural due process grounds, that a guilty plea must be knowing and voluntary).

242. 434 U.S. 357 (1978).

a plea is not rendered involuntary even if it were motivated by the defendant's fear of receiving the death penalty if convicted at trial.[243] In *Bordenkircher*, the Court held that it did not violate the Due Process Clause for a prosecutor to threaten to re-indict the defendant on more serious charges unless he pleaded guilty (and then to carry out the threat).[244] The Court reasoned that "'the imposition of these difficult choices [is] an inevitable'—and permissible— 'attribute of any legitimate system which tolerates and encourages the negotiation of pleas.'"[245]

This precedent is clearly hostile to any argument that pretrial detention might render a guilty plea involuntary. But the Supreme Court did leave the door ajar. In *Brady*, the Court qualified its acceptance of bargains driven by fear: "Of course, the agents of the State may not produce a plea by actual or threatened physical harm or by mental coercion overbearing the will of the defendant."[246] And in *Bordenkircher*, the Court suggested that its decision was predicated on the assumption that the inducement at issue would not lead an innocent person to plead guilty. The Court reasoned that "[d]efendants advised by competent counsel and protected by other procedural safeguards are . . . unlikely to be driven to false self-condemnation."[247] It also noted that the case did not "involve the constitutional implications" of a prosecutor threatening harm or offering benefit to a third party, "which might pose a greater danger of inducing a false guilty plea by skewing the assessment of the risks a defendant must consider."[248]

These offhand caveats are hardly a firm foundation for a new jurisprudence of due process limits to coercion in plea bargaining, but they are suggestive. Evidence that pretrial detention leads to wrongful convictions by guilty plea might lead the Court to reconsider its due process conclusions. The empirical analysis in this Article suggests that approximately 17% of people detained pretrial in the Harris County dataset who pleaded guilty (or no contest) would not have been convicted but for their detention. This suggests

---

243. 397 U.S. at 750-51. The Court noted that "[t]he State to some degree encourages pleas of guilty at every important step in the criminal process," and it rejected the idea "that a guilty plea is compelled and invalid under the Fifth Amendment whenever motivated by the defendant's desire to accept the certainty or probability of a lesser penalty rather than face a wider range of possibilities" after trial. *Id.*; *see also id.* at 751 ("The issue we deal with is inherent in the criminal law and its administration . . . .").

244. *Bordenkircher*, 434 U.S. at 358, 365.

245. *Id.* at 364 (alteration in original) (quoting Chaffin v. Stynchcombe, 412 U.S. 17, 31 (1973)).

246. *Brady*, 397 U.S. at 750.

247. *Bordenkircher*, 434 U.S. at 363.

248. *Id.* at 364 n.8; *see also id.* at 363 ("[I]n the 'give-and-take' of plea bargaining, there is no such element of punishment or retaliation so long as the accused is *free* to accept or reject the prosecution's offer." (emphasis added)).

*Downstream Consequences*
69 Stan. L. Rev. 711 (2017)

that they pleaded guilty simply to go home, not because of the strength of the case against them. It is impossible to tell how many of them were actually innocent. But the combination of statistics along these lines and evidence in an individual case might be compelling.

Consider, for instance, the case of Joseph Curry.[249] According to his allegations in a recent civil suit, Curry had discovered in 2012 that there was a warrant out for his arrest, accusing him of petty theft at a Walmart he had never entered. When he called the Pennsylvania state police to clarify the situation, he was arrested and jailed. Bail was set at $20,000, which he could not afford. In the months he was detained and waiting for his case to proceed, Curry "missed the birth of his only child, lost his job, and feared losing his home and vehicle. Ultimately, he pled *nolo contendere* in order to return home."[250]

Confronted with convincing evidence of facts like these in an appeal or postconviction proceeding, a court might find that the continued pretrial detention of a person in these circumstances constituted "mental coercion overbearing the will of the defendant,"[251] who was ultimately "driven to false self-condemnation."[252] The court could find that such a plea was not sufficiently voluntary to comport with due process. It would therefore vacate the plea and conviction. There would be some risk to pursuing this strategy for the defendant because the charge could be reinstated and he could again be arrested and jailed. If the evidence of his innocence were compelling, though, one hopes that this would not be the case.

There is little chance that a due process/coercion argument can serve as a useful vehicle for large-scale change in the pretrial system because it is necessarily individualized. But it might have traction in individual cases. And perhaps it might lead courts and prosecutors to question whether a pretrial detainee who can reasonably be released upon a guilty plea should be detained in the first place. Finally, individual court decisions grappling with the due process/coercion argument might begin to fill in the fuzzy outlines of the constitutional limit on coercive plea bargaining practices more generally.

## Conclusion

Pretrial detention has a significant impact on downstream criminal justice outcomes—both in the immediate case and through the future criminal activity

---

249. The facts of this case are recited in *Curry v. Yachera*, No. 15-1692, 2016 WL 4547188, at *1-2 (3d Cir. Sept. 1, 2016).

250. *Id.* at *3.

251. *Brady*, 397 U.S. at 750.

252. *Bordenkircher*, 434 U.S. at 363.

of detained defendants. Detention increases the rate of guilty pleas and leads detained individuals to commit more crime in the future. These findings not only carry import for Harris County; they also raise a host of broader empirical and constitutional questions that merit attention.

To appreciate the magnitude of the effects this Article documents, we offer the following thought experiment: imagine if, during the period of the sample, Harris County had released those defendants assigned the lowest amount of bail—$500—on personal bond (recognizance) rather than assessing bail. On the basis of the rate of detention among people with $500 bail set, the estimated effects of pretrial detention reported above, and other data carefully documenting the costs of detention and probation supervision in Harris County,[253] we predict the county would have released 40,000 additional defendants pretrial. These individuals would have avoided approximately 5900 criminal convictions, many of which would have come through possibly erroneous guilty pleas. Incarceration days in the county jail—severely overcrowded as of April 2016—would have been reduced by at least 400,000.[254] Over the next eighteen months after their release, these defendants would have committed 1600 fewer felonies and 2400 fewer misdemeanors. On net, after accounting for both reductions in jail time and increases in probation time, the county would have saved an estimated $20 million in supervision costs alone. Thus, with better pretrial detention policy, Harris County could save millions of dollars per year, increase public safety, and likely reduce wrongful convictions.

Our findings also carry import beyond the borders of Harris County. Many of the key features of Harris County's system—a heavy reliance on cash bail, assembly-line handling of bail hearings, and nonexistent representation for defendants at these hearings—are characteristic of misdemeanor bail systems across the country. This Article presents strong empirical evidence that under such circumstances, bail hearings influence later case outcomes. This evidence demands further guidance from the courts as to whether the Sixth Amendment guarantees the assistance of counsel at such hearings and whether such a process sufficiently protects the due process and Eighth Amendment rights of misdemeanor defendants.

253. *E.g.*, Tex. Criminal Justice Coal., Harris County, Texas: Adult Criminal Justice Data Sheet (n.d.), http://countyresources.texascjc.org/sites/default/files/adult_county_data_sheets/TCJC's%20Adult%20Harris%20County%20Data%20Sheet.pdf; Vera Inst. of Justice, The Price of Jails: Measuring the Taxpayer Cost of Local Incarceration 28 (2015), http://www.vera.org/sites/default/files/resources/downloads/price-of-jails.pdf.

254. This is actually a conservative estimate because it is based on the estimate of the change in the jail sentence associated with detention and thus ignores time spent in pretrial detention that does not end up counting against the final sentence of the accused.

Our results also have important implications for the conduct of future empirical studies assessing the effects of pretrial detention. Our analysis suggests that prior work measuring the association between pretrial detention and case outcomes, which controlled for only a limited set of defendant and case characteristics, may have overestimated the causal effect of detention. After controlling for a broader set of characteristics, however—including the exact offense and the precise amount of bail set at the initial hearing—we are able to obtain correlational estimates that approach the causal estimates we observe using a natural experiment. In this respect, this Article's results mirror those of Stevenson.[255] Researchers therefore may be able to learn much about bail effects across many other jurisdictions operating under different systems without resorting to costly, and in some cases practically infeasible, randomized controlled trials so long as they account for preexisting differences between the pools of detained and released defendants. Such future work could help catalyze a shift toward bail systems that reduce wealth disparities, increase public safety, and minimize the lengthy periods of detention that have such high budgetary and human costs.

---

255. *See supra* notes 63-67 and accompanying text.

*Downstream Consequences*
69 Stan. L. Rev. 711 (2017)

## Appendix

### Figure A.1

Google Daily Keyword Search Volume by Day of Week (Standardized Score)





*Downstream Consequences*
69 STAN. L. REV. 711 (2017)



**"Check Cashing"**

This figure plots average daily Google search volume by day of week for several search terms that serve as proxies for liquidity. For each term, daily search volume was standardized and then averaged by day of week to construct the bars in the chart. Data were downloaded from Google Trends[256] and cover the period from January 31, 2016 to April 23, 2016.

---

256. GOOGLE TRENDS, https://www.google.com/trends (last visited Mar. 3, 2017).

*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

**Figure A.2**
Distribution of Bail Assessments by Day of Week of Hearing



*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

**Table A.1**
Numeric Results for Misdemeanor Recidivism Analysis

| Days Since Bail Hearing | Cumulative New Misdemeanors per Released Defendant | Estimated Effect of Detention | Standard Error | *p*-Value | Percent Change in Misdemeanors Due to Detention |
|---|---|---|---|---|---|
| 1 | 0.0004 | -0.0004 | 0.00006 | 4.56E-10 | -97.0 |
| 2 | 0.0010 | -0.0009 | 0.00013 | 4.55E-11 | -89.1 |
| 3 | 0.0015 | -0.0008 | 0.00018 | 1.12E-05 | -50.6 |
| 4 | 0.0022 | -0.0010 | 0.00022 | 5.52E-06 | -45.6 |
| 5 | 0.0029 | -0.0011 | 0.00026 | 1.74E-05 | -38.1 |
| 6 | 0.0037 | -0.0012 | 0.00030 | 7.28E-05 | -31.8 |
| 7 | 0.0046 | -0.0014 | 0.00033 | 2.14E-05 | -31.2 |
| 8 | 0.0052 | -0.0014 | 0.00036 | 0.000 | -26.8 |
| 9 | 0.0059 | -0.0012 | 0.00040 | 0.003 | -20.0 |
| 10 | 0.0065 | -0.0011 | 0.00043 | 0.009 | -17.0 |
| 11 | 0.0072 | -0.0013 | 0.00045 | 0.005 | -17.6 |
| 12 | 0.0080 | -0.0013 | 0.00048 | 0.005 | -16.6 |
| 13 | 0.0089 | -0.0013 | 0.00050 | 0.009 | -14.8 |
| 14 | 0.0098 | -0.0009 | 0.00053 | 0.079 | -9.5 |
| 15 | 0.0106 | -0.0008 | 0.00056 | 0.127 | -8.0 |
| 16 | 0.0112 | -0.0008 | 0.00057 | 0.178 | -6.9 |
| 17 | 0.0118 | -0.0004 | 0.00059 | 0.520 | -3.2 |
| 18 | 0.0125 | -0.0001 | 0.00061 | 0.870 | -0.8 |
| 19 | 0.0130 | 0.0002 | 0.00062 | 0.800 | 1.2 |
| 20 | 0.0137 | 0.0005 | 0.00064 | 0.406 | 3.9 |
| 21 | 0.0145 | 0.0006 | 0.00066 | 0.399 | 3.9 |
| 22 | 0.0151 | 0.0009 | 0.00068 | 0.197 | 5.8 |
| 23 | 0.0157 | 0.0010 | 0.00069 | 0.149 | 6.3 |
| 24 | 0.0164 | 0.0012 | 0.00071 | 0.097 | 7.1 |
| 25 | 0.0170 | 0.0013 | 0.00072 | 0.069 | 7.7 |
| 26 | 0.0177 | 0.0014 | 0.00074 | 0.054 | 8.0 |
| 27 | 0.0183 | 0.0017 | 0.00075 | 0.025 | 9.2 |
| 28 | 0.0190 | 0.0019 | 0.00076 | 0.012 | 10.1 |
| 29 | 0.0197 | 0.0020 | 0.00078 | 0.009 | 10.3 |
| 30 | 0.0204 | 0.0022 | 0.00079 | 0.005 | 10.9 |

*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

| | | | | | |
|---|---|---|---|---|---|
| 60 | 0.0413 | 0.0075 | 0.00113 | 2.32E-11 | 18.2 |
| 120 | 0.0805 | 0.0154 | 0.00158 | 1.58E-22 | 19.2 |
| 180 | 0.1160 | 0.0219 | 0.00193 | 4.98E-30 | 18.9 |
| 240 | 0.1480 | 0.0284 | 0.00223 | 3.26E-37 | 19.2 |
| 300 | 0.1830 | 0.0364 | 0.00249 | 3.58E-48 | 19.9 |
| 360 | 0.2086 | 0.0447 | 0.00272 | 1.19E-60 | 21.4 |
| 420 | 0.2335 | 0.0515 | 0.00294 | 1.36E-68 | 22.0 |
| 480 | 0.2575 | 0.0584 | 0.00314 | 3.07E-77 | 22.7 |
| 540 | 0.2808 | 0.0638 | 0.00332 | 5.13E-82 | 22.7 |

*Downstream Consequences*
69 STAN. L. REV. 711 (2017)

**Table A.2**

Numeric Results for Felony Recidivism Analysis

| Days Since Bail Hearing | Cumulative New Felonies per Released Defendant | Estimated Effect of Detention | Standard Error | *p*-Value | Percent Change in Felonies Due to Detention |
|---|---|---|---|---|---|
| 5 | 0.0015 | -0.0012 | 0.00018 | 1.48E-10 | -79.5 |
| 10 | 0.0032 | -0.0018 | 0.00028 | 6.28E-10 | -55.1 |
| 15 | 0.0052 | -0.0022 | 0.00038 | 1.05E-08 | -42.2 |
| 20 | 0.0069 | -0.0022 | 0.00045 | 6.67E-07 | -32.5 |
| 25 | 0.0084 | -0.0020 | 0.00051 | 0.0001 | -23.7 |
| 30 | 0.0101 | -0.0022 | 0.00056 | 0.0001 | -21.3 |
| 35 | 0.0117 | -0.0022 | 0.00061 | 0.000 | -18.6 |
| 40 | 0.0133 | -0.0020 | 0.00065 | 0.002 | -15.4 |
| 45 | 0.0148 | -0.0019 | 0.00068 | 0.005 | -13.0 |
| 50 | 0.0162 | -0.0018 | 0.00072 | 0.015 | -10.8 |
| 55 | 0.0176 | -0.0012 | 0.00076 | 0.111 | -6.9 |
| 60 | 0.0192 | -0.0010 | 0.00079 | 0.212 | -5.2 |
| 65 | 0.0205 | -0.0003 | 0.00082 | 0.697 | -1.6 |
| 70 | 0.0218 | 0.0004 | 0.00085 | 0.650 | 1.8 |
| 75 | 0.0233 | 0.0007 | 0.00089 | 0.429 | 3.0 |
| 80 | 0.0247 | 0.0009 | 0.00092 | 0.328 | 3.6 |
| 85 | 0.0260 | 0.0014 | 0.00095 | 0.126 | 5.6 |
| 90 | 0.0274 | 0.0019 | 0.00097 | 0.046 | 7.1 |
| 95 | 0.0286 | 0.0023 | 0.00100 | 0.021 | 8.0 |
| 100 | 0.0298 | 0.0028 | 0.00102 | 0.006 | 9.4 |
| 120 | 0.0351 | 0.0047 | 0.00111 | 0.000 | 13.5 |
| 180 | 0.0498 | 0.0104 | 0.00136 | 0.000 | 20.9 |
| 240 | 0.0644 | 0.0150 | 0.00157 | 0.000 | 23.3 |
| 300 | 0.0782 | 0.0196 | 0.00177 | 0.000 | 25.1 |
| 360 | 0.0911 | 0.0250 | 0.00194 | 0.000 | 27.4 |
| 420 | 0.1039 | 0.0296 | 0.00210 | 0.000 | 28.5 |
| 480 | 0.1163 | 0.0343 | 0.00224 | 0.000 | 29.5 |
| 540 | 0.1280 | 0.0395 | 0.00237 | 0.000 | 30.9 |