**EXHIBIT W**

**To Declaration of Micah West in Support of
Motion for Preliminary Injunction
& Motion for Class Certification**

# THE D.C. PRETRIAL SERVICES AGENCY: LESSONS FROM FIVE DECADES OF INNOVATION AND GROWTH

In 1963, the District of Columbia Junior Bar Association toured the city's jail and wrote a scathing report on its conditions. The report noted that most of the inmates were pretrial defendants who could not pay bail. As a result of that report, the Georgetown Law School submitted a proposal to the Ford Foundation for a two-and-one-half year pilot bail project, similar to the Manhattan Bail Project, which had been implemented in New York City two years earlier. The proposal was funded, and later that year, with a staff of five interviewers and one secretary, the D.C. Bail Project began its work, using a borrowed office in the law school's building, close to the courthouse.



Bruce Beaudin

Bruce Beaudin, who was a Georgetown law student at the time, was the first interviewer hired by the D.C. Bail Project. He recalls the first case the program handled. "It took two-and-a-half days," says Beaudin. "The judge had never gotten detailed information about the defendant for a bail hearing before, and he kept asking for more, so we'd have to go back and get what he wanted. But in the end he did release the defendant."

Today, nearly 50 years after that modest beginning, the D.C. Pretrial Services Agency has grown to a staff of over 300, interviewing about 20,000 defendants a year, supervising about 12,000, and providing a variety of other services to both the U.S. District Court and the Superior Court of the District of Columbia. It is universally acknowledged by stakeholders within the District as being indispensible to the operation of the criminal justice system.

The agency is also a model nationally for demonstrating that the vision for pretrial justice outlined in the standards of the American Bar Association and the National Association of Pretrial Services Agencies can be achieved. That vision calls for the use of the least restrictive conditions of release to reasonably assure public safety and appearance in court, the use of detention when those assurances cannot be met, the sparing use of financial bail, and the abolition of commercial surety bail.

The following chart shows the incremental, but steady, progress made by the agency in making a reality the vision for a pretrial release decision-making process that results in the safe release of the majority of defendants and virtually eliminates the use of money bail.

2

**MOVING AWAY FROM RELIANCE ON MONEY BAIL**



Non-Financial Release Rates for the Years 1962, 1965, 1967, 1971, 1975, and 2008

Sources: Wayne H. Thomas, Jr., *Bail Reform in America,* University of California Press, Berkley, 1976 for data from 1962 through 1975, and *Leading the Field: District of Columbia Pretrial Services Agency FY 2008 Annual Report* for 2008 data.

As the chart shows, 80% of all defendants are currently released without a money bond. As to the remainder, 15% are held by the court without bail. Only five percent have financial bail. None are out on commercial surety bail.

The high non-financial release rate has been accomplished without sacrificing the safety of the public or the appearance of defendants in court. Agency data show that 88% of released defendants make all court appearances, and 88% complete the pretrial release period without any new arrests.[1]

This Case Study looks at how the D.C. Pretrial Services Agency moved the District's courts from being totally reliant upon money bail to virtually eliminating its use while maintaining high rates of court appearance and good conduct while on pretrial release. It tells the story of an agency that has always been on the move, seeking to define its own future and the future of the system it serves, rather than allowing circumstances outside its control to dictate the course of events. It also provides lessons that other jurisdictions could learn in seeking to move closer to the vision enunciated in the national standards.

**GETTING OFF THE GROUND**

According to Beaudin, who went on to serve as director of the agency from 1968 until his appointment as a District of Columbia Superior Court judge in 1984, the agency began by targeting selected felony defendants who remained in jail after their first appearance and while they were awaiting indictment. "We had no standing in the courtroom," explains Beaudin. "So when we identified those who we thought had a chance we had to take those cases to legal aid (the

predecessor to the public defenders office) and the prosecutor and have them bring those cases before the court."

This situation began to change with the passage of the Federal Bail Reform Act of 1966, which provided a list of factors that the judge must consider in making a pretrial release decision. Many of those factors, such as community ties, residence status, and employment, involved information that was not available to the court in most cases. But it was information that the Bail Project, which by then was called the D.C. Bail Agency,[2] was collecting. And since the Federal Bail Reform Act was applicable to courts within the District of Columbia, judges in D.C. needed the added information.

Thus, by 1967, the agency was interviewing all felony defendants and providing the results of its investigation directly to the court. The number of staff had grown to 13, with an annual budget of $130,000. Still, the growth did not come without difficulties as the agency worked to implement, through its recommendations, the Bail Reform Act's call for release on the least restrictive conditions reasonably calculated to assure appearance. "We went through a lot of trials and tribulations back then," says Beaudin. "Some judges kicked us out of their courtrooms."

As Beaudin later wrote of the difficulties encountered in those days: "Little thought was given to testing the conditions enumerated in the [Bail Reform] Act and financial bond continued to be used as a means of detaining high risk accused. Some of the problems of administering the Act which had not been anticipated soon surfaced. There was no method designed to notify those released of their court dates. There was no one to supervise releasees prior to trial."[3]

These concerns led to the creation of a committee in 1968, chaired by U.S. District Judge George Hart, to study the implementation of the Bail Reform Act in D.C. That committee, looking at the work that the agency had done up until that point, recommended expansion of the agency "to carry out a broad new range of pretrial services," including providing supervision of defendants and serving as "the central check-in and information agency at the courts for all defendants released pending appearance in criminal proceedings."[4]

### THE AGENCY'S MISSION EVOLVES

In 1970, Congress adopted most of the Hart Committee's recommendations as part of the D.C. Court Reform and Criminal Procedure Act. This Act, which took effect in 1971, greatly expanded the responsibilities of the agency, leading to a growth from 13 to 39 staff and the establishment of a supervision unit. The Act also required that judges consider the risk of danger to the community, in addition to failure to appear in court, in the pretrial release decision, and authorized the court to hold defendants in pretrial detention in specific, limited circumstances. In addition, the Act mandated that the agency "supervise all persons released on nonsurety release, including release on personal recognizance, personal bond, nonfinancial conditions, or cash deposit or percentage deposit with the registry of the court;" a provision that came to be understood to mean that the agency did not supervise persons released on surety bonds.[5]

4

"The organizational culture of the agency was formed at that time," says John A. (Jay) Carver, who joined the agency in 1971 while still in law school, and served as its director from 1984 to 1997. As Carver explains, while the agency was established out of concern over the poor not being able to post bail, by the early 1970s it was clear that the law required a new mission for the agency – to provide information and a range of options to the court on all cases so that the court could make an informed decision in every case.

The agency recognized that the only way to assure that the court was getting the best information and range of options possible was to collect and analyze data. At a time when automated information systems were just a dream for most government agencies, the agency was hard at work to build its own computer data base. In 1974, the agency sought and received a U.S. Department of Justice grant of $53,000 to develop the automated system. With the system, which was implemented in 1977, the agency was able to enter and store information from its interview and verification process, speed up significantly the time needed to prepare reports, monitor compliance with release conditions, and generate court date reminder letters for defendants. The agency was also able to generate data on its performance.

And the agency used those data to drive its innovations. For example, the data showed that in the late 1970s the agency was refraining from making any recommendation to the court in 40 percent of cases due to the perceived high risks presented. When the agency reviewed data showing that the court was actually releasing about 40 percent of the defendants that the agency was not even recommending, it decided it had to revamp its recommendation scheme. It determined that it would no longer refrain from making a recommendation in the tough cases. Rather, it would present the court with a release option – with conditions, as appropriate – in every case. Moreover, since the law required that the court consider both danger to the community and appearance in court in the release decision, the agency would make a separate assessment for each of these two considerations.

The agency also decided that it would begin to encourage the court and prosecutor's office to make greater use of the detention provisions allowed by law. Up until that time, the detention provisions of the Court Reform Act were being invoked sparingly. The court was continuing to use high money bail as the vehicle to hold the highest risk defendants. The agency began identifying which defendants were eligible for detention under the law, and recommending hearings to determine whether detention was necessary to protect the safety of the community.

The new recommendation scheme was implemented in 1980. In an evaluation of that new scheme, published in 1984, the evaluators suggested that the agency re-think its position of making a release recommendation in every case because, according to the findings of the evaluation, the court was declining to follow those recommendations in a large number of cases. In a written response to that recommendation, the agency said: "We are committed to forging policies that 'set the tone' for what we believe to be the requirements of the law. If these policies do not seem to comport with current practice, we do not feel it incumbent upon us to change them only to reflect the status quo."

Rather than change its recommendation policies so that they better fit the decisions being made by the court, the agency responded by working to expand the options available to the court. "The

commitment was to always expand the range of options available to judges," says Carver. Over the course of the next few years, the agency implemented three significant initiatives designed to address the concerns of judges: a Failure to Appear Unit, which worked to prevent the issuance of bench warrants for defendants who had legitimate reasons for missing court and resolving warrants once issued by encouraging defendants to voluntarily surrender on the warrant to the agency; a Drug Testing Unit, which screened all defendants for drug use prior to the initial appearance in court and provided regular testing of defendants while on release when ordered by the court; and an Intensive Supervision Unit, which supervised higher risk defendants in halfway houses.

These innovations gave the court the confidence to expand non-financial release, but there was still significant use of money bail in cases of defendants who were eligible for detention. Data collected by the agency from a six-month period in 1990 showed that while 29% of defendants were eligible for detention hearings, such hearings were held for only about 5%, and less than half of those were ultimately detained. Two-thirds of those eligible for detention had a money bond set instead. While many of these defendants remained in jail because they could not post the bail, many others of these potentially dangerous defendants were able to purchase their release.

In 1991, during the height of a crack cocaine epidemic in D.C., there were a number of highly-publicized drive-by shootings that focused attention on the bail system. Carver worked closely with the U.S. Attorneys Office and the Public Defender's Office on a bill before the D.C. Council. The resulting legislation, passed in 1992, expanded the scope of pretrial detention and included several rebuttable presumptions for detention. Carver was also successful in getting language inserted in the bill that prohibited the court from setting a financial bail that resulted in the defendant remaining in jail. (See box for the language of this provision.)

**(Sec.2 §23-1321(c)(3) of the D.C. Code)**

A judicial officer may not impose a financial condition under paragraph (1)(B)(xii) or (xiii) of this subsection to assure the safety of any other person or the community, but may impose such a financial condition to reasonably assure the defendant's presence at all court proceedings *that does not result in the preventive detention of the person*, except as provided in § 23-1322(b). (Emphasis added.)

The impact of this bill was immediately apparent. In the year before the law took effect only 2% of defendants were held under a detention provision. In the year after it became law, 15% were detained.

Many in the District's criminal justice system credit Carver's insertion of the clause forbidding the use of money bail to detain a defendant as the single most important event in ridding D.C. of bail bonding for profit and rendering any use of money bail to rare occasions. "If that statutory command is interpreted to mean that you have a right to a bond that you can meet, then money quickly loses its efficacy in almost all contexts," notes D.C. Superior Court Senior Judge Truman A. Morrison III, pointing out that 95% of defendants in D.C. are indigent.

6

While acknowledging the importance of the 1992 act, Carver sees that the virtual demise of money bail in D.C. and the certainty of detention for the highest risk defendants was a long process of demonstrating how the pretrial release decision-making process could work without money bail. "To make the detention parts work, we had to make the release options work. By expanding those options, we got away from money. It was a natural progression."

### SUSTAINING A "CONSISTENT COMMITMENT TO INNOVATION"

That long process of establishing a pretrial release process that could work well without relying on money bail did not end in 1992. As Judge Morrison notes, the agency continues to exhibit "a consistent commitment to innovation." The agency, he says, has a "captive courthouse when they innovate. The court listens to the agency when it has plans to make changes. This in itself is remarkable."

**Since 1992, the agency has begun and sustained the following initiatives:**

- The administration of the Superior Court's Drug Court Program, which acts a diversion program for certain misdemeanor defendants and as a way to receive a possible probation sentence for other defendants.
- Providing assessments and supervision for defendants participating in the Mental Health Diversion Program for defendants with mental illness who are charged with non-violent crimes.
- The establishment of the Specialized Supervision Unit, which targets defendants with mental illness, mild mental retardation, and co-occurring mental health and substance abuse problems.
- Providing supervision services to the East of the River Community Court, which offers diversion opportunities to non-domestic violence related misdemeanor defendants arising out of certain high crime areas of the city.
- The establishment of a U.S. Department of Health and Human Services-certified on-site drug testing laboratory to provide the greatest possible assurance of accurate drug test results.
- The implementation of the Drug Testing Management System to automate the collection and analysis of urine samples for the on-site laboratory, using barcode technology to track each step in the process and assure accurate and timely transmittal of drug test results to the court.
- The implementation of the High Intensity Supervision Program, which uses electronic monitoring (EM), including wireless cellular EM, and Global Positioning System (GPS) technology to monitor high risk defendants.
- The establishment of New Directions, which provides sanctions-based substance abuse treatment, supervision, and case management to drug-involved defendants who do not otherwise qualify for Drug Court.
- The establishment of the Social Services and Assessment Center, which conducts comprehensive mental health and substance abuse treatment assessments of defendants.
- The development of PRISM, a web-based information system.

7



Susie Shaffer
Director of the D.C.
Pretrial Services Agency

To some, consistently seeking to innovate, especially after the agency had virtually achieved the vision of the ABA and NAPSA standards for a system that operates without bail money, may seem to be risky. What would happen to the agency's hard-won reputation for excellence if any of its innovations should fail? "We don't think about any risks in starting something new," says Susie Shaffer, director of the agency since 1997. "We focus on our mission and its principal stakeholder – the court." She explains that many initiatives start as pilot projects. "We run them for a while, figure out what is working and what is not. By having the data to know what is working and what is not, we can get the funding to make the adjustments and go to full implementation."

## IMPLICATIONS FOR OTHER JURISDICTIONS

The agency's administrators, past and present, have identified several keys to the success of the agency in creating and sustaining bail reform that are transferrable to any jurisdiction:

- *Belief in and focus on the mission and vision of the agency.* The mission and vision of the agency are constantly present before the staff (they are posted throughout their offices and are embedded into their e-mail correspondences), and every piece of work that staff do is tied to the mission and vision. "We strongly believe in what we do," says Shaffer.
- *Having a "reformer" mentality as an organizational culture.* The reform that staff sought at the outset was to fight against the injustice of poverty. As the bail laws changed, changing with it the mission of the agency, the office culture retained the reformer mentality, but staff focused reform efforts on providing good government.
- *Empowering staff to be productive by creating a continuous learning environment.* While in its earliest years, on-the-job training was all that was available to new staff, the agency soon designed a structured and intensive training program for new staff and ongoing in-service training opportunities. Over the years, the training programs have been constantly reviewed and enhanced. The agency also provides staff with an array of career development opportunities that allow them to hone their skills. For example, the agency has established a Mentoring Program, where senior staff members serve as mentors to less experienced staff.
- *Making the collection, analysis and distribution of reliable data a high priority.* The agency learned very early in its life the role that data could play in identifying problems that needed to be addressed and then designing problem-solving strategies. "Back then, we were the only reliable source of data," says Carver. "It is the reason why we were able to get federal grants." Today, the agency uses data in sophisticated logic models to measure performance and set new goals.
- *Recognizing the importance of consultations and collaborations.* From participation in in-service training of other key stakeholders (i.e., judges, prosecutors, public defenders, police) to making sure that it is always a participant at the table, the agency has been a full partner in the District's criminal justice system. Moreover, the agency has focused on how the whole system can be enhanced with effective pretrial services. As Carver notes, "We've always tried to be comprehensive in our approach. We're not trying to solve just one piece of the puzzle."
- *Building on its reputation to get buy-in for new initiatives.* As the reputation of the agency for excellent work grew within the D.C. criminal justice system, so did the trust level of the agency. The agency used that trust to convince key stakeholders that it could make new initiatives work. "Success breeds success," says Shaffer.

8

To be sure, there are factors that are unique to D.C. that certainly have contributed in part to the successes the agency has enjoyed over the past five decades. For example, the resources available to the program grew dramatically when it became a federal agency, but that did not happen until 2000 – long after the agency had established its local and national reputation for innovation and excellence. And the agency has operated under statutes that closely match the model laid out in the ABA and NAPSA Standards, but many state statutes declare a strong presumption for release by non-financial means and allow the court to detain high risk defendants without bail.

The D.C. Pretrial Services Agency has drawn the only architectural plans that exist for successfully building a pretrial release decision-making process that results in the safe release of the overwhelming majority of defendants and does not rely on money bail. Other jurisdictions seeking the same result should carefully examine what the District of Columbia has done.

### Mission and Vision of the D.C. Pretrial Services Agency

The mission of the D.C. PSA is to assess, supervise and provide services for defendants, and collaborate with the justice community, to assist the courts in making pretrial release decisions. PSA promotes community safety and return to court while honoring the presumption of innocence.

PSA's vision is to thrive as a leader within the justice system by developing an empowered workforce that embodies integrity, excellence, accountability, and innovation in the delivery of the highest quality services.

---

1 Spurgeon Kennedy, "A Window Into Some of PSA Accomplishments During Fiscal Year 2009," *The Advocate*, Fall 2009, at 3.

2 The name of the agency was changed to the District of Columbia Pretrial Services Agency in 1978.

3 Bruce D. Beaudin, "Bail in the District – What It Was; Is; and Will Be," *American University Law Review*, Vol. 20 (1970-71).

4 Quoted in Wayne H. Thomas, Jr., *Bail Reform in America*, University of California Press; Berkley, 1976, pp. 166-167.

5 D.C. Court Reform and Criminal Procedure Act, Pub. L. 91-358, title II, § 210(a), 84 Stat. 640 (1970); D.C. Official Code § 23-1303(h).

6 Mary A. Toborg, Anthony M.J. Yezer, Philip Tseng, and B. Lynn Carpenter, *Pretrial Release Assessment of Danger and Flight: Method Makes a Difference*, Lazar Management Group, Inc., 1984, at 30.