**EXHIBIT BB**

**To Declaration of Micah West in Support of
Motion for Preliminary Injunction
& Motion for Class Certification**

**Is it too much, too little, or just right? How are we defining success? Could we do this better?** The only way to answer such questions is to gather more information about who is in our jails—why they are there, and for how long—and whether current pretrial practices produce the intended results: court appearance and public safety.

# PRETRIAL JUSTICE: HOW MUCH DOES IT COST?

In nearly every jurisdiction, for nearly every criminal offense, courts require people to pay money to be released from jail before their trial. In recent years, many—from local city councils to the White House[1] —have begun to question this practice, for both its inequities and its negative effect on public safety. But there is also the matter of financial costs. Money bond systems create unnecessarily high pretrial (and post-adjudication) incarceration rates that weigh down justice system budgets. Each day someone is in jail, the price of his or her food, medical care, and security (excluding fixed building expenses) may be conservatively estimated at $85 a day. Roughly 450,000 people are detained before trial on any given day at a daily cost to U.S. taxpayers of more than $38 million.

*The Costs of the Money Bail System*........2

*The Costs of Posting Money Bond*............3

*The Costs of Mass Incarceration*..............4

*The Cost Savings of Change*...................5

*Conclusion*……………………………….6

This brief summarizes what researchers and practitioners have learned as of January 2017 about the costs of the current system compared to legal and evidence-based improvements such as moving away from money bail, implementing pretrial risk assessment, providing court reminders, and monitoring or supervision.

## The Purposes of Bail

The decision to detain or release a person after arrest is legally straightforward. By law, courts must:
- maximize public safety,
- maximize court appearance, and
- maximize pretrial liberty.



20170112-01

How can courts achieve all three goals at the same time? National standards and research recommend:
- Ensuring arrested people have a lawyer at their first appearance before the court,
- Conducting individualized determinations of a person's risk of flight and to public safety,
- Applying a hierarchy of release options that result in least restrictive conditions, and
- Assigning money bond only when no other conditions can reasonably assure court appearance. (By law, courts may not assign high money bail amounts to keep someone in jail in an effort to protect public safety.)[2]

## The Costs of the Money Bond System

Jailing arrested people before trial is the greatest expense generated by current pretrial justice practice. As noted earlier in this brief, taxpayers spend approximately $38 million per day to jail people who are awaiting trial (63% of the total jail population, or more than 450,000 individuals on any given day). Annually, this $14 billion[3] is used to detain people who are mostly low risk[4], including many whose charges will ultimately be dropped. By adopting commonsense policies that detain only higher risk people, that money could pay for a bevy of other needed services.

This is, however, just a portion of the total price tag. The collateral costs to justice systems, communities, and individuals, have been estimated to be as high as $10 for every $1 in direct costs.[5] This suggests that the true cost of existing money-based pretrial systems is closer to $140 billion per year.

Jail costs vary widely depending on region, how long individuals are incarcerated, special health or accommodation needs, and other factors. For example:

• It costs about $460 per day to house one person in New York City's Rikers Island detention center, or more than $167,000[6] per year—nearly equal to four years' tuition at Princeton University.[7] In 2014, 1,427 people had been detained at Rikers for more than one year.[8]

### What could you get for $14 billion?
Shelter & services for all **50,000** homeless veterans and homelessness prevention for the **1.4 million** vets at risk

or

**300,000** firefighters

or

**250,000** elementary school teachers

or

Head Start for **1.8 million** children

or

Free or reduced lunch for **31 million** children

"Leaving Homeless Person On The Streets: $31,065. Giving Them Housing: $10,051." May 7, 2014, Think Progress; "Background & Statistics," National Coalition for Homeless Veterans; "Firefighter Salary," Indeed; "Occupational Outlook Handbook: Kindergarten and Elementary School Teachers," U.S. Department of Labor, Bureau of Labor Statistics; "Head Start Program Fact Sheet Fiscal Year 2010," Head Start; "National School Lunch Program," U.S. Department of Agriculture, Food and Nutrition Service.



- It costs three times as much to process and jail the small percentage of individuals who cycle in and out of jail repeatedly compared to more typical inmates. These people are generally accused of low-level, nonviolent offenses stemming from homelessness, substance use and mental health issues.[9]

- It is 60-100% more expensive to jail people who have health, mental health, or substance use disorders.[10]  It is estimated that two-thirds of people in jail suffer from these problems.[11]

- It is expensive just to put a person in jail. Intake costs—for booking, creating records, medical screenings, and uniforms—may exceed $800 and are incurred even if the person is released within the hour.[12]

## The Costs of Posting Money Bond

Millions of people manage to pay money bond—at the cost of neglecting other critical expenses and draining their communities of billions of dollars every year. A recent study in Mary-

### Saving Money—Not a Fairy Tale

Alan[*] earns the median annual income in Baltimore: **$26,164**. He is arrested and assessed as "medium risk" for having failed to appear in court on previous charges. This means that, statistically, Alan has an **87% likelihood** of coming back to court and staying arrest-free before trial. Alan's bond is set at **$50,000**, slightly above average for medium-risk defendants in Baltimore.[†]  To pay a bail bondsman's ten percent fee would cost Alan more than **two months'** salary—and he isn't working because he's in jail. So Alan stays in jail for **42 days** (the average length of stay)[‡] before he finally pleads guilty just to get out (privately, he maintains his innocence). Alan's incarceration cost taxpayers at least **$5,460**.[§]  He has lost his job and his family is facing eviction. Because he spent time in jail, Alan is now statistically more likely to engage in crime. Because of his guilty plea, he will have a harder time finding a job.

If Alan had been released without money bond, community supervision costs to taxpayers would have been **$105**. He could have kept his job, kept his apartment, and cared for his family

About **35,000** people are committed to the Baltimore jail every year.[¶]

---

\*   A fictional representation of a common case.
†  "Commission to Reform Maryland's Pretrial System: Final Report," December 19, 2014. The Governor's Commission to Reform Maryland's Pretrial System.
‡ "Public Safety Overview: Presentation to the Legislative Policy Committee," June 6, 2013, Annapolis, Maryland. Maryland Joint Prison Task Force, Department of Public Safety and Correctional Services on Public Safety and the Baltimore City Detention Center Briefing.
§  Robert C. Embry Jr., "The path to an overdue end of bail," *Baltimore Sun*, June 7, 2016, www.baltimoresun.com/news/opinion/oped/bs-ed-bail-reform-20160607-story.html.
¶ Nastassia Walsh, "Baltimore Behind Bars: How to Reduce the Jail Population, Save Money and Improve Pubic Safety," Justice Policy Institute, June 2010.



## The Costs of Getting It Wrong

A small percentage of people should not be released after arrest because they pose unmanageable risks to public safety. Pretrial practices that rely on money allow these people to buy their way out of jail, sometimes with tragic consequences. Research shows that nearly half of the most dangerous defendants pay money bond and are released.* Just as it is unnecessarily costly to incarcerate low-risk people who cannot afford money bond, we pay a price for letting high-risk individuals buy their freedom without oversight.

In May 2014, a Colorado state trooper was shot by a man who had been released on $75,000 bond for charges including second degree attempted murder and assault. The trooper barely survived. The Colorado State Patrol estimates known costs in this case—for medical expenses, lost wages, and other related costs—to exceed $550,000.† The mental and emotional costs cannot be as easily calculated.

---

\* "Research Summary: Developing a National Model for Pretrial Risk Assessment," Laura and John Arnold Foundation.
† Personal communication with Colorado State Patrol, August 2016.

land found that people arrested in the state from 2011 to 2015 paid combined bail bond premiums of more than $256 million. More than $75 million was paid in cases that were dropped or found not guilty. Those people do not get their money back. This system perpetuates cycles of poverty for some communities and disproportionately impacts communities and families of color.[13]

Take, for example, the case of Demorrea Tarver, arrested in Baltimore in 2008 and charged with drug possession. Tarver's mother paid a bail bondsman a $5,000 down payment on the $27,500 non-refundable bond premium (10% of the full $275,000 bond amount). All charges were dropped weeks later, but the Tarvers were still required to pay $300 per month to the bondsman. When they were unable to pay that, the case went to debt collection. Demorrea Tarver currently pays $100 a month on this debt, which is less than the interest that accrues. At this rate he will NEVER pay off his bail debt.[14]

## The Costs of Mass Incarceration

Current pretrial justice systems that result in increased crime, convictions, and incarceration contribute to mass incarceration—a problem that costs taxpayers as much as $1 trillion annually (almost 6% of the gross domestic product). [15]

Compared to identical people released before trial, low-risk people held longer than three days are:
• Arrested 74% more frequently during the pretrial phase and 51% more up to 2 years later;[16]
• 30% more likely to be convicted or plead



guilty, with resulting sentence lengths 18 months longer;[17]
• Four times more likely to receive a jail sentence and three times more likely to receive a longer jail sentence; and
• Three times more likely to receive a prison sentence and twice as likely to receive a longer prison sentence.[18]

## The Cost Savings of Change

It has been estimated that implementing validated, evidence-based risk assessment to guide pretrial release decisions could yield $78 billion in savings and benefits, nationally.[19] The cost savings presented below focus on two common strategies: *replacing bond schedules with pretrial risk assessment* and *using non-financial conditions of release*, such as court reminders, monitoring and supervision, and unsecured bonds (in which individuals pay money only if they fail to appear in court.)

• An analysis using the Pretrial Cost-Benefit Model developed by economists found **Denver, Colorado** could avoid nearly $6 million in costs and also reduce crime by using a risk-based system and setting release goals by risk level (e.g., release 65% of Level 1 defendants within 24 hours and 25% more within two to seven days).[20]

• **Santa Clara County, California** uses a locally validated pretrial risk assessment tool that saved $33 million in six months by keeping 1,400 defendants out of jail.[21] Pretrial release costs the county just $15-$25 per day compared to $204 per day for jail. The county maintains a 95% court appearance rate and a 99% public safety rate of defendants released without supervision.

• In **Kentucky**, 88% of all arrested people are released and only 3% are given extra supervision conditions.[22] Kentucky saved counties approximately $25 million in jail costs in one year by increasing the pretrial release rate by 5%, resulting in nearly 11,000 additional people released pretrial. Supervision costs in Kentucky are 2%-10% of detention costs.[23]

• In **San Francisco**, a cost-benefit analysis of expanding pretrial diversion projected a drop in jail usage leading to savings of at least $3 million per year.[24]

• A cost analysis by the sheriff's office in **Broward County, Florida** estimated the county could save more than $125 million annually by diverting 30% of arrested people from jail using programs already in place. The study also found the average cost of pretrial detention to be more than 15 times the cost of day reporting and nearly 75 times the cost of pretrial supervision.[25]

> A recent study in Maryland found that people arrested in the state from 2011 to 2015 paid combined bail bond premiums of more than $256 million. More than $75 million was paid in cases that were dropped or found not guilty. Those people do not get their money back. This system perpetuates cycles of poverty for some communities and disproportionately impacts communities and families of color.



- A study of **Harris County, Texas** calculated that if all misdemeanor defendants between 2008 and 2013 assigned money bond of $500 had been released without financial conditions there would have been
    - 40,000 more people released pretrial;
    - 5,900 avoided criminal convictions (mainly from a drop in wrongful guilty pleas);
    - 400,000 fewer jail bed-days used [26];
    - 1,600 fewer felonies and 2,400 fewer misdemeanors committed by people within 18 months of their release; and
    - $20 million in saved supervision costs.[27]

- **The District of Columbia** releases roughly 88% of arrested people and supervises about 70% of those released at an average cost of $18 per day per individual. DC's jail operates at 60% below capacity, with pretrial cases accounting for only 12% of the jail population (compared to 63% nationally).[28] The District has consistently high court appearance rates and low pretrial arrest rates. [See sidebar for more on DC's pretrial costs.]

### The Truth About DC's Pretrial Costs

The District of Columbia's Pretrial Services Agency (PSA) produces excellent results without relying on money bond. However, critics often decry its sizeable budget. Because PSA is an independent federal agency it carries costs that other local agencies don't have. Salaries and benefits are set for employees at the federal rate, which typically exceeds state and local employee pay. PSA performs full human resources and administrative functions in-house; most other pretrial services agencies rely on city, county, or state offices for these duties. PSA also has its own drug specimen collection and testing laboratory—which other jurisdictions outsource to other agencies. When these costs are accounted for, DC's $29.4 million pretrial budget is modest and comparable to other jurisdictions.

## Conclusion

Costs and cost savings are of great concern to people interested in creating pretrial justice systems that are safer and more effective. The evidence shows that current pretrial practices—especially those that use money bail and over-use jail beds for lower risk people—are needlessly expensive and doesn't produce positive results. On the other hand, legal and evidence-based improvements save money and produce more desirable outcomes for systems and the people they serve.

To learn more about pretrial systems and their costs, please visit any of the following resources:
Pretrial Justice Institute (www.pretrial.org)
University of Pretrial (university.pretrial.org)
Dr. Michael Wilson, MW Consulting (www.m-w-consulting.org/projects)



## Endnotes

1 "Fines, Fee, and Bail:  Payments in the Criminal Justice System that Disproportionately Impact the Poor," *Council of Economic Advisers Issue Brief*, December 2015.
2 "Criminal Justice Section Standards: Pretrial Release," American Bar Association. Accessed November 23, 2016. www.americanbar.org/publications/criminal_justice_section_archive/crimjust_standards_pretrialrelease_toc.html.
3 Natalie Ortiz, "County Jails at a Crossroads," July 8, 2015, National Association of Counties.
4 U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Jail Inmates at Midyear 2014*, by Todd D. Minton and Zhen Zeng, June 2015, NCJ 248629; "The Price of Jails: Measuring the Taxpayer Cost of Local Incarceration," Vera Institute of Justice, May 2015.
5 Michael McLaughlin, et al., *The Economic Burden of Incarceration in the U.S.*, George Warren Brown School of Social Work, Working Paper, July 2016, #CI072016.
6 Natasha Lennard, "State prison inmate costs NY as much as Ivy league education," Salon, October 1, 2013.
7 "Ivy League Tuition," Ivy Coach. Accessed January 10, 2017. www.ivycoach.com/the-ivy-coach-blog/tag/ivy-league-tuition/.
8 Rebecca Davis O'Brien, "New York City Courts Resolve 42% of Long-Term Cases at Rikers Island," *Wall Street Journal*, June 17, 2015.
9 Cindy Rodriguez, "The Frequent Flyers of Rikers Island," November 16, 2015, WNYC, www.wnyc.org/story/frequent-flyers-rikers-island/.
10 E. Fuller Torrey, Aaron D. Kennard, Don Eslinger, Richard Lamb, James Payle, "More Mentally Ill Persons are in Jails and Prisons than Hospitals: A Survey of the States," May 2010, Treatment Advocacy Center, www.treatmentadvocacycenter.org/storage/documents/final_jails_v_hospitals_study.pdf.
11 Roger H. Peters, Harry K. Wexler, Arthur J. Lurigio, "Editorial: Co-Occurring Substance Use and Mental Health Disorders in the Criminal Justice System: A New Frontier of Clinical Practice and Research," *Psychiatric Rehabilitation Journal* 38 (2015): 1-6, www.apa.org/pubs/journals/features/prj-0000135.pdf.
12 Gerald Wheeler and Gerald Fry, "Project ORANGE JUMPSUIT: Effects of Pretrial Status and Days Detained on Case Outcome of Harris County Felony & Misdemeanor A/B Defendants," September 2014, www.themisresearch.org/files/POJSept_11_2014.pdf.
13 Maryland Office of the Pubic Defender, *The High Cost of Bail: How Maryland's Reliance on Money Bail Jails the Poor and Costs the Community Millions*, November 2016, www.opd.state.md.us/Portals/0/Downloads/High%20Cost%20of%20Bail.pdf.
14 Annalies Winny, "Demorrea Tarver's charges were dropped, but the 10 percent fee he promised a bail bondsman on his $275,000 bail has him drowning in debt," July 20, 2016, *City Paper.*
15 Michael McLaughlin, Carrie Pettus-Davis, Derek Brown, Chris Veeh, Tanya, Renn, "The Economic Burden of Incarceration in the U.S.," October 2016, George Warren Brown School of Social Work, Institute for Advancing Justice Research and Innovation, Working Paper #AJI072016.
16 "Research Summary: Pretrial Criminal Justice Research," Laura and John Arnold Foundation, November, 2013.
17 Megan Stevenson, "Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes," (working paper, University of Pennsylvania Law School, May 2, 2016), https://www.law.upenn.edu/cf/faculty/mstevens/workingpapers/Distortion-of-Justice-April-2016.pdf.
18 "Research Summary: Pretrial Criminal Justice Research," Laura and John Arnold Foundation, November, 2013.
19 Shima Baradaran Baughman, "Costs of Pretrial Detention" (2016), *Boston University Law Review*, 2017, Forthcoming; University of Utah College of Law Research Paper No. 160. Available at SSRN: https://ssrn.com/abstract=2757251.
20 "Denver Pretrial Cost-Benefit Analysis," presentation by Michael Wilson to Pretrial Justice Working Group, March 2016.
21 Board of Supervisors of the County of Santa Clara Management Audit Division, "Management Audit of the Office of Pretrial Services," February 2012, www.sccgov.org/sites/bos/Management%20Audit/Documents/PTSFinalReport.pdf.
22 Charlotte McPherson, "Pretrial Supervision, Like Detention, Should Be Carefully Limited," July 19, 2016, blog for Pretrial Justice Institute.
23 Nancy LaVigne, et al, "Justice Reinvestment Initiative State Assessment Report," Urban Institute, January 2014.
24 Michael Wilson, "Justice Reinvestment in San Francisco: Cost Analysis," February 11, 2014, www.sfdph.org/dph/files/jrp/13-SF-Cost-Analysis.pdf.
25 Alex Piquero, "Cost-Benefit Analysis for Jail Alternatives and Jail," Broward Sheriff's Office, Department of Community Control, October 2010, criminology.fsu.edu/wp-content/uploads/Cost-Benefit-Analysis-for-Jail-Alternatives-and-Jail.pdf.
26 Community Resources for Justice, "Basic Jail Population Analysis," www.crj.org/page/-/cjifiles/Jail_Pop_Overview_071311.pdf.
27 Paul Heaton, Sandra Mayson, Megan Stevenson, "The Downstream Consequences of Misdemeanor Pretrial Detention," (July 14, 2016). *Stanford Law Review*, Vol. 69, 2017, Forthcoming; U of Penn, Inst for Law & Econ Research Paper No. 16-18. Available at SSRN: https://ssrn.com/abstract=2809840.
28 Clifford T. Keenan, "It's About Results, Not Money," Pretrial Services Agency for the District of Columbia. www.psa.gov/?q=node/499.

