**EXHIBIT EE**


**To Declaration of Micah West in Support of
Motion for Preliminary Injunction
& Motion for Class Certification**



# Incarceration's Front Door:
## The Misuse of Jails in America

FEBRUARY 2015 (UPDATED 7/29/15)

CENTER ON SENTENCING AND CORRECTIONS



Ram Subramanian • Ruth Delaney • Stephen Roberts • Nancy Fishman • Peggy McGarry

## FROM THE PRESIDENT

*Incarceration's Front Door* addresses what is arguably one of the chief drivers of difficulty in our troubled criminal justice system: jails.

The report's encyclopedic examination of jail use—who's in jail and the myriad paths leading there—is meant to inform. But it should also unnerve and incite us to action. As Vera's president, I observe injustice routinely. Nonetheless even I—as this report came together—was jolted by the extent to which unconvicted people in this country are held in jail simply because they are too poor to pay what it costs to get out. I was startled by the numbers of people detained for behavior that stems primarily from mental illness, homelessness, or addiction. I was dismayed by how even a brief stay in jail can be destructive to individuals, their families, and entire communities. And I've been at this work for a while now.

I suspect that many readers will come to this report thinking that jail is reserved only for those too dangerous to be released while awaiting trial or those deemed likely to flee rather than face prosecution. Indeed, jails are necessary for some  people. Yet too often we see ordinary people, some even our neighbors, held for minor violations such as driving with a suspended license, public intoxication, or shoplifting because they cannot afford bail as low as $500. Single parents may lose custody of their children, sole wage-earners in families, their jobs—while all of us, the taxpayers, pay for them to stay in jail.

*Incarceration's Front Door* reviews the research and interrogates the data from a wide range of sources to open a window on the widespread misuse of jails in America. It also draws on Vera's long experience in the field and examples from jurisdictions of different sizes and compositions to suggest how the negative consequences of this misuse can be mitigated. Indeed, this report marks a bittersweet homecoming for Vera as our very first project was The Manhattan Bail Project, which showed that many, if not most, people accused of committing a crime can be relied on to appear in court without having to post bail or be held until trial. The lessons we learned and shared in 1961 have not stuck nearly enough.

As the report makes clear, jails are all around us—in nearly every town and city. Yet too few of us know who's there or why they are there or what can be done to improve them. I hope that *Incarceration's Front Door* provides the critical insight to inspire you to find out more.

Nicholas Turner
President and Director
Vera Institute of Justice

# Contents

4    Gateway to the criminal justice system

7    Decades of growth

11   Portrait of the jailed

12   Costs and consequences

18   Six key decision points that influence the use
     and size of jails

    20    Arrest

    25    Charge

    29    Pretrial release and bail

    36    Case processing

    38    Disposition and sentencing

    41    Reentry and community supervision

46   Conclusion

48   Endnotes

# Gateway to the criminal justice system

Though there is hardly a town without one or a big city without several, jails are rarely on the radar of most Americans. There are more than 3,000 jails in the United States, holding 731,000 people on any given day—more than the population of Detroit and nearly as many people as live in San Francisco.[1] This number, high as it may be, is only a one-day snapshot. In the course of a typical year, there are nearly 12 million jail admissions—equivalent to the populations of Los Angeles and New York City combined and nearly 19 times the annual admissions to state and federal prisons.[2] Although in common parlance jails are often confused with prisons—the state or federal institutions where most of those convicted of crimes and given a sentence of imprisonment are sent—jails are locally run facilities, primarily holding people arrested but not yet convicted, and are the place where most people land immediately following arrest. Jails are the gateway to the formal criminal justice system in a country that holds more people in custody than any other country on the planet.[3]

Intended to house only those deemed to be a danger to society or a flight risk before trial, jails have become massive warehouses primarily for those too poor to post even low bail or too sick for existing community resources to manage. Most jail inmates—three out of five people—are legally presumed innocent, awaiting

## Locked up: Annual admissions

Jails have a much broader reach than prisons. Although state and federal prisons hold about twice the number of people on any given day than jails do, jails have almost 19 times the number of annual admissions than prisons do.



Local jails
11,700,000



State & federal prisons
631,000

trial or resolution of their cases through plea negotiation in facilities that are often overcrowded, noisy, and chaotic.[4] (See Figure 1.) While jails do hold people accused of serious, violent crimes, nearly 75 percent of the population of both sentenced offenders and pretrial detainees are in jail for nonviolent traffic, property, drug, or public order offenses.[5] In New York City, nearly 50 percent of cases which resulted in some jail time were for misdemeanors or lesser charges.[6] In Los Angeles County, a study of the jail system in 2008 by the Vera Institute of Justice (Vera) found that the single largest group booked into the jail consisted of people charged with traffic and vehicular offenses.[7]

Although most defendants admitted to jail over the course of a year are released within hours or days, rather than weeks or months, even a short stay in jail is more than an inconvenience. Being detained is often the beginning of a journey through the criminal justice system that can take many wrong turns. Just a few days in jail can increase the likelihood of a sentence of incarceration and the harshness of that sentence, reduce economic viability, promote future criminal behavior, and worsen the health of those who enter—making jail a gateway to deeper and more lasting involvement in the criminal justice system at considerable costs to the people involved and to society at large. These costs are also borne by their families and communities, depressing economies, contributing to increased crime, and breaking familial and social bonds. For the disproportionately high number of those who enter jails from minority communities, or who suffer from mental illness, addiction, and homelessness, time spent in jail exacerbates already difficult conditions and puts many on a cycle of incarceration from which it is extremely difficult to break free.

Recent criminal justice reform efforts have focused in the main on reducing the number of people in state prisons.[8] Prompted by ballooning state corrections budgets and a plummeting crime rate, policymakers across the political spectrum have been willing to re-examine the punitive policies that relied on incarceration as a principal crime control strategy.[9] This new policy environment has also been encouraged and buoyed by consistent public opinion polls that show most Americans support alternatives to incarceration—particularly for nonviolent offenses—and research demonstrating that certain types of law-breakers can be safely and more effectively supervised in the community.[10]

Given the complex role jails play in compounding the manifold negative consequences of mass incarceration in America—well acknowledged today on both sides of the aisle—local policymakers and their constituents interested in reducing recidivism, improving public safety, and promoting stronger, healthier communities might do well to take a hard look at how the jail in their city or county is used. To help foster public debate and action by public officials, this report offers an overview of the nation's misuse of jails. It examines the characteristics of the people who typically cycle in and out of jails; some of the key policies that contributed to the rise in the use of jail; and the impact of jail incarceration on individuals, families, and communities. It also looks at key decision points where strategies can be adopted to decrease the misuse of jails within the American criminal justice system.

## Figure 1: Convicted and unconvicted jail inmates, 2013



38% Convicted

62% Unconvicted

Source: Todd D. Minton and Daniela Golinelli, *Jail Inmates at Midyear 2013 - Statistical Tables.* (Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2014), appendix table 3, p. 11

## WHAT IS A JAIL?



The history of jails in English-speaking countries, including America, can be traced back to twelfth-century England during the reign of King Henry II who ordered their construction and placed them under the control of the crown's local government representative, the county sheriff. Their primary purpose was to detain people awaiting trial and those convicted but awaiting punishment. The earliest reference to jails in the United States is to the construction of a "people pen" in 1632 in prerevolutionary Boston. Mirroring the brutal British penal codes and practices of the day, the dominant form of criminal punishment in colonial America was corporal—with serious crimes punishable by death, physical mutilation, branding, or whipping, and lesser offenses by public ridicule and humiliation through the use of the stocks, the pillory, the public cage, or the ducking stool. But with the conversion of Philadelphia's Walnut Street Jail into the country's first penitentiary in 1790—as part of penal reform championed by the Quakers—incarceration as punishment soon became the default response for serious law-breaking and with it the modern prison system was born.[a]

Today jails are, with few exceptions, municipal or county-level confinement facilities that are administered by local law enforcement agencies or departments of correction.[b] Like their historical antecedents they are used to detain people awaiting trial who are deemed a flight risk or a danger to public safety. But many also house a range of other people caught up in the criminal system as described below. Jails range in size from small "lock-ups" that hold no more than a handful of people to networks of facilities, such as the eight jails in Los Angeles County that house approximately 20,000 inmates.[c] Their costs are mainly paid for by a municipality or county with reimbursements sometimes coming from the state or federal governments.

Unlike state prisons, which almost exclusively hold people serving state sentences, jail populations are heterogeneous, making them particularly challenging to manage.

Jails may house:

> **Pretrial detainees** held from the time they are arrested until they post bail, are released on their own recognizance or to some form of pretrial community supervision, or until the cases against them are settled by trial or plea.

> **Locally sentenced inmates** convicted of minor crimes for which they have received short custodial sentences, typically a year or less but longer in some states.[d]

> **State sentenced inmates** convicted of more serious crimes awaiting transfer to a state prison or assigned to serve their sentence in a

local facility due to prison overcrowding. Local jurisdictions are paid to house these overflow inmates. This latter trend is most significant in California, where the state department of correction is under court order to reduce crowding in prisons.[e]

> **Apprehended probation violators** who are either awaiting a hearing on an alleged violation of the terms of their supervision in the community, or serving the remainder of their sentence in local confinement.

> **Apprehended parole violators** awaiting a hearing on an alleged violation or transfer back to state prison.

> **Pretrial federal detainees** awaiting trial on federal charges, in jurisdictions where no federal detention beds are available. Local jurisdictions are paid to house these inmates.

> **Apprehended pretrial or sentenced inmates from other jurisdictions** awaiting transfer or housed at the jail due to unavailability of beds in the other state or local jurisdiction.

> **Immigration and Customs Enforcement (ICE) detainees** held at the request of the U.S. government pending adjudication of immigration violations or deportation. Local jurisdictions are paid to house these inmates.

[a] For a brief overview of the history of jails, see http://law.jrank.org/pages/1399/Jails-Historical-perspective.html.
[b] Six states—Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont—do not have locally-run jails and instead run unified correctional systems, meaning that both prisons and jails are under the jurisdiction of the state's Department of Corrections. See Barbara Krauth, *A Review of the Jail Function within State Unified Corrections Systems* (1997), 2, http://static.nicic.gov/Library/014024.pdf, p. 2.
[c] Vera Institute of Justice, *Los Angeles County Jail Overcrowding Reduction Project,* (New York: NY: Vera Institute of Justice, 2011), i.
[d] Individuals sentenced to a jail rather than a prison sentence are usually convicted of a misdemeanor—a low-level criminal offense that typically has no more than a maximum custodial sentence of a year. Some states, such as Texas, allow jail sentences for certain felony offenders (known as "state jail felonies"), while in other states, such as Pennsylvania, certain types of misdemeanors expose individuals to incarceration of more than one year.
[e] See *Brown v. Plata*, 131 S.Ct. 1910 (2011).

# Decades of growth

By every measure, the scale at which jails operate has grown dramatically over the past three decades. The number of annual admissions nearly doubled, from six million in 1983 to 11.7 million in 2013.[11] While there are no national data on how many unique individuals these admissions represent, data from Chicago and New York City suggest that a small minority is responsible for upwards of one-half of all admissions to jail—that is, some people return to jail over and over. In Chicago, 21 percent of the people admitted to jail between 2007 and 2011 accounted for 50 percent of all admissions.[12] In New York City, from 2008

through mid-year 2013, just shy of 500 people were admitted to jail 18 times or more, accounting for more than 10,000 jail admissions and 300,000 days in jail.[13] The number of people in jail on any given day has also climbed—from 224,000 people in 1983 to 731,000 in 2013, the latest year for which data are available.[14]

### Jail's revolving door in New York City, 2008 - 2013



**473** people were admitted to jail 18 times or more:

> 85% charged with misdemeanor or violation

> 21% had a serious mental illness

> 99.4% had a substance use disorder



Accounting for more than **10,000** jail admissions



and more than **300,000** days in jail

The rate of confinement (that is, the proportion of the population in jail at any one time) also rose markedly over roughly the same time: increasing from 96 per 100,000 U.S. residents in 1983 to a peak of 259 per 100,000 in 2007.[15] The rate has since declined to 231 per 100,000 in 2013.[16]  This growth in the confinement rate continued for years after crime rates started to decline (see Figure 2.) Both

## Figure 2: Crime and jail rates per 100,000



Source: For jail rates, see Craig A. Perkins, James J. Stephan, and Allen J. Beck, *Jails and Jail Inmates: 1993-94*. (Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 1995); Allen J. Beck and Jennifer C. Karberg, *Prison and Jail Inmates at Midyear 2000*. (Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2001); Todd D. Minton and Daniela Golinelli, *Jail Inmates at Midyear 2013 - Statistical Tables*. (Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2014); and for crime rates, see Uniform Crime Reporting Statistics - UCR Data Online at http://www.ucrdatatool.gov/.

violent and property crime rates peaked in 1991 and have been declining steadily ever since—nationally, violent crime is down 49 percent from its highest point more than 20 years ago and property crime is down 44 percent.[17]

While the country has continued to grow safer—at least by the most common measures of public safety—an ever-larger proportion of the population is being sent to jail, though research demonstrates that there is little causal connection between improved public safety and an increased use of incarceration.[18] Notably, much of this growth in jail use tracks the rise of drug crime enforcement. From 1981 until 2006, when they peaked, total drug arrests more than tripled, from 560,000 to 1.9 million, and the drug arrest rate (per 100,000) grew 160 percent. The share of people in jail accused or convicted of a drug crime increased sharply in the 1980s,

## Figure 3: Drug arrests, 1981–2012



Source: Howard N. Snyder, and Joseph Mulako-Wangota, Bureau of Justice Statistics. With underlying data from the FBI's Uniform Crime Reporting (UCR) Program, the information presented in this figure was generated using the Arrest Data Analysis Tool at www.bjs.gov.

## Figure 4: Drug defendants and inmates as share of jail populations



Source: For the 1983 drug share, see Allen J. Beck, *Profile of Jail Inmates, 1989* (Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 1991); and for 2002, see Doris J. James, *Profile of Jail Inmates, 2002* (Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2004).

from nine percent in 1983 to 23 percent in 1989, and has hovered there ever since (see Figures 3 and 4).[19]

Not only are more people ending up in jail, those who get there are spending more time behind bars. The length of stay increased from an average of 14 days in 1983 to 23 days in 2013.[20] Although the national data on length of stay do not distinguish between those held pretrial and those sentenced to a term in jail, this increase is nevertheless a significant and worrisome trend. Moreover, since the proportion of jail inmates that are being held pretrial has grown substantially in the last thirty years—from about 40 to 62 percent—it is highly likely that the increase in the average length of stay is largely driven by longer stays in jails by people who are unconvicted of any crime.

## Length of stay in jails

Average length of stay in days has been increasing over the past 30 years.



14 DAYS



23 DAYS

## ABOUT THE DATA

Wherever possible, the authors of this report support their analysis of the current state of jails in the United States with reference to the latest available national data—most of which are collected by the U.S. Department of Justice's Bureau of Justice Statistics (BJS). The BJS releases jail reports with statistical tables annually as part of its *Prison and Jail Inmates at Midyear* series. These reports include data on jail capacities, population counts, and demographic breakdowns. They do not, however, include more detailed data on such topics as the severity of charges or the prevalence of mental health issues. The last time the BJS released data on these topics was in 2002 in its *Survey of Inmates in Local Jails*, a detailed survey of a sample of nationally representative jail inmates. These surveys were conducted in five-to-seven year intervals from 1972 through 2002, but have not been conducted since. This report includes figures from the latest survey where the survey's findings are still relevant and more recent figures are not available. The authors also draw attention to data from local jurisdictions when doing so can illuminate an issue or a notable trend.

# Portrait of the jailed

While jails still serve their historical purpose of detaining those awaiting trial or sentencing who are either a danger to public safety or a flight risk, they have come to hold many who are neither. Underlying the behavior that lands someone in jail, there is often a history of substance abuse, mental illness, poverty, failure in school, and victimization. Sixty-eight percent of people in jail have a history of abusing drugs, alcohol, or both.[21] Forty-seven percent of jail inmates have not graduated from high school or passed the General Educational Development (GED) test.[22]

Nationally, African Americans are jailed at almost four times the rate of white Americans.[23] Despite making up only 13 percent of the U.S. population, African Americans account for 36 percent of the jail population (see Figure 5).[24] Locally, disparities can be even starker: in New York City, for example, blacks are jailed at nearly 12 times the rate of whites and Latinos more than five times the rate of whites.[25]

Among the many disadvantaged people in jails, the largest group by far is people with a mental illness. Jails have been described as the "treatment of last resort" for those who are mentally ill and as "de facto mental hospitals" because they fill the vacuum created by the shuttering of state psychiatric hospitals

## Figure 5: Racial disparities



WHITE 47.2%  BLACK 35.8%  WHITE 62.6%  BLACK 13.2%

Source: Todd D. Minton and Daniela Golinelli, *Jail Inmates at Midyear 2013 - Statistical Tables* (Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2014) and United States Census Bureau of the Census "QuickFacts."

## Mental illness and substance use disorders in jails



14.5%  31%  3.2%  4.9%

**Serious mental illnesses**



72% of people in jail with a serious mental illness also have a substance use disorder.



68% all jail inmates

9% general population

**Diagnosable substance use disorders**

and other efforts to deinstitutionalize people with serious mental illness during the 1970s, which occurred without creating adequate resources to care for those displaced in the community.[26]

Serious mental illness, which includes bipolar disorder, schizophrenia, and major depression, affects an estimated 14.5 percent of men and 31 percent of women in jails—rates that are four to six times higher than in the general population.[27] According to the BJS, 60 percent of jail inmates reported having had symptoms of a mental health disorder in the prior twelve months.[28] People with serious mental illnesses are often poor, homeless, and likely to have co-occurring substance use disorders and, thus when untreated, are far more prone to the kinds of public order offenses and minor crimes that have been the focus of law enforcement in recent years and have helped swell jail populations.[29]

The prevalence of people with mental illness in jail is at odds with the design, operation, and resources in most jails. Characterized by constant noise, bright lights, an ever-changing population, and an atmosphere of threat and violence, most jails are unlikely to offer any respite for people with mental illness. Coupled with the near-absence of mental health treatment, time in jail is likely to mean further deterioration in their illness. According to the latest available data, 83 percent of jail inmates with mental illness did not receive mental health care after admission.[30] The lack of treatment in a chaotic environment contributes to a worsening state of illness and is a major reason why those with mental illness in jail are more likely to be placed in solitary confinement, either as punishment for breaking rules or for their own protection since they are also more likely to be victimized.[31]

While most people with serious mental illness in jails, both men and women, enter jail charged with minor, nonviolent crimes, they end up staying in jail for longer periods of time. In Los Angeles, for example, Vera found that users of the Department of Mental Health's services on average spent more than twice as much time in custody than did the general custodial population—43 days and 18 days respectively.[32]

# Costs and consequences

The growth of jails has been costly in many ways, contributing little, if at all, to the enhancement of public safety. From 1982 to 2011, local expenditures on corrections—largely building and running jails—increased nearly 235 percent.[33] The increasing direct costs of operating jails, however, are matched by the indirect costs and consequences of jailing people who do not need to be there or holding them for longer than necessary. These consequences—in lost wages, worsening

## BEYOND MENTAL ILLNESS

For people with mental illness in jail, their illness is often at the center of several interrelated problems. A BJS study published in 2006—the most recent national study of its kind—showed that people with mental illness in jail are more likely than others to experience homelessness, unemployment, and substance abuse.[a]

> Seventeen percent of people with mental illness in jail were homeless in the year before their arrest, compared to nine percent of the rest of the jail population.

> Nearly a third of the people in jail with mental illness were unemployed in the month before arrest, compared to less than a quarter of the rest of the jail population.

> Thirty-four percent of people with mental illness in jail were using drugs at the time of their arrest compared to 20 percent of the rest of the jail population. Fifteen percent of people with mental illness were using both drugs and alcohol at the time of their arrest compared to seven percent of the rest of the jail population.

[a] Doris J. James and Lauren Glaze, *Mental Health Problems of Prison and Jail Inmates* (Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2006), p.4.

physical and mental health, possible loss of custody of children, a job, or a place to live—harm those incarcerated and, by extension, their families and communities. Ultimately, these consequences are corrosive and costly for everyone because no matter how disadvantaged people are when they enter jail, they are likely to emerge with their lives further destabilized and, therefore, less able to be healthy, contributing members of society.[34]

Of the more than $60 billion spent annually on correctional institutions, $22.2 billion, or about one third, is spent by local jurisdictions.[35] Even this figure fails to capture the true costs of jails to local jurisdictions, as money spent on jails—for pension plans for staff for example, or healthcare for inmates—often comes out of the budget of non-correctional agencies. Cities and counties have to cover most costs themselves, drawing on the same pool of tax revenue that supports schools, transportation, and an array of other public services.[36]

## Figure 6: Pretrial detention and sentencing

Compared to low-risk defendants released prior to trial, those detained before trial were…



…more likely to receive a sentence of imprisonment

**4x** more likely

…more likely to be given a longer prison sentence

**3x** longer

Source: Christopher Lowenkamp, Marie VanNostrand, and Alexander M. Holsinger, *Investigating the Impact of Pretrial Detention on Sentencing Outcomes* (New York: The Laura and John Arnold Foundation, 2013).

## Figure 7: Pretrial detention and reoffending

Compared to low-risk defendants held for no more than 24 hours, those held for 8-14 days were...



…more likely to be rearrested before trial

**56%**

…more likely to recidivate after sentence completion

**51%**

Source: Christopher Lowenkamp, Marie VanNostrand, and Alexander M. Holsinger, *The Hidden Costs of Pretrial Detentions.* (New York: The Laura and John Arnold Foundation, 2013).

## WORSE CASE OUTCOMES AND DECREASED PUBLIC SAFETY

Recent research supported by the Laura and John Arnold Foundation on people held in jail pending the resolution of the charge(s) against them (commonly referred to as "pretrial detention")—with data drawn from counties in two states in different parts of the country—has reignited interest in pretrial policies and practices. Researchers found that even a relatively short period in jail pretrial—as few as two days—correlates with negative outcomes for defendants and for public safety when compared to those defendants released within 24 hours. While results varied by length of detention and risk level, in virtually every category, those detained were more likely to be rearrested before trial, to receive a sentence of imprisonment, to be given a longer term of imprisonment, and to recidivate after sentence completion (see Figures 6 and 7). The probabilities were especially high for low-risk individuals and for those held for their entire pretrial period and remained true even when researchers controlled for relevant factors including risk level, supervision status, offense type, offense level, time at risk in the community, demographics, and other factors.[37]

Earlier research had noted that those held pretrial may be more likely to receive custodial as well as longer sentences because defendants already in jail receive and accept less favorable plea agreements and do not have the leverage to press for better ones.[38] In the Arnold Foundation study, however, the harsher sentences held even for those detained for only a few days (and who, therefore, did have the freedom to hold out for a more favorable offer from prosecutors). For the much smaller number of defendants who go to trial, research has found that jurors tend to view defendants brought to court in jail uniforms and shackles as guilty regardless of the merits of the case.[39] For policymakers interested in reducing incarceration at both the state and local levels, this research has major implications: reducing detention, especially for low- and medium-risk defendants, can help reduce incarceration by lowering recidivism and prison terms.

## DIFFERENTIAL RACIAL IMPACT

Community-level consequences of incarceration are most evident in African American and Latino communities whose members are disproportionately represented in jails across the country. While blacks and Latinos combined make up 30 percent of the general population, they are 51 percent of the jail population.[40] This disparity is caused by myriad and interconnected factors, including policing practices that concentrate law enforcement activities in low-income, minority communities, combined with the socio-economic disadvantages experienced by residents in those neighborhoods.[41] Black males, in particular, are arrested at a younger age and at higher rates than their white counterparts, often giving them a longer "rap" sheet regardless of the charges or the eventual dispositions of the cases.[42] Schools in minority neighborhoods are more likely to have law enforcement officers on site and to embrace "zero tolerance" policies.[43] "Stop, question, and frisk" policies have been shown to target young men of color, especially black men.[44] Black men are also more likely to be arrested for drug crimes despite similar rates of use when compared to whites.[45] With arrest records on file at earlier ages, subsequent contacts with police result in more severe case outcomes as these young men come of age.[46]

Black men are also disproportionately held pretrial as a result of an inability to post monetary bail. Although their bail amounts are similar to bail amounts set for whites, black men appear to be caught in a cycle of disadvantage. Because they are incarcerated at higher rates they are more likely to be unemployed and/or in debt, resulting in more trouble posting bail.[47]

Moreover, these disparities persist at sentencing. Black men in the state and federal justice systems tend to receive longer sentences than their white counterparts convicted of similar crimes—differences that become more pronounced as the severity of sentences increase.[48]

## ACCUMULATION OF CRIMINAL JUSTICE DEBT

Many jails, courts, and other criminal justice agencies charge for the services they provide, including jails that charge for clothing and laundry, room and board, medical care, rehabilitative programming, and even core functions such as booking.[49] In addition, most jails have contracts with private telephone and video conferencing companies that charge higher rates to inmates than they do in the community.[50] While each individual fee may be small, they add up. Some people have been required to pay thousands of dollars in fines and fees.[51] Even when jurisdictions offer payment plans, they often include surcharges and other fees.[52] Add to this child support payments, credit card debt, rent, and other living expenses that can accumulate during incarceration—often with late charges or compounded interested tacked on—the financial picture for many leaving jail is very bleak.

Moreover, fees may continue to accrue after release. If convicted, an individual may be ordered to pay restitution; if sentenced to probation or court-ordered programming or treatment, a person may also have to pay supervision fees plus

the programming costs.[53] For many, these payments are impossible to make: people who spend more than a few days in jail, and who often work at low-wage jobs to begin with, risk losing their jobs and may find getting new ones extremely challenging, especially if they have supervision and programming obligations that interfere with the work day.[54] This, in turn, increases their vulnerability to being incarcerated again. In Florida, for example, agencies expect to collect only nine percent of fines and fees assessed.[55]

Although debtors prisons were formerly abolished in the United States almost two hundred years ago, many people today are returned to jail for non-payment of fines and fees.[56] Although the use of incarceration for failure to pay a debt is unconstitutional absent evidence that a person willfully refuses despite an ability to pay (and that alternative punitive measures are unavailable), there are no specific guidelines for how judges should evaluate a defendant's ability to pay, resulting in both inconsistency in the application of this rule, and a risk that people are returned to custody simply for being poor.[57]

According to one study that examined prison and jail incarceration together, individuals who do manage to find work after release earn less on average than their counterparts who have never been incarcerated.[58] Among formerly incarcerated men in that study—two-thirds of whom were employed before being incarcerated—hourly wages decreased by 11 percent, annual employment by nine weeks, and annual earnings by 40 percent as a result of time spent in jail or prison (See Figure 8.)

## Figure 8: Incarceration reduces earnings power

Estimated effect of incarceration on male wages, weeks worked annually, and annual earnings, predicted at age 45



Source: The Pew Charitable Trusts, *Collateral Costs: Incarceration's Effect on Economic Mobility* (Washington, DC: The Pew Charitable Trusts, 2010).

Public benefit programs may not be able to help. For those who were receiving or were eligible for benefits like food stamps or Medicaid, a jail stay can cause a suspension or termination of that support.[59] Suspended benefits can be more easily restarted upon release, whereas terminated benefits can take years to reinstate.[60] Even a short gap in benefits, however, can have serious consequences for the large number of people leaving jail who have debt, little or no income from work, and may also have a chronic illness—an end result that is particularly disproportionate when people are accused of non-serious offenses, such as a traffic or ordinance violation.

Housing can also be a challenge for people jailed for even a short period of time. Those in debt may find it impossible to afford market-rate housing, and, much like employers, many landlords are unwilling to rent to someone with a criminal record (of arrest or conviction or both). Staying with family members can also be problematic, especially if they live in public housing as many local public housing authorities ban, at least temporarily, those with a criminal record.[61] A survey in Baltimore found that people who have spent time in jail or prison are much less likely to hold a lease or mortgage after release than they were prior to being confined.[62] Another study showed that people are far more likely to become homeless for some period following release from jail, even when the charges are dismissed.[63]

## DECLINING HEALTH

Given high levels of need and the constant churning of their population, most jails struggle to deliver health care that meets minimally accepted standards of care in the community. This is particularly critical as people in jail report high rates of medical problems.[64] Moreover, conditions in jail—especially crowding and poor sanitation—can be especially harmful to the many in custody with chronic health problems, particularly mental illness, and facilitate the spread of contagious diseases.[65] The greater prevalence of contagious diseases in jails affects both the families and communities to which those incarcerated there return.[66] Since most people do not stay in jail for very long, it is difficult to provide them adequate care while incarcerated or to connect them to treatment in the community upon release.[67] Lack of continuity of care is likely a large part of the reason why people with mental illness tend to cycle in and out of jail.

## HARM TO FAMILIES AND COMMUNITIES

Families and communities also suffer from the misuse of jails. For families, the consequences are manifold—financial, structural, and emotional. Communities where rates of incarceration are high tend to experience declines in social and economic well-being as well as in public safety.[68]

Families face considerable financial consequences when a member goes to jail. They may have to pool limited family resources to post bail or to pay for jail telephone calls and other services, and they may experience a loss of income or housing when the incarcerated person was the primary earner or leaseholder.

To some degree, every family— regardless of socio-economic circumstances— is temporarily broken apart when a member is jailed, with the consequences most pronounced when the jailed person has children. In particular, when mothers go to jail, their children are more likely to experience a change in care-giver or to enter foster care.[69] A study of mothers in Illinois' Cook County Jail found that those whose children entered foster care upon their incarceration were half as likely to reunite with their children upon release when compared to non-incarcerated mothers with children in foster care.[70]

Jails can make conditions in already struggling communities worse. Jail ad-missions tend to be concentrated in neighborhoods with elevated rates of pov-erty, crime, and racial segregation, and low rates of educational attainment and employment—and which are also often heavily policed.[71] In turn, high rates of incarceration further destabilize these communities, often leading to increased rates of crime and even higher levels of police enforcement.[72]

# Six key decision points that influence the use and size of jails

Although there is new appetite for reducing America's reliance on incarcer-ation, scaling back jail populations will be a complicated task. How and why so many people cycle through jails is the result of decisions dispersed among largely autonomous system actors—which together make up one system of incarceration. These include the police who choose to arrest, release, or book people into jail; prosecutors who determine whether to charge or divert arrest-ed persons; pretrial services program providers who make custody and release recommendations; judges, magistrates, or bail commissioners who decide whom to detain or release, and under what conditions; other court actors, from attorneys and judges to administrators, whose action or inaction can accelerate or delay pending cases; and community corrections agencies who choose how and when to respond to persons who violate their conditions of supervision in the community. Release and detention decisions may also depend on the existence of critical community services that can provide the supports needed to keep people charged with crimes out of custody.

Given that all of these actors may be driven by contradictory goals or incen-tives and may operate with varying degrees of knowledge of, or enthusiasm for, alternatives to jail incarceration, it can be very difficult to align or coordinate their efforts to ensure that jails are used only when absolutely necessary to serve the public good. But it's not impossible.

New York City provides a good example of how changes in local system practices across agencies can work in concert to reduce the number of people in custody. New York substantially decreased its jail and prison (as well as community corrections) populations between 2000 and 2009, primarily as a result of changes in policy and practice around arrest and the use of alterna-

*How and why so many people cycle through jails is the result of decisions dispersed among largely autonomous system actors.*

tives to incarceration and other diversion programs, requiring in tandem policy changes across the police department, the courts, and district attorneys' offices. Throughout that period, the crime rate in the city continued to fall.[73]

Because jail admissions and length of stay—the two main determinants of jail populations—are a function of decisions made by multiple criminal justice system actors at the local level, opportunities can and do arise along the trajectory of a typical individual case to prevent a person from going to jail unnecessarily or to release him or her as soon as safely possible. However, in practice, seizing the opportunity at any given point can be challenging and will require some coordination among system actors since their actions in large part depend on information provided or action taken by others in the system.

## DIAGNOSING LOS ANGELES COUNTY'S OVERCROWDED JAILS



"Bigger and more expensive jails aren't the only solution," noted a 2012 *Los Angeles Times* editorial titled "LA County Jails: What's the Fix?"[a] The editorial drew on Vera's analysis of Los Angeles County jails and the systems that fill them. Los Angeles County is the largest county in the United States, and it also operates the largest jail system. Eight jails are fed by 88 municipalities with 47 law enforcement agencies, and more than 30 courthouses with more than 400 judges. In 2009, the Los Angeles County Chief Executive Office and its Criminal Justice Coordination Committee contracted with Vera to study persistent overcrowding in the jails and make recommendations for safely and efficiently alleviating it.

Understanding this complex operation and the problem of overcrowding began with an analysis of administrative data from nine agencies involving the 800,000 cases booked into the county jail system in 2007 and 2008. Vera reviewed policies, procedures, and practices from the agencies that influence the size of the jail population (including police departments, the courts, the prosecutor and public defender offices, the probation department, the state corrections and parole agencies, and the L.A. County Sheriff's Department), convened focus groups and meetings and conducted more than 100 confidential interviews.

Over the course of two years, researchers matched information from the nine major databases to track the progress of more than 54,000 cases from arrest to disposition within that time frame. The study analyzed the flow of people into and out of jail and through the court process. Through analysis of individual cases and large administrative data sets, the researchers created profiles of typical offenders and identified trends in jail usage. Their analysis also revealed key decision points that influence the size of the jail population, as well as bottlenecks that cause delays that keep people in jail longer than necessary.

On the basis of this analysis, Vera issued a final report to the county that reviewed the issues and challenges identified and made 39 recommendations—that ranged from pretrial screening and bail schedules to the integration of key databases—to reduce jail crowding and improve the effectiveness of the justice system.[b]  In particular, the report detailed the many obstacles to effective responses to people with mental illness caught up in the criminal justice system and the lack of diversion options.

[a] Editorial Board, "L.A. County's broken jails: What's the fix?" *Los Angeles Times*, January 30, 2012.
[b] Vera Institute of Justice, *Los Angeles County Jail Overcrowding Reduction Project: Final Report* (New York, NY: Vera Institute of Justice, 2011).

Six key decision points—arrest, charge, pretrial release/bail, case processing, disposition and sentencing, and supervision and reentry—are explored in the sections that follow through an analysis of who is involved, what typically happens, and what could happen otherwise to reduce jail incarceration through the implementation of strategic reforms.

## ARREST

Arrest is a person's entry point into the criminal justice system. An incident occurs and law enforcement—the police or sheriff's department—is called to the scene, or there is an interaction with or observation by law enforcement in the course of regular duties, such as a traffic stop or a street encounter.

What happens at arrest is an important determinant of the flow and number of accused persons who enter jail. The police have several choices when responding to reported or observed criminal activity. They decide whether to decline intervention; whether an arrest, summons, or verbal warning is warranted; or whether to refer an individual to services outside the criminal justice system, such as community mental health or substance abuse programs. Even when a police officer feels that circumstances justify an arrest, that decision does not have to open the door to jail. Under most state laws, the officer may take the suspect to the station house to be photographed and fingerprinted and where a more detailed background check can be completed.[74] Where available, computers in cars or hand-held tablets allow police officers to conduct some of these procedures in the field. Law enforcement can then release the defendant using a "notice-to-appear" or "desk appearance" ticket to secure a promise from the person to appear in court when required.[75]

How the police make an arrest decision is influenced by a number of intersecting factors and dynamics on a precinct, departmental, local, state, and federal level. While state and federal laws define what constitutes a criminal offense, local political pressures, policy decisions, and departmental priorities will play a larger role in how and when police resources are used and where they are deployed. In some jurisdictions, pressure from public officials—often

*Even when a police officer feels that circumstances justify an arrest, that decision does not have to open the door to jail.*

responding to the concerns of residents and businesses to combat low-level, quality-of-life offenses (see "Broken Windows Policing" on page 21.) —has led to zero-tolerance policing policies that may also require arresting anyone who breaks the law. This may increase the number of misdemeanor or non-criminal arrests (ordinance violations) for drug possession, vagrancy, loitering, and other public order offenses. Meanwhile, political or community pressures may determine which neighborhoods to target, how and when line officers are deployed, and which arrest protocols to follow, including whether pre-arrest (e.g., cite and release) or post-arrest (e.g., the provision of an appearance ticket at the police precinct) diversion options are available for certain types of offenses.

Other important dynamics on the department and community level may also be at play. Some police departments institute informal or formal arrest quotas or targets and link performance evaluations and career advancement to compliance with them.[76] These policies have been the subject of extensive litigation, so it is difficult to estimate how prevalent they remain. In some cash-strapped municipalities, police officers understand that they need to make more arrests in order to raise revenue through fines, fees, and asset forfeiture—as has been the focus of some press coverage in the wake of recent events in Ferguson, Missouri.[77] On the other hand, police departments in resource-poor neighborhoods may

## BROKEN WINDOWS POLICING



Published in the *Atlantic Monthly* in 1982, George Kelling and James Q. Wilson's essay titled "Broken Windows" has had a large and lasting influence on police strategy around the nation.[a] In it the authors argued that quality-of-life offenses, such as graffiti or public intoxication, can give residents the impression that neighborhood crime is on the rise, causing residents to become fearful, avoid public areas, and lose trust in local law enforcement. The authors also suggested that criminals may become emboldened by this decay, which they may perceive as a marker of an apathetic community and an ineffective police force, leading to an increase in serious crime. Kelling and Wilson posited "broken windows" as an evocative metaphor of the disarray that may ensue: "If a window in a building is broken and is left unrepaired, all the rest of the windows will soon be broken."

The broken windows theory was zealously adopted by police forces around the country in the 1990s and early 2000s. Quality-of-life and low-level offenses or infractions were targeted through zero-tolerance and stop-and-frisk policies as a way of preventing more serious crime from flourishing.[b] In 1994, New York City Police Commissioner William Bratton implemented broken windows policing which resulted in a steep increase in misdemeanor marijuana arrests—from 1,851 arrests in 1994 to more than 50,000 in 2000, a 2,760% increase.[c]

Despite the ubiquity of this approach, there is little evidence that broken windows policing is effective at reducing overall crime.[d] An exhaustive review of research by the National Research Council concluded that there is not strong evidence that aggressively responding to minor offenses, particularly with arrest, effectively reduces or prevents more serious crime.[e] Furthermore, critics argue that these types of policies often target low-income, minority communities and are, therefore, applied inequitably.

It is worth noting that Kelling and Wilson did not argue explicitly for more arrests of disorderly community members. Instead, they suggested that police officers should help uphold social norms in the communities they serve by reducing public nuisances, such as redirecting an intoxicated loiterer to a less public area of town. As originally formulated, their theory supports increased *interactions* with residents, but not necessarily increased arrests or citations. In an interview in 2015, Kelling explained, "Broken windows is a tactic, an essential part of community policing, that works with the community to identify problems and set priorities…We don't want police to just be making arrests."[f]

[a] George L. Kelling and James Q. Wilson, "Broken Windows," *Atlantic Monthly* (March 1, 1982).
[b] Bernard E. Harcourt and Jens Ludwig, "Broken Windows: New Evidence from New York City and a Five-City Social Experiment," *University of Chicago Law Review* 73 (2006): 271-319.
[c] Bernard E. Harcourt and Jens Ludwig, "Reefer Madness: Broken Windows Policing and Misdemeanor Marijuana Arrests in New York City, 1989-2000," *University of Chicago Public Law & Legal Theory Working Paper* 142 (2006) and Andrew Golub, Bruce D. Johnson, and Eloise Dunlap, "The Race/Ethnicity Disparity in Misdemeanor Marijuana Arrests in New York City," *Criminology & Public Policy* 6, no. 1 (2007): 131-164.
[d] See Bernard E. Harcourt and Jens Ledwig, "Broken Windows," edited by Wesley Skogan and Kathleen Frdyl, in *Fairness and Effectiveness in Policing: The Evidence* (Washington, DC: National Academy of Sciences, 2004); Jeffrey Fagan and Garth Davies, "Street Stops and Broken Windows: Terry, Race, and Disorder in New York City," *Fordham Urban Law Journal* 28, no. 2 (2000): 457-504; and Center for Evidence-Based Crime Policy, George Mason University "Broken Windows Policing," http://cebcp.org/evidence-based-policing/what-works-in-policing/research-evidence-review/broken-windows-policing/
[e] See for example, Skogan and Frdyl, 2004.
[f] Patt Morison, "'Broken Windows' Policing Isn't Broken, Says Criminologist George L. Kelling," *Los Angeles Times*, January 6, 2015.

have no other option but to arrest and jail when responding to certain types of people—those who are intoxicated, mentally ill, or drug addicted—because of a lack of partnerships with community-based treatment and triage centers, or because such community resources simply do not exist.

The likelihood that arrest will lead to a jail booking has increased steadily over the years. Thirty years ago, when crime rates overall were higher, there were 51 admissions into jail for every 100 arrests.[78] By 2012, the most recent year for which national data are available, that number had climbed to 95 admissions per 100 arrests.[79] While not all admissions come from arrests—warrants for people suspected of parole and probation violations, for example, provide another route to jail—the growth in admissions even as arrest rates have declined reflects changing policies rather than growth in more serious crimes by high-risk individuals. According to an analysis of 17 state courts, nearly 78

## Thirty-year trends: Arrest and booking rates per 100,000

Even as arrest rates have decreased sharply—tracking crime rates—bookings into jail have continued to grow. In 1983 there were only half as many bookings as arrests while in 2012 bookings nearly matched arrests, suggesting a greater propensity to hold many who in earlier times would have been released.



percent of all cases in which a district attorney files charges involve people accused of misdemeanor crimes; and in some jurisdictions such as New York City, many of these are for minor drug offenses.[80] Drug crimes are the only offenses for which the arrest rate continued to increase throughout the 1990s and into the new century.[81]

### POLICING DIFFERENTLY: ALTERNATIVES TO ARREST AND DETENTION



**Citation and release.** The New Orleans Police Department is just one among many law enforcement agencies that is relying more on citation and release. In the summer of 2008, the city council enacted an ordinance mandating the use of a summons rather than arrest when police encounter people who commit a municipal offense other than domestic violence. From 2009 through 2011, the use of summonses in cases other than domestic violence and public intoxication increased from 41 percent to more than 70 percent. Arrests correspondingly dropped from 59 percent to 30 percent.[a] This change in approach not only conserves costly jail beds, it is also an enormous time-saver for officers, allowing them to focus on serious public safety concerns.

**Pre-booking diversion programs.** The Law Enforcement Assisted Diversion (LEAD) Program in King County, Washington, identifies people arrested for lower-level drug and prostitution offenses and diverts them away from the criminal justice system and into community-based services.[b] When police-initiated diversion programs like this are effective, they yield benefits all around—for individuals, their families, and communities—and reserve expensive criminal justice system resources for more serious cases.

**Programs for offenders with behavioral health issues.** Every police officer in Portland, Oregon, receives training in how to respond to a suspect who appears to suffer from mental illness or is under the influence of drugs or alcohol.[c] Beyond basic training, the department established a special corps of officers who volunteer and receive more intensive training to focus on calls for service involving unstable people. The department is also involved in prevention, running a Mobile Crisis Unit that pairs an officer with a licensed mental health professional who can connect people with appropriate mental health services in the community. And for people whose mental illness or substance use disorder is driving their repeated encounters with law enforcement—typically as suspects in drug or property crimes—the department participates in a Service Coordination Team that offers treatment in lieu of detention. Between 2008 and 2010, the team saved the county nearly $16 million in jail costs alone. The work in Portland reflects an emerging trend nationally in which police departments are forging innovative and powerful partnerships with local mental health service providers.

[a] Criminal Justice Leadership Alliance, "Use of Summonses versus Custodial Arrest for Municipal Offenses," December 8, 2010, and Criminal Justice Leadership Alliance, "Use of Summonses versus Custodial Arrest for Municipal Offenses," July 14, 2011, unpublished reports provided to Vera in its role as a member of the alliance.
[b] "Law Enforcement Assisted Diversion," http://leadkingcounty.org/.
c City of Portland, Police Bureau, "Behavioral Health Unit," http://cebcp.org/evidence-based-policing/what-works-in-policing/research-evidence-review/broken-windows-policing/
[d] Cameron Smith, *Report of the Reset Subcommittee on Public Safety* (Boston: Crime & Justice Institute, 2010), 16, http://www.oregon.gov/CJC/docs/pubsafe_subcomreport_final.pdf.

The policies and pressures that have led police officers to arrest and detain a larger proportion of criminal suspects are not unchangeable, though they may receive considerable public support, as zero-tolerance policies have until recently. Some law enforcement agencies are focusing on community crime prevention strategies that do not always involve detaining people. They are making more use of citation and release, partnering with service agencies to divert certain groups of defendants away from the justice system altogether, and increasing their capacity to respond constructively to people with a mental health or substance abuse problem.

## CHARGE

After a police officer has arrested and detained someone suspected of breaking the law, the person has to be formally charged in order for the case to proceed—and that decision has to be made quickly following a custodial arrest.[82] It is up to the prosecutor to accept or decline the case, and if he or she chooses the former, to determine what charge(s) to file, which usually occurs during arraignment. The prosecutor's charging decisions are important to the outcome of the criminal case and the accused person's future, but they also have significant influence on jail populations.

Prosecutors screen new arrests, looking at whether the elements of the alleged crime are present in the arrest complaint and whether the quality of evidence seems sufficient to support charges against the person. Prosecutors may reduce, increase, or dismiss charges, depending on the information provided to them by the police, or request additional information before making a decision.

Once a prosecutor determines that a case is legally sufficient to move forward, he or she brings charges, unless there is clear exculpatory evidence or if institutional policy in the public interest determines otherwise.[83] Because the initial charge is used as a baseline from which the prosecutor will pivot later in the case through plea negotiations, few legally sufficient cases are dismissed or diverted at this early point in the process, even though the prosecutor has wide discretion to do both.

When a person is formally charged, the type and severity of the initial charge(s), as well as any charge enhancements invoked, influence bail amounts and eligibility for non-financial pretrial release as well as diversion programs or community-based sanctions designed to address underlying problems. In turn, these charge decisions influence whether the person will be detained pretrial (and for how long) and, if convicted, be given a custodial sentence.

Some district attorney offices are re-evaluating their handling of certain cases, declining to prosecute some types or relying more on alternatives to prosecution, which do not require filing formal charges, such as problem-solving courts and other pre-charge diversion programs. This shift in course, while hardly widespread across the nation's 3,000 counties, does reflect a belief among some prosecutors that jails are not always the best option for ensuring public safety, and a growing desire among them to reduce the number of people exposed to the collateral consequences that accrue to people who are charged with a criminal offense and spend time in jail.[84]

While it is easy enough to do so in individual cases, systematic efforts to move away from a reliance on prosecution and jail detention will require district attorneys to participate in an analysis of their current jail populations and the longer-term outcomes for specific categories of people, charges, and dispositions. With a view to producing improved public safety, district attorneys

*District attorneys can serve as leaders in the creation of community-based solutions to crime problems and in the early identification of defendants suitable for diversion.*

## IN LIEU OF PROSECUTION



**Decline to prosecute.** In July 2014, Kings County (Brooklyn, NY) District Attorney Kenneth P. Thompson decided to stop prosecuting most people arrested for low-level marijuana offenses.[a] Mr. Thompson said in a memo that the new policy was established to keep nonviolent individuals, especially young people of color, out of the criminal justice system because open cases as well as convictions can become barriers to employment, housing, and higher education. The policy was established after years of steady increases in misdemeanor marijuana arrests, including more than 8,000 such arrests in the year ending June 30, 2014.

**Community prosecution.** In communities from Denver, Colorado to Milwaukee, Wisconsin, assistant district attorneys are assigned to work in specific neighborhoods, often co-locating in police stations, to develop partnerships with neighborhood organizations and learn the problems (whether a "drug house" or a poorly lit bus stop) that make places less safe.[b] They work with community members to develop prevention strategies to reduce both crime and arrests and with victims to better understand their fears and losses and to explain court processes. Together with service providers, prosecutors also identify those whose behavior is a nuisance or worse in the neighborhood, and help keep them out of the criminal justice system if that can be done safely.

**Pre-charge diversion.** The Hennepin County (Minnesota) District Attorney's Office partners with a local nonprofit, Operation de Novo, Inc., to provide an alternative to prosecution for people with no felony history and a limited misdemeanor history who have been arrested for a felony-level property crime where restitution is no more than $2500—people who otherwise are likely to be detained pretrial and to receive a jail sentence.[c] Operation de Novo case managers work with eligible arrestees to set requirements and goals for the year, which include community service and victim restitution. Those who successfully complete the program have a way to "pay their debt" to society and their victim without the added burden of a criminal conviction. In one recent year, the program handled 828 felony cases, collected and returned $440,200 in restitution to victims, and oversaw 10,720 hours of client community service.[d]

**Community courts.** Many cities run courts located in local communities that take a problem-solving approach to crime. Focusing primarily on misdemeanor, quality-of-life offenses—such as simple drug possession, theft,

prostitution, drinking in public, and trespassing—these courts work with community-based organizations to create opportunities for participants to do required community service and to offer support designed to reduce their re-offending.[e] While some community courts intervene after an individual has been formally charged and pled guilty, the City of San Francisco runs 10 neighborhood courts that operate as true alternatives to prosecution.[e] Prosecutors refer eligible misdemeanor cases to volunteer adjudicators who are residents of the neighborhood and use restorative justice practices to hold individuals accountable for their actions, address any underlying problems, and meet the needs of victims. Once individuals comply with the directives of the neighborhood court, prosecutors dismiss their cases.

[a] Stephanie Clifford and Joseph Goldstein, "Brooklyn Prosecutor Limits When He'll Target Marijuana, *New York Times*, July 8, 2014.
[b] See Center for Court Innovation, "Denver's Community Justice Councils," *http://www.courtinnovation.org/research/denver%E2%80%99s-community-justice-councils?url=research%2F5%25-2Fall&mode=5&type=all&page=2* and Milwaukee County District Attorney's Office, *The Milwaukee Community Prosecution Model*, http://county.milwaukee.gov/ImageLibrary/User/jkrueger/Electronic/CP_Program_Description1.pdf.
[c] Authors' interview with Niki Leicht, Executive Director, Operation de Novo, Inc., December 3, 2014.
[d] Spurgeon Kennedy et al., *Promising Practices in Pretrial Diversion* (Washington, DC: National Association of Pretrial Services Agencies, 2006), 11; for an overview of adult diversion programs in Hennepin County, see http://www.operationdenovo.org/.
[e] For information about community courts, including examples from around the country, see Center for Court Innovation, "Community Court," http://www.courtinnovation.org/research/4/publication.
[f] City and County of San Francisco, District Attorney, "Neighborhood Courts," http://www.sfdistrictattorney.org/index.aspx?page=178.

can serve as leaders in the creation of community-based solutions to crime problems and in the early identification of defendants suitable for diversion, especially those whose underlying problems contribute to their criminal behavior—such as mental illness, substance abuse, or homelessness. Population and outcome analyses can help produce a risk assessment instrument for use at initial case review.[85] (See "What is Risk Assessment?" on page 31.)

To be viable and effective in these cases, alternative to prosecution programs must have strong links to communities. Such links allow prosecutors to identify service providers to which they can refer troubled people; to establish realistic conditions and goals for those diverted; and to build public understanding and support for their use of diversion and other programs.[86]

## RIGHT-SIZING THE JAIL IN NEW ORLEANS

Following the devastation of Hurricane Katrina, and the major issues with the criminal justice system in New Orleans it revealed, members of the New Orleans City Council asked Vera to conduct an assessment of the city's justice system and to identify the areas most in need of change.[a] At the time Katrina struck, New Orleans had a population of 455,188 and the Orleans Parish Prison (the city's local jail) had a capacity of 8,000 and typically held more than 6,000. (By comparison, New York City, with a population of 8.4 million, has a jail population of 11,408.) The jail was heavily damaged and the Federal Emergency Management Agency agreed to pay most of the costs of constructing a new one. The sheriff proposed a new jail of 5,400 beds, despite the drop in the city's post-storm population to 370,000.[a]

Vera's final report to the city in 2007 looked at ways to reduce the jail population and to create more options for both pretrial defendants and those sentenced.[b] Its top two recommendations: address the long wait time from arrest and booking to arraignment—then averaging 64 days—and create a pretrial screening process, based on an objective assessment of individual risk, on which judges would base their release or detention decisions.

Vera established an office in New Orleans to work with city officials (the Mayor's Office, the district attorney, the Orleans Public Defender, the courts, the city council, the New Orleans Police Department, and others), civic institutions, and organizations with deep roots in the communities most affected by the criminal justice system to develop and implement these and other changes. By 2011, a working group of city officials staffed by Vera had succeeded in reducing the average time before arraignment from 64 days to 10.5 days. Another working group helped the court implement a system of vertical case allotment that makes much more efficient use of resources for the public defender and prosecutor offices. And, today, the police in New Orleans issue a far higher percentage of summons in lieu of arrest than ever before.

In 2012, with support from many of these agencies and community organizations, Vera developed a comprehensive pretrial services system for the city that includes: universal screening; interviews with defendants; investigation of information prior to the first court appearance; the use of a risk assessment instrument to guide release decisions; the ability to supervise defendants; and a court-date reminder system to help defendants meet their obligations. Finally, as the city nears completion of its new jail, the mayor's office has committed to a smaller jail of 1,438 beds.

Vera's experience in post-Katrina New Orleans demonstrates that reform is possible but requires thorough data analysis, collaborative and productive relationships with community leaders and elected officials, and early positive outcomes demonstrating enhanced justice, efficiency, and public safety.

[a] Katy Reckdahl, "Orleans Parish Prison Size Recommendation Issued," *The Times Picayune* November 19, 2010.
[b] Vera Institute of Justice, *A Report Submitted to the Criminal Justice Committee of the New Orleans City Council* (New York, NY: Vera Institute of Justice, 2007).

## PRETRIAL RELEASE AND BAIL

Once a person has been arrested, there is a presumption that the person will be released pending the outcome of his or her case, unless the individual poses a danger to persons or property or seems likely to flee.[87] In some jurisdictions, police commanders have the authority to release people directly from the station house using a bail schedule. In most places, however, the bail or release decision is made by a judge, magistrate, or bail commissioner. These officers of the court have considerable discretion in evaluating the person's circumstances and making decisions about release. They can set conditions or require assurances, such as bail, to facilitate release whenever possible.[88] The presumption that defendants should be released unless they present a clear danger or pose a flight risk to avoid prosecution is rooted in the principle that people are innocent until proven guilty and should be treated as such. Actual pretrial release practices, however, are at odds with this fundamental principle, as illustrated by the fact that today six out of 10 people in jail are detained pretrial.[89]

In 1990, most felony defendants who were freed from jail pending the resolution of their cases were released on non-financial conditions (comparable national data on misdemeanor defendants are not available).[90] Nearly 20 years later, in 2009 (the latest year for which data are available), those released on their own recognizance (also referred to as ROR) made up only 23 percent of all felony defendants released pretrial.[91] While an additional 15 percent were released on other types of non-financial bail, the remaining 61 percent of defendants were required to post financial bail, either by providing the whole or a portion of the total amount or equivalent collateral, or by hiring a bail bondsman to post the sum in the form of a private surety bond for a non-refundable fee.[92] Among 2009 felony cases, private surety bonds accounted for four out of five releases that involved money and close to half of all releases.[93] In addition to requiring bail more frequently, judges also increased bail amounts. The average bail amount in felony cases increased 43 percent (in constant dollar values) between 1992 and 2009, from $38,800 to $55,400.[94] As a result of these factors, more and more defendants remain in jail simply because they cannot pay their way out.

## Financial and non-financial release conditions

Felony defendants who were freed from jail pending the resolution of their cases were more likely to have been released on recognizance or other non-financial conditions in 1990 than in 2009 and were more likely to have been released on private bonds or other financial conditions in 2009 than in 1990.



In the years since Vera launched The Manhattan Bail Project in 1961—the nation's first experiment with pretrial services—numerous studies have pointed to the same, highly reliable indicators associated with success or failure on release during the pretrial period (i.e., whether or not defendants stay out of trouble or show up to court when required).[95] In particular, community ties through family and work are strong predictors of success, while a record of prior convictions, especially felonies, a history of juvenile arrests, and a history of failure to appear in court are associated with failure.[96] Even for those with some risk of failure, the chance of success can be improved and the risk mitigated with additional support and supervision in the community. Noticeably missing from either list is the financial means to pay bail, which is not a strong predictor of pretrial success (defined as remaining arrest-free during the pretrial period and appearing at scheduled court dates).[97] Indeed, as bail amounts increased, pretrial failure rates remained steady at about 30 percent.[98]

Putting this research into practice is within the reach of most jurisdictions.[99] Using these risk factors—and any others chosen by the court—the court or pretrial services agency administers the assessments. These typically involve gathering information on the defendant's criminal history as well as requesting personal information (e.g., length of residence at current address, current employment status, etc.) from the defendant and verifying it through phone calls.

## WHAT IS RISK ASSESSMENT?[a] 

The foundation of good criminal justice and correctional practices is the administration of a validated risk or risk and needs assessment tool to defendants and offenders. Risk assessment instruments measure the likelihood that a person will reoffend if or when released into the community. Needs assessments identify a person's criminogenic needs—that is, personal deficits and circumstances known to predict criminal activity if not changed.

Today's assessment tools measure *static* (those things that can't be changed, such as age, criminal history, etc.) and *dynamic* (those that can, such as drug addiction, anti-social peers, etc.) risk factors, criminogenic needs, and strengths or protective factors present in a person's behavior, life, or history. There are a variety of assessment tools available for different purposes. Some are proprietary while others are available at no cost. Whatever tool is used in whatever context, states and counties must validate them using data from their own populations.

Assessment tools are used to some degree in all states and in many counties at a number of decision points in the criminal justice process and in a variety of settings. Judges and releasing authorities use information from assessment tools to guide decisions regarding pretrial release or detention and release on parole; corrections agencies use them for placement within correctional facilities, assignment to supervision level or to specialized caseloads, and for recommendations regarding conditions of release. Since the best tools evaluate the person's dynamic or changeable risk factors and needs, they should be re-administered routinely to determine whether current supervision or custody levels and programming are still appropriate.

A 2012 survey conducted by Vera found that a majority of community supervision agencies and releasing authorities routinely utilize assessment tools. Responses from 72 agencies across 41 states indicated that 82 percent of respondents regularly assessed both risk and need. While these self-reported numbers may be inflated, the responses do show correctional agency awareness of the importance of assessments.

[a] Adapted from Peggy McGarry et al., *The Potential of Community Corrections to Improve Safety and Reduce Incarceration* (New York, NY: Vera Institute of Justice, 2013), p. 16.

Each factor of the collected information is assigned a numerical score weighted to its relevance to pretrial failure. The greater the association of the factor with pretrial failure, the higher the score assigned to it.[100]

## What's keeping them in?

In this view of 2013 New York City jail data, more than 50% of jail inmates held until case disposition remained in jail because they couldn't afford bail of $2,500 or less. Most of these were misdemeanor cases.

Low bail = $2,500 or less.



13% Felony, low bail

42% Felony, high or no bail

41% Misdemeanor or Violation, low bail

4% Misdemeanor or Violation, high bail

Despite the predictive accuracy of risk assessments, few of the more than 3,000 court systems in the United States rely on these tools to make decisions about pretrial release. Some jurisdictions have implemented bail schedules in the interest of standardizing bail amounts. These link bail amounts to the severity of the initial charge, with criminal charge serving as a proxy for risk of re-arrest and flight, and the bail amount meant to mitigate that risk.[101] Unfortunately, the severity of the initial charge(s)—a decision entirely within the discretion of the prosecutor—has not been shown to be a good predictor of public safety or appearance in court. And this practice can lead to some serious unintended consequences for both individuals and public safety: low-risk defendants who cannot afford to post bail linger in jail, while some high-risk defendants are released because they can afford a large bail amount.[102]

Money, or the lack thereof, is now the most important factor in determining whether someone is held in jail pretrial. Almost everyone is offered monetary bail, but the majority of defendants cannot raise the money quickly or, in some cases, at all. Many who cannot make bail initially will be released at some point pending trial. However, 38 percent of felony defendants will spend the entirety of their pretrial periods in jail.[103] Yet, only one in ten of these defendants is detained because he or she is denied bail. The rest simply cannot afford the bail amount the judge sets.[104] For example, in New York City in 2013, 54 percent of jail inmates held until their cases had been disposed remained in jail because they could not afford bail of $2,500 or less—with 31 percent of the non-felony defendants held on bond amounts of $500 or less.[105]

*Money, or the lack thereof, is now the most important factor in determining whether someone is held in jail pretrial.*

## FACILITATING PRETRIAL RELEASE



**Risk assessment.** Kentucky has a single statewide agency that assesses all defendants using a locally validated risk assessment instrument. In recent years, the court has released 70 percent of all defendants pretrial, with only four percent requiring bail.[a] Outcomes for people released without monetary bail in Kentucky are far better than for those released nationally with such bail. In Kentucky, just eight percent of defendants at liberty in the community were rearrested during the pretrial period and 10 percent missed a court date.[b] Among people released on bail nationwide, 16 percent were rearrested and 17 percent missed a court date.[c]

**Early bail hearings.** A growing number of jurisdictions are moving to hold most bail hearings within 24 hours of arrest—a move that is crucial given recent research that shows long-term outcomes are considerably worse for defendants held in jail longer than 24 hours, even if they are later released.[d] There are two ways to achieve this: holding bail hearings within 24 hours of arrest and authorizing pretrial services agencies to release defendants assessed as low risk. In Delaware, magistrates work around the clock to review cases and make initial bail determinations (in part by using a risk assessment instrument) within the first 24 hours of arrest.[e] In Connecticut, the pretrial services agency assesses and releases low-risk defendants at their discretion, reporting an 11 percent failure to appear rate among those released.[f]

**Pretrial supervision.** Developing the capacity to monitor and assist defendants during the pretrial period makes it possible for judges and other court officers who make release and detention decisions to release higher-risk people who would otherwise be detained pending trial. The work with defendants typically involves establishing specific parameters for their behavior during the pretrial period and linking them with service providers in the community to help them address longstanding problems and remind them about upcoming court dates.[g] Washington, DC's Pretrial Services Agency (DCPTS) has a very robust release and supervision program: 85 percent of defendants are released on ROR or with conditions supervised by DCPTS—and of that 85 percent, in 2012, just 11 percent were rearrested while released, and 11 percent failed to appear.[h]

In 2006, Cocinino County, Arizona found that about 23 percent of the jail population were defendants who were detained after failing to appear at scheduled court dates. The county tested several court reminder systems for defendants who received citations in the field. The failure to appear rate was reduced from 25 percent in the control group to six percent in the reminder

group when the caller spoke directly to the defendant, 15 percent when a message was left with another person, and 21 percent when a message was left on an answering service.[i] In this and other areas, research shows that tailoring release conditions to a defendant's circumstances both facilitates release and increases success during the pretrial period.[j]

[a] Tara Boh Klute and Mark Heyerly, *Report on Impact of House Bill 463: Outcomes, Challenges and Recommendations* (Frankfurt, KY: Pretrial Services, Administrative Office of the Courts, 2012).
[b] Ibid.
[c] Brian A. Reaves, *Felony Defendants in Large Urban Counties, 2009-Statistical Tables* (Washington, DC: Bureau of Justice Statistics, Department of Justice, 2013)
[d] Laura and John Arnold Foundation, *Research Summary: Pretrial Criminal Justice Research* (New York, NY: Laura and John Arnold Foundation, 2013).
[e] Alan Davis, *Legal Memorandum No.11-294* (Georgetown, DE: Delaware Justice of the Peace Courts, 2011).
[f] See State of Connecticut, Judicial Branch, *Adult Services Bail Intake/Assessment Procedures 4.1* (Connecticut: Court Support Services Division, 2013); James Carrollo, bail regional manager, Adult Probation and Bail Services, Connecticut Court Support Services Division, telephone interview by Vera, on April 8, 2014).
[g] Donna Makowiecki and Thomas J. Wolf, "Enter...Stage Left...U.S. Pretrial Services," Federal Probation 71, no. 2 (2007): 7-9; see also William Henry, "The Pretrial Services Act: 25 Years Later," *Federal Probation* 71, no. 2 (2007): 16.
[h] Pretrial Services Agency of the District of Columbia, *Congressional Budget Justification and Performance Budget Request, Fiscal Year 2014* (April 2013), 7.
[i] Marie VanNostrand, Kenneth Rose, and Kimberly Weibrecht, *State of the Science of Pretrial Release Recommendations and Supervision* (Washington, DC:  Pretrial Justice Institute, 2011), 17-19.
[j] Ibid., pp. 27-29.

As this illustrates, bail amounts are not set in relation to an individual's ability to pay. This fact hurts some groups more than others, given socio-economic disparities in the United States.[106] A recent study shows that although black men are detained pretrial at higher rates than white men or black or white women, bail amounts are not set higher for them.[107] Rather, as stated above, black men appear to be caught in a cycle of disadvantage: incarcerated at higher rates and, therefore, more likely to be unemployed and/or in debt, they have more trouble posting bail.

When out-of-reach bail amounts are combined with overloaded courts, a situation arises in which defendants can spend more time in jail pretrial than the longest sentence they could receive if convicted.[108] These cases, in particular, turn our ideals about justice upside down. Sentenced to "time served" and released, the system punishes these individuals while they are presumed to be innocent, and then releases them once they are found guilty.

Building on the broad discretion judges have in deciding whether or not to release someone pretrial and the sizeable body of evidence about how to set release conditions, judges need not rely on bail. There are other options for the safe release of many more defendants either on their own recognizance or with the aid of special conditions and supervision. These options, deployed under the umbrella term of pretrial services, require jurisdictions to develop the capacity to conduct formal risk assessments, to speed the time from arrest to initial bail hearing, and to invest in pretrial supervision resources to enable the non-financial release of those deemed too high a risk for ROR. Most important, the success of pretrial services depends on the trust of and appropriate use by the court or its designees.

*Judges need not rely on bail. There are other options for the safe release of many more defendants either on their own recognizance or with the aid of special conditions and supervision.*

# Diversion and release opportunities during the typical criminal case trajectory



## CASE PROCESSING

Given the large proportion of defendants detained pending the resolution of their cases, the speed—or lack thereof—at which cases are processed through the courts has a direct impact on jail populations. When defendants are detained throughout the process, the duration of the case equals the number of days, weeks, or months a defendant is held in jail. Even when a defendant is released at some point prior to being adjudicated, delays earlier in the process extend his or her time behind bars. A large sample of defendants in Los Angeles County, all accused of felony crimes and all detained pretrial, spent 53 days on average in jail by the time their cases were resolved.[109] More than 25 percent of the people in jail pretrial had stays longer than 80 days, with more than 800 defendants spending in excess of 200 days in jail until case resolution.[110]

Unlike previous decision points that focus on a moment in time, the processing of a case encompasses the entire adjudication process, from a person's initial appearance in court through disposition and sentencing. A slow pace is most evident in the official delays that occur at different points in the process. Postponements or continuances occur routinely, despite laws meant to guarantee a speedy trial.[111] In larger jurisdictions, with high-volume court dockets, the sheer number of cases coupled with the routine use of postponements can cause chronic case backlogs that leave people waiting in jail for months, sometimes years, even when the case is ultimately dismissed.[112] A recent analysis of New Jersey's jail population, for example, revealed that **nearly half of all pending cases, mostly involving defendants detained pretrial, were in backlog status.**[113]

Cases can be postponed or continued for any number of reasons, and literally everyone involved in the adjudication of a case—courts and potentially also juries and witnesses, pretrial services, prosecutors and defense attorneys, police, and jail administrators—can either initiate or indirectly cause a postponement. Of all the possible causes, three broad categories—lack of readiness, logistical challenges, and the tactical use of delays—are particularly instructive to examine in the context of their impact on jail populations.

Lack of readiness on both sides of a case is a leading reason for delays, and may be in part a result of an overburdened court system flooded by huge misdemeanor case loads.[114] A study of 54 misdemeanor marijuana cases scheduled to go to trial in the Bronx revealed that the district attorney requested adjournments in 80 percent of cases because the prosecutor was not ready to proceed—meaning they were not ready on 75 of 89 trial dates.[115]

Aside from the complexities of an actual trial—and very few cases go to trial—the processing of a criminal case includes many stages and events, all of which require coordination among different agencies and individuals.[116] This is a logistical challenge under the best circumstances and a morass under the worst. Complicated plea or sentencing negotiations; defendants who fail to show up in court for hearings because of miscommunication between the court

*Lack of readiness, logistical challenges, and the tactical use of delays are particularly instructive to examine in the context of their impact on jail populations.*

## CASE PROCESSING REFORMS



**Time limits with real consequences.** Overcrowded conditions in the Bernalillo County Jail caused primarily by a backlog of roughly 3,000 cases, many involving defendants held pretrial, compelled the New Mexico Supreme Court to announce new rules aimed at limiting court delays.[a] Under the new rules, which take effect in February 2015, all criminal cases will be assigned to one of three tracks according to the complexity of the case and must adhere to a specific timeline.[b] The clock starts at arraignment and a postponement requires the presiding judge to issue a written finding of good cause. The rules are also designed to prevent postponing trials to accommodate prolonged plea bargaining as well as last-minute pleas filed on the eve of a trial. Importantly, both sides in a case will be subject to sanctions and fines for failing to meet the established deadlines, and the supreme court will also be tracking which judges are allowing cases to fall behind the timetables.

**Special backlog courts.** Some jurisdictions, including both Bronx County, New York, and Bernalillo County, New Mexico, have recently enlisted the services of judges from other counties or hired new judges to oversee special court dockets designed to clear backlogged cases. In the Bronx, cases that are more than two years old receive priority and judges assigned to these cases are mandated to either bring the case to trial or compel the two sides to reach a plea agreement.[c]

**Case consolidation.** To address the inherent inefficiencies and delays that happen when a person has open cases in more than one court—cases that may range in nature and severity from traffic violations to felonies—officials in Orange County, California adopted a policy to "package" cases. Under the policy, a single justice center becomes the physical locus and administrative body for resolving all open cases countywide that involve a particular defendant.[d] Implementing the policy required updating and consolidating separate court databases to enable easy searches and access to all related files. Case consolidation not only speeds case processing, reducing stays in jail pretrial, it also generates more accurate information for jail administrators about a person's expected length of stay.

[a] Mike Gallagher, "New Rule Aims To Unclog Courts, Cut Jail Population," *Albuquerque Journal*, November 13, 2014, http://www.abqjournal.com/495530/news/new-rule-aims-to-unclog-courts.html; for recommendations to reduce jail overcrowding in Bernalillo County, see Bernalillo County Criminal Justice Reform Commission, *Preliminary Report to Interim Courts, Corrections and Justice Committee*, September 2014 at www.nmlegis.gov/LCS/handouts/CJRS%20092414%20Item%203%20BernCo%20Crim%20Justice%20Reform%20Commission%20report.pdf
[b] Ibid.
[c] James McKinley, "Bronx Courts Make Gains in Reducing Court Backlogs," *The New York Times*, December 11, 2013; New York State Unified Court System (NY Courts), "State Court System Reports Dramatic Cut in Bronx Felony Case Inventory, Announces Plan to Slash the Borough's Misdemeanor Backlog and Names New Bronx Appointment," press release (New York: NY Courts, December 11, 2013), http://www.nycourts.gov/press/PDFs/PR13_14a.pdf.
[d] Cherie Garofalo, *The Impact of Coordinating Multiple Criminal Cases in the Multiple Court Sites of the Orange County Superior Court* (Williamsburg, VA: National Center for State Courts, Institute for Court Management, 2011).

and jail; problems producing witnesses or evidence; and scheduling conflicts, especially involving defendants that have pending cases in more than one court, are among the many logistical problems that commonly occur. Misdemeanor courts are also often training grounds for young prosecutors and defense attorneys, and their cases typically take longer to resolve than they might if more seasoned attorneys were handling them.[117]

Both sides in a criminal case may use postponements for tactical purposes. Prosecutors might delay a case in an attempt to pressure a defendant to plead guilty, especially if the person is held in jail and prolonging the case will extend his or her time behind bars.[118] On their part, defenders believe that some delays may benefit their clients, since the quality of the prosecution's evidence usually degrades with time. In particular, delays can make it harder for prosecutors to maintain contact with key witnesses and may also have a negative effect on the credibility of witness testimony because memories fade over time.[119]

Delays in case processing come at great cost to the counties and municipalities holding defendants pretrial; to the agencies involved as cases drag on with multiple court appearances and conferences; to victims for whom justice is delayed; and to the detained people and their families in severed ties, lost wages, accumulated debt, and other burdens commonly associated with an extended stay in jail. Recognizing that greater efficiencies in case processing benefit everyone, jurisdictions have made efforts to significantly reduce delays and clear case backlogs.

## DISPOSITION AND SENTENCING

A criminal case comes to its conclusion at the point of disposition and sentencing. This can occur at arraignment or any point thereafter. In most cases, defendants plead or are found guilty by a court, have their case dismissed, or are found not guilty. Since 94 to 97 percent of criminal convictions are reached through a negotiated plea, much of the decision-making power in disposition remains with the prosecutor, who can leverage the initial charge decision and the amount of money bail requested to bring a case more quickly to a close with a plea deal.[120] Particularly for defendants on low-level charges—who have been detained pretrial due to an inability to pay bail, a lack of pretrial diversion options, or an inability to qualify for those options that are available—a guilty plea may, paradoxically, be the fastest way to get out of jail.[121]

Even at the point of disposition, there are options that allow for the release of people from custody without their having to accept a permanent guilty plea, which can have lasting collateral consequences for employment, housing, immigration status, and access to public benefits. Alternative resolutions such as conditional discharge, deferred prosecution, or adjournment in contemplation of dismissal provide for release conditioned by continuing lawful behavior with ongoing supervision and, in some cases, other requirements like participation in a treatment program or community service. If the conditions of the discharge or adjournment are met, the case will be dismissed. Some problem-solving courts will require that participants enter a guilty plea in order to participate,

## INVESTING IN ALTERNATIVE DISPOSITIONS



**Problem-solving courts.** Lawmakers in Indiana recently authorized the use of problem-solving courts as a condition of a misdemeanor sentence. Even a county sheriff can refer someone to a problem-solving court.[a] Indiana is among a growing number of states and localities that are investing in problem-solving courts. These courts tend to focus on groups of people with distinct needs—substance abuse, mental illness, homelessness, post-traumatic stress disorder as a result of participation in combat, and a history of prostitution—and aim to hold people accountable while also addressing their needs. They can be a way for individuals to wipe the slate clean, since success typically guarantees that prosecutors will vacate a guilty plea, if filed, and dismiss the charges.

As of 2013, approximately 2,800 drug courts and more than 300 mental health courts were operating in jurisdictions across the country, with other types of problem-solving courts in development.[b] While many of these courts are limited to misdemeanor cases, many others, such as one in Baltimore, specifically handle felony drug cases, or other felony cases where the defendant has a substance use disorder, through referrals from the district attorney's office.[c] Equally innovative, Michigan passed laws in 2013 that provide a framework for counties to establish and run mental health courts and explicitly allow participation by people who have previously participated in a similar program.[d]

**Pretrial diversion.** Some states are expanding their post-charge diversion programs so that more defendants can participate. In 2013, for example, New Jersey's conditional dismissal program in the state's misdemeanor court expanded to defendants charged with non-drug misdemeanor crimes, such as trespassing and shoplifting.[e] Similarly, in the same year, the Alabama legislature authorized district attorneys to establish pretrial diversion programs in their jurisdictions open to defendants charged with misdemeanors, traffic offenses, property crimes, most drug crimes, and other offenses within prescribed limits.[f] Finally, understanding that most behavior change is slow and subject to setbacks, Colorado passed a law in 2013 allowing judges to impose additional conditions rather than pull individuals out of the state's deferred judgment program following any violation of program terms in order to enhance the likelihood of eventual success by participants in the program.[g]

[a] Indiana HB 1016 (2013).
[b] For information on drug courts, see National Institute of Justice, "Drug Courts," http://www.nij.gov/topics/courts/drug-courts/Pages/welcome.aspx. For information on mental health courts, see Council of State Governments Justice Center, "Mental Health Courts," http://csgjusticecenter.org/mental-health-court-project/ and Substance Abuse and Mental Health Administration, "Adult Mental Health Treatment Court Database," http://gainscenter.samhsa.gov/grant_programs/adultmhc.asp. For information on newly created problem-solving courts, see Ram Subramanian and Rebecka Moreno, *Recalibrating Justice: A Review of 2013 State Sentencing and Corrections Trends* (New York, NY: Vera Institute of Justice, 2014) 19-21.
[c] See Juliette Mackin et al., *Baltimore City Circuit Court Adult Drug Treatment Court and Felony Diversion Initiative: Outcome and Cost Evaluation Final Report*, (Portland, OR: NPS Research, 2009).
[d] Michigan HB 4694 (2013). This law was tie-barred with  three other enacted bills—HB 4695,  HB 4696 and HB 4697— all of which deal with more detailed aspects of mental health court operations, procedures, and requirements.
[e] New Jersey A 3598. NJ has two diversion programs, the Pre-Trial Intervention Program (PTI) and the Conditional Discharge Program (CDP), both of which result in the dismissal of charges upon successful completion. PTI only applies to felonies, and CDP only applies to misdemeanors and (now) petty offenses. Upon successful completion of the program, charges are dismissed and individuals can apply to have their records expunged six months after dismissal.
[f] Alabama HB 494 (2013). This law applies only to district attorneys operating in the absence of a local act. Additional laws were passed in 2013 granting the authority to establish discretionary pretrial diversion programs to any governing body of a municipality generally (HB 648) as well as specifically to Huntsville (HB 452), Geneva County (HB 495), Irondale (HB 638), Fultondale (HB 644), Hoover (HB 645), St. Clair County (HB 649), and Alabaster (SB 467).
[g] Colorado SB 250 (2013).

with sentencing deferred pending completion of programming and conditions. Successful participants will have those pleas vacated and charges either dismissed or reduced, or will be given a non-custodial sentence.

For those whose cases are not dismissed or deferred pending dismissal in some manner, a guilty plea or finding can lead to a custodial sentence in state prison or jail, a period of confinement in a residential community corrections or treatment facility, a sentence of probation supervision, or a split sentence of confinement followed by a period of community supervision. Those who have already served time in jail pre-disposition may receive a sentence of time served: for low-level cases, time served may actually exceed the custodial sentence they could have received if convicted of the offense. Those ultimately serving time in jails will primarily be lower-level felons and misdemeanants, serving sentences on average of less than one year.

As the overall size of the jail population has risen, so too has the number of people held in jails post-conviction—despite the fact that the sentenced population has been steadily declining as a percentage of the jail population since the 1990s. In 1990, sentenced inmates represented 48.5 percent of the population.[122] By 2000, it had declined to 44 percent, and by 2013, the sentenced population was 38 percent of the total jail population.[123]  This decline does not mean that fewer people are receiving custodial jail sentences, particularly in light of the concurrent rise in the number of sentenced felons serving lengthy sentences in state prisons. It is simply that the number of people held in jails pretrial has been rising at a faster rate, and these people are staying for longer periods of time. As noted above, some of those pretrial days will count towards time served but will not later be captured statistically as post-conviction time.

In light of decades of mass incarceration and the myriad collateral consequences that can beset a person with a criminal record, many jurisdictions are now moving to resolve more cases in ways that hold people accountable without using incarceration as punishment or burdening them with a criminal conviction.[124] Building on lessons learned from the first generation of alternatives to incarceration, including problem-solving courts and post-charge diversion programs, jurisdictions are working to create clear and focused eligibility criteria and use validated risk and needs assessment tools to better match people with programs.[125] They are also trying to improve success rates and address one of the most persistent challenges—finding ways to respond effectively to non-compliant participants instead of punishing bad behavior with jail time.[126]

## USING ADMINISTRATIVE DATA TO PRIORITIZE JAIL REENTRY SERVICES



Prior to the late 1990s, jail reentry and jail discharge planning were virtually unheard of, and few jails provided services to support people as they left custody. However, in the past decade, jails have begun to implement new service models with the aim of reducing recidivism. While they are an important innovation, jail reentry services typically have inadequate funding and programming, and most are swamped by the extent of the demand.

In collaboration with the New York City Department of Correction (DOC), Vera's Substance Use and Mental Health Program developed and validated (for men) a low-cost and easy-to-implement tool—called the Service Priority Indicator (SPI)—that jail officials could use to identify those who would benefit most from access to the system's limited discharge planning resources.[a]

Using existing data recorded in the DOC's jail management database, researchers identified four risk factors for recidivism—age at jail admission, current charge, number of prior DOC admissions, and recent DOC admissions—and assigned a score to each based on the strength of its correlation with readmission to DOC custody. The scores, which range from zero to seven, were then grouped into four service priority levels, equivalent to having low, medium, high, or very high risk of readmission, with those at the greatest risk of recidivism also identified as very high priority for receiving discharge planning services. Vera's research also found that those identified by the SPI as having a very high service priority tended to stay in jail longer and were more likely to be released upon completion of their sentences—offering a window of opportunity to provide jail-to-community reentry services.

[a] Qing Wei and Jim Parsons, *Using Administrative Data to Prioritize Jail Reentry Services: Findings from the comprehensive Transition Planning Project* (New York, NY: Vera Institute of Justice, 2012).

## REENTRY AND COMMUNITY SUPERVISION

There are several ways in which sentenced offenders come under community supervision. They can be directly sentenced to probation, their sentence can be split between terms of incarceration and probation, or part of their custodial sentence can be served in the community on parole at the discretion of the paroling authorities.

Community supervision usually entails the adherence to certain conditions set by the judge if on probation, or the paroling authority if on parole. In addition, the supervising agency or agent can set the type and intensity of programming and other rules, such as the number of required office visits. People who fail to follow their conditions face sanctions, including revocation to prison or jail.

Although in some jurisdictions the conditions or rules of supervision are guided by risk and needs assessments, in practice many do not conduct thorough assessments and end up applying a generic set of requirements for all people on supervision. In the case of low-risk offenders, this can actually increase their risk of failure.[127]

Positive activities like school, work, and religious participation can be impeded by unnecessarily restrictive terms of supervision and obligations, including restrictions on movement, having a driver's license suspended, curfews, frequent reporting, and mandatory programming that does not reduce risk.[128] In some jurisdictions, a violation as minor as missing a scheduled appointment can result in an immediate return to jail; and when a former prisoner or probationer is accused of violating the terms of his or her conditional release, he or she is often sent to jail to await the adjudication of the suspected violation.

However, when the person on supervision and the supervising officer thoughtfully incorporate the results of a risk and needs assessment into the terms of supervision and needed services and supports are available, then a term of community supervision can be of great benefit to the person and his or her family, reduce the likelihood of future incarceration, and make a positive contribution to public safety.[129]

*A term of community supervision can be of great benefit to the person and his or her family, reduce the likelihood of future incarceration, and make a positive contribution to public safety.*

## IMPROVING COMMUNITY SUPERVISION AND RESTRUCTURING CRIMINAL JUSTICE DEBT



**Community supervision: calibrating conditions to risk.** The most important change needed to improve supervision and reduce recidivism is the adoption and careful implementation of a validated risk and needs assessment tool at the time of release from jail, when a person is placed on probation, and at regular intervals throughout the supervision term. While growing numbers of states have mandated that state agencies use such tools and their results to guide supervision, their use on the local level needs to be more widely adopted.[a]

Jurisdictions interested in instituting or expanding supervision options for low-risk offenders might look to Georgia, which recently implemented an automated reporting system for the roughly 80,000 low-risk probationers under supervision.[b] The call-in system triggers further scrutiny from the supervising officer if a probationer provides a non-standard response to a series of questions. Georgia, which has approximately 820 probation officers, has been able to allocate more resources to the 25,000 medium- and high-risk probationers under supervision by using this system, thus increasing public safety and improving supervision quality. The system also reduced the cost of supervising low-risk offenders from $1.68 to $0.45 per day.[c]

**Implementing graduated responses in community supervision.** More and more jurisdictions are relying on graduated responses and sanctions to respond to people who violate the conditions of their release or to reward the accomplishments of those who are making marked improvements in compliance.[d] Agencies have developed grids that match types of rule-breaking with particular punishments that increase in severity depending on the number of times a person has broken a particular rule or the number of rules broken at any one time and have created an array of rewards or recognition according to the level or length of compliance and achievement (securing a GED, for example). In a number of jurisdictions, such as Oregon and Kansas, technical revocations went down after implementing such policies.[e]

**Implementing other evidence-based practices.** A critical piece of evidence-based practice is determining the level of supervision and the intensity of programming and interventions needed—through the use of validated risk and needs assessments—and then applying the results across populations in order to ensure that the appropriate resources are available. Once risk and needs are identified, only programs and strategies that have been proven to work should be employed in addressing those risks and needs. For example, research has amply demonstrated the effectiveness of motivational interviewing and the use of options like cognitive-behavioral treatment, which have been adopted in many jurisdictions.[f] There are still many agencies, however, that have yet to integrate these and other practices into their supervision.

**Making basic reentry tools available to everyone leaving confinement.** While challenged with high inmate turnover and heterogeneous populations, jails are nonetheless well-situated for reentry efforts. They typically are located near the communities to which people in jail will return, making outreach efforts easy to accomplish. Using a risk and needs assessment instrument, jail reentry staff can work with community providers to develop reentry plans for people leaving jail that target specific needs.[g] Jurisdictions such as Douglas County in Kansas and Davidson County in Tennessee have introduced case planning and evidence-based programming in jail, and have developed networks of reentry providers that meet people while they are still in jail, work with them to build their case plans, and meet them on release day to assist with the transition home.[h]

**Allowing debt payment plans.** Professionals who supervise people in the community, pretrial or post-conviction, understand the heavy burden of criminal justice debt—which often drives many people back to jail—but they lack the authority to adjust payments or provide relief in other ways. Efforts to implement reforms in this area can face considerable resistance, since fines and fees help to fund courts, pretrial services, jails, and com-

munity supervision. In jurisdictions where budgets are especially tight, the pressure to collect fees in full can be great.[i] Despite these challenges, some jurisdictions are making efforts to reduce criminal justice debt burdens.

Community supervision agencies in South Carolina have the authority to restructure payment plans, stretching a person's criminal justice debt over more years as a way to reduce monthly payments.[j]  Washington State allows judges to waive the interest people have accrued on debt to the criminal justice system that is not restitution, where people show that the payment of the accrued interest will cause hardship for them and their family, or if they have made a good faith effort to pay.[k] Maine allows community service in lieu of cash payments, and Ohio, West Virginia, and New York allow for modified child support payments following a period of incarceration.[l] Even where such options exist, however, people may not know about them or be able to navigate the court process to take advantage of these rights—especially those who do not have a supervision agent in the community from whom they can seek advice and assistance.

[a] Nancy LaVigne, et al, *Justice Reinvestment Initiative State Assessment Report* (Washington, DC: The Urban Institute, 2014).

[b] J. Ginn, *Georgia Probation Program Lets Some Offenders Phone It In*, (New York, NY: Council of State Governments, 2014), at http://www.csg.org/pubs/capitolideas/enews/issue100_2.aspx.

[c] Ibid.

[d] For example see Peggy McGarry et al., *The Potential of Community Corrections to Improve Safety and Reduce Incarceration* (New York, NY: Vera Institute of Justice, 2013), 18-19; and Lauren-Brooke Eisen and Juliene James, *Reallocating Justice Resources: A Review of State 2011 Sentencing Trends* (New York, NY: Vera Institute of Justice, 2012), 14-15.

[e] See for example, Oregon Department of Corrections, *The Effectiveness of Community-Based Sanctions in Reducing Recidivism* (Salem, OR: Oregon Department of Corrections, 2002), 25-27; and Kansas Department of Corrections, *Kansas Behavior Response/Adjustment Grid*, http://www.doc.ks.gov/kdoc-policies/AdultIMPP/chapter-14/14137.pdf.

[f] See, for example, Steve Aos, *Evidence-based Adult Corrections Programs: What Works and What Does Not* (Olympia, WA: Washington State Institute of Public Policy, 2006); and Janeen Buck Willison, et al., *Process and Systems Change Evaluation Findings from the Transition from Jail to Community Initiative* (Washington, DC: Urban Institute, 2008).

[g] See Jim Parsons, "Addressing the Unique Challenges of Jail Reentry," in *Offender Reentry*, edited by M. Crow and J. Ortiz Smykla (Burlington, MA: Jones and Bartlett Learning, 2014), 105-123; and Amy Solomon et al., *Life after Lockup*, (Washington, DC: Urban Institute, 2008).

[h] Willison, et al., 2008.

[i] American Civil Liberties Union, *In for a Penny: The Rise of America's New Debtors Prisons*, (New York, NY: American Civil Liberties Union, 2010), 25, 50 and 55; Council on State Governments, *Repaying Debts*, (Washington, DC: Council of State Governments and the Bureau of Justice Assistance, 2007), 33; A. Bannon, M. Nagrecha, and R. Diller, *Criminal Justice Debt: a Barrier to Reentry* (New York, NY: Brennan Center for Justice, 2010), 30-31.

[j] South Carolina SB 1154 (2010).

[k] Washington SB 5423 (2011). This excludes restitution.

[l] West Virginia HB 4521 (2012); New York AB 8178 (2009); Maine HP 1032 (2013).

With or without formal supervision, people who have experienced lengthy jail or prison stays need basic reentry support.[130] Most immediate, people being released from incarceration need valid identification cards—necessary to gain them access to any benefits to which they may be entitled such as Medicaid—and assistance with opening a bank account and applying for housing and job opportunities. If those being released have chronic medical conditions, providing them with medications and referrals to medical care in the community are fundamental to their functioning. Permanent housing, avenues to education, and long-term employment come next. At the state level, corrections officials are making significant efforts to address these reentry needs upon release, but assistance at the local jail level is far more scarce.

While many factors can diminish a person's chances of successfully reentering the community, debt is one of the most toxic. Criminal justice fines and fees follow people from jail and prison back into the community and, combined with other financial burdens, can become a major barrier to finding and maintaining employment, housing, family relationships, community ties, and stable mental and physical health—the very conditions known to support success. In some jurisdictions, non-payment of fines and fees results in immediate arrest and additional jail time.[131] There are accounts of people who deliberately skip supervision appointments or miss court dates because they cannot pay their fines, setting in motion a process that eventually will lead them back to jail.[132] When fines and fees loom large, some people may actually choose to return to jail rather than face their debts.[133]

To end the cycling of people in and out of jail, jurisdictions are taking steps to improve community supervision by better matching conditions of release to assessed risk and relying on graduated responses to rule-breaking in place of automatic jail time. Some jurisdictions have also made progress in developing jail reentry resources, and a few jurisdictions are tackling through legislation the issue of debt and the barriers it creates for people trying to get back on their feet.

# Conclusion

Jails matter. Yet against a national backdrop of declining crime rates, most of the debate about incarceration in recent years has focused on prisons. A significant body of research shows that our reliance on incarceration as a primary crime control policy has had only a marginal impact on public safety. As a result, there is an emerging consensus that it has not been worth the fiscal and human costs. The role that local jails play in this story has not, until recently, garnered similar attention or analyses. That is starting to change and the new focus could not be timelier. With nearly 12 million annual admissions—almost 19 times those to state and federal prisons—jails have an impact that is both far-reaching and profound.

While jails serve an important function in local justice systems—primarily to hold people who are deemed, by reliable means, unlikely to appear in court or likely to reoffend if released while their cases are processed—this is no longer exclusively what jails are or whom they hold. With so many people cycling through them—some many times over—jurisdictions need to ensure that jails, while doing their part to keep the public secure, take seriously their responsibility to treat those in their custody with dignity, in settings that are safe, healthy, and able to help people return quickly to their communities or adjust to serving their sentences elsewhere. As this report has documented, this is not necessarily what jails do today.

The misuse of jails is neither inevitable nor irreversible. But to chart a different course will take leadership and vision. No single decision or decision maker in a local justice system determines who fills the local jail. While some jurisdictions  have made strides in developing, implementing, and evaluating off-ramps from the path that leads to the jailhouse door, change at one point in the system will have limited impact if other key actors and policies pull in the opposite direction. To both scale back and improve how jails are used in a sustainable way, localities must engage all justice system actors in collaborative study and action. Only in this way can jurisdictions hope to make the systemic changes needed to stem the tide of people entering jails and to shorten the stay for those admitted.

*The misuse of jails is neither inevitable nor irreversible.*

# ENDNOTES

1   For the number of jail jurisdictions, see James Stephan and Georgette Walsh, Census of Jail Facilities, 2006 (Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2011), 1; For the average daily jail population in 2013 see Todd D. Minton and Daniela Golinelli, Jail Inmates at Midyear 2013 - Statistical Tables (Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2014), 6; for population data from the 2010 census see U.S. Census Bureau, *State and Country Quickfacts – Detroit, Michigan,* http://quickfacts.census.gov/qfd/states/26/2622000.html, and U.S. Census Bureau, *State and Country Quickfacts – San Francisco, California,* http://quickfacts.census.gov/qfd/states/06/0667000.html.

2   For the 2013 jail admissions data see, Minton and Golinelli, 2014, 4; for population data from the 2010 census see U.S. Census Bureau, *State and Country Quickfacts – Los Angeles, California,* http://quickfacts.census.gov/qfd/states/06/0644000.html; and U.S. Census Bureau, *State and Country Quickfacts – New York, New York,* http://quickfacts.census.gov/qfd/states/36/3651000.html. For annual admissions to state and federal prisons, see E. Ann Carson, *Prisoners in 2013* (Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2014).

3   For comparison incarceration rates, see International Centre for Prison Studies, "World Prison Brief," http://www.prisonstudies.org/highest-to-lowest/prison-population%20total?field_region_taxonomy_tid=All&=Apply.

4   Although not explicitly articulated in the Constitution, the presumption of innocence is regarded as a crucial element of the constitutional right to due process under the law and "a basic component of a fair trial under our system of criminal justice." See *Estelle v. Williams,* 425 U.S. 501, 503 (1976). The primary import of this presumption today is the allocation of the burden of proof in criminal trials. See *Bell v. Wolfish* 441 U.S. 520, 533 (1979). According to this legal doctrine, prosecutors are required to prove guilt beyond a reasonable doubt. See *Coffin v. United States,* 156 U.S. 432, 460 (1895) and *Kentucky v. Whorton,* 441 U.S. 786, 790 (1979) (Stewart, J., dissenting). At common law, the presumption of innocence had a wider meaning. It also protected defendants during the time between charge and conviction, ensuring that most individuals would remain at liberty prior to trial and that those individuals unable to make bail and held in pretrial detention were not there to be punished, but merely held in safe and humane custody in order to return them to court for trial. See William Blackstone, *Commentaries on the Laws of England, Vol. IV,* 297 (1765). Regarding the protections the presumption has historically implied during the pretrial period, until relatively recently U.S. law largely conformed with the common law, since bail was presumed in all non-capital cases. See *Judiciary Act of 1798,* 1 Stat. 73 §33 (1798). With statutory changes between the 1960s and 1980s, however, public safety considerations are now taken when judges make pretrial release and detention decisions. See *Bail Reform Act 1966* and *Bail Reform Act 1984.* For defendants held in jail prior to trial—whether for failure to post bail or due to a potential risk posed to the community—the presumption continues to protect against the consideration of pretrial detention as evidence of guilt. See *Wolfish,* 441 U.S. at 533. For reports on jail conditions of confinement, see for example, Roy L. Austin, deputy assistant attorney general, U.S. Department of Justice, Civil Rights Division, to George Touart, interim county administrator, and Sheriff David Morgan, Escambia County, Pensacola, FL, *Re: Investigation of the Escambia County Jail,* May 22, 2013; Grace Chung Becker, acting assistant attorney general, U.S. Department of Justice, Civil Rights Division, and Patrick J. Fitzgerald, United States attorney, Northern District of Illinois, to Todd H. Stroger, president, Cook County Board, and Thomas Dart, sheriff, Cook County, Chicago, IL, *Re: Cook County Jail, Chicago, IL,* July 11, 2008; Loretta King, acting assistant attorney general, U.S. Department of Justice, Civil Rights Division, to Marlin N. Gusman, criminal sheriff, Orleans Parish, New Orleans, LA, *Re: Orleans Parish Prison System, New Orleans, Louisiana,* September 11, 2009; Jocelyn Samuels, acting assistant attorney general, U.S. Department of Justice, Civil Rights Division, and Preet Bharara, United States attorney, Southern District of New York, to Mayor Bill de Blasio, Commissioner Joseph Ponte, NYC Department of Correction, and Zachary Carter, Corporation Counsel of the City of New York, New York, *Re: CRIPA Investigation*

of the New York City Department of Correction Jails on Rikers Island, August 4, 2014; and Jonathan Smith, chief, U.S. Department of Justice, Civil Rights Section, Special Litigation Section, and André Birotte, Jr., United States Attorney, Central District of California, to Anthony Peck, deputy county counsel, Monterey Park, CA, and Stephanie Jo Reagan, principal deputy county counsel, Los Angeles County Department of Mental Health, Los Angeles, CA, *Re: Mental Health Care and Suicide Prevention Practices at Los Angeles County Jails,* June 4, 2014.

5   Doris J. James, *Profile of Jail Inmates, 2002,* (Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2004), 3.

6   Approx. 20,000 of 43,000 people who were detained following arraignment faced non-felony charges. See New York City Criminal Justice Agency, *Annual Report 2013* (New York: New York City Criminal Justice Agency, 2014), 30.

7   Traffic and vehicular charges made up 26 percent (161,000) of all charges. See Vera Institute of Justice, *Los Angeles County Jail Overcrowding Reduction Project* (Los Angeles, CA: Vera Institute of Justice, 2011), xv. This study was done prior to the enactment of the *Public Safety Realignment Act* (AB 109) of 2011 which transferred a large number of convicted felony offenders in state prison or on parole to the authority of California's 58 counties. For recent research on the impact of AB 109 on jail populations, see Magnus Lofstrom and Steven Raphael, *Impact of Realignment on County Jail Populations* (San Francisco, CA: Public Policy Institute of California, 2013).

8   For example, at least 29 states have taken steps to reform mandatory penalties since 2000, and many more in the last few years have taken steps to expand community-based sentencing options, such as drug treatment probation programs targeting high-risk, previously prison-bound drug-addicted offenders or reclassifying offenses by creating more gradation in felony levels per type of criminal offense or lowering low-level crimes from felonies to misdemeanors. For more information regarding recent state sentencing and corrections reforms, see for example, Adrienne Austin, *Criminal Justice Trends: Key Legislative Changes in Sentencing Policy, 2001-2010* (New York, NY: Vera Institute of Justice, 2010); Lauren-Brooke Eisen and Juliene James, *Reallocating Justice Resources: A Review of State 2011 Sentencing Trends* (New York, NY: Vera Institute of Justice, 2012); Ram Subramanian and Ruth Delaney, *Playbook for Change? States Reconsider Mandatory Sentences* (New York, NY: Vera Institute of Justice, 2014); Ram Subramanian and Rebecka Moreno, *Drug War Détente? A Review of State-level Drug Law Reform* (New York, NY: Vera Institute of Justice, 2014); and Ram Subramanian and Rebecka Moreno, *Recalibrating Justice: A Review of 2013 State Sentencing and Corrections Trends* (New York, NY: Vera Institute of Justice, 2014). Also see Alison Lawrence, *Trends in Sentencing and Corrections: State Legislation* (Washington, DC: National Conference of State Legislatures, 2013); Nicole D. Porter, *The State of Sentencing 2013: Developments in Policy and Practice* (Washington, DC: The Sentencing Project, 2014); and Nicole D. Porter, *The State of Sentencing 2012: Developments in Policy and Practice* (Washington, DC: The Sentencing Project, 2013).

9   For information about the impact of the fiscal crisis and low crime rates on sentencing and corrections, see Ram Subramanian and Rebecca Tublitz, *Realigning Justice Resources: A Review of Population and Spending Shifts in Prison and Community Corrections* (New York, NY: Vera Institute of Justice, 2012), 20. Also see Alison Shames and Michael Woodruff, *The Continuing Fiscal Crisis in Corrections: Setting A New Course* (New York, NY: Vera Institute of Justice, 2010), 4.

10  For results of public opinion polls which show that most Americans support alternatives to incarceration for nonviolent offenses, see Pew Center on the States, *Public Opinion on Sentencing and Corrections Policy in America* (Washington, DC: The Pew Charitible Trusts, 2012), also see Jill Mizell, *An Overview of Public Opinion and Discourse on Criminal Justice Issues* (New York, NY: The Opportunity Agenda, 2014), 19-22. For research demonstrating that community-based drug treatment programs, for example, are more effective than incarceration for drug offenders, see S. Aos et al., *Washington's Drug Offender*

*Sentencing Alternative: An Evaluation Of Benefits And Costs* (Olympia, WA: Washington State Institute for Public Policy, 2005); M. Finigan et al., *The Impact of a Mature Drug Court over 10 Years of Operation: Recidivism and Costs* (Portland, Oregon: NPC Research, Inc., 2007); S. B. Rossman et al., *The Multi-Site Adult Drug Court Evaluation: The Impact of Drug Courts* (Washington, DC: Urban Institute, Justice Policy Center, 2011); and  E.L. Sevigny, B.K. Fuleihan, and F.V. Ferdik, "Do drug courts reduce the use of incarceration?: A meta-analysis," *Journal of Criminal Justice*, 41, no.6 (2013): 416-425. For research that demonstrates that community-based sanctions are more effective than incarceration for certain types of offenders more generally, see for example, Christopher T. Lowenkamp and Edward J. Latessa, "Understanding the Risk Principle: How and Why Correctional Interventions Harm Low-Risk Offenders," *Topics in Community Corrections* (Washington, DC: National Institute of Corrections, 2004).

11  For 1983 admissions, see Craig A. Perkins, James J. Stephan, and Allen J. Beck, *Jails and Jail Inmates 1993-94*, (Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 1995), 13. For 2013 admissions, see Minton and Golinelli, 2014, p.4.

12  David E. Olson and Koert Huddle, "An Examination of Admissions, Discharges & the Population of the Cook County Jail, 2012", *Social Justice*, Paper 16 (2013), http://ecommons.luc.edu/social_justice/16/

13  Mayor's Task Force on Behavioral Health and the Criminal Justice System, *Action Plan* (City of New York: Mayor Bill de Blasio, 2014), 6, http://nyc.gov/BHTF.

14  For 1983 jail population, see Allen J. Beck, *Profile of Jail Inmates 1989*, (Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 1991), 3. For 2013 jail population, see Minton and Golinelli,  2014, p.6.

15  For 1993 rate, see Perkins, Stephan, and Beck, 1995, p. 2. For 2007 rate, see Minton and Golinelli, 2014, p.6.

16  Minton and Golinelli, 2014, p.6.

17  Uniform Crime Reporting Statistics - *UCR Data Online*, http://www.ucrdatatool.gov/. The violent crime rate decreased from 758 to 387 and the property crime rate decreased from 5,140 to 2,859.

18  Pew Center on the States, *State of Recidivism: The Revolving Door of America's Prisons* (Washington, DC: Pew Charitable Trusts, 2011); Don Stemen, *Reconsidering Incarceration: New Directions for Reducing Crime* (New York, NY: Vera Institute of Justice, 2007). Also see J. Travis, B. Western, and S. Redburn, eds. *The Growth of Incarceration in the United States: Exploring Causes and Consequence* (Washington, DC: National Research Council, 2014).

19  For drug arrest rates, see Howard N. Snyder and Joseph Mulako-Wangota, *Arrest Data Analysis Tool*, (Washington, DC: Bureau of Justice Statistics, 2013), selecting Drug Abuse Violation—Total at www.bjs.gov, (accessed Nov. 29, 2014). For 1983 and 1989 drug jailing rates, see Beck, 1991, p.11; for later drug jailing rates, see Doris J. James, *Profile of Jail Inmates, 2002* (Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2004).

20  Authors' approximations based on data from Beck, 1991, p. 7; and Minton and Golinelli, 2014, p. 6. To approximate length of stay (LOS) from aggregate annual admissions (ADM) and average daily populations (ADP), we used the formula LOS = ADP/(ADM/365). The numbers are intended to illustrate the trend more than precise estimates.

21  The percentage is a weighted average for those with and without mental illness who abused drugs or alcohol from Doris J. James and Lauren Glaze, *Mental Health Problems of Prison and Jail Inmates* (Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2006), 5-6.

22  Caroline Wolf Harlow, *Education and Correctional Populations* (Washington, DC: US Department of Justice, Office of Justice Programs,

Bureau of Justice Statistics, 2003), 2.

23  Authors' calculations based on Minton and Golinelli, 2014, p. 2; and Bureau of the Census, "U.S. Census QuickFacts," http://quickfacts.census.gov/qfd/states/00000.html. Using racial breakdowns of jail populations and U.S. Census figures from 2010, we determined that African Americans are jailed at a rate of 751 per 100,000 and whites are jailed at a rate of 168 per 100,000.

24  Minton and Golinelli, 2014, p. 7; and Bureau of the Census, "U.S. Census QuickFacts" at http://quickfacts.census.gov/qfd/states/00000.html.

25  Authors' calculations based on New York City Independent Budget Office, *NYC's Jail Population: Who's There and Why?* (New York: New York City Independent Budget Office, 2012), http://ibo.nyc.ny.us/cgi-park2/?p=516; and Bureau of the Census,  "U.S. Census QuickFacts," http://quickfacts.census.gov/qfd/states/00000.html. The population of the Rikers Island jail is 57 percent black, 33 percent Latino, and 7 percent white. The population of New York City is 22 percent black, 29 percent Latino, and 33 percent white.

26  J. Blecher, "Are jails replacing the mental health system for the homeless mentally ill?," *Community Mental Health Journal* 24, no. 3 (1988): 185-95; D. Shenson, N. Dubler, and D. Michaels, "Jails and prisons: The new asylums?," *American Journal of Public Health* 80, no. 6 (1990): 655-694. For history of the deinstitutionalization of the mentally ill generally, see Bernard E. Harcourt, *Reducing Mass Incarceration: Lessons from the Deinstitutionalization of Mental Hospitals in the 1960s* (Chicago: University of Chicago Public Law & Legal Theory Working Paper No. 335, 2011). Also see Richard G. Frank and Sherry A. Glied, *Better But Not Well: Mental Health Policy in the United States since 1950* (Baltimore, MD: The Johns Hopkins University Press, 2006).

27  Henry J. Steadman, F.C. Osher, et al., "Prevalence of Serious Mental Illness Among Jail Inmates," *Psychiatric Services* 60, no. 6, (June, 2009): 761; and although women still make up a relatively small proportion of the jail population—14 percent in 2013— their share has been steadily increasing, up from 11 percent since 2000, Minton and Golinelli, 2014, p. 7.

28  James and Glaze, 2006, p. 1. Symptoms of a mental disorder were based on criteria specified in the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* (DSM-IV). For a general discussion of mental illness in jails, see Travis, Western, and Redburn, 2014.

29  H. Richard Lamb and Linda Weinberger, "The Shift of Psychiatric Inpatient Care From Hospitals to Jails and Prisons," *Journal of the American Academy of Psychiatry and the Law Online* 33, no. 4 (2005): 529, 531. Also see H. Richard Lamb, Linda Weinberger, and Walter DeCuir, "The Police and Mental Health," *Psychiatric Services* 53, Issue 10 (2002): 1266, 1269 at http://ps.psychiatryonline.org/doi/full/10.1176/appi.ps.53.10.1266.

30  James and Glaze, 2006, p. 9.

31  David H. Cloud, Ernest Drucker, Angela Browne, and Jim Parsons, "Public Health and Solitary Confinement in the United States," *American Journal of Public Health*.

32  Vera Institute of Justice, *Los Angeles County Jail Overcrowding Reduction Project* (Los Angeles, CA: Vera Institute of Justice, 2011), xix.

33  For 1982 expenditures, see Tracey Kyckelhahn, *Justice Expenditures and Employment, FY 1982-2007* (Washington, DC: Department of Justice, 2011), 6; for 2011 expenditures, see Tracey Kyckelhahn, *Local Government Corrections Expenditures, FY 2005–2011*, (Washington, DC: Department of Justice, Bureau of Justice Statistics, 2013), 1-4, 7. The 2011 report shows local expenditures on corrections as $7,068 million in 1982 (in 2007 dollars) and the 2013 report shows local expenditures on corrections to be $26,400 million in 2011 (in 2011 dollars). When both figures are adjusted to constant 2011 dollars, the increase is about 235 percent.

34  A. L.  Solomon, *Life after lockup: Improving reentry from jail to the*

community (Washington, DC: Urban Institute, Justice Policy Center, 2008), 15-24.

35  Kyckelhahn, 2013, p. 4.

36  State funds and other sources of revenue, including fines and fees, may cover a small percentage of operating costs. Barbara Krauth and Karin Stayton, *Fees Paid by Jail Inmates: Fee Categories, Revenues, and Management Perspectives in a Sample of U.S. Jails* (Washington, DC: U.S. Department of Justice, National Institute of Corrections, 2005), 2-4, 6-7, 15-17, 36-38, 40-41.

37  Christopher Lowenkamp, Marie VanNostrand, and Alexander M. Holsinger, *The Hidden Costs of Pretrial Detention* (New York, NY: The Laura and John Arnold Foundation, 2013), 11. Lowenkamp et al.'s research in this area does not explore the causes of these negative outcomes. One, as yet untested, hypothesis could be that detained low- and moderate-risk individuals suffer the same over-programming consequences as low- and moderate-risk probationers and parolees who recidivate at higher rates when they receive overly-intensive supervision as compared to those who receive supervision matched to their assessed risk. For research on assessed risk and intervention level, see D.A. Andrews and James Bonta, *The psychology of criminal conduct* (Albany, NY: Lexis Nexis/Anderson Pub. Research, 2010) on the negative impact of high-intensity supervision and interventions with low- and medium-low risk probationers and parolees.

38  See Lowenkamp, VanNostrand, and Holsinger, 2013, p. 10-11; John S. Goldkamp, *Two Classes of Accused: A study of Bail and Detention in American Justice* (Cambridge, MA: Ballinger Pub. Co., 1979); and Malcolm Feeley, *The Process is the Punishment: Handling Cases in a Lower Criminal Court*, (New York: Russell Sage Foundation, 1979). For a comprehensive review of current research, see Jeffrey David Manns, *Liberty Takings: a Framework for Com[p]ensating Pretrial Detainees* (Cambridge, MA: Harvard Law School, John M. Olin Center for Law, Economics, and Business, 2005); and The Pretrial Justice Institute, *Rational and Transparent Bail Decision Making: Moving From a Cash-Based to a Risk-Based Process*, (Washington, DC, Pretrial Justice Institute/MacArthur Foundation 2012).

39  Goldkamp, 1979; Feeley, 1979; and Manns, 2005.

40  For racial breakdowns of jail populations, see Minton and Golinelli, 2014, p. 6. For racial breakdowns of the general population, see U.S. Census QuickFacts, http://quickfacts.census.gov/qfd/states/00000.html.

41  For the example of New York City, see Jeffrey Fagan and Garth Davies, "Street Stops and Broken Windows: Terry, Race, and Disorder in New York City," *Fordham Urban Law Journal* 28, no.2 (2000): 457-464.

42  Marc Mauer and Nazgol Ghandnoosh, *Incorporating Racial Equity into Criminal Justice Reform* (Washington, DC: The Sentencing Project, 2014), 6-7.

43  For research demonstrating that schools in minority neighborhoods are more likely to have law enforcement officers on site, see Aaron Kupchik and Geoff Ward "Race, Poverty, and Exclusionary School Security: An Empirical Analysis of US Elementary, Middle, and High Schools," Y*outh Violence and Juvenile Justice* 12, no. 4 (2013): 332-354; and Allison Ann Payne and Kelly Welch, "Modeling the Effects of Racial Threat on Punitive and Restorative School Discipline Practices," *Criminology* 48, no. 4 (2010): 1019-1062.

44  For information about stop and frisk practices in New York, see Jennifer Fratello, Andres Rengifo, and Jennifer Trone, *Coming of Age in the Era of Stop and Frisk* (New York, NY: Vera Institute of Justice, 2013).

45  Mauer and Ghandnoosh, 2014, pp. 6-7.

46  Robert Brame, Shawn Bushway, Ray Paternoster, Michael Turner, "Demographic Patterns of Cumulative Arrest Prevalence by Ages 18 and 23," *Crime and Delinquency*, 60(3), (2014), 1.

47  Tina Frierburger and Carly Hilinski. "The Impact of Race, Gender, and Age on the Pretrial Decision," *Criminal Justice Review* 35(3), (2010), 330.

48  American Civil Liberties Union, *Racial Disparities in Sentencing: Hearing on Reports of Racism in the Justice System of the United States.* (Washington, DC: American Civil Liberties Union, 2014), 1-3.

49  Barbara Krauth and Karin Stayton, pp. 7-35.

50  These fees include medical visits (including pharmacy prescriptions, eye care, and dental), telephone use, per diem/pay to stay, booking, photocopying, barber/hair care, bonding, escort/transportation, notary, laundry, check-processing, detoxification at intake, substance abuse testing, substance abuse treatment, weekend programs, electronic monitoring, community service, GED testing, jail industries/jobs programs, work release, vocational aptitude testing, and day reporting. See Krauth and Stayton, 2005, pp. 7-35.

51  See American Civil Liberties Union, *In for a Penny: The Rise of America's New Debtors Prisons* (New York, NY: American Civil Liberties Union, 2010), 6-8; and Council on State Governments, *Repaying Debts* (Washington, DC: Council of State Governments and the Bureau of Justice Assistance, 2007), 7-8. Also see, A. Bannon, M. Nagrecha, and R. Diller, *Criminal Justice Debt: a Barrier to Reentry* (New York, NY: Brennan Center for Justice, 2010), 7-10.

52  Bannon, Nagrecha, and Diller, 2010, p.10.

53  Council on State Governments, *Repaying Debts* (Washington, DC: Council of State Governments and the Bureau of Justice Assistance, 2007), 2.

54  In addition, more and more employers are conducting criminal background checks as part of their hiring processes. Some surveys suggest that 90 percent of employers conduct such checks, and they are not always limited to convictions. NELP found that in one survey, over 90 percent of employers reported requiring criminal background checks as a part of hiring decisions. They may also inquire about previous arrests or criminal charges, regardless of the outcome. See Michelle Natividad Rodriguez and Maurice Emsellem, *65 Million Need not Apply: The Case for Reforming Criminal Background Checks for Employment* (Washington, DC: The National Employment Law Project, 2011), 1.

55  Bannon, Nagrecha, and Diller, 2010, p.13.

56  See American Civil Liberties Union, 2010, p. 5; Council on State Governments, 2007 p. 3; Bannon, Nagrecha, and Diller, 2010, pp. 19-26; Douglass Evans, *The Debt Penalty—Exposing the Financial Barriers to Offender Reintegration* (New York, NY: Research and Evaluation Center, John Jay College of Criminal Justice, City University of New York, 2014), 1.

57  *Bearden v. Georgia*, 461 U.S. 660, 668-69 (1983).

58  Bruce Western and Becky Pettit, *Collateral Costs: Incarceration's Effect on Economic Mobility* (Washington, DC: the Pew Charitable Trusts, 2010), 11.

59  When an individual enrolled in Medicaid is detained, the majority of states terminate Medicaid benefits, despite federal guidance that allows for the suspension of Medicaid for individuals involved in the criminal justice system whose eligibility for the program is not linked to Supplemental Security Income. See Anita Cardwell and Meaghan Gilmore, *County Jails and the Affordable Care Act: Enrolling Eligible Individuals in Health Coverage* (Washington, DC: National Association of Counties, 2012), 3.

60  Each federal program has different eligibility criteria in relation to prison or jail stays. See Social Security Administration, *What Prisoners Need to Know* (Washington, DC: Social Security Administration, 2010), http://www.ssa.gov/pubs/EN-05-10133.pdf; U.S. Department of Veterans Affairs, "Incarcerated Veterans," http://www.benefits.va.gov/persona/veteran-incarcerated.asp .

61  See Corrinne A. Carey, *No second chance: People with criminal records denied access to public housing* (New York, NY: Human Rights Watch, 2004), 3, http://www.hrw.org/reports/2004/usa1104/usa1104.pdf; and Stephen Metraux, Caterina Roman, and Richard Cho, "Incarceration and Homelessness," (Washington DC: National Symposium on Homelessness Research, 2007), 9.

62  A survey found that 63 percent of homeless formerly incarcerated people in Baltimore, MD surveyed had owned or rented a home prior to incarceration, but only 29 percent owned or rented a home after release. The survey does not distinguish between jail and prison, but notes that 41 percent of respondents were incarcerated for a year or less. See Center for Poverty Solutions, *Barriers to Stability: Homelessness and Incarceration's Revolving Door in Baltimore City* (Baltimore, MD: Open Society Foundations, 2003), 14-15.

63  See Greg A. Greenbergand and Richard Rosenheck, "Jail Incarceration, Homelessness, and Mental Health: A National Study," *Psychiatric Services* 59, no. 2 (2008): 170-177; National Association of Counties, Corporation for Supportive Housing, *Supportive Housing for Justice-Involved Frequent Users of County Public Systems* (Washington, DC.: National Association of Counties, 2013), 3.

64  More than half (53 percent) of female jail inmates reported having a current medical problem, compared to about (35 percent) of male jail inmates. See Laura M. Maruschak, *Medical Problems of Jail Inmates*, (Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics, 2006), 1, http://www.bjs.gov/content/pub/pdf/mpji.pdf.

65  See Richard G Frank and Sherry A. Glied, *Better But Not Well: Mental Health Policy in the United States since 1950* (Baltimore, MD: Johns Hopkins University Press, 2006); Kathleen N. Ly et al., "The increasing burden of mortality from viral hepatitis in the United States between 1999 and 2007," *Annals of Internal Medicine* 156, no. 4 (2012): 271-278; Jessica R. MacNeil, Mark N. Lobato, and Marisa Moore, "An unanswered health disparity: tuberculosis among correctional inmates, 1993 through 2003," *American Journal of Public Health* 95 no. 10 (2005): 1800; Marushka L. Silveira, 2006, p. 1.

66  Nicholas Freudenberg, "Jails, prisons, and the health of urban populations: A review of the impact of the correctional system on community health" *Journal of Urban Health: Bulletin of the New York Academy of Medicine* 78, no. 2 (2011): 214–235.

67  Dora M. Dumont et al., "Public health and the epidemic of incarceration," *Annual Review of Public Health* 33 (2012): 331-333; Andrew P. Wilper et al., "The health and health care of US prisoners: results of a nationwide survey," *American Journal of Public Health* 99, no. 4 (2009): 666-672; Sasha Abramsky and Jamie Fellner, *Ill-Equipped: US Prisons and Offenders with Mental Illness* (New York: Human Rights Watch, 2003), 16, 22, 40.

68  Nicholas Freudenberg, Jessie Daniels, Martha Crum, Tiffany Perkins, and Beth E. Richie, "Coming Home From Jail: The Social and Health Consequences of Community Reentry for Women, Male Adolescents, and Their Families and Communities," *American Journal of Public Health.* 95 (2005): 1725.

69  In 2005, 79 percent of women in jail were mothers, with nearly 250,000 children between them.  See Susan McCampbell, *The Gender-Responsive Strategies Project: Jail Applications* (Washington, DC: National Institute of Corrections, US Department of Justice, 2005), 2, 4.

70  Steve Christian, *Children of Incarcerated Parents* (Washington, DC: National Council of State Legislatures, 2009), 5.

71  Todd Clear's research looks at the impact of incarceration on communities, including high rates of community members in both jail and prison. Todd R. Clear, "The Effects of High Imprisonment Rates on Communities," *Crime and Justice* 37, no. 1 (2008): 97-132, 114-117. Also see Andrew Petteruti and Nastassia Walsh, *Jailing Communities: The Impact of Jail Expansion and Effective Public Safety Strategies* (Washington DC: Justice Policy Institute, 2008), 18-20; and Nancy G. La Vigne, Pamela Lachman, Shebani Rao, Andrea Matthews. *Stop and Frisk: Balancing Crime Control with Community Relations* (Washington, DC: Urban Institute, 2014): 20-21.

72  Todd R. Clear, *Imprisoning communities: How mass incarceration makes disadvantaged neighborhoods worse* (Oxford: Oxford University Press, 2007).

73  James Austin and Michael Jacobson, *How New York City Reduced Mass Incarceration: A Model for Change?* (New York, NY: Vera Institute of Justice, 2013), 25.

74  State laws allow citation and release primarily in response to traffic violations, infractions, low-level misdemeanors, and sometimes low-level felonies. Louisiana, Oregon, and New York, for example, offer this for some felonies. Both state laws and departmental policies range widely in terms of presuming or allowing this practice. There are states and/or municipalities, for example, that list specific crimes for which a citation is the presumed response, absent mitigating circumstances, while others provide no guidance at all. See National Conference of State Legislatures, *Citation in Lieu of Arrest* (2013)

75  Ibid. With varying degrees of formality, officers consider an array of factors, including whether the suspect seems to pose a danger to persons or property and the person's criminal record, including any outstanding warrants; whether or not the suspect and any family members reside locally and the suspect's employment status and other possible ties to the community as indicators of the likelihood that the person will appear in court; and whether the suspect is under the influence of drugs or alcohol or appears to be mentally ill. See for example, Mary T. Phillips, *The Past, Present , and Possible Future of Desk Appearance Tickets in New York City,* (New York: New York City Criminal Justice Agency, 2014). In some jurisdictions, the police may also require the person to post a small amount of bail to create an incentive for the person to appear in court for arraignment.

76  The practice of "for-profit" or "quota" policing can result in unlawful stops, summonses, and arrests. Quotas are requirements that an officer issue a certain number of violations within a specific timeframe and are sometimes imposed to accrue court fines and fees from defendants to help reduce budgetary deficits in cities or counties. See for example, New York Civil Liberties Union report "NYCLU Lawsuit Challenges Primitive Quota System in Bronx Precinct" (New York, NY: New York Civil Liberties Union, 2012), http://www.nyclu.org/news/nyclu-lawsuit-challenges-primitive-quota-system-bronx-precinct. While it still remains a practice in some jurisdictions, there has been much investigation and litigation in jurisdictions across the United States, including in Georgia, New Jersey, Illinois, and New York, regarding the illegality of violation and ticket quotas.  See for example, *Fraternal Order of Police, Lodge 1 v City of Camden,*  Civ. No 10-1502 (D.N.J. Sep. 26, 2013); Plaintiff's Complaint, *Craig Matthews v City of New York, Raymond Kelly*, 12 Civ.1354 (S.D.N.Y. filed Feb. 23, 2012).

77  For research on civil forfeiture, see Marian R. Williams, Jefferson E. Holcomb, Tomislav V. Kovandzic, and Scott Bullock, *Policing for Profit: The Abuse of Civil Asset Forfeiture* (Washington, DC: Institute for Justice, March 2010) http://www.ij.org/policing-for-profit-the-abuse-of-civil-asset-forfeiture-4; J. Worrall,  and T. Kovandzic, "Is Policing For Profit? Answers from Asset Forfeiture" *Criminology and Public Policy* 7 (2008): 219-244; and John L. Worrall, "Addicted to the Drug War: The Role of Civil Asset Forfeiture as Budgetary Necessity in Contemporary Law Enforcement" *Journal of Criminal Justice* 29 (2001): 171–187. For an example of press coverage about Missouri, see Radley Balko, "How Municipalities in St. Louis County, MO., Profit From Poverty," *Washington Post,* September 3, 2014.

78  Authors' calculation from Bureau of Justice Statistics, *Jail Inmates 1984* (Washington, DC: US Department of Justice, Bureau of Justice Statistics, 1986), 2; and Snyder and Mulako-Wangota, 2013. In 1983 there were 11.7 million arrests and 6 million jail admissions.

79  Authors' calculation from Minton and Golinelli, 2014, p. 4; and Snyder and Mulako-Wangota, 2013. In 2012 there were 12.2 million arrests and 11.6 million jail admissions.

80  For the analysis of 17 state courts, see Robert LaFountain et al., *Examining the Work of State Courts: An Analysis of 2010 State Court Caseloads* (Washington DC: National Center for State Courts, 2012), 24. For the analysis of misdemeanor arrests in New York City, see Preeti

Chauhan et al., *Trends in Misdemeanor Arrests in New York* (New York: John Jay College of Criminal Justice, 2014).

81  The arrest rate for drug crimes peaked in 2006. See Howard N. Snyder and Joseph Mulako-Wangota, Bureau of Justice Statistics. With underlying data from the FBI's Uniform Crime Reporting (UCR) Program, U.S. drug arrest estimates were generated using the Arrest Data Analysis Tool at http://www.bjs.gov.

82  The U.S. Constitution affords defendants adversarial safeguards in criminal proceedings including a timely judicial determination of probable cause as a pre-requisite to detention under the Fourth Amendment. See *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975). Similarly, under the Sixth Amendment the Court found that there must be a reasonable time between arrest and arraignment. See *Barker v. Wingo*, 407 U.S. 514, 530-31 (1972). These holdings have been codified under Federal Rule of Criminal Procedure 5.1, which states that a person arrested in the United States must be presented "without unnecessary delay" to a magistrate or judge.  See Fed. Rules Cr. Proc. Rule 5, 18 U.S.C.A., FRCRP Rule 5. The Supreme Court subsequently found that in order to satisfy *Gerstein's* promptness requirement, a jurisdiction that chooses to combine probable cause determinations with other pretrial proceedings must do so as soon as is reasonably feasible, but no later than 48 hours after arrest. See *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991). States that combine "probable cause determinations" with initial court appearances have interpreted "unnecessary delay" to mean no more than 48 hours. See Pen C §825; CCP §§134-135; Govt C §§6700, 6706; *People v Lee*  3 CA3d 514, 521 (1970). Despite the Supreme Court's 48 hour mandate, many jurisdictions provide a 72-hour window for arraignment. Typically state statutes do not permit law enforcement to detain a person for more than 72 hours before arraignment and others comport with the Supreme Court mandate of 48 hours and some even fewer. For example, in New York and Washington, DC, statute requires 24 hours and in California legislature interprets "unnecessary delay" as no more than 48 hours, not including holidays. See Kimyetta R. Robinson, *From Arrest to Appeal: A Guide to Criminal Cases in The New York State Courts* (New York, NY: The Fund for Modern Courts, 2005), 12; also see Washington, DC Super. Ct. R. Crim. P. 5(c).—a defendant has the right to an immediate probable cause determination; Pen C §825; CCP §§134-135; Govt C §§6700, 6706. *People v Lee* 3 CA3d 51 (1970). However, while courts have found that unreasonable pre-arraignment detention is unconstitutional, there is no remedy for the violation.

83  See *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978), "In our system, so long as prosecutor has probable cause to believe that the accused committed offense defined by statute, decision whether to prosecute, and what charge to file or bring before a grand jury, and generally rests entirely in his discretion."  However, "a prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution." See *U.S. v. Goodwin*, 457 U.S. 368 (1982). Also see, for example, *Hassan v Magistrates Court*, 191 N.Y.S. 2nd 238, 243 (Sup. Ct. 1959), "Just because a crime has been committed, it does not follow that there must necessarily be a prosecution for it lies with the district attorney to determine whether the acts which may fall within the literal letter of the law should as a matter of public policy not be prosecuted." Additionally, recognizing the prosecution's broad enforcement and discretionary power, the American Bar Association created a rule in its Model Rules for Professional Responsibility to guide prosecutors' duties.  See Model Rules of Professional Conduct Rule 3.8 (2005).

84  For examples of recent state reforms that expand deferred prosecution programs out of concern about collateral consequences of criminal convictions see Ram Subramanian and Rebecka Moreno, *Relief in Sight? States Rethink the Collateral Consequences of Criminal Conviction, 2009-2014* (New York, NY: Vera Institute of Justice, 2014).

85  For information on the history of risk assessment in criminal justice, see D.A. Andrews, James Bonta, and J. Stephen Wormith, "The Recent Past and Near Future of Risk and/or Need Assessment," *Crime & Delinquency* 52,  no. 1 (2006): 7-27.

86  National Association of Pretrial Services Agencies, *Promising Practices in Pretrial Diversion* (Washington, DC: National Association of Pretrial Services Agencies, 2010).

87  Broadly, bail refers to conditions put upon an accused person to ensure that, if released from custody, he or she reappears for trial. See *Stack v. Boyle*, 342 U.S. 1, 4 (1951) ("The right to release before trial is conditioned upon the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty.") While the Eighth Amendment prohibits *excessive* bail, the Constitution does not create an absolute right to bail. See *United States v. Salerno*, 481 U.S. 739, 754-55 (1987). Presently, there is a presumption towards releasing people pending trial. However, if an individual is deemed to pose a safety risk or flight risk, then pretrial detention is allowed. See *Salerno*, 418 U.S. at 751 (Government's interest in public safety can outweigh an individual's liberty interest.) The decision whether or not to release a defendant is usually made first at arraignment or another initial court appearance, and can be revisited multiple times during the movement of a case through the courts.

88  For example, under Federal bail law, see 18 U.S.C. § 3142, *as amended in 1984*, courts can deal with an individual charged with a crime pending trial in several ways. If a judicial officer can determine that the individual doesn't pose a safety or flight risk, the individual should be released upon his or her own recognizance, or after promising to pay money for failure to appear: see § 3142(b). Second, if the judicial officer feels more safeguards are necessary to ensure either the individual's reappearance or to ensure the safety of the community, the court can impose further conditions (for example, compliance with a curfew, electronic monitoring, or prohibitions on firearm possession): see § 3142(c). Determinations for either outcome are made by considering the nature of the offense, the weight of evidence against the individual, the history and character of the individual, and whether the individual poses a significant risk to the community: see § 3142(g). Alternatively, an individual may be temporarily detained in order to facilitate the revocation of any other conditional release he or she may be under—for example, if the individual is on probation, parole, or awaiting trial for another offense: see § 3142(d). However, temporary detainment is only triggered if an individual poses a flight or safety risk: see § 3142(d)(2). Finally, only some individuals can be detained until trial. Those charged with crimes of violence, certain drug offenses, certain repeat offenses, and offenses carrying maximum life sentences trigger the ability for the court to hold a hearing to determine whether indefinite detention is warranted: see § 3142(f). Additionally, individuals whose pose a significant flight risk or are likely to obstruct justice or threaten witnesses are also eligible for indefinite detention. Ibid. Typically, at the hearing, the government must show, by clear and convincing evidence, that no conditions of release can reasonably assure the safety of the community. However, certain charges—including certain drug offenses, certain acts of terrorism, and many offenses involving a minor victim—carry a presumption of detention that the defendant must rebut: see § 3142(e). At the state level, bail laws vary. For an overview of differences among state bail laws, see Pretrial Justice Institute's "Matrix of Bail Laws," http://www.pretrial.org/wpfb-file/matrix-of-state-bail-laws-april-2010-pdf/.

89   Minton and Golinelli, 2014, p.1.

90  Pheny Z. Smith, *Felony Defendants in Large Urban Counties, 1990* (Washington, DC: Bureau of Justice Statistics, Department of Justice, 1993), 8; and Brian A. Reaves, *Felony Defendants in Large Urban Counties, 2009-Statistical Tables* (Washington, DC: Bureau of Justice Statistics, Department of Justice, 2013), 1.

91  Reaves, 2013, p.15.

92  Ibid.

93  Ibid. A surety bond is an agreement between the court and a third person (the surety) to pay a certain amount if the defendant named in the agreement fails to appear in court.  The bond may be secured, requiring an actual payment of the sum or some portion of it in court pending the appearance of the defendant, or unsecured, requiring only the promise to pay if the defendant doesn't appear.  Private surety agents, known as bail bondsmen, charge a nonrefundable fee in exchange for paying or

promising to pay the amount necessary to get someone out of jail. They may also require some kind of collateral from the defendant that will be forfeited if he or she fails to show up for court dates. Some states, most recently Kentucky, have outlawed private for-profit sureties.

94  Reaves, 2013, p. 19; Brian A. Reaves and Paul Smith, *Felony Defendants in Large Urban Counties, 1992* (Washington, DC: Bureau of Justice Statistics, Department of Justice, 1995), 20. The 1992 mean bail ($25,400) is shown in 2009 dollars.

95  See Marion Katsive, *New Areas for Bail Reform: A Report on the Manhattan Bail Reevaluation Project* (New York, NY: Vera Institute of Justice, 1968). See generally Kristin Bechtel, Christopher T. Lowenkamp and Alex Holsinger, "Identifying the Predictors of Pretrial Failure: A Meta-Analysis" *Federal Probation* 75, no. 2 (2011).

96  Bechtel, Lowenkamp, and Holsinger, 2011, pp.1-2.

97  Melissa Neal, *Bail Fail: Why the U.S. Should End the Practice of Using Money for Bail* (Washington, DC: Justice Policy Institute, 2012), 3-4, 21-22.

98  Reaves, 2013, pp. 15, 20.

99  Donna Makowiecki and Thomas Wolf, "Enter...Stage Left...U.S. Pretrial Services," *Federal Probation* 71, no. 2: 7-9; also see William Henry, "The Pretrial Services Act: 25 Years Later," *Federal Probation* 71, no. 2 (2007): 16.

100  Bechtel, Lowenkamp and Holsinger, 2011.

101  For example, see the Los Angeles County 2011 Felony Bail Schedule, http://www.metalaw.us/resource/Bail%20Schedule_Infractions_Misdemeanors.pdf; and see Pretrial Justice Institute, *Rational and Transparent Bail Decisions: Moving from a Cash-based to a Risk-based Process* (Washington, DC: Pretrial Justice Institute, 2012) 18-42; Michael R. Jones, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Option* (Washington, DC: Pretrial Justice Institute, 2013).

102  Timothy Schnacke, *Money as a Criminal Justice Stakeholder: The Judge's Decision to Release or Detain a Defendant Pretrial* (Washington, DC: National Institute of Corrections, U.S. Department of Justice, 2014) 30-39.

103  Reaves, 2013, p. 15.

104  Ibid.

105  13,352 felony defendants (including remands) and 10,868 non-felony defendants were not released prior to disposition. 3,407 non-felony defendants with bonds of $500 or less were not released prior to disposition. See New York Criminal Justice Agency, *New York Criminal Justice Agency Annual Report* (New York: Criminal Justice Agency, 2013), 30.

106  Frierburger and Hilinski, 2010, p. 330.

107  Ibid.

108  Jamie Fellner, *The Price of Freedom: Bail and Pretrial Detention of Low Income Nonfelony Defendants in New York City* (New York, NY: Human Rights Watch, 2010), 27-30.

109  Vera Institute of Justice, *Los Angeles County Jail Overcrowding Reduction Project*, 68.

110  Ibid.

111  The Sixth Amendment of the U.S. Constitution provides that in "all criminal prosecutions, the accused shall enjoy the right to a speedy trial." This same protection is also embodied in the Fourteen Amendment's due process clause. In 1974, the Speedy Trial Act 18 U.S.C. §§ 3161-3174— later amended in 1979— set forth time limits for completing federal prosecutions providing for dismissal of the criminal action if there are delays without good cause. Each state has its own speedy trial provision, embodied in legislation, court rulings, or both.

112  A recent *New Yorker* essay tells the story of one young man who spent three years in jail, missing both his junior and senior years in high school and insisting on his innocence, before the Bronx district attorney dismissed the charges against him. See Jennifer Gonnerman, "Before the Law: A boy was accused of taking a backpack. The courts took the next three years of his life," *The New Yorker*, October 6, 2014. According to a *New York Times* investigation, he is just one of many defendants whose cases are stalled in the Bronx courts. See William Glaberson, "Faltering Courts Mired in Delays," *The New York Times*, April 13, 2013, http://www.nytimes.com/2013/04/14/nyregion/justice-denied-bronx-court-system-mired-in-delays.html. Also see William Glabeerson's four-part report, "Justice Denied: Inside the Bronx's Dysfunctional Court System," *The New York Times*, April 13, 14, 15 and 30, 2013.

113  Marie VanNostrand, *New Jersey Jail Population Analysis: Identifying Opportunities to Safely and Responsibly Reduce Jail Population* (Trenton, NJ: Drug Policy Alliance, 2013), 14.

114  See note 80. Also, see Jenny Roberts, "Crashing the Misdemeanor System," *Washington and Lee Law Review* 70 (2013) and Jenny Roberts, "Why Misdemeanors Matter: Defining Effective Advocacy in Lower Criminal Courts," *U.C. Davis Law Review* 45 (2011).

115  The Bronx Defenders Fundamental Fairness Project, *No Day in Court: Marijuana Possession Cases and the Failure of the Bronx Criminal Courts* (Bronx, NY: The Bronx Defenders, 2013).

116  After arraignment, for example, a criminal case will typically include a preliminary meeting between the two sides to see whether the case can be resolved short of having a trial. For felonies, in some jurisdictions a grand jury will be convened to examine the evidence and determine whether charges should be brought. There will also likely be pretrial hearings, some which will deal with procedural or constitutional issues related to the evidence procured by law enforcement and depending on the outcome, a judge may decide to alter course. The judge may require more information, another hearing, may bind the case over on different charges, or reduce or dismiss the charges. If convicted, there is usually a gap in time between conviction and sentencing, in part because the sentencing judge may require a report about the defendant to inform the sentencing decision—a report that is typically put together by the court's probation department Sometimes the victim and character witnesses might be called to the judge in determining an appropriate sentence.

117  Vera Institute of Justice, *Los Angeles County Jail Overcrowding Reduction Project* (2011), 71.

118  See note 121. Also, ibid, p. 70.

119  See William Glaberson for example, "For 3 Years After Killing, Evidence Fades as a Suspect Sits in Jail," *The New York Times* April 15, 2013 http://www.nytimes.com/2013/04/14/nyregion/justice-denied-bronx-court-system-mired-in-delays.html.

120  More than 97 percent of federal convictions and 94 percent of state convictions are the result of guilty pleas. See Bureau of Justice Statistics, *Sourcebook of Criminal Justice Statistics Online*, Table 5.22.2010, http://www.albany.edu/sourcebook/pdf/t5222010.pdf; and S. Rosenmerkel, M. Durose, and D. Farole, *Felony Sentences in State Courts, 2006–Statistical Tables* (Washington, DC: Bureau of Justice Statistics, 2009), 1; also see Lindsey Devers, *Plea and Charge Bargaining: Research Summary* (Washington, DC: Bureau of Justice Assistance, 2011), 1. For a brief discussion on the relative power prosecutors have in plea bargaining see Rodney J. Uphoff, "The Criminal Defense Lawyer As Effective Negotiator: A Systemic Approach" *Clinical Law Review* 2 (1995): 73, 88-89 & n. 63 (1992).

121  See for example *People v. Llovet*, N.Y.L.J., Apr. 24, 1998 (Kings Cty. Crim. Ct.) which found that "many of the pleas of guilty to misdemeanors were by defendants who could achieve their freedom only by pleading guilty. (Plead guilty and get out, maintain your innocence and remain incarcerated in lieu of bail.) Thus if all defendants had the economic wherewithal to make bail, it is clear that many

fewer…would plead guilty to misdemeanors." Also see Gerard E. Lynch, "Our Administrative System of Criminal Justice," *Fordham Law Review* 66 (1998): 2117, 2146 ("Pleading guilty at the first opportunity in exchange for a sentence of 'time [already] served' is often an offer that cannot be refused.")

122  James J. Stephan and Louis W. Jankowski, *Jail Inmates, 1990*, (Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 1991), 2.

123  Minton and Golinelli, 2014, p.7.

124  See Subramanian and Moreno, 2014, p. 11.

125  For a discussion of treatment matching and dosage strategies that incorporate criminogenic risk and needs assessments, see April Pattavina and Faye S. Taxman, *Simulation strategies to reduce recidivism: Risk need responsivity (RNR) modeling for the criminal justice system* (New York, NY: Springer, 2013).

126  These strategies have not been without criticism. Advocates for health-based approaches to addiction argue that drug courts have made the criminal justice system more punitive toward addiction by penalizing relapse with incarceration and dropping from programs those who are not able to abstain from drug use for a sufficient period of time as determined by a judge. See Drug Policy Alliance, *Drug Courts Are Not the Answer: Toward a Health-Center Approach to Drug Use* (New York, NY: Drug Policy Alliance, 2011), 16. Critics have also pointed to a phenomenon known as 'net widening,' which refers to "well-meaning police officers and prosecutors arrest[ing] and charg[ing] more offenders under the assumption that something worthwhile could happen to such offenders once they were in the penal system and eligible for drug court rehabilitation," Joel Gross, "The Effects of Net-Widening on Minority and Indigent Drug Offenders: A Critique of Drug Courts," *University of Maryland Law Journal of Race, Religion, Gender and Class* 10 (2010): 161, 167. They note that many of those individuals are low-level offenders—often with no criminal record and no record of addiction—who might have otherwise not been brought into the system. See Eric Miller, "Drug Courts and Judicial Interventionism,"*Ohio State Law Journal* 65 (2004): 1483, 1569. Mental health advocates have put forth similar arguments regarding mental health courts. See, e.g., Susan Stefan & Bruce J. Winick, "A Dialogue on Mental Health Courts," *Psychology, Public Policy & Law* 11 (2005): 507.

127  Christopher T. Lowenkamp and Edward J. Latessa, "Understanding the Risk Principle: How and Why Correctional Interventions Can Harm Low-Risk Offenders," *Topics in Community Corrections*, Annual Issue (2004).

128  See Peggy McGarry et al., *The Potential of Community Corrections to Improve Safety and Reduce Incarceration* (New York, NY: Vera Institute of Justice, Center on Sentencing and Corrections, July 2013), 12.  See also, Lowenkamp and Latessa, 2004.

129  McGarry et al., 2013, pp. 15-19.

130  For information about jail reentry challenges, see Talia Sandwick et al., *Making The Transition: Rethinking Jail Reentry in Los Angeles County* (New York, NY: Vera Institute of Justice, 2013); Amy L. Solomon et al., *Life After Lockup: Improving Reentry from Jail to the Community* (Washington, DC: Urban Institute Justice Policy Center, 2008); Jim Parsons, "Addressing the Unique Challenges of Jail Reentry" in *Offender Reentry: Rethinking Criminology and Criminal Justice*, edited by Matthew S. Crow and John Ortiz Smykla (Burlington, MA: Jones & Bartlett Learning, 2014).

131  American Civil Liberties Union, 2010, p. 73; and Bannon, Nagrecha, and Diller, 2010, p. 11. See also Alexes Harris, Heather Evans, and Katherine Beckett, "Drawing blood from stones: Legal debt and social inequality in the contemporary United States," *American Journal of Sociology*, 115 no. 6 (2014): 1782-1785; and Douglas Evans, Douglas, *The Debt Penalty — Exposing the Financial Barriers to Offender Reintegration* (New York, NY: Research & Evaluation Center, John Jay College of Criminal Justice, City University of New York, 2014), 8-9.

132   American Civil Liberties Union, 2010, p. 22. Bannon,  Nagrecha, and Diller, 2010, p. 24.

133  Ibid, p. 23.

# Acknowledgments

The authors would like to thank Jennifer Trone for her deft assistance in the writing of this report. A special thank you to Sean Addie, Vedan Anthony-North, Christina Dominguez, Sophie Gebreselassie, Christine Herrman, Kaitlin Kall, Maia Spotts, and Elizabeth Swavola for their research and other support.
We would especially like to thank Patricia Connelly for her invaluable assistance in the planning and editing of this report; Carl Ferrero for creating the charts, graphs, and infographics; and Mary Crowley and Daniel Wilhelm for their insight and guidance throughout the project.

We would like to thank Laurie Garduque, Patrick Griffin, and Soledad McGrath of the MacArthur Foundation for their support throughout the development of this report.

This report was created with support from the John D. and Catherine T. MacArthur Foundation as part of its Safety and Justice Challenge initiative, which seeks to address over-incarceration by changing the way America thinks about and uses jails. Core to the Challenge is a competition designed to support efforts to improve local criminal justice systems in jurisdictions across the country that are working to safely reduce over-reliance on jails, with a particular focus on addressing disproportionate impact on low-income individuals and communities of color. More information is available at www.SafetyandJusticeChallenge.org.

  

© Vera Institute of Justice 2015. All rights reserved. An electronic version of this report is posted on Vera's website at www.vera.org/incarcerations-front-door.

Cover photograph © Ed Kashi/VII

The Vera Institute of Justice is an independent nonprofit organization that combines expertise in research, demonstration projects, and technical assistance to help leaders in government and civil society improve the systems people rely on for justice and safety. For more information, visit www.vera.org.

For more information about this report, contact Ram Subramanian, director of publications, Center on Sentencing and Corrections, at rsubramanian@vera.org.

**Suggested Citation**

Ram Subramanian et al. *Incarceration's Front Door: The Misuse of Jail in America.*
New York, NY: Vera Institute of Justice, 2015.



Vera Institute of Justice
233 Broadway, 12th Floor
New York, NY 10279
Tel: (212) 334-1300
Fax: (212) 941-9407

Washington DC Office
1100 First St. NE, Suite 950
Washington, DC 20002
Tel: (202) 465-8900
Fax: (202) 408-1972

New Orleans Office
546 Carondelet St.
New Orleans, LA 70130
Tel: (504) 593-0937
Fax: (212) 941-9407

Los Angeles Office
707 Wilshire Blvd., Suite 3850
Los Angeles, CA 90017
Tel: (213) 223-2442
Fax: (213) 955-9250

