**EXHIBIT GG**

**To Declaration of Micah West in Support of
Motion for Preliminary Injunction
& Motion for Class Certification**

No. 16-10521

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

MAURICE WALKER, on behalf of himself and others similarly situated,

*Plaintiff-Appellee*,

*v.*

CITY OF CALHOUN, GA,

*Defendant-Appellant*.

On Appeal from the United States District Court for the
Northern District of Georgia
No. 4:15-cv-00170-HLM

## BRIEF FOR AMERICAN BAR ASSOCIATION AS AMICUS CURIAE
## IN SUPPORT OF APPELLEES AND AFFIRMANCE

Of Counsel:
Paul R.Q. Wolfson
John T. Byrnes

PAULETTE BROWN
AMERICAN BAR ASSOCIATION
32 North Clark Street
Chicago, IL  60654
(312) 988-5000
abapresident@americanbar.org

August 18, 2016

No. 16-10521, *Walker v. City of Calhoun, GA*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1, the American Bar Association hereby certifies that no publicly held corporation owns 10% or more of any of the American Bar Association's stock.  The American Bar Association also certifies that the following is a complete list of the trial judge and all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this particular case on appeal.

American Bail Coalition, Amicus

American Bar Association, Amicus

American Contractors Indemnity Corporation, Contributed Amicus Funding

Bail USA, Inc., Contributed Amicus Funding

Beacham III, A. Franklin, Attorney for Appellant

Brinson, Askew, Berry, Seigler, Richardson & Davis, LLP

Brown, Paulette, Attorney for Amicus

Byrnes, John, Attorney for Amicus

Carlock, Copeland & Stair LLP

City of Calhoun, Georgia, Appellant

Clement, Paul D., Attorney for Amici

Davis, J. Anderson, Attorney for Appellant

Equal Justice Under Law

No. 16-10521, *Walker v. City of Calhoun, GA*

Geraghty, Sarah, Attorney for Appellant

Georgia Association of Professional Bondsmen, Amicus

Georgia Sheriffs' Association, Amicus

Govignon, George P., Attorney for Appellant

Grozine, Abby C., Attorney for Appellant

Karakatsanis, Alec, Attorney for Appellee

Lucas, Samuel L., Attorney for Appellant

McGinley, Michael H., Attorney for Amici

Murphy, Honorable Harold L., United States District Judge

Palmetto Surety Corporation, Contributed Amicus Funding

Primerano, Ryan, Attorney for Appellee

Root, David F., Attorney for Appellant

Southern Center for Human Rights

Walker, Maurice, Appellee

Wold, Megan M., Attorney for Amici

Wolfson, Paul R.Q., Attorney for Amicus

<u>/s/   Paulette Brown</u>
PAULETTE BROWN
AMERICAN BAR ASSOCIATION
32 North Clark Street
Chicago, IL  60654
(312) 988-5000
abapresident@americanbar.org

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT...................................................................C-1

TABLE OF AUTHORITIES ...................................................................... iii

INTEREST OF AMICUS CURIAE ..........................................................1

QUESTION PRESENTED .........................................................................5

SUMMARY OF ARGUMENT ..................................................................5

ARGUMENT ..............................................................................................7

I.    THE ABA CRIMINAL JUSTICE STANDARDS REJECT INFLEXIBLE
      MONEY-BAIL SYSTEMS, WHICH ARE DEFICIENT AS A MATTER
      OF POLICY AND CONSTITUTIONAL LAW .........................................7

      A.    The ABA Has Long Viewed Inflexible Money-Bail
            Systems As Inherently Discriminatory, Deleterious To
            The Rights Of The Accused, And Unnecessary To
            Ensure Justice ....................................................................7

      B.    Given The Grave Concerns Raised By Overuse Of
            Money Bail, The ABA's Criminal Justice Standards
            Caution Against Its Use Without Consideration Of The
            Defendant's Individual Circumstances ...............................11

II.   AN INFLEXIBLE MONEY-BAIL SYSTEM HARMS INDIGENT
      CRIMINAL DEFENDANTS AND DOES NOT SERVE THE FAIR AND
      PROPER ADMINISTRATION OF JUSTICE ..........................................15

      A.    Money Bail Burdens Indigent Criminal Defendants...........15

      B.    An Inflexible Money-Bail System Does Not Advance
            The Interests Of Pretrial Justice .......................................19

      C.    A Consensus Has Developed That Inflexible Money-Bail
            Systems Are Unfair And Do Not Work ..............................22

III.    THE COUNTY'S INFLEXIBLE BAIL SCHEME ILLUSTRATES THE
        CONSTITUTIONAL PROBLEMS WITH MONEY BAIL ......................................... 25

CONCLUSION ....................................................................................................... 28

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Ayala v. State*, 425 S.E.2d 282 (Ga. 1993) ................................................................2

*Barker v. Wingo*, 407 U.S. 514 (1972) ....................................................................16

*Bearden v. Georgia*, 461 U.S. 660 (1983) ..........................................................2, 26

*Fuentes v. Shevin*, 407 U.S. 67 (1972)...................................................................27

*Griffin v. Illinois*, 351 U.S. 12 (1956).............................................................11, 26

*Padilla v. Kentucky*, 130 S. Ct. 1473 (2010) ..........................................................2

*Pugh v. Rainwater*, 572 F.2d 1053 (5th Cir. 1978) ...............................................26

*Smith v. Bennett*, 365 U.S. 708 (1961)...................................................................26

*Stack v. Boyle*, 342 U.S. 1 (1951) .........................................................................26

*Strickland v. Washington*, 466 U.S. 668 (1984) .....................................................2

*Tate v. Short*, 401 U.S. 395 (1971) ..................................................................11, 26

*Turner v. Rogers*, 564 U.S. 431 (2011) .................................................................27

*United States v. Salerno*, 481 U.S. 739 (1987) ......................................................26

*United States v. Teague*, 953 F.2d 1525 (11th Cir. 1992) .......................................2

*Williams v. Illinois*, 399 U.S. 235 (1970) ..............................................................26

## OTHER AUTHORITIES

American Bar Association, *Standards Relating to Pretrial Release—
    Approved Draft, 1968* ...........................................................................8, 9, 10

American Bar Association, *ABA Standards for Criminal Justice*, ch.
    10, Pretrial Release (2d ed. 1979)...........................................................10, 11

American Bar Association, *ABA Standards for Criminal Justice: Pretrial Release* (3d ed. 2007), *available at* http://www. americanbar.org/content/dam/aba/publications/criminal _justice_standards/pretrial_release.authcheckdam.pdf ........................*passim*

Abell Foundation, *The Pretrial Release Project: A Study of Maryland's Pretrial Release and Bail System* (2011), *available at* http://www.abell.org/sites/default/files/publications/hhs_ pretrial_9.01(1).pdf ........................................................................20

American Council of Chief Defenders, *Policy Statement on Fair and Effective Pretrial Justice Practices* (June 4, 2011), *available at* http://www.pretrial.org/download/policy-statements/ACCD %20Pretrial%20Release%20Policy%20Statement%20June%20 2011.pdf ..........................................................................................22

American Jail Association, *Resolutions of the American Jail Association* (2014), *available at* http://www.american jail.org/wp-content/uploads/2014/03/Resolutions-08_25_14.pdf ................22

American Probation and Parole Association, *Resolution – Pretrial Supervision* (enacted June 2010), *available at* https://www. appa-net.org/eweb/Dynamicpage.aspx?site=APPA_2&webcode =IB_Resolution&wps_key=3fa8c704-5ebc-4163-9be8-ca48a 106a259 ............................................................................................22

Arnold Foundation, Press Release, *More Than 20 Cities and States Adopt Risk Assessment Tool To Help Judges Decide Which Defendants To Detain Prior to Trial* (June 26, 2015), *available at* http://www.arnoldfoundation.org/more-than-20-cities-and- states-adopt-risk-assessment-tool-to-help-judges-decide-which- defendants-to-detain-prior-to-trial/ ................................................24

Association of Prosecuting Attorneys, *Policy Statement on Pretrial Justice*, http://www.prosecutingattorneys.org/wp-content/ uploads/APA-Pretrial-Policy-Statement1.pdf (last visited August 18, 2016) ................................................................................22

Bibas, Stephanos, *Plea Bargaining Outside the Shadow of Trial*, 117 Harv. L. Rev. 2463 (2004) ......................................................19

Boruchowitz, Robert C., et al., *Minor Crimes, Massive Waste: The Terrible Toll of America's Broken Misdemeanor Courts* (National Association of Criminal Defense Lawyers, Apr. 2009) *available at* https://www.nacdl.org/WorkArea/Download Asset.aspx?id=20808 .................................................................... 19

Brown, Paulette, ABA President, Letter to Editor, *The Justice Department Makes the Right Call*, Wash. Post, Mar. 18, 2016, *available at* https://www.washingtonpost.com/opinions/the-justice-department-makes-the-right-call/2016/03/18/64e948d8-eba9-11e5-a9ce-681055c7a05f_story.html .................................................... 23

Cohen, Thomas H. & Brian A. Reaves, *Pretrial Release of Felony Defendants in State Court* (Bureau of Justice Statistics, Nov. 2007), *available at* http://www.bjs.gov/content/pub/pdf/prfdsc.pdf ........................................................................................ 20

Conference of Chief Justices, *Resolution 3* (adopted Jan. 30, 2013), *avalailable at* http://www.pretrial.org/wp-content/uploads/2013/05/CCJ-Resolution-on-Pretrial.pdf.................................... 22

Council of Economic Advisers, Issue Brief, *Fines, Fees, and Bail* (Dec. 2015), *available at* https://www.whitehouse.gov/sites/default/files/page/files/1215_cea_fine_fee_bail_issue_brief.pdf ................. 21

Dear Colleague Letter from Vanita Gupta, Principal Dep. Ass't Att'y Gen., Civil Rights Division and Lisa Foster, Director, Office for Access to Justice (Mar. 14, 2016), *available at* https://www.justice.gov/crt/file/832461/download ........................................... 23

Gupta, Arpit et al., *The Heavy Costs of High Bail: Evidence from Judge Randomization*, Columbia Law and Economics Working Paper No. 531 (2016), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2774453 ................................................. 18

Herian, Mitchel N. & Brian H. Bornstein, *Reducing Failure to Appear in Nebraska: A Field Study*, Nebraska Lawyer 11 (Sept. 2010), *available at* http://digitalcommons.unl.edu/cgi/viewcontent.cgi?article=1008&context=publicpolicyfacpub.................................... 21

International Association of Chiefs of Police, *Pretrial Release and Detention Process* (adopted Oct. 21, 2014), *available at* http://www.pretrial.org/download/policy-statements/Pretrial%20 Release%20and%20Detention%20Process%20-IACP%20 2014.pdf ....................................................................22

Jones, Michael R., *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option* (Pretrial Justice Institute 2013), *available at* http://www.pretrial.org/download/research/ Unsecured+Bonds,+The+As+Effective+and+Most+Efficient +Pretrial+Release+Option+-+Jones+2013.pdf ..............................20

Klute, Tara Boh & Mark Heyerly, *Report on Impact of House Bill 463: Outcomes, Challenges, and Recommendations* (KY Pretrial Services, June 2012), *available at* http://www.pretrial. org/download/law-policy/Kentucky%20Pre%20Post%20HB %20463%20First%20Year%20Pretrial%20Report.pdf ................24

Leipold, Andrew D., *How the Pretrial Process Contributes to Wrongful Convictions*, 42 Am. Crim. L. Rev. 1123 (2005) ..........17

Lowenkamp, Christopher T. & Mary VanNostrand, *Exploring the Impact of Supervision on Pretrial Outcomes* (Arnold Foundation, 2013), *available at* http://www.arnoldfoundation. org/wp-content/uploads/2014/02/LJAF_Report_Supervision _FNL.pdf ....................................................................21

Lowenkamp, Christopher T., et al., *Investigating the Impact of Pretrial Detention on Sentencing Outcomes* (Arnold Foundation, Nov. 2013), *available at* http://www.arnold foundation.org/wp-content/uploads/2014/02/LJAF_Report _state-sentencing_FNL.pdf...........................................18

Marcus, Martin, *The Making of the ABA Criminal Justice Standards: Forty Years of Excellence*, 23 Crim. Just. 10 (Winter 2009), *available at* http://www.americanbar.org/content/dam/aba/ publications/criminal_justice_magazine/makingofstandards_ marcus.authcheckdam.pdf ..............................................2

Minton, Todd D. & Daniella Golinelli, *Jail Inmates at Midyear 2012 - Statistical Tables* (Bureau of Justice Statistics, May 2013), *available at* http://www.bjs.gov/content/pub/pdf/jim13st.pdf ......................21

Montopoli, Brian, *Is the U.S. Bail System Unfair?*, CBS News, Feb. 8, 2013, *available at* http://www.cbsnews.com/news/is-the-us-bail -system-unfair/ ...............................................................................16

National Association of Counties, *The American County Platform and Resolutions 2016-2017*, *available at* http://www.naco.org/sites/ default/files/documents/ 2016-2017%20American%20County %20Platform.pdf (last visited August 18, 2016) ...........................................22

National Association of Criminal Defense Lawyers, *Policy on Pretrial Release and Limited Use of Financial Bond*, *available at* http:// www.pretrial.org/download/policy-statements/NACDL%20 Pretrial%20Resolution%20(7-2012).pdf (last visited August 18, 2016) .............................................................................22

National Association of Pretrial Services Agencies, *Standards on Pretrial Release* (3d ed. 2004), *available at* http://www.pretrial. org/download/performance-measures/napsa%20standards%20 2004.pdf .........................................................................23

National Sheriffs Association, *Resolution 2012-6, National Sheriffs' Association Supports & Recognizes The Contribution Of Pretrial Services Agencies To Enhance Public Safety* (2012), *available at* http://www.sheriffs.org/sites/default/files/uploads/ documents/2012resolutions/2012-6%20Pretrial%20Services.pdf ...............22

National Symposium on Pretrial Justice, *Summary Report of Proceedings* 39 (2011), *available at* http://www.pretrial.org/ download/infostop/NSPJ%20Report%202011.pdf .......................................23

Phillips, Mary T., *A Decade of Bail Research in New York City* (New York Criminal Justice Agency, Inc., Aug. 2012), *available at* https://static1.squarespace.com/static/546cc3c3e4b0e3dbf861c9 74/t/54906416e4b02102b7c91376/1418748950483/CJA+-+ DecadeBailResearch12.pdf.......................................................17

Phillips, Mary T., *Pretrial Detention and Case Outcomes, Part 1: Nonfelony Cases* (New York City Criminal Justice Agency, Inc., 2007), *available at* http://www.nycja.org/lwdcms/doc-view.php?module=reports&module_id=669&doc_name=doc .....................18

Pinto, Nick, *The Bail Trap*, N.Y. Times Magazine (Aug. 13, 2015), *available at* http://www.nytimes.com/2015/08/16/magazine/the-bail-trap.html?_r=0 ...............................................................................16

Pretrial Services Agency for the District of Columbia, *Performance Measures*, http://www.psa.gov/?q=data/performance_measures (data as of June 30, 2015) ............................................................20

Rankin, Anne, *The Effect of Pretrial Detention*, 39 N.Y.U. L. Rev. 641 (1964).........................................................................18

*Rational and Transparent Bail Decision Making: Moving From a Cash-Based to a Risk-Based Process* (Pretrial Justice Inst., MacArthur Found. 2012), *available at* http://www.safetyand justicechallenge.org/wp-content/uploads/2015/05/Rational-and-Transparent-Bail-Decision-Making.pdf ........................................18

Schnacke, Timothy R., et al., *The Jefferson County Bail Project: Lessons Learned from a Process of Pretrial Change at the Local Level* (Pretrial Justice Institute, June 2014), *available at* http://www.pretrial.org/download/pji-reports/Jefferson%20 County%20Bail%20Project-%20Lessons%20Learned%20-%20 PJI%202014.pdf..........................................................................24

Vetter, Stephanie J. & John Clark, *The Delivery of Pretrial Justice in Rural Areas: A Guide for Rural County Officials* (National Association of Counties, 2012), *available at* http://www.pretrial.org/download/pji-reports/The%20Delivery%20of %20Pretrial%20Justice%20in%20Rural%20Areas%20-%20 A%20Guide%20for%20Rural%20County%20Officials.pdf........................17

Widgery, Amber, National Conference of State Legislators, *Guidance for Setting Release Conditions* (May 13, 2015), http://www.ncsl.org/research/civil-and-criminal-justice/guidance-for-setting-release-conditions.aspx.................................................................23

## INTEREST OF AMICUS CURIAE

The American Bar Association (ABA) is one of the largest voluntary professional membership organizations and the leading organization of legal professionals in the United States.[1]  Its more than 400,000 members come from all fifty States, the District of Columbia, and the United States territories, and include prosecutors, public defenders, and private defense counsel.  Its membership includes attorneys in law firms, corporations, nonprofit organizations, and local, state, and federal governments.  Members also include judges, legislators, law professors, law students, and non-lawyer associates in related fields.[2]

Since its founding in 1878, the ABA has worked to protect the rights secured by the Constitution, in particular the rights under the Due Process and Equal Protection Clauses of those accused of crimes.  The ABA's extensive work in those areas is reflected in the *ABA Standards for Criminal Justice* ("Criminal Justice Standards"), a comprehensive set of principles articulating the ABA's

---

[1]     No counsel for a party authored this brief in whole or part, and no counsel or party made a monetary contribution to fund the preparation or submission of this Brief.  No person other than the amicus curiae, its members, and its counsel made any monetary contribution to its preparation and submission.

[2]     Neither this brief nor the decision to file it should be interpreted to reflect the views of any judicial member of the ABA.  No member of the Judicial Division Council participated in the adoption or endorsement of the positions in this brief, nor was the brief circulated to any member of the Judicial Division Council before filing.

recommendations for fair and effective systems of criminal justice.[3]  Now in their

third edition, the Criminal Justice Standards were developed and revised by the

ABA Criminal Justice Section, working through broadly representative task forces

made up of prosecutors, defense lawyers, judges, academics, and members of the

public, and then approved by the ABA House of Delegates, the ABA's

policymaking body.  Although the Criminal Justice Standards are not intended to

restate constitutional principles, the Supreme Court and other courts have

frequently looked to the Standards for guidance about the appropriate balance

between individual rights and public safety in the field of criminal justice.  *See,

e.g.*, *Padilla v. Kentucky*, 130 S. Ct. 1473, 1482 (2010); *Strickland v. Washington*,

466 U.S. 668, 688 (1984); *Bearden v. Georgia*, 461 U.S. 660, 669 n.10 (1983);

*United States v. Teague*, 953 F.2d 1525, 1533 & n.10 (11th Cir. 1992); *Ayala v.

State*, 425 S.E.2d 282, 284 (Ga. 1993) ("The standards for determining whether to

grant release prior to trial are based on the 1968 American Bar Association pretrial

release standards.").  The lengthy section in the Criminal Justice Standards on

pretrial release ("Pretrial Release Standards") reflects exhaustive study by the

ABA about appropriate systems of pretrial release and detention that will secure

---

[3]    The Criminal Justice Standards are available at http://www.americanbar.org/
groups/criminal_justice/standards.html; *see also* Marcus, *The Making of the ABA
Criminal Justice Standards: Forty Years of Excellence*, 23 Crim. Just. 10, 14-15
(Winter 2009).  Pertinent provisions of the Standards are set forth in an addendum
to this brief.

the rights of the accused to a fair trial and the effective assistance of counsel,

protect the community, and ensure that persons accused of crimes appear for court

dates.  As discussed below, those Standards reflect the ABA's conclusions that,

although there may be narrow circumstances in which monetary conditions of

release are necessary to ensure a defendant's appearance, inflexible money-bail

requirements drawn from a preset schedule of offenses, which takes no account of

a defendant's individual circumstances, should be abolished.  Inflexible money-

bail systems discriminate against the indigent, seriously impair the rights of

persons accused of crimes (including and especially their rights to mount an

effective defense to the charges against them), and provide little if any benefit to

the public.  Furthermore, financial conditions on pretrial release should not be

imposed unless no less restrictive conditions of release will reasonably ensure the

defendant's appearance in court, and even when imposed, financial conditions

should preferably be unsecured—*i.e.*, not requiring a payment of cash by the

defendant.  Under no circumstance should money bail be used as an opportunity

for revenue collection.

The ABA submits this brief to assist this Court with its examination of the

inflexible money-bail system under review in this case.  Monetary conditions of

release may be appropriate "when no other conditions will ensure appearance."

Standard 10-1.4(c).  But inflexible money-bail systems that rely on preset bail

schedules—instead of individualized determinations of the appropriate conditions of release—violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  Under our system of justice, the right of any individual to liberty, as well as the right to mount an effective defense to criminal charges, should not depend on that person's ability to pay.  The Standards provide a valuable and workable alternative to these inflexible systems and provide guidance on how jurisdictions can protect the constitutional rights of the accused while advancing their legitimate criminal justice interests.

## QUESTION PRESENTED

Whether a bail system that allows pretrial release only if the defendant pays an amount of money bail that is fixed by reference to a schedule of offenses, rather than the defendant's individual circumstances, violates the Equal Protection and Due Process clauses of the Fourteenth Amendment.

## SUMMARY OF ARGUMENT

For decades, the ABA has urged jurisdictions to reduce their reliance on financial conditions on pretrial release and to eliminate inflexible money-bail schemes based on preset bail schedules. *See* Standard 10-1.4; Standard 10-5.3. When the First Edition of the ABA's Criminal Justice Standards was adopted in 1968, the ABA emphasized the serious constitutional concerns with inflexible money-bail systems, which discriminate against the indigent and impair defendants' ability to prepare an effective defense. The ABA's concerns about overuse of money bail have only deepened over time, and the Third Edition of the Standards now provides that monetary conditions on pretrial release are appropriate only once the court considers the defendant's individual circumstances and the possibility of alternative conditions of release.

Decades of research and study have shown that excessive use of money bail harms defendants with little offsetting benefit to jurisdictions that use such systems. Inflexible money-bail systems disrupt the lives of indigent defendants,

- 5 -

lead to worse legal outcomes, and pressure defendants to plead guilty. At the same time, inflexible money-bail systems, which tie pretrial detention to the defendant's ability to pay rather than an objective risk assessment, do not improve appearance rates or public safety, and leave jurisdictions that use such systems bearing the costs of overcrowded jails. It is no surprise, therefore, that a wide range of criminal justice stakeholders and a growing number of States and local jurisdictions have joined the ABA in rejecting inflexible use of money bail.

Inflexible money-bail systems like the one at issue in this case violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The Supreme Court has repeatedly affirmed that individuals may not be incarcerated solely because of their inability to pay fines, fees, and court costs. That principle is particularly strong in the context of pretrial detention, given that our criminal justice system affords the accused a presumption of innocence. Moreover, an inflexible money-bail system based on a preset bond schedule fails to provide the individualized determination necessary to comport with due process. Accordingly, the district court's order entering a preliminary injunction should be affirmed.

# ARGUMENT

## I.    THE ABA CRIMINAL JUSTICE STANDARDS REJECT INFLEXIBLE MONEY-BAIL SYSTEMS, WHICH ARE DEFICIENT AS A MATTER OF POLICY AND CONSTITUTIONAL LAW

### A.    The ABA Has Long Viewed Inflexible Money-Bail Systems As Inherently Discriminatory, Deleterious To The Rights Of The Accused, And Unnecessary To Ensure Justice

The ABA has long been concerned about the deleterious effects of inflexible money-bail systems, under which an accused person's right to release depends on his ability to pay an amount that may bear no relation to his individual circumstances, the protection of public safety, or the needs of the administration of justice.  The ABA's examination of money bail was stimulated by Attorney General Robert F. Kennedy's address to the ABA House of Delegates in August 1962, in which Attorney General Kennedy, surveying the problems of access to justice facing the indigent, identified "[t]he problem of bail" as having "received too little attention," and stressed that "the indigent defendant who cannot offer security for his appearance is denied [the] opportunity [to establish his innocence]. He cannot provide for his family and for his defense, and cannot take an active part to prove his innocence."[4]

---

[4]    Kennedy, Address, American Bar Association House of Delegates, San Francisco, California, Aug. 6, 1962, at 5, *available at* https://www.justice.gov/sites/default/files/ag/legacy/2011/01/20/08-06-1962%20Pro.pdf.

The First Edition of the ABA's Criminal Justice Standards, adopted by the House of Delegates in 1968, reflected the ABA's fundamental judgment that an accused person's right to liberty—and right to mount an effective defense to criminal charges—should not be determined by that person's financial resources. Although the ABA did not advocate for the abolition of all monetary conditions on release, the First Edition of the Standards urged that "[r]eliance on money bail should be reduced to minimal proportions" and should be "required only in cases in which no other condition will reasonably ensure the defendant's appearance." American Bar Association Project on Standards for Criminal Justice, *Standards Relating to Pretrial Release—Approved Draft, 1968*, § 1.2 ("First Edition"); *see also id.* §5.3(a) ("Money bail should be set only when it is found that no other conditions on release will reasonably assure the defendant's appearance.").

Commentary accompanying the First Edition of the Standards recognized the grave constitutional and policy concerns with overuse of money bail.[5]  The commentary explained that bail "inevitably discriminates against the poor," noting studies showing that a significant percentage of defendants could not make a bail

---

[5]    Unlike the Standards themselves, which set forth black-letter principles adopted by the ABA House of Delegates, commentary accompanying the Standards is not adopted by the House of Delegates.  The commentary accompanying the Standards therefore "does not necessarily represent the official position of the ABA," but it nonetheless "serves a useful explanation of the black-letter standards."  *See ABA Standards for Criminal Justice: Pretrial Release* at ii (3d ed. 2007).

of $500.  *See* First Edition at 1.  The commentary also emphasized that pretrial detention can prevent a defendant "from contributing to the preparation of his defense," leading to worse outcomes for the very defendants least able to afford effective counsel.  *Id.* at 3.  More generally, the commentary recognized the human toll of unnecessary pretrial detention, which subjects a defendant "to the psychological and physical deprivations of jail life," risks him "los[ing] his job if he has one," and shoulders the "innocent members of his family" with the burdens of his detention.  *Id.* at 2-3; *see also id.* at 23 ("[U]nnecessary pretrial detention involves unconscionable costs both to individual defendants and their families and to the public which must pay the financial price of detention.").

The First Edition of the Standards also expressed the ABA's judgment that money bail should rarely be necessary to serve legitimate interests of the criminal justice system: protecting the public and ensuring the defendant's appearance in court.  For defendants who have secure ties to the community, non-monetary conditions of release should usually be sufficient to ensure their court appearance; for those who are inclined to flee anyway, money bail is unlikely to deter them from doing so.  Thus, jurisdictions should look to the defendant's community ties, rather than arbitrary monetary amounts, as the best security for the defendant's appearance in court:  "[I]f a quick but careful inquiry is made into the facts concerning the defendant's roots in the community a vastly more rational bail

decision can be made," and "risk of financial loss is an insubstantial deterrent to flight for a large number of defendants whose ties to the community are sufficient to bring them to court."  First Edition at 2.

The Second Edition of the ABA's Pretrial Release Standards, adopted by the ABA House of Delegates in 1979 after a decade of further study, continued and sharpened the ABA's criticism of excessive use of money bail.  *See ABA Standards for Criminal Justice*, ch. 10, Pretrial Release (2d ed. 1979) ("Second Edition").  The Second Edition again stressed that "[r]elease on monetary conditions should be reduced to minimal proportions" and that money bail "should be required only in cases in which no other conditions will reasonably ensure the defendant's appearance."  *Id.* at Standard 10-1.3(c).  The Second Edition also recommended that "[w]hen monetary conditions are imposed, bail should be set at the lowest level necessary to ensure the defendant's reappearance and with regard for the defendant's ability to post bond."  *Id.*  As the accompanying historical background explains, this additional emphasis against excessive use of money bail made explicit a point that was previously implicit—"that a monetary condition ought not to be imposed except in amounts necessary to achieve its legitimate purpose."  *Id.* at 10.14.

This continued insistence on a limited role for monetary conditions of release reflected the ABA's serious concerns about the constitutionality of

inflexible money-bail schemes, which result in incarceration of individuals for the sole reason that they cannot pay for their freedom. *See* Second Edition at 10.78-10.79 (citing, *inter alia*, *Griffin v. Illinois*, 351 U.S. 12 (1956), and *Tate v. Short*, 401 U.S. 395 (1971)). As the commentary to the Second Edition stressed, although money-bail systems are common, "[i]n practice … monetary conditions rarely serve their legitimate function," and "[a]lthough release on monetary condition is the oldest form of pretrial release, it is also the least desirable." *Id.* at 10.78.

In addition, the Second Edition of the Standards articulated ABA policy on a point directly relevant here: If it is necessary to impose a monetary condition on a defendant's pretrial release, then that monetary condition should preferably be in the form of an *unsecured* bond, rather than a secured bond or an unsecured bond accompanied by a partial cash payment. *See id.* at Standard 10-5.4(d). In other words, only in very rare circumstances should a defendant be required to pay any sum of money to the court *before* he is released. Rather, it should ordinarily be sufficient to require the defendant to agree to pay a sum of money if he fails to appear as required.

> **B.    Given The Grave Concerns Raised By Overuse Of Money Bail, The ABA's Criminal Justice Standards Caution Against Its Use Without Consideration Of The Defendant's Individual Circumstances**

The ABA comprehensively reviewed pretrial release practices, including the use of monetary conditions for release, in the Third Edition of its Criminal Justice

Standards, adopted by the ABA House of Delegates in 2007 and currently in force. *See ABA Standards for Criminal Justice*, Pretrial Release (3d ed. 2007). As those Standards explain, two decades' worth of additional study and experience have confirmed the ABA's conclusions that an inflexible money-bail system serves no legitimate public safety purpose, needlessly harms persons accused of crimes, and imposes unnecessary costs on the public. Monetary conditions of release should never be drawn from an inflexible schedule, should be imposed only after consideration of the defendant's individual circumstances, and should never prevent the defendant's release solely because the defendant is unable to pay.

Standard 10-1.4 expresses the ABA's conclusion that money bail should rarely be used to secure a defendant's appearance in court, and that when monetary conditions of release are necessary, an unsecured bond should be preferred to a secured bond. As the Standards explain, jurisdictions should "adopt procedures designed to promote the release of defendants on their own recognizance or, when necessary, unsecured bond." Standard 10-1.4(a). Jurisdictions should impose financial conditions only "when no other conditions will ensure appearance," and should always "consider releasing the defendant on an unsecured bond." Standard 10-1.4(c). Furthermore, the Standards underscore that monetary conditions should be used only to ensure appearance—they "should not be employed to respond to concerns for public safety." Standard 10-1.4(d). The Standards also stress,

without qualification, that a bail system should not make it impossible for accused persons to gain release solely because of their indigence: "The judicial officer should not impose a financial condition of release that results in the pretrial detention of a defendant solely due to the defendant's inability to pay." Standard 10-1.4(e).

In particular, the Standards recognize the problems with rigid bail schedules, in which the amount of bail is fixed in advance by the nature or name of the charge. The Standards provide that financial conditions "should *never* be set by reference to a predetermined schedule of amounts fixed according to the nature of the charge." Standard 10-5.3(e) (emphasis added). Instead, consistent with the demands of due process, the Standards urge that "[f]inancial conditions should be the result of an *individualized decision* taking into account the special circumstances of each defendant, the defendant's ability to meet the financial conditions and the defendant's flight risk." *Id.* (emphasis added). Furthermore, because of the burden financial conditions may impose on the indigent, the Standards call on jurisdictions to consider conditions of release other than a secured bond in conducting these individualized determinations. Standard 10-5.3(a) ("Financial conditions other than unsecured bond should be imposed only when no other less restrictive condition of release will reasonably ensure the defendant's appearance in court."); *see also* Standard 10-5.3(d) (providing that a

judicial officer imposing financial conditions should first consider an unsecured bond).

The commentary accompanying the Third Edition of the Standards emphasizes a range of serious concerns about excessive use of financial conditions and lack of individualized determinations, not only for the defendant accused of a crime but also for the public. Unwarranted pretrial detention infringes on defendants' constitutional rights, "making it difficult for the defendant to consult with counsel, locate witnesses, and gather evidence" and placing a particularly heavy burden "on poor defendants and on racial and cultural minorities." Standards at 32-33. "Pretrial detention also strains the defendant's family relations and is likely to result in loss of employment." *Id*. at 33. And jurisdictions must bear the costs of the detention, expending "scarce public resources for construction and operation of new jail facilities." *Id*.

For these reasons, jurisdictions should follow the "least restrictive conditions principle" in ordering pretrial release and should never set bail so high that a person cannot meet it because he lacks the means to do so: "If the court finds that unsecured bond is not sufficient, it may require the defendant to post bail; however, *the bail amount must be within the reach of the defendant* and should not be at an amount greater than necessary to assure the defendant's appearance in court." *Id.* at 43-44 (emphasis added).

Commentary to the Standards elaborates on reasons why jurisdictions should never follow a preset bail schedule.  Most fundamentally, the nature or name of the charge against the defendant may have little to do with the need for particular conditions on release.  To the contrary, to ensure the defendant's appearance in court and to protect public safety, it is far more sensible to consider the particular circumstances of the case, including the defendant's risk of flight and (if monetary conditions are necessary) the defendant's financial situation.  *See* Standards at 50-51 (commentary to Standard 10-1.7); *id.* at 111 (commentary to Standard 10-5.3(a)).  Moreover, inflexible money-bail standards inevitably discriminate against indigent defendants who cannot make bail in even small amounts.  As the commentary explains, a money-bail system that does not consider the defendant's individual circumstances, including his ability to pay, "undermin[es] basic concepts of equal justice":  "'In a system which grants pretrial liberty for money, those who can afford a bondsman go free; those who cannot stay in jail.'"  *Id.* at 111-112 (quoting Freed & Wald, *Bail in the United States* 21 (1964)).

## II.    AN INFLEXIBLE MONEY-BAIL SYSTEM HARMS INDIGENT CRIMINAL DEFENDANTS AND DOES NOT SERVE THE FAIR AND PROPER ADMINISTRATION OF JUSTICE

### A.    Money Bail Burdens Indigent Criminal Defendants

Extensive research has shown that overuse of money bail adversely affects indigent defendants in serious ways, undermining the fairness, effectiveness, and

credibility of our criminal justice system.  In addition to depriving persons of their liberty because of their financial situation, money bail often impairs their ability to mount a defense to the charges against them and wreaks havoc with their lives.

*First*, even a few days in jail can disrupt a defendant's life, leading to long-term negative consequences.  Indigent defendants cannot work or earn income while detained and may lose their jobs while waiting for a hearing, making it even more difficult to make bail.  *See Barker v. Wingo*, 407 U.S. 514, 532-333 (1972).  Children may be left unsupervised, and elderly or sick relatives may have no one else to take care of them.  Defendants living in shelters may lose housing for missing curfews or for prolonged absence.  *See* Pinto, *The Bail Trap*, N.Y. Times Magazine (Aug. 13, 2015).  Given indigent defendants' already diminished level of economic security and often shaky social safety nets, a prolonged pretrial detention may trigger a downward spiral, even if they are ultimately acquitted.

Yet for many indigent defendants, there is no option other than to wait in jail.  Defendants and their families are frequently unable to afford a fixed monetary bond or a nonrefundable 10 or 20% commercial surety fee.  Indeed, in many cases a commercial surety is not even an option; many bail bondsmen will not even offer small bonds—meaning that, ironically, indigent defendants who are charged with the least serious offenses may be more likely to stay in jail.  *See* Montopoli, *Is the U.S. Bail System Unfair?*, CBS News, Feb. 8, 2013.  Data show that many

- 16 -

defendants are unable to meet even relatively small bond amounts; in New York City, for example, only 26% of criminal defendants made bail set at less than $500 at arraignment, and only 7% made bail set at $5,000 (the median amount for a felony).  Phillips, *A Decade of Bail Research in New York City* 51 tbl. 7 (New York Criminal Justice Agency, Inc., Aug. 2012).  Even for those defendants who are ultimately able to secure the necessary resources, the process of doing so may take days, leading to many of the same adverse consequences.[6]

*Second*, pretrial detention frustrates the legal rights of indigent defendants. While detained, defendants find it difficult to communicate with or engage counsel—especially in jurisdictions that do not appoint counsel immediately after a defendant is taken into custody.  *See* Leipold, *How the Pretrial Process Contributes to Wrongful Convictions*, 42 Am. Crim. L. Rev. 1123, 1130 (2005). Detention also impairs defendants' ability to prepare a defense; by the time of release, evidence may have already been lost and witnesses' memories faded.

---

[6]   In rural areas, long distances and limited staff further increase the likelihood of prolonged detention before a defendant's first appearance before a judicial officer.  It is therefore particularly important to find alternatives to inflexible money-bail systems in those jurisdictions.  *See* Vetter & Clark, *The Delivery of Pretrial Justice in Rural Areas: A Guide for Rural County Officials* (National Association of Counties, 2012).  The ABA's Criminal Justice Standards state that "the defendant should in no instance be held by police longer than 24 hours without appearing before a judicial officer," Standard 10-4.1, but in many areas of the country, suspects are held for much longer times.

For more than fifty years, researchers have found that pretrial detention leads to worse case outcomes for indigent defendants.  *See* Rankin, *The Effect of Pretrial Detention*, 39 N.Y.U. L. Rev. 641 (1964).  Even when controlling for factors such as current charge, prior criminal history, and community ties, research has shown that defendants detained in jail are more likely to be convicted, more likely to be sentenced to a prison term, more likely to receive a longer sentence, and more likely to commit a future crime than defendants released during the pretrial period.  *See* Gupta et al., *The Heavy Costs of High Bail:  Evidence from Judge Randomization* 2-3, Columbia Law and Economics Working Paper No. 531 (2016); *Rational and Transparent Bail Decision Making: Moving From a Cash-Based to a Risk-Based Process* 2 (Pretrial Justice Inst., MacArthur Found. 2012); Phillips, *Pretrial Detention and Case Outcomes, Part 1: Nonfelony Cases* 55-56 (New York City Criminal Justice Agency, Inc., 2007).  These consequences are particularly perverse because they may weigh heaviest on the lowest-risk defendants; one study found that low-risk defendants detained for the entire pretrial period are more than five times more likely to be sentenced to jail compared to low-risk defendants released at some point before trial, and nearly four times more likely to be sentenced to prison—with sentences that, on average, are nearly three times longer.  *See* Lowenkamp et al., *Investigation the Impact of Pretrial Detention on Sentencing Outcomes* 11 (Arnold Found., Nov. 2013).

- 18 -

*Third*, the prospect of prolonged pretrial detention may encourage premature guilty pleas from defendants who are innocent or have potential defenses to the charges. In many cases, the anticipated time of pretrial detention may exceed the length of an actual sentence; for some minor crimes, defendants may not face incarceration at all. *See* Bibas, *Plea Bargaining Outside the Shadow of Trial*, 117 Harv. L. Rev. 2464, 2492 (2004) (noting that defendants charged with misdemeanors or lesser felonies are more likely to be incarcerated before than after conviction). When given the choice between immediate release and trial after prolonged detention, many defendants reasonably decide to plead guilty. *See* Boruchowitz et al., *Minor Crimes, Massive Waste* 32-33 (National Ass'n of Criminal Defense Lawyers, Apr. 2009). That prospect is directly contrary to the purpose of financial conditions on release, which is solely to ensure the defendant's appearance. *See* Standards at 44 (commentary to Standard 10-1.4(d)) ("Money bail should not be used for any reason other than to respond to a risk of flight."); *cf. id.* at 112 (commentary to Standard 10-5.3(c)) ("Threats of unaffordable bail in order to compel defendants to cooperate with the government are … inappropriate.").

### B.    An Inflexible Money-Bail System Does Not Advance The Interests Of Pretrial Justice

For all of its costs to indigent defendants, money bail—particularly when imposed without regard to a defendant's individual circumstances—often fails to

advance the primary interests of a pretrial release system:  ensuring that released

defendants appear for their court dates, and keeping high-risk defendants in

detention.  *See* Standard 10.1-1.  Instead of basing pretrial detention status on

individualized risk factors, money-bail systems often end up linking pretrial

detention status primarily to the defendant's ability to pay, which benefits neither

indigent defendants nor public safety.  *See* Cohen & Reaves, *Pretrial Release of*

*Felony Defendants in State Court* 3 fig. 3 (Bureau of Justice Statistics, Nov. 2007)

(showing direct relationship between the bail amount and likelihood of detention).

The available evidence indicates that money bail is rarely necessary to

ensure court appearances.  The District of Columbia does not use money bail, and

yet it maintains appearance rates for released defendants of 90%—as compared to

a national average of less than 80%.[7]  Indeed, one recent study found that

defendants whose releases were conditioned on unsecured bonds appeared for their

court dates at slightly *higher* rates than those posting secured bonds, with the

exception of the highest-risk category of defendants.  *See* Jones, *Unsecured Bonds:*

*The As Effective and Most Efficient Pretrial Release Option* 11 (Pretrial Justice

---

[7]     *Compare* Pretrial Services Agency for the District of Columbia*,*
*Performance Measures*, http://www.psa.gov/?q=data/performance_measures (data
as of June 30, 2015) *with* Cohen & Reaves, *Pretrial Release of Felony Defendants*
*in State Court* 8 fig. 5 (Bureau of Justice Statistics, Nov. 2007).

Institute 2013).[8] By contrast, research has shown significant increases in appearance rates from alternative approaches, such as supervised release or simply giving notice before a court date. *See* Lowenkamp & VanNostrand, *Exploring the Impact of Supervision on Pretrial Outcomes* 17 (Arnold Found., 2013); Herian & Bornstein, *Reducing Failure to Appear in Nebraska: A Field Study*, Nebraska Lawyer 11, 12-13 (Sept. 2010).

At the same time, excessive use of money bail imposes heavy costs on the criminal justice system. Approximately 61% of inmates in local jails—more than 400,000 individuals—are awaiting trial at any given time. *See* Minton & Golinelli, *Jail Inmates at Midyear 2012 - Statistical Tables* 5-6 tbls. 2-3 (Bureau of Justice Statistics, May 2013). At an average daily cost per inmate from $50 to as high as $500, the total annual cost of pretrial detention is estimated to be $9 billion, or 11% of total spending on corrections. *See* Council of Economic Advisers, Issue Brief, *Fines, Fees, and Bail* 8 (Dec. 2015). This immense cost to States and local jurisdictions yields little in the way of public safety, and yet it also represents a grave deprivation of liberty for thousands of indigent defendants.

---

[8]    *See also* Abell Foundation, *The Pretrial Release Project:  A Study of Maryland's Pretrial Release and Bail System* 48 (2011) (citing studies finding higher or similar appearance rates for defendants released on non-financial bail compared to financial bail), *available at* http://www.abell.org/sites/default/files/publications/hhs_pretrial_9.01(1).pdf.

## C.    A Consensus Has Developed That Inflexible Money-Bail Systems Are Unfair And Do Not Work

The ABA is not alone in its opposition to inflexible money-bail systems.

Numerous organizations across the spectrum of the criminal justice system have

also emphasized the importance of conducting individualized assessments in

setting conditions for pretrial release and minimizing the use of money bail.[9]  In

---

[9]    Nat'l Ass'n of Counties, *The American County Platform and Resolutions 2016-2017*, at 104 ("NACo also recommends that states and localities make greater use of such non-financial pretrial release options, such as citation release and release on recognizance, where there is a reasonable expectation that public safety will not be threatened.."); Conference of Chief Justices, *Resolution 3*, at 2 (adopted Jan. 30, 2013) ("[T]he Conference of Chief Justices commends and endorses the Policy Paper on Evidence-Based Pretrial Release and joins with Conference of State Court Administrators to urge that court leaders promote, collaborate, and accomplish the adoption of evidence-based assessment of risk in setting pretrial release conditions and advocate for the presumptive use of non-financial release conditions[.]"); Ass'n of Prosecuting Attys, *Policy Statement on Pretrial Justice* ("Pretrial services employing validated risk assessments provide useful data and offer practical information essential to making informed decisions during court proceedings and determining conditions of supervision and sentencing, when appropriate."); Am. Jail Ass'n, *Resolutions of the American Jail Association* 36 (2014) ("[P]retrial supervision can be a safe and cost effective alternative to jail for those awaiting trial[.]"); Int'l Ass'n of Chiefs of Police, *Pretrial Release and Detention Process* (adopted Oct. 21, 2014) ("[T]he pretrial release and detention process currently utilized throughout most of the United States relies on limited information and the use of a bail schedule, without considering empirically developed information regarding individual risks posed by defendants[.]"); Am. Council of Chief Defenders, *Policy Statement on Fair and Effective Pretrial Justice Practices* 1 (June 4, 2011) ("Several national organizations have developed national standards on pretrial practices, and these provide excellent guidelines for defenders in developing strategies to improve pretrial outcomes.  Defenders should become familiar with these standards and strive to implement them in daily practice."); Nat'l Ass'n of Criminal Defense Lawyers, *Policy on Pretrial Release and Limited Use of Financial Bond* 1

2011, the U.S. Department of Justice Office of Justice Programs convened a

National Symposium on Pretrial Justice; key recommendations from the

symposium included "[e]liminating the use of automatic, predetermined money

bail" and the use of pretrial service programs to "[a]ssess each defendant's level of

risk."  National Symposium on Pretrial Justice, *Summary Report of Proceedings* 39

(2011).  As recently as March 14, 2016, the Department of Justice reminded courts

that they "must not employ bail or bond practices that cause indigent defendants to

remain incarcerated solely because they cannot afford to pay for their release."

Dear Colleague Letter from Gupta, Principal Dep. Ass't Att'y Gen., Civil Rights

Division and Foster, Director, Office for Access to Justice 2 (Mar. 14, 2016); *see

also* Brown, ABA President, Letter to Editor, *The Justice Department Makes the

Right Call*, Wash. Post, Mar. 18, 2016.  There is no serious dispute among criminal

justice stakeholders that inflexible money-bail schemes have no place in the

American justice system.

---

("Consistent with the current ABA Standards on Pretrial Release, these guidelines
permit the denial of bail only when the judicial officer finds clear and convincing
evidence the accused represents a significant risk of flight or imminent physical
harm to others."); Nat'l Sheriffs Ass'n, *Resolution 2012-6, National Sheriffs'
Association Supports & Recognizes The Contribution Of Pretrial Services
Agencies To Enhance Public Safety* (2012) ("[A] justice system relying heavily on
financial conditions of release at the pretrial stage is inconsistent with a fair and
efficient justice system."); Am. Probation and Parole Ass'n, *Resolution – Pretrial
Supervision* (enacted June 2010) ("[P]retrial supervision has proven a safe and cost
effective alternative to jail for many individuals awaiting trial[.]"); *see also* Nat'l
Ass'n of Pretrial Services Agencies, *Standards on Pretrial Release* (3d ed. 2004).

States and local jurisdictions have followed suit.  Currently, 21 States expressly provide for a presumption in favor of releasing defendants on personal recognizance or an unsecured bond, and 16 require courts to impose the least restrictive condition on pretrial release.  *See* Widgery, National Conference of State Legislators, *Guidance for Setting Release Conditions* (May 13, 2015); *cf.* Standard 10.1-6 (recognizing "policy favoring release"); *cf.* Standard 10.1-2 ("In deciding pretrial release, the judicial officer should assign the least restrictive condition(s) of release.").  State court systems are also increasingly using fact-sensitive risk-assessment tools, rather than inflexible bail schedules, to evaluate appropriate conditions on a defendant's pretrial release.  *See* Arnold Found., Press Release, *More Than 20 Cities and States Adopt Risk Assessment Tool To Help Judges Decide Which Defendants To Detain Prior to Trial* (June 26, 2015); *cf.* Standard 10-1.10 ("Every jurisdiction should establish a pretrial services agency or program to collect and present the necessary information, [and] present risk assessments[.]").  Local jurisdictions have explored the use of these tools for years, and 15 States have now authorized their use by statute, with six States—Delaware, Colorado, Kentucky, New Jersey, South Carolina, and West Virginia—requiring such assessments for all defendants.  Evaluations of these policies have further strengthened the conclusions that pretrial release determinations should take the defendant's individual circumstances into account, and that monetary conditions of release should play a

- 24 -

limited role.  *See* Schnacke et al., *The Jefferson County Bail Project: Lessons Learned from a Process of Pretrial Change at the Local Level* 12 (Pretrial Justice Institute, June 2014); Klute & Heyerly, *Report on Impact of House Bill 463: Outcomes, Challenges, and Recommendations* 5-6 (KY Pretrial Servs., June 2012).

In sum, evidence and experience show that an inflexible money-bail system has no place in a modern system of criminal justice.  In the few circumstances where a financial condition of release is necessary to ensure a defendant's appearance at trial, a court can impose one, provided that it is tailored so that a defendant is not held in jail merely because he cannot afford to pay the bond.  But in the great majority of cases, money bail—and certainly a money-bail system in which the amount of the bail is mechanically set by reference to a schedule of charges, with no consideration of the defendant's ties to the community or financial circumstances—should be unnecessary, and will only hobble the accused person's ability to muster a defense to the charges against him while imposing a grave human toll.

## III.   THE COUNTY'S INFLEXIBLE BAIL SCHEME ILLUSTRATES THE CONSTITUTIONAL PROBLEMS WITH MONEY BAIL

The ABA's Criminal Justice Standards are founded on the basic constitutional premise that an individual should not be incarcerated solely based on his inability to pay.  Faithful application of the Standards—including individualized risk assessments, the imposition of only the least restrictive

conditions, and a general presumption in favor of pretrial release—should ensure that defendants' constitutional rights will be protected. Here, however, the County's pretrial release system falls far short of ABA guidelines, and has resulted in violations of both the Equal Protection and Due Process Clauses.

In *Bearden v. Georgia*, 461 U.S. 660 (1983), the Supreme Court made clear that depriving an individual of "conditional freedom simply because, through no fault of his own, he cannot pay … would be contrary to the fundamental fairness required by the Fourteenth Amendment." *Id*. at 672-673. Consistent with that principle, the Court has rejected government policies and practices in a wide range of contexts that have the effect of "punishing a person for his poverty." *Id*. at 671 (revocation of probation for inability to pay fine); *see, e.g.*, *Tate v. Short*, 401 U.S. 395, 398 (1971) (incarceration for inability to pay traffic fines); *Williams v. Illinois*, 399 U.S. 235, 240-241 (1970) (incarceration beyond statutory maximum due to inability to pay fine); *Smith v. Bennett*, 365 U.S. 708, 711 (1961) (inability to pay fee to file petition for writ of habeas corpus); *Griffin v. Illinois*, 351 U.S. 12, 19 (1956) (inability to cover cost of transcript on appeal).

A defendant's constitutional interests are particularly strong in the pretrial detention context. While awaiting trial, a criminal defendant has not been found guilty of any crime and must be afforded a presumption of innocence. *Stack v. Boyle*, 342 U.S. 1, 4 (1951) ("Unless this right to bail before trial is preserved, the

presumption of innocence, secured only after centuries of struggle, would lose its meaning.").  Accordingly, before overriding a defendant's "strong interest in liberty," jurisdictions must recognize the "importance and fundamental nature" of the right to pretrial release and must carefully consider whether the government has advanced "sufficiently weighty" interests to the contrary.  *United States v. Salerno*, 481 U.S. 739, 750-751 (1987).  Inflexible money-bail systems that rely on preset bail schedules, like the one the City of Calhoun uses, do not meet that standard.  As the Fifth Circuit explained in *Pugh v. Rainwater*, 572 F.2d 1053 (5th Cir. 1978) (en banc), when the appearance of an indigent defendant can be assured by an alternate form of release, "pretrial confinement for inability to post money bail would constitute imposition of an excessive restraint."  *Id.* at 1058.  Following the Fifth Circuit's reasoning, even if money bail might be constitutionally acceptable in certain circumstances, it can never be the only option available to indigent defendants.

In addition to treating defendants differently and arbitrarily depending on their financial status, inflexible money-bail systems violate the fundamental constitutional requirement that individuals must generally be given notice and an opportunity to be heard before being deprived of their liberty or property.  *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972).  When ability to pay is at issue, the defendant must be given notice that ability to pay may be a "critical question" in the proceedings, and given an

opportunity to provide information about his financial status.  *Turner v. Rogers*, 564 U.S. 431, 446-448 (2011).  Then, the court must actually take that information into account and make an "express finding … that the defendant has the ability to pay."  *Id.* at 447-448.  In the context of pretrial release, therefore, if a jurisdiction considers imposing a monetary condition of release, it must take account of the defendant's individual ability to pay, the availability of less restrictive alternatives, and the need for pretrial detention in the first place.  Inflexible money-bail systems do not satisfy this due process requirement; the preset bail schedule is outcome-determinative.  As indigent defendants are given no opportunity to challenge these schedules, they are unconstitutional.

## CONCLUSION

The order of the district court entering a preliminary injunction should be affirmed.

Respectfully submitted.

/s/  Paulette Brown

Of Counsel:                       PAULETTE BROWN
Paul R.Q. Wolfson                 AMERICAN BAR ASSOCIATION
John T. Byrnes                    32 North Clark Street
                                  Chicago,  IL 60654
                                  (312) 988-5000
                                  abapresident@americanbar.org
August 18, 2016

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).

1.    This brief complies with the type-volume limitations of Fed. R. App. P. 29(d) because this brief contains 6,551 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B) and 11th Cir. R. 32-4.

2.    The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.



/s/  Paulette Brown
PAULETTE BROWN



August 18, 2016

# ADDENDUM

# TABLE OF CONTENTS

Page

*ABA Standards for Criminal Justice: Pretrial Release* (3d ed. 2007)
  (excerpts)

Standard 10-1.1 ............................................................................................. A1

Standard 10-1.2 ............................................................................................. A1

Standard 10-1.4 ............................................................................................. A1

Standard 10-1.7 ............................................................................................. A2

Standard 10-5.3 ............................................................................................. A3

# ABA STANDARDS FOR CRIMINAL JUSTICE: PRETRIAL RELEASE (EXCERPTS)

**Standard 10-1.1        Purposes of the pretrial release decision**

The purposes of the pretrial release decision include providing due process to those accused of crime, maintaining the integrity of the judicial process by securing defendants for trial, and protecting victims, witnesses and the community from threat, danger or interference.  The judge or judicial officer decides whether to release a defendant on personal recognizance or unsecured appearance bond, release a defendant on a condition or combination of conditions, temporarily detain a defendant, or detain a defendant according to procedures outlined in these Standards.  The law favors the release of defendants pending adjudication of charges.  Deprivation of liberty pending trial is harsh and oppressive, subjects defendants to economic and psychological hardship, interferes with their ability to defend themselves, and, in many instances, deprives their families of support.  These Standards limit the circumstances under which pretrial detention may be authorized and provide procedural safeguards to govern pretrial detention proceedings.

**Standard 10-1.2.        Release under least restrictive conditions; diversion and other alternative release options**

In deciding pretrial release, the judicial officer should assign the least restrictive condition(s) of release that will reasonably ensure a defendant's attendance at court proceedings and protect the community, victims, witnesses or any other person.  Such conditions may include participation in drug treatment, diversion programs or other pre-adjudication alternatives.  The court should have a wide array of programs or options available to promote pretrial release on conditions that ensure appearance and protect the safety of the community, victims and witnesses pending trial and should have the capacity to develop release options appropriate to the risks and special needs posed by defendants, if released to the community.  When no conditions of release are sufficient to accomplish the aims of pretrial release, defendants may be detained through specific procedures.

**Standard 10-1.4.        Conditions of release**

(a) Consistent with these Standards, each jurisdiction should adopt procedures designed to promote the release of defendants on their own

A1

recognizance or, when necessary, unsecured bond. Additional conditions should be imposed on release only when the need is demonstrated by the facts of the individual case reasonably to ensure appearance at court proceedings, to protect the community, victims, witnesses or any other person and to maintain the integrity of the judicial process. Whenever possible, methods for providing the appropriate judicial officer with reliable information relevant to the release decision should be developed, preferably through a pretrial services agency or function, as described in Standard 10-1.9.

(b) When release on personal recognizance is not appropriate reasonably to ensure the defendant's appearance at court and to prevent the commission of criminal offenses that threaten the safety of the community or any person, constitutionally permissible non-financial conditions of release should be employed consistent with Standard 10-5.2.

(c) Release on financial conditions should be used only when no other conditions will ensure appearance. When financial conditions are imposed, the court should first consider releasing the defendant on an unsecured bond. If unsecured bond is not deemed a sufficient condition of release, and the court still seeks to impose monetary conditions, bail should be set at the lowest level necessary to ensure the defendant's appearance and with regard to a defendant's financial ability to post bond.

(d) Financial conditions should not be employed to respond to concerns for public safety.

(e) The judicial officer should not impose a financial condition of release that results in the pretrial detention of a defendant solely due to the defendant's inability to pay.

(f) Consistent with the processes provided in these Standards, compensated sureties should be abolished. When financial bail is imposed, the defendant should be released on the deposit of cash or securities with the court of not more than ten percent of the amount of the bail, to be returned at the conclusion of the case.

## Standard 10-1.7.    Consideration of the nature of the charge in determining release options

Although the charge itself may be a predicate to pretrial detention proceedings, the judicial officer should exercise care not to give inordinate weight

to the nature of the present charge in evaluating factors for the pretrial release decision except when, coupled with other specified factors, the charge itself may cause the initiation of a pretrial detention hearing pursuant to the provisions of Standard 10-5.9.

**Standard 10-5.3.    Release on financial conditions**

(a) Financial conditions other than unsecured bond should be imposed only when no other less restrictive condition of release will reasonably ensure the defendant's appearance in court.  The judicial officer should not impose a financial condition that results in the pretrial detention of the defendant solely due to an inability to pay.

(b) Financial conditions of release should not be set to prevent future criminal conduct during the pretrial period or to protect the safety of the community or any person.

(c) Financial conditions should not be set to punish or frighten the defendant or to placate public opinion.

(d) On finding that a financial condition of release should be set, the judicial officer should require the first of the following alternatives thought sufficient to provide reasonable assurance of the defendant's reappearance:

(i) the execution of an unsecured bond in an amount specified by the judicial officer, either signed by other persons or not;

(ii) the execution of an unsecured bond in an amount specified by the judicial officer, accompanied by the deposit of cash or securities equal to ten percent of the face amount of the bond.  The full deposit should be returned at the conclusion of the proceedings, provided the defendant has not defaulted in the performance of the conditions of the bond; or

(iii) the execution of a bond secured by the deposit of the full amount in cash or other property or by the obligation of qualified, uncompensated sureties.

(e) Financial conditions should be the result of an individualized decision taking into account the special circumstances of each defendant, the defendant's ability to meet the financial conditions and the defendant's flight risk, and should

never be set by reference to a predetermined schedule of amounts fixed according to the nature of the charge.

(f) Financial conditions should be distinguished from the practice of allowing a defendant charged with a traffic or other minor offense to post a sum of money to be forfeited in lieu of any court appearance.  This is in the nature of a stipulated fine and, where permitted, may be employed according to a predetermined schedule.

(g) In appropriate circumstances when the judicial officer is satisfied that such an arrangement will ensure the appearance of the defendant, third parties should be permitted to fulfill these financial conditions[.]

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of August, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.


/s/  Paulette Brown
PAULETTE BROWN