**EXHIBIT II**

**To Declaration of Micah West in Support of
Motion for Preliminary Injunction
& Motion for Class Certification**

5/12/2017 Head of the Civil Rights Division Vanita Gupta Delivers Remarks at the Symposium on the Criminalization of Poverty at University of Michigan Law Sch…

Case 3:17-cv-00321-WKW-SMD Document 6-39 Filed 05/18/17 Page 2 of 5

JUSTICE NEWS

## Head of the Civil Rights Division Vanita Gupta Delivers Remarks at the Symposium on the Criminalization of Poverty at University of Michigan Law School

Ann Arbor, MI ~ Friday, February 19, 2016

Good morning. Thank you, Margo [Schlanger], for your kind introduction and for your outstanding leadership and thoughtful scholarship in the field of civil rights. I also want to thank University of Michigan Law School for hosting this important symposium. And I want to acknowledge the students from the *Michigan Journal of Race & Law* for organizing this weekend's engaging conference. It's energizing to join so many distinguished scholars, advocates and lawyers dedicated to serving the public interest and committed to advancing criminal justice reform.

In communities across America today, from Ferguson, Missouri, to Flint, Michigan, too many people – especially young people and people of color – live trapped by the weight of poverty and injustice. They suffer the disparate impact of policies driven by, at best, benign neglect, and at worst, deliberate indifference. And they see how discrimination stacks the deck against them.

So today, as we discuss the inequality that pervades our criminal justice system – a defining civil rights challenge of the 21st century – we must also acknowledge the broader inequalities we face in other segments of society. Because discrimination in so many areas – from the classroom, to the workforce, to the marketplace – perpetuates the inequality we see in our justice system. And for those already living paycheck-to-paycheck, a single incident – whether an arrest by the police or a fine by the court – can set off a downward spiral. It can lead to a cycle of profound problems that ruin lives and tear apart families. Problems like losing your health care, your job, your children or your home.

As someone who focuses on civil rights work and criminal justice reform, I see these problems every day. But today in America, I also see a country on the cusp of change. Across a wide range of political perspectives, policymakers and advocates have come together to bridge divides and support meaningful criminal justice reform.

And I'm proud to say that this administration – and this Department of Justice – has made criminal justice reform a top priority. We believe that our country needs, and deserves, a criminal justice system that more effectively protects our communities, more fairly treats our people and more prudently spends our resources. And we believe that no matter how deeply rooted and long-standing the injustices that underlie inequality in our criminal justice system – with clear thinking, hard work and collaboration – we can make real progress.

As part of this broader reform agenda, the Civil Rights Division – along with other stakeholders and advocates around the country, including many of you here today – has worked to confront these challenges at the front end of our justice system. Together, we're asking the tough but critical questions. How do we prevent people from getting trapped by the criminal justice system in the first place? And how do we address the fact that poor people, people of color, people with disabilities and people with mental illness get trapped far more often and find themselves far worse off than others?

Our resolve to address these challenges extends throughout the Civil Rights Division and across the entire Department of Justice. You can see it in our efforts to advance constitutional, effective and accountable community policing. You can see it in our work to combat the criminalization of mental illness – by ensuring police officers have de-escalation training and by replacing jail sentences with meaningful community services for people with mental illness. And you can see it in our commitment to shine light on a problem too often ignored and neglected: the unjustifiable, counter-productive – and frequently unconstitutional – treatment of the poor in our nation's courtrooms.

5/12/2017 Head of the Civil Rights Division Vanita Gupta Delivers Remarks at the Symposium on the Criminalization of Poverty at University of Michigan Law Sch…

Case 3:17-cv-00321-WKW-SMD Document 6-39 Filed 05/18/17 Page 3 of 5

Our country's justice system guarantees equal protection for all people, regardless of their money or their means. As former Attorney General Robert Kennedy once said, "If justice is priced in the market place, individual liberty will be curtailed and respect for law diminished." As the Supreme Court ruled in *Bearden v. Georgia*, our Constitution prohibits "punishing a person for his [or her] poverty." And as Attorney General Loretta E. Lynch recently warned, we must see the danger in "thinking of justice as a commodity that can be quantified rather than a right inherent to all." Policies that punish people merely because of their poverty violate both the laws that govern our nation and the values that shape our democracy.

Last year, our report on the Ferguson Police Department made headlines for exposing a system pervaded by racial bias. It demonstrated how policing and court practices disproportionately impacted African-American residents. But we also found another powerful and troubling dynamic at work: the city's undue focus on policing as a means to generate revenue.

In Ferguson, we uncovered emails explicitly referencing the use of enforcement strategies "to fill the revenue pipeline" – without due consideration for whether officers could better protect the city by focusing on neighborhood policing, rather than debt collection. The amount of money coming from court fines and fees exploded, rising from almost $1.4 million in 2010, to a projected more than $3 million last year. We found the city issuing multiple citations with excessive fines and fees for minor violations. Fines like $302 for jaywalking; $427 for disturbing the peace; and $531 for allowing high grass and weeds to grow on your lawn. And we found the inability of poor people to pay these fines and fees leading to multiple arrests, jail time and payments that far exceeded the cost of the original ticket. These practices have left a devastating impact on poor residents.

One man originally charged for driving with a revoked license in 2007 eventually owed the city more than $1,000 in fines and fees. But without a job, he had no way to gather the money. So he wrote to the city: "I want to pay you guys what I owe [and] … I have been trying to scrape up what I can [but] … with warrants it's hard to get a job." The court clerk went ahead and issued a warrant for his arrest anyways. In addition to residents, Ferguson police officers also expressed concern about the undue focus on law enforcement as a vehicle for revenue generation. We heard one officer question why the police department didn't allow residents to use their limited means to fix broken headlights – and actually benefit public safety – rather than pay fines to fill the city's coffers.

As we demonstrated with our lawsuit last week, the Justice Department will continue its vigorous efforts to ensure that Ferguson's law enforcement practices fully comply with the Constitution, fairly serve the entire community and productively support public safety. Ferguson residents and police officers deserve nothing less.

We know that this problem of excessive fines and fees extends well beyond Ferguson. Some of you in this room have been working on these issues around the country. In fact, the problem exists in many of the country's 6,500 municipal courts. That's why last December, the Justice Department and the White House convened a two-day conference with advocates, judges, legislators, court administrators and federal officials to diagnose the problem and develop solutions. We heard court leaders express surprise, and even outrage, that such practices had become routine. Many jurisdictions have already implemented changes to the practice of imposing excessive fines and fees on their residents. And in the coming months, the department will continue its efforts to help other communities implement critical reforms in this area.

In addition to enforcement efforts, the Civil Rights Division engages on a range of fronts to address unconstitutional practices that result in punishing the poor. Our involvement in an Idaho case last year provides a key example. According to media reports, Boise, Idaho, resident Janet Bell became homeless more than a decade ago. She lost part of her left arm from an infection she caught living on the streets, an infection that nearly killed her. When the city began issuing her multiple citations simply for camping on the street, she had no money to pay them and no other place to go. The police arrested Janet, along with several other homeless individuals, for violating Boise ordinances that criminalize sleeping or camping in public.

Last summer, the Justice Department filed a statement of interest in the case. We made a simple argument. Because every human being must sleep at some time and in some place, punishing a person for sleeping in public – when they have nowhere else to go – criminalizes homelessness. It violates the Eighth Amendment. As Janet said in a *VICE News* interview last year, "Of course, everybody wants to move the homeless, but they got to be somewhere, don't they?" Beyond the constitutional issues, criminalizing homelessness also constitutes poor public

5/12/2017 Head of the Civil Rights Division Vanita Gupta Delivers Remarks at the Symposium on the Criminalization of Poverty at University of Michigan Law Sch…

Case 3:17-cv-00321-WKW-SMD Document 6-39 Filed 05/18/17 Page 4 of 5

policy. It fails to give homeless people the resources they need to get on their feet and find stable housing. And it does nothing to break the cycle of poverty.

In another critical area, when poor people find themselves without adequate legal representation, too often it leads to a chain of events that traps them in the criminal justice system. When Justice Hugo Black wrote the Supreme Court's opinion in *Gideon v. Wainwright*, he explained that America guarantees fair trials "in which every defendant stands equal before the law." Yet even more than half a century after the court affirmed the "obvious truth" that a fair trial requires the right to counsel, too many poor defendants still face barriers to justice. As lawyers, we have a legal obligation, and indeed, a moral imperative, to help fulfill the promise of *Gideon* for all Americans.

Each day, public defenders perform one of the most critical functions of our democracy. But in too many communities, insufficient funding for indigent defense can lead to situations where even well-intentioned and capable public defenders serve, in effect, as attorneys in name only. That's what the Justice Department said in a statement of interest we filed in a case called *Hurrell-Harring v. State of New York*. We argued that denial of one's Sixth Amendment right to counsel can result from a range of factors, including a lack of resources, high workloads and under-staffed public defenders' offices. When public defenders cannot adequately provide traditional markers of representation – including timely and confidential consultation with their client, appropriate investigation and meaningful adversarial testing of the prosecution's case – it can violate one's right to counsel.

Take the story of Syracuse, New York, resident, James Adams, one of the plaintiffs in the *Hurrell-Harring* case. After he allegedly stole sticks of deodorant from a Rite Aid drugstore, police arrested him on charges of felony robbery and burglary. He faced up to 14 years in prison. With bail set at $2,500, which he couldn't afford, James sat in jail for more than three months. According to the New York Civil Liberties Union (NYCLU), he never saw his attorney outside of open court. And at one of his court appearances, the attorney didn't even bother to attend.

Just weeks after the Justice Department filed its statement of interest, New York reached a comprehensive settlement agreement with the plaintiffs to implement transformative reforms to its public defense system across five counties in the state. These reforms include guaranteeing that indigent criminal defendants will have legal counsel at arraignments. They also include establishing caseload and workload standards for public defenders to ensure they have the time and resources to adequately serve each client.

The story of James Adams and the issue of indigent defense highlight another important area of the justice system that disproportionately harms people in poverty. In certain pretrial detention systems around the country, bail practices end up penalizing defendants simply because they cannot afford to pay for their release. Of course, sometimes we must use pretrial detention to protect the safety of our communities. But bail or bond systems that fail to account for indigence can result in detention based on wealth, not on valid concerns such as public safety or securing defendants' appearance in court.

In 1964, former Attorney General Kennedy organized the country's first National Conference on Bail and Criminal Justice to draw attention to our pressing need for pretrial justice reform. And this June, we'll celebrate the 50th anniversary of the landmark legislation he helped pass, the Bail Reform Act of 1966. This law fundamentally changed our federal system's reliance on money bail. It created a presumption of release for most defendants on their own recognizance, and it allowed more restrictive release conditions only upon an individualized assessment of the defendant's likelihood to reappear in court. The Act's explicit purpose was "to assure that all persons, regardless of their financial status, shall not needlessly be detained" pending trial.

Yet even after decades of established law and clear precedent, some of America's pretrial systems continue to reflect the troubling link between financial means and jail time. Because the same observation that former Attorney General Kennedy made more than half a century ago – the fact that thousands of people sit in jail before trial each year simply because "they cannot afford to pay for their freedom" – still holds true today. And it leaves a devastating impact on our most vulnerable communities.

Consider the story of Clanton, Alabama, resident, Christy Dawn Varden – a 41-year-old mother of two who relied on food stamps and struggled with mental and physical health issues. After police arrested her in a Walmart parking lot on shoplifting and other misdemeanor charges last year, she couldn't afford to pay $2,000 in bail to get released. The court said she had to wait in jail for one week before seeing a judge. Christy explained her dilemma best in this

5/12/2017 Head of the Civil Rights Division Vanita Gupta Delivers Remarks at the Symposium on the Criminalization of Poverty at University of Michigan Law Sch…

Case 3:17-cv-00321-WKW-SMD Document 6-39 Filed 05/18/17 Page 5 of 5

handwritten affidavit: "I am indigent. I have no assets. I have no bank account and no real property. My only source of income is food stamps. I cannot afford to buy my release from jail." Shortly after she sued the city of Clanton, the Justice Department filed a statement of interest in the case. We argued that using money bail to incarcerate someone solely because he or she cannot afford to pay violates the equal protection clause of the 14th Amendment. Last year, the city of Clanton agreed to release most misdemeanor defendants without forcing them to pay bail.

Beyond the constitutional issues at stake, these troubling bail practices also constitute poor public policy. Research demonstrates a compelling case regarding the impact of pretrial incarceration, without regard for one's ability to pay, on public safety.

In addition, pretrial incarceration that results solely from one's inability to pay can have a devastating impact on other areas of one's life. It can leave ripple effects throughout struggling communities. And it can cause defendants to lose their jobs or their health benefits as they struggle to provide for their families.

The inequality that exists in certain state pretrial systems contributes to the disproportionately harmful impacts against poor people and people of color that we see in sentencing and other areas of the criminal justice system.

The issues I highlighted this morning share a common thread. And the stories of Janet Bell, James Adams and Christy Dawn Varden each involve a troubling trend. When the criminal justice system ends up punishing people for the size of their wallet rather than the severity of their crime, it raises serious constitutional concerns. It traps the most vulnerable among us in a cycle of perpetual poverty. It fails to advance public safety. And it undermines the legitimacy of our justice system.

In my role as head of the Civil Rights Division at the Department of Justice, I have seen this problem time and time again. In nearly every case, defendants with limited means face more obstacles, more roadblocks and more barriers than those with lots of money.

But I also know the strategies we need to fight injustice. In the cases of Janet Bell, James Adams and Christy Dawn Varden, our efforts to combat injustice did not occur in silos. We relied on collaboration among public defenders, civil rights advocates, legal aid lawyers and government lawyers. When we work together to bridge old divides and forge new partnerships, it enables our collective work to leave a larger impact on communities and people desperately in need.

One of my former law professors and now admired colleagues, Bryan Stevenson, has said that "the opposite of poverty is not wealth … the opposite of poverty is justice."

Even today, in 2016, too many people grow up in our country and view justice as the provenance of the wealthy. They hear about the ideal of equal justice, but they find that in reality, it feels distant from the grasp of their community – far off and out of reach. And make no mistake. When poor people face barriers to justice, it not only impacts the poor. It impacts all of us. It creates new societal problems that extend far beyond our criminal justice system. And it threatens the foundation of our democracy.

But together, we can combat those barriers. Together, we can shape solutions in our courtrooms and bring change to our communities. And together, we must fulfill the fundamental promise of America – a promise that is written throughout our Constitution and woven into the fabric of our nation – so that we can make equal justice, equal opportunity and fundamental fairness a reality for all.

Thank you.

---

**Speaker:**
Vanita Gupta, Head of the Civil Rights Division

**Topic(s):**
Civil Rights

**Component(s):**
Civil Rights Division