**EXHIBIT LL**

**To Declaration of Micah West in Support of
Motion for Preliminary Injunction
& Motion for Class Certification**

# University of Pennsylvania Law Review

**FOUNDED 1852**

*Formerly*
## American Law Register

| | | |
|---|---|---|
| VOL. 113 | MAY 1965 | No. 7 |

## THE COMING CONSTITUTIONAL CRISIS IN BAIL: I *

### CALEB FOOTE †

One striking manifestation of the resurgence of concern for the administration of criminal justice which characterizes the present decade is the attack upon the inadequacies and unfairness of the bail system as it affects indigent defendants. Unlike other areas of ferment in criminal law administration, this changing attitude toward bail is the only major reform of recent decades in which the courts have played a wholly passive role. With search and seizure and indigents' right to counsel the Supreme Court has warned, cajoled and, finally becoming impatient with the snail-like pace of reform, forced major change down the throats of the states by way of the fourteenth amendment.[1] The Court's initiative in these areas has precipitated a storm of controversy and created constitutional crises both in police operations and in the court practices of those states which had previously failed to make provision for assigning counsel to indigents in all cases.

Strangely enough, however, the courts have remained almost entirely silent in the face of mounting documentation of the discriminatory effect upon indigents of the bail bond system's requirement of financial security for pretrial release. The studies which have been made in the

---

\* This is part I of a two-part article. Part II will appear in the June issue.

† Professor of Law, University of Pennsylvania. A.B. 1939, Harvard University, M.A. 1941, Columbia University, LL.B. 1953, University of Pennsylvania. Member, Pennsylvania Bar.

[1] Gideon v. Wainwright, 372 U.S. 335 (1963); Mapp v. Ohio, 367 U.S. 643 (1961).

last decade [2] have established three things which, when they finally find their way into the grist of litigation, seem bound to pose most serious constitutional questions.

First, it has been established that pretrial imprisonment of the poor solely as a result of their poverty, under harsher conditions than those applied to convicted prisoners, so pervades our system that for a majority of defendants accused of anything more serious than petty crimes, the bail system operates effectively to deny rather than to facilitate liberty pending trial.[3]

Second, it is also apparent that but for their poverty a substantial proportion of these jailed indigent defendants would never suffer any imprisonment because, after serving their pretrial jail term, they are either not convicted [4] or the disposition of their cases does not include imprisonment.[5]

Third, there is an extraordinary correlation between pretrial status (jail or bail) and the severity of the sentence after conviction, the jailed defendant being two or three times more likely to receive a prison sentence.[6] The last finding raises difficult problems of evaluation, for some other variable may be an important factor in causing both the pretrial jail status and the more severe sentence, although the most recent study shows that the ratio holds constant even when some of the more obvious variables are controlled.[7]

These findings as a whole reveal a shocking discrepancy which disadvantages the poor in our administration of criminal justice. It is probable, moreover, that the evidence summarized above does not reveal the full extent of the discrimination. For example, there has been no adequate investigation of the mechanics of the guilty plea, although we

---

[2] Foote, Markle & Wooley, *Compelling Appearance in Court: Administration of Bail in Philadelphia*, 102 U. PA. L. REV. 1031 (1954) [hereinafter cited as *Philadelphia Bail Study*]; Rankin, *The Effect of Pretrial Detention*, 39 N.Y.U.L. REV. 641 (1964) [hereinafter cited as Rankin]; Note, *A Study of the Administration of Bail in New York City*, 106 U. PA. L. REV. 693 (1958) [hereinafter cited as *New York Bail Study*]. Some of these studies and numerous other recent investigations are summarized in FREED & WALD, BAIL IN THE UNITED STATES: 1964, 9-21 (Report to the National Conference on Bail and Criminal Justice, 1964) [hereinafter cited as FREED & WALD]. For references to other published studies see *id.* at 112-16.

[3] See, *e.g.*, *Philadelphia Bail Study* 1032-33; *New York Bail Study* 711-12; Rankin 634; FREED & WALD 15-16.

[4] *E.g.*, Rankin 642 (27% of sample of 358 jailed defendants were not convicted); *Philadelphia Bail Study* 1052, Table 1 (depending on offense, proportion of jailed defendants not convicted ranged from 7% to 27%); *New York Bail Study* 726-27.

[5] Rankin 642 (9% of those tried, convicted but not sentenced to prison); *Philadelphia Bail Study* 1040 (23% of those tried given suspended sentence, 9% sentenced to time already served); *New York Bail Study* 727 (13.5% of those sentenced given suspended sentence, 2.6% sentenced to time already served).

[6] Rankin 642; *Philadelphia Bail Study* 1054; *New York Bail Study* 727.

[7] Rankin 655.

know that this is the predominant means of conviction.[8]  While the statistical data in the bail studies of the possible correlation between pretrial jail status and increased likelihood of conviction is incomplete, the subtleties involved in the guilty plea will require a more searching analysis than can be provided by conviction rate statistics.  It is plausible, at least, that denial of pretrial liberty provides a psychological inducement to plead guilty which would be absent if the defendant were at liberty pending trial.[9]

*Recent reform efforts*—The first move generated by these findings to ameliorate the unfairness of the bail system for the poor has not necessitated and thus has entirely bypassed litigation of constitutional questions.  Starting with the creation by a New York businessman of the Vera Foundation and its sponsorship of the Manhattan Bail Project, a reform movement to develop procedures for the prompt pretrial release without financial security of reliable but impecunious defendants is now spreading rapidly through the country with the endorsement of the Department of Justice and the support of the Ford Foundation.[10] As developed in New York, the plan provides for a brief interview with an indigent defendant before his preliminary hearing where probable reliability of the defendant in appearing for trial is estimated by the application of plausible (but untested) assumptions.  Information is sought as to his prior record, residence patterns, current and recent employment and references, and family ties in the jurisdiction after which there is a quick verification of the data by telephone or from available official records.  A defendant meeting sufficiently high standards will be recommended to the court for release without security.

Recently the Vera Foundation and the New York Police Department have launched another experimental program designed to reduce further the incidence of pretrial detention.[11]  At several precinct station houses in New York, law students acting as Vera investigators go to work as soon as those accused of disorderly conduct, simple assault, or petit larceny are brought in after arrest.  If on the basis of quick investigation the accused is recommended by Vera as a good risk, the precinct desk officer may order release and issue a summons for the date and place at which the accused is to appear in criminal court. For minor offenses this represents a long overdue reform.

---

[8] See Packer, *Two Models of the Criminal Process*, 113 U. Pa. L. Rev. 1, 46-47 (1964); Note, *Guilty Plea Bargaining: Compromises by Prosecutors To Secure Guilty Pleas*, 112 U. Pa. L. Rev. 865-66 & n.4 (1964).

[9] See Packer, *supra* note 8, at 39-40.

[10] Freed & Wald 59-64, and references cited *id.* at 114-15.  For a description of other reform efforts in recent years, see *id.* at 64-83.

[11] Freed & Wald 72-73.

Admirable as these developments are, however, they provide no cure-all for indigent bail problems. Even in a jurisdiction with an extensive project a substantial proportion of urban indigent defendants would not meet the standards of reliability which have so far been applied and would not obtain a recommendation of release. Further, a proportion of those recommended would not be released, the number depending upon the extent of judicial sympathy and cooperation with the plan. Political considerations may additionally limit the plan's operation, for example, the Manhattan Bail Project's exclusion of past or current narcotics and sex offenders and those currently charged with assault against police officers. But a more important limiting factor is the necessity of obtaining popular approval for the establishment of the plan in each community, and, as even the Ford Foundation's resources are not inexhaustible, of securing continuing financial support through local appropriations. While one would hope that our administration of criminal justice will one day be able to accomplish a major reform in the interest of fairness to the defendant without having to be coerced by the Supreme Court,[12] prior experience gives no indication that such a day is at hand. The sluggishness of the states in responding to the indigent counsel problem is not encouraging. Despite decades of judicial prodding and reform effort, in 1963 there were still "nearly 40 counties with populations of 400,000 or more which have no organized [defender] services whatsoever," and many existing facilities were rated inadequate.[13]

For two categories of indigent defendants administrative bail reform offers little immediate prospect of relief. The first are the defendants brought to trial in jurisdictions having no "Vera" or other reform plans; the second are those denied relief within a reform jurisdiction. Between them they will comprise the great majority of all indigent defendants for at least several decades. For such defendants the only foreseeable remedy lies in constitutional adjudication within the judicial system. Because of the publicity being given this problem and our growing sensitivity about unfairness in our criminal procedure resulting from poverty, it is a fair guess that the next major clash between our norms of actual administration and the constitutional theories expounded in recent years by the Supreme Court will revolve around the discrimination against the poor which is inherent in the bail system. Yet any satisfactory resolution of the constitutional ques-

---

[12] See the observation of Attorney-General Kennedy, Law Day Address, University of Chicago Law School, May 1, 1964: "[T]he fundamental question remains: Should there ever have been a need for the *Gideon* decision? Did we need a Constitutional determination to tell us our professional responsibilities?"

[13] Marsden, *The Lawyer's Response to the Demand for Both Stability and Change Through Law*, 17 VAND. L.J. 125, 132 (1963).

tions is likely to prove extremely difficult.   Compared with other due process problems which have arisen in recent years, bail presents differences in the treatment of the poor which are more pervasive and pernicious.   The stakes for the defendant and the state are higher, and values critical to the present age are more sharply in conflict with the force that is generated by centuries of accumulated habit and unquestioned tradition.   There would today be little dispute with the judgment that "one of the prime objectives of the civilized administration of justice is to render the poverty of the litigant an irrelevancy," [14] and that the provision of as equal justice as is practicable is a constitutional mandate as well as a policy goal.   But for centuries we have also placed almost exclusive reliance for the regulation of pretrial detention and the production of defendants in court upon a bail system which not only uses financial incentives as a deterrent to flight but also delegates to private bondsmen much of the policing which enforces appearance in court, and have accumulated almost no experience with alternative measures.

   Nor are there any easy alternatives for an accommodation of nondiscriminatory protection of defendants' access to pretrial freedom and suitable regard for the state's interest.   In some European countries, bail is either not authorized, as in Sweden, where it is "considered to lead to inequality before the law," or, although provided for by law, has fallen into disuse, as for example, in Norway, Denmark, West Germany.[15]   In these and other European countries the right to release turns on nonfinancial factors such as the degree of risk that during pretrial liberty the accused might flee, commit crimes, or tamper with the evidence.   Where such risks are high, release can be denied altogether, or lesser security measures may be employed—for example, a ban on travel or requirement that the accused report periodically to the police.

   It is immediately apparent, however, that any attempted adoption of the substantive European law of detention would pose tremendous problems.   For one thing, the apparent simplicity and rationality of individualizing the detention decision to the particular circumstances of the particular defendant is largely deceptive.   In the best adjudicatory climate the determination of such vague predictive criteria as future dangerousness or possible flight is necessarily unreliable, and under the actual conditions by which the pretrial detention determination is made in this country the probability of maladministration is

---

[14] ATT'Y GEN. COMM. ON POVERTY AND THE ADMINISTRATION OF FEDERAL CRIMINAL JUSTICE, REPORT, 5-6 (1963) [hereinafter cited as ATT'Y GEN. REP.].

[15] Bratholm, *Arrest and Detention in Norway*, 108 U. PA. L. REV. 336, 347-48 (1960).

infinite. Even in Scandanavian countries, where the substantive law is applied by a trained, career judiciary with a tradition of much greater leniency to defendants than obtains in this country, the results appear to be very uneven. Although the substantive legal principles governing detention "are generally coincident in the three countries" of Norway, Denmark and Sweden, Bratholm has reported that detention is significantly more frequent in Oslo than in Copenhagen and at least four times more frequent than in Stockholm.[16] Bratholm attributes the discrepancy to "the tendency of Norwegian courts and police to exploit the institution [of detention] for purposes not recognized by the Criminal Procedure Act," [17] but one would expect that the vagueness of the concepts applied would produce unevenness of administration in any event. If a criterion such as future dangerousness were applied in America, it is predictable that the magistrates and lower judiciary who today deliberately set high bail for indigents to prevent their release would have an equal opportunity to obtain the detention of the poor, the friendless, and the Negro by labelling them "dangerous."

Even more critical, a proposal to substitute European individualized discretion for our present absolute right to bail would require us to reexamine our fundamental concepts of the criminal trial process in an adversary system. Any resolution of the detention problem involves an allocation of inescapable costs. Someone has to pay a price for the fact that we have to have a pretrial period between accusation and final adjudication. If defendants are kept locked up, the cost is borne by those among them who are innocent or prejudiced by the detention. If they are all released, society pays in those cases where the defendant flees or commits new crimes. In theory our system inclines to the second alternative. As Justice Jackson said, "the spirit of the [bail] procedure is to enable . . . [defendants] to stay out of jail until a trial has found them guilty"; the resulting danger to society "is a calculated risk which the law takes as the price of our system of justice."[18] It is true that these words of Justice Jackson sound a hollow and hypocritical note when they are read against the facts of day-to-day bail administration, for our law as actually administered puts most of the cost upon the shoulders of the poor who are detained and not upon society. But there is a value in unrealized ideals, and to close the gap between ideal and reality by abandoning the ideal is not a course lightly to be undertaken. The concept that accused persons should not be punished prior to a finding of guilty has deep

---

[16] Bratholm, *supra* note 15, at 342-43.
[17] *Id.* at 343.
[18] Stack v. Boyle, 342 U.S. 1, 7-8 (1951) (concurring opinion).

*CRISIS IN BAIL*

roots in our culture, with no fully comparable history in Europe, and under our adversary system we have felt it peculiarly appropriate that the accused have the opportunity of "searching for evidence and witnesses, and preparing a defense." [19]

This policy problem is further complicated by the ambiguous and uncertain status of bail in the federal constitutional system. Standing alone, the excessive bail clause of the eighth amendment poses puzzling questions of interpretation and historical analysis. In addition, as applied to indigents, any rights alleged under the eighth amendment overlap broader due process and equal protections claims inherent in the financial discrimination and prejudice of the bail system. If one indulges in the assumption that the present blatant financial discrimination of the bail system cannot long survive the current renaissance of interest in equal justice for the poor, then it makes a critical difference whether the Court finds a resolution of the problem in an interpretation which reads the eighth amendment as including a right to pretrial release or, on the other hand, bypasses the eighth amendment and fashions a less sweeping and more flexible remedy in the name of due process and equal protection. By the former holding the kind of solution which the Europeans have evolved would be constitutionally proscribed, but if the second path is followed we might well end up with a system almost indistinguishable from that of the continent.

Accordingly this article first examines in some detail the threshold question: does the eighth amendment import a right to bail? It is my thesis that the particular form in which the bail question appears in the Constitution is the result of an historical accident, and that the most plausible resolution of this constitutional riddle is to find an intention to grant such a right. Second, if one assumes a right to bail, what constitutional meaning is to be attached in the case of indigents to the requirement that such bail shall not be "excessive"? The third section poses a hypothetical case which raises the major constitutional questions to suggest the kinds of problems with which the courts will be faced during the next decade. Finally, we will consider some of the policy and administrative problems which would be created by either an eighth amendment or a due process-equal protection resolution of the discrimination question.

### I. The Eighth Amendment and Right to Bail

Recognition of the importance of bail in order to avoid pretrial imprisonment was a central theme in the long struggle to implement the promise of the famous 39th chapter of Magna Carta that "no

---

[19] *Ibid.*

freeman shall be arrested, or detained in prison . . . unless . . . by the law of the land." [20]    It is significant that three of the most critical steps in this process—the Petition of Right in 1628,[21] the Habeas Corpus Act of 1679,[22] and the Bill of Rights of 1689 [23]—grew out of cases which alleged abusive denial of freedom on bail pending trial.

*Darnel's Case* in 1627 [24] involved five knights who had been thrown in prison by Charles I and who brought an action for habeas corpus at the king's bench.    The return of the prison warden merely recited that Darnel "was and is committed by the special command of his majesty, &c." [25]    Serjeant Bramston opened for his client by stating that "it is his petition, that he may be bailed from his imprisonment . . . for it being before trial and conviction had by law, it is but an accusation, and he that is only accused ought by law to be let to bail." [26]    Counsel for another of the knights asked "how can the court adjudge upon this return, that Sir John Corbet ought be kept in prison, and . . . that he is not bailable?" [27]    The Attorney General argued [28] that the version of Magna Carta chapter 39, enacted in 1354 [29] upon which the petitioners relied did not apply to pretrial imprisonment.[30]    It was his position that only imprisonment pursuant to "final prosecution" must be "by due process of law"; the pretrial period "is not within the meaning of the statute." [31]    When the judges proved their subservience to the King by denying release, the case was taken up in Commons as soon as Parliament convened early the next year.    In the debates [32] which ensued during the preparation of the Petition of Right there was repeated discussion of the fact that, if the decision in *Darnel's Case* stood, it would impair the effectiveness of the Statute of Westminster the First of 1275 [33] which governed ad-

---

[20] The translation is that adopted in 1 CHAFEE, DOCUMENTS ON FUNDAMENTAL HUMAN RIGHTS 249, 251 (1963).

[21] 1628, 3 Charles 1, c. 1.

[22] 1679, 31 Charles 2, c. 2.

[23] 1689, 1 W. & M. st. 2, c. 2.

[24] 3 How. St. Tr. 1 (1627).

[25] *Id.* at 3.

[26] *Id.* at 6-7.

[27] *Id.* at 25.

[28] *Id.* at 39.

[29] 1354, 28 Edw. 3, c. 3: "Item, That no man . . . shall be . . . taken nor imprisoned . . . without being brought in answer by due process of the law." 1 CHAFEE, *op. cit. supra* note 20, at 254.   Note the first use of "due process of the law" for Magna Carta's "the law of the land."

[30] 3 How. St. Tr. at 39.

[31] *Ibid.*

[32] The entire proceedings appear in 3 How. St. Tr. 59-234, immediately following the report of *Darnel's Case.*

[33] 1275, 3 Edw. 1, c. 15.

mission to bail; thus Coke stated that "the cause of imprisonment must be known, else the statute will be of little force . . . ." [34]

It was against this background that the Petition of Right was adopted [35] and received from Charles I the grudging answer, "Soit droit fait come il est désiré par le Petition." [36]    Reciting the abuse of cases like that of Darnel, the Petition prayed that "no freeman in any such manner as is before mentioned, be imprisoned or detained" [37] and thereby brought the force of Magna Carta to bear upon pretrial imprisonment.

Not quite half a century later, on June 27, 1676, one Jenkes was arrested and imprisoned, apparently for inciting to riot in making a speech asking that Charles II be petitioned to call a new Parliament.[38] The charge was one which by statute required that Jenkes be admitted to bail, but on the following August 18 he was still trying in vain to get anyone to set and take his bail, and he was ultimately released only by an informal process.[39]    Cases such as Jenkes' in turn contributed to the enactment of the great Habeas Corpus Act of 1679, which recited that "many of the King's subjects have been and hereafter may be long detained in prison, in such cases where by law they are bailable . . . ." [40]    The act provided in great detail for an habeas corpus procedure which plugged the loopholes and made even the king's bench judges subject to penalties for noncompliance.

The Act of 1679 stopped the procedural runaround to which Jenkes had been subjected, but by setting impossibly high bail the judges erected another obstacle to thwart the purpose of the law on pretrial detention.    When, therefore, Parliament drew up a Bill of Rights which was accepted by William and Mary as they assumed the throne, one of the abuses by which the late King was alleged to have tried "to subvert . . . the laws and liberties of the kingdom" was that "excessive bail hath been required of persons committed in criminal cases, to elude the benefit of the laws made for the liberty

---

[34] 3 How. St. Tr. at 69.   Coke also invoked the Bible: "I will conclude with the highest authority, that is, 25 chap. of the Acts of the Apostles, the last verse, where St. Paul saith, 'It is against reason to send a man to prison without shewing a cause.'" *Ibid.*   See also *id.* at 74, 78, 87-88.

[35] *Id.* at 221-24.

[36] *Id.* at 230.

[37] *Id.* at 224, ¶ x.

[38] Jenkes' Case, 6 How. St. Tr. 1189, 1208 (1676).

[39] The King ordered his release on bail after the Lord Chief Justice, apparently suffering pangs of conscience because he believed bail "could not be denied," went to the Lord Chancellor, who sent him to the Lord Treasurer, who sent him to the King, who "immediately commanded that the laws should have their due course." *Id.* at 1207-08.

[40] 1679, 31 Charles 2, c. 2.

of the subjects." [41]   The remedy which followed was the language with which we are concerned: "That excessive bail ought not to be required . . . ." [42]

Two things stand out in this history. The first is that relief against abusive pretrial imprisonment was one of those fundamental aspects of liberty which was of most concern during the formative era of English law. The evils which were being combatted were obvious; as Jenkes said in one of his futile petitions:

> My Lord, I have been imprisoned since the 28th of June, to my great loss, charge, and prejudice of my health. I have hitherto been denied bail, Habeas Corpus and the Writ of Main-prize; which I am informed, were never before denied to any of his majesty's subjects in the like case . . . . I do not beg a discharge, for I desire nothing more than to clear my innocence by a public trial. [43]

His friends added that without bail "he might lie there all his life-time without trial, which no subject ought to do." [44]

We should note, second, that as the English protection against pretrial detention evolved it came to comprise three separate but essential elements. The first was the determination of whether a given defendant had the right to release on bail, answered by the Petition of Right, by a long line of statutes which spelled out which cases must and which must not be bailed by justices of the peace or (in the early period) by sheriffs, and by the discretionary power of the judges of the king's bench to bail any case not bailable by the lower judiciary. Second was the simple, effective habeas corpus procedure which was developed to convert into reality rights derived from legislation which could otherwise be thwarted. Third was the protection against judicial abuse provided by the excessive bail clause of the Bill of Rights of 1689.

The protective structure thus stands like a three-legged stool, but when the Americans strengthened and converted their English statutory legacy into constitutional dogma they unaccountably left off one of the legs. This is the heart of the federal constitutional problem. The principle of habeas corpus found its way into Article 1, section 9 of the Constitution, while the excessive bail language of the 1689 Bill of Rights was included in our eighth amendment. But the underlying right to the remedy of bail itself, which these enactments supplemented and guaranteed, was omitted.

---

[41] Bill of Rights, 1689, 1 W. & M., st. 2, c. 2, preamble, clause 10.
[42] Bill of Rights, 1689, 1 W. & M., st. 2, c. 2, rights, clause 10.
[43] 6 How. St. Tr. at 1205.
[44] *Id.* at 1206.

Thus removed from its English historical context and standing, as it is, incomplete and alone, the excessive bail clause of the eighth amendment represents some of the most ambiguous language in the Bill of Rights. It is susceptible of at least three interpretations:

(1) Bail cannot be demanded in an excessive sum in cases made bailable by other provisions of law, but the clause of itself imports no right to bail.[45] Such an interpretation reaches the extraordinary result of a constitutional provision being merely auxiliary to some other law, which in the federal system must be statutory. It requires one to believe that a basic human right would be deliberately inserted in a constitution in a form which permitted Congress to restrict it at will, or even to render the eighth amendment entirely moot by enacting legislation denying the right to bail in all cases. Such legislative power is consistent with the English theory of civil liberties, in which Parliament itself constitutes the ultimate authority from which there is no other protection, but would constitute an anomaly in the American Bill of Rights whose central concern was protection against abuse by Congress. The difficulty is compounded when it is recalled that the other clauses in the eighth amendment—no excessive fines and no cruel and unusual punishment—traditionally have been interpreted to protect against abuse of legislative but not of judicial discretion.[46]

This first interpretation, moreover, leaves the amendment meaningless in the absence of legislation establishing the scope of the right to bail. The problem of such a patently incomplete constitutional protection on the subject of bail led most states, therefore, to supplement the excessive bail clause by a clause granting the right to bail in all noncapital cases. The two clauses were first found side by side in the North Carolina Constitution of 1776 and the Pennsylvania Constitution of 1790, and the pattern was widely copied in other states in the nineteenth century.[47] The same anomaly would become acute in the federal system if the eighth amendment clause were held applicable to the states through the fourteenth amendment. Since the federal statutory right to bail could not be incorporated for this purpose, the Court would have to adopt one of the following alternative interpretations.

(2) Bail cannot be demanded in an excessive amount in cases in which the court sets bail, but in the absence of other statutory or

---

[45] See People *ex rel.* Shapiro v. Keeper of City Prison, 290 N.Y. 393, 49 N.E.2d 498 (1943).

[46] See Gallege v. United States, 276 F.2d 914, 918 (9th Cir. 1960); Papendrea v. United States, 275 F.2d 325 (9th Cir. 1960); United States v. Rosenberg, 195 F.2d 583 (2d Cir. 1952).

[47] See N.C. Const., Declaration of Rights, § x (Dec. 18, 1776); Pa. Const. art. ix, §§ 13, 14 (1790). See, *e.g.*, Conn. Const. art. 1, § 14; N.J. Const., art 1, ¶ 10.

constitutional restriction the court retains discretion to deny bail altogether.[48] This widely-held interpretation fails to give effective protection even against judicial action, let alone possible legislative abuse. By making the clause say to the bail-setting court that it may not do indirectly what it is, however, permitted to do directly—deny release—the clause is reduced to the stature of little more than a pious platitude. If this is what the clause means, any purported application of it to the states through the fourteenth amendment would in practice amount only to a meaningless formality.[49] Men such as George Mason and James Madison, who were primarily responsible for the draftsmanship of the eighth amendment, felt with intensity the importance of what they were doing. It is difficult to believe that as to bail they intended nothing more than to play games with words.

(3) The excessive bail clause implies a constitutional right to bail. This frequently stated interpretation has been reached by finding that as a necessary implication [50] or because of the difficulty of the alternatives posed above or, as suggested below, because it may be the interpretation most consistent with the historical evolution of the eighth amendment. One problem with this approach is that the precise scope of the "right" is undefined; for example, does it apply in capital cases, on appeal, or to allegedly especially dangerous offenders? Much more difficult is the obvious objection that if the founders intended by the eighth amendment to establish the right to bail in all or most cases, why did they not say so directly instead of clothing their purpose in ambiguity? They had ample colonial precedents for a forthright declaration of a right to bail, going back to the Massachusetts Body of Liberties in 1641. Indeed, only two years before the Bill of Rights was debated in Congress the Continental Congress had inserted as one of the protections enacted as part of the Ordinance to govern the Northwest Territory a bail guarantee which, omitting any reference to "excessive" bail, provided that "all persons shall be bailable, unless for capital offences, where the proof shall be evident, or the presumption great." [51] This language, in turn, found

---

[48] See Carlson v. Landon, 342 U.S. 524, 544-46 (1952) (alternative holding); State v. Konigsberg, 33 N.J. 367, 164 A.2d 740 (1960); *Ex parte* Voll, 41 Cal. 29, 31-32 (1871).

[49] For an example of such gamesmanship see Mastrian v. Hedman, 326 F.2d 708 (8th Cir.), *cert. denied*, 376 U.S. 965 (1964).

[50] *E.g.,* Carlson v. Landon, 342 U.S. 524, 554-58 (1952) (Black & Burton, JJ., dissenting). United States v. Motlow, 10 F.2d 657, 659 (7th Cir.) (Butler, Circuit Justice, 1926): "The provision forbidding excessive bail would be futile if magistrates were left free to deny bail."

[51] An Ordinance for the government of the Territory of the United States North-West of the River Ohio, July 13, 1787, art. ii.

its way into the Judiciary Act [52] which was debated in the first Congress concurrently with the debate on the proposed Bill of Rights.

While the paucity of direct evidence relevant to the enactment of the eighth amendment precludes a satisfactory historical answer to this interpretive riddle, much can be learned from an examination of how the precise language of the eighth amendment clause, and only this language, found its way to the floor of the first Congress. Contemporary American and English bail law is also significant in ascertaining the probable intention behind the use of the clause and is highly relevant to any attempt to accommodate the language of the amendment to the policy problems of current criminal administration.

## A. The First Congress and the Colonial Experience With Bail

The bail problem was before the first Congress in the spring and summer of 1789 in two separate legislative packages: the excessive bail clause as one of the proposed amendments to the Constitution, and section 33 of the Judiciary Act extending an absolute right to bail in all noncapital federal criminal cases. Madison first announced his intention of introducing constitutional amendments in the House on May 4,[53] actually proposed them on June 8,[54] and reintroduced them on July 21.[55] The House sent seventeen proposed amendments to the Senate on August 24 [56] and on September 21 concurred in the Senate's action reducing the number of amendments to twelve.[57] Meanwhile the Judiciary Act was drafted in a Senate committee between April 7 and June 12,[58] passed the Senate July 17,[59] was debated in the House on August 29 and 31 [60] and, after some negotiation between the two branches, was finally completed with Senate passage on September 29.[61]

Both the amendments and the Judiciary Act were controversial and were related, at least as perceived by opponents of the establish-

---

[52] 1 Stat. 91, § 33 (1789). Substantially the same provision now appears in FED. R. CRIM. P. 46.

[53] 1 ANNALS OF CONG. 247 (1789-91) (pagination in citations to the ANNALS in this article is that found in the version known as 1 DEBATES & PROCEEDINGS IN THE CONGRESS OF THE UNITED STATES: 1789-1791 (1834)). For a discussion of this session of Congress see RUTLAND, THE BIRTH OF THE BILL OF RIGHTS 197-215 (1955) [hereinafter cited as RUTLAND].

[54] 1 ANNALS OF CONG. 424, 433-36 (1789-91); RUTLAND 206-07.

[55] RUTLAND 206-07.

[56] RUTLAND 209.

[57] RUTLAND 215. These were submitted to the states, and ten of them received the necessary approval and came into effect in 1791. *Id.* at 233 & n.1.

[58] 1 ANNALS OF CONG. 18, 46 (1789-91).

[59] *Id.* at 50.

[60] *Id.* at 796-833.

[61] *Id.* at 92, 93.

ment of a system of lower federal courts who sought both to obtain an amendment negating such a system and to defeat the plan in the Judiciary Act.[62] But most of the vigorous debate on the Bill of Rights turned on the question of whether or not any amendments at all were needed and the House debate on the Judiciary Act was almost entirely concerned with the lower federal court proposal.[63] Debate on the merits of particular proposals in either legislation was otherwise meagre or absent. As to bail there is no record of any debate in either House or Senate on the right to bail provision of the Judiciary Act, and there are only a few lines in the House record [64] and nothing in the Senate's as to the excessive bail amendment.

In short, I have found nothing to indicate that anyone in Congress recognized the anomaly of advancing the basic right governing pretrial practice in the form of a statute while enshrining the subsidiary protection ensuring fair implementation of that right in the Constitution itself. Each bail provision was enacted as originally proposed, on the one hand, by Madison, and on the other, by the Senate committee. There is no evidence in Madison's speech in the House on June 8, in which for the first time he revealed the proposed content of the Bill of Rights, that he had any knowledge of what the Senate committee was about to recommend on the subject of bail. It is equally unlikely that the Senate committee, which had already been working for two months on the Judiciary Act and which reported its draft bill only four days after Madison's speech, was influenced in drafting its bail proposal by either that speech or by any knowledge that a constitutional amendment on the subject might be enacted at some indefinite time in the future. Whereas in June even the desirability of any bill of rights was uncertain, passage of a judiciary act was recognized as an immediate necessity.[65] There is, therefore, no evidence in the concurrent consideration of the Bill of Rights and Judiciary Act of any deliberate congressional intention to exclude a right to bail under what became the eighth amendment.

Even if what happened in Congress in 1789 is not helpful in resolving the anomaly of the eighth amendment, we are fortunate in

---

[62] See Warren, *New Light on the History of the Federal Judiciary Act of 1789*, 37 HARV. L. REV. 49, 123 (1923).

[63] 1 ANNALS OF CONG. 796-809, 812-15, 825-65 (1789-91).

[64] *Id.* at 754; see text accompanying note 121 *infra*.

[65] See the remarks of Congressman William Smith on August 13:

The Constitution establishes three branches to constitute a whole; the Legislative and Executive are now in existence, but the Judicial is uncreated. While we remain in this state, not a single part of the revenue system can operate; no breach of your laws can be punished; illicit trade cannot be prevented.

1 ANNALS OF CONG. 705 (1789-91).

*CRISIS IN BAIL*

having other evidence which goes far to explain how this curious development occurred. Just as the right to bail statute and the excessive bail amendment were apparently independently conceived and considered in the Congress, they were the products of two entirely different chains of historical development.

The first of these separate chains was the background English history to which we have already made reference. By the time of the American revolution, English bail law was a tangled morass. The basic Statute of Westminster the First of 1275 [66] provided a detailed enumeration of what offenses sheriffs must bail or could not bail and remained the basic guideline "for five centuries and a-half." [67] It represented a reaction against abuses which had developed under earlier law which gave sheriffs discretion whether or not to admit to bail.[68] In succeeding centuries many additional statutes were piled one upon another as the power to bail was transferred from the sheriff to the justice of the peace and as Parliament sought to check illegal bailing of nonbailable offenders.[69] Such English bail statutes were important matrices in the struggle which shaped our criminal procedure.[70] As we have already noted, the detailed statutory pattern was reinforced by the Petition of Right, the Habeas Corpus Act and the excessive bail clause of the 1689 Bill of Rights.

This confusing legislative patchwork quilt was not discarded until well into the nineteenth century, when by 7 Geo. 4, c. 64, and 11 & 12 Vict., c. 42, s. 23, all prior legislation was repealed and, in a major modification of policy, the justices of the peace were given discretionary power to grant or deny bail in all felonies or common law misdemeanors.[71] But at the time of the enactment of the eighth amendment the basic pattern was legislation which either required the justice

---

[66] 1275, 3 Edw. 1, c. 12.

[67] 1 STEPHEN, A HISTORY OF THE CRIMINAL LAW OF ENGLAND 236 (1883). For the purposes of this article the term "bail" is used for any release on security without regard to the ancient distinctions among bail, mainprise or the writ *de odio et atia.* See 2 POLLOCK & MAITLAND, THE HISTORY OF ENGLISH LAW BEFORE THE TIME OF EDWARD I 587-90 (2d ed. 1898). As to the very early origins of the procedure, see DE HAAS, ANTIQUITIES OF BAIL (1939).

[68] 1 STEPHEN, *op. cit. supra* note 67, at 236. For the importance of the sheriff's judicial role in the 13th century, see STENTON, ENGLISH JUSTICE BETWEEN THE NORMAN CONQUEST AND THE GREAT CHARTER 1066-1215, at 80-82 (1964).

[69] 4 HOLDSWORTH, A HISTORY OF ENGLISH LAW 526-28 (3d ed. 1945) ; 1 STEPHEN, *op. cit. supra* note 67, at 235-37.

[70] *Id.* at 237. For example, we have already noticed that the evolution of habeas corpus was closely tied to abuses of bail law. The bail legislation of 1486 was part of the tightening up on judicial administration which included the creation of the Star Chamber, and an act touching bailment of persons, 1554, 12 Phil. & M., c. 13, a statute designed to guard against collusion in granting bail, for the first time made provision for what became the preliminary hearing.

[71] *Id.* at 238.

to admit to bail or to deny it. There were two exceptions to this nondiscretionary policy. One was the fact that during the proliferation of statutes after 1275 there crept in a third category of cases, described by Blackstone as "of a dubious nature," which "seem to have been in the discretion of the justices, whether bailable or not." [72] Second, the statutes all related to the bailing power of the justice of the peace or, in very early times, the sheriff. Cases which the justices were forbidden to admit to bail were apparently always bailable in the discretion of a higher judge or court such as the king's bench; [73] in any event that power was settled by the Petition of Right of 1628 and in the Parliamentary debate of that year it was stated that this discretionary power to bail even the most serious cases "the constant practice hath been anciently and modernly to bail men . . ." [74]

When one turns to prerevolutionary America the English statutory pattern was in force in at least some of the colonies. [75] In New York, the Charter of Liberties and Privileges of 1683 incorporated a right to bail which excepted "treason or felony plainly and specially Expressed and menconed in the Warrant . . ." [76] As this limitation is taken almost verbatim from the Habeas Corpus Act's clause excepting the same class from the act, and as its reenactment in 1691 expressly referred to English bail law, [77] it serves as another indication of the interrelationship of English and some colonial legislation.

---

[72] 4 BLACKSTONE, COMMENTARIES 296 (1st Am. ed. 1772).

[73] 1 STEPHEN, *op. cit. supra* note 67, at 243.

[74] *Proceedings in Parliament relating to the Liberty of the Subject*, in 3 How. St. Tr. 59, 154 (1628).

[75] 2 Statutes at Large of S.C. 452, 481 (Cooper 1837) (enacting basic English bail statutes, for example Bail Act, 1487, 3 Hen. 7, c. 3; Bailment of Persons Act, 1554, 1 & 2 Phil. & M., c. 13) ; see Keith v. Barton, 2 Hill 214 (S.C. 1834). In Georgia, the Statute of Westminister First of 1275, 3 Edw. 1, c. 15, was declared in force in a codification of SCHLEY, A DIGEST OF THE ENGLISH STATUTES OF FORCE IN THE STATE OF GEORGIA 83 (1826), and presumably was regarded as in force during the colonial period. Several basic English bail statutes were included in the Province of North Carolina Act of 1749 "to put in Force in this Province" many English statutes. See Brown, *British Statutes*, in AMERICAN LAW 1776-1836, at 360, 366, 368 (1964). The North Carolina Act, however, was disallowed by an order in council. *Id.* at 17.

[76] 1 N.Y. COLONIAL LAWS 111, 114 (1894).

[77] Act Declaring Rights and Privileges, May 13, 1691, in *id.* at 244, 247, qualified the limitation of the English Habeas Corpus Act, 1679, 31 Charles 2, c.2, by adding the following language: "and that the fellony be such as is restrained from Bayle by the Law of England."

As to the confused status of these charters in colonial New York see BRADFORD, LAWS AND ACTS OF THE GENERAL ASSEMBLY FOR THEIR MAJESTIES PROVINCE OF NEW YORK at cxii (Fowler facsimile ed. 1894) :

   The act [of 1691] itself, like its predecessor, the celebrated "Charter of Libertys" of 1683, was finally vetoed by the crown, but without seriously curtailing the liberties of the people, or altering the constitution of the province, already settled on the basis of English public law.

See also 1 HAMLIN & BAKER, SUPREME COURT OF JUDICATURE OF THE PROVINCE OF NEW YORK 1691-1704, at 378-89 (1959) ; they quote from another source that a reason

By far the most significant thing about the colonial experience, however, was an entirely indigenous development which deviated sharply from English precedent and which ultimately produced the language of the Judiciary Act adopted by the first Congress. This stream goes back to the Massachusetts Body of Liberties in 1641, which included the following provision:

> 18. No mans person shall be restrained or imprisoned by any Authority what so ever, before the Law hath sentenced him thereto, If he can put in sufficient securitie, bayle or mainprise, for his appearance, and good behavior in the meane time, unlesse it be Crimes Capital, and Contempts in open Court, and in such cases where some expresse act of Court [*i.e.* legislature] doth allow it.[78]

Where this major bench mark in American bail history came from appears to be a mystery; there was certainly nothing like it in England. According to Winthrop, the Body of Liberties resulted from the desire to substitute "positive laws" for those cases in which the magistrates "might proceed according to their discretions." [79]   The clause was reenacted in 1648 as part of the first comprehensive codification in the colony.[80]

The Massachusetts pattern reappeared in numerous forms along the way to the first Congress of 1789. In 1682 it was stated in the fundamental law of Pennsylvania [81] in a form which reappeared in North Carolina in 1776 [82] and later was widely copied in 19th century state constitutions: "That all prisoners shall be bailable by sufficient sureties, unless for capital offences, where the proof is evident, or the presumption great . . . ."

In the decade immediately preceding debates in the first Congress, the Massachusetts influence appeared again in two important acts. In the fall of 1776 the Virginia legislature ordered a complete "revisal"

---

for the royal disallowance of the 1691 charter was that it gave too great and unreasonable privileges to the province. *Id.* at 385 n.196. In 1853 it was held that the 1683 charter was not in force in New York, but with some implication that the 1691 charter survived the English disallowance. See Van Winkle v. Constantine, 10 N.Y. 422, 427-28 (1853).

[78] *Massachusetts Body of Liberties*, in Massachusetts Colonial Laws 37 (Whitmore ed. 1887). For a recent construction of this clause, which is still in force in Massachusetts, to permit discretion in granting bail in capital cases see Commonwealth v. Baker, 343 Mass. 162, 177 N.E.2d 283 (1961).

[79] Quoted in Haskins, Law and Authority in Early Massachusetts 36 (1960). Winthrop specifically wished "a body of grounds of laws, in resemblance to a Magna Charta, which . . . should be received for fundamental laws." *Ibid.*

[80] Laws and Liberties of Massachusetts of 1648, at 28 (Farrand ed. 1929).

[81] *Laws Agreed Upon in England, May 3, 1682*, in Proceedings Relative to Calling the Conventions of 1776 and 1790, at 26, 28 (1825).

[82] N.C. Const. Declaration of Rights § x (Dec. 18, 1776).

of its laws [83] to adapt them "into conformity with republican principles," [84] and delegated the task to a small committee of which Jefferson was a member.[85]   As part of this work Jefferson drafted a bill which entirely eliminated any judicial discretion as to whether bail should be granted "if the crime be punishable in life or limb, or if it be manslaughter, and there be good cause to believe the party guilty thereof, he shall not be admitted to bail; all other cases are bailable." [86]   Another bill in the "revisal" was an act "for Proportioning Crimes and Punishments in Cases Heretofore Capital," [87] in which Jefferson propounded his occasionally strangely repressive and sometimes brilliantly radical proposals for criminal law reform.[88]   Read together, the two bills provide a comparatively liberal bail structure. Aside from treason and murder, where capital punishment was retained, statistically important crimes like burglary, housebreaking, all forms of larceny and horsestealing were made noncapital and thereby bailable.   Jefferson had some strange notions about rape, sodomy and maiming of which he later recanted,[89] and whether these offenses were

[83] For an account of this activity, the text of the proposed statutes and their disposition in the legislature see 2 THE PAPERS OF THOMAS JEFFERSON 305-665 (Boyd ed. 1950).

[84] *Id.* at 305.

[85] The committee first met in January, 1777 to divide up the work.   Jefferson, *Autobiography*, in 1 WRITINGS OF THOMAS JEFFERSON 1, 58 (Ford ed. 1892).   Two years later the members came together with their products and "meeting day by day, we examined critically our several parts, sentence by sentence, scrutinizing and amending until we had agreed on the whole." *Id.* at 61.   The committee's report, with full notes and annotations, is published in 2 THE PAPERS OF THOMAS JEFFERSON 305-665 (Boyd ed. 1950).   Originally there had been five members of the committee, but two withdrew and "Jefferson was nominally and actually the leading figure in the revisal." *Id.* at 313.   The "revisal" is an extraordinary document of legislative reform, all the more remarkable when one considers that Jefferson had no budget, no research assistants or advisory committees, and that during these same two years he was involved in the day to day work of the Virginia legislature where his legislative "accomplishment . . . was astonishing.   He was in himself a veritable legislative drafting bureau." *Id.* at 306.   The "revisal" is most widely known for its Act for Establishing Religious Freedom, *id.* at 545, its democratization of descent law, *id.* at 391-93 (abolishing primogeniture) and its proposals on education, *id.* at 526 (free public elementary schools for all children), *id.* at 535 (transformation, complete with proposed curriculum, of William and Mary College into a university), *id.* at 544 (public library, really a center for advanced study and research, to be created at Richmond).   These projects have overshadowed many important proposals for reform of civil law, *e.g.*, *id.* at 626 (legal aid) and criminal law and procedure with which much of the "revisal" was concerned.   *E.g.*, *id.* at 103 (criminal procedure); notes 86-87 *infra*.

[86] *Id.* at 481.

[87] *Id.* at 492-507.   Unlike most of the rest of the "revisal," Jefferson appended to this bill numerous annotations and comments.

[88] *Compare* the proposals for hanging and then gibbeting some murderers, *id.* at 495, or castrating, *inter alia*, those guilty of polygamy, *id.* at 497, *with* the abolition of the felony murder rule, *id.* at 496, the cogent reasons advanced for the abolition of suicide and bestiality as crimes, *id.* at 496-97, the rejection of the English statute which made concealment by the mother of the death of a bastard child murder, *id.* at 494, and the general moderation of the penalties substituted for capital punishment.

[89] On the provision of the lex talionis for these crimes Jefferson later wrote: "How this last revolting principle came to obtain our approbation, I do not remember." Jefferson, *Autobiography*, in 1 WRITINGS OF THOMAS JEFFERSON 1, 60 (Ford ed. 1892).

intended to be bailable depended upon whether, for example, cutting through the cartilage of the nose "a hole of one half inch diameter at the least" constituted a crime punishable in life or limb" (and thereby non-bailable).[90]

This Virginia "revisal of the laws" did not reach the Virginia legislature until 1785. Jefferson being out of the country, Madison introduced the bills [91] and was thus acquainted at first hand with the liberal, nondiscretionary approach to bail which characterized this stream of colonial development. Many years later Jefferson paid tribute to "the unwearied exertions of Mr. Madison" in steering the revision through the legislature "in opposition to the endless quibbles, chicaneries, perversions, vexations and delays of lawyers and demi-lawyers . . . ." [92] The end result was anomalous: the bail bill was adopted but the crimes act defeated in the House by a single vote,[93] leaving a bail provision designed to be broad rather restrictive instead.

In 1787 this preconstitutional liberal trend culminated in the Continental Congress with the adoption of the Northwest Ordinance, to which we will return in a moment, guaranteeing an absolute right to bail in noncapital cases in terms identical to those used in Pennsylvania in 1682.[94]

By the time of the first Congress, then, American experience had gone far beyond contemporaneous English law in the scope given the right to bail.[95] Haskins' comment about the significance of the bail provision in the Massachusetts Body of Liberties is equally applicable to Pennsylvania and the Virginia Revision: "In the simplicity of its administration, as well as in the protection that it afforded to the accused, the colonial practice was certainly far in advance of the English." [96] This in turn was part of a broad humanization of the criminal law which ran far ahead of contemporaneous English thought and practice. This liberalization was not just the example of a Jefferson who was decades if not centuries ahead of his own time [97]

---

[90] 2 PAPERS OF THOMAS JEFFERSON 497 (Boyd ed. 1950).

[91] *Ibid.*

[92] Jefferson, *Autobiography,* in 1 WRITINGS OF THOMAS JEFFERSON 1, 62 (Ford ed. 1892).

[93] 2 THE PAPERS OF THOMAS JEFFERSON 481, 506 (Boyd ed. 1950). Madison wrote Jefferson that "The rage against Horse stealers had a great influence on the fate of the [crimes] Bill. Our old bloody code is by this event fully restored. . . ." *Id.* at 506.

[94] See note 51 *supra.*

[95] There may be other colonial material which I have not been able to find, but this analysis is persuasive in view of the well established trends in the major colonies of Massachusetts, Pennsylvania and Virginia.

[96] HASKINS, *op. cit. supra* note 79, at 199.

[97] *Compare, e.g.,* 2 PAPERS OF THOMAS JEFFERSON 496 (Boyd ed. 1950) (Virginia "revisal" proposal to abolish the felony murder rule by abrogating transferred intent), *with* British Homicide Act of 1957, 5 & 6 Eliz. 2, c. 11, § 1.

but was characteristic of influential colonial opinion. The Quaker leadership of Pennsylvania won world-wide renown for their progressive leadership in penology, while in Massachusetts

> . . . no more striking or important example of the influence of Puritan beliefs upon the law can be found than in the procedures developed for dealing with criminal offenses. The evidence of the court records provides notable illustrations of the extent to which the magistrates directed the criminal law of the colony away from traditional concepts of retribution which permeated English criminal law, toward practices which emphasized moral persuasion in order to reform the offender. . . . The colonial laws . . . prescribed relatively mild punishments for crimes such as theft and burglary for which many hundreds of Englishmen were sent to the gallows every year.[98]

Equally striking are the opposing tendencies in English and American law with regard to the amount of discretion extended to the judiciary in the determination of right to release on bail. We have seen in England a movement from the legislation of 1275 which, reacting against abuse of discretion, imposed upon the lower judiciary a nondiscretionary pattern, through centuries in which there was a slow accretion of some discretionary power, with an ultimate substitution in the nineteenth century of a broad judicial discretion in place of legislative definition of the scope of the right. By the time this last stage had been reached, America had moved so far in the other direction that, usually by explicit state constitutional provision or, as in the federal system, by statute, the right to bail had become absolute in all noncapital cases. Thus Jefferson's Virginia bill was explicit in depriving the justice of all discretion, providing punishment if he "let any go at large, on bail, who is not bailable, or refuse to admit to bail any who have right to be so admitted . . . ."[99] At the time of the first Congress, the American trend towards a fixed absolute right was already well advanced, but the significant change in England towards discretion was still largely in the future.

In the light of this history on both sides of the Atlantic, statements such as the following by the New Jersey Supreme Court are incomprehensible: "At common law . . . in this country . . . the grant of bail in

---

[98] HASKINS, *op. cit. supra* note 79, at 204, 211. But of course the Massachusetts pattern cannot be characterized as "humanitarian in any modern sense," for the "colonial laws extended the penalty of death to several offenses" not so punished in England. The crimes taken off the death list, however, were those which numerically were most frequent.

[99] 2 THE PAPERS OF THOMAS JEFFERSON 481 (Boyd ed. 1950).

all cases rested in the discretion of the courts." [100]   The only authorities
cited for this proposition were three cases involving capital offenses.
Similarly barren of relevant authority are comparable declarations in
California [101] and New York.[102]  In *Carlson v. Landon*, a 5-4 majority
of the Supreme Court held that alien communists under deportation
charges are not entitled to bail under the eighth amendment.[103]   The
rather cavalier paragraph by which the majority disposes of the issue
is ambiguous.  It concludes only that the amendment "does not require
that bail be allowed under the circumstances of these cases," but
earlier the Court implied that in any event the excessive bail clause
does not confer a right to bail in ordinary criminal prosecutions.   The
court states that the English excessive bail clause "has never been
thought to accord a right to bail in all cases, but merely to provide
that bail shall not be excessive in those cases where it is proper to
grant bail."  Aside from the misleading use of the word "proper,"
as if the court regarded propriety as a judicially instead of legislatively
determined factor, the authority cited to support the statement indicates
that the majority misunderstood English bail law as it then existed.
For this sentence the Court referred to the section of an 1824
English bail treatise which dealt with the common law powers of the
court of king's bench to bail in their discretion offenses made non-
bailable by statute.[104]   Of course this discretionary power to afford
relief for meritorious but nonbailable cases is entirely irrelevant to the
issue of what relationship may exist between an excessive bail clause
and the right to bail.  This misconception about the relative distribution
of bail power among the various English courts and the fact that
American courts seem not to have realized that the bail powers of the
justices of the peace have been largely discretionary only since 1826
may be responsible for the error of assuming English bail law always
to have been discretionary.[105]

---

[100] State v. Konigsberg, 33 N.J. 367, 370, 164 A.2d 740, 742 (1960).

[101] *Ex parte* Voll, 41 Cal. 29, 31-32 (1871).

[102] People *ex rel.* Shapiro v. Keeper of City Prison, 290 N.Y. 393, 49 N.E.2d
498 (1943).  The court held that N.Y. Code Crim. Pro. § 553, providing that bail
is discretionary in felony cases, was constitutional notwithstanding an excessive
bail clause in the New York Constitution.  The discretionary power to deny bail
under this statute, however, has been very narrowly construed in New York.  See
*New York Bail Study* 697-98.

[103] Carlson v. Landon, 342 U.S. 524, 545-46 (1952).

[104] PETERSDORFF, A PRACTICAL TREATISE ON THE LAW OF BAIL (1824).  The
Court's citation, 342 U.S. at 545 n.43, is to page "483 *et seq.*"  At 483-87 is the
section on the powers of the court of king's bench.  Petersdorff's summary of the
applicable statutory law is at 475-82.

[105] Of course it is with the period prior to 1826, when bail power was substantially
not discretionary, with which we are exclusively concerned in trying to ascertain the
intention of our first Congress.

### B. *The Unknown Social History of Bail*

How well a bail system works in effectuating the policy of releasing defendants prior to conviction cannot be ascertained from reading constitutions, statutes, and cases. A future historian who had only such sources available to him in trying to ascertain what was actually going on today would be completely misled, for although our paper rights cast us in a very liberal light, our practice is in fact quite repressive. What we need is a social history of bail which would allow us to compare actual pretrial practices in relevant periods of history. Such data does not exist and cannot be reconstructed. All we can find are hints from which we guess how much risk society really took and how the costs of a pretrial administration were actually allocated between the defendant and the state in any given period. But such guesses are hazardous. The Statute of Westminster the First, which provided a substantial list of offenses which were bailable even though together with a longer enumeration of nonbailable crimes, also suggests at least a certain liberality. Indeed, our "historical evidence" indicates that in England in the thirteenth and fourteenth centuries pretrial detention was actually rarely utilized.[106] It is difficult, however, to draw any useful conclusions from these facts about how early English bail policy actually worked in practice. Not only were most of the seriously accused excluded because of the proliferation of capital crimes, but primitive procedures for dealing with persons accused removed many more from the pretrial population. In 1275 both outlawry [107] and the hue and cry were still extant; in the thirteenth century "this [hue and cry] barbaric justice is ridding England of more malefactors than the king's courts can hang." [108] Under either of these procedures the

---

[106] 2 Pollock & Maitland, History of English Law 584 (2d ed. 1898): "It was not common to keep men in prison. This apparent leniency of our law was not due to any love of an abstract liberty. Imprisonment was costly and troublesome. . . . [and] there were many ways out of it. . . . The sheriff did not want to keep prisoners; his inclination was to discharge himself of all responsibility by handing them over to their friends." *Ibid.*

[107] For a discussion of "outlawry" see *id.* at 580-81.

[108] *Id.* at 579.

When a felony is committed, the hue and cry (*hutesium et clamor*) should be raised. . . . The neighbours should turn out with the bows, arrows, knives, that they are bound to keep and, besides much shouting, there will be horn-blowing; the "hue" will be "horned" from vill to vill.

Now if a man is overtaken by hue and cry while he has still about him the signs of his crime, he will have short shrift. Should he make any resistance, he will be cut down. But even if he submits to capture, his fate is already decided. He will be bound, and, if we suppose him a thief, the stolen goods will be bound on his back. He will be brought before some court (like enough it is a court hurriedly summoned for the purpose), and without being allowed to say one word in self-defence, he will be promptly hanged, beheaded or precipitated from a cliff, and the owner of the stolen goods will perhaps act as an amateur executioner.

*Id.* at 578-79.

question of what to do with a man between arrest and trial was entirely moot, because there was no pretrial period to speak of and virtually no trial, the culprit being hustled to his death in short order. Society can perhaps afford the luxury of a liberal bail procedure if it is certain that all the really dangerous and obviously guilty defendants have been hanged first. In any event, even more than today, bail legislation on the statute books probably bore little relation to the actualities of practice.

Emphasis has been given above to the importance of the Massachusetts Body of Liberties of 1641 in that it deviated from and liberalized English bail law. But the theoretical liberality of that 1641 bail statute should not be overdrawn. Massachusetts punished with death and therefore made nonbailable the offenses of

> idolatry, witchcraft, blasphemy, bestiality, sodomy, adultery, rape, man stealing, treason, false witness with intent to take life, cursing or smiting a parent, stubbornness or rebelliousness on the part of a son against his parents, and homicide committed with malice prepense, by guile or poisoning, or suddenly in . . . anger or cruelty or passion.[109]

Here Massachusetts did soften the more barbaric law of England— most notably, the list of capital offenses omits burglary, robbery and larceny while its oddities can be explained by an examination of the book of Deuteronomy to which the Puritans were so devoted. But it would be fallacious to compare the Massachusetts statute with contemporary provisions using almost identical language. Social conditions doubtless made it much harder in fact for an accused to flee the jurisdiction, probably detention facilities were inadequate, and the general immobility of the population imposed risks on society of a very different order.

However, there is some Massachusetts data suggesting that the liberality of the written law was reflected in practice although the details of actual administration are substantially unknown. The published records of some seventeenth century Massachusetts courts indicate that it was routine to release pending trial defendants charged with such serious and sometimes capital offenses as: burglary, theft, aggravated assault and battery, attempted rape, bigamy, fornication and bastardy (the favorite offenses of that colony at that time), arson, infanticide, manslaughter and blasphemy.[110] Some New York records

---

[109] Haskins, *op. cit. supra* note 79, at 145-46.

[110] A particularly useful and vivid account of lower court practice in Massachusetts is Colonial Justice in Western Massachusetts (1639-1702): The Pynchon Court Record (J. Smith ed. 1961). For references to pretrial release see *id.* at 151, 153, 281 (burglary), 292 (aggravated assault and battery), 316 (theft), 389-90 (at-

suggest similar liberality, for example, release in cases of sedition, riot, treason, theft and murder, together with one instance of bail pending appeal following imposition of the death sentence.[111]   There are scattered instances of pretrial practice in the court records of other colonies, and the frequent declarations of forfeiture also attest to a common pattern of pretrial release.[112]   When bond was required commital to jail was the alternative to putting up the required security; but in the great majority of instances cited, the record shows that the accused was actually released.   While these colonial practice materials which have been available to me are fragmentary, I have found in them no indication of anything other than liberal administration of the relatively liberal colonial laws.   They constitute some evidence of the attitude which the former colonists brought with them to independence and constitution-making.

## C. The Virginia Declaration of Rights

It is probably not surprising that for nearly ninety years after Parliament had enacted the English Bill of Rights there appears to have been no reference to excessive bail in any American legislation. The charter-making period of colonial history had been completed by the end of the seventeenth century and in any event the colonists, as British subjects, assumed they were protected by the principles of such basic English legislation as Magna Carta, the Habeas Corpus Act, and the Bill of Rights.[113]   In any event, the excessive bail proviso of the

tempted rape?).  See also 2 Maine Province & Court Records (Libby ed. 1931), at 104-05 (stealing), 424 (bigamy) ; 3 Maine Province & Court Records (Moody ed. 1947), at 65 (perjury), 258 (murder), 258-59 (attempted rape of nine year old girl), 273 (assault) ; 4 Maine Province & Court Records (Allen ed. 1958), at 282 (theft), 288-89 (attempted rape?), 310-11 (bond pending appeal), 341 (fornication, bastardy), 341-42 (manslaughter?), 373-74 (infanticide) ; *Records of the Suffolk County Court 1671-80*, in 29 Publications of the Colonial Society of Massachusetts (1933), at *e.g.*, 86-87 (blasphemy), 150 (bigamy), 310 (theft).

[111] 1 Hamlin & Baker, *op. cit. supra* note 77, at 60 n.51, 169 n.66 (murder), (theft), 287-89 (practice of courts in hearing bail cases), 307 (pending appeal of death sentence) ; 2 Hamlin & Baker, Supreme Court of Judicature of the Province of New York 1691-1704, at 110-12 (1959), 246-48 (riot), 289 (treason) ; 3 Hamlin & Baker, Supreme Court of Judicature of the Province of New York 1691-1704, at 49 (1959) (sedition).

[112] Court Records of Kent County, Delaware 1680-1705 (1959), at 294-95 ; Court Records of Prince Georges County, Maryland 1696-1699 (1964), at 460 (maiming) ; 2 Rhode Island Court Records 1662-1670 (1922), at 13, 37, 52 ; The Superior Court Diary of William Samuel Johnson 1772-1773 (Farrell ed. 1942) (Connecticut), at xliii (counterfeiting, etc.).

References to forfeitures appear in the sources cited in notes 110-11 *supra*.  See, *e.g.*, 2 Hamlin & Baker, *op. cit. supra* note 111, at 288; *Records of the Suffolk County Court, supra* note 111, at 183, 442, 478 (remission), 409 (fornication and bastardy, surety charged also with support of child).

[113] See, *e.g.*, resolutions 5-7 of the *Declaration and Resolves of the Continental Congress, Oct. 14, 1774*, in 1 Journals of the Continental Congress, 1774-89 63-73 (Wash. 1904) (assuming protection from English law).

1689 Bill of Rights was merely one segment of the English history, and we have already noted that the preamble of this clause makes it abundantly clear that its only purpose was to shore up the enforcement of preexisting rights to bail. The relatively subsidiary importance of the clause in English law is illustrated by Blackstone's relegation of it to a single sentence buried in the middle of a five-page chapter on bail.[114]

But in June of 1776, less than a month before the proclamation of the Declaration of Independence in Philadelphia, the Virginia legislature enacted the famous Virginia Declaration of Rights, and here for the first time, as clause nine, appeared the language taken from the English Bill of Rights: "That excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." With the substitution of "shall not" for "ought not to be," this is the wording of the eighth amendment. Aside from the obvious inference to be drawn from the identity of language, the path from Williamsburg in 1776 to the Congress in 1789 can easily be traced. The Virginia Declaration exercised a magnetic force, and its ninth section was incorporated in the Revolutionary period constitutions of Maryland, Delaware, North Carolina, Georgia and Massachusetts. It was in Virginia, moreover, that one of the most vigorous fights developed in the struggle over ratification of the Constitution. By the time of the Virginia debate the Constitution had been ratified without qualification in six states; three others, Massachusetts, South Carolina and New Hampshire, had coupled ratification with strong recommendations for the adoption of certain amendments as a bill of rights. These did not, however, make any reference to bail. This latter procedure was adopted in Virginia, whose convention recommended a bill of rights closely following the language of their earlier Declaration of Rights, including the excessive bail clause. The subsequent ratifications by New York, North Carolina and Rhode Island included the same recommendation. When Madison rose in the House of Representatives a year later to propose the amendments which became the Bill of Rights he took the excessive bail language exactly as it had been recommended by the Virginia Convention, which in turn had taken it verbatim from the 1776 Declaration.

---

[114] As made available to the colonists in the first American edition of Blackstone, published in Philadelphia in 1772, the sentence reads:

> And lest the intention of the law should be frustrated by the justices requiring bail to a greater amount than the nature of the case demands, it is expressly declared by statute [Bill of Rights, 1689] 1 W. & M. st. 2, c. 1. that excessive bail ought not to be required: though what bail shall be called excessive, must be left to the courts, on considering the circumstances of the case, to determine.

4 BLACKSTONE, COMMENTARIES 294 (1st Am. ed. 1772).

### D. The Role of George Mason

The man who wrote both the Declaration of Rights in 1776 and the amendments proposed to Congress by the Virginia ratification convention in 1788 was George Mason, one of the unsung heroes of the revolutionary era.[115]  As the evidence is persuasive that the excessive bail language of the Declaration was carried forward into the Bill of Rights without further thought or analysis after it left Mason's hands, his role is one of critical importance in understanding the original objective of these few words.

There was little about Mason which would have foretold his creative genius in fashioning our constitutional law.  Although educated in the library of a lawyer uncle which included a generous share of law books and although he served for many years as a lay justice for Fairfax County, he had no technical training or experience as a lawyer.  He was preoccupied with raising nine young children after the death of his wife and with managing a 5,000-acre plantation just down river from Mount Vernon with 500 slaves who not only produced and shipped out tobacco and wheat but also made the plantation almost entirely self-sufficient in such matters as food, liquor, lumber, clothing and shoes.  His correspondence was mostly about his immediate concerns: running the plantation, requisitioning supplies and powder for the militia, promoting the development of western land, collecting his debts or getting his debtors thrown in jail, riding to hounds or hunting deer in his private game preserve with his neighbor, George Washington, and protecting the Potomac from marauding robbers or scavenging British naval parties.  Throughout his life he shunned public office, and only the most compelling circumstances could dislodge him from these local, family, and plantation responsibilities.  The Virginia Convention of June, 1776, was such a circumstance, and it catapulted him into the role of chief architect of fundamental American liberties.

Two years before, in 1774, Mason had drafted the Fairfax Resolves,[116] a protest document whose influence can be seen in the Declaration and Resolves of the First Continental Congress later that year.[117]  At that time, however, Mason's role was not that of rebel but

---

[115] See 1 ROWLAND, LIFE OF GEORGE MASON 234-50 (1892).  A reproduction of Mason's draft is in *id.* at 240.  For the material on Mason I have also drawn upon HILL, GEORGE MASON, CONSTITUTIONALIST (1938) and RUTLAND 30-40.

[116] HILL, *op. cit. supra* note 115, at 112-16.

[117] The draft of the *Resolves,* from a manuscript in Mason's handwriting, are printed in 1 ROWLAND, *op. cit. supra* note 115, at 418-27.

of loyal British subject,[118] importuning and pleading in the great tradition which before had produced such monuments as Magna Carta, the Petition of Right delivered to Charles I and the English Bill of Rights of 1688. But when the 1776 Virginia convention met, the die for revolution had been cast—the Declaration of Independence was only four weeks away and the task was to form a new government for the Commonwealth. Mason himself noted that his draft Declaration of Rights was the first document of its kind in American history.[119] Nor had it any counterpart in England, whose great charters of liberty were either statutes like the Habeas Corpus Act with "no noble language, just down-to-earth regulations . . ."[120] or enactments like Magna Carta and the Bill of Rights, in which specific concessions were obtained from the Crown. Indeed, the form of the English Bill of Rights bears a striking resemblance to the colonial protest documents of 1774, first spelling out grievances and then reaching for solutions. Mason's outlook in 1776, however, was entirely prospective. There was no certain form of future government, no body of existing law and precedent whose incorporation could be assumed, and he described as his objective the creation of a "new government upon a broad foundation" and the provision of "the most effectual securities for the essential rights of human nature, both in civil and religious liberty."[121] The philosophy of Locke and Sidney, some of the finest creations of the 600 year struggle for liberty in England, a strong conviction of the importance of man, and an intense but practical idealism were some of the ingredients that filtered through his mind into the Declaration. It is difficult today, when much of what he wrote has become trite with familiarity, to appreciate the extent of Mason's creative innovation. This is because his selection and phrasing was borrowed by Jefferson for the Declaration of Independence, because the Virginia Declaration became the model for most subsequent state constitutions, and because many of the clauses found their way into the Bill of Rights. But anyone who puts himself into its historical context in reading Mason's Declaration is likely to agree with Jefferson's estimate of Mason as "a man of the first order of wisdom among those who acted on the theatre of the revolution, of expansive mind, profound judgment,

---

[118] "8. Resolved, That it is our greatest wish and inclination, as well as interest, to continue our connexion with, and dependence upon, the British government . . . ." From the Fairfax Resolves, *id.* at 421.

[119] He may have been unfamiliar with the Massachusetts Body of Liberties of 1641, which in certain respects had a similar purpose. See HASKINS, *op. cit. supra* note 79, at 36.

[120] 2 CHAFEE, DOCUMENTS ON FUNDAMENTAL HUMAN RIGHTS 13 (1963).

[121] 1 ROWLAND, *op. cit. supra* note 115, at 239.

cogent in argument, learned in the lore of our former constitution, and earnest for the republican change on democratic principles." [122]

Why, then, in a document generally so well adapted to its purpose, did Mason deal with the problem of pretrial detention in so incomplete and ambiguous a fashion? In every other operative clause of the Declaration, for example, habeas corpus, jury trial, confrontation, venue, self-incrimination, general searches, the prohibition against governmental action is clearly stated. The defect in his treatment of bail seems most likely to have arisen from Mason's failure to appreciate what I have stressed above: the tripartite nature of the English protection against abusive pretrial detention, involving procedure and the right to bail as well as control of the judicial abuse of excessive bail. This was lawyer's law, and whereas Mason was certainly familiar with the ringing language of the English Bill of Rights, the underlying fundamental bail law was buried in technical jargon. Mason himself recognized his limitations in this respect. When four years later he was appointed to serve on the committee for the revision of Virginia law, he excused himself "as, being no lawyer, he felt himself unqualified for the work." [123]

Mason's mistake, if such it was, was thereafter carried forward with so little discussion that the latent ambiguity of the clause was never noticed. The only reference in the record of congressional debate on the Bill of Rights to the excessive bail clause is the following statement in the House, set out in its entirety:

> Mr. Livermore.—The clause seems to express a great deal of humanity, on which account I have no objection to it; but as it seems to have no meaning in it, I do not think it necessary. What is meant by the terms excessive bail? Who are to be the judges? [124]

The speaker then made similarly brief objections to the vagueness of the other clauses of the amendment. This observation could have provoked the kind of debate which would have illuminated the entire question, but instead the record shows only that the amendment was then "agreed to by a considerable majority."

Mason's drafting error might also have been corrected if note had been taken of a curious occurrence in the Continental Congress in 1787. The Northwest Ordinance adopted in that year, as noted

---

[122] Jefferson, *Autobiography*, in 1 WRITINGS OF THOMAS JEFFERSON 1, 56 (Ford ed. 1892).

[123] *Id.* at 59.

[124] 1 ANNALS OF CONG. 754 (1789-91).

above, included a guarantee (to "forever remain unaltered unless by common consent") whose language provides an interesting contrast to the eighth amendment:

> Article the Second . . . . all persons shall be bailable, unless for capital offences, where the proof shall be evident, or the presumption great; all fines shall be moderate; and no cruel or unusual punishments shall be inflicted . . . .[125]

The first clause is taken almost verbatim from the Pennsylvania law of 1682, and the rest is adapted from the second part of paragraph 10 of the English Bill of Rights but omits the opening language of that paragraph which proscribes excessive bail.  The omission, then, must have been deliberate.  This deduction is reinforced by the fact that the draftsman of the Ordinance was Nathan Dane of Massachusetts, who stated that he was guided "mainly, from the laws of Massachusetts." [126]  The Massachusetts constitution of 1780, in turn, had incorporated verbatim the excessive bail clause of Mason's Virginia Declaration.  Unlike Mason, Dane was a well trained and experienced lawyer.[127]  One can only speculate that, not without reason, he may have regarded the excessive bail clause as unnecessary surplusage because the requirement that "all persons be bailable" included by necessary implication the requirement that bail be reasonable.  But Dane was not a member of the first Congress, and there was no one present to correct Mason's apparent assumption that the excessive bail clause alone was sufficient to epitomize the protections evolved from the long struggle against pretrial imprisonment.

Two other factors give some support for my conclusion that the excessive bail clause was meant to provide a constitutional right to bail and that the inadequacy of the form adopted for this purpose was the result of inadvertence.  The first is that bail was apparently not a point of dispute between the colonies and England immediately before the Revolution.  It is not mentioned in the 1774 protest documents such as the Fairfax Resolves, the Declaration and Resolves of the First Continental Congress, or the Address to the People of Quebec.  This was doubtless in part due to the development of separate American law on the subject and in part to an unchallenged assumption that the

---

[125] An Ordinance for the government of the Territory of the United States North-West of the River Ohio, July 13, 1787, art. ii.

[126] RUTLAND 104.

[127] Dane graduated from Harvard College "with high honors," read law in the office of a judge in Salem, and his legal work, which included an eight volume "comprehensive compendium" of American law, "displayed not only his great legal attainments but a meticulous attention to detail and a methodical labor which was characteristic of everything he undertook."  His support of Harvard Law School resulted in the Dane Professorship at that school.  Knott, *Nathan Dane*, in 5 DICTIONARY OF AMERICAN BIOGRAPHY 63-64 (1930).

right against pretrial imprisonment existed. Chafee has noted a similar lack of contemporaneous discussion about habeas corpus, where the "importance of the writ itself is virtually taken for granted." [128] Thus many early state constitutions failed to mention habeas corpus at all. "It had been so long and solidly established in every colony that assertion was probably considered unnecessary. Contrast the urgency of including freedom of religion and speech and several other liberties which had been often impaired in colonial history." [129] Not unnaturally attention was concentrated on issues of immediate controversy; bail got carried along on a kind of automatic historical reflex.

Second, to construe the eighth amendment as not providing a constitutional right to bail secure against legislative abridgment flies in the face of everything we know about the purpose of the Bill of Rights as a whole. When Madison first proposed the Bill of Rights in Congress he stressed the inadequacy of the English approach in its declaration of rights:

> In the declaration of rights which that country has established, the truth is, they have gone no farther than to raise a barrier against the power of the Crown; the power of the legislature is left altogether indefinite. . . .
>
> But although . . . it may not be thought necessary to provide limits for the legislative power in that country, yet a different opinion prevails in the United States. The people of many states have thought it necessary to raise barriers against power in all forms and departments of Government . . . .[130]

He then went on to stress that protection against abuse

> must be levelled against the Legislative [branch], for it is the most powerful, and most likely to be abused, because it is under the least control. Hence, so far as a declaration of rights can tend to prevent the exercise of undue power, it cannot be doubted but such declaration is proper.[131]

Ten years later, in writing about freedom of the press and the Sedition Act, Madison reiterated that whereas the English Bill of Rights was "not reared against the Parliament, but against the royal perogative, . . . in the United States the case is altogether different" in that protection against legislative abuse is also secured.[132]

---

[128] 1 CHAFEE, *op. cit. supra* note 20, at 53.
[129] *Id.* at 54.
[130] 1 ANNALS OF CONG. 436 (1789-91).
[131] *Id.* at 437.
[132] 6 WRITINGS OF JAMES MADISON 386-87 (Hunt ed. 1906). Compare Bridges v. California, 314 U.S. 252, 263-68 (1941), rejecting an argument drawn from "deeply rooted" principles of the common law on the ground that this is not the standard to be applied under the first amendment and relying upon Madison's statements.

In conclusion, no direct evidence has been found as to the intent behind the ambiguous language of the excessive bail clause, but all the circumstances surrounding its adoption in the first Congress argue against giving it a narrow reading.   These include the critical place of protests against abusive pretrial detention in the evolution of English liberty, the nondiscretionary character of contemporaneous English law, the colonial experience with liberalizing bail law, the contemporaneous legislation during the period of the Confederation, the circumstances surrounding the Virginia Declaration of Rights, Mason's expressed intent to provide "effectual securities for . . . essential rights," and the objective through the Bill of Rights to provide protection against legislative abuse.   What the precise scope and substance of this right to bail should be under modern conditions neither can nor should be deduced from history.   But however such detail may be resolved, the only end which seems consistent with these historical antecedents is that the clause was intended to afford protection against pretrial imprisonment in a broad category of cases.

## II. The Application of the Eighth Amendment

### A. An Historical Caveat: Bail History and the Poor

When we turn to the nature of the protection afforded by a right to bail and its application to the high proportion of indigent defendants in modern society, the potential usefulness of historical evidence sharply diminishes.   We have already noted that under colonial practice in at least a few courts most defendants appeared to be released, but there are instances in which the defendants were unable to obtain release.   In one case heard by Judge Pynchon in Massachusetts in July, 1674, James Browne and Benjamin Allyn were charged with burglary and theft:

> I required Both of them to become Bound in .20£ Bond a piece with .2. sufficient suertys for theire appearance at Next County Court at Springfield in September next as also for theire good Behaviour in the meane tyme.   [Accordingly] Benjamin Allyn in Twenty Pounds and Israell Dewey as suerty in like sum . . . Doe acknowledge themselves Bound . . . and in case of default therein to forfeite the said sums . . . .   James Browne finding noe Suertys was committed . . . till the Cort or till he shall find suerty . . .[133]

---

[133] Colonial Justice in Western Massachusetts, *op. cit. supra* note 110, at 280-81.   This case was tried and the defendants found guilty on September 29, and in a disposition typical of the cases I have found they were required to pay treble damages for the liquor stolen, to pay various costs, and "to be Branded in their Forheades for their Burglary with the letter B . . . ." *Id.* at 281.   For another salty instance

It is impossible to determine whether, in the absence of professional bondsmen, the courts placed any restrictions upon allowing defendants to sign their own bonds or upon whom they would accept as sureties. Indeed, it is important to recall that few persons in the colonies would have been concerned or have even thought about the welfare of poor classes from which so large a proportion of our defendant population is drawn. In 1777 the Continental Congress, in providing in article IV of the Articles of Confederation for "free ingress and regress" of citizens among states, explicitly excluded from its operation those citizens who were "paupers." In 1788, a year before Congress was to consider what was to become the eighth amendment, Massachusetts enacted legislation which, supplemented in 1794 and 1796, provided for compulsory work in houses of correction for, *inter alia*, "all rogues, vagabonds and idle persons" and "common railers or brawlers, such as neglect their callings or employment, mispend what they earn, and do not provide for themselves for the support of their families . . ."; [134] for the expulsion of Negroes [135] and of nonresident "vagrant, strolling and poor people" who "intrude and shelter themselves . . . to the injury of the rightful inhabitants"; [136] for binding out to work for a year at a time all persons

> married or unmarried, upwards of twenty-one years of age, as are able of body, but have no visible means of support, who live idly, and use and exercise no ordinary or daily lawful trade or business to get their living by; [137]

and for the removal of paupers to their lawful settlements. [138] This legislation was widely copied by other states in the eighteenth and early nineteenth centuries. [139] As late as 1837 the United States Supreme Court noted that it is "as competent and as necessary for a State to provide precautionary measures against the moral pestilence of paupers, vagabonds, and possibly convicts, as it is to guard against [a] physical

---

of life among the Puritans see *id.* at 389-91. As for the disposition of sexual offenders see Chaffe's introduction to Records of the Suffolk County Court, *op. cit. supra* note 110, at lxxxi: "It must have been as good as a circus parade to the hard-working people to see women stripped to the waist and whipped at a cart's tail through the streets."

[134] Act of March 26, 1788, § 2, 1 Laws of Mass. 1780-1807 411 (1807).

[135] Act of March 26, 1788, § 6, 1 Laws of Mass. 1780-1807 413 (1807).

[136] Act of June 17, 1796, 2 Perpetual Laws of Mass. 1780-1800 361 (1801).

[137] Act of Feb. 26, 1794, § 6, 2 Laws of Mass. 1780-1807 619, 622 (1807).

[138] Act of Feb. 26, 1794, § 10, 2 Laws of Mass. 1780-1807 623-26 (1807).

[139] Riesenfeld, *Law-making and Legislative Precedent in American Legal History*, 33 Minn. L. Rev. 103, 105 n.9 (1949).

pestilence . . . ." [140]   That historical manifestation of this attitude most directly relevant to pretrial detention is imprisonment for debt. In 1830, for example, it was estimated that in the northern and eastern states three times as many persons were imprisoned for debt as were imprisoned for crime.   The number reached 50,000 a year including 7,000 in Pennsylvania, which ostensibly had abolished imprisonment for debt in 1776,[141] and of these, thirty Philadelphians were jailed for debts of less than one dollar.[142]

A similar attitude toward the poor prevailed in England as reflected in the culmination of centuries of repressive legislation which sought, *inter alia*, to keep the price of labor down by harsh vagrancy legislation [143] and centuries of "poor" laws whose operation in the eighteenth century was described by Sidney and Beatrice Webb as "callous inhumanity," "brutal demoralisation" and "heedless cruelty" with inadequate "provision for even the most innocent and deserving" of the poor and an "almost complete lack of any intelligent treatment of the infants and children, the sick and those of unsound mind." [144] One recoils at the wealth of documentation provided for this statement. For example, in 1815 eleven London parishes, in order to be spared the expense of support, took 2,026 children of poor parents from their families and shipped them out to manufacturers in the north of England.[145]

This was the context in which the law of bail developed.   It is not surprising that a society unconcerned about the callous cruelty of the poor laws or the imprisonment of civil debtors also did not become excited about economic discrimination against alleged criminals.   What is surprising is that it is taking so long for the changed attitude towards the poor in other contexts to percolate down to the bail system.   Imprisonment for debt was substantially controlled in the nineteenth

---

[140] City of New York v. Miln, 36 U.S. (11 Pet.) 102, 142 (1837).   This language was finally repudiated in Edwards v. California, 314 U.S. 160, 177 (1941), but not before it had been restated in numerous dicta, *e.g.*, Passenger Cases, 48 U.S. (7 How.) 282, 425 (1849).

[141] PA. CONST. § 28 (1776) ; PA. CONST. art. 9, § 16 (1790).   See RUTLAND 47.   Compare Max Radin's sarcastic observation about early state constitutional provisions which "undertake to wipe out imprisonment for debt by a single sentence." Radin, *Debt*, in 5 ENCYC. SOC. SCI. 32, 37-38 (1931).   He reports that the practice continued into the 20th century.   The first substantial reform legislation in England was The Debtors Act, 1869, 32 & 33 Vict. c. 62.

[142] These figures are from the NORTH AMERICAN REVIEW for April 1831, quoted in Ford, *Imprisonment for Debt*, 25 MICH. L. REV. 24, 29 (1926).

[143] For a history of this legislation, which stemmed from the breakup of feudalism and the economic chaos occasioned by the black death in the middle of the 14th century, see Foote, *Vagrancy-type Law and Its Administration*, 104 U. PA. L. REV. 603, 615-16 (1956).

[144] WEBB & WEBB, ENGLISH LOCAL GOVERNMENT: ENGLISH POOR LAW HISTORY 424 (1927).

[145] *Id.* at 203.

century, the Social Security Act enacted in 1933, and restrictions on interstate travel of paupers outlawed in 1941.[146]  But only in recent years has the bail problem as it affects indigent defendants in the pretrial period come to the surface, and only in very recent years has it arisen in the courts.

### B. *"Excessive Bail" in Indigent Cases*

The threshold of the problem for paupers that courts must decide is the constitutional standard which determines whether bail is excessive.  Relevant case history is scanty.  The first significant decision involved one Lawrence, who was taken into custody in 1835 after he had fired two loaded pistols at President Jackson in the capitol rotunda but missed.  Lawrence was brought before Chief Judge Cranch, who "supposed bail in $1,000 would be sufficient, as it was not a penitentiary offense, there being no actual battery, and as he did not appear to have any property." [147]  The district attorney objected that the defendant's friends might bail him out so he could try again.

> The chief judge then said that there was no evidence before him to induce a suspicion that any other person was concerned in the act; that the constitution forbade him to require excessive bail; and that to require larger bail than the prisoner could give would be to require excessive bail, and to deny bail in a case clearly bailable by law . . . . That the discretion of the magistrate in taking bail in a criminal case, is to be guided by the compound consideration of the ability of the prisoner to give bail, and the atrocity of the offence.  That as the prisoner had some reputable friends who might be disposed to bail him, he would require bail in the sum of $1,500.  The sum, if the ability of the prisoner only were to be considered, is, probably, too large; but if the atrocity of the offence alone were considered, might seem too small . . . .[148]

The opinion is ambiguous as to whether the 1,500 dollars was designed to make it possible or impossible for Lawrence's "reputable friends" to bail him; in either event the bail issue was soon mooted when Lawrence was committed on the ground of insanity.

But at least the court recognized the impossible dilemma posed by the eighth amendment and its opinion might have launched further

---

[146] See Edwards v. California, 314 U.S. 160, 185 (1941) (concurring opinion).

[147] United States v. Lawrence, 26 Fed. Cas. 887, 888 (No. 15577) (C.C.D.C. 1835).

[148] *Id.* at 887-89.

analysis of the problem. Instead, however, the courts retreated to double-talk and silence. Only a handful of cases since *Lawrence* even reach the question of the defendant's financial inability to raise the amount demanded. Few have seemed to follow the *Lawrence* dictum;[149] others have ignored the matter,[150] flatly stated that the inability of the accused to make bail is not grounds for relief,[151] or given the issue that summary treatment reserved for frivolous questions—or very difficult problems.[152] Still other courts have subordinated the defendant's ability to some objective standard such as the suitability of the amount as proportionate to the offense charged[153] or the ability of "the ordinary citizen in like circumstances."[154] The circular reasoning characteristic of the encyclopedists is in this instance an unfortunate accurate reflection of the barren state of the case law:

> Bail must not be in a prohibitory amount, more than the accused can reasonably be expected under the circumstances to give, for if so it is substantially a denial of bail within the constitutional provision. However, a mere inability to procure bail in a certain amount does not of itself make such amount excessive . . . .[155]

---

[149] United States v. Brawner, 7 Fed. 86 (W.D. Tenn. 1881) ($5,000 bail reduced to $2,500; defendant had testified that he had only land worth $75 and his father owned 240 acres worth $8-$10 per acre); *Ex parte* Castillo, 102 Tex. Crim. 52, 277 S.W. 126 (1925) ($3,000 bail for laboring Mexican charged with prohibition offense reduced to the $500 defendant said his friends could put up). However, in both these cases it is doubtful if the defendant's limited ability was the determinative factor. In *Brawner* the court found that "it is a rule of our courts in this district to require $2,000 in cases like this. . . ." 7 Fed. at 89, while in *Castillo* $500 may well have been closer to the local norm for prohibition offenses.

See also Harrison v. Stone, 113 Fla. 471, 152 So. 19 (1934) (court looked at the limited assets of laborer in fixing $1,000 bail in homicide case where evidence was inconclusive); State v. Alvarez, 182 La. 50, 161 So. 17 (1935) (implication that ability of accused was an important consideration in reducing $25,000 to $2,500 where there was "nothing in the evidence to show that he is in a position to furnish a bond in excess of that amount," *id.* at 54, 161 So. at 18).

[150] See, *e.g.,* United States v. Dioguardi, 237 F.2d 57 (2d Cir. 1956); *In re* Morehead, 107 Cal. App. 2d 346, 237 P.2d 335 (1951) (court did not even include resources of defendant as a factor to be considered in setting bail).

[151] See, *e.g.,* United States v. Rumrich, 180 F.2d 575, 576 (2d Cir. 1950) (per curiam) ("A person arrested upon a criminal charge, who cannot give bail, has no recourse but to move for trial."); People *ex rel.* Fraser v. Britt, 289 N.Y. 614, 43 N.E.2d 836 (1942) (mem.); see Delaney v. Shobe, 218 Ore. 626, 346 P.2d 126 (1959) (not sufficient as sole ground for reduction).

[152] See, *e.g., Ex parte* Duncan, 54 Cal. 75 (1879).

[153] *Ex parte* Malley, 50 Nev. 248, 256 Pac. 512 (1927) ($100,000 bail for alleged embezzler of $500,000 affirmed, for even if it were true that defendant could afford only $25,000, this is not determinative and it must appear that bail is disproportionate to the offense charged).

[154] Mendenhall v. Sweat, 117 Fla. 659, 158 So. 280 (1934). As the court notes that the accused in the *Mendenhall* case was insolvent, *id.* at 662, 158 So. at 281, of what relevance to him could this standard be unless the court means by "like circumstances" an ordinary insolvent citizen?

[155] 6 C.J., *Bail* § 222, at 989 (1916). (Footnotes omitted.)

As to actual practice bail studies have abundantly proved that the *Lawrence* dictum is largely ignored. In the New York bail study in no observed case did a magistrate ask about the defendant's financial ability, and in two-thirds of the cases observed in the Philadelphia study no questions were asked about any of the factors said to be relevant to setting bail.[156] Indeed, the Attorney General's Poverty Committee recently noted the characteristic failure of American bail practice to establish any procedure "to provide the bail-setting authority with relevant factual data indispensable to sound bail decisions." [157]

The only other pre-1960 case worth special mention is *Stack v. Boyle*,[158] although not directly on point since the twelve Smith Act conspiracy defendants did not allege that they were indigent. Rather each objected that bail had been set in the uniform amount of 50,000 dollars for the illegitimate purpose of assuring that they would remain in jail pending trial. Apparently envisaging an individualized procedure, the Court sent the cases back "so that a hearing may be held for the purpose of fixing reasonable bail for each petitioner." [159] The Supreme Court's opinion gave constitutional sanction under the eighth amendment to the Federal Rule of Criminal Procedure 46(c) standard that the amount is to be such as to "insure the presence of the defendant" and that anything more, presumably that exacted for any other purpose, is excessive.[160] But neither the Court's opinion nor that of Mr. Justice Jackson used language calculated to advance the position of indigents.

---

[156] *New York Bail Study* 709; see *Philadelphia Bail Study* 1038 & n.32.

[157] ATT'Y GEN. REP. 62.

[158] 342 U.S. 1 (1951).

[159] *Id.* at 7.

[160] This is the usual rule in state courts as well. *E.g.,* Gusick v. Boies, 72 Ariz. 233, 233 P.2d 446 (1951). Unusually high bail cannot be justified on the grounds that the defendant is vile and reprehensible, Gusick v. Boies, 72 Ariz. 309, 234 P.2d 430 (1951); or to impose punishment, Johnson v. State, 30 Ala. App. 593, 10 So. 2d 298 (1942); or because public opinion is aroused against the defendants, *In re* Stegman, 112 N.J. Eq. 72, 163 Atl. 422 (1932); or because the defendant will not cooperate with the district attorney, People *ex rel.* Ruberstein v. Warden, 279 App. Div. 47, 107 N.Y.S.2d 948 (1951); or to prevent the prisoner from being released, People *ex rel.* Sammons v. Snow, 340 Ill. 464, 173 N.E. 8 (1930) ($50,000 bail set for vagrancy and trial judge stated, "If I thought he would get out on that I would make it more," *id.* at 469, 173 N.E. at 9). See generally Annot., 72 A.L.R. 801 (1931).

Of course the distinction between the justified motive of insuring appearance and unjustified motives such as those enumerated above in practice amounts to little. The factor of insuring appearance is so vague and the discretion given the trial judge accordingly so broad, see notes 150-55 *supra*, that this issue is likely to come up only if the judge lets the cat out of the bag by explicitly verbalizing his improper motive. It should be recalled that the correlation between insuring appearance at trial and the amount of bail set is entirely unknown, and such correlation as exists presumably varies according to whether the money at stake belongs to the defendant, or his relatives, or (as is usually the case) a bondsman or bonding company.

The Court stated that the base standard to be applied is the amount "usually fixed for serious charges of crime"; if any greater amount is required "that is a matter to which evidence should be directed in a hearing so that the constitutional rights of each petitioner may be preserved." [161]   On the other hand Mr. Justice Jackson noted that if the unusually high bail was set merely to keep the defendants in jail, "it is contrary to the whole policy and philosophy of bail." [162]   He then added: "This is not to say that every defendant is entitled to such bail as he can provide, but he is entitled to an opportunity to make it in a reasonable amount." [163]

There seems to be implied dictum in these words that bail set in the average amount is reasonable and that individualization is required only for amounts greater than the average.  This also seems to be the most plausible explanation of the earlier case law.  The Court does not explicitly go as far as a very early New Hampshire case, which quoted with apparent approval Hawkins' statement that bail "ought never to be less than 40*l* for a capital crime, but may be as much higher" as the justice in his discretion sees fit.[164]  Yet the effect of *Stack v. Boyle* is to leave courts free to establish such minimum scales, and the evidence is overwhelming that this is in fact what has been done.[165]

The bail "usually fixed" for serious crimes, however, is in an amount which the great majority of defendants cannot make.  Thus for robbery bail of 2,500 dollars at least is probably the norm,[166] although available studies show that the following proportions of defendants could not make bail in the amounts shown:

---

[161] 342 U.S. at 6.

[162] 342 U.S. at 10 (Jackson, J., concurring).

[163] *Ibid.*

[164] Evans v. Foster, 1 N.H. 374 (1819) (alternative holding) (quoting HAWKINS PLEAS OF THE CROWN that bail "ought never to be less than 40 *l* for a capital crime, but may be as much higher as the justices in discretion shall think fit to require upon consideration of the ability and quality of the prisoner and the nature of the offence." "The property and character of the respondent ought perhaps, in some instances to affect the amount of the recognizance," but bail ought to be enough to ensure appearance.  (Civil action against magistrate for causing plaintiff's incarceration by demanding excessive bail which plaintiff could not make.  Nonsuit affirmed.)).

[165] Mr. Justice Harlan does not tell us how he got the data used in Noto v. United States, 76 Sup. Ct. 255 (Harlan, Circuit Justice, 1955), except for his reference to "the record in the present case [and] the research of my Law Clerk," *id.* at 258 n.4. In any event, following precisely the steps outlined in the text, he found that bail for similar communist cases averaged $9000, that there were no special aggravating circumstances in Noto's case, and that $30,000 bail would be reduced to $10,000.  For another application of the averaging rule see United States v. Weiss, 233 F.2d 463, 466 (7th Cir. 1956).

[166] In the list of bail amounts in Philadelphia, "Robbery . . . (b) Knife or Gun" is listed as "$2500 normal." *Philadelphia Bail Study* 12.  In the District of Columbia, a similar list for "station house bail" includes the figure of $3000 for attempted robbery.  FREED & WALD 19.

(a) $1,501-$2,500, 60 percent of a sample of 286 federal defendants in four districts;[167]

(b) $501-$1,500, over half of the accused, in a three year study of the Southern District in New York;[168]

(c) $1,000 or more, 68 percent of a sample of Philadelphia state court defendants;[169]

(d) $2,500, 63 percent of New York City state felony defendants.[170]

Those high sounding platitudes in the opinions in *Stack v. Boyle*[171] certainly take on a hollow tone when it is realized that the case apparently sanctions the very bail-setting law which has brought about such results.

What is most perplexing is why observers of the bail system lost sight of this obvious and devastating discrimination, seen so clearly early in our history. Soon after Chief Judge Cranch decided the *Lawrence* case, one of the early students of the sociology of law made the same point even more forcefully. Discussing some of the anomalies he had found in America, De Toqueville wrote:

> [N]o man can entirely shake off the influence of the past; and the settlers, intentionally or not, mingled habits and notions derived from their education and the traditions of their country with those habits and notions which were exclusively their own . . . .
>
> I shall quote a single example to illustrate my meaning. The civil and criminal procedure of the Americans has only two means of action,—committal or bail. The first act of the magistrate is to exact security from the defendant, or, in case of refusal, to incarcerate him . . . .
>
> It is evident that such a legislation is hostile to the poor, and favorable only to the rich. The poor man has not always a security to produce, even in a civil case; and if he is obliged to wait for justice in prison, he is speedily reduced to distress. . . . Nothing can be more aristocratic than this system of legislation. Yet in America, it is the poor who

---

[167] Figures compiled from ATT'Y GEN. REP., Table iv at 135.

[168] *Id.* at 66-67.

[169] *Philadelphia Bail Study* 1032.

[170] *New York Bail Study* 707.

[171] For example, the Court characterized bail as the "traditional right to freedom" without which "the presumption of innocence, secured only after centuries of struggle, would lose its meaning." Stack v. Boyle, 342 U.S. 1, 4 (1951). "The practice of admission to bail, as it has evolved in Anglo-American law, is not a device for keeping persons in jail upon mere accusation until it is found convenient to give them a trial. On the contrary, the spirit of the procedure is to enable them to stay out of jail until a trial has found them guilty." *Id.* at 7-8 (concurring opinion).

> make the law, and they usually reserve the greatest advantages of society to themselves.  The explanation of the phenomenon is to be found in England; the laws of which I speak are English, and the Americans have retained them, although repugnant to the general tenor of their legislation and the mass of their ideas.[172]

But later observers of the bail system, perhaps on the philosophy that what is ordained [173] and inevitable [174] is not worth troubling about, have paid little attention to the problem.  There are only scattered references in the writings on bail of Arthur Beeley,[175] Raymond Moley,[176] and Wayne Morse [177] to the impact of the system upon the poor.  Even such an admirable precursor of modern empirical sociological research as the Cleveland Crime Survey of 1920-1922 directed by Dean Pound and Justice Frankfurter, was inexplicably silent on the social efficacy of the bail system as measured by the proportion of defendants who obtained pretrial freedom.[178]

One of the most disturbing manifestations of this blindness has been the preoccupation of bail reformers with attempts to clean up the graft and abuse traditionally associated with bail bondsmen.  The two most common targets have been the practice whereby bondsmen reduce their cost of doing business by avoiding forfeiture in most cases of default and the fraud perpetrated against the state by bonds-

---

[172] 1 DE TOQUEVILLE, DEMOCRACY IN AMERICA 55-56 (Bradley ed. 1963).  (Footnote omitted.)  This edition is a revised translation; the book was first published in France in 1835, and an English translation appeared immediately thereafter.

[173] "The Lord maketh poor, and maketh rich: he bringeth low, and lifteth up." 1 *Samuel* 2:7.

[174] "The poor and strangers shall be always with us."  Longsdorf, *Is Bail a Rich Man's Privilege?*, 7 F.R.D. 309, 311 (1948); *cf. Matthew* 26:11.

[175] BEELEY, THE BAIL SYSTEM IN CHICAGO 59-153 (1927).  While primarily concerned with the abuse of straw bail, Beeley examined 170 untried, detained defendants and, on the basis of untested assumptions about what made for reliability, concluded that "at least 65" were "dependable" and could have been released without substantial risk that they would abscond.  *Id.* at 159.

[176] Moley, *Bail*, in 2 ENCYC. SOC. SCI. 386, 387 (1932).

[177] Morse & Beattie, *Survey of the Administration of Criminal Justice in Oregon*, 11 ORE. L. REV. (Supp. 1932).  This study's statistics demonstrated that at each stage of the criminal proceeding—after arrest, after bind-over and after indictment—whether the defendant had bail or jail status had a significant relationship with the disposition of the case in the next stage, with those in jail receiving a substantially less favorable disposition.  *Id.* at 99, 101, 106, 116-17.  This finding, which appears to have been "lost" and which is not stressed or analyzed in the study itself, anticipated by some twenty-five years the statistical studies of the last decade.  See note 2 *supra*.

[178] CRIMINAL JUSTICE IN CLEVELAND (Pound & Frankfurter eds. 1922).  Discussion of the bail system is at 154-55, 184-87, 212-13, 290-92, and 313-14.  While the study does make reference to the "illogical variability in amounts [of bail] demanded," *id.* at 154, and to "looking-glass justice" in jailing a witness in a robbery case while releasing the accused robber on bond, *id.* at 314, its emphasis is all on abuses arising out of bailed cases.  For a similar emphasis, see Moley, *Bail Bonds*, in THE MISSOURI CRIME SURVEY 189 (1926).

men who put up fictitious collateral—what is known in the trade as straw bail. No doubt one of our social goals is to make bondsmen honest and responsible. But the fact that our bail system works at all even for a minority of defendants may be due in considerable measure to the prevalance of such loopholes and loose enforcement since there is almost inevitably a correlation between the risk and expense of the bondsman's undertaking and the proportion of defendants who achieve pretrial liberty. If this is so, there is a certain irony in taking a system which is not working well to begin with and subjecting it to a "reform" which would leave it even less able to perform its primary function of getting defendants out of jail before they have been tried.

No doubt the insulation of appellate judges from everyday administration of the criminal law and the fact that they "are almost invariably drawn from the propertied classes and share its assumptions" [179] also have contributed to the imperceptive handling of the problem. Judge Learned Hand once made the sweeping assertion that "under our criminal procedure the accused has every advantage." [180] This is comparable to the remarks of the justices in *Stack v. Boyle* about the importance of the liberating policy behind the bail system [181] at the same time that they were apparently putting their stamp of approval on a practice which effectively thwarts that policy. The most charitable explanation for such judicial inactivity is ignorance by judges and justices about the actual administration of the bail system, which of course has kept most defendants just where it will most advantage the prosecution: behind bars.

### C. Facing the Constitutional Question

How to reconcile modern concern for equal legal rights for the poor with historical disinterest, which until the last decade simply read indigents as beyond the scope of constitutional protection against pretrial imprisonment, poses problems of the greatest complexity. So far, both the actual reform projects which have been noted above and the current proposals for legislative reform which will be discussed below have not necessitated facing the constitutional problem. But as the history which has been recounted indicates, the constitutional questions cannot be ignored. The whole thrust of the excessive bail clause

[179] L. Hand, *Mr. Justice Holmes at Eighty-five*, in MR. JUSTICE HOLMES 119 (Frankfurter ed. 1931).
[180] United States v. Garsson, 291 Fed. 646, 649 (S.D.N.Y. 1923). Although Judge Hand did not qualify his statement, he was obviously not thinking about the bail system. For a devastating analysis of his comment in the immediate context which gave rise to it see A. M. Goldstein, *The State and the Accused: Balance of Advantage in Criminal Procedure*, 69 YALE L.J. 1149 (1960).
[181] See note 158 *supra*.

is to ensure fair access to pretrial liberty for those entitled to it by law. Under the construction presently given to it, the eighth amendment and its historical heritage have come full circle. Originally it was designed to thwart abuse of discretion and ensure pretrial protection for the class of defendants who were the concern of reformers in the seventeenth and eighteenth centuries—political opponents of the Crown. Now it is being used to defeat those very same rights for a group—the indigents—with whom the law was unconcerned in those earlier centuries but who now represent the current major interest in law reform.

Such discrimination against the poor cannot survive in its present blatant form. What is not clear, however, is how the impasse will be broken. One alternative would be to ignore the eighth amendment entirely, thus relegating it to historical curiosity sharing the same dusty quarters as the second amendment, and instead to forge a partial solution upon more vague and therefore more adaptable constitutional principles derived from the fifth and fourteenth amendments. If such a resolution offers release only to those indigent accused who are "good bail risks," its effect will be to grant to the lower judiciary substantial discretion to grant or deny release. Such a solution carries with it the high risk that in actual administration much of the present poverty-based discriminatory practice would simply be perpetuated under a different label.

The other possibility is to build upon the historical motivation and underlying purposes of the eighth amendment but to expand its scope to accommodate present humanitarian values. In its broadest application this second alternative would release rich and poor alike pending trial, denying altogether or very sharply restricting any judicial discretion to refuse release, at the cost of greater risks to society and the creation of administrative problems of the first magnitude.

To pose these hard core constitutional and administrative issues in their sharpest form, the next section of this article will examine an hypothetical case of an accused drawn from that substantial population of defendants who are not "good bail risks" under the present standards. Such a defendant is outside the operation of any of the current reform proposals, and it is in such a case that the United States Supreme Court will have to decide the fate of the eighth amendment.

*(To Be Concluded)*