**EXHIBIT OO**


**To Declaration of Micah West in Support of
Motion for Preliminary Injunction
& Motion for Class Certification**



# The Price of Jails:

## Measuring the Taxpayer Cost of Local Incarceration

MAY 2015

CENTER ON SENTENCING AND CORRECTIONS



Christian Henrichson • Joshua Rinaldi • Ruth Delaney

## FROM THE PRESIDENT

A look at who is currently in jail—and why—makes it clear that, after decades of rising inmate populations, the costs of jail surely outweigh the benefits. Many local governments are now looking at how they too can help solve the problem of mass incarceration. These efforts are not just timely but essential, because county and city justice systems contain a third of the country's incarcerated population on any given day.

The fiscal costs of jail are high and, as this report details, actually higher than most realize. The jail is one of a community's largest investments and its funding is drawn from the same sources that support public hospitals, schools, social services, roads, and many other essential functions of local government. It is exactly for this reason that counties and cities are well positioned to reinvest jail savings into programs and services that will help keep many people, especially those who are poor or have serious mental illness, from entering or staying in jail in the first place. And, in terms of public safety, this is a much better investment.

One problem that has bedeviled efforts by state governments to reinvest correctional savings is the so-called wrong pockets problem. That arises when savings do not accrue to the stakeholders responsible for curbing the costs, but rather to different jurisdictions or departments in a sprawling state bureaucracy, each with their own parochial interests.

But at the local level there is a chance to make good on the oft-told promise of community reinvestment because there is generally greater political consensus than at the state level, and the discrete geography of counties means that there is no resource competition with other regions of the state. And the local commissioners, mayors, and council members that know their communities best will then have the opportunity to reallocate funds to programs and services that better address the needs of so many in their jails.

Downsizing jail populations is easier said than done and will require collaboration among police, prosecutors, judges, and community corrections officials—all of whom have different perspectives and priorities. But for those who are up to the challenge, this report makes it plain that a large sum of money is on the table. More than we may have realized.

Nicholas Turner
President and Director
Vera Institute of Justice

# Contents

4     Introduction

6     Methods: Measuring the price of jail

10    Results: Counting all costs—the actual price of jails

18    A tale of two counties: Inmate populations drive costs

21    Measuring a jail's cost savings

24    Conclusion

26    Appendix: Summary of survey results

32    Endnotes

# Introduction

The story of how the United States arrived at the world's highest incarceration rate has been well told. An abundance of scholarship—both empirical and theoretical—covers this ground in great detail, discussing its causes and contours, as well as its human and economic consequences.[1] The issue of mass incarceration is increasingly discussed in the corridors of government as well. Concerned about high costs and the stubbornly high rates of people returning to prison, states and the federal government have, in recent years, looked for more cost-effective ways to improve public safety, reconsidering in particular who gets punished, how, and for how long.[2] With research demonstrating that some people can be safely supervised in the community at a lower cost, new legislation has focused on shrinking prison populations by expanding the number of criminal offenses that don't require incarceration, reducing the length of custodial sentences, or both.[3]

Most discussions about the overreliance on incarceration have focused on decreasing the use of state prisons, which now hold 1.4 million men and women—five times more than in the 1970s.[4] But prisons—state and federally operated facilities that hold sentenced people—are not the only places where people are incarcerated. Less discussed but gaining increased attention is the parallel growth in the use of jails—locally run confinement facilities used primarily to detain persons arrested but not yet convicted of any crime—which now hold more than 730,000 people, more than triple their population in 1983.[5]

Although hidden from view and misunderstood by the public, jails play a central role in local justice systems. These are the places where most arrested men and women land and where many remain as their cases wind through the criminal justice system toward resolution. And as more people cycle through the thousands of jail systems in this country—with nearly 12 million admissions in 2013—jails have become one of the most significant public safety expenditures a community makes every year.[6] Bigger jail populations mean increased costs for staff and associated overhead expenses (including costs related to expanded intake, diagnostic, and release procedures) and for basic necessities such as food, clothing, health care, and programming. In certain jurisdictions, the increased number of people in jail has led to costly construction of new facilities, including expanded maintenance and debt service costs.[7] The U.S. Department of Justice estimated that local communities spent $22.2 billion on jails in 2011.[8]

## More inmates, higher costs

Rising inmate populations have led to rising costs because more inmates mean more jail employees. On average, there is one jail employee for every 3.3 inmates—a proportion that has barely changed since 1983. (See endnotes 7 and 8.)



4x MORE COSTS

735,601 inmates

$22.2 BILLION

2011

223,551 inmates

$5.7 BILLION

1983

But as high as $22.2 billion sounds, it actually underestimates the price of jails, because other government agencies bear a large share of jail costs that are not reflected in jail budgets. For example, in addition to the $1.1 billion spent by the City of New York Department of Correction in 2014, other city agencies spent an additional $1.3 billion for jail employee benefits, health care and education programs for incarcerated people, and administration, bringing the total cost to $2.4 billion.[9]

Because the costs reported are too often incomplete, policymakers and the public are seldom aware of the full extent of their community's financial commitment to the operations of the local jail. Given the outsize role jails play in the country's criminal justice system—incarcerating millions of people annually—it is striking that the national price tag for jails remains unknown and that taxpayers who foot most of the bill remain unaware of what their dollars are buying.

As policymakers focus on justice reform at the local level and consider how to spend scarce community resources effectively to improve public safety outcomes, they need to understand how much communities are spending to support jails and their operations. With this knowledge, in addition to the growing evidence base about which criminal justice practices work, local leaders can make better decisions about how and when to use jails and determine whether those dollars could be invested more effectively.[10] And because county govern-

*The largest jail costs are those associated with personnel. Because these expenses are driven by jail population, jurisdictions that wish to lower their costs must take sustainable steps to reduce the number of people they incarcerate.*

ments fund the jail and community-based programs, they are well situated to reinvest jail savings into the programs and services needed by many people in their facilities, such as mental health or substance abuse treatment and housing or employment assistance.[11]

Without having a grasp of their jails' costs, policymakers will not know the full scope of potential jail savings in their jurisdictions. This report seeks to inform both the national discussion about the role of jails in the U.S. criminal justice system and the decisions of local policymakers as they prioritize public safety investments on limited budgets. To this end, researchers at the Vera Institute of Justice (Vera) developed a survey to help measure the actual price of jails and fielded it nationwide through direct outreach as well as communications through professional networks. Vera received responses from 35 jail jurisdictions across the country. In documenting how jail expenses in these 35 places add up and who pays for them, the findings of Vera's study confirm that the county general fund foots the bill for jails and that those costs are more expensive than most people realize.

The first part of this report describes these findings in depth, looking in particular at jail expenses that are typically outside of corrections budgets, which must be accounted for to calculate a more precise estimate of the actual price of jails. The largest jail costs are those associated with personnel. Because these expenses are driven by jail population, jurisdictions that wish to lower their costs must take sustainable steps to reduce the number of people they incarcerate. The report concludes by suggesting how policymakers can use cost-of-jail information to better understand the impact of their policy choices.

This report focuses on the importance of determining the *actual* price tag for the county or local jail—that is, capturing all costs associated with running and staffing the local correctional facility, both inside and outside the jail budget. While this baseline number is critical information for both policymakers and the public, it still underestimates the *true* cost of jail incarceration, which would incorporate the financial and social costs to individuals, families, and communities when so many people end up behind the jail walls. Calculating these costs is beyond the scope of this report but should be part of any complete cost-benefit analysis of jail incarceration.

# Methods: Measuring the price of jail

If the actual price of a jail cannot be determined by looking at the jail line item in a county budget, how can policymakers and administrators figure it out? Vera researchers, in consultation with jail finance officials in six jurisdictions, developed a survey instrument to capture all of the costs incurred to run a jail, as well as the extent to which those costs were included in the jail's budget or were paid by another department.[12] (The survey is available at vera.org/price-of-jails.) The survey also asked about the sources of revenue that supported

## JAILS IN THE U.S.



Although the terms "prison" and "jail" are often used interchangeably, the two types of custodial correctional institutions are distinctly different. Prisons are state or federally run facilities that typically hold people with sentences of more than a year.[a] Jails are short-term facilities that usually operate under the authority of county governments or independently elected sheriffs. Jails primarily hold unconvicted men, women, and sometimes juveniles pending case resolution, as well as a smaller number of convicted people with a custodial sentence usually of one year or less.

Jail jurisdictions in the United States vary significantly, ranging from the majority of counties that each have only one small jail to larger counties or cities with a network of jails, such as the eight jails in Los Angeles County that incarcerate 19,000 people.[b] Although the largest 159 jails—which hold more than 1,000 people each—constitute only 5 percent of U.S. jails, they hold nearly 50 percent of all people incarcerated in the nation's jails.[c] Meanwhile, about a third of the total jail population can be found in the nation's 608 medium-size jails, which each hold 200 to 999 people. Small jails, which hold fewer than 200 people, represent the vast majority of jails (73 percent), but only 17 percent of the jail population nationwide.

### U.S. jail jurisdictions and populations by jurisdiction size (2006) [d]

|  | Small (1-199) | | Medium (200-999) | | Large (1,000+) | | Total |
|---|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |  |
| Jurisdictions | 2,150 | 73.7 | 608 | 20.8 | 159 | 5.5 | 2,917 |
| Incarcerated people | 132,038 | 17.4 | 264,555 | 34.8 | 364,146 | 47.9 | 760,739 |

[a] For more information about these definitions, see U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Terms and Definitions: Local Jail Inmates and Jail Facilities*, http://www.bjs.gov/index.cfm?ty=tdtp&tid=12.
[b] For the size of the LA County jail system, see Vera Institute of Justice, *Los Angeles County Jail Overcrowding Reduction Project Final Report*, (New York: Vera Institute of Justice, 2011).
[c] There is no common definition of small, medium, and large jails; these designations are inherently subjective. The authors chose to categorize jails with more than 1,000 beds as "large" to align with the National Institute of Corrections "Large Jail Network." For information on the Large Jail Network, see Connie Clem, *Proceedings of the Large Jail Network Meeting, March 2014* (Washington, DC: National Institute of Corrections, 2014). The distinction between small and medium jails is more arbitrary, but the authors selected a threshold of 200 because most jails under this threshold are in rural counties. The use of this threshold illustrates that relatively few incarcerated people are in small jails, which constitute the vast majority of these facilities.
[d] Authors' analysis of public use data set from James Stephan and Georgette Walsh, *Census of Jail Facilities, 2006* (Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2011). Total jail jurisdictions exclude the combined jail-prison systems in Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont. Jurisdictions in this figure vary slightly from the figure presented in Stephan and Walsh (2011)—2,860—because of their reclassification of some jail reporting units.

*Vera researchers, in consultation with jail finance officials in six jurisdictions, developed a survey instrument to capture all of the costs incurred to run a jail, as well as the extent to which those costs were included in the jail's budget or were paid by another department.*

the jail's expenses, to document the extent to which jail costs were paid with county, state, or federal dollars, or other sources.

In addition, the survey sought to gather basic facts about the jail, including the average daily inmate population, the number of uniformed and other staff, staff salaries, and the number of beds and housing units, which are key measures needed to calculate the marginal cost of the jail, which is the amount the total cost of jail changes when the inmate population changes. (See "Measuring a Jail's Cost Savings" on page 21 for further discussion of marginal costs.)

In February 2015, Vera distributed the survey through the National Institute of Corrections' Large Jail Network, which includes the more than 150 jail jurisdictions with at least 1,000 beds and house nearly half of all incarcerated people in the country's jails. To reach small and medium jails and encourage participation in the survey, Vera researchers also directly contacted nearly 100 jails nationwide. These jurisdictions included many that have received technical assistance through the U.S. Department of Justice's Bureau of Justice Assistance and others recommended by national membership organizations, including the National Sheriffs' Association and National Association of Counties. To ensure maximum survey participation, Vera researchers responded to all questions from potential participants, extended deadlines when requested, and followed up with jurisdictions that didn't respond. Several state associations, including the Sheriffs' Association of Texas and the County Commissioners Association of Pennsylvania, distributed an announcement of the survey to their members in support of the study.

Thirty-five jail jurisdictions returned the survey, representing those with small, medium, and large jails in 18 states from every region of the country. These jails range from the very small—Pitkin County, Colorado, with an average daily inmate population (ADP) of 17—to the very large: New York City, with an ADP of 11,408. Combined, the surveyed jurisdictions have an ADP of 64,920, representing approximately 9 percent of all people incarcerated in the nation's jails. Thanks to efforts by the Sheriffs' Association of Texas, nine jurisdictions in Texas returned surveys, the most from a single state. The full study sample includes the following:

> 5 small jails, with an ADP of fewer than 200 incarcerated people;

> 12 medium jails, with an ADP of 200 to 999 incarcerated people; and

> 18 large jails, with an ADP of more than 1,000 incarcerated people.

Vera researchers reviewed each survey to ensure that all the data provided was internally consistent—meaning that the response to one question did not contradict other answers—and contacted the relevant county agencies regarding information about jail costs paid by other departments that the survey respondent was unable to obtain. Vera researchers also contacted survey respondents if the responses suggested that they did not understand one or more questions. When Vera made any corrections to responses, a revised survey was returned to respondents for verification.

## PRICE OF JAILS SURVEY: Participating Jurisdictions



| State | Jurisdiction |
| --- | --- |
| California | Alameda County (Oakland) |
| Colorado | Boulder County |
| | Mesa County |
| | Pitkin County |
| Florida | Miami-Dade County |
| | Palm Beach County |
| | Volusia County (Daytona Beach) |
| Georgia | Cherokee County |
| Kansas | Johnson County |
| Kentucky | Louisville Metro |
| Massachusetts | Hampden County (Springfield) |
| Minnesota | Ramsey County (Saint Paul) |
| North Carolina | Mecklenburg County (Charlotte) |
| Nebraska | Douglas County (Omaha) |
| New Mexico | Bernalillo County (Albuquerque) |

| State | Jurisdiction |
| --- | --- |
| New York | Allegany County |
| | Chautauqua County |
| | New York City |
| | Onondaga County Justice Center, NY (Syracuse) |
| Pennsylvania | Clinton County, PA |
| Tennessee | Davidson County Sheriff's Office (Nashville) |
| | Shelby County Division of Corrections (Memphis) |
| Texas | Brazos County (College Station) |
| | Dallas County |
| | Guadalupe County |
| | Harris County (Houston) |
| | Limestone County |
| | Lubbock County |
| | Potter County |
| | Rockwall County |
| | Travis County |
| Virginia | Albemarle-Charlottesville Regional Jail |
| Washington | City of Kent |
| | King County (Seattle) |
| Wisconsin | Milwaukee County House of Correction |



**Figure 1: Breakdown of total reported jail costs from surveys**

- **Total employee costs** include salaries, fringe benefits, and pension contributions.
- **Capital costs** include capital expenditures and debt service.
- **All other costs** include non-personnel expenses such as contracts, supplies, and utilities.

# Results: Counting all costs—the actual price of jails

The survey results confirmed that pinning down the total cost of a jail or jail system is not a simple task, even for the agency that runs it. As an initial question, the survey asked whether the agency publicly reports the cost of operations in any manner. Seven of the 35 surveyed jurisdictions reported that they do not, although they can supply this information upon request. Figure 3 provides an overview of the types of costs jails incur. The largest cost category across all jail jurisdictions is personnel, including both salary and benefits.

All jail jurisdictions in Vera's sample reported that at least some of their expenses were covered by one or more other government agencies, but their ability to identify the precise amounts of these outside costs varied. (See Figure 2.) Ten jurisdictions could not identify the amounts for any of these costs and only five jurisdictions—Chautauqua County, New York; Onondaga County, New York; Mecklenburg County, North Carolina; Milwaukee County House of Correction, Wisconsin; and Pitkin County, Colorado—could provide data on all of the costs outside their jail budget in part because these were among the jails where relatively few of the costs are outside the jail budget. The costs tallied for these jurisdictions come closest to the actual price of their jails. The remaining 20 jurisdictions could account for only some of the costs outside their jail budgets; the amount of outside costs these jurisdictions reported is a conservative estimate. But even so, the total price of jail determined through Vera's survey is more accurate than these jurisdictions have previously reported, which only included the jail budget.

## Figure 2: Percentage of costs outside of jail budget

| Less than 10% | 10% to 20% | More than 20% |
|---|---|---|
| Cherokee County, GA<br>0.1% | Clinton County, PA<br>14.9% | Ramsey County, MN<br>(St. Paul)<br>20.2% |
| Miami-Dade County, FL<br>0.2% | Hampden County, MA<br>(Springfield)<br>17.8% | King County, WA (Seattle)<br>21.5% |
| Rockwall County, TX<br>0.4% | Davidson County Sheriff's<br>Office, TN (Nashville)<br>19.8% | Johnson County, KS<br>22.0% |
| Louisville Metro, KY<br>0.4% | | Boulder County, CO<br>23.9% |
| Bernalillo County, NM<br>(Albuquerque)<br>0.8% | | Lubbock County, TX<br>24.4% |
| Mecklenburg County, NC<br>(Charlotte)<br>0.9% | | Limestone County, TX<br>27.7% |
| Alameda County, CA<br>(Oakland)<br>1.0% | | Allegany County, NY<br>29.1% |
| Milwaukee County House<br>of Correction, WI<br>2.5% | | New York City, NY<br>53.6% |
| Onondaga County Justice<br>Center, NY (Syracuse)<br>2.7 % | | |
| Chautauqua County, NY<br>3.3% | | |
| Potter County, TX<br>4.5% | | |
| Travis County, TX (Austin)<br>5.6% | | |
| Brazos County, TX<br>(College Station)<br>9.4% | | |
| Pitkin County, CO<br>9.8% | | |

See appendix for more information. The Albemarle-Charlottesville Regional Jail, VA; Dallas County, TX; Douglas County, NE (Omaha); Guadalupe County, TX; Harris County, TX (Houston); City of Kent, WA; Mesa County, CO; Palm Beach County, FL; the Shelby County Division of Corrections, TN (Memphis); and Volusia County, FL (Daytona Beach) could not identify any of the costs outside their budget.

## COST CATEGORIES OUTSIDE JAIL BUDGETS

As noted previously, every jurisdiction that responded to Vera's survey indicated that at least a portion of total jail costs was paid by another government agency—ranging from approximately 1 percent to more than 53 percent of total costs. These outside costs typically fall into six categories:

1. employee benefits;
2. inmate health care;
3. capital costs;
4. administrative costs;
5. legal judgments and claims; and
6. inmate programming and other costs.

Employee benefits and inmate health care made up the lion's share of jail costs that were typically outside jail budgets—with employee benefits averaging more than 20 percent of total jail spending and inmate health care averaging approximately 10 percent, although health care costs were higher in large cities.[13] The total cost of jail is thus considerably underestimated when these outside costs are excluded.

Some other outside costs have far less impact if excluded from the total. Capital costs, for example, varied widely across jurisdictions, but averaged 6 percent—with a range of less than 1 percent to 23 percent—for the 18 jails that reported these expenses. Administrative costs averaged 6 percent. Legal judgments and claims averaged 1 percent, as did inmate programming and other costs.

Figure 3 shows the cost categories in which some or all of the costs fall outside the jail budgets of the surveyed jurisdictions.[14] See the appendix for a summary of the survey results for each of the 35 surveyed jurisdictions.

## EMPLOYEE BENEFITS

Although all surveyed jail jurisdictions provide funding for employees' salaries, 15 of 35 jails reported that another agency pays for a portion of their benefits—most commonly, pension contributions. The cost of employee fringe benefits varied widely—for example, they amounted to 32 percent of salaries in Hampden County, Massachusetts, and 70 percent of salaries in New York City.[15] But even fringe benefits on the lower end of the range add up. In Hampden County, $14.6 million in fringe benefit expenses—18 percent of all jail spending—were outside the jail budget and paid directly by the Commonwealth of Massachusetts.

*Employee benefits and inmate health care made up the lion's share of jail costs that were typically outside jail budgets—with employee benefits averaging more than 20 percent of total jail spending and inmate health care averaging approximately 10 percent.*

## Figure 3: Costs outside jail budget (FY 2014)

| JAIL JURISDICTION | EMPLOYEE BENEFITS | INMATE HEALTH CARE | CAPITAL COSTS | ADMINISTRATIVE COSTS | LEGAL JUDGMENTS | INMATE PROGRAMMING & OTHER COSTS | COST CATEGORIES OUTSIDE OF JAIL BUDGET |
|---|---|---|---|---|---|---|---|
| Alameda County, CA | | ◗ | ◗ | ◗ | | | 3 |
| Albemarle-Charlottesville, VA | | ◗ | | | | | 1 |
| Allegany County, NY | ● | | ◗ | ● | ● | ◗ | 5 |
| Bernalillo County, NM | | ◗ | | ● | ◗ | ◗ | 4 |
| Boulder County, CO | ◗ | ◗ | | ◗ | ◗ | ◗ | 4 |
| Brazos County, TX | | ◗ | ● | ◗ | | ◗ | 4 |
| Chautauqua County, NY | | ◗ | ◗ | ◗ | ◗ | | 4 |
| Cherokee County, GA | | ◗ | ● | ● | ● | ◗ | 5 |
| Clinton County, PA | ◗ | ◗ | ◗ | ◗ | | | 4 |
| Dallas County, TX | ● | ● | ● | ● | ◗ | | 5 |
| Davidson County Sheriff's Office, TN* | ◗ | ● | ● | ◗ | | | 4 |
| Douglas County, NE | | | | ● | ● | ◗ | 4 |
| Guadalupe County, TX | | | | ● | ● | ◗ | 3 |
| Hampden County, MA | ◗ | | ◗ | | ◗ | | 3 |
| Harris County, TX | ◗ | ◗ | ● | ● | ● | ◗ | 6 |
| Johnson County, KS | | | ● | ● | ● | | 3 |
| City of Kent, WA | | | | ● | | ● | 2 |
| King County, WA | | ● | | ◗ | ● | ◗ | 4 |
| Limestone County, TX | | | ● | ● | ● | | 3 |
| Louisville Metro, KY | | | | ● | ● | | 2 |
| Lubbock County, TX | | ● | ◗ | ● | ● | | 4 |
| Mecklenburg County, NC | | | | | | ◗ | 1 |
| Mesa County, CO | ● | ◗ | ● | ● | ● | ◗ | 6 |
| Miami-Dade County, FL | | ● | | | | | 1 |
| Milwaukee County House of Correction, WI* | | | ◗ | | | ◗ | 2 |
| New York City, NY | ● | ● | ● | ● | ● | ◗ | 6 |
| Onondaga County Justice Center, NY* | | | | | | ◗ | 1 |
| Palm Beach County, FL | ◗ | | | ● | ◗ | ◗ | 4 |
| Pitkin County, CO | | | | ● | | | 1 |
| Potter County, TX | ◗ | ◗ | ◗ | ● | ● | | 5 |
| Ramsey County, MN | | ◗ | ● | ● | ● | | 4 |
| Rockwall County, TX | ◗ | | ● | ● | | | 3 |
| Shelby County Division of Corrections, TN* | | ◗ | | | | | 1 |
| Travis County, TX | ◗ | ◗ | ◗ | ● | ● | ◗ | 5 |
| Volusia County, FL | ◗ | ◗ | ◗ | ● | ● | ◗ | 5 |
| **Total (35 jurisdictions)** | **15** | **18** | **20** | **27** | **25** | **17** | **122** |

Key    ◗ Some jail costs are outside the jail budget.    ● All jail costs are outside the jail budget.
* Respondent jail jurisdiction is in a county with multiple jail jurisdictions. Data is not applicable to other jail jurisdictions in the county.

## INMATE HEALTH CARE

Jails provide health care services—which include costs for doctors, nurses, pharmaceuticals, and hospital care—directly or through contracted providers. These costs can be sizable. For example, in Washington State, King County Public Health paid $29 million in health care services for incarcerated people in the custody of the King County jail (ADP 2,076), an amount that accounted for 20 percent of total jail costs. Although such expenses are often paid through a jail budget, 18 of 35 jails indicated that another county agency paid at least a portion of inmate medical costs. Among the jurisdictions surveyed, this practice is most prevalent in large counties. For example, the University of New Mexico provides hospital care for people incarcerated at the Bernalillo County Metropolitan Detention Center; Parkland Hospital provides all medical care for incarcerated people at the Dallas County Jail; and the New York City Department of Health and Mental Hygiene provides health care for all incarcerated people in jail citywide.

## CAPITAL COSTS

Jail costs include the expense of purchasing and maintaining buildings and equipment. Although counties often draw on the jail operating budget for smaller purchases (such as to replace flooring) and issue bonds to make larger purchases (such as to build a new housing unit), 20 jail jurisdictions surveyed indicated that other county departments paid for a portion of capital costs. For example, in Alameda County, California, both the Auditor-Controller Agency

## Focus on Texas

Respondents from nine county jails in Texas indicated that there are six categories of costs frequently paid by other county agencies: employee benefits, capital costs, legal judgments and claims, administrative costs, inmate health care, and other miscellaneous costs. These costs can add substantially to the total price of jail.



|  |  |  |  |  |  | MISC |
|---|---|---|---|---|---|---|
| Brazos |  | ✔ | ✔ | ✔ | ✔ |  |
| Dallas | ✔ | ✔ | ✔ | ✔ | ✔ |  |
| Guadalupe |  |  | ✔ | ✔ | ✔ | ✔ |
| Harris | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Limestone |  | ✔ | ✔ | ✔ |  |  |
| Lubbock |  |  | ✔ | ✔ | ✔ |  |
| Potter | ✔ | ✔ | ✔ |  | ✔ |  |
| Rockwall |  |  | ✔ | ✔ |  |  |
| Travis | ✔ | ✔ | ✔ | ✔ |  | ✔ |

and the County Administrator's Office manage debt service for the Alameda County Jail. But these costs were difficult for respondents to ascertain. Only nine of the 20 jurisdictions reporting that a portion of their capital costs were paid from funds outside the jail budget could provide the amount of that cost.

## ADMINISTRATIVE COSTS

Judging from survey results, many jails are not administratively self-sufficient: 27 of 35 respondents reported that they leverage the resources of other county agencies to provide human resources, information technology, and legal services. Smaller counties, in particular, often manage these functions centrally. One example is Pitkin County, Colorado, where various county agencies provided $220,045 in administrative services such as human resources and finance for the jail, an amount that was 10 percent of total jail spending. Among the other jails that could identify the amount of these costs, outside administrative costs averaged about 5 percent of total costs.

## LEGAL JUDGMENTS, CLAIMS, AND SETTLEMENTS

The costs of jail-related legal judgments and claims are often paid through a county's central account. Twenty-five of 35 jail jurisdictions reported that another agency pays for at least a portion of these costs. For example, the legal division for the Metropolitan Government of Nashville and Davidson County, in Tennessee, pays for judgments and claims on behalf of the Davidson County Sheriff's Office. These costs are difficult to tally because they are commingled with the cost of judgments and claims for other county agencies. They are, however, usually small relative to total jail spending. For example, in fiscal year 2014, the cost of judgments and claims in Davidson County amounted to less than 2 percent of total spending.

## INMATE PROGRAMMING AND OTHER COSTS

Some jails provide education and training programs, in part to improve people's transition when they return to the community. But payment for these programs often falls outside the jail budget. For example, the Milwaukee Area Technical College provides GED training for the Milwaukee County House of Correction. And the inmate welfare fund—which in some jurisdictions is an account separate from the jail budget—provides for vocational training programs at the King County Department of Adult and Juvenile Detention, in Washington. (See "How Jails Are Funded," page 16, for further discussion of inmate welfare funds.) In some jurisdictions, other departments also manage costs for other functions of the jail, such as inmate transportation, but these costs amount to a trivial proportion of total jail spending.

*Many jails are not administratively self-sufficient: 27 of 35 respondents reported that they leverage the resources of other county agencies to provide human resources, information technology, and legal services.*

## HOW JAILS ARE FUNDED

Thirty-two of the 35 surveyed jurisdictions provided data about their revenue sources and reported that the county general fund paid for more than 85 percent of jail costs. There are some exceptions, such as in the Commonwealth of Massachusetts (Hampden County in Vera's sample), where the state government provides funding to the jails. Twenty-three jurisdictions reported receiving some revenue through boarding contracts for housing incarcerated people for other county, state, and/or federal jurisdictions.[16]

Another small contribution to jail budgets—about 3 percent of jail spending on average—comes from inmate-generated revenue. In some jails, this revenue is directed into "inmate welfare funds," which jails use to pay for programs, goods, or services, as determined by legislative or administrative policy. In other jails, such as the Shelby County Division of Corrections and the Milwaukee County House of Correction, inmate-generated revenue is returned to the state or county general fund. Many factors influence the size of inmate welfare funds, including the services paid for with funds, the sources of revenue, and the size of the jail. These funds typically support expenses such as programming (educational, recreational, entertainment, or other), supplies, and books and other library materials.[17]

Jail administrators often point to inmate-generated funds as crucial to supporting jail programming. For example, in Washington, 80 to 90 percent of King County's inmate welfare fund is supported by telephone commissions—money received from telephone-service providers out of payments for collect phone calls from incarcerated people. (See "Inmate-Generated Revenue" on page 17 for more information.) The fund supports a wide range of activities and services, such as special meals for religious celebrations, reading glasses, books and other supplies, and professional contracts and services. It also sometimes pays the salaries of staff who oversee programming in the jail. Recent federal proposals to limit phone-call rates have prompted concerns among corrections officials about how the decline in phone commissions could adversely affect programming.[18] But given how small a portion of the budget these funds are, it may not be an excessive burden on county or municipal budgets to pay for these programs directly.

*Thirty-two of the 35 surveyed jurisdictions provided data about their revenue sources and reported that the county general fund paid for more than 85 percent of jail costs.*

## INMATE-GENERATED REVENUE



Most jails—90 percent nationally, according to the latest data—generate revenue from the people they incarcerate.[a] In Vera's sample, thirty-one of 32 of the jurisdictions indicated that they charge incarcerated people fees. Although the proportion varies from 1 to 6 percent of jail expenses, inmate-generated revenues amount to an average of 3 percent of total jail revenues among surveyed jurisdictions. The largest sources of this type of revenue are commissary purchases—items bought by incarcerated people from the internal jail store, from toothbrushes and food to portable music players (41 percent); telephone and video calls (29 percent); co-payments for medical services (6 percent); and jail work programs that allow certain incarcerated people to work in the community but require them to turn over to the jail a significant portion of their wages to participate (4 percent). Among the jails that charge these fees, revenue averages $384 per inmate per year for phone calls, $452 for commissary purchases, and $52 for medical fees.[b] Other less-frequently assessed charges include fees for booking, electronic monitoring, drug testing, laundry, home detention, and fingerprinting.[c]

A look at two types of fees, telephone and work program fees, show how these charges vary. In Vera's sample, the Hampden County jail (Massachusetts), the King County jail (Washington), and the Milwaukee County House of Correction (Wisconsin) charge 10 to 15 cents per minute for local calls, as well as a 2 to 3 dollar initiation fee to begin the call.[d] Jails typically take in revenue through their phone contracts, collecting a commission on usage. In those three jurisdictions, commissions range from 51 to 58 percent of call revenue. Revenue generated from jail work programs also varies; the fees charged incarcerated people can be flat or scaled to the wages they earn. For example, Hampden and King Counties use scaled charges, while the Milwaukee County House of Correction and the Shelby County Division of Corrections (Tennessee) charge flat fees. Depending on the jail, participation in work programs can be voluntary or court-ordered, and is usually reserved for the smaller number of people serving sentences in county facilities as opposed to those who are incarcerated pretrial.

Although the amount of money collected from these sources is small relative to total jail spending, it can be considerable for people who are incarcerated—amounting to $1,259 per inmate per year in the surveyed jurisdictions.[e]  Given that fees are attached to everyday life in jail, incarcerated people must either depend on the jail to provide essential items free of charge, or amass debt for charges incurred during their stay for which they may be liable even after their release.[f] While some jurisdictions write off debts incurred by incarcerated people as uncollectable, others, such as King County, may seek payment through collections agencies post-release. Still others, such as the Shelby County Division of Corrections, collect debts incurred during a prior jail stay if a person is re-incarcerated and has the resources to pay. In still others, such as King Coun-

ty, jail administrators may seek payment of debts through collection agencies post-release. Many jurisdictions include provisions for people who do not have the resources to pay, providing them with stamps and envelopes, necessary items for hygiene and other purposes, and medical visits at no charge.

[a] Barbara Krauth and Karin Stayton, *Fees Paid by Jail Inmates: Fee Categories, Revenues, and Management Perspectives in a Sample of U.S. Jails*, (Washington, DC: National Institute of Corrections, 2005), 10.
[b] The average cost of jail work programs could not be estimated because the survey did not collect data on the number of work program participants.
[c] Authors' calculations using responses from Vera's Price of Jails survey.
[d] Information on calling rates and work programs was obtained through interviews with officials at the Hampden County Sheriff's Office, the Milwaukee County House of Correction, the King County Department of Adult and Juvenile Detention, and the Shelby County Division of Corrections.
[e] This amount is calculated by dividing the total amount of inmate-generated revenue by the average number of inmates in the surveyed jails.
[f] To meet basic needs, many jurisdictions provide some items and services for people who do not have the resources to pay, providing them with stamps and envelopes, necessary items for hygiene and other purposes, as well as medical visits at no charge.

*Although the amount of money collected from these sources is small relative to total jail spending, it can be considerable for people who are incarcerated— amounting to $1,259 per inmate per year in the surveyed jurisdictions.*

# A tale of two counties: Inmate populations drive costs

As the survey confirmed, local jails cost more than policymakers, jail administrators, or the public realize. The survey also showed that most of these costs are for personnel—costs that come from within a jail's budget as well as those other county agencies pay. The entire survey sample spent about 75 percent of total jail expenses on staff costs, including salaries and benefits.[19] Thus, local policymakers who decide that the price tag for their jails is too steep will need to take deliberate steps to reduce personnel costs. The only way to have a real impact on personnel costs is by reducing the size of the jail population. Reducing the number of staff without reducing the population would impact the safety of the jail; the number of incarcerated people dictates the numbers of employees required to process and supervise them, and as a result staffing ratios don't vary that much. Across the board salary or benefit cuts are rarely an option.

In contrast, other types of downsizing, such as administrative or program cuts, will have a relatively small impact on jail spending. Such cost-saving measures affect few changes in jail personnel, if any. In addition, some of these expenses, such as money spent on programming, make up a minuscule proportion of total jail spending. Among the jurisdictions in the entire survey sample, for example, program costs amounted to no more than 1 percent of total jail spending.[20] Therefore, these types of cuts—often the most palatable to make—will never generate enough savings for communities to reinvest in alternatives and may even lead to some unintended and unwanted consequences, such as higher recidivism rates and higher medium and long term costs. What's more, unless local jurisdictions reduce the size of their jail population, they may potentially face more costly options, such as exceeding their facility's capacity, which can jeopardize the safety of incarcerated people and staff alike (and also invite lawsuits); building

## A tale of two counties: Inmate populations drive costs (FY 2014)

Johnson County is about the same size as Bernalillo County.



**Johnson County Kansas**



**Bernalillo County New Mexico**

**574,272**
RESIDENTS

**675,551**
RESIDENTS

Jail is more expensive in in Johnson County.



**$191.95**
PER INMATE PER DAY



**$85.63**
PER INMATE PER DAY

*BECAUSE*

Staffing ratio is lower. Salaries are higher.



: 1.4 INMATES

: 4.1 INMATES

**$94K**
AVG. SALARY

**$54K**
AVG. SALARY

*BUT*

Fewer are incarcerated in Johnson County.





*SO*

**693 inmates**
(121 PER 100,000)

**2,496 inmates**
(369 PER 100,000)

Taxpayers in Johnson County spend less on the jail.

*TOTAL ANNUAL COST*





**$49 million**
($82 per resident)

**$78 million**
($113 per resident)

*Local policymakers who decide that the price tag for their jails is too steep will need to take deliberate steps to reduce the size of their jail populations.*

an expensive new facility; or entering into pricey boarding contracts with other jurisdictions to manage potential population overflow.

Although the two key determinants of jail population—the number of jail admissions and length of stay—are well known, reducing the number of people incarcerated is easier said than done. The task requires sustained cooperation and collaboration among the agencies and actors whose policies and actions determine who goes to jail and for how long. These actors include the police who decide whom to arrest; the local prosecutor who decides whom to charge; the judicial officer and prosecutor who make or inform bail, diversion, or disposition decisions at arraignment; and the court, prosecution, and defense counsel who agree to the type of case disposition and sentence at the end of a criminal case. The way in which police and other system actors respond to probation or parole violations and outstanding warrants also influences the jail population. But because what happens at each of these decision points varies significantly from place to place, each county needs to pinpoint the specific drivers of their jail inmate population to identify the best reforms for their own jurisdiction.

Inmate population is such a key cost driver that it is possible for "expensive" jails (meaning those with a high average per-inmate cost) to be the least costly to taxpayers. Consider the example of two counties of similar size: Johnson County, Kansas, and Bernalillo County, New Mexico, with county populations of 574,272 and 675,551, respectively.[21] By comparing the average cost per inmate, the jail in Johnson County appears to be more than twice as expensive as the jail in Bernalillo County ($191.95 per day versus $85.63 per day). This is because Johnson County has higher average salaries ($94,899) and a lower staffing ratio (1.4 inmates per corrections officer); Bernalillo County has an average salary of $54,819 and a staffing ratio of 4.1 inmates per corrections officer.[22]

But taxpayers in Johnson County spend less on the jail than taxpayers in Bernalillo County do, because the incarceration rate is more than three times lower (121 per 100,000 versus 369 per 100,000). As a result, the annual cost of jail in Johnson County is $49 million ($82 per county resident), versus $78 million ($113 per county resident) in Bernalillo County.

Bernalillo County has faced a long-standing federal lawsuit regarding jail conditions and has historically relied on costly out-of-county beds for as many as 700 inmates. Recognizing the urgent need to reduce the jail population, the county formed a Criminal Justice Review Commission to create an emergency jail population management plan designed to reduce overcrowding.[23] The commission developed 40 initiatives to reduce the jail population, such as setting probation violation hearings 20 days from arrest rather than 30 days from filing, increasing the use of citation rather than arrest, and funding an assistant district attorney for misdemeanor arraignments to hasten case processing.

Many of these initiatives have been implemented and, as a result, the jail population has already declined sharply since 2014—the period for which we collected data. During fiscal year 2014 the average daily population was 2,496 (or 369 per 100,000), but as of April 2015 the jail population has since declined 39 percent to 1,523 (or 225 per 100,000).

The decline in the inmate population, in turn, will yield saving for taxpayers. The county is already saving the money that had been spent on out-of-county jail beds. And the jail has closed one housing unit and plans to close another later in the year—a striking turn of events in a just a couple years.

# Measuring a jail's cost savings

Because the size of the inmate population is the biggest cost driver for jails, jurisdictions that reduce the size of their jails have an opportunity to realize savings. But identifying the amount of those savings is more complicated than it may seem. This is because the jail's cost savings cannot be calculated using the most commonly available measures of cost: the average per-inmate cost and the jail budget.

Multiplying the average cost by any reduction in the average inmate count overestimates savings because the average cost includes fixed expenses for administration, utilities, and facilities that do not change when the inmate population declines. And comparisons of year-over-year total jail budgets will not produce an accurate measure of savings. This is because inflation—meaning the continually rising costs (for salaries, pensions, health care, and utilities) that are independent of the number of inmates in the jail—will consume a portion of any savings generated by declining inmate populations. In fact, the effect of these rising costs means that it is possible for the jail budget to increase even as the inmate population and the number of jail employees declines.

Calculations of jail or prison savings should instead be made using marginal costs, which are also sometimes called incremental costs. In this context, "marginal" does not mean small or insignificant, but at the margin of an existing level of operation; it describes the cost or savings realized because of an incremental change in activity.[24] For correctional facilities, this means the additional cost or savings realized because of a change in the inmate population. Unlike average costs, which include fixed costs that mostly cannot be changed, the marginal cost comprises two types of costs that are inherently more changeable: First, it includes "variable costs," costs such as food and laundry services that are directly linked to the number of incarcerated people and change immediately as this number goes up or down. Second, marginal cost includes "step-fixed costs," such as personnel costs, that change in stepwise increments. For example, in the context of a jail, personnel expenses are step-fixed costs when the inmate population declines to the point that an entire housing unit can be closed and associated staffing reductions can occur.

Despite the fact that marginal costs can accurately estimate the impact of a particular policy, only six of 30 surveyed jails that responded to questions about marginal costs (20 percent) reported that they calculate this metric. One jurisdiction in the survey sample that does calculate marginal costs—Hampden County, Massachusetts—provides a good example of how a jail's marginal cost can be used to determine savings.

## Fewer inmates, lower costs

Jurisdictions like Hampden County in Massachusetts that reduce their jail population realize savings in increments. As the inmate population declines, jails save on variable costs like food and laundry. Step-fixed costs, such as uniformed guard personnel, cannot be saved until a housing unit closes. The jail will save even more step-fixed costs when multiple housing units are closed and reductions can be made in personnel who work across the facility, such as medical and clerical staff.



**DECREASING INMATE POPULATION**

One inmate          One housing unit          Several housing units

Between 2008 and 2014, the inmate population in Hampden County had declined by 30 percent (634 inmates). This decrease was the result of declining crime rates in the county's largest city (Springfield); fewer prosecutions, combined with more diversions to probation supervision; and reentry initiatives by the jail that have reduced recidivism by 25 percent since 2000.[25]

Because the decline in the number of incarcerated people was so large, the sheriff's department was able to close six housing units—each with an average of 55 beds—and downsize 11 others from 107 to 77 beds, saving step-fixed expenses as well as daily variable expenses. (See "Fewer inmates, lower costs" on page 22.) If the decrease in inmate population was not sufficient to close a housing unit, the department would have only saved the variable costs.

The Hampden County Sheriff's Department estimates that the variable cost is $5,840 per inmate annually and the step-fixed cost to staff a post in a housing unit is approximately $400,000. When several housing units are eliminated, then another $700,000 for other jail personnel (e.g., counselors, clerical, medical, program, and maintenance staff) can be saved. Thus, the drop in the jail population has led to $13.1 million in annual savings for the department.[26] When the $2.9

million of annual savings the state accrues is added to this sum—because the Commonwealth of Massachusetts saves an additional 30 cents in fringe benefits costs for each dollar of salary savings—the total annual jail savings is $16 million.

If instead the average daily cost ($143.72 per inmate) had been used to calculate the savings in Hampden County, the result would have been $33.3 million annually, a calculation that erroneously overestimates the savings. And using the jail budget to estimate savings would result in an underestimate. From 2008 to 2014—the period when the average daily inmate population declined by 634—annual spending at the Hampden County Sheriff's Department declined by $2.8 million. But this amount should not be mistaken for the jail's savings for two reasons. First, the 2008 amount is not adjusted for inflation and therefore is not directly comparable with 2014 dollars and hence that year's costs. (Between 2008 and 2014, the average cost of staff salaries increased 15 percent because of annual cost-of-living increases.)[27] Second, the calculation excludes the fringe benefits savings to the Commonwealth.

## The right (and wrong) way to calculate jail savings

| INMATE POPULATION REDUCTION | X | MARGINAL COST | = | ACCURATE ESTIMATE OF SAVINGS |

| INMATE POPULATION REDUCTION | X | AVERAGE COST | = | INACCURATE ESTIMATE OF SAVINGS |

**Inaccurate because:** Average cost includes fixed costs that do not change.

| SHERIFF'S BUDGET BEFORE INMATE DECLINE | − | SHERIFF'S BUDGET AFTER INMATE DECLINE | = | INACCURATE ESTIMATE OF SAVINGS |

**Inaccurate because:** Calculation excludes costs at other county agencies and does not account for inflation or staff salary increases.

# Conclusion

*So only by widening the lens—looking beyond the jail to the decisions made by police, prosecutors, judges, and community corrections officials— will jurisdictions be able to significantly reduce the size of their jails...*

Although a sheriff or jail administrator is accountable for the safe, secure, and constitutional operations of a jail, the public is ultimately responsible. Just as schools, parks, and roads are *our* schools, parks, and roads, the jails are our jails. As government leaders and the public question whether jail is being used cost-effectively to meet a community's safety and justice needs, they need to understand what the total costs are. Responses to Vera's survey of local jails demonstrated that determining the price of a jail is not simply a matter of looking up the line item in a county budget, given that in many places, other departments bear significant jail costs. But the survey results also showed that the task of identifying all costs, though difficult, is possible. With collaboration among county agencies, a jurisdiction can put together a complete picture of what it spends on jail incarceration. The methodology developed for this study can serve as a tool to do that.

Although determining the actual price of the jail is a critical inquiry that local policymakers must undertake, calculating this amount is only the first step in a broader analysis to understand what type of investment a community wants to make in its jail. When elected officials and other policymakers know a jail's total cost and marginal cost—as well as the many cost-effective alternatives to jail detention—they can make better decisions to match the appropriate amount of local tax dollars to the jail.

The only way localities can safely reduce the costs incurred by jail incarceration is to limit the number of people who enter and stay in jails. This is no small task. How and why so many people cycle through jails is a result of decisions dispersed among largely autonomous system actors. This means that the power to downsize the jail is largely in the hands of stakeholders outside its walls. So only by widening the lens—looking beyond the jail to the decisions made by police, prosecutors, judges, and community corrections officials—will jurisdictions be able to significantly reduce the size of their jails, save scarce county and municipal resources, and make the necessary community reinvestments to address the health and social service needs that have for too long landed at the doorstep of the jail.

# Appendix: SUMMARY OF PRICE OF JAILS SURVEY RESULTS (FY 2014)

| JAIL JURISDICTION | 2014 COUNTY POPULATION† | AVERAGE DAILY JAIL POPULATION | COSTS PAID BY JAIL BUDGET | REPORTED COSTS OUTSIDE THE JAIL BUDGET† | TOTAL REPORTED COST* |
|---|---|---|---|---|---|
| ALAMEDA COUNTY, CA (OAKLAND) | 1,610,921 | 3,380 | $190,223,004 | $1,877,047 | $192,100,051 |
| ALBEMARLE-CHARLOTTESVILLE REGIONAL JAIL, VA² | 163,688 | 414 | $13,786,686 | None reported | $13,786,686 |
| ALLEGANY COUNTY, NY | 47,736 | 131 | $5,486,178 | $2,254,780 | $7,740,958 |
| BERNALILLO COUNTY, NM (ALBUQUERQUE) | 675,551 | 2,496 | $77,366,694 | $650,000 | $78,016,694 |
| BOULDER COUNTY, CO | 313,333 | 484 | $14,874,143 | $4,670,968 | $19,545,111 |
| BRAZOS COUNTY, TX (COLLEGE STATION) | 209,152 | 619 | $11,117,453 | $1,149,380 | $12,266,833 |
| CHAUTAUQUA COUNTY, NY | 132,053 | 284 | $11,688,978 | $396,758 | $12,085,736 |
| CHEROKEE COUNTY, GA | 230,985 | 597 | $10,367,718 | $9,090 | $10,376,808 |
| CLINTON COUNTY, PA | 39,745 | 283 | $5,642,919 | $987,729 | $6,630,648 |
| DALLAS COUNTY, TX | 2,518,638 | 6,144 | $110,132,749 | None reported | $110,132,749 |
| DAVIDSON COUNTY SHERIFF'S OFFICE, TN (NASHVILLE)⁴ | 668,347 | 1,975 | $62,341,532 | $15,395,327 | $77,736,859 |
| DOUGLAS COUNTY, NE (OMAHA) | 543,244 | 1,240 | $37,747,484 | None reported | $37,747,484 |
| GUADALUPE COUNTY, TX | 147,250 | 322 | $6,032,719 | None reported | $6,032,719 |
| HAMPDEN COUNTY, MA (SPRINGFIELD) | 468,161 | 1,569 | $67,663,871 | $14,640,390 | $82,304,261 |

| DETAILS ON REPORTED COSTS OUTSIDE THE JAIL BUDGET | UNREPORTED JAIL COSTS OUTSIDE THE JAIL BUDGET | REPORTED AVERAGE DAILY COST PER INMATE* | REPORTED AVERAGE ANNUAL COST PER INMATE* | JAIL INCARCERATION RATE (PER 100,000)[6] | ANNUAL COST PER COUNTY RESIDENT[7] |
|---|---|---|---|---|---|
| Inmate mental health care ($1.9 million) | Capital expenditures ▶ central administration ▶ | $155.71 | $56,834 | 185 | $106 |
| The amount of jail costs outside the jail budget could not be determined. | Inmate hospital care ● | $91.24 | $33,301 | 244 | $50 |
| Pensions ($823,102); employee fringe benefits ($1.4 million); inmate transportation ($47,873) | Retiree health care ● capital expenditures ▶ legal judgments ● central administration ● | $161.47 | $58,938 | 124 | $108 |
| Inmate hospital care ($650,000) | Legal judgments ▶ central administration ● inmate education/GED ● inmate vocational training ● | $85.63 | $31,257 | 369 | $113 |
| Pensions ($875,770); employee fringe benefits ($3.8 million); inmate mental health care ($30,000) | Legal judgments ▶ central administration ▶ | $110.64 | $40,382 | 154 | $58 |
| Capital expenditures ($239,272); hospital care ($107,622); inmate pharmaceuticals ($427,974); inmate medical care ($374,512) | Legal judgments ● central administration ● | $54.29 | $19,817 | 294 | $53 |
| Capital expenditures ($106,758); central administration ($200,000); inmate hospital care ($15,000); inmate education/GED ($50,000); inmate vocational training ($25,000) | No costs were excluded from the total reported cost. | $116.79 | $42,627 | 199 | $84 |
| Inmate education/GED ($9,090) | Capital expenditures ● inmate hospital care ▶ inmate pharmaceuticals ● inmate mental health care ● inmate medical care ▶ inmate education/GED ● | $47.66 | $17,396 | 258 | $42 |
| Pensions ($448,010); capital expenditures ($95,000); central administration ($444,719) | Legal judgments ● | $64.19 | $23,430 | 304 | $64 |
| The amount of jail costs outside the jail budget could not be determined. | Pension contributions ● retiree health care ● employee fringe benefits ● capital expenditures ● legal judgments ● central administration ▶ inmate hospital care ● inmate pharmaceuticals ● inmate mental health care ● inmate medical care ● | $49.11 | $17,925 | Not estimated[3] | Not estimated[3] |
| Employee fringe benefits ($2.4 million); legal judgments ($1.4 million); inmate medical care ($11.6 million) | Capital expenditures ● | $107.84 | $39,360 | Not estimated[4] | Not estimated[4] |
| The amount of jail costs outside the jail budget could not be determined. | Pension contributions ● retiree health care ● employee fringe benefits ● legal judgments ● central administration ● inmate transportation ▶ | $83.40 | $30,442 | 149 | $48 |
| The amount of jail costs outside the jail budget could not be determined. | Legal judgments ● central administration ● inmate transportation ▶ | $51.33 | $18,735 | 166 | $32 |
| Employee benefits ($14.6 million) | Capital expenditures ▶ legal judgments ▶ | $143.72 | $52,457 | 331 | $159 |

| JAIL JURISDICTION | 2014 COUNTY POPULATION[1] | AVERAGE DAILY JAIL POPULATION | COSTS PAID BY JAIL BUDGET | REPORTED COSTS OUTSIDE THE JAIL BUDGET[†] | TOTAL REPORTED COST* |
|---|---|---|---|---|---|
| HARRIS COUNTY, TX (HOUSTON) | 4,441,370 | 9,041 | $172,511,829 | None reported | $172,511,829 |
| JOHNSON COUNTY, KS | 574,272 | 693 | $37,888,796 | $10,692,591 | $48,581,387 |
| CITY OF KENT, WA | 124,435 | 134 | $4,056,722 | None reported | $4,056,722 |
| KING COUNTY, WA (SEATTLE)[5] | 1,955,532 | 2,076 | $114,700,189 | $31,429,749 | $146,129,938 |
| LIMESTONE COUNTY, TX | 23,524 | 114 | $3,355,780 | $1,284,554 | $4,640,334 |
| LOUISVILLE METRO, KY | 760,026 | 1,991 | $52,074,975 | $216,054 | $52,291,029 |
| LUBBOCK COUNTY, TX | 293,974 | 1,222 | $21,618,115 | $6,970,500 | $28,588,615 |
| MECKLENBURG COUNTY, NC (CHARLOTTE) | 1,012,539 | 1,878 | $112,792,000 | $1,021,685 | $113,813,685 |
| MESA COUNTY, CO | 148,255 | 332 | $7,981,528 | None reported | $7,981,528 |
| MIAMI-DADE COUNTY, FL | 2,662,874 | 4,693 | $299,059,960 | $499,114 | $299,559,074 |
| MILWAUKEE COUNTY HOUSE OF CORRECTION, WI[4] | 956,406 | 1,352 | $62,056,293 | $1,622,210 | $63,678,503 |
| NEW YORK CITY, NY | 8,405,837 | 11,408 | $1,103,036,050 | $1,275,676,550 | $2,378,712,600 |
| ONONDAGA COUNTY JUSTICE CENTER, NY (SYRACUSE)[4] | 468,196 | 611 | $47,308,134 | $1,300,000 | $48,608,134 |
| PALM BEACH COUNTY, FL | 1,397,710 | 2,300 | $133,421,938 | None reported | $133,421,938 |

| DETAILS ON REPORTED COSTS OUTSIDE THE JAIL BUDGET | UNREPORTED JAIL COSTS OUTSIDE THE JAIL BUDGET | REPORTED AVERAGE DAILY COST PER INMATE* | REPORTED AVERAGE ANNUAL COST PER INMATE* | JAIL INCARCERATION RATE (PER 100,000)[6] | ANNUAL COST PER COUNTY RESIDENT[7] |
|---|---|---|---|---|---|
| The amount of jail costs outside the jail budget could not be determined. | Retiree health care ● capital expenditures ● legal judgments ● central administration ● inmate hospital care ● inmate education/GED ● | $52.28 | $19,081 | Not estimated[3] | Not estimated[3] |
| Capital expenditures ($6.3 million); central administration ($4.4 million) | Legal judgments ● | $191.95 | $70,063 | 121 | $82 |
| The amount of jail costs outside the jail budget could not be determined. | Central administration ◗ | $83.18 | $30,360 | 105 | $30 |
| Inmate hospital care ($131,827); inmate pharmaceuticals ($1.9 million); inmate mental health ($3.5 million); inmate medical care ($24.3 million); inmate education/GED ($70,000); vocational training ($59,000) | Legal judgments ● central administration ◗ | $192.85 | $70,390 | 81 | $61 |
| Capital expenditures ($1.3 million) | Legal judgments ● central administration ● | $111.52 | $40,705 | 285 | $178 |
| Legal judgments ($216,054) | Central administration ● | $71.96 | $26,264 | 262 | $57 |
| Capital expenditures ($6.5 million); inmate mental health care ($477,612) | Legal judgments ● central administration ● inmate hospital care ● inmate pharmaceuticals ● inmate medical care ● | $64.10 | $23,395 | 386 | $81 |
| Inmate transportation ($1 million) | No costs were excluded from the total reported cost. | $166.04 | $60,604 | 128 | $86 |
| The amount of jail costs outside the jail budget could not be determined. | Pension contributions ● retiree health care ● other employee fringe benefits ● capital expenditures ● legal judgments ● central administration ● inmate hospital care ◗ inmate medical care ● inmate transportation ● | $65.87 | $24,041 | 216 | $48 |
| Inmate hospital care ($499,114) | Inmate pharmaceuticals ● inmate mental health care ● inmate medical care ● | $174.88 | $63,831 | 164 | $111 |
| Capital expenditures ($1.6 million); inmate education/GED ($20,560) | No costs were excluded from the total reported cost. | $129.04 | $47,099 | Not estimated[4] | Not estimated[4] |
| Pensions ($374 million); employee fringe benefits ($460 million); capital ($178 million); central administration ($14.7 million); inmate hospital ($50.2 million); pharmaceuticals ($18.4 million); inmate mental health ($39.9 million); inmate medical care ($129.3 million); inmate education/GED ($10.3 million in FY12); inmate transportation ($867,181) | Retiree health care ● legal judgments ● | $571.27 | $208,513 | 136 | $279 |
| Inmate education/GED ($1.3 million) | No costs were excluded from the total reported cost. | $217.96 | $79,555 | Not estimated[4] | Not estimated[4] |
| The amount of jail costs outside the jail budget could not be determined. | Pension contributions ◗ retiree health care ● employee fringe benefits ◗ legal judgments ● central administration ◗ inmate education/GED ◗ inmate vocational training ◗ inmate transportation ◗ | $158.93 | $58,010 | Not estimated[3] | Not estimated[3] |

| JAIL JURISDICTION | 2014 COUNTY POPULATION[1] | AVERAGE DAILY JAIL POPULATION | COSTS PAID BY JAIL BUDGET | REPORTED COSTS OUTSIDE THE JAIL BUDGET[†] | TOTAL REPORTED COST[*] |
|---|---|---|---|---|---|
| PITKIN COUNTY, CO | 17,626 | 17 | $2,020,020 | $220,045 | $2,240,065 |
| POTTER COUNTY, TX | 121,627 | 510 | $10,249,960 | $487,285 | $10,737,245 |
| RAMSEY COUNTY, MN (ST. PAUL) | 532,655 | 372 | $16,871,707 | $4,263,000 | $21,134,707 |
| ROCKWALL COUNTY, TX | 87,809 | 168 | $5,776,999 | $21,457 | $5,798,456 |
| SHELBY COUNTY DIVISION OF CORRECTIONS, TN (MEMPHIS)[4] | 938,803 | 2,257 | $59,362,635 | None reported | $59,362,635 |
| TRAVIS COUNTY, TX (AUSTIN) | 1,151,145 | 2,362 | $102,894,832 | $6,062,953 | $108,957,785 |
| VOLUSIA COUNTY, FL (DAYTONA BEACH) | 507,531 | 1,452 | $37,151,191 | None reported | $37,151,191 |

**Source:** Vera Price of Jails survey. For the survey instrument, see vera.org/price-of-jails.

**Notes:**

◗ Cost partially outside jail budget
● Cost entirely outside jail budget
† See the column "Details on reported costs outside the jail budget" for details on these costs.
★ See the column "Unreported costs outside the jail budget" for information on the expenses missing from this estimate.
[1] U.S. Census Bureau: State and County QuickFacts; county data is for 2014. City data is for 2013.
[2] The Albemarle-Charlottesville Regional Jail serves multiple jurisdictions; the county-population estimate includes Albemarle County, Nelson County, and the independent city of Charlottesville.
[3] Respondent did not report the data on revenue and non-county inmates necessary to make this calculation.
[4] Respondent jail is in a county where there is another jail that did not respond to this survey. The data is applicable only to this jail and not all jails in the county. Vera therefore did not calculate the incarceration rate and cost per-resident because the county-level data is incomplete.
[5] Population estimate in King County excludes the population of the city of Kent, which uses an independent city jail (and also responded to this survey).
[6] Data excludes inmates held for other local, state, and federal authorities.
[7] This cost represents the total jail expenses paid by the county government divided by the number of county inmates, which excludes inmates held for other jurisdictions. Boarding payments from other jurisdictions, grants, and inmate-generated revenues are excluded from this cost.

| DETAILS ON REPORTED COSTS OUTSIDE THE JAIL BUDGET | UNREPORTED JAIL COSTS OUTSIDE THE JAIL BUDGET | REPORTED AVERAGE DAILY COST PER INMATE* | REPORTED AVERAGE ANNUAL COST PER INMATE* | JAIL INCARCERATION RATE (PER 100,000)[6] | ANNUAL COST PER COUNTY RESIDENT[7] |
|---|---|---|---|---|---|
| Central administration ($220,045) | No costs were excluded from the total reported cost. | $361.01 | $131,769 | 96 | $123 |
| Pension contributions ($148,216); employee fringe benefits ($50,019); capital expenditures ($200,572); central administration ($88,478) | Retiree health care ● legal judgments ● inmate hospital care ◗ inmate pharmaceuticals ◗ inmate mental health care ◗ | $57.68 | $21,053 | 419 | $84 |
| Inmate hospital care ($1.2 million); pharmaceuticals ($92,000); inmate mental health care ($171,000); inmate medical care ($2.8 million) | Capital expenditures ● legal judgments ● central administration ● | $155.65 | $56,814 | 66 | $37 |
| Retiree health care ($9,600); employee fringe benefits ($11,857) | Legal judgments ● central administration ● | $94.56 | $34,515 | 179 | $61 |
| The amount of jail costs outside the jail budget could not be determined. | Inmate hospital care ◗ | $72.06 | $26,302 | Not estimated[4] | Not estimated[4] |
| Central administration ($6.1 million) | Retiree health care ● capital expenditures ◗ legal judgments ● inmate transportation ◗ | $126.38 | $46,129 | 203 | $92 |
| The amount of jail costs outside the jail budget could not be determined. | Retiree health care ● capital expenditures ◗ legal judgments ● central administration ● booking/intake ◗ inmate transportation ● | $70.10 | $25,586 | 286 | $72 |

## ENDNOTES

1   Jeremy Travis, Bruce Western, and Steve Redburn, eds., *The Growth of Incarceration in the United States: Exploring Causes and Consequences* (Washington, DC: The National Academies Press, 2014).

2   For information about recent state sentencing reforms, see Ram Subramanian and Rebecka Moreno, *Recalibrating Justice: A Review of 2013 State Sentencing and Corrections Trends* (New York: Vera Institute of Justice, 2014). The U.S. Congress created the Charles Colson Task Force on Federal Corrections to examine challenges in the federal corrections system and develop practical, data-driven policy responses, see www.colsontaskforce.org.

3   For more information regarding recent state sentencing and corrections reforms, see for example, Adrienne Austin, *Criminal Justice Trends: Key Legislative Changes in Sentencing Policy, 2001-2010* (New York: Vera Institute of Justice, 2010); Lauren-Brooke Eisen and Juliene James, *Reallocating Justice Resources: A Review of State 2011 Sentencing Trends* (New York: Vera Institute of Justice, 2012); Ram Subramanian and Ruth Delaney, *Playbook for Change? States Reconsider Mandatory Sentences* (New York: Vera Institute of Justice, 2014); Ram Subramanian and Rebecka Moreno, *Drug War Détente? A Review of State-Level Drug Law Reform* (New York: Vera Institute of Justice, 2014); and Ram Subramanian and Rebecka Moreno, *Recalibrating Justice*, 2014. Also see Alison Lawrence, *Trends in Sentencing and Corrections: State Legislation* (Washington, DC: National Conference of State Legislatures, 2013); Nicole D. Porter, *The State of Sentencing 2013: Developments in Policy and Practice* (Washington, DC: The Sentencing Project, 2014); and Nicole D. Porter, *The State of Sentencing 2012: Developments in Policy and Practice* (Washington, DC: The Sentencing Project, 2013).

4   The state "total jurisdiction" prison population was 277,473 in 1978 and 1,359,568 in 2013. See the Corrections Statistical Analysis Tool (CSAT) – Prisoners at www.bjs.gov/index.cfm?ty=nps (accessed April 26, 2015).

5   For the 1983 inmate population, see U.S. Department of Justice, *Census of Local Jails, 1983* (Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 1988). For the 2011 inmate population, see Todd D. Minton and Daniela Golinelli, *Jail Inmates at Midyear 2013 – Statistical Tables* (Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2014).

6   For more information on jail admissions, see Ram Subramanian et al. *Incarceration's Front Door: The Misuse of Jail in America* (New York: Vera Institute of Justice, 2015).

7   Rising inmate populations have been accompanied by rising costs because more inmates mean more jail employees. On average, there is one jail employee for every 3.3 inmates—a proportion that has barely changed since 1983 when it was 3.5—so the increasing number of inmates has been mirrored by an increasing number of jail employees. There are 231,000 jail employees nationwide, more than triple the amount in 1983. For the number of jail employees and jail inmates per employee in 1983, see Craig A. Perkins, James J. Stephan, and Allen J. Beck, *Jails and Jail Inmates: 1993-94* (Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 1995), 1. For the number of jail employees and jail inmates per employee in 2006, see James Stephan and Georgette Walsh, *Census of Jail Facilities, 2006* (Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, 2011), 1, 22. More employees, in larger jails, have led to greater costs. Since 1983, the nationwide cost of local corrections—jail and community corrections—has increased from $6.8 billion to $26.4 billion (costs are adjusted to constant 2011 dollars). For data on local corrections costs, see U.S. Census Bureau, Finances of State and Local Governments, Fiscal Years 1957–2008, (Washington, DC: U.S. Census, Department of Commerce, 2010) and U.S. Census Bureau, Annual Survey of Government Finances, 2005–2011.

8   For the U.S. government's $22.2 billion estimate of the cost of local correctional institutions (jails) in 2011, see Tracey Kyckelhahn, *Local Government Corrections Expenditures, FY 2005–2011*, (Washington, DC: Department of Justice, Bureau of Justice Statistics, 2013), 3. The cost of local correctional institutions (jails) in 1983 is not available from BJS; the authors estimate this amount to be $5.7 billion based on the percentage increase in total local corrections costs between 1983 and 2011 (see endnote 7).

9   Vera Institute of Justice, Price of Jails survey. Information on jail costs outside the Department of Correction budget provided by the New York City Office of Management and Budget. See the appendix for a synopsis of the survey data provided by the City of New York.

10   See the U.S. Department of Justice's CrimeSolutions.gov for more on this evidence base.

11   David Cloud, *On Life Support: Public Health in the Age of Mass Incarceration* (New York: Vera Institute of Justice, 2014).

12   Vera developed the Price of Jails survey in consultation with jail finance officials from Allegheny County, Pennsylvania; Bernalillo County, New Mexico; Hampden County, Massachusetts; Mesa County, Colorado; Milwaukee County, Wisconsin; and New York City. These jurisdictions also pretested the survey.

13   Vera Price of Jails survey. In Allegany County, NY and New York City, all fringe benefits are outside the jail budget, and amount to 29 percent and 35 percent of the total jail cost, respectively. Also, personnel costs amount to 75 percent of the total jail cost in the 35 surveyed jails (see endnote 19); assuming a fringe benefit rate of 35 percent, these costs therefore account for about 20 percent of total jail spending (the fringe benefit rates are 32 percent in Hampden County and 75 percent in New York City); see endnote 14. The proportion of total jail costs represented by inmate health care costs varies by jail size: small jails, 7 percent; medium jails, 10 percent; large jails, 13 percent. See "Jails in the U.S." on page 7 for information about the inmate population thresholds for small, medium, and large jails.

14   The extent of jail costs outside jail budgets (see Figure 2) is similar to the percentage of prison costs excluded from state prison budgets. But in the case of jails, inmate health care is often outside the jail budget and provided by a public health department, particularly in large counties, whereas inmate health care is always managed by the corrections department at the state level. (In eight of the 40 states surveyed, however, other state agencies paid for part of hospital costs.) For more information on prison costs, see Christian Henrichson and Ruth Delaney, *The Price of Prisons: What Incarceration Costs Taxpayers* (New York: Vera Institute of Justice, 2012).

15   The fringe benefit rates for uniformed corrections employees in New York City and the Commonwealth of Massachusetts were obtained from each jurisdiction's **Cost Allocation Plan**, which is publicly available from the U.S. Department of Health and Human Services Program Support Center, www.rates.psc.gov/fms/dca/dca_swcap.html (accessed March 30, 2015).

16   Most jails principally serve the needs of the justice system in which they are located (or a regional catchment), but some jails also board federal inmates. Vera found that federal inmates typically constitute a negligible proportion of most of the surveyed jails but represent a larger share in some jails. Federal inmates made up an average of 3 percent of total inmates in 19 of the 23 jails that reported that they hold inmates from other jurisdictions; three jails did not complete this portion of the survey. But in four jails, the proportion of total inmates in the jurisdiction of the federal government is much higher: Allegany County, New York (53 percent, mostly inmates held for the U.S. Marshals Service); Douglas County, Nebraska (27 percent, inmates held for the U.S. Marshals Service and U.S. Immigration and Customs Enforcement); Guadalupe County, Texas (22 percent, inmates held for the U.S. Marshals Service); and Mecklenburg County, North Carolina (29 percent, inmates mostly held for the U.S. Marshals Service). When jails hold a large number of inmates from other jurisdictions, it is important that they charge the average, not marginal, cost of jail so they can fully recover all of their costs. Otherwise, local taxpayers are subsidizing the cost to house inmates from outside of their jurisdiction. Jurisdictions that house only a few inmates for other authorities—and have available beds—can accept a payment that is closer to their marginal cost, because in the absence of that federal inmate, the jail would need to pay staff salaries and fixed costs for the empty bed.

17   Information obtained through interviews with officials at the Hampden County Sheriff's Office, the Milwaukee County House of Correction, the King County Department of Adult and Juvenile Detention, and the Shelby County Division of Corrections.

18  For more on the Federal Communication Commission's proposed rule,
    see *Rates for Interstate Inmate Calling Services, Second Further Notice of
    Proposed Rulemaking*, WC Docket No. 12-375 (Washington, DC: Federal
    Communications Commission, October 22, 2014).

19  Personnel costs in the 35 surveyed jurisdictions—including salaries and bene-
    fits reported both within and outside the jail budget—amounted to $3.3 billion
    of the $4.4 billion in reported jail costs.

20  Although the survey only collected the cost of programming outside the jail
    budget, this amount across the survey sample totaled $11.9 million (of which
    $10.3 million was in New York City) of the $4.4 billion in total jail costs—ap-
    proximately 0.27 percent. Although these sampled sites also incur program-
    ming costs within the jail budget, the amounts of these costs outside the jail
    budget suggests they are likely similarly small.

21  For information on county populations, see U.S. Census Bureau: State and
    County QuickFacts. Data on jail costs is from Vera's Price of Jails survey. See
    the appendix for additional information on these calculations.

22  Data from Vera's Price of Jail survey. Staffing ratio based on all jail employees
    (uniformed and non-uniformed). Average salary for uniformed jail employees.

23  Information on the Bernalillo County Criminal Justice Review Commission and the
    county's recent reforms obtained from Jail Population Management Plan (Albu-
    querque, NM: Bernalillo County Public Safety), provided by Elizabeth Simpson,
    Bernalillo County Public Safety Division, e-mail exchange with Vera, May 8 and
    May 15, 2015.

24  For more information on marginal costs, see Christian Henrichson and Sarah
    Galgano, *A Guide to Calculating Justice-System Marginal Costs* (New York:
    Vera Institute of Justice, 2013).

25  Data on the inmate population supplied by William Christofori, Hampden
    County Correctional Center, e-mail exchange with Vera, July 15, 2015.
    Information about the causes of the population decline obtained through
    a fact sheet prepared by Martha Lyman and Rich McCarthy, provided
    by William Christofori, Hampden County Jail Correctional Center, e-mail
    exchange with Vera, March 31, 2015. Recidivism is defined as the three-
    year re-incarceration rates for people released after serving a sentence in
    Hampden County Sheriff's Department facilities.

26  Marginal cost data obtained through the Price of Jails survey and William
    Christofori, Hampden County Jail Correctional Center, e-mail exchange with
    Vera, May 1, 2015. From 2008 to 2014, the number of jail employees declined
    by 154, from 979 to 825. The reduction of 154 positions comprises 102 uni-
    formed officers that staffed 17 guard posts and 52 non-uniformed staff. Each
    post is covered for three shifts a day and the relief factor for each post is 2.0,
    meaning that two employees are required to staff a post to account for the
    time each employee is unavailable because of leave or training. Therefore,
    six employees (3 shifts × 2.0 relief factor), at an average salary of $65,000, is
    required to staff each post for a total cost of $390,000. Salary savings for the
    52 non-uniformed staff is $2.9 million annually. Total savings of $16 million
    comprises: variable cost savings ($3.7 million), uniform personnel step-fixed
    savings ($6.5 million); uniform fringe ($2.1 million); non-uniform personnel
    ($2.9 million); and non-uniform fringe ($800,000) annually.

27  Data on cost-of-living increases supplied by William Christofori, Hampden
    County Jail Correctional Center, e-mail exchange with Vera, July 18, 2014.

# Acknowledgments

The authors would like to thank the Price of Jails advisory board—LaToya Warren of the Allegheny County Bureau of Corrections, in Pennsylvania; Steve Farlow of the Jail Operations Division of the Mesa County Sheriff's Office, in Colorado; Jennifer Gallegos of the Bernalillo County Metropolitan Detention Center, in New Mexico; Erik Berliner of the City of New York Department of Correction; Joseph Antonelli of the City of New York Office of Management and Budget; Michael Hafemann of the Milwaukee House of Correction; and William Christofori of the Hampden County Sheriff's Department, in Massachusetts.

We also thank the 35 jails throughout the United States whose participation in this survey is a testament to the field's eagerness to advance our collective understanding of the cost of jail, and the many individuals who generated awareness of the Price of Jails project: Mike Jackson of the National Institute of Corrections; Fred Wilson of the National Sheriffs' Association; Juliene James of the Bureau of Justice Assistance; Sheriff A.J. Louderback and Sheriff Kelly Rowe of the Sheriffs' Association of Texas; Meaghan Gilmore of the National Association of Counties; Christie Davidson of the Correctional Management Institute of Texas; Robert McKee of the Tennessee Department of Correction; Jeff Goetz of the Boulder County Sheriff's Office; Lore Joplin of Lore Joplin Consulting; Michael Wilson of Michael Wilson Consulting; Brinda Penyak of the County Commissioners Association of Pennsylvania; Peggy Burke and Becki Ney of the Center for Effective Public Policy; Lisa Brooks of the Crime and Justice Institute; and Richard Kinney of the New York State Commission of Correction.

We would especially like to thank Ram Subramanian, Nancy Fishman, and Peggy McGarry for their insight and guidance in developing this report; Carl Ferrero for creating the charts, graphs, and infographics; and Jules Verdone and Patricia Connelly for editing.

We also thank Laurie Garduque, Patrick Griffin, and Soledad McGrath of the John D. and Catherine T. MacArthur Foundation, whose support made this work possible.

This report was created with support from the John D. and Catherine T. MacArthur Foundation as part of its Safety and Justice Challenge initiative, which seeks to address over-incarceration by changing the way America thinks about and uses jails. Core to the Challenge is a competition designed to support efforts to improve local criminal justice systems in jurisdictions across the country that are working to safely reduce over-reliance on jails, with a particular focus on addressing disproportionate impact on low-income individuals and communities of color. More information is available at www.SafetyandJusticeChallenge.org.

 

© Vera Institute of Justice 2015. All rights reserved. An electronic version of this report is posted on Vera's website at www.vera.org/price-of-jails.

Cover photograph © Ed Kashi/VII

The Vera Institute of Justice is an independent nonprofit organization that combines expertise in research, demonstration projects, and technical assistance to help leaders in government and civil society improve the systems people rely on for justice and safety. For more information, visit www.vera.org.

For more information about this report, contact Ram Subramanian, director of publications, Center on Sentencing and Corrections, at rsubramanian@vera.org.

**Suggested Citation**

Christian Henrichson, Joshua Rinaldi, and Ruth Delaney,
*The Price of Jails: Measuring the Taxpayer Cost of Local Incarceration.*
New York: Vera Institute of Justice, 2015.



Vera Institute of Justice
233 Broadway, 12th Floor
New York, NY 10279
Tel: (212) 334-1300
Fax: (212) 941-9407

Washington DC Office
1100 First St. NE, Suite 950
Washington, DC 20002
Tel: (202) 465-8900
Fax: (202) 408-1972

New Orleans Office
546 Carondelet St.
New Orleans, LA 70130
Tel: (504) 593-0937
Fax: (212) 941-9407

Los Angeles Office
707 Wilshire Blvd., Suite 3850
Los Angeles, CA 90017
Tel: (213) 223-2442
Fax: (213) 955-9250

