**EXHIBIT QQ**

**To Declaration of Micah West in Support of
Motion for Preliminary Injunction
& Motion for Class Certification**

The New York Times Magazine | https://nyti.ms/1IJKXjS

# The Bail Trap

Every year, thousands of innocent people are sent to jail only because they can't afford to
post bail, putting them at risk of losing their jobs, custody of their children — even their lives.

By NICK PINTO    AUG. 13, 2015

On the morning of Nov. 20 last year, Tyrone Tomlin sat in the cage of one of the Brooklyn criminal courthouse's interview rooms, a bare white cinder-block cell about the size of an office cubicle. Hardly visible through the heavy steel screen in front of him was Alison Stocking, the public defender who had just been assigned to his case. Tomlin, exhausted and frustrated, was trying to explain how he came to be arrested the afternoon before. It wasn't entirely clear to Tomlin himself. Still in his work clothes, his boots encrusted with concrete dust, he recounted what had happened.

The previous afternoon, he was heading home from a construction job. Tomlin had served two short stints in prison on felony convictions for auto theft and selling drugs in the late '80s and mid-'90s, but even now, grizzled with white stubble and looking older than his 53 years, he found it hard to land steady work and relied on temporary construction gigs to get by. Around the corner from his home in Crown Heights, the Brooklyn neighborhood where Tomlin has lived his entire life, he ran into some friends near the corner of Schenectady and Lincoln Avenues outside the FM Brothers Discount store, its stock of buckets, mops, backpacks and toilet paper overflowing onto the sidewalk. As he and his friends caught up, two plainclothes officers from the New York Police Department's Brooklyn North narcotics squad, recognizable by the badges on their belts and their bulletproof vests, paused outside

the store. At the time, Tomlin thought nothing of it. "I'm not doing anything wrong," he remembers thinking. "We're just talking."

Tomlin broke off to go inside the store and buy a soda. The clerk wrapped it in a paper bag and handed him a straw. Back outside, as the conversation wound down, one of the officers called the men over. He asked one of Tomlin's friends if he was carrying anything he shouldn't; he frisked him. Then he turned to Tomlin, who was holding his bagged soda and straw. "He thought it was a beer," Tomlin guesses. "He opens the bag up, it was a soda. He says, 'What you got in the other hand?' I says, 'I got a straw that I'm about to use for the soda.'" The officer asked Tomlin if he had anything on him that he shouldn't. "I says, 'No, you can check me, I don't have nothing on me.' He checks me. He's going all through my socks and everything." The next thing Tomlin knew, he says, he was getting handcuffed. "I said, 'Officer, what am I getting locked up for?' He says, 'Drug paraphernalia.' I says, 'Drug paraphernalia?' He opens up his hand and shows me the straw."

Stocking, an attorney with Brooklyn Defender Services, a public-defense office that represents 45,000 indigent clients a year, had picked up Tomlin's case file a few minutes before interviewing him. The folder was fat, always a bad sign to a public defender. The documentation submitted by the arresting officer explained that his training and experience told him that plastic straws are "a commonly used method of packaging heroin residue." The rest of the file contained Tomlin's criminal history, which included 41 convictions, all of them, save the two decades-old felonies, for low-level nonviolent misdemeanors — crimes of poverty like shoplifting food from the corner store. With a record like that, Stocking told her client, the district attorney's office would most likely ask the judge to set bail, and there was a good chance that the judge would do it. If Tomlin couldn't come up with the money, he'd go to jail until his case was resolved.

Their conversation didn't last long. On average, a couple of hundred cases pass through Brooklyn's arraignment courtrooms every day, and the public defenders who handle the overwhelming majority of those cases rarely get to spend more than 10 minutes with each client before the defendant is called into court for arraignment. Before leaving, Stocking relayed what the assistant district attorney told her a few minutes earlier: The prosecution was prepared to offer Tomlin a deal. Plead guilty to

a misdemeanor charge of criminal possession of a controlled substance, serve 30 days on Rikers and be done with it. Tomlin said he wasn't interested. A guilty plea would only add to his record and compound the penalties if he were arrested again. "They're mistaken," he told Stocking. "It's a regular straw!" When the straw was tested by the police evidence lab, he assured her, it would show that he was telling the truth. In the meantime, there was no way he was pleading guilty to anything.

When it was Tomlin's turn in front of the judge, events unfolded as predicted: The assistant district attorney handling the case offered him 30 days for a guilty plea. After he refused, the A.D.A. asked for bail. The judge agreed, setting it at $1,500. Tomlin, living paycheck to paycheck, had nothing like that kind of money. "If it had been $100, I might have been able to get that," he said afterward. As it was, less than 24 hours after getting off work, Tomlin was on a bus to Rikers Island, New York's notorious jail complex, where his situation was about to get a lot worse.

**"Criminal justice,"** President Obama said in a speech to the N.A.A.C.P. last month, "is not as fair as it should be. Mass incarceration makes our country worse off, and we need to do something about it." Two days after the speech, Obama became the first sitting president to visit a federal prison, meeting with convicts in a corrections institution in El Reno, Okla. The setting was dramatic, but mass incarceration isn't actually a federal problem. Of the 2.2 million people currently locked up in this country, fewer than one in 10 is being held in a federal prison. Far more are serving time in state prisons, and nearly three-quarters of a million aren't in prison at all but in local city and county jails. Of those in jails, 60 percent haven't been convicted of anything. They're innocent in the eyes of the law, awaiting resolution in their cases. Some of these inmates are being held because they're considered dangerous or unlikely to return to court for their hearings. But many of them simply cannot afford to pay the bail that has been set.

Occasionally, these cases make the news. In June, Sandra Bland was found dead in her cell in Texas after failing to come up with $500 for her release. But often, they go unnoticed. The federal government doesn't track the number of people locked up because they can't make bail. What we do know is that at any given time, close to 450,000 people are in pretrial detention in the United States — a figure that includes both those denied bail and those unable to pay the bail that has been set. Even that

figure fails to capture the churn of local incarceration: In a given year, city and county jails across the country admit between 11 million and 13 million people. In New York City, where courts use bail far less than in many jurisdictions, roughly 45,000 people are jailed each year simply because they can't pay their court-assigned bail. And while the city's courts set bail much lower than the national average, only one in 10 defendants is able to pay it at arraignment. To put a finer point on it: Even when bail is set comparatively low — at $500 or less, as it is in one-third of nonfelony cases — only 15 percent of defendants are able to come up with the money to avoid jail.

Bail hasn't always been a mechanism for locking people up. When the concept first took shape in England during the Middle Ages, it was emancipatory. Rather than detaining people indefinitely without trial, magistrates were required to let defendants go free before seeing a judge, guaranteeing their return to court with a bond. If the defendant failed to return, he would forfeit the amount of the bond. The bond might be secured — that is, with some or all of the amount of the bond paid in advance and returned at the end of the trial — or it might not. In 1689, the English Bill of Rights outlawed the widespread practice of keeping defendants in jail by setting deliberately unaffordable bail, declaring that "excessive bail shall not be required, nor excessive fines imposed." The same language was adopted word for word a century later in the Eighth Amendment to the United States Constitution.

But as bail has evolved in America, it has become less and less a tool for keeping people out of jail, and more and more a trap door for those who cannot afford to pay it. Unsecured bond has become vanishingly rare, and in most jurisdictions, there are only two ways to make bail: post the entire amount yourself up front — what's called "money bail" or "cash bail" — or pay a commercial bail bondsman to do so. For relatively low bail amounts — say, below $2,000, the range in which most New York City bails fall — the second option often doesn't even exist; bondsmen can't make enough money from such small bails to make it worth their while.

With national attention suddenly focused on the criminal-justice system, bail has been cited as an easy target for reformers. But ensuring that no one is held in jail based on poverty would, in many respects, necessitate a complete reordering of criminal justice. The open secret is that in most jurisdictions, bail is the grease that

keeps the gears of the overburdened system turning. Faced with the prospect of going to jail for want of bail, many defendants accept plea deals instead, sometimes at their arraignments. New York City courts processed 365,000 arraignments in 2013; well under 5 percent of those cases went all the way to a trial resolution. If even a small fraction of those defendants asserted their right to a trial, criminal courts would be overwhelmed. By encouraging poor defendants to plead guilty, bail keeps the system afloat.

**"What, did they arrest** all of Brooklyn today?" one court officer asked another on a recent Sunday night in one of the two bustling arraignment courtrooms in Downtown Brooklyn. Defendants, a vast majority of them black, paraded past the judge in quick succession: Unlicensed operation of a motor vehicle. Open container of alcohol in public. Marijuana possession. Riding a bicycle on the sidewalk. Misdemeanors, many of them minor, some aggravated by an outstanding bench warrant for failure to appear in court on another case, failure to complete court-ordered community service or failure to pay a fine. Hundreds of people were awaiting arraignment, first in central booking across the street, then in cells on the ninth floor and finally in a small communal cell called "the pen" behind the arraignment courtrooms on the ground floor. On this night, there were more than a dozen men in the cell waiting to see a lawyer, pacing, sitting on benches, crouching in corners.

One man called out from the pen, saying that there was dried excrement in there from the day before. "Nobody comes in here to clean!" he exclaimed. "It's mad dirty!" A guard approached the bars and briefly sprayed a can of air freshener. Around the corner, the pen opened onto a series of booths, where, separated by heavy metal screens, the defendants met with their lawyers. Scott Hechinger, a senior trial attorney with Brooklyn Defender Services, picked up a stack of case files, quickly scanned the charges and rap sheets, stepped down a short hallway behind the courtroom and started calling names through the mesh screen. The first client was charged with criminal mischief after getting in an argument with his girlfriend and breaking some bowls. It was more complicated than that, he told Hechinger. She came home drunk, threw his clothes out the window. It escalated. He left. They arrested him across the street. Hechinger called the girlfriend and left a message. He

called the client's mother, whom the man lived with. If bail was set, how much could she afford? At most $250. Time's up. Next case.

A young man jumped a subway turnstile. Prosecutors were offering to make it go away and let him out that night if he did two days of community service and avoided being rearrested for the next six months. This one was easy. "Take the deal," Hechinger said. It was better than paying a $120 fee.

Next up was a homeless teenager, charged with "obstruction of governmental administration." The paperwork said the police saw him with a knife, and that he resisted arrest. He said there was no knife, that the cops stopped him for no reason and beat him. He showed Hechinger bruises on his arms and a fat lip. It was hard to see much through the screen. Hechinger promised to take a closer look in a few minutes when they were in front of the judge together. The final person was a man arrested for driving with a suspended license, a straightforward case.

After less than half an hour, Hechinger was back in the courtroom. The defendants he interviewed were marched out onto a bench against the left wall. First was the turnstile jumper. The prosecutor laid out the charges and the offer. The defendant took the deal and would have to complete community service. Next was the homeless teenager. The prosecutor asked for bail of $5,000. Hechinger argued that bail was unnecessary. The judge set it at $250. The teenager didn't have it. He would be sleeping at Rikers. The guy with the suspended license was released on his own recognizance — without any bail — and would be due back in court in a couple of months. Next appeared the man who broke his girlfriend's bowls. The prosecutor wanted bail set at $2,500. Hechinger argued that there was no reason to believe his client wouldn't return to court on his own. The judge set it at $1,000. "Your honor, I called the mother, she said she could afford $250," Hechinger said. "I'm sorry, counselor, that's my bail decision," the judge responded.

Another half-hour had elapsed. Hechinger went back to the case pile and picked up another stack. One of the three other defenders working the courtroom stepped up with her own cases. When court shut down for the night at 1 a.m., defendants were still waiting. They would stay in their cells and be arraigned when court started up again in the morning.

The sheer speed of the arraignment process makes it virtually impossible for the court to make informed decisions. Prosecutors have nothing to go on but a statement from the police and possibly a complaining witness, and defense lawyers know only what they've been able to glean from their brief interviews and perhaps a phone call or two. It's in this hurried moment, at the very outset of a criminal case, before evidence has been weighed or even gathered, that a defendant's freedom is decided. The stakes are high, and not only for the obvious reason that jail is an unpleasant and often dangerous place to be. A pretrial stretch in jail can unravel the lives of vulnerable defendants in significant ways.

The next hearing in Tyrone Tomlin's drinking-straw case was scheduled for a week after his arraignment. He left the courthouse, was loaded onto a bus and crossed the narrow causeway that connects Queens to Rikers. Tomlin was assigned to the Anna M. Kross Center, one of 10 correctional facilities on the island.

Incarcerated people rarely have nice things to say about the places where they're locked up, but an investigation by the United States attorney's office this year found "a deep-seated culture of violence" among Rikers guards, who reported using force against inmates more than 4,000 times last year. Violence among inmates is also pervasive. A Department of Corrections document obtained by The Daily News reported 108 stabbings and slashings in the last year. "That place is miserable," Tomlin said. "It's dangerous. It's every man for himself. You could get abused, you could get raped, you could get extorted. That stuff is all around."

Housed in a unit with more than 50 other prisoners, Tomlin tried to keep his head down, and he was able to get through a week without incident. Outside, his aunt worried about him. His employer had no idea where he was. On Nov. 25, he was back in court for a discovery hearing, during which prosecutors were supposed to turn over any relevant evidence. None was presented, but prosecutors repeated their offer for Tomlin to plead guilty. He still refused. "I wasn't taking nothing, because I didn't do nothing," he says. His case was adjourned for another two weeks.

Tomlin's willingness to hold out against the charges was unusual. Across the criminal-justice system, bail acts as a tool of compulsion, forcing people who would not otherwise plead guilty to do so. A 2012 report by the New York City Criminal

Justice Agency, based on 10 years' worth of criminal statistics, bears this out. In nonfelony cases in which defendants were not detained before their trials, either because no bail was set or because they were able to pay it, only half were eventually convicted. When defendants were locked up until their cases were resolved, the conviction rate jumped to 92 percent. This isn't just anecdotal; a multivariate analysis found that even controlling for other factors, pretrial detention was the single greatest predictor of conviction. "The data suggest that detention itself creates enough pressure to increase guilty pleas," the report concluded.

Still awaiting a trial, Tomlin returned to Rikers and quickly got into trouble with a group of younger inmates while on the phone with his aunt. "A young guy tells me, 'Yo, pop, you gotta get off the phone,' " he said. "I said, 'I'm in the middle of an important call.' He wanted me to just hang up." Tomlin quickly realized he'd made a mistake. That evening, in the shower, he was jumped by a group of young men. "Most of the punches went to the side of my head and my eye," he said. "I was tussling one and had to worry about the other three, there was blows coming from everywhere." Punched, kicked and stomped, Tomlin received medical attention, his face monstrously misshapen, his left eye swollen shut. "You'd think I was Frankenstein's brother or something," he said.

Tomlin's eye was still swollen shut on Dec. 10, three weeks after his arrest, when he returned to court. At this hearing, prosecutors handed over a report from the police laboratory, which had tested the drinking straw. At the top of the report, in bold, underlined capital letters, were the words "No Controlled Substance Identified, Notify District Attorney."

The report had been faxed to the district attorney on Nov. 25, the same day as Tomlin's last court hearing and days before his beating. The key to his freedom had been sitting unexamined. Conceding that the case had unraveled, the prosecutor asked that the charges be dismissed. "The judge says, 'Mr. Tomlin, this is your lucky day, you're going home,' " Tomlin recalls. "I just left the courtroom, signed some papers and that was it."

Tomlin had lost three weeks of income, was subjected to brutal physical violence and missed Thanksgiving dinner with his family. But he resisted the pressure to

plead guilty. His previous convictions all came from pleas, most of them made with bail looming over him. He knows the bitter Catch-22 of pleading guilty to get out of jail. "It feels great to go home," he says. "Anybody's happy to go home. But at the same time, it feels bad, because that's more damage on your record."

For defendants who would fight their cases and maintain their innocence if they had the money, a guilty plea involves a ritual of court procedure that verges on the Kafkaesque:

"Your lawyer tells me you want to plead guilty to the charge. Is that correct?" the judge will ask. Yes, the defendant must reply.

"You understand that by your plea of guilty you are giving up certain trial rights?" Yes.

"The right to remain silent, the right to confront witnesses against you, the right to have the prosecutor prove your guilt beyond a reasonable doubt?" Yes, yes, yes.

And then: "Are you pleading guilty freely and voluntarily, because you are in fact guilty?"

Hechinger, the lawyer with Brooklyn Defender Services, hates this part of the process. "A lot of times, at that last question, you feel the client beside you bristle," he says. "Everyone in the room knows it's not 'freely and voluntarily.' They're making a decision coerced by money. In many cases, if they had money, they wouldn't be pleading. But they put their heads down, and they say, 'Yes.' It's a horrible, deflating feeling."

**The long-term damage** that bail inflicts on vulnerable defendants extends well beyond incarceration. Disappearing into the machinery of the justice system separates family members, interrupts work and jeopardizes housing. "Most of our clients are people who have crawled their way up from poverty or are in the throes of poverty," Hechinger says. "Our clients work in service-level positions where if you're gone for a day, you lose your job. People in need of caretaking — the elderly, the young — are left without caretakers. People who live in shelters, where if they miss their curfews, they lose their housing. Folks with immigration concerns are quicker

to be put on the immigration radar. So when our clients have bail set, they suffer on the inside, they worry about what's happening on the outside, and when they get out, they come back to a world that's more difficult than the already difficult situation that they were in before."

This spring, a 24-year-old woman named Adriana found herself newly single in New York, trying to make a life for herself and her daughter. Short and round, with oversize glasses that frequently slide off her nose, she has an easy manner and deadpan sense of humor that belie her past as a runaway from an abusive mother. Adriana arrived in New York in the middle of 2014 with her baby daughter, not yet 2, and knew no one but her boyfriend at the time, a controlling figure who lived off her earnings from massages she advertised on Craigslist. (Like many runaways, Adriana had sometimes relied on sex work to survive, though recently she was trying to avoid it.) After separating from her boyfriend, Adriana managed to secure a spot in a Brooklyn shelter for victims of domestic violence. "I was trying to get a job, trying to get my life together," she says. She was focused on her daughter. "I just want to be the best mother for her that I can be," she says. "That's my priority. That's my only priority." (Because of safety concerns, Adriana asked not to be identified by her full name.)

On the night of March 18, Adriana realized she was running low on diapers. A friend at the shelter who also had a child agreed to keep an eye on her daughter, and Adriana headed to a nearby Target. This was after curfew, and when a staff member saw Adriana leaving without her daughter, she called the police. "When I got to Target, I started getting all these texts from my friend," Adriana says. "She was saying, 'You've got to get back here — there are staff in your room, and they won't let me in to look after the baby.'" Adriana rushed home with the diapers. In the shelter's courtyard, she was met by police officers, who had her daughter.

"Where are you going with my baby?" she asked, according to court documents. "That's my baby. I just went to the store to buy diapers." It didn't matter. The police placed her under arrest, charging her with endangering the welfare of a child. She gave one of the officers the diapers she'd just bought, in case her daughter needed to be changed. She was handcuffed and taken to the precinct. The police took her

daughter to the station, too, where she was turned over to the city's Administration for Children's Services and eventually placed in a foster home.

Before her arraignment two days later, Adriana explained to her public defender what happened. Her friend could confirm that she was looking after the baby, she said. The lawyer told Adriana she'd do her best to get her released on her own recognizance. But when Adriana appeared in front of Judge Rosemarie Montalbano, the assistant district attorney asked for bail to be set at $5,000. Adriana had no criminal record and had never failed to make a court appearance, but the prosecutor cited an "A.C.S. history," meaning that Adriana and her daughter had previous contact with the Administration for Children's Services. This was true but misleading. The A.C.S. report involving Adriana had found that she wasn't responsible for any neglect or abuse. What the A.C.S. did find was violence and coercion on the part of her boyfriend; this is how Adriana landed a spot in the domestic-violence shelter.

But arraignments happen quickly. Just as there was no time to track down Adriana's friend to confirm that her daughter hadn't been left unsupervised, there was no time to find out what the A.C.S. order actually said. The judge set bail at $1,500. Adriana's public defender couldn't believe it. "Judge, I'm going to ask you to state the reason for setting bail in this case," she said, according to the court transcript. "Thank you, counsel," was the judge's only reply.

With no way to come up with $1,500, Adriana spent the next two weeks on Rikers Island. Her bail made it harder for her to fight her case, but it also effectively dismantled the new life she was trying to build for herself and her daughter. She lost her bed at the shelter, and her child was living with strangers. "It feels like they were kicking me when I was down," she says.

Over subsequent hearings, Adriana's lawyers tried to get her bail lifted, but they ran into another common problem facing defendants: Once a judge sets bail, other judges are often reluctant to second-guess their colleague's decision. If they free a defendant who commits a crime while out on bail, the blowback from politicians, police unions and the tabloid press can be substantial. "I have no idea what motivated Judge Montalbano to set bail," said Judge Andrew Borrok at one of

Adriana's hearings, four days after her arraignment. Still, he said, "I'm not inclined to change what's been done."

Adriana's lawyers managed to move her case to a court that specialized in sex-trafficking cases, hoping for a more sympathetic judge and prosecutors. In the trafficking court, however, prosecutors remained reluctant to lift bail, now citing concerns that Adriana's safety could be at risk if her ex-boyfriend found out she was set free. Ultimately, after two weeks of hearings, prosecutors agreed to remove Adriana's bail provided she complete weekly "life-skills coursework" administered by a group that serves arrested sex workers. "Congratulations on being in a place where a lot of people care about you," Adriana remembers the judge telling her as she stood before him in handcuffs, quietly asking a court officer to push her glasses back up her nose. "There's a lot of people in this room that want good things to happen to you. The fear is that you're not ready for all of these great things."

The judge ordered Adriana released. She could begin reassembling her life, finding a new shelter, retrieving whatever remained of her possessions. But her baby was still in foster care, and her case still wasn't resolved. In June, a judge finally agreed to dismiss her case if she wasn't arrested for the next six months. As this story went to press, five months after her arrest, she was still fighting in family court to regain custody of her daughter.

Outside the courtroom after the hearing for her release, Scott Hechinger, who helped coordinate Adriana's defense, was exasperated. "Remember," he said, "this is all about some diapers! Bail changes the conversation. If bail hadn't been set, Adriana wouldn't have to be negotiating to get out of Rikers. She'd just be released."

**In early 2013**, Jonathan Lippman, chief judge of the State of New York, decided that the business-as-usual approach to setting bail could not be tolerated any longer. "We still have a long way to go before we can claim that we have established a coherent, rational approach to pretrial justice," he said in his annual State of the Judiciary address. "Incarcerating indigent defendants for no other reason than that they cannot meet even a minimum bail amount strips our justice system of its credibility and distorts its operation." Lippman sent a package of proposed legislation to reduce the reliance on cash bail to lawmakers in Albany, and

he lobbied for the reforms hard in the press. His efforts went nowhere. "Zero," Lippman says, shaking his head. "Nothing." Lawmakers had no appetite for bail reform.

Two years later, that may be changing. This summer, the New York City Council took a tentative step toward reform by earmarking $1.4 million for a citywide fund to bail out low-level offenders. The fund, proposed with much fanfare by Speaker Melissa Mark-Viverito in her State of the City address in February, is modeled on a number of smaller bail funds around the city. The oldest of these, the Bronx Freedom Fund, was established in 2007 in association with the Bronx Defenders, a public-defender organization. The founders shut down the fund after only a year and a half, after a judge argued that it was effectively operating as an unlicensed bail-bond business. But before they did, the fund bailed out nearly 200 defendants and generated some illuminating statistics. Ninety-six percent of the fund's clients made it to every one of their court appearances, a return rate higher even than that of people who posted their own bail. More than half of the Freedom Fund's clients, now able to fight their cases outside jail, saw their charges completely dismissed. Not a single client went to jail on the charges for which bail had been posted. By comparison, defendants held on bail for the duration of their cases were convicted 92 percent of the time. The numbers showed what everyone familiar with the system already knew anecdotally: Bail makes poor people who would otherwise win their cases plead guilty.

Armed with these statistics, as well as a 2010 Human Rights Watch report that calculated that New York City was paying $42 million a year to incarcerate nonfelony defendants, the Freedom Fund's founders managed to persuade state lawmakers to pass legislation explicitly legalizing nonprofit bail funds. In 2013, the Freedom Fund resumed operation. Close behind was the Brooklyn Community Bail Fund, begun by Scott Hechinger and a colleague at Brooklyn Defender Services. It was opened this spring and has already bailed out more than 60 clients.

But even the staunchest supporters of bail funds are quick to say that they are, at best, temporary Band-Aids for a broken system. "They are a useful form of relief as long as people are being locked up because they're poor," says Hechinger, who is

no longer affiliated with the Brooklyn bail fund. "They're an intervention for an urgent need. But they're not actual bail reform."

Earlier this summer, in the wake of the shocking suicide of Kalief Browder, a Bronx teenager arrested on suspicion of stealing a backpack and held on bail for three years in Rikers before his case was dismissed, Mayor Bill de Blasio unveiled his own initiative. "I wish, I deeply wish, we hadn't lost him — but he did not die in vain," de Blasio said. The centerpiece of de Blasio's initiative is a $17.8 million citywide initiative based on pilot programs that have been running in Queens and Manhattan, offering something called "supervised release." Under these programs, a small number of qualifying defendants, who might otherwise be held on bail, are instead set free and required to check in with caseworkers by phone and in person. The pilot programs have shown good results, but they have narrowly tailored eligibility requirements. Tyrone Tomlin, for example, would not have been eligible because he had too many previous convictions. Kalief Browder would not have been eligible, either, because the crime he was accused of, stealing a backpack, was charged as second-degree robbery, a violent felony. "If Kalief Browder's death wasn't in vain," says Peter Goldberg, executive director of the Brooklyn Community Bail Fund, "it won't be because of the proposals we've seen so far from the city."

The only truly meaningful reform, many observers agree, is to take money out of the bail process entirely. Lippman has been championing this idea for several years. "You have to eliminate cash bail," he says. The ramifications of such a move are far-reaching. Without bail — and the quick guilty pleas that it produces — courts would come under significant strain. "The system would shut down," Goldberg says. "A lot of the 250 people who were waiting to be arraigned in Brooklyn last night would all be coming back to court soon to go forward with a trial for a misdemeanor that no one has any interest in pursuing." This crisis, Goldberg believes, would be a good thing. "You want pressure on the system. You want everyone involved to be reconsidering. Because of how much it could clog the system, you might have people on high telling cops to stop picking people up for an open-container violation, because 'I don't want to deal with it in my courtroom.' "

The idea of eliminating cash bail is hardly unprecedented. When Washington overhauled its bail system in the 1980s and '90s, it instituted a supervised-release

program and other measures designed to reduce the number of people held on bail. But judges continued to set bail until the law was rewritten to effectively forbid the imprisonment of people on financial grounds. The number of people locked up on bail plummeted. "D.C. had all the tools in place," says Cherise Fanno Burdeen, executive director of the Pretrial Justice Institute. "They just needed a way to change the court culture." Kentucky, Colorado and, last year, New Jersey have joined Washington in adopting legislation severely curtailing bail's use.

The more modest reforms being proposed in New York City, Goldberg says, are hardly cause for celebration. "Robert Kennedy, when he was attorney general, raised exactly the concerns with bail we're talking about now," he says. "Fifty years later, we're still having the conversation. We can't be satisfied with cosmetic fixes. And the truth is, even meaningful bail reform is just the beginning. The real work is asking why we're arresting so many people on low-level offenses in the first place, and why so many of them come from poor black and brown communities. Bail is easy."

**In late June,** Tyrone Tomlin sat at a picnic table in St. John's Park in Crown Heights, trying to cool down after a hot day of work and sipping bodega iced tea through a straw. Beneath his baseball cap, his left eye still looked askew, his gaze unfocused and hard to meet. "My sight is still a little blurry," he said. "I still feel the aftereffects. Pains in my eye, in my head." The whole situation could have been worse, he knows. He could have been hurt more seriously at Rikers. He could have been fired from his construction job, after being a no-show for the better part of a month while locked up. But even so, he was still angry about what happened last winter. "I'm not no prince," he acknowledged. "But I got a raw deal."

The inability to make bail has been a virtual constant in Tomlin's life. His first encounter with the law came when he was 14 or 15 — he recalls being picked up on a robbery charge and sent to Spofford juvenile detention center in the Bronx because his family couldn't pay bail. After a few months, he says, he pleaded guilty and received probation. "They said it's supposed to teach you a lesson," he said. "It just got me worse." In two-thirds of the times he has pleaded guilty to misdemeanors in the last 14 years, he did so either at arraignment to avoid being sent to Rikers or after already spending as much as two weeks at Rikers. Not once has he been able to pay bail.

"I'm not Johnny Rich-Kid with a silver spoon," he says. For Tomlin, the historical evolutions of bail and pretrial jurisprudence are abstractions without meaning in his life. Bail is simply a feature of the landscape, the thing that means he is locked up when someone with more money wouldn't be. "Sure, yeah, I'm mad about it," he said grudgingly. "But that's the way it is. I've got to accept it. It's not right, but it's the way it is." He shrugged. "What are you going to do?"

Nick Pinto is a freelance journalist living in Brooklyn. He last wrote for the magazine about the history and purpose of policing.

*Sign up for our newsletter to get the best of The New York Times Magazine delivered to your inbox every week.*

A version of this article appears in print on August 16, 2015, on Page MM38 of the Sunday Magazine with the headline: The Bail Trap.

© 2017 The New York Times Company